**Pages 1 - 33**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

ERICA FRASCO, individually and )
on behalf of all others         )
similarly situated,             )
                                )
          Plaintiffs,           )
                                )
  VS.                           )     **NO. C 21-00757  JD**
                                )
FLO HEALTH, INC.,               )
                                )
          Defendant.            )
_____  )

                    San Francisco, California
                     Thursday, May 5, 2022

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    LOWEY DANNENBERG, P.C.
                    44 South Broadway - Suite 1100
                    White Plains, New York  10601
                BY: **AMANDA G. FIORILLA, ATTORNEY AT LAW**
                    **CHRISTIAN LEVIS, ATTORNEY AT LAW**

                    LABATON SUCHAROW LLP
                    140 Broadway
                    New York, New York  1005
                BY: **CAROL C. VILLEGAS, ATTORNEY AT LAW**

For Defendant Flo Health, Inc.:
                    GIBSON DUNN & CRUTCHER
                    2001 Ross Avenue - Suite 2100
                    Dallas, Texas  75201
                BY: **ASHLEY MARIE ROGERS, ATTORNEY AT LAW**

        **(APPEARANCES CONTINUED ON THE FOLLOWING PAGE)**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
              United States District Court - Official Reporter

**APPEARANCES:**   (Cont'd)

For Defendant Flo Health, Inc.:

       GIBSON DUNN & CRUTCHER
       555 Mission Street - Suite 3000
       San Francisco, California  94105
    BY:  **JOSEPH R. ROSE, ATTORNEY AT LAW**

       DECHERT LLP
       One International Place
       100 Oliver Street
       Boston, Massachusetts  02210
    BY:  **BRENDA R. SHARTON, ATTORNEY AT LAW**

       DECHERT LLP
       U.S. Bank Tower
       633 West 5th Street - Suite 4900
       Los Angeles, California  90071
    BY:  **BENJAMIN SADUN, ATTORNEY AT LAW**


For Defendant Google LLC:

       WILLKIE, FARR & GALLAGHER LLP
       One Front Street - Floor 34
       San Francisco, California  94111
    BY:  **EDUARDO E. SANTACANA, ATTORNEY AT LAW**
      **SIMONA A. AGNOLUCCI, ATTORNEY AT LAW**
      **TIFFANY M. LIN, ATTORNEY AT LAW**


For Defendant AppsFlyer:

       LATHAM & WATKINS LLP
       505 Montgomery Street - Suite 2000
       San Francisco, California  94111
    BY:  **MELANIE M. BLUNSCHI, ATTORNEY AT LAW**


For Defendant Flurry, Inc.:

       HUNTON ANDREWS KURTH LLP
       550 South Hope Street - Suite 2000
       Los Angeles, California  90071
    BY:  **ANN MARIE MORTIMER, ATTORNEY AT LAW**

**Thursday - May 5, 2022**                                    **10:16 a.m.**

                        **P R O C E E D I N G S**

                              **---000---**

        **THE CLERK:**  Calling 21-757, Frasco versus Flo Health, Inc.

    Counsel, please state your appearance for the record.  You can use either the podium or the mics on the tables.

        **MS. SHARTON:**  Good morning, Your Honor, nice to see you in person, Brenda Sharton on behalf of Flo Health, Defendant.

        **THE COURT:**  Okay.

        **THE CLERK:**  You need to use the microphones.

        **MR. SADUN:**  Good morning, Your Honor, Benjamin Sadun, also here on behalf of Flo Health.

        **MS. ROGERS:**  Good morning, Your Honor, Ashley Rogers from Gibson Dunn & Crutcher on behalf of Defendant Meta Platform, Inc. formerly Facebook, Inc.

        **THE COURT:**  All right.

        **MR. SANTACANA:**  Good morning, Your Honor, Eduardo Santacana, Willkie Farr & Gallagher for Google.  And with me today are Tiffany Lynn and Simona Agnolucci.

        **MS. BLUNSCHI:**  Melanie Blunschi of Latham & Watkins on behalf of Defendant AppsFlyer.

    To streamline our argument today we were going to allow Google and Meta to take the lead on claims that apply to us but

just wanted to flag that of those seven claims AppsFlyer is only named in two of them, the aiding and abetting claims, because it is a service provider under the data processing laws and not -- and does not have an advertising business.

MS. MORTIMER:  Good morning, Your Honor, Ann Marie Mortimer from Hunton Andrews Kurth on half of Defendant Flurry.

And again to streamline the argument, Your Honor, Google and Meta will be taking the lead.

THE COURT:  You said Flurry; is that right?

MS. MORTIMER:  That's correct, Your Honor, I represent Flurry.

THE COURT:  Okay, yeah.  Is that it?  Okay.

THE CLERK:  Plaintiff hasn't made their appearance.

THE COURT:  Yes.

MS. VILLEGAS:  Good morning, Your Honor, Carol Villegas from Labaton Sucharow on behalf of the Plaintiffs.

THE COURT:  Oh, yes.  I need to write that down.

MS. FIORILLA:  Good morning, Your Honor, Amanda Fiorilla from Lowey Dannenberg on behalf of Plaintiffs.

MR. LEVIS:  Good morning.  This is Christian Levis, also from Lowey Dannenberg on behalf of the Plaintiffs.

THE COURT:  Okay.  Well, who is going to take the lead on the Plaintiffs' side?

MS. VILLEGAS:  Good morning, Your Honor, Carol Villegas from Labaton.  We are actually splitting the argument.

Mr. Levis is going to be responding to arguments from Flo and I will be responding to arguments from the non-Flo Defendants.

**THE COURT:** Well, I -- okay, I don't think we need that.  Just -- can you just stay up there?  I have some questions.

**MS. VILLEGAS:** Sure.

**THE COURT:** You know, if I ask you a question you can't answer, you can certainly ask a colleague.  That's not a problem.

So, let me just -- on the Stored Communications Act -- first of all, let me just make an observation.  I know it's important.  You have to vindicate your clients rights.  You have got so many claims.  Not really the best approach.

I mean, it is here now.  But just for the future, every district judge -- and I'm among them -- will tell you, you know, it is a rare day that you need more than three.  So it is just a lot.  And I think it is really highly duplicative.  But in any event, just for next time.  It is here now.

So on the Stored Communications Act I think you are missing an allegation about Flo and its communication between users.

Now if you were to amend on that, would you have facts?  I mean, actual facts to show that it would come within the purview of the Stored Communications Act as a person providing

an electronic communication service -- I mean, a communications platform or service?

MS. VILLEGAS:  I believe so, Your Honor.

THE COURT:  How would you do that, though?  Because as I understand it, that's not how Flo works.

What are you going to say, just roughly?  I'm not tying your hands.  What would you say?

MS. VILLEGAS:  I might defer to Mr. Levis on this one since he was handling the Stored Communications Act.

THE COURT:  That's fine.

MR. LEVIS:  I will just stand here and use this microphone.  It is easier.

I think we allude to this in our description of the claim in the claims for relief section in that describing the way that the app works and the communication among Flo and its users is incidental to the backup purpose that it serves in terms of taking the information that users enter into the app that is located and stored on their phone and also storing copies of it on their systems as well.

THE COURT:  Let me try it this way:  Where in the complaint is an allegation that Flo's platform allows for communication between users?  Can you point me to the paragraph?

MR. LEVIS:  You are asking between the users of Flo -- between the users of Flo's platform specifically?

**THE COURT:** Yes.

**MR. LEVIS:** That allegation is not in the complaint.

**THE COURT:** Okay. Well, don't you think you need that?

**MR. LEVIS:** I think that for the purposes of the Stored Communications Act, they can be a communication service provider. It is not necessarily -- it is not necessary that they provide communications among the members of the Flo platform itself, but if -- this service --

**THE COURT:** Why do you say that, though?

**MR. LEVIS:** Because if the service is allowing for communication among, for example, the users in Flo and the users' data being transferred outside of Flo to other third parties, then that communication is a communication that would fall within the electronic -- the Stored Communications Act.

**THE COURT:** Flo?

**MS. VILLEGAS:** Your Honor, I'd just like to add one thing on that point. I do believe there is an allegation in the complaint, though, that Flo users can communicate with each other through the app by posting --

**THE COURT:** I couldn't find that. Can you --

**MS. VILLEGAS:** -- messages.

**THE COURT:** What paragraph is that?

**MS. VILLEGAS:** I will find it, Your Honor.

**THE COURT:** All right. Flo?

**MS. SHARTON:**  Yeah, I think Your Honor is absolutely right.  There is no -- Flo is not an electronic communications service.  Certainly that is not alleged.

The Plaintiffs do not allege that data was stored temporarily for purposes of transmitting it.

The Plaintiffs' opposition did not dispute that point but instead tried to rely on a backup prong, and the Plaintiffs do not allege that the app events were created from any backup data but rather as users navigated through the app.

So I think they absolutely do not have the elements of the Stored Communications Act.

**THE COURT:**  Well, I'm inclined to agree with that. The other problem is, you know, the Stored Communications Act is like 1980s legislation and it just doesn't fit the world anymore as we know it for computer life.

Anyway, I'm probably going to grant that with leave to amend.

The other one I have question for Plaintiff is on the -- unjust enrichment against everybody but Flo, I just don't -- what is the inequitable conduct that they did that might warrant the equitable remedy of unjust enrichment?

**MS. VILLEGAS:**  So, Your Honor --

**THE COURT:**  I understand they got the data, okay; but they are just third parties buying data.  Didn't necessarily know anything about your allegations with respect to Flo's

conduct.  So what did they do that might warrant an unjust enrichment claim?

MS. VILLEGAS:  Well, I guess if your question is how do we know that they had knowledge that this information was coming in and that they were using the information, I have an answer for that.

THE COURT:  Well, not the information but why that was inequitable.  This is an equitable claim.

MS. VILLEGAS:  Yes.

THE COURT:  You have to show that this was inequitable for the non-Flo Defendants who have purchased that data.

There is no allegation as far as I can see in the complaint.  You can help me find it if I missed it, and there is no allegation that any of those other Defendants misrepresented anything, lied about anything, did anything other than just buy data.  There is nothing inherently unjust about that.

MS. VILLEGAS:  So, the basis of our allegation, Your Honor, is that they had this SDK, which is a software development kit.  This was actually designed not by Flo but by the non-Flo Defendants.

And the purpose of the SDK -- it is a business tool -- it is meant to get information from apps so that they can use it in their advertising.  Not a neutral tool.  It is a tool specifically designed so that they can collect information and

use it for advertising.

**THE COURT:**  There's nothing -- SDKs are part of our modern life.  There is nothing unjust about using an SDK.

**MS. VILLEGAS:**  Well, Your Honor, we would argue that the issue here is a little bit different because we are dealing with health data where there was no consent or notice.

Again, this is their SDKs.  They can, you know, embed in the SDKs a way to provide notice to the user, a way to stop themselves from actually getting the health information itself, instead of calling it pregnancy -- you know, user pregnancy week, they could just have -- make sure that all the events were called Event One, Event Two, Event Three.

So it is within their purview and control to make sure that they are not getting this very health -- sensitive health data.

And because they are in control of the SDK, they are also in control of the information they get.

In this case the information they got was information that was very sensitive about periods, pregnancy, sexual health.

And at least in the case of Meta, we have alleged that the FTC found that they use the information.  So we --

**THE COURT:**  How would -- how would -- I mean, just -- I don't agree with that but just for fun for me -- interest, let's call it not fun, for interest -- for the Court's interest, how would they possibly ever communicate with a Flo

customer?

**MS. VILLEGAS:**  Well, so --

**THE COURT:**  How would they ever do what you --

**MS. VILLEGAS:**  I have an answer for that.  I mean, this SDK is embedded in the Flo app.  They could make it so that there is a pop-up that says, you know, "We are also going to be using your information for advertising purposes."

It is in their control to be able to convey this information if they wanted to, but they didn't because it is big business for them to be getting this information about pregnancy.  It is worth a lot of money.

So it is easier for them not to say anything at all; take the information; and at least in the case of Meta, use the information.

And we believe our allegations support that with the rest of the Defendants that do have an advertising platform -- Google, Meta and Flurry -- that there is at least a very strong inference that the information coming in from Flo was being used for advertising and other purposes.

**THE COURT:**  Okay.  Flo?

**MS. SHARTON:**  Yes.  I would like to start, Your Honor -- there has been a number of kind of misconceptions but I would like to start with your statement, which is there is nothing unfair about the use of an SDK.

That is all that is alleged here.  There is no sale of

information.  There was no purchase of information.

And Flo, a startup in 2016, reproductive pregnancy app, their trouble started in February of 2019 when the Wall Street Journal did an article, it was on a larger topic, but in it they gave -- they mentioned Flo and they gave the erroneous impression that Flo was selling user data.  That led to the complaints being filed and all kinds of other things.

The other misconception is the FTC didn't find anything. It was a settlement with no admission of wrongdoing, but I do want to talk --

THE COURT:  I'm with you on all that.

MS. SHARTON:  Okay.  I thought I heard you say that and I appreciate it.  I would like to talk about two grounds.

THE COURT:  By the way, when I say "I'm with you on all of that," that means I'm aware of what you are saying. Not --

MS. SHARTON:  I see.

THE COURT:  Not saying anything beyond that.  Anyway, go ahead on this unjust -- well, you are not really -- this isn't really you.  This is really the non-Flo Defendants, so let me --

MS. SHARTON:  I am happy to come back and talk about Flo.

THE COURT:  Let me hear from someone --

MS. SHARTON:  Sure.

**MS. ROGERS:**  Good morning, Your Honor.  Your Honor is absolutely right that SDKs are an ordinary part of modern life.

Plaintiffs are under a misconception.  They are seeking to draw the analytics Defendants into this case on the sole basis that these companies provided Flo Health with the same ubiquitous, free, publicly available tools that millions of app developers use on a daily basis to send information to the analytics Defendants to receive information about their app audiences.

What the Plaintiffs are asking you to do here today, Your Honor, is to accept a new theory of vicarious strict liability that would render the analytics Defendants liable whenever anybody uses their neutral tools to send data to the analytics Defendants that allegedly violates the analytics Defendants' terms.

The analytics Defendants do not want personally identifiable health information.  They make that very clear in all of our contracts.

All of the analytics Defendants contractually prohibit developers like Flo from sending -- using the SDKs to send personally identifiable health information and require the developers to disclose to users the sending of their data through the SDKs.

Now the Plaintiffs said something that I want to correct, which is that analytics Defendants have control of the SDKs.

The analytics -- the SDKs are neutral tools that an app can use to -- can download publicly available and can integrate into their app in order to transmit information to the analytics Defendants.

The analytic -- the developer that chooses to integrate an SDK chooses precisely what data to searched to the analytics Defendants.

They can choose to create or send standard app events which are predefined, pre-named events that are common to many apps that track standard actions.

And developers like Flo can choose to create custom app events which are customized to the app by definition.  These are app events that track actions unique to a specific app.

Here, the allegation is that Flo Health using analytics SDKs created custom app events that are specific to the Flo Health app and that Flo Health purposefully chose names for those custom app events that included Plaintiffs' personally identifiable health information and that Flo Health then sent that data to the analytics Defendants via the neutral tools.

Now, even accepting the conclusory allegation that Flo overstepped analytics Defendants' contractual restrictions on sending personally identifiable health information, blaming the analytics Defendants for merely receiving data that Flo Health created and Flo Health named, it is not right.  It is not reasonable.  And, Your Honor, it is not just.

THE COURT:  Well, you are missing the key word for 12(b)6 and that is "plausible."  That's all we are looking at.

MS. ROGERS:  It is not plausible.

THE COURT:  Who knows?  We are dealing in more mundane concepts.  Have they plausibly alleged a claim?

Look, I will just tell you for the most part, except for those two things that I said, I'm probably going to let it go forward.  I think I'm going to dismiss those two.

Being where you are in the United States and in our circuit, you are going to have a chance to amend.  I don't have a problem with that.

But most of this is all factual, and we are just not at a stage where we are going to be able to sort all that out.

But that's my sort of leaning.  I will take any closing comments.

Look, I have read the briefs and I have spent a lot of time thinking about it.  So I don't -- please don't feel compelled to hit every point, just maybe a highlight or two from -- do you want to be divided between Flo and analytics; is that a good -- okay, go ahead.

MS. SHARTON:  Sure.

THE COURT:  Okay, go ahead.  I feel like I'm using your name when I say "Flo."

MS. SHARTON:  I understand.

THE COURT:  It is not 1942.  Go ahead.

**MS. SHARTON:**  Brenda Sharton on behalf of Flo, Your Honor.  I would like to encourage you to look at two specific things regarding the complaint.

**THE COURT:**  Yes.

**MS. SHARTON:**  And these are, I think, dispositive and would require dismissal.

**THE COURT:**  12(b)6 dispositive.  12(b)6, yes.

**MS. SHARTON:**  The lack of standing under Article III and we do have -- I actually have an old-school demonstrative. I haven't done this in a while.

**THE COURT:**  Oh, okay.  Oh, particle board, all right.

**MS. SHARTON:**  There is literally just no harm alleged.

**THE COURT:**  Can you come over this way a little bit? Is this a quote?

**MS. SHARTON:**  Yes.  And this is -- in the complaint, Your Honor, right from the complaint, this is the only thing that is alleged for harm.  Because this information was shared with non-Flo Defendants users could be targeted for ads and that the users may find overwhelming.  And that's in paragraph 19 of the complaint.

It goes on --

**THE COURT:**  Thank you.

**MS. SHARTON:**  It goes on to say non-Flo Defendants could use this information to target that user.

Now, this is precisely the type of speculative,

hypothetical, attenuated chain of events that have been rejected time and time again under *TransUnion* and also *Lopez v. Apple*.

They just don't have any harm.  And the reason being too is that this was just use of an SDK where it just navigate -- wherever the user navigated to the app, that got sent to the analytics Defendants on an aggregated -- on a de-identified basis, so literally these titles know where you navigated.

And the Ninth Circuit has made clear in *Smith v. Facebook* and in *Zynga*, it is very analogous where you navigate or browse on websites is not content.  It is simply record information.

And in *Zynga*, although it didn't turn on the sensitivity of the data, the Ninth Circuit said you could have a situation where you are outing someone as gay who didn't want to be outed, but that is record information.  Just because you went to that website doesn't mean you are gay.

And then the second one was *Smith v. Facebook*, which was about navigating on health sites, cancer.com, particular types of cancer.  And they said the fact that you went and viewed that or in *Zynga* clicked that doesn't mean it is so.

And we think it is completely analogous.  And, in fact, Judge Corley in the *Gonzalez* case -- then Magistrate Corley -- said that the Ninth Circuit has soundly rejected the notion and went on to say that for where you go on a website and browse and for mobile apps is not content.

So I just want to point that out because I think --

THE COURT:  Let's pause there --

MS. SHARTON:  -- there is a disconnect.

THE COURT:  -- and hear from the Plaintiff on that issue.

MS. SHARTON:  And then if I may, Your Honor, on the statute of limitations --

THE COURT:  We are going to bounce back and forth.

MS. SHARTON:  Okay.

MR. LEVIS:  Sure, I will respond to that briefly.  I think in terms of the Article III standing -- we address this in our papers -- *TransUnion* is very clear that there are categories of classical harm that give rise to constitutional standing.  The disclosure of private information is one of the longest recognized harm in that category.

The allegations about the disclosure of this type of highly sensitive medical information along with the breach of contract allegations and other claims that we allege very clearly places this within this Court's jurisdiction.

The demonstrative I appreciate, but I believe that is maybe one of the types of harm that might arise from this conduct.  It is certainly not the only harm.

THE COURT:  Your main harm is invasion of privacy.

MR. LEVIS:  Correct.

THE COURT:  I get it.

**MS. SHARTON:** And that requires identification. This was de-identified data, Your Honor.

And *Eichenberger* makes very clear that even if -- it has got to be tied to someone, an individual. And here it wasn't. It is aggregated data.

And there is literally no allegation that the analytics Defendants did anything with the info. It is just a swath of de-identified info which was completely and explicitly disclosed.

**THE COURT:** I have already held in multiple cases, including the *Facebook* case that settled for $650 million, that these privacy violations are well within the domain of *Spokeo*. So, you are going to lose on that one.

What about -- limitations is typically a fact issue as well. I'm not saying you don't have a defense, but it is extremely difficult to do limitations issues at the pleading stage because they need a record. So you may ultimately win on that one.

But my practice is unless it is plain as day on the face of the complaint, which is not the case here, it's not granted at the 12(b)6 stage.

Now, summary judgment, something else, perfectly fine. I mean, it's just -- the fact that you can't do it now doesn't mean you can't do it later.

We are just talking about what is going to go forward in

the complaint.  It is really just what is going to walk through the door.  And what happens after that, who knows.  That is for discovery and everything else to --

MS. SHARTON:  Can I take a small crack --

THE COURT:  Sure, yes.

MS. SHARTON:  -- at the plain as day because --

THE COURT:  Of course.  If you want --

MS. SHARTON:  -- actually that was my argument on the statute of limitations.

THE COURT:  You know, if you want to point to a specific provision in the amended complaint --

MS. SHARTON:  I do, Your Honor.

THE COURT:  -- that would be -- okay, which one?

MS. SHARTON:  Yes.  On paragraph 124 -- and just like the *McAlvey* case --

THE COURT:  124.

MS. SHARTON:  124, they talk about how this was bombshell news in February of 2019, okay.

And they don't have anywhere in the complaint -- California law is crystal clear.  As you know, you need to allege two things, the time and manner of discovery and why you couldn't have discovered it earlier.

And in their opposition brief they don't argue this.  They don't say -- you know, they recognize they are in tolling land; and then the burden of proof goes on them.

There is no allegation as to when they discovered -- on its face February of 2019 -- bombshell news.  *McAlvey, Plumley*, there is a whole line of cases that say constructive notice. We gave you a request for judicial notice on 112 articles. Associated Press picked it up.  In *McAlvey* there were 117 articles.  It is almost an identical case.

Nowhere did they meet their burden of saying when they -- why they couldn't have discovered it earlier.  It was almost two years later they filed suit, January of 2021.

Then they nonsensically in the opposition say:  Well, we couldn't have had notice until June of 2021 when the FTC put out their notice on this, which is completely nonsensical because every single Plaintiff had filed before then.

So to say "we couldn't have known until after we filed suit," makes no sense.

And then two other paragraphs, if I may, because --

**THE COURT:**  Sure.

**MS. SHARTON:**  -- I think on its face this is super important.

In paragraph 184 they say Flo received hundreds of complaints after that February 2019 article.

In paragraph 186 they say more than a hundred users deleted the app.  These are actual class members -- purported class members.  These are actual Plaintiffs with actual knowledge if you read the face of their complaint.  That's a

problem.

And so right now they have no allegation about when they discovered it, time and manner or why they couldn't have earlier. That's their burden. That is black letter law.

And then they actually go on to say: Hey, lots of our Plaintiffs actually complained. And I think that that's where we come out saying on the face of the complaint as it stands now, it's just got to be dismissed.

And the *McAlvey* court said the bottom line is the Plaintiffs acknowledge the publicity -- that is the key here. They call it bombshell news -- but they nevertheless fail to explain how they manage to ignore these newspaper articles. And we think we have the exact same situation here.

THE COURT: Okay. Plaintiff?

MR. LEVIS: Sure, I will respond briefly just by pointing to something that Ms. Sharton mentioned earlier today in her description of the Wall Street Journal article that she is relying on now for notice purposes as an erroneous -- creating the erroneous impression that Flo was selling user data.

There is a dispute about what this article says and what it means, and apparently to this day Flo denies what the actual content of that article was about.

And so our allegation is that we learned and were on notice of the conduct here once the FTC actually came out and

found that it had occurred.  And it was at that point that we filed our claims.

Now, I understand the demonstrative that Defendants attach to their motion which cites to about 112 headlines, none of which mentioned Flo, none of which say the word "Flo" in any of them.

And I understand the factual argument that they are trying to make, but I do not believe that that is an argument they can actually demonstrate at this point.

It is an affirmative defense.  If they want to try and prove it later on, they are free to do so.  There is simply not enough for them to make that --

**THE COURT:**  Well, it is going to be an issue.  I mean, I appreciate that.  Okay.  I mean, it is not going to go away.

This just -- we are just kicking the can down the road a little bit because I would like to see the record, but it is a non-trivial defense from what I have seen.

So I'm not willing to yank the complaint because I think that is wrong at this stage but it is coming.

**MR. LEVIS:**  Understood.

**THE COURT:**  Okay.  I will have this out relatively soon.  And -- oh, you have a discovery dispute.

**THE CLERK:**  Use the microphone, please.

**MS. BLUNSCHI:**  I apologize, Your Honor.  I think --

**THE CLERK:**  Your name again, please.

**MS. BLUNSCHI:**  Melanie Blunschi on behalf of Defendants AppsFlyer, which is one of the analytics Defendants.

I know you asked for just closing words from the Flo Defendants and the analytics Defendants, and I just wanted to indulge a sentence or two about AppsFlyer, which is a differently situated Defendant.

**THE COURT:**  Okay, sure, yeah.  I mean, I have all the papers, but I am happy to hear a key point.

**MS. BLUNSCHI:**  Thank you.  Just since the briefing was combined, I wanted to underscore that AppsFlyer is the only one of the analytics Defendants that is not alleged to have any advertising business.

So to the extent that the harm here is the potential to use this data in advertising, we are differently situated and could not have done that.  It is a pure service provider providing only analytic services.

And so when you look at the aiding and abetting claims, those are the only two claims against AppsFlyer.

I just wanted to suggest that Judge Davila's recent decision in *Barrett versus Apple*, 523 F.Supp.3d, 1132, is very instructive on those claims.

Aiding and abetting is a very high standard that requires intent to facilitate the commission of the tort, and the assistance that is provided has to be a substantial factor in causing the injury.

And as Ms. Rogers said here, all we have alleged are neutral SDKs that were not tailored to Flo that were being used in tens of thousands of apps.

And so we would ask as you review the complaint, would be grateful for your focus on whether Plaintiffs have adequately alleged the very high standard of intent to facilitate the commission of the alleged torts especially with respect to AppsFlyer, which does not even have an advertising business.

**THE COURT:** Okay. Thank you. All right. Let's -- who is going to -- is -- Cloudflare, are they here?

**MR. SADUN:** They are not, Your Honor, but we are prepared to argue --

**COURT REPORTER:** I'm sorry, your name again?

**MR. SADUN:** Benjamin Sadun for Flo Health. Flo is prepared to argue why the subpoena is going to be quashed.

**THE COURT:** You don't have to crane your neck. Go up to the podium. Well, I just don't understand. Cloudflare has not objected; that's right?

**MS. FIORILLA:** No, they have not served --

**COURT REPORTER:** I'm sorry, your name again?

**MS. FIORILLA:** Amanda Fiorilla.

No, Your Honor, they have not served their responses and objections. We had provided them with a short extension.

And before their responses and objections were due, Flo had filed their motion to quash and Cloudflare has stated they

will not be responding to the subpoena until this issue was resolved.

THE COURT:  But they were served?

MS. FIORILLA:  Yes, they were served March 1st, 2022.

THE COURT:  All right.  Now -- I'm sorry, you are with Flo?

MR. SADUN:  Yes, Your Honor.

THE COURT:  Now, what is Flo's relationship to Cloudflare?  Is there a -- do you own it?

MR. SADUN:  We do not own Cloudflare but we are a subscriber of their services.  They provide our IT technical infrastructure.  They block malicious traffic to Flo and they keep the system secure.

And so it is highly technical trade secret, very closely held information that is essential to keeping Flo from being hacked and secure.

And so the information sought by Plaintiffs absolutely infringes upon Flo's interest, which gives us standing to object to this overbroad subpoena that is in no manner tailored to the actual allegations in this case.

Nowhere in the subpoena do they limit it to health information.  Nowhere in the subpoena do they ask about custom app events.  Cloudflare is --

THE COURT:  So Cloud is a third-party vendor for Flo. What do they do?

**MR. SADUN:**  They provide IT technical infrastructure support.  So effectively they try to detect through artificial intelligence malicious traffic and outsiders trying to hack the system and they block it.

**THE COURT:**  Don't produce any -- that's out.  You don't need any of that.

**MS. FIORILLA:**  I agree with you.

**THE COURT:**  They don't have to produce any of that.  That's off the table.

**MS. FIORILLA:**  Yes, I agree with you.

**THE COURT:**  Don't worry about that.  You don't have to reproduce it.  So what is left for Cloudflare?

**MS. FIORILLA:**  Yes.  So Cloudflare not only provides IT services -- it is in Flo's letter -- they also provide content distribution services.

Our understanding is that Cloudflare is the entity who receives Flo Health's data and this includes their user data; it includes health data; it includes identifying information.

Cloudflare then processes this data on behalf of Flo Health.  They store this data on behalf of Flo Health.  So what we would be interested in knowing is how that dataflow process works.  Where does Flo Health's data go?  How is it processed?  Where is it stored?  Is it sent to third parties and when?

And we do think those are relevant to our claims.  We think at a minimum it relates to sharing data with third

parties as well as proving that data -- I'm sorry -- as well as supporting our claims under the Wire Tap and Stored Communications Act claim.

What Flo said about providing IT security, we are not interested in documents that are going to show, say, Cloudflare's audits and their security assessments and things like that.  We don't --

THE COURT:  Yeah, you are not going to get that.  I think I have the -- I'm going to have to stop in a few minutes because I have got another hearing coming up.

MR. SADUN:  I direct, Your Honor's attention to Exhibit A.

THE COURT:  You have docket 134 which looks like the RFPs?

MR. SADUN:  Exhibit A.

THE COURT:  Exhibit A, it's docket 134.  So which ones -- just tell me which ones you want with the understanding that you are not going to get, you know, the technical stuff on the security --

MS. FIORILLA:  We don't want their IT security information.  I will say I do think the best way to limit these RFPs would just be for Plaintiffs to meet and confer with Cloudflare to discuss what documents they do have because to the extent they don't have documents, then we simply just can't get them.  And that would be fine with us.

**THE COURT:** You want to do that instead? That's fine.

**MR. SADUN:** Your Honor, we would object to that recourse. We do have standing. This implicates our --

**THE COURT:** You don't have standing to block it completely, Counsel. That's not going to happen. It is discovery, okay.

You have came in here and you've told me you are worried about sensitive security hacking. Fine. I said they are not going to get it. You won. You are not going --

**MR. SADUN:** That's one of our arguments.

**THE COURT:** -- to block the rest of it. They are going to meet and confer with Cloudflare.

**MR. SADUN:** Can I point out one thing to Your Honor?

**THE COURT:** No. That's it. It's done. This is discovery. This is not Armageddon. You go ahead and meet and confer with Cloudflare. Before anything gets produced, make sure that you share it with Flo. They don't want to have any problems. All right. Just say, "here is what we are going to do." All right?

**MS. FIORILLA:** Will do.

**THE COURT:** Okay. Anything else for today?

**UNIDENTIFIED ATTORNEY:** Your Honor, I apologize --

**COURT REPORTER:** I'm sorry, your name again?

**UNIDENTIFIED ATTORNEY:** I don't --

**THE COURT:** We are not re-visiting the motion to

dismiss.  That's closed.

**UNIDENTIFIED ATTORNEY:**  Okay, thank you.

**THE COURT:**  All right.  Anything else for today, Plaintiffs?

**MS. VILLEGAS:**  Nothing from us, Your Honor.

**THE COURT:**  What is happening next?  Do you have a status conference coming up?

**MS. VILLEGAS:**  We are in the middle of discovery, Your Honor.

**THE COURT:**  Did I issue a scheduling order?

**MS. VILLEGAS:**  We do have a scheduling order, yes.

**THE COURT:**  How are you trying to resolve this?  Do you have a -- what are you doing for that?

**MS. VILLEGAS:**  We -- actually Your Honor asked that we postpone any settlement conference until after the ruling on the motion to dismiss.  So I think once we get your ruling, we agree to attend a settlement conference within, I believe, 60 days.

**THE COURT:**  You have somebody -- somebody lined up?

**MS. VILLEGAS:**  Not yet, Your Honor, but we are happy to meet and confer with the Defendants on that and pick a --

**THE COURT:**  You want a magistrate judge?

**MS. VILLEGAS:**  -- private mediator.

**THE COURT:**  You don't want a magistrate judge?

**MS. SHARTON:**  I think we would have to just -- we can

meet and confer and that would certainly be on the table, but we have clients we would have to go back to.

**THE COURT:**  Well, it is a rare offer.  I just will tell you it is a scarce resource, but I'm perfectly happy in this case to make it available; but it is up to you, whatever you think is best.  You know, you are much closer to the dynamic than I am, so whatever you prefer.

How about this?  A week from today just file your election, okay.  And if you are going to use someone who is private, I want you to identify that person and have them retained.

I'm sure you know, as well or better than I do, that case filings are way up in this district and the local mediators, private services are under water and it is taking a very long time to schedule things.

Now, you may be looking farther.  That is perfectly fine. But I don't think they are probably going to be any differently situated than people here in town.

So find someone.  Make a commitment.  Get it scheduled. There is no reason -- you can dual track.  You can fight like gladiators on the merits side and still talk like friends on the settlement side; okay.  There is no reason you can't do that.  That's what we do.  All right.

Now, if you do prefer a magistrate judge, just let me know and I will select one and send you to the magistrate judge;

okay.  If you don't want to, that's fine.  You don't have to say anything.  Just identify it.

In a week just file a little one paragraph thing.  "We have selected X and Y" or "we request a reference to a magistrate judge."  That's all you got to do; okay.

Now, I don't normally do this but there are a lot of moving parts here, so I -- in my bigger cases between just by volume of people and claims, I will often set up regular status conferences.  You can cancel them if you need to, but I have the sense that maybe that might be beneficial here.  So why don't we just -- is that okay?  What do you think, Plaintiffs?

**MS. VILLEGAS:**  Yes, Your Honor.

**THE COURT:**  Defendants, you are all right with that?

**MS. SHARTON:**  That's fine, Your Honor, yeah.

**THE COURT:**  Why don't we just set a quarterly conference; okay.  If you don't need it, nothing to discuss, that's perfectly fine.  Just write a week ahead of time and say "thanks, we don't need to come in."  You don't have to say "thanks," but "we don't need to come in."

And if you have things, you just give me an agenda and a little bit of background and we can see, you know, what is happening at that point; okay.

**MS. VILLEGAS:**  Okay.

**THE COURT:**  I will set one for 90 days from today -- well, I will do probably maybe 45 days from today, and then we

will get on the 90-day track.  Anything else?  Good?  Okay, great.  Thanks very much.

(Proceedings adjourned at 10:54 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Friday, May 13, 2022

_____

Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
United States District Court - Official Reporter