**WILLKIE FARR & GALLAGHER LLP**
BENEDICT Y. HUR (SBN: 224018)
  bhur@willkie.com
SIMONA AGNOLUCCI (SBN: 246943)
  sagnolucci@willkie.com
EDUARDO E. SANTACANA (SBN: 281668)
  esantacana@willkie.com
TIFFANY LIN (SBN: 321472)
  tlin@willkie.com
YUHAN ALICE CHI (SBN: 324072)
  ychi@willkie.com
One Front Street, 34th Floor
San Francisco, CA 94111
Telephone:  (415) 858-7400

Attorneys for Defendant
GOOGLE LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO

| | |
|---|---|
| ERICA FRASCO, et al., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>FLO HEALTH, INC., et al.,<br><br>Defendants. | Case No.  3:21-CV-00757-JD<br><br>**GOOGLE LLC'S NOTICE OF MOTION AND MOTION TO STRIKE OPINION OF EXPERT JENNIFER GOLBECK**<br><br>Date:    November 30, 2023<br>Time:    10:00 a.m.<br>Judge:  Hon. James Donato<br>Ctrm:   11 – 19th Floor, SF<br><br>Action Filed:    September 2, 2021<br>Trial Date:      December 2, 2024 |

GOOGLE'S MOTION TO STRIKE OPINION OF EXPERT JENNIFER GOLBECK
Case No.  3:21-CV-00757-JD

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE THAT** on November 30, 2023, at 10:00 a.m., before the Honorable James Donato in Courtroom 11 of the United States District Court for the Northern District of California, San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, CA 94102, Defendant Google LLC ("Google") will move the Court to strike portions of the May 9, 2023 Report of Plaintiffs' Technical Expert Jennifer Golbeck ("Report") pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) ("*Daubert*"). This Motion is based on this Notice of Motion, accompanying Memorandum of Points and Authorities and exhibits attached thereto, the Declaration of Benedict Y. Hur dated September 29, 2023, Declaration of Kevin Lam dated September 29, 2023, and all other evidence in the record.

This Court should strike the following portions of Dr. Golbeck's Report: Page 1, Lines 17–19; Page 3, Line 27; Page 4, Lines 1–7; Page 31, Lines 6–8; Page 33, Lines 1–3; Page 35, Lines 12–14; Page 36, Lines 6–13; Page 37, Lines 1–3, 8–21; Page 38, Lines 1–17, 25–28. For the reasons stated in the Memorandum of Points and Authorities, these portions of Dr. Golbeck's Report do not rest upon any factual foundation in the record, and should be excluded as unreliable under Federal Rule of Evidence 702 and *Daubert*.

## **ISSUES PRESENTED**

Whether the following portions of Dr. Golbeck's Report should be struck as unreliable under Rule 702 and *Daubert*: Page 1, Lines 17–19; Page 3, Line 27; Page 4, Lines 1–7; Page 31, Lines 6–8; Page 33, Lines 1–3; Page 35, Lines 12–14; Page 36, Lines 6–13; Page 37, Lines 1–3, 8–21; Page 38, Lines 1–17, 25–28.

1 Dated: September 29, 2023

2 **WILLKIE FARR & GALLAGHER LLP**

3 By: */s/ Benedict Y. Hur*
        Benedict Y. Hur

4       Simona Agnolucci
        Eduardo E. Santacana

5       Tiffany Lin
        Yuhan Alice Chi

6

7       *Counsel for Defendant*
        *Google LLC*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

I.     **INTRODUCTION** ................................................................................................. 1

II.    **BACKGROUND** .................................................................................................. 2

    A.    Factual and Procedural Background ........................................................ 2

    B.    Dr. Jennifer Golbeck's Affirmative Expert Report................................. 4

    C.    Dr. Jennifer Golbeck's Expert Testimony Has Been Struck in Prior Cases Due to Lack of Foundation ........................................................... 4

III.    **LEGAL STANDARD** ........................................................................................ 5

IV.    **ARGUMENT** ..................................................................................................... 6

    A.    Portions of Dr. Golbeck's Report Should Be Excluded for Citing No Evidence at All ........................................................................................ 6

    B.    Dr. Golbeck's Conclusion Is Based on Insufficient Facts or Data ........ 6

        1.    Dr. Golbeck Makes Unfounded Assumptions about Flo App Data from General Documents about GA4F ................................... 7

        2.    Dr. Golbeck Disregards Specific Restrictions that Were Present on Flo App Data ..................................................................... 8

        3.    Dr. Golbeck's Conclusion Ignores Clear Record Evidence Showing that Google Did Not Use Flo App Data for Any Advertising Purpose ............. 12

            a.    Google's Interrogatory Responses Specifically Address Advertising-Related Machine Learning ................................ 12

            b.    No Flo App Data Was Used for Any Advertising-Related Purpose .......................................................................14

        4.    Dr. Golbeck Fails to Analyze the Machine Learning Systems that Are the Subject of Her Conclusion ......................................... 15

V.    **CONCLUSION** ............................................................................................. 155

GOOGLE'S MOTION TO STRIKE OPINION OF EXPERT JENNIFER GOLBECK
Case No.  3:21-CV-00757-JD

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*BJB Elec. LP v. Bridgelux, Inc.*,
   2023 WL 4849764 (N.D. Cal. July 28, 2023)...................................................................5, 7

*BladeRoom Grp. Ltd. v. Facebook, Inc.*,
   2018 WL 1611835 (N.D. Cal. Apr. 3, 2018) ........................................................................7

*Guidroz-Brault v. Missouri Pacific R.R. Co.*,
   254 F.3d 825 (9th Cir. 2001) ..............................................................................................7

*Maheu v. Hughes Tool Co.*,
   569 F.2d 459 (9th Cir. 1977) ..............................................................................................5

*O'Connor v. Starbucks Corp.*,
   2008 WL 2761586 (N.D. Cal. July 14, 2008) ......................................................................7

*Stephens v. Union Pac. R.R. Co.*,
   935 F.3d 852 (9th Cir. 2019) ..............................................................................................2

*Stiner v. Brookdale Senior Living, Inc.*,
   2023 WL 2722294 (N.D. Cal. Mar. 30, 2023)......................................................................5

*ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*,
   648 F. App'x 609 (9th Cir. 2016) .......................................................................................6

*Utne v. Home Depot U.S.A., Inc.*,
   2022 WL 1443338 (N.D. Cal. May 6, 2022) ........................................................................5

**Other Authorities**

Fed. R. Civ. P. 104(a) ...............................................................................................................6

Fed. R. Civ. P. Rules 702 and 104(a).........................................................................................6

Fed. R. Evid. 106, 615, and 702.................................................................................................5

Fed. R. Evid. 702 ...............................................................................................................5, 6, 7

Fed. R. Evid. 702(b)..................................................................................................................17

Fed. R. Evid. 703 .......................................................................................................................7

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.  INTRODUCTION

Plaintiffs have abandoned their allegations that Google Analytics for Firebase ("GA4F"), used information it received from the Flo Health App to target ads to Flo App users. *See* ECF No. 64 ¶¶ 18–19. In the two years since the Complaint was filed, discovery has not borne out the supposed harms Plaintiffs speculated about in their Complaint. *See id.* There is no evidence that Google used the analytics data it received from the Flo App ("Flo App Data") to target Flo App users with ads *at all*, let alone target pregnant Flo App users with ads for prenatal vitamins, breast pumps, or fertility treatments. *Id.* There also is no evidence Google used Flo App Data to target Flo App users for skin care products based on their indication that they experienced oily skin during their menstrual cycle. *Id.* In short, Plaintiffs uncovered no evidence because there never was any; Google did not use the information users entered into the Flo App to "develop profiles about users or target them for advertisements." *See id.* Rather, as Google has consistently explained, and as the record shows in this case, Google processed the data it received from the Flo App *only* to provide Flo with analytics services. Google did not use the data it received from the Flo App for advertising, machine learning, or any other internal or external purpose.

Plaintiffs' inability to substantiate any of their allegations regarding Google's alleged use of Flo App Data is fatal to their claims. So, during expert discovery, in an eleventh-hour attempt to manufacture a genuine dispute of material fact where none exists, Plaintiffs attempted to introduce a new theory into the record in the guise of an expert opinion: "[t]he Flo Custom App Event Data was used by Google; it was made available to Google's machine learning systems used for Google's advertising business" (the "Conclusion"). The vehicle for this belated new theory is Plaintiffs' technical expert, Dr. Jennifer Golbeck, but her Conclusion is completely unsupported by the record, the Report itself, and her own testimony. Advertising-related machine learning, as described by Dr. Golbeck, is no more than the creation of models used for advertising, which Google has already determined it did not conduct.[1] In any event, to avoid unnecessary quibbling

---

[1] Though Dr. Golbeck's Conclusion pertains only to advertising-related machine learning, Google did not use Flo App Data for *any* machine learning, whether advertising-related or otherwise, for the reasons discussed herein. *See* Declaration of Benedict Y. Hur in support of Google's Motion

over terminology, Google has included a declaration from Kevin Lam confirming that Flo App Data "was not made available to, or used in, any of Google's machine learning systems, including those that are used for advertising." Declaration of Kevin Lam in support of Google's Motion for Summary Judgment and Motion to Strike Expert Opinion ("Lam Decl.") ¶ 6.

Dr. Golbeck's Conclusion is nothing more than a baseless factual assertion masquerading as expert opinion and must be excluded as unreliable and unfounded. *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856 (9th Cir. 2019) (noting that an expert's opinion must rest on "facts or data in the case that the expert has been made aware of or personally observed," not merely assumptions and speculation). Because Dr. Golbeck's Conclusion is unreliable, the Court should strike the following portions of Dr. Golbeck's Report: Page 1, Lines 17–19; Page 3, Line 27; Page 4, Lines 1–7; Page 31, Lines 6–8; Page 33, Lines 1–3; Page 35, Lines 12–14; Page 36, Lines 6–13; Page 37, Lines 1–3, 8–21; Page 38, Lines 1–17, 25–28.

## II.   BACKGROUND

### A.   Factual and Procedural Background

GA4F is a measurement tool that allows app developers, such as Flo Health Inc. ("Flo"), to measure user interactions on their mobile apps by incorporating the GA4F software development kit ("SDK") into their apps. Hur Decl., Ex. 2 (Google's Interrogatory ("ROG" Responses ("Resp.")) at 18-19. The Flo Health App ("Flo App") was a customer of GA4F, and transmitted data to Google in the form of standard and custom app events, and standard user properties, relating to users' interactions with the Flo App. *See id.* at 18–19. The standard and custom app events the Flo App transmitted to Google, as well as the user properties transmitted with the app events, did not include users' email addresses, phone numbers, names, or any other information that identified an individual. *Id.* at 20.

Plaintiffs Erica Frasco, Sarah Wellman, Justine Pietryzk, Jennifer Chen, Tesha Gamino, Autumn Meigs, Leah Ridgway, and Madeline Kiss (together, "Plaintiffs") filed a Consolidated Complaint ("Complaint") on September 2, 2021. ECF No. 64. As to Google, Plaintiffs allege that the Flo App disclosed users' sensitive health information to Google through the GA4F SDK in

---

to Strike ("Hur Decl."), Ex. 1 (May 9, 2023 Report of Dr. Jennifer Golbeck) ("Report" or "Golbeck Report") at 31; *infra* Section II.A.

violation of users' privacy, and that Google used the sensitive health information to target ads to those users. *See id.*

Fact discovery in this matter concluded on April 17, 2023. ECF No. 267. The record undisputedly shows that Google processed Flo App Data[2] only to provide Flo with analytics services, and not for any other purposes, including any of Plaintiffs' theorized purposes, which have included advertising, ads targeting, ads modeling,, marketing, product development, diagnostics, product improvement, research, and machine learning. Hur Decl., Ex. 2 (Google ROG Resp.) at 22–23; Lam Decl. ¶ 6. The various settings that the Flo App configured in their GA4F account prevented Google from using any Flo App Data for any of the non-analytics purposes Plaintiffs alleged. For example, the Flo App did not enable a setting called "data sharing with Google," which prevented Google from using Flo App Data for Google's internal purposes, such as product development, diagnostics, product improvement, and research. Hur Decl., Ex. 2 (Google ROG Resp.) at 23. In addition, the Flo App did not enable Signals; therefore, Google did not identify users associated with Flo App Data. *Id.* at 20. Furthermore, Google classified the Flo App as a "sensitive" app in the Google Ads system, meaning that Google could not use Flo App Data for any advertising purpose, including targeted advertising or advertising-related machine learning. Lam Decl. ¶ 6; Hur Decl, Ex. 3 (Deposition Transcript of Kevin Lam ("Lam Dep. Tr.")) at 94:5–13. Finally, Google determined, through its investigation, that none of the audience lists[3] containing Flo App Data were ever used for advertising. Hur Decl., Ex. 2 (Google ROG Resp.) at 22.

---

[2] The parties agree that the data at issue in this case, referred to herein as "Flo App Data," consists of (i) all Custom App Events sent by Flo Health; and (ii) all data, including identifiers, Standard App Events, and other associated data sent by Flo Health, in conjunction with the Custom App Events, during the relevant time period. *See* ECF No. 207 at 1 (defining "User Data" as such); Hur Decl., Ex. 2 (Google ROG Resp.) at 6 (defining "Flo App Data"). The Flo App transmitted Flo App Data to Google only through its use of the GA4F SDK; the Flo App's use of any Google products unrelated to GA4F or Flo App Data is outside the scope of this case. *See* ECF No. 207 at 1; Hur Decl., Ex. 2 (Google ROG Resp.) at 6.

[3] An audience list is a list of users; audiences allow a developer to organize the GA4F data it collected in ways that are important to its business. Hur Decl., Ex. 4 at GOOG-FLO-00065559. GA4F provides two predefined audiences: "All users" (Users who have ever launched your app) and "Purchasers" (Users who have completed an in-app purchase or ecommerce purchase. *Id.* In addition, app developers may also create custom audiences. *Id.*

---

3

### B.   Dr. Jennifer Golbeck's Affirmative Expert Report

Plaintiffs submitted the affirmative technical expert report of Dr. Jennifer Golbeck on May 9, 2023. Hur Decl., Ex. 1 (Golbeck Report). The Report contained expert opinions relating to Defendant Meta Platforms, Inc. ("Meta") and Google. Dr. Golbeck was deposed on July 11, 2023. As to Google, Dr. Golbeck opined, without any foundational support, that the custom app events Google received from the Flo App were made available to Google's "machine learning systems" used for advertising.[4] Dr. Golbeck rendered her Conclusion based on an observation of how Google's systems work *in general*, not specifically as to the Flo App and the Flo App's specific settings. The Conclusion is unsupported by any evidence in the record and is nothing more than a last-ditch effort by Plaintiffs to create a factual dispute where none exists.

### C.   Dr. Jennifer Golbeck's Expert Testimony Has Been Struck in Prior Cases Due to Lack of Foundation

Dr. Jennifer Golbeck's expert testimony has been struck in two prior cases as unreliable due to lack of foundation: *Rembrandt Social Media, LP v. Facebook, Inc.* and *Jensen v. Cablevision Sys. Corp.*

In *Rembrandt Social Media, LP v. Facebook, Inc.*, the Eastern District of Virginia excluded Dr. Golbeck's testimony, explaining that "[s]he gives no sources for this opinion, and provides no reason to believe her opinion is based on a reasoned explanation." Hur Decl., Ex. 6 (*Rembrandt* Order) at 3. The court excluded Dr. Golbeck's challenged testimony and stated that it was "unsupported by facts or data, and she provides no reasons or bases for her opinion." *Id.* at 4. The court therefore excluded the testimony under *Daubert* "as unreliable and unhelpful." *Id.*

In *Jensen v. Cablevision Systems Corp.*, the Eastern District of New York struck 28 paragraphs of Dr. Golbeck's expert report due to lack of personal knowledge, explaining that the report contained "an improper rehashing of otherwise admissible evidence" and that "[i]nterpreting admissible evidence without having personal knowledge or experience is improper." Hur Decl.,

---

[4] Dr. Golbeck confirmed that her Conclusion relates only to custom app event data, and not standard app events that Google received from the Flo App. Hur Decl., Ex. 5 (Golbeck Dep. Tr.) at 165:4–166:20 ("Q: You don't offer an opinion that Google used standard app event data from Flo; is that right? . . . . A: That seems accurate.").

Ex. 7 (*Jensen* Memorandum of Decision & Order) at 28. The court held that Dr. Golbeck's report "include[d] speculation regarding the meaning of certain internal documents as well as conjecture as to the company's intentions," and that "Dr. Golbeck is simply repeating otherwise admissible evidence." *Id.* at 29. The court held that Dr. Golbeck had "no personal knowledge regarding any of this information, and it is only presented to the fact-finder for the purpose of repeating Plaintiff's factual narrative." *Id.*

### III.    LEGAL STANDARD

For expert testimony to be admissible, (1) expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony must be based on sufficient facts or data; (3) the testimony must be the product of reliable principles and methods; and (4) the testimony must reflect a reliable application of the relevant principles and methods to the facts of the case. *Utne v. Home Depot U.S.A., Inc.*, 2022 WL 1443338, at *2 (N.D. Cal. May 6, 2022) (citing Fed. R. Evid. 702). "[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "[E]xpert testimony is not admissible under Rule 702 if it is based on assumptions that are unsubstantiated by the record." *BJB Elec. LP v. Bridgelux, Inc.*, 2023 WL 4849764, at *2 (N.D. Cal. July 28, 2023). "Expert evidence based on a fictitious set of facts is just as unreliable as evidence based upon no research at all." *Id.* (quotation omitted). *See also Maheu v. Hughes Tool Co.*, 569 F.2d 459, 475 (9th Cir. 1977) (rejecting damages assessment based on "sheer fantasy").

"The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, that the admissibility requirements are satisfied." *Stiner v. Brookdale Senior Living, Inc.*, 2023 WL 2722294, at *5 (N.D. Cal. Mar. 30, 2023). On December 1, 2023, unless Congress rejects the United States Supreme Court's approval of proposed amendments to the Federal Rules of Evidence, FRE 702 will be amended to clarify and emphasize the Court's responsibility to resolve disputes over expert witness admissibility according to the preponderance of the evidence standard. *See* Proposed Amendments to F.R.E. 106, 615, and 702 Absent Contrary Congressional Action, 344 F.R.D. 850, 857 (Apr. 24, 2023). That amendment was proposed because "many

courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility," and, in the Rules Committee's view, "[t]hese rulings are an incorrect application of Rules 702 and 104(a)." *Id.*, Comm. Note to F.R.E. 702 Am. To illustrate what does go to weight rather than admissibility, the Rules Committee explained that "if the court finds it more likely than not that an expert has a sufficient basis to support an opinion, the fact that the expert has not read every single study that exists will raise a question of weight and not admissibility." *Id.* at 858. But at all times, "expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology" because "jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support." *Id.* Simply put, "[t]he Rule 104(a) standard does not require perfection" but it also "does not permit the expert to make claims that are unsupported by the expert's basis and methodology." *Id.* at 859. The Rules Committee clarified that "[n]othing in the amendment imposes any new, specific procedures. Rather, the amendment is simply intended to clarify that Rule 104(a)'s requirement applies to expert opinions under Rule 702." *Id.*

## IV.    ARGUMENT

### A.    Portions of Dr. Golbeck's Report Should Be Excluded for Citing No Evidence at All

The following sections of Dr. Golbeck's Report lack any citation to the record or other support and should be excluded on that basis alone. *See* Hur Decl., Ex. 1 (Golbeck Report) at 1:17-19; 3:27–4:7; 31:6–8; 33:1–3; 36:6–13; 37:8–12; 38:3–17; *id.*, Ex. 6 (*Rembrandt* Order) at 3 (excluding Dr. Golbeck's testimony because "[s]he gives no sources for this opinion, and provides no reason to believe her opinion is based on a reasoned explanation").

### B.    Dr. Golbeck's Conclusion Is Based on Insufficient Facts or Data

An expert opinion must be "based on sufficient facts or data" in order to comply with Rule 702. That is, in order to be reliable, the expert's conclusions must not involve "too great an analytical gap between the data and the opinion proffered." *See ThermoLife Int'l, LLC v. Gaspari Nutrition Inc.*, 648 F. App'x 609, 614 (9th Cir. 2016) (quotations omitted) (affirming exclusion

where there was no evidence in the record to support the expert opinion). An expert may base an opinion on facts or data in the case; *see* Fed. R. Evid. 703; however, an expert cannot *manufacture* a fact that does not exist in the case. *See BladeRoom Grp. Ltd. v. Facebook, Inc.*, 2018 WL 1611835, at *5 (N.D. Cal. Apr. 3, 2018) (excluding expert opinion because it "is an unsupported factual conclusion outside of his expertise.").

Dr. Golbeck's Conclusion lacks foundational support in the record and should be excluded as speculative. *O'Connor v. Starbucks Corp.*, 2008 WL 2761586, at *7 (N.D. Cal. July 14, 2008) (holding expert conclusion was "simply speculation and conjecture" because it was "not based on sufficient facts or data"). Dr. Golbeck purports to be an expert in machine learning systems and how they may or may not process data made available to them. Hur Decl., Ex. 1 (Golbeck Report) at 4. She does not, however, purport to be an expert in the inputs from Google Analytics that are supposedly made available to Google's "machine learning systems used for advertising" or under which conditions. Not surprisingly, her Conclusion that "[t]he Flo Custom App Event Data was used by Google; it was made available to Google's machine learning systems used for Google's advertising business," Hur Decl., Ex. 1 (Golbeck Report) at 31:7–8, is based solely on Google documents she cites, not independent expertise she offers. The problem is, the documents she cites do not say what she asserts, and she ignores the only evidence in the record that specifically addresses Flo App Data. *See infra* Section IV.B.3. Indeed, the record is clear that Google processed Flo App Data only to provide Flo with analytics, and Plaintiffs cannot create contrary evidence by submitting an expert report that puts forth an unfounded factual conclusion. *See Guidroz-Brault v. Missouri Pacific R.R. Co.*, 254 F.3d 825, 831–32 (9th Cir. 2001) (noting that, in the context of an expert affidavit in support of a motion for summary judgment, "although the underlying factual details need not be disclosed in the affidavit, the underlying facts *must exist*.") (emphasis added). Because Dr. Golbeck's  Conclusion is "based on assumptions that are unsubstantiated by the record." it should be excluded under Rule 702. *BJB Elec. LP.*, 2023 WL 4849764, at *2.

### 1.   Dr. Golbeck Makes Unfounded Assumptions about Flo App Data from General Documents about GA4F

Throughout her Report and deposition, Dr. Golbeck was unable to point to any documents or evidence that supported her Conclusion that *Flo App Data* specifically was used in Google's

advertising-related machine learning systems:

> **Q:** Okay. Have you seen in this case any document suggesting that Flo App Data specifically was used in Google's machine learning systems?
>
> **A:** To – to the best of my recollection, I don't remember seeing a document that specifically discusses the Flo custom app events going into the Google machine learning algorithms.

Hur Decl., Ex. 5 (Golbeck Dep. Tr.) at 173:7–13. During her deposition, Dr. Golbeck merely pointed to documents that generally discussed Google Analytics data and machine learning, but admitted that none of the documents she relied upon were specific to the Flo App. *See, e.g.*, *id.* at 173:2–6 ("Q: And is it your opinion that this document discusses Flo app data specifically? A: It does not, is my recollection. It talks about the GA4F SDK data generally, is – is my recollection."); *id.* at 187:1–4 ("Q: Dr. Golbeck, I believe you've testified that the document cited in footnote 117 is not about Flo app data, right? A: It's about app data generally.").

In addition, when asked to support her assertion that "the Flo Custom App Event Data Google received through the GA4F SDK was made available to Google's systems for Google's own purposes," Hur Decl., Ex. 1 (Golbeck Report) at 35:12–14, Dr. Golbeck admitted that "this whole paragraph is making general assertions about how data is used in machine learning systems at Google" and stated "I'm not speaking specifically to any Flo app data in this paragraph." Hur Decl., Ex. 5 (Golbeck Dep. Tr.) at 199:13–201:11.[5]

### 2. Dr. Golbeck Disregards Specific Restrictions that Were Present on Flo App Data

Google processed Flo App Data only to provide Flo with analytics and not for any other purpose because (1) the Flo App was classified as "sensitive" in the Google Ads system; (2) the Flo App employed the NPA feature; (3) the Flo App did not enable the "data sharing with Google" setting; and (4) Flo did not advertise using the Flo App Data in its linked GA4F account. Hur Decl., Ex. 2 (Google ROG Resp.) at 22–23; *id.* Ex 4 (Lam Dep. Tr.) at 94:11–95:11; 96:22–97:11.

---

[5] Though Google may use data from other apps for product development, research, diagnostics, or other internal purposes like machine learning, in this case, as discussed herein, Google did not use Flo App Data for those purposes. And, though Google may use data from other apps for advertising-related machine learning, in the case of the Flo App, Google did not use any Flo App Data for machine learning or any other advertising purpose. Lam Decl. ¶ 6.

1  Dr. Golbeck's conclusion that these restrictions did not in fact prevent the use of Flo App Data for

2  advertising-related machine learning is unfounded.[6]

3      *First*, the Flo App's classification as "sensitive" prevented Google from using any Flo App

4  Data in any machine learning systems used for advertising. Lam Decl. ¶ 6; Hur Decl., Ex. 2

5  (Google ROG Resp.) at 22-23. Dr. Golbeck incorrectly concludes that Google's classification of

6  the Flo App as "sensitive" did not limit Google's ability to use Flo App Data in its machine learning

7  systems for advertising purposes. Hur Decl., Ex. 1 (Golbeck Report) at 37. For this conclusion,

8  Dr. Golbeck's Report cites only one document, GOOG-FLO-00088952. This is a product

9  requirements document that pertains to the development of the Non-Personalized Advertising

10 ("NPA") feature, not the sensitivity classification, and is not specific to the Flo App. Hur Decl.,

11 Ex. 8 (GOOG-FLO-00088952). The document also does not include any discussion of machine

12 learning. *See id.* When asked about this conclusion during her deposition, Dr. Golbeck was unable

13 to point to any additional basis aside from that included in her Report. Hur Decl., Ex. 5 (Golbeck

14 Dep. Tr.) at 201:15-203:1. Additionally, the record is clear that, because the Flo App was classified

15 as "sensitive" (which Dr. Golbeck does not dispute), Google could not use any Flo App Data for

16 advertising-related machine learning. *Supra* Section II.A; Hur Decl., Ex. 9 at GOOG-FLO-

17 00064261–62 ███████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████████

19 (emphasis added); Lam Decl. ¶ 6.

20     *Second*, although Google's decision to label the Flo App "Sensitive" prevented Google

21 from personalizing ads based on Flo App Data, Flo also proactively chose to use the NPA feature.

22 The Flo App used the NPA feature to exclude 228 app events from use in personalized advertising,

23 including   custom   app   events   like   R_SELECT__LAST_PERIOD_DATE,

24 R_SELECT_PERIOD_LENGTH,   R_PREGNANCY_WEEK_CHOSEN_UNKNOWN,   and

25 R_PREGNANCY_METHOD.[7] Hur Decl., Ex. 2 (Google ROG Resp.) at 22 and Ex. D attached

26

27 _____

   [6] ████████████████████████████████████████████████████████████
   █████████████████████████████████████████ ur, Decl. Ex. 1 (Golbeck Report) at 22:20-21.

28    Google did not use any Flo App Data, including custom app events that were not marked "NPA,"
   for any advertising purpose, including personalized advertising or machine learning, because the

thereto. Dr. Golbeck's failure to address the Flo App's use of the NPA feature in her Report again illustrates that her Conclusion lacks any factual basis and cannot be admitted. *See id.* Ex. 1 (Golbeck Report) at 37. Dr. Golbeck simply ignored Google's interrogatory responses when she concluded that "I have not seen any documents or testimony that would lead me to believe Flo self-selected into this [NPA] category, and therefore have assumed the default status (of not using the NPA flag) was employed." *Id.* at 37:8–10. Even though she had cited Google's interrogatory responses in her report, Dr. Golbeck acknowledged her failure to consider them when opining that Flo did not use the NPA feature. *Id.* Ex. 5 at 212:9–21 ("Q: You talk about the NPA system on page 37 of your report, right? A: I do. Q: And you failed to mention that Flo marked 228 events NPA, right? [objection] A: I did not mention that they marked 228 events as NPA. Q: And instead, you said you've seen nothing to lead you to believe that Flo self-selected into the NPA category, right? A: Correct.").

Dr. Golbeck opines that "regardless of whether the NPA flag was employed by Flo, this flag merely restricted 'personalized' advertising, and would not limit Google's ability to use the data for other purposes, including within its machine learning systems." Hur Decl., Ex. 1 (Golbeck Report) at 37:10–12. When asked for the basis of her opinion, she pointed to footnotes 136 and 137 in her Report, which discuss only GA4F functionality generally, and are not specific to the Flo App or machine learning. *See* Hur Decl., Ex. 5 (Golbeck Dep. Tr.) at 214:1–11; 215:23–25 (citing Hur Decl., Ex. 8 (GOOG-FLO-00088952) (product requirements document for the development of the NPA feature, but no discussion of the Flo App or machine learning); *id.* Ex. 10 (Ganem 30(b)(1) Dep. Tr.) at 44:6–17 (testifying about a potential model that was never developed, but no mention of the Flo App or machine learning)). The product requirements document for the NPA feature clearly shows that the NPA flag prevents the developer and Google's use of the flagged data in personalized advertising. *See* Hur Decl., Ex. 8 at GOOG-FLO-00088952 ███████████████████████████████████████████████████

████████████████████████████████ In addition, the documents that Dr. Golbeck cites do not even mention machine learning, much less support her conclusion that the NPA flag (which Flo

---

Flo App was classified as "sensitive" in the Google Ads system. *See* Lam Decl. ¶ 6; *infra* Section IV.B.2.

employed) would not have prevented Google from using Flo's custom app events for advertising-related machine learning. *See generally id.* Exs. 9–10 (GOOG-FLO-00088952–958; Ganem 30(b)(1) Dep. Tr.).

During her deposition, Dr. Golbeck was unable to point to any Flo-specific documents to support her Conclusion, but merely said that, because she did not see a document that specifically stated the converse, she assumed her Conclusion was true:

> **Q:** Have you cited a document that suggests that the NPA flag would not limit Google's ability to use the data for other purposes, including within its machine learning systems?
>
> **A:** I think those citations in [footnotes] 136 [GOOG-FLO-00088952] and 137 [GOOG-FLO-00088952; Ganem 30(b)(1) Dep. Tr. at 44:6-17] document that the NPA restriction is a narrow one that restricts the data from being used in personalization. They make no arguments about the data being restricted for the other machine learning purposes that I document in section B. . . .
>
> **Q:** It's your opinion that the absence of reference to other purposes, including within its machine learning systems, is evidence that the NPA flag does not, in fact, restrict those uses. Is that fair?
>
> **A**: I think so. . . . .
>
> **Q**: On what do you base your opinion that the personalized advertising is a narrow restriction?
>
> **A:** I sort of mean it linguistically, right? They could say if you flag as NPA, it won't be used for advertising ***or anywhere in our systems***. . . . So this personalized advertising purposes is linguistically quite narrow compared to a lot of other ways that we've seen data use described by Google.

Hur Decl., Ex. 5 (Golbeck Dep. Tr.) at 215:19–218:4 (emphasis added).

*Third*, Dr. Golbeck's Report entirely fails to address the "data sharing with Google" setting. *See generally* Hur Decl., Ex. 1 (Golbeck Report). As discussed in Google's interrogatory responses, because the Flo App did not enable "data sharing with Google," Google did not use Flo App Data for product development, research, diagnostics, or to improve Google's own products. Hur Decl., Ex. 2 (Google ROG Resp.) at 23.

*Finally*, the record shows that Flo linked only one of its GA4F properties to one of its Google Ads accounts, meaning that only one Google Ads account (Account 355-062-3707) could have had access to any Flo App Data. *See id.* at 21. However, Dr. Golbeck repeatedly relies upon irrelevant documents that pertain only to *non-linked* Flo Ads accounts. Non-linked Flo Ads accounts, such as Flo Ads account 807-232-5127, would have been unable to access the Flo App

1   Data at issue in this case, which only emphasizes the unreliability of her Conclusion. *See id.* Ex. 5

2   (Golbeck Dep. Tr.) at 198:8–199:12 ("Q: This document does not say that account 807-232-5127

3   was linked with Flo's GA4F SDK account, correct? A: I think that's right, not explicitly. . . . Q:

4   Based upon what you're seeing on page 77, fair to say that it does not discuss account number

5   807-232-5127 being linked to Flo's GA4F SDK account? A: That's right."); 204:11–14 ("Q: Does

6   Exhibit 515 explain that Flo linked its GA4F SDK account with Google Ads account 807-232-

7   5127? A: It does not.").

8          3.      <u>Dr. Golbeck's Conclusion Ignores Clear Record Evidence Showing that</u>
               <u>Google Did Not Use Flo App Data for Any Advertising Purpose</u>
9

10         Dr. Golbeck's Conclusion also ignores facts in the record showing that Google did not

11  process Flo App Data for any purpose other than to provide the Flo App with analytics.

12  Specifically, Google's interrogatory responses state:

13              ***Google did not use Flo App Data for any purpose other than to provide the***
                ***Flo App with analytics services. Google did not use Flo App Data for***
14              ***advertising, including ads targeting or ads modeling***. Additionally, based on
                Google's investigation to date, Google did not use Flo App Data for product
15              development, research, diagnostics, or to improve Google's own products,
                because the Flo App never enabled the relevant feature ("Data Sharing with
16              Google") in GA for Firebase that would have allowed Google to use Flo App
                Data for those purposes.
17

18  Hur Decl., Ex. 2 (Google ROG Resp.) at 22–23 (emphasis added).

19         The only rationales Dr. Golbeck provides for disregarding Google's sworn interrogatory

20  responses are (1) Google's interrogatory responses do not specifically address the machine

21  learning she alleges Google conducted; and (2) Flo was a Google Ads customer and generally used

22  Google Ads to advertise. Both rationales are flawed.

23              a.      **Google's Interrogatory Responses Specifically Address**
                        **Advertising-Related Machine Learning**
24

25         Dr. Golbeck is incorrect that Google's interrogatory responses do not address the

26  Conclusion she reaches in her Report regarding advertising-related machine learning. In fact,

27  Google's interrogatory responses ***specifically address*** advertising-related machine learning:

28  "Google did not use Flo App Data for advertising, including ads targeting or ***ads modeling***." *Id.* at

22–23 (emphasis added). During her deposition, when confronted with Google's interrogatory

responses, Dr. Golbeck attempted to obfuscate the issue by claiming that because Google did not use the specific phrase "machine learning" in its interrogatory responses, Google did not specifically address machine learning. Hur Decl., Ex. 5 (Golbeck Dep. Tr.) at 176:5–179:10 ("[the interrogatory responses] didn't say it wasn't used in any machine learning system anywhere.").

To begin with, if Google's interrogatory responses do not specifically use the term "machine learning," that is entirely due to the fact that the term "machine learning" is merely an eleventh-hour theory that Plaintiffs fabricated long after the close of fact discovery in this matter. The term "machine learning" is not used anywhere in the Complaint, nor in any discovery response Plaintiffs served on Google during the pendency of this case. Even putting aside Plaintiffs' efforts at sandbagging (which should not be rewarded), it would be absurd to require Google to list every possible purpose for which Flo App Data was *not* used. Regardless, the two terms mean the same thing: Dr. Golbeck's own definition of "machine learning" is the same as what Google's interrogatory response refers to as "ads modeling." Dr. Golbeck's Report describes machine learning as "processes whereby computers are provided data and a goal, and computer operations generate a predictive *model*." Hur Decl., Ex. 1 (Golbeck Report) at 2:8–9 (emphasis added); *id.* at 6. Google's documents similarly describe advertising-related machine learning as modeling. *See, e.g.*, Hur. Decl., Ex. 9 at GOOG-FLO-00064256. Even under Dr. Golbeck's own definition, machine learning is the creation of models, and advertising-related machine learning (the only type of machine learning Dr. Golbeck alleges Google conducted using Flo App Data) is the same as ads modeling. In any event, to address Dr. Golbeck's semantic obfuscation, Google has provided a declaration from Kevin Lam explaining that "Flo App Data was not made available to, or used in, any of Google's machine learning systems, including those that are used for advertising." Lam Decl. ¶ 6.

The record shows that "the only thing that Google did with the app events from Flo was to use them to show analytic data back to Flo about what users did within the Flo App," which does "not constitute use of the machine learning algorithms." Hur Decl., Ex. 2 (Google ROG Resp.) at 22:23–24; *id.*, Ex. 5 (Golbeck Dep. Tr.) at 188:3–9 (Dr. Golbeck admitting that "If the only thing that Google did with the app events from Flo was to use them to show analytic data back to Flo

about what users did within the Flo App . . . that alone would not constitute use of the machine learning algorithms."). Even according to Dr. Golbeck's own understanding, Google did not use Flo App Data for advertising-related machine learning.

### b. No Flo App Data Was Used for Any Advertising-Related Purpose

The record is clear that neither Flo, nor Google, used Flo App Data to serve ads. In fact, Dr. Golbeck never opines that *Flo App Data* specifically was used to serve advertisements:

> **Q:** - - are you rendering any opinion that Flo app data was used to serve advertisements?
> **A:** I am not.
> **Q:** . . . . Okay. So you're actually not opining that Flo app data was used for remarketing purposes; is that right?
> **A:** That's correct.

Hur Decl., Ex. 5 (Golbeck Dep. Tr.) at 219:18–220:1; *see also id.* at 229:5–9 ("Q: Having reviewed these documents, can you now conclude that you're not offering an opinion that Flo app event data was used for remarketing data? A: Yes."); 225:8–11 ("Q: Is it your opinion that Flo app event data was used for . . . remarketing purposes? A: I don't think I'm offering any opinions on that in here."). Indeed, Dr. Golbeck admits that Flo App Data could have been given no weight in the machine learning systems she describes in her Report:

> **Q:** And what I'm trying to understand is, are there any other uses besides making data available that you are opining, you know, Google engaged in? [objection] . . .
>
> **A:** Okay. So I'll give a high-level answer, and then we can drill down if - - if that's not answering what you want. I talk a lot about after that data is made available to the machine learning algorithms, what are the possible ways that it then works its way through the Google system. But I'm not offering opinions on - - on how that happened or - - or if it was even weighted in a way that it impacted the algorithmic results. . . . ***Theoretically, that could have been given no weight. I don't know.***

*Id.* at 169:17–170:22 (emphasis added).

In addition, Dr. Golbeck also admitted that she did not see anything in the record indicating that the audience lists that contained Flo App Data were ever used for advertising.

> **Q:** And then the [interrogatory] response concludes (as read): "Based on Google's investigation to date, none of the audience lists present in projects 'flo-smart-period-tracker' or project 'flo-health' were ever used in advertising." Do you see that?
> **A:** It - - it says "for advertising," but yes, I see that.

GOOGLE'S MOTION TO STRIKE OPINION OF EXPERT JENNIFER GOLBECK
Case No.  3:21-CV-00757-JD

**Q:** Have you seen anything in the record that contradicts that assertion?
**A:** Not that I can remember.

*Id.* at 206:11–23.[8]

    *Finally*, as explained in Google's interrogatory responses and testimony of Google witnesses, Google determined that no Flo App Data was used for any advertising purpose; Google processed Flo App Data only to provide Flo with analytics. Hur Decl., Ex. 2 (Google ROG Resp.) at 22–23; *id.* Ex. 3 (Lam Dep. Tr.) at 94:11–95:11; 96:22–97:11; Lam Decl. ¶ 6. Dr. Golbeck's unsupported assertion should be excluded.

        4.   <u>Dr. Golbeck Fails to Analyze the Machine Learning Systems that Are the Subject of Her Conclusion</u>

    Though Dr. Golbeck's Conclusion centers around what she calls "Google's machine learning systems," she also fails to analyze the particular machine learning systems she is referring to in her Conclusion, and does not discuss how the systems work or how they allegedly use the Flo App Data. Aside from generally referring to "machine learning technology," and explaining that machine learning technology requires data, Dr. Golbeck does not give further specifics or explain the process by which the machine learning systems are provided with GA4F data. *See* Hur Decl., Ex. 1 (Golbeck Report) at 31–32. She fails to address what particular GA4F data is provided to the systems (e.g., standard app events or custom app events), whether there are any filters in place, or whether any apps are excluded from this process. *See generally id.* Dr. Golbeck does not explain what happens to the data once it reaches the machine learning system and the purposes for which the data could be used, only opining generally that the systems are used for "advertising." *See id.* at 31. Her Conclusion thus does not rest on "sufficient facts or data" and should therefore be excluded. Fed. R. Evid. 702(b).

**V.    CONCLUSION**

    For the foregoing reasons, the Court should grant Google's Motion to Strike the Opinion of Plaintiffs' Expert Jennifer Golbeck.

---

[8] The Flo App was a Google Ads customer. Google has confirmed that (1) only one Flo GA4F account was linked to one Flo Google Ads account; and (2) none of the audience lists that contained Flo App Data in that linked GA4F account were ever used to serve ads. Hur Decl., Ex. 2 (Google ROG Resp.) at 22. Any advertising that Flo may have conducted using non-Flo-App Data (i.e., data aside from the data Flo sent to GA4F) is outside the scope of this case.

Dated: September 29, 2023

**WILLKIE FARR & GALLAGHER LLP**

By: */s/ Benedict Y. Hur*
    Benedict Y. Hur
    Simona Agnolucci
    Eduardo E. Santacana
    Tiffany Lin
    Yuhan Alice Chi

    *Counsel for Defendant*
    *Google LLC*