**Pages 1 - 39**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge Presiding

ERICA FRASCO, individually and )
on behalf of all others        )
similarly situated; et al.,    )
                               )
          Plaintiffs,          )
                               )
  VS.                          )        **NO. 3:21-cv-00757 JD**
                               )
FLO HEALTH, INC., a Delaware   )
corporation; et al.,           )
                               )
          Defendants.          )
_____)

San Francisco, California
Thursday, February 22, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    LOWEY DANNENBERG, PC
                    44 South Broadway - Suite 1100
                    White Plains, New York  10601
                BY: **CHRISTIAN LEVIS, ATTORNEY AT LAW**
                    **AMANDA G. FIORILLA, ATTORNEY AT LAW**

                    SPECTOR, ROSEMAN & KODROFF, P.C.
                    2001 Market Street - Suite 3420
                    Philadelphia, Pennsylvania  19103
                BY: **DIANA J. ZINSER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Kelly Shainline, CSR No. 3321, RPR, CRR
              Official Stenographic Reporter

**APPEARANCES**:   (CONTINUED)

For Plaintiffs:
                             LABATON KELLER SUCHAROW LLP
                             140 Broadway
                             New York, New York 10005
                    BY:   **CAROL C. VILLEGAS, ATTORNEY AT LAW**

For Defendant Meta:
                             GIBSON, DUNN & CRUTCHER LLP
                             333 South Grand Avenue
                             Los Angeles, California  90071
                    BY:   **CHRISTOPHER CHORBA, ATTORNEY AT LAW**
                          **LAUREN M. BLAS, ATTORNEY AT LAW**

                             GIBSON, DUNN & CRUTCHER LLP
                             One Embarcadero Center - Suite 2600
                             San Francisco, California  94111
                    BY:   **ABIGAIL A. BARRERA, ATTORNEY AT LAW**
                          **VIOLA LI, ATTORNEY AT LAW**

For Defendant Flo Health, Inc.:
                             DECHERT LLP
                             One International Place
                             100 Oliver Street
                             Boston, Massachusetts  02210
                    BY:   **BRENDA R. SHARTON, ATTORNEY AT LAW**

                             DECHERT LLP
                             U.S. Bank Tower
                             633 West 5th Street - Suite 4900
                             Los Angeles, California  90071
                    BY:   **BENJAMIN SADUN, ATTORNEY AT LAW**

For Defendant Google LLC:
                             WILKE FARR & GALLAGHER LLP
                             333 Bush Street
                             San Francisco, California  94104
                    BY:   **BENEDICT Y. HUR, ATTORNEY AT LAW**
                          **SIMONA A. AGNOLUCCI, ATTORNEY AT LAW**
                          **TIFFANY M. LIN, ATTORNEY AT LAW**
                          **VIOLA LI, ATTORNEY AT LAW**

                             HUNTON ANDREWS KURTH LLP
                             550 South Hope Street - Suite 2000
                             Los Angeles, California  90071
                    BY:   **ANN MARIE MORTIMER, ATTORNEY AT LAW**

Also Present:           **Nikki Stitt Sokol, Meta**

**Thursday - February 22, 2024**                                    **10:41 a.m.**

**P R O C E E D I N G S**

**---000---**

THE CLERK:  Calling Civil 21-757, Frasco vs. Flo Health, Inc.

Counsel, you're going to need to use the microphones at the podiums.

THE COURT:  All right.  Go ahead.  Plaintiffs.

THE CLERK:  You need to state your appearances for the record.

MR. LEVIS:  Good morning.  Christian Levis, Lowey Dannenberg, for the plaintiffs.

MS. ZINSER:  Good morning, Your Honor.  Diana Zinser for the plaintiffs.

MS. VILLEGAS:  Good morning, Your Honor.  Carol Villegas for the plaintiffs.

MS. FIORILLA:  Good morning, Your Honor.  Amanda Fiorilla on behalf of the plaintiffs.

MR. CHORBA:  Good morning, Your Honor.  Chris Chorba and with me I have Lauren Blas, Abbey Barrera, Viola Li, and my client Nikki Sokol on behalf of Meta.

MS. SHARTON:  Good morning, Your Honor.  Brenda Sharton on behalf of Flo Health from Dechert, and with me is my colleague Benjamin Sadun.

MS. MORTIMER:  Good morning, Your Honor.  Ann Marie

Mortimer on behalf of Flurry.

**MR. HUR:**  Good morning, Your Honor.  Ben Hur, Simona Agnolucci, and Tiffany Lin from Wilke Farr & Gallagher on behalf of Google.

**THE COURT:**  Well, I keep hoping you're going to turn the corner in this case and it doesn't happen.

How could there be seven -- who's going to talk for the defendants?  How can you-all possibly have seven experts in this case?  I'm just baffled.  You-all are litigating this case like it's World War III and it's just not, it just really is not.  So why are there seven experts that I have to look at in this case?

**MR. LEVIS:**  There's not seven experts from us.  I think it's just collectively there's multiple parties and they have different experts.

**THE COURT:**  I'm talking about collectively.

**MR. LEVIS:**  Yeah.

**THE COURT:**  I've got someone named Golbeck, Zervas, Miller, Maither, Karkanias, Sorini, Chiou and Hitt.

**MR. LEVIS:**  Golbeck is --

**THE COURT:**  I don't understand how this is even remotely possible, and I'm talking to all of you now.  I'm looking at this fellow, but I'm talking to all of you.  I have had massive multidistrict litigation cases with two experts on each side.  How does this case possibly call for seven experts?

**MR. LEVIS:**  I'm not sure.  Golbeck is ours.  The rest are the defendants.  I just understand that they independently chose their own experts, but I don't have comment on that.

**THE COURT:**  These are all defendants' experts?

**MR. LEVIS:**  Except for Golbeck, that's right.

**THE COURT:**  How is this possible?

**MR. CHORBA:**  Your Honor, I believe they have more than Professor Golbeck.  There's at least three that are before you on this particular motion.

**THE COURT:**  Your colleague just said they have one expert on the plaintiffs' side.

**MR. LEVIS:**  On that list.  There's two other experts that we have.

**THE COURT:**  There are two experts that are not on this list?

**MR. LEVIS:**  Yeah, I think so.

**THE COURT:**  So there are nine experts?

**MR. LEVIS:**  That would be right.

**THE COURT:**  That's just not going to happen.  You-all are out of control.  You've been out of control from day one.  You've been woodshedded with the discovery conferences that I only do in the most egregious cases.  This thing has just dribbled and drabbled on.  I have been bombarded with an endless series of nitpicky discovery letters.  It's just been a train wreck.  It's not going to happen.  Okay?

You each get two experts per side.  That's it.

**MR. LEVIS:**  Okay.

**THE COURT:**  Pick your best two.  I don't know what they're going to be on, but that's it.  You get two experts per side.  All right?

**MR. LEVIS:**  All right.

**THE COURT:**  So you're going to redo all of this with those two experts, and that is the only -- those are the only four people I will look at.  Four 702 motions is already three too many, but I will do it.

**MR. LEVIS:**  Understood.

**MR. CHORBA:**  Your Honor, there's just -- we've heard you loud and clear.  There was one issue that I do want to flag that's somewhat unique about this case, and that they've named competitors and there's competitively sensitive information. So one of the reasons why --

**THE COURT:**  You know what?  I'm not doing it.  I'm not having two, three, four, five experts all say the same thing because Meta and Google are living in fear of betraying their trade secrets.  That's just not going to happen.  All right? That's ludicrous.  I'm sorry to say, that is absolutely ludicrous.  You can make this work.

**MR. CHORBA:**  We hear you, Your Honor.

**THE COURT:**  This is not a patent case where bet-the-company technology is an issue.  It's not.  A lot of it

is off-the-shelf SDK kits; right?

**MR. LEVIS:**  That's right.

**THE COURT:**  There's nothing about SDK kits off the shelf that are going to imperil the commercial future of Meta, Google, or any other defendants.

You need to work this out.  So I'm blanking this slate and you're going to redo all of this.  All right?

Now, you're going to have to redo summary judgment and everything else too, but we're not going to do this.  This is an absolutely abusive litigation in terms of resources, not to mention -- you know, what you bill your clients is between you and them, but what you ask me to do is between you and me. This is an absurd overkill approach to this case.  This case is not that difficult.  Conceptually or factually it's not that difficult.  You know this.

Your colleague is nodding his head yes.  You should know this too.  What's your name?

**MR. LEVIS:**  Christian Levis.  I'm not disagreeing with you.

**THE COURT:**  Yeah, you should know that too.

Now, you're going to redo all of this.

Now, while you're here, I have two more discovery disputes.  Now, what's going on with those?  Docket Number 353 and 362.

**MR. LEVIS:**  One was related to source code.

**THE COURT:** To who?

**MR. LEVIS:** The source code that Flo provided to its expert but would not produce to us, and we asked that whatever they provided to their expert be provided to us.

**THE COURT:** Why do you need their source code?

**MR. LEVIS:** Because their expert relied on it in his report, and we did not know what he relied on. We've no way to question it or challenge it.

**THE COURT:** All right. Who's going to --

**MR. SADUN:** Yes, Your Honor.

**THE COURT:** You are? You have to make your appearance again.

**MR. SADUN:** Benjamin Sadun for Flo Health.

**THE COURT:** Okay. What's with the source code? Did you use the source code? You can't do sword and shield.

**MR. SADUN:** We gave them the source code, Your Honor. They have it so there's nothing they seek. Their expert said they were able to extract source code from the files that we provided. We gave them 12 zip files, and so the only difference is they're saying "They're not decompressed for us," yet their own expert said, "We have the source code and can look at it."

On top of which, that was a negotiated agreement. The parties specifically agreed, and I can quote the agreement that's memorialized in writing, but --

**THE COURT:** You're shooting at me with a machine gun. Just slow down.

You're saying you have provided the source code to Mr. Levis?

**MR. SADUN:** We provided APKs and binaries, which are zip files that contain the source code, yes, Your Honor.

**THE COURT:** All right.

**MR. LEVIS:** Yeah, just -- so there's a --

**THE COURT:** Your colleague says you haven't.

**MR. LEVIS:** Yeah, we don't. So just to make clear, there's -- they gave us the file that you would download from the app store for six versions of the app. Their expert --

**THE COURT:** When you say "the file," you mean the source code?

**MR. LEVIS:** No, no. I mean when you go -- if you go to the app store, Google Play Store, Apple App Store, you can install an app on your phone. They gave us the file.

**THE COURT:** You will not believe how much I know about the Google Play Store.

**MR. LEVIS:** I know you do.

So they gave us --

**THE COURT:** All right. Just go ahead. Yeah, so -- all right.

**MR. LEVIS:** They gave us what you download. What they gave their expert was the actual access to all of their source

code.

**THE COURT:**  For the app?

**MR. LEVIS:**  For the app.  Which all we asked them to give us is what they let their expert review so that we could challenge whatever statements he made, but they did not give it to us.

**THE COURT:**  I'm still not understanding.  I'm sorry, is it Mr. Sadun?

**MR. SADUN:**  Yes, Your Honor.

**THE COURT:**  Did you give him the source code?

**MR. SADUN:**  We gave them the files as part of an agreement.  The parties specifically negotiated whether or not source code --

**THE COURT:**  I want you to stop and use my words.

**MR. SADUN:**  Yes, Your Honor.

**THE COURT:**  You keep substituting "file."  I'm not asking that.  Did you give the plaintiffs the source code?

**MR. SADUN:**  Yes, in the form of APKs and binaries.

**MR. LEVIS:**  Yeah, it's not --

**THE COURT:**  What do you want me to do?  I'm not a computer engineer.  I can't help you.  Okay?

**MR. LEVIS:**  All we would like is the --

**THE COURT:**  This is emblematic of the ridiculousness this case has brought to the Court from day one.  You-all can't even agree on whether you handed the other side an orange or

not.

He said he gave you a crate of oranges.  You say you've never seen an orange in your life.

**MR. LEVIS:**  No, no.  That's not true.

**THE COURT:**  What am I supposed to do?

**MR. LEVIS:**  All we wanted is whatever -- in expert discovery, whatever information you turn over to your expert, you should produce to us.  They gave their expert different things than what they gave to us.

**THE COURT:**  They don't have to produce everything.  The expert can look at things; but if it's not in the expert report or otherwise relied on, you don't get it.

**MR. LEVIS:**  And it is relied on, and that was the issue.  He relied on the full source code that they let him inspect.  They did not let us look at the same source code.  That's the issue.

**THE COURT:**  Which one of this multitude of experts is it?

**MR. SADUN:**  It's Drs. Eagleman and Karkanias.  Eagleman for plaintiffs; Karkanias for Flo.  And their expert has screenshots of Flo's source code in his expert report.  So it's laughable for them now to claim they don't have access to what they included.

**THE COURT:**  Counsel, you need to slow down and not use words like "laughable."  You are not in a situation --

**MR. SADUN:**  Yes, Your Honor.

**THE COURT:**  -- to throw terms like that around. You're not reading the room.

**MR. SADUN:**  Of course.

**THE COURT:**  Meaning me.

**MR. SADUN:**  I understand.

**THE COURT:**  You don't seem to understand or you wouldn't use the word "laughable."  So dial it back and talk to me like a rational, responsible professional.

**MR. SADUN:**  Absolutely.

Your Honor, their expert's report contains source code screenshots.  Their expert's methodology was to download APKs and binaries from the Internet and examine the source code.  We provided exactly that.

And on top of which the parties reached an agreement --

**THE COURT:**  How do you propose I work this out?

**MR. SADUN:**  Their expert was satisfied with these materials.  I suppose you can make an order --

**THE COURT:**  That's not the question.

**MR. SADUN:**  -- so they can get these materials.

**THE COURT:**  Stop.  Stop.  Look at me.  Listen.  Pause and answer my question.  How do you propose I work this out?

**MR. SADUN:**  You should deny their motion.

**THE COURT:**  That's absurd.

How do you propose I work this out?

**MR. LEVIS:**  Let us inspect the same thing their expert inspected, limited to that.  Whatever he looked at, we can look at and we can respond to it.  That's it.

**THE COURT:**  Who's "we"?  Who's going to do it?

**MR. LEVIS:**  Our expert.  I don't -- I'm not going to be doing the inspection.

**THE COURT:**  What are you proposing?

**MR. LEVIS:**  Our expert inspect the same source code their expert inspected.  That's it.

**THE COURT:**  Well, no, not the same source code.  You want your expert to see whatever his client provided to the --

**MR. LEVIS:**  To their expert.  Yeah, whatever their expert relied on in the report is what we want.

**THE COURT:**  It's typically an appendix in the report.

**MR. LEVIS:**  That's correct.  That is not in there.  The expert mentions and relies on the source code, but it's not -- it is stated as something he relies on, but they obviously don't attach the source code to the report.  We don't know specifically --

**THE COURT:**  He didn't identify it in the list of things considered?

**MR. LEVIS:**  Right.  There's not like a list of files that were relied on that we could say "Give us these 10 files."

**THE COURT:**  There's not?

**MR. LEVIS:**  No.

**MR. SADUN:**  Your Honor, that's not correct.  If I may be heard.

**THE COURT:**  Okay.

**MR. SADUN:**  On page 1 of Karkanias' report, he specifically discloses that he reviewed the source code.  And plaintiffs waited five months after his report, three months after the close of expert discovery, after all the depositions, to seek these materials.

And in between then and that period, they specifically agreed, I'm going to read two sentences to Your Honor (as read):

"Plaintiffs will not seek the inspection or production of the Flo source code.  This applies to not only now but moving forward."

And in exchange we gave them the zip files, the same zip files they're now claiming are inadequate.  We reached an agreement, we reached a compromise, and now they want more.

**MR. LEVIS:**  I would only like to say that the agreement that he's talking about was negotiated in response to a discovery request where we sought inspection of the source code.  They objected saying it was too burdensome and difficult.  We said, "Okay.  Give us some files."  They then went ahead and --

**THE COURT:**  All right.  Well, then let's just -- what's the other discovery -- is there another discovery

dispute?

**MR. LEVIS:**  I don't know actually.

**THE COURT:**  Is it just this?  This is the last one?

**MR. LEVIS:**  Is there another discovery dispute?

**MR. SADUN:**  There's just the issue of expert reports.  That's seemingly mooted now.

**THE COURT:**  All right.

**MR. LEVIS:**  Oh, yeah.  That's --

**THE COURT:**  There's another one?

**MR. LEVIS:**  No, no, no.  I don't think so.

**THE COURT:**  All right.  It is this.

All right.  Okay.  Well --

**MR. HUR:**  Your Honor, may I be heard briefly?

**THE COURT:**  Sure.

**MR. HUR:**  Your Honor, Ben Hur for Google.

I would just like to note, Your Honor, that Google's motion for summary judgment does not depend on any expert testimony.  Google's motion is based on the fact that it did not use this data for any of its own purposes.  Plaintiffs did not --

**THE COURT:**  You're expert free?  Not a mention of an expert in Google's summary judgment motion?

**MR. HUR:**  Your Honor, we did mention it because we were worried that the plaintiffs were going to rely on an expert to say that Google used the information.

**THE COURT:**  Did they?

**MR. HUR:**  They chose not to --

**THE COURT:**  They didn't?

**MR. HUR:**  -- so we withdrew the motion.

**THE COURT:**  Do you agree with that?

**MR. LEVIS:**  That's right.  We argued based on Google's documents and there actual --

**THE COURT:**  So that one is completely free of any experts.

**MR. LEVIS:**  We're not relying on an expert, either of us.

**THE COURT:**  Okay.  Maybe I'll take that one.

**MR. HUR:**  May I argue that then, Your Honor?

**THE COURT:**  No, but I'll look at it.

**MR. HUR:**  You'll look at it.

**THE COURT:**  I don't need any argument.  You're going to live or die what's in the papers, so I don't need someone to regurgitate them.

So all right.  I'm taking your word for it, Mr. Hur, there's zero expert material implicated in your motion.

**MR. HUR:**  Your Honor, there's no expert material implicated in the motion.

**THE COURT:**  In other words, the motion can be decided without looking at a line of any expert report?

**MR. HUR:**  Your Honor, they do cite their expert

reports.  They do cite one expert report, but I can explain to you why it isn't relevant and they're not disputing a fact.

THE COURT:  You're agreeing, though, that I don't need to look at any expert reports; right?

MR. LEVIS:  I agree with you, and we -- I think we might have mentioned it somewhere, but we actually stipulated --

THE COURT:  That's fine.

MR. LEVIS:  -- we stipulated with them --

THE COURT:  Here's what I'm going to do.

MR. LEVIS:  -- to withdraw the motion.

THE COURT:  With the agreement on both of your representations, which I'm going to bank on, I'm going hold you to them, I will look at the summary judgment motion.  I will not look at any expert materials because you both have assured me I can resolve the motion without looking at them.

All right, Mr. Levis?

MR. LEVIS:  Yeah.  Okay.

THE COURT:  Mr. Hur?

MR. HUR:  Thank you, Your Honor.

THE COURT:  Okay.  Have you talked with Google about -- have you-all talked about a resolution?  Just Google to plaintiffs?

MR. LEVIS:  No, other than I think maybe we -- initially when there was a conference early on with Judge

Hixson where I think we met preliminarily, we decided early in the case that we needed to do some work. We haven't spoken since then.

**THE COURT:** How long ago was that?

**MR. LEVIS:** Several months ago. I don't know -- I don't remember exactly.

**THE COURT:** Several months? Not --

**MR. LEVIS:** It was probably a year ago.

**THE COURT:** How long?

**MR. LEVIS:** Probably a year ago.

**THE COURT:** A year ago? All right. You need to call Judge Hixson and get back on his calendar. Do that today. Okay?

**MR. LEVIS:** Okay.

**THE COURT:** You call him and you get something set up.

I am fine doing it individually. Okay? Google, I'm getting the sense you think you're kind of off on your own; and if you are, just have a separate meeting with Judge Hixson and the plaintiffs. All right?

You don't need -- I think this traveling in a pack has become an incredible impediment to the efficiency and fair administration of justice. So carve yourself off if you think -- you know, if you think you have a killer factual defense, you have a conversation with Mr. Hur and Judge Hixson separately. How about that?

**MR. HUR:**  Understood, Your Honor.  We'll do.

**THE COURT:**  You make it work.  Don't get hung up on -- you know, you're not -- there's no yolk tying you all together, okay?  So make that happen.

Okay.  Now, what do you want to do about the experts?  Just tell me how many you think you really need and tell me what they're going to say.

**MR. LEVIS:**  For -- I took Your Honor before to say there's two for each side.

**THE COURT:**  Yeah.  Well, I know that, but the heat of the moment is over.  Now you can talk me out of it.  So give me -- this is your chance; and after that, I'm going to go back to two.

**MR. LEVIS:**  No, I'm fine with two actually.  I mean, I think there are two --

**THE COURT:**  Just tell me what they're going to be.  Just roughly.  The subject matter.

**MR. LEVIS:**  Yeah, yeah.  There is one expert that is going to talk about the mechanics of the SDKs and the transmission of information from the front end.  So in terms of --

**THE COURT:**  All right.  So it's how SDKs transmit -- collect and transmit data, something like that?

**MR. LEVIS:**  Right.  So the way the case works is we have information being sent from the Flo app to the advertising

defendant servers.

**THE COURT:**  Yep.

**MR. LEVIS:**  There's an expert about front end getting the data to the servers.  The back end --

**THE COURT:**  Why is that an expert issue, though?  I mean, that's --

**MR. LEVIS:**  Because there's technical aspects about, you know, how the apps work, what's being collected, showing the transmission out of the app, that it helps to have somebody.

**THE COURT:**  What's your second expert?

**MR. LEVIS:**  And then I think we would use -- there are two experts now, one dealing with the value or the sensitivity of health data and one on machine learning.  I think we would use the expert on machine learning, Jen Golbeck, who is the one --

**THE COURT:**  I don't -- you don't need an expert on the value and sensitivity of health data.

Remember what a Rule 702 expert does:  Teaches the jury something that they don't know in their ordinary experience.  Everybody knows health data is valuable and secret.  Okay?  Don't -- I'm not going to let you do -- unless you have a special twist on that, I'm not going to -- that's not expert testimony.

So who's the other one you want?

**MR. LEVIS:**  Jen Golbeck.  She's the --

**THE COURT:**  No, I know.  The subject matter.

**MR. LEVIS:**  She's the machine learning expert, and she'll talk --

**THE COURT:**  Machine learning?

**MR. LEVIS:**  Correct.  And the reason --

**THE COURT:**  Why do you need a machine learning --

**MR. LEVIS:**  Sure.  So some of the issues here relate to the incorporation and use of data into defendants' systems. And as Your Honor may remember, we were dealing with this before, we were looking for source code to try and show that, you know, physically.  And I think Your Honor rightfully said you can do that through documents, testimony, et cetera.

So we have an expert who talks about machine learning, how the systems work, to explain how incorporating data into advertising models and processes results in, let's say, you know, ads or things being shown to people, or really how this is used in terms of training models and systems so defendants benefit from the data.

**THE COURT:**  Okay.

**MR. LEVIS:**  Other than that, we're dealing with flowcharts and, you know, technical documentation about back-end systems that might be hard for a jury to understand.

**THE COURT:**  All right.  Well, those two make sense for me categorically.

All right.  Defendants?

**MR. HUR:**  Your Honor --

**THE COURT:**  Speak up.  You get two counter-experts.  What more do you need?

**MR. HUR:**  Speaking for Google and at the risk of getting -- drawing your ire, Your Honor, I do think it would be helpful --

**THE COURT:**  Mr. Hur, there is no ire in this courtroom.  There are things that go well and there are things that go badly.  There's no ire.

**MR. HUR:**  Sorry, Your Honor.

**THE COURT:**  So please be careful and may I say judicious in your word use.  Those words have no place in the courtroom in the United States.

Now, just tell me which experts you think you need.  And when I say "you," are you talking only about Google right now?

**MR. HUR:**  Yes, Your Honor.  On behalf of Google, we would like our own technical expert to deal just with Google-specific issues at least on behalf of Google.

**THE COURT:**  What is that expert -- why don't you just have a Google employee?  Okay?  I just did a giant Google antitrust case and 9/10ths of it were Google people coming in saying "Here's how this works."

Why do you need an expert?  Why can't you just have a Google engineer come in and say "I do this all day every day.

Here's how this works"?

**MR. HUR:**  Your Honor, I think we certainly can have Google employees who can speak to that.  We also --

**THE COURT:**  All right.  You need to do that.  So that -- you need to do that.  Okay?

I know Google inside and out, I can tell you, not just from that one case I did but from countless others.  You get an employee to do that.

Now, who do you need as an expert?

**MR. HUR:**  Your Honor, we believe we need an expert to rebut the points that Mr. Levis just stated.

**THE COURT:**  That's fine.  Of course.  You get two for that, but what else?  I'm talking about you.  What do you want that's not -- I just said you get two to respond.  What do you want beyond that?

**MR. HUR:**  Your Honor, I don't think we need anything beyond that to respond.

**THE COURT:**  All right.  That's good.  All right.  So Google is going to be zero.

Who's next?

**MR. CHORBA:**  Your Honor, I can just say on behalf of Meta -- Chris Chorba -- none of the experts with respect to Meta are necessary for class certification; and, in fact, that's why the motions that were recently --

**THE COURT:**  Okay.  We're not talking about that.

We're talking about trial.  Okay?  So who do you want?

**MR. CHORBA:**  Fair enough, Your Honor.  We need to rebut the experts that they intend --

**THE COURT:**  Okay.  Everybody gets two.  Now, you're going to do two collectively.  Okay?

**MR. CHORBA:**  Right.  And we've heard you loud and clear.

**THE COURT:**  Collectively.  One for everybody on the defense side.

**MR. CHORBA:**  We've heard you --

**THE COURT:**  You get those.  You don't have to worry about those.  Now, who do you want in addition to that?

**MR. CHORBA:**  Well, again, Your Honor, there's Meta-specific issues, but I've heard what you've said; that we'll have an employee take care of that so --

**THE COURT:**  Have the employees do it.  That's perfect.  All right.  Anything else?  Any other experts on the Meta side?

**MR. CHORBA:**  Your Honor, our experts were largely rebuttal experts.  They dealt with issues involving the claim of injury.  We think the actual evidence in the case rebuts this just through the lens of the named plaintiffs.  So I'd like to confer with my team as to whether or not that's necessary, but I do think that's the type of thing --

**THE COURT:**  What kind of expert would that be?

**MR. CHORBA:** Well, we could work together. Your Honor, they don't really have a damages analysis expert, but it would be a rebuttal to what you would traditionally see in a case like this about damages.

Now, they claim, well, we're seeking statutory damages, we can just --

**THE COURT:** It's CIPA, isn't it?

**MR. LEVIS:** Yeah, that's one of the claims, correct. It's a statutory damages claim.

**THE COURT:** So it's statutory.

**MR. CHORBA:** Well, Your Honor, there's still issues and factors that the Court has to consider. We cited Judge Hamilton's decision in a case involving my client from several years ago where there are factors that the Court needs to consider in assessing statutory damages.

**THE COURT:** But that's not an expert.

**MR. CHORBA:** Well --

**THE COURT:** That's you telling me "Here's what you should do, Judge."

**MR. CHORBA:** Your Honor, again, rebuttal to what their expert is claiming, that you're able to somehow do this across the entire class. Again --

**THE COURT:** Okay.

**MR. CHORBA:** We're defendants.

**THE COURT:** Step back. They only have two experts, a

machine learning person and an SDK person.  They don't have anyone who's testifying about damages.  So there is no one to rebut.

**MR. CHORBA:**  Well, Your Honor, then we would like someone who -- again, we've already submitted a report on behalf of someone, but I think we can work with the group on that person based on Your Honor's comments.

**THE COURT:**  But there's a threshold question which you need to answer and I'm not hearing it.  What is the legal -- what is the legal issue -- or what is the factual issue?  Not the legal issue.  What is the factual issue that this expert will be teaching the jury on?

**MR. CHORBA:**  Well, Your Honor --

**THE COURT:**  They're not going to be taught on the factors the judge -- the Court takes into account.  So what is it you need from this person for trial?

**MR. CHORBA:**  Your Honor, the issue surrounding subjective privacy preferences, which is a key issue for each of the claims that they have raised.  They've offered expert testimony on that issue.  Now, their expert's testimony is that you can make that sweeping determination across.  So if you reject that, then perhaps we don't need a rebuttal expert.

**THE COURT:**  I need to step in.  I have a feeling that no one's listening what's actually being said in this courtroom.

Your colleague here just said, "I'm going to use two people" -- I'm going to say this for the last time because I'm getting tired and I've got better things to do -- "machine learning, SDK kits."  He didn't say "I'm going to have someone talk about CIPA damages."  He didn't say "I'm having somebody come in and talk about the subjective value of privacy."

So I don't know what you're talking about.  Okay?

**MR. CHORBA:**  Well, Your Honor --

**THE COURT:**  There are two people who are going to testify, and they have nothing to do with anything you just said.

**MR. CHORBA:**  And, Your Honor, we want to rebut those, and we will work together either with employees or with the --

**THE COURT:**  All right.  Meta is going to be zero.

Who's next?

**MS. SHARTON:**  Your Honor, thank you.  Brenda Sharton on behalf of Flo Health.

We have economists and we have a --

**THE COURT:**  Economists?

**MS. SHARTON:**  -- a technical.  So we can put that aside for the moment, and --

**THE COURT:**  We're doing this now.  I can't keep putting stuff aside in this case because it just gets worse and worse.

**MS. SHARTON:**  Well, I meant we would be willing to --

**THE COURT:**  What do you need the economist for?

**MS. SHARTON:**  We need Karkanias because there is no one who could testify about how the Flo app works.  How the SDKs --

**THE COURT:**  An economist is going to testify about that?

**MS. SHARTON:**  No, no.  He's a technical expert, Your-Honor.  That's why I was saying we need to have Karkanias in the case.

**THE COURT:**  Please stop.

**MS. SHARTON:**  Yeah.

**THE COURT:**  Listen.  Listen.  Listen.  That's the first rule in life.  That's the cardinal rule in court.

Why do you need an economist?

**MS. SHARTON:**  I was putting them aside and saying we can live without them.

**THE COURT:**  We're not putting him aside or her aside.  Why do you need an economist?  You just said you need an economist.

**MS. SHARTON:**  I said we don't.  That's what I meant by putting them to the side.  We don't -- we can -- given what Mr. Levis has said --

**THE COURT:**  You're not putting it aside.  You're dropping it.  There's no economist.

All right.  I get it now.  The economist is out.

Who else do you need?

**MS. SHARTON:**  We need Mr. Karkanias, a technical expert, is imperative for Flo.

**THE COURT:**  What is he going to do?

**MS. SHARTON:**  He's going to talk about how the app works, how the SDK worked, how it -- what gets sent.

**THE COURT:**  Why do you need -- why don't you just have a Flo employee do that?

**MS. SHARTON:**  Because Flo, unlike -- I'm glad you asked that because Flo, unlike the other defendants, this is a bet-the-company case.  It's an extremely small company.  At the time the SDKs were put in place at the beginning of the class period, there were less than 10 people.  Most of those are not they're anymore, and it's --

**THE COURT:**  There's nobody at Flo who can say "Here's how our app works"?

**MS. SHARTON:**  No.  This is how the SDK that was put on, exactly what was transmitted from the device to the analytics companies, and then also the de-identified and aggregated data that came back.

**THE COURT:**  Well, you can have an SDK -- you-all can have an SDK expert.  You get that?  You're all going to do that.

What does Flo need?

**MS. SHARTON:**  That's what I'm talking about.  They

need that SDK expert.

**THE COURT:** All right. That's going to be the shared resource. But you said something about explaining how the Flo app works.

**MS. SHARTON:** I don't have anybody from -- the class period is 2016 to 2019 and there's precious few. The app developers that were there in the beginning are not there. I need somebody who can look back.

**THE COURT:** There's no employee at Flo who can say "For that three-year period, here's how the app worked"?

**MS. SHARTON:** Not that was there at the time. Not an engineer or a technical expert. So we're having him testify about exactly how this works.

**THE COURT:** Is it radically different after 2019? I mean, did anything change?

**MS. SHARTON:** Yes. They removed the SDKs in February of 2019.

**THE COURT:** So nobody at Flo knows anything about what happened for the relevant time period?

**MS. SHARTON:** Not a technical person or a technical expert that could describe in the way that needs to be described.

**THE COURT:** How many employees does Flo have?

**MS. SHARTON:** They have about -- they had about 100 at the time that the class period ends. I think they're up to a

few hundred now.

**THE COURT:**  I thought you said 10.

**MS. SHARTON:**  It's a very small company.

**THE COURT:**  I misheard you I guess.  I thought you said 10.  I misheard you.

**MS. SHARTON:**  In the beginning of the class period when the SDKs -- when they availed themselves of these free analytics SDKs --

**THE COURT:**  You can't find anybody who actually worked at Flo from 2016 to 2019 to deal with this?

**MS. SHARTON:**  We have people that work there but not able to explain to a jury how a technical -- how the SDKs work and what they involve and what data went where.

**THE COURT:**  I find that to be --

**MS. SHARTON:**  And there's also a language barrier.

**THE COURT:**  -- strikingly odd that nobody can explain how your company worked for an entire three-year period.

**MS. SHARTON:**  It's not the company, Your Honor.  We're talking about SDKs.

**THE COURT:**  It's your product.  No one can explain how our app worked, which is your company because that's all the public deals with, no one can explain for three years this is how the app worked?  It strikes me as unusual.

**MS. SHARTON:**  I'm sure that they could explain at a very high level how the app worked, but we're talking about the

12 custom app events at issue.  There's also --

**THE COURT:**  So you're going to hire some person to come in and say "I'm going to be the voice of Flo for 2016 to 2019"?  Is that what you want to do?

**MS. SHARTON:**  Well, on the technical side.  And also there is a language barrier as well.  So we have a technical expert.  He's already put the report in.  The work is already done, and they've gone to great expense to do that.

**THE COURT:**  How is that different from the SDK expert?

**MS. SHARTON:**  No, that would be the same.  He'd be the same.

**THE COURT:**  Well, so now I'm confused.

**MS. SHARTON:**  Well, I'm sorry.  He would testify --

**THE COURT:**  Do you need a separate expert to talk only about how the Flo app worked from 2016 to 2019?

**MS. SHARTON:**  And he would cover how SDKs were introduced into the Flo app.

**THE COURT:**  All right.

**MS. SHARTON:**  What they did from Flo's perspective versus from the analytics companies, which are a very different side of it.

**THE COURT:**  All right.  So the SDK person can do all that.

**MS. SHARTON:**  Not for Flo Health.  They wouldn't have seen the -- he's studied and, as you've talked about earlier,

he's gone through what the app --

THE COURT:  Okay.

MS. SHARTON:  -- involved technically from way back in the beginning.  So we really do need him.

THE COURT:  I'm getting lost in a web of words.  Just I think this is a yes-or-no question if you can try it.  All right?  Do you need your own Flo personal expert to talk about how the app worked from 2016 from 2019?

MS. SHARTON:  We do, yes.

THE COURT:  You do?  Okay.  All right.  I mean, they don't have -- that's probably okay.

MR. LEVIS:  It's fine.  Mr. Karkanias is the report that reviewed the source code, and I would just say --

THE COURT:  That's too much detail.

All right.  So Flo gets one person on how their product worked -- how the app worked between 2016 and 2019 because nobody at the company knows.  Okay.  That's fine.

Now, anybody else you need?  Flo is sitting down.  Does that mean there's nobody else you need?  That's it for Flo?

MS. SHARTON:  I'm listening to what you're saying and, yeah, I think --

THE COURT:  No.  The question is:  Is there anyone else you need for experts?

MS. SHARTON:  Just the two plus Karkanias.

THE COURT:  Yes, yes.  That's okay.

All right.  Good.  Okay.

**MS. MORTIMER:**  Your Honor, briefly on behalf of Flurry, similarly --

**THE COURT:**  On behalf of who?

**MS. MORTIMER:**  Flurry, Your Honor.

**THE COURT:**  Flurry, okay.

**MS. MORTIMER:**  Yes.

Flurry will not be offering analytic service at the time of the trial and, likewise, will not have an employee who's able to explain how the app operated.  That is why we offered that testimony through our expert.  We'd like to be able to --

**THE COURT:**  There's nobody at Flurry?  What time period for Flurry?  2016 to 2019?

**MS. MORTIMER:**  To 2019, Your Honor.

**THE COURT:**  Same time period as Flo.

**MS. MORTIMER:**  But they're no longer offering the analytic services, Your Honor.  So it's a small -- it was already a small company, no longer providing the service. That's why we did it through an expert testimony.

**THE COURT:**  You can't find a former employee or anybody to come in?

**MS. MORTIMER:**  Your Honor, looking forward and, again, because it's no longer offering that same analytic service, that is why we provided the expert testimony.

And I'm mindful that the Court says there will be an SDK

expert; but to explain specifically, because these are important issue for the jury how Flurry operated --

THE COURT: All right.

MS. MORTIMER: -- we'd like to preserve that expert testimony.

THE COURT: You want the same thing as Flo? You want one person to say "Here's how Flurry works" --

MS. MORTIMER: Yes, Your Honor.

THE COURT: -- "2016 to 2019"?

All right. Well, what are you going to do to rebut that? You don't need an expert, do you? You're just going to cross-examine them?

MR. LEVIS: I expect some of it might be covered by our expert who's talking about SDKs since we're going to be talking about the SDKs in the Flo app.

THE COURT: Okay. That's good.

MR. LEVIS: And I think you're right, we can probably cross-examine that person; and as long as we have the materials they relied on, we can do that effectively.

THE COURT: All right. So based on the showings today, the plaintiffs will have one expert on SDK collection transmission. I'm not tying your hands. It's just -- and two, one on machine learning.

And the defendants will collectively have one responsive expert per that defense side for each of those two.

Flo can have one expert come in and talk about how the Flo app -- that's it.  Nothing more.  Nothing duplicative.  No editorializing "And, you know, while I'm here, let me also talk about machine learning."  None of that.  One person who can talk about how Flo's app worked as relevant to this case between 2016 and 2019.

And Flurry can have one expert to talk about how the Flurry app worked -- just that only, nothing more -- between 2016 and 2019.

Okay.  Now, with that understanding, you're going to redo all this expert stuff.  Okay?  Let's clear the deck.  It's morning.  It's morning in Courtroom 11 for Flo, and we're going to rise with the new sun and we're going to put all this behind us and we're going to get this thing done.

So I'm going to blank everything except Google's motion for summary judgment, which we've already discussed is completely divorced from any expert testimony that I need to take into account.  So I'll do something with that, and everything else is going to be terminated.

**MR. LEVIS:**  Class certification?

**THE COURT:**  Well, I mean, it's all based on people I'm not going to consider now; right?

So you have nine experts.  I'm not looking at any experts who are off the table now.  I'll leave it up to you.  Just think it over.  You know that brief better than I do so --

**MR. LEVIS:** No, I do.

**THE COURT:** No, you don't have do it right now.  Just think it over.  All right?  Why don't you meet and confer with your colleagues over there on the defense side, and you-all can make a recommendation one week from now.  All right?

**MR. LEVIS:** Fine.

**THE COURT:** So if you believe that I can do the current briefing without having to look at any of these experts that are not going to be on deck, fine; but you both need to attest to that.  Okay?  If there's some ambiguity or disagreement or you can't work it out, maybe I'll have you back and we'll talk about what next step to do.

One week from today, is that enough time?

**MR. LEVIS:** That's fine.

**THE COURT:** Defendants, enough time one week from today?

**MR. CHORBA:** Plenty of time, Your Honor.  Thank you.

**THE COURT:** Okay.  Good.

Plenty of time?  Well, all right.

**MR. CHORBA:** I'm listening.

**THE COURT:** Okay.  Anything else for today?  Plaintiffs?

**MR. LEVIS:** Nothing from us.

**THE COURT:** Defendants?

**MR. CHORBA:** No.  Thank you, Your Honor.

**THE COURT:**  All right.

**MR. HUR:**  Your Honor, I'm sorry.

**THE COURT:**  Yeah, go ahead.

**MR. HUR:**  Are you going to set a schedule -- is the Court going to set a schedule for the new expert reports or shall we just work that out and come to you with a proposal?

**THE COURT:**  Just work something out.  Okay?

Did I set a trial date?

**MR. LEVIS:**  Did you set a trial date?  I don't know.

**THE COURT:**  Did I set a trial date?  I don't remember.

**MR. LEVIS:**  I don't remember, honestly.

**THE COURT:**  Did I?

**THE CLERK:**  Yes.

**THE COURT:**  I did?  Nobody knows.

**MR. HUR:**  There's a trial date, yes.

**MR. CHORBA:**  I believe it's in December, Your Honor.

**THE COURT:**  Oh, December.  Oh, okay.  We'll leave that on for now.

Oh, and you need to go see Judge Hixson.  Now, be flexible.  Everyone, both sides, need to see Judge Hixson.  If you want to have individual discussions, do it.  Okay? Don't -- you know, you're not water buffalo.  You don't have to all travel in a pack.  You can do whatever you want.  All right?

**MR. CHORBA:**  Understood.

**THE COURT:**  Okay.   Thanks very much.

(Proceedings adjourned at 11:17 a.m)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Monday, February 26, 2024

_____

Kelly Shainline, CSR No. 13476, RPR, CRR
U.S. Court Reporter