**Pages 1 - 47**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | |
|---|---|
| ERICA FRASCO, et al., individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>VS.<br><br>FLO HEALTH, INC., META PLATFORMS, INC., GOOGLE, LLC, and FLURRY, LLC,<br><br>          Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)   **NO. 3:21-CV-00757 JD**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

San Francisco, California
Thursday, May 15, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

> LOWEY DANNENBERG, P.C.
> 44 South Broadway, Suite 1100
> White Plains, New York 10601
> **BY:  CHRISTIAN LEVIS, ATTORNEY AT LAW**
> **AMANDA G. FIORILLA, ATTORNEY AT LAW**
>
>
> SPECTOR ROSEMAN & KODROFF, P.C.
> Two Commerce Square
> 2001 Market Street, Suite 3420
> Philadelphia, Pennsylvania 19103
> **BY:  DIANA J. ZINSER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
          CSR No. 7445, Official Stenographic Reporter

**APPEARANCES**:  (CONTINUED)

For Plaintiff:

LABATON KELLER SUCHAROW LLP
140 Broadway
New York, New York 10005
BY:  **JAKE BISSELL-LINSK, ATTORNEY AT LAW**

For Defendant Flo Health, Inc.:

DECHERT LLP
US Bank Tower
633 West 5th Street, Suite 4900
Los Angeles, California 90071-2032
BY:  **BENJAMIN M. SADUN, ATTORNEY AT LAW**

DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, Pennsylvania 19104-2808
BY:  **THEODORE E. YALE, ATTORNEY AT LAW**

For Defendant Meta Platforms, Inc.:

LATHAM & WATKINS
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
BY:  **ANDREW B. CLUBOK, ATTORNEY AT LAW**

LATHAM & WATKINS LLP
650 Town Center Drive, 20th Floor
Costa Mesa, California 92626
BY:  **MICHELE D. JOHNSON, ATTORNEY AT LAW**

LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, California 94111
BY:  **MELANIE M. BLUNSCHI, ATTORNEY AT LAW**

GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, California 94111-3715
BY:  **ELIZABETH K. McCLOSKEY, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES**:   (CONTINUED)

For Defendant Google, LLC:
                        WILLKIE FARR & GALLAGHER LLP
                        333 Bush Street
                        San Francisco, California 94104
              BY:  **BENEDICT Y. HUR, ATTORNEY AT LAW**
                   **TIFFANY M. LIN, ATTORNEY AT LAW**


For Defendant Flurry, LLC:
                        HUNTON ANDREWS KURTH LLP
                        550 South Hope Street, Suite 2000
                        Los Angeles, California 90071
              BY:  **ANN MARIE MORTIMER, ATTORNEY AT LAW**


Also Present:           **Karin Nicole Stitt Sokol**
                        **Meta Platforms, Inc.**

                        **Carrie Bodner**
                        **Meta Platforms, Inc.**

**Thursday - May 15, 2025**                              **10:31 a.m.**

P R O C E E D I N G S

---o0o---

THE COURTROOM DEPUTY:  Calling Civil 21-757, Frasco versus Flo Health.

THE COURT:  Thank you.

THE COURTROOM DEPUTY:  You're welcome.

Could counsel please state your appearances for the record, and you'll need to use the microphone at the podium.

MR. LEVIS:  Good morning, Your Honor.  Christian Levis from Lowey Dannenberg for plaintiffs.  With me as well is Amanda Fiorilla from Lowey Dannenberg.

MR. SADUN:  Good morning, Your Honor.  Benjamin Sadun for defendant --

THE COURT:  Oh, oh.  Aren't there more plaintiffs, or no?

MR. LEVIS:  Yeah.

MR. SADUN:  Apologies.

MS. ZINSER:  Good morning, Your Honor.  Diana Zinser from Spector Roseman & Kodroff on behalf of plaintiffs and the proposed class.

MR. BISSELL-LINSK:  Good morning, Your Honor.  I'm Jake Bissell-Linsk from Labaton Keller Sucharow for the plaintiffs and proposed class.

MS. FIORILLA:  Amanda Fiorilla from Lowey Dannenberg

on behalf of plaintiffs.

**THE COURT:**  Okay.  Yes?

**MR. SADUN:**  Good morning, Your Honor.  Benjamin Sadun for Flo Health.

**MR. YALE:**  Good morning, Your Honor.  Theodore Yale, also for Flo Health.

**MR. HUR:**  Good morning, Your Honor.  Ben Hur and Tiffany Lin for defendant Google.

**MS. JOHNSON:**  Good morning, Your Honor.  Michele Johnson.  Also with me for Meta are Andrew Clubok, Melanie Blunschi, Elizabeth McCloskey, and from Meta's Legal Department we have Nikki Sokol and Carrie Bodner.

**MS. MORTIMER:**  Good morning, Your Honor.  Ann Marie Mortimer on behalf of Flurry.

**THE COURT:**  Okay.  Just stay there.

**MS. MORTIMER:**  I will, Your Honor.

**THE COURT:**  Let's do Flurry first.

Is that it for defendants?  That's it?

(No audible response.)

**THE COURT:**  Okay.  All right.  Preliminary approval, looked pretty good.  I just had a couple of questions.

So you're going to cap fees and costs at no more than 700,000; right?

**MR. LEVIS:**  Yes.

**THE COURT:**  Okay.  So I take it the 3.5 million,

that's it?  There's no money left, even though they're owned by Yahoo! or somebody --

MR. LEVIS:  Yeah.

THE COURT:  -- with deep pockets?

MR. LEVIS:  Yeah.  I mean, we spent a lot of time exploring this when we were trying to work this out; and, I mean, I can tell you we tried to find as much as we could; and that's what we --

THE COURT:  All right.

MR. LEVIS:  That's what was there.

THE COURT:  So Flo is going to provide -- who's going to provide the email information for notice?

MR. LEVIS:  We -- yeah.  We raised this with Flo.  We talked about it briefly.  I don't think we've discussed it further since.

But our hope was that -- we know there is an email list -- they would provide the list to the administrator.  We don't need it.  But they would use that to disseminate notice to the class.

THE COURT:  How many people is it going to be?

MR. LEVIS:  I don't know the size of the list because I haven't gotten information --

THE COURT:  Just an estimate.

MR. LEVIS:  It's tens of millions of people.

THE COURT:  Well, so what's the average recovery going

to be?

**MR. LEVIS:**  It would be relatively small if it was only the three and a half million.  I think our hope and how we had set this up was that, optimistically, we would have resolved some of the other defendants' cases at this time and done it together.

But, yes, the recovery on a per person basis, depending on claims, would be relatively low, depending on what the claims were.  It's just a situation where there's not a lot of money to give out.

**THE COURT:**  I mean, if even -- I mean, if even 500,000 people do it, it's, like, $6 per person.  Right?

**MR. LEVIS:**  Yeah.

**THE COURT:**  Okay.  Well, does it make sense to do all this?

I mean, here's what I was thinking.  The admin fees are awfully high.  $476,000 in a case where the defendant is going to supply the email, the claim form is online, the payments are going to be electronic.  I mean, that's just a lot of money which, if there are other settlements, could be leveraged in a much more efficient fashion.

So do you want to wait and see what happens?

**MR. LEVIS:**  Yes.  So I think that was our -- that would have been our preference is to wait.  And like I mentioned, I think maybe just from the progress we made in

working on that aspect, we'd hoped maybe by now we would have another one to put before Your Honor.  But, yes, if there's a way to combine it to be more efficient, that would be ideal.

**THE COURT:**  Well, I think we should because I think this is too much money for too little gain, and I don't want to have to go spend another $400,000.

All this money should go to victims.

**MR. LEVIS:**  Yeah, I agree.

**THE COURT:**  You shouldn't be doubling or tripling the cost of notice because these come in serially.

Now, look, maybe nobody else will settle.  I don't know.  Trial is coming up.  So maybe not; maybe they will.  But I don't see a particular need to rush, unless you believe the emails are going to get so stale that you won't be able to reach anybody.  Is there any reason to believe that?

**MR. LEVIS:**  I don't think so.  I mean, one of the standard processes -- and I think some of the admin fees that you're seeing there -- are probably related to checking and making sure the addresses are valid.  There's usually some process so that we don't just spam a bunch of dead emails.  But I don't know how frequently they're refreshed or, like, how old the list is.

I think that's something that we will have to deal with at the time.  It doesn't seem like a concern enough to me, though, that I would rush to do this, to answer Your Honor's question.

**THE COURT:** Okay. Well, Defendant, do you have anything to add, Flurry?

**MS. MORTIMER:** No, Your Honor.

**THE COURT:** All right. Here's what I'd like to do. How about if I -- I'm just going to tell you it's conceptually approved, but I don't want to actually do it because that will trigger deadlines.

**MR. LEVIS:** Yeah.

**THE COURT:** All right. So unless you tell me otherwise, I think that's not unfair to the class. Right?

**MR. LEVIS:** No. I agree.

**THE COURT:** You'd suggest that?

**MR. LEVIS:** Yeah, I think that would be acceptable to us.

**THE COURT:** Any objection to that, Defendant?

**MS. MORTIMER:** No, Your Honor.

**THE COURT:** Okay. So consider it preliminarily, preliminarily approved. Okay?

**MR. LEVIS:** Thank you.

**THE COURT:** And we won't make it real until maybe two months. I don't know. We'll see.

**MR. LEVIS:** Sure.

**THE COURT:** All right?

Now, if things drag on too long, just send me a little -- poke me a little bit and say, "Maybe we should just do this."

**MR. LEVIS:**  Yeah.

**THE COURT:**  I'll leave it up to you.  Okay?

**MR. LEVIS:**  Okay.

**THE COURT:**  All right.  Anything else on this one, Flurry?

(No audible response.)

**THE COURT:**  Okay.  Good.

All right.  Now, I'm going to resolve all of your pending merits-based Federal Rule of Evidence 702 motions today.  The class cert decision is coming out very soon, as well as -- is it Meta's summary judgment?  Yeah.  Okay?

So what are we going to -- these dispositions on the Federal Rule of Evidence 702 challenges are in, and in advance of the class certification decision and summary judgment. Things may change.  So I may say, for example, "It's okay for an expert to say X"; but the class certification or summary judgment order may say that's out of the case, in which case you're just going to read the prior approval to have been for naught.  All right?  So there's no reason to be befuddled.  It will all work out in the end.  Okay?

Who's going to take the lead on the defendants' 702 motions?

**MR. LEVIS:**  Ms. Fiorilla will be handling the 702 motions for us, so I'll sit down.

**THE COURT:**  All of them?  Plaintiff and --

**MR. LEVIS:**  All of them.

**THE COURT:**  -- defendant?

**MR. LEVIS:**  Yep.

**THE COURT:**  Okay.

**MR. SADUN:**  Your Honor, we --

**THE COURT:**  Defendant?  Yes.

(Reporter interrupts to clarify the record.)

**MR. SADUN:**  Benjamin Sadun for Flo Health.

We know Your Honor's preference for less-experienced junior associates to have oral advocacy opportunities.  So for two of the motions, my colleague Ted Yale, an associate at our firm, is prepared to argue.

**THE COURT:**  All right.  Okay.  Let's do the first one. This is plaintiffs' motion to exclude the opinions of Lorin Hitt, Docket Number 517.

I'm having trouble seeing why that should stay out, Plaintiff.

**MS. FIORILLA:**  Thank you, Your Honor.

Our problem with Lorin Hitt, who is a Flo-specific expert, is the report is essentially a bunch of conclusions about what evidence is or is not in the record.

So if you look at the report, Lorin Hitt opines she's not aware of any evidence that data has value; she's not aware of any evidence that there's a market for custom app events; not aware of any evidence that data was valuable to other

defendants.  "Not aware" is found 26 times in Lorin Hitt's report.

The jury doesn't need Lorin Hitt to tell them what the evidence does or doesn't say.  The jury will just look at the evidence themselves.

**THE COURT:**  All right.  Defendant?

**MR. YALE:**  Good morning, Your Honor.  This is Theodore Yale for Flo.

That is simply not what Professor Hitt's opinion is doing. Professor Hitt is not just pontificating what he's aware or not aware of or just saying what is or is not in the record.  If you just look at his report, he did a very methodological approach to see if he could corroborate any of plaintiffs' theories of value.  He did an independent assessment of whether there's value.

And then since this case is all about plaintiffs saying this data has value, he then looked at all the supposed indicators that plaintiffs identified to see if those also demonstrate value.  He looked everywhere where you would want an economist to look.  He looked if there were markets.  He looked at if this could be used for AI.  He looked at all the supposed examples that plaintiffs and their expert mention about data brokers.  And he walks through and he explains why those don't support plaintiffs' theories.

And, furthermore, he is an expert in the valuation of data

and machine learning and technology in economics and information sciences. So when he's saying he's not aware of any evidence, he's not saying, you know, the record does not contain any evidence. He's saying, "I have looked everywhere where one should look. I have looked at the record; I have looked at plaintiffs' theories; I've drawn on my thirty years of experience as an information economist; and it's not there."

THE COURT: Okay. Here is the disposition. The motion to exclude witness Hitt is denied.

Plaintiffs fault Hitt for not, quote, "reviewing the relevant record rather than just the narrow set of documents Flo handed him," closed quote, and suggest that had he done a broader search, he would have reached different conclusions. Such objections plainly go to the weight and not the admissibility of the proposed plaintiffs' -- proposed expert witness's testimony.

See *Alaska Rent-A-Car v. Avis Budget Group, Inc.*, 738 F.3d 960, pincite 969, Ninth Circuit 2'13, quote, "Courts should not exclude opinions merely because they are impeachable," closed quote.

In addition, Hitt's report relies on extensive evidence and explains the bases of his conclusions. To the extent the plaintiffs believe there is contrary evidence or that he should have done more to investigate certain things, those may be raised properly in the course of cross-examination.

See *Elosu*, E-l-o-s-u, *v. Middlefork Ranch, Inc.*, 26 F.4th 1017, pincite 1028, Ninth Circuit 2022.

Okay.  That resolves Hitt.

Plaintiffs' motion to exclude the opinions of Amalia Miller, Docket Number 519.

Defendants, I'm having trouble seeing why Ms. Miller should be permitted to testify.

**MS. McCLOSKEY:**  Oh, I'm sorry.  Can you repeat that, Your Honor?

(Reporter interrupts to clarify the record.)

**MS. McCLOSKEY:**  Elizabeth McCloskey on behalf of Meta.

**THE COURT:**  I'm inclined to grant it.  So tell me why you think that's a mistake.

**MS. McCLOSKEY:**  Dr. Miller applies a framework that's well established --

**THE COURT:**  Oh, is it Dr. Miller?

**MS. McCLOSKEY:**  Dr. Miller, yes.

**THE COURT:**  Okay.

**MS. McCLOSKEY:**  -- a framework that's well established in economic theory, the revealed preferences theory.  It was established back in the 1930s and has been applied by economists ever since.

She explains that stated privacy preference- -- stated preferences are often different from revealed preferences.  And in this case, she looked at the entire record to determine what

were the stated preferences as to privacy of the named plaintiffs and revealed preferences based on actions that they had taken that were in the record, and she applies those and makes an individualized determination about what you can tell about privacy preferences, both on the stated and revealed preferences.

THE COURT: Well, this is an objective standard. The reasonable expectation of privacy is an objective standard. What difference does that make with respect to that standard?

MS. McCLOSKEY: Well, I think it is important in this case that different plaintiffs treated different information in different ways. So not all plaintiffs viewed information that's here at issue about information that they entered into the Flo app as private. And you can see that, based on their revealed preferences, how they actually use the app, what information they inputted, what information they revealed publicly.

THE COURT: Doesn't that seem a little patronizing, though, to hire somebody to come in and say, "Don't believe those people. Here's what they really meant"? That's basically what you're asking Dr. Miller to do.

MS. McCLOSKEY: She's applying a well-established economic theory. I don't think it's patronizing. I think she's applying this theory that she has developed through literature. And she's a professor of economics at the

University of Virginia.

So she's just really looking at and putting into context for the jury, you have to look both at what people say and what people do.  And this is a theory that economists apply all the time and have for many years.

**THE COURT:**  Well, economists are often fond of saying, "Don't believe them.  Believe us.  We know what we're talking about."

Plaintiff?

**MS. FIORILLA:**  Yes, Your Honor.  I agree with you. The standard is objective.

And what counsel's explaining is that their expert wants to opine on how their expert thinks plaintiffs subjectively feel.  It's just not compatible with the standard.  It's kind of misleading in a way.  Secondly, even if that were an acceptable methodology, it's clear it's not applied reliably.

What Dr. Miller tries to look at is things like:  Did a plaintiff ever say on social media that they have cramps? That's a bit different than the expectation of privacy here, which is:  I was using a health app that said they wouldn't share my health data, but then they sent it to some of the biggest ad companies in the world.

So there's a mismatch.  It's apples to oranges.  One doesn't actually support the other.  So the methodology itself doesn't work based on the standard, and then how it's applied

isn't reliable either.  They're not actually comparable.

THE COURT:  All right.  The motion to exclude Dr. Miller is granted.

As I've indicated, her proposed testimony does not fit the legal standard of an objectively reasonable expectation of privacy that is going to be applied in this case.

In addition to that, I'm skeptical that her testimony amounts to the type of scientific, technical, or other specialized knowledge that would be helpful to a jury as demanded by Federal Rule of Evidence 702(a) for an expert to testify.

Much of what she intends to say is simply that you shouldn't believe the plaintiffs' words; you should believe their actions.  Perfectly fine point to make, but you can do that in cross-examination and other ways that do not entail or demand an expert witness's testimony.  In effect, her opinions simply don't go beyond the common knowledge of an average lay person.  So she is excluded.

Okay.  Defendants, let's turn now to plaintiffs' motion to exclude the opinions of Chris Karkanias.  Karkanias?  How do you say that?

MS. FIORILLA:  "Kar KANE Ee Us," Your Honor.

THE COURT:  Karkanias.  Okay.  It's Docket Number 521.

I'm inclined to grant that.  Talk to me about that.

MR. SADUN:  Your Honor, Chris Karkanias is the expert

Your Honor specifically allowed in earlier proceedings when we explained that Flo Health had only a couple of employees during the relevant time --

THE COURT:  Well, I think you misled me a little bit. I didn't understand what you were saying.

So here's what I understand.  Let me just jump in.  You say you don't have any employees who worked with the SDKs and the other interfaces way back when.  Right?  So you need someone to kind of fill in that historical gap, and you're proposing to have this person do that.

MR. SADUN:  That's correct.  He opines specifically on Flo's use of the SDKs as opposed to what happens on the other side of the transaction once the --

THE COURT:  Yes.

MR. SADUN:  -- SDKs have the information.

THE COURT:  So why don't you just get a current Flo engineer?  That seems like a much better witness.  That person actually works at Flo.  That person is an engineer in the field with Flo's products, just working on a prior version of the SDK.  That's makes a lot more sense to me.

MR. SADUN:  Well, fact discovery is closed, for one thing, Your Honor, and --

THE COURT:  Why didn't you do that? is what I'm asking.  You can still do it.

MR. SADUN:  I appreciate Your Honor's saying we can

still do it, but in this instance, it was not a very technically --

**THE COURT:**  I may have said that --

**MR. SADUN:**  -- sophisticated company.

**THE COURT:**  -- too quickly.  We'll talk about that.

**MR. SADUN:**  But --

**THE COURT:**  Why didn't you do it?

**MR. SADUN:**  We did not do it because those early employees are not as technologically sophisticated as an expert could be or more later employees would be.

**THE COURT:**  I don't understand.  Look, you just want someone --

**MR. SADUN:**  If you want someone --

**THE COURT:**  You want someone to say here's how the SDK worked in, let's say, 2016.  Is that a relevant date?

**MR. SADUN:**  Yes.

**MS. FIORILLA:**  Yes.

**THE COURT:**  All right.  And everybody who worked there in 2016 is gone.  Okay.

Have a current expert open up the 2016 SDK, which is likely to be less sophisticated, less complicated, and less challenging than the one he or she is working with today, and say, "Ah, here's how it works."

It's like a 30(b)(6) designee.  You just designate a corporate rep who's going to be educated on what the SDK -- I

just -- bringing in a witness, an expert witness just doesn't make any sense to me.  It's not experty.

MR. SADUN:  The component of his analysis --

THE COURT:  That's a new word.  It's not experty.

MR. SADUN:  I appreciate that, Your Honor.

The component of his analysis that is experty is he used mitmproxy, sideloadly, and budget technologies to load the app and then be able to intercept, in real time, data packet transfers.  Flo, itself, is not capable of doing that analysis. An expert needs --

THE COURT:  Why not?  You have engineers who work with the SDKs.  They know exactly what -- look, these things don't do things that they aren't taught or told to do.  They do only the functionality they're programmed for.

So whoever is in charge -- you have an engineer running SDKs at Flo today, don't you?

MR. SADUN:  Well, the Flo app works very differently. We don't use the performance analytics SDKs anymore.

THE COURT:  All right.  But you've got software engineers who works with something that looks like an SDK.

MR. SADUN:  We use libraries of code.  That's true.

THE COURT:  Yeah.  Okay.  So, I mean, that person is going to be fully competent of saying, "Here's what we did in 2016.  Now, I wasn't personally there, but I looked at the software, and here's how it worked."

That makes a lot more sense to me than this fellow.

Also, I mean, you want him to testify on things about whether Flo engaged in best practices, whether they exercised due diligence?  That's not --

**MR. SADUN:**  Those are rebuttal opinions because their expert says the opposite of those things, their technological expert, Mr. Egelman.

But as to --

**THE COURT:**  Well --

**MR. SADUN:**  -- Karkanias himself, the reality is, I would think a personal knowledge objection would impede a witness who --

**THE COURT:**  No, no.  It's like a 30(b)(6).

**MR. SADUN:**  Okay.  So we're going to --

**THE COURT:**  You know what it's almost like?  There's an exception for treating physicians.  This will be like an exception for treating engineers.

Do you have any problem with that, Plaintiffs?

**MS. FIORILLA:**  No, Your Honor.  We actually pointed out in our motion that Ms. -- I'm sorry -- Mr. Karkanias does rely on testimony from a Flo employee --

**THE COURT:**  Oh.

**MS. FIORILLA:**  -- to say the -- some Flo app users are apparently men.

That's Max Scrobov.  He was an employee at Flo during the

relevant time, and he's still there.

**THE COURT:**  Okay.

**MS. FIORILLA:**  In addition, we took the deposition of Flo's chief technology officer, Roman Bugaev.  He was the chief technology officer from 2016 to 2019.

**THE COURT:**  That same person?

**MS. FIORILLA:**  Same --

**MR. SADUN:**  That's not correct, Your Honor.

**MS. FIORILLA:**  It's two employees who we deposed who both worked at Flo during this time period.

**MR. SADUN:**  Respectfully, Your Honor, Roman Bugaev did not join until 2018.

**THE COURT:**  Okay.  I can't help you with that.  I have no idea.

So here's what we're going to do.  You're going to designate a person most knowledgeable to testify at trial who's a current Flo engineer.  That makes perfect sense to me.

And you-all are not going to object to that; right, Plaintiffs?

**MS. FIORILLA:**  No.

**THE COURT:**  Okay.  So what else is left for this expert to do?

**MR. SADUN:**  I have two questions, Your Honor.  He was currently rebutting the opinions of their technologist.  Are those rebuttal opinions still in?

**THE COURT:**  Oh, wait.  I'm sorry.

Before we do that, so when can you do that?  In a week?  How long is it going to take you to do that?

**MR. SADUN:**  Our clients are overseas.

**THE COURT:**  You know everybody at Flo inside and out.

**MR. SADUN:**  They don't all speak English.

**THE COURT:**  You know everybody at Flo inside and out.  You can pick one in a week; right?

**MR. SADUN:**  I --

**THE COURT:**  Here's our witness.

**MR. SADUN:**  I appreciate that.  I think two weeks would be a more reasonable time period.

**THE COURT:**  Two weeks.  Set up a deposition.  Okay?  Just a very short deposition.

Where is this person?  Are they in Belarus?

**MR. SADUN:**  Their staff are spread across western Europe.  It might -- depending on who we select, it could be in London; it could be in Lithuania.  I would need to --

**THE COURT:**  All right.  Somebody gets an overseas trip.  But just, you're going to split the cost.  This is not a sanction thing.  Do it like it's regular discovery.

Just this.  Just get it done soon because trial is coming up.  All right?  So get it done soon.  And then there won't be any personal knowledge objections at trial as long as that person is just talking about here's how these things worked in

predecessor years.  Okay?

**MR. SADUN:**  Your Honor, I do have two clarifications.

**THE COURT:**  Yes.

**MR. SADUN:**  First is, what of Karkanias's rebuttal opinions?

**THE COURT:**  Wait a minute.  No, that takes care of the engineering part.

Now, if you take all that out, so this Karkanias is out and all that, what's left that he is being sponsored for?

**MR. SADUN:**  He is responsing -- responding to the technical opinions of Serge Egelman, who did his own analysis on data packet transmissions caught in real time.  And he does his own counterpart experiment to identify what is sent and what's not.

**THE COURT:**  Oh, okay.

**MS. FIORILLA:**  Your Honor, if I can --

**THE COURT:**  What's wrong with that?

**MS. FIORILLA:**  -- respond to that.

**THE COURT:**  Yeah.

**MS. FIORILLA:**  Yeah.  So the Court gave each side an SDK expert.  So we had Dr. Egelman.  Defendants have Georgios Zervas.  They both conduct this type of SDK analysis about --

**THE COURT:**  Wait.  Who's the other one for defendants?

**MS. FIORILLA:**  Georgios Zervas.  That's their joint resource for an SDK expert.

Chris Karkanias was supposed to be the --

THE COURT: Zervas, Z-e-r-v-a-s, that fellow?

MS. FIORILLA: Yes.

THE COURT: Okay.

MS. FIORILLA: Karkanias is supposed to be this limited Flo substitute employee expert. He's not supposed to serve as a rebuttal to Dr. Egelman. Georgios Zervas is the rebuttal to Dr. Egelman. They essentially are putting forth two rebuttals for one expert.

MR. SADUN: Your Honor, may I be heard?

THE COURT: Yes.

MR. SADUN: First, your order at that time concerned affirmative reports only. There was no decision as to what we would do on rebuttal. That is defendants' prerogative.

Second, as I explained earlier, Zervas and Karkanias are looking at different components of the data packet transmission. One is collecting the information and sending it, and the other is focused on, once intercepted --

THE COURT: All right. Let me just jump in.

I can't resolve this on this record. So just bring them to trial. If it turns out it's duplicative rebuttal or beyond the scope of what I just said here, I'll stop it. Okay? So it's granted in part and then deferred pending trial.

MS. FIORILLA: If I -- if I can real quickly, Your Honor?

**THE COURT:** Yeah.

**MS. FIORILLA:** The SDK analysis that's in the rebuttal specifically, our main problem with that was Karkanias's opinions were that the events don't match users' inputs. So users enter, say, 2 and the event says 3.

We had raised with Mr. Karkanias, we can't test or verify any of his opinions because he didn't tell us what he entered. So he's saying what he entered in --

**THE COURT:** You can pan-fry him at trial with all that. Okay?

**MS. FIORILLA:** Okay.

**THE COURT:** But we're going to wait till then.

Okay. Plaintiffs' motion to exclude the opinions of Georgios Zervas, Z-e-r-v, as in "victor," a-s, Docket Number 530.

Plaintiffs, this looks like a perfectly fine expert to me. What's the problem?

**MS. FIORILLA:** I have two main problems with Georgios Zervas, Your Honor.

The first is, he looked at three versions of the Flo app and four custom app events. He tries to provide opinions about 12 events. So the analysis, to me, is only one-third complete because he looks at four events; there's actually 12 events.

**THE COURT:** Perfect for cross-examination. Not good for exclusion.

**MS. FIORILLA:** Okay. My other primary issue with Zervas is he -- to support his analysis, he primarily looks at documents that are publicly available, so defendants' public statements. We have tons of discovery in this case about what defendants actually did. Looking at what defendants say publicly isn't the same thing as their actual processes. It's not a reliable application of a methodology.

**THE COURT:** Okay. Defendant?

**MS. BLUNSCHI:** Melanie Blunschi on behalf of Meta.

**THE COURT:** A little closer.

**MS. BLUNSCHI:** Melanie Blunschi on behalf of Meta, arguing for all defendants on this motion.

With respect to those points, number one, that's just a mischaracterization of what Dr. Zervas looked at. He looked at code; he looked at discovery responses; he looked at information from this case as well as publicly available information.

But even if there was a problem with his evidentiary basis, that is clearly a question that goes to weight and is the province of the jury to think about whether he relied on sufficient --

**THE COURT:** All right. Motion to exclude -- is it Dr. Zervas? Doctor? Mister or doctor?

**MS. BLUNSCHI:** Doctor.

**THE COURT:** All right. The motion to exclude

Dr. Zervas is denied.

Zervas is plainly qualified as a technical expert to opine on the topics that his report addresses.  I'm not going to recite his background and qualifications, but I have no question that he is qualified for those topics.  The fact that he teaches and focuses on marketing does not undermine his ability or his qualification to discuss how SDKs or analytics work and other technical topics.

His opinions are also within the scope of what I referenced in -- with respect to software development kits and data sharing in Docket Number 419.

As I've alluded to in our discussion this morning, plaintiffs' objections to his opinions turn on questions about whether Zervas's testing was robust enough, whether he looked at the right data, whether it was more limited or less limited than what he should have done.  All of that is grist for cross-examination as to weight and is not a basis for exclusion.

That's under *Elosu*, E-l-o-s-u, 26 F.4th at 1025-1026.

Okay.  That resolves the plaintiffs' 702 motions.

Let's turn to defendants, starting with the motion to exclude Serge -- is it Serge or Sergey?

**MS. FIORILLA:**  Serge.

**THE COURT:**  -- Serge Egelman.

He also seems perfectly fine.  And, in fact, I thought

this was a rather lightweight series of objections.

Now, what is the problem, Defendants?

**MR. CLUBOK:**  Well, hopefully --

(Reporter interrupts to clarify the record.)

**MR. CLUBOK:**  Yes.  Thank you.  Andrew Clubok on behalf of Meta.

Your Honor, one particular issue stands out, which is that Dr. Egelman repeatedly says in his expert report -- and apparently wants to characterize his opinions to the jury -- that information that was transferred, supposedly, to Meta or Google constitutes health information.

He's a computer scientist, and he purports to test to see what code is actually transmitted.  That would be in his expertise if he did the methodology correctly, and I will -- I would like to mention one issue on that.

But it's one thing for him to say, "Here are the lines of code.  Here are the words or bits of data that was transferred."  It's another thing entirely for him to continue to say, "Here's the sensitive healthcare data that was transferred."  And that's what he wants to do.

And, in fact, we tested him, of course, in his deposition. He admitted over and over again, he's not an expert on healthcare.  He has nothing special to say about that beyond what any layperson would say.  He claimed he was just using it in the colloquial sense.

So we said great.  It's easy.  He should just not be allowed to do that.  Just like Judge Koh found in the *Perfect 10* case and like so many other courts have found, you can't slip in the ultimate issue for the jury and give the imprimatur of an expert to continually say either, for example, "This is the copyrighted material" if that's the heart of the case or "This is the healthcare material" if that's a key part of the case.

Very different for a computer scientist to use those terms as opposed to just say, "Here are the facts."

**THE COURT:**  Let me ask you a question.  If pregnancy is not a healthcare issue, what is it?

**MR. CLUBOK:**  Your Honor, pregnancy -- and my colleague is going to talk about pregnancy.

But how about whether or not you know the date of your last period?  Is that healthcare information?  And particularly, Your Honor, if I -- by the way, because men use this app.  Let's say I go onto the Flo Health app and I --

**THE COURT:**  Let me ask you this:  If you're worried about the last date of your period because it's later than you expected or you had some problem with it, are you going to call a doctor about that, a healthcare professional, or are you going to call somebody at Subway?

**MR. CLUBOK:**  I don't know that.  My colleague --

**THE COURT:**  You do not.

You're going to call a doctor.  Do you think you're going to have people -- you think -- I'm not going to order people not to use the world "healthcare" at trial.  Your thing just seems frivolous to me.  I don't even understand what you're saying.

MR. CLUBOK:  Well, Your Honor --

THE COURT:  This expert is going to use the word "healthcare" and you're all worked up about that?  I don't get it.  This is a case about pregnancy, women's menstruation, sexual health practices.  What is it you think I'm going to do at trial?  Say the word "healthcare" is banned?  That's not an ultimate issue in the fact.  That's a perfectly legitimate way, ordinary description of what these conditions are that the women were on the website for.

MR. CLUBOK:  But, first of all, so -- I think none of the information satisfies the healthcare definition under CMIA or HIPAA.

THE COURT:  You can argue that.  That's a legal point. But when you're talking -- people in a courtroom talking in a way that ordinary, plain language demands, healthcare is perfectly fine.

MR. CLUBOK:  That's exactly what courts say experts in computer science should not be allowed to do because, if it's ordinary, why does an expert have to say it?  If it's ordinary, then the jury can do it, and it intrudes upon them to have this

expert continually --

THE COURT:  You're not --

MR. CLUBOK:  -- say it.

THE COURT:  You're not understanding my point.  No expert is going to get up and say, "In my official opinion, this is healthcare data."  They're just going to use a description as part of the business practices that this -- your app does.  This is what it is.  It was marketed and sold as a sexual health, pregnancy health, menstruation health application.  It's perfectly fine for an expert to say "healthcare."

MR. CLUBOK:  So much -- virtually -- frankly, all of what was transmitted was not healthcare, but 90 percent of it is inarguably not healthcare.  It is words.  It's bits of codes.  For him to keep saying "healthcare" is a problem.

And frankly, Your Honor, they give up the ghost.  Here -- what they say on page 2 and 14 --

THE COURT:  All right.

MR. CLUBOK:  May I --

THE COURT:  Please.

Plaintiff?

MS. FIORILLA:  I agree with you, Your Honor.  Do you know the date of your last period?  When was your last period?  How long was it?  The first questions my gynecologist asks me every year when I go in for an appointment.

I don't know another word besides "health information," besides more specific words, maybe "women's health information," "gynecological information," "period and pregnancy information."

He said it's the ordinary use of the word.  He's not providing an expert opinion.  I don't know what else they want besides, like you said, banning the word.

THE COURT:  What's your other objection to Egelman?

MR. CLUBOK:  The other one I'm sure will go nowhere because Your Honor has already spoken.  And I'm sorry.  I don't mean to repeat.

He did not -- his whole testimony is:  If you type in this to the Flo Health app in one communication, supposedly Meta or Google gets this.  And the fact is, he provided what the output is to Meta and Google under his theory, but he did not provide to us what he typed in.  So it is absolutely impossible to replicate his methodology, to understand his methodology, to know -- to be able to test the methodology.

There's a litany of cases in the Ninth Circuit -- we cite ten of them -- where exactly -- when experts do exactly this thing, they hide their methodology, they hide the actual process they use to make their -- it's not just it makes for good cross-examination or bad cross-examination.  It makes it impossible to reproduce what they did.

And, Your Honor, we think it's pretty clear why they did

it, because it would be so clear if you looked at his notes --

**THE COURT:**   This is not a black box.   I've written on black boxes with expert testimony.   I have sustained back box objections.   This is not one of them.

Okay.   The motion to deny Egelman -- to exclude Egelman is denied.   As I've indicated, I think the defendants' criticisms and basis for seeking exclusion under Rule 702 border on the frivolous.   Egelman's expert report thoroughly explains his methodology and the steps he took and the tools he used and the codes and versions of codes that he tested.

Certainly true, there are some very granular parts of this process that are not necessarily spelled out with neon lights in his report or record; but that is not a basis for concluding that his methodology is so opaque, his detail is so lacking, and his explanation is so inadequate that it should be excluded under Rule 702.   There certainly is no evidence that his methodology in any way approaches anything akin to junk science or anything not accepted within the field of his expertise.

With respect to the objections to the scope of his testing, the inclusiveness of the inputs, or the number of versions he tested, that all goes to weight, not admissibility.

See, e.g., *Fortune Dynamic Inc. v. Victoria Secret Stores Brand Management*, 618 F.3rd. 1025, pincite 1038, Ninth Circuit 2010, and *CZ Services, Inc. vs. Express Scripts,* 2020 Westlaw 4518978 at page *8, N.D. Cal., August 5, 2020.

Defendants' objections to Egelman's characterization of data as, quote, "health data" simply go too far.  He plainly uses that term in a layperson's fashion, and it is not in any way going to confuse, mislead, or baffle the jury in any material respect, and defendants certainly have not established that.

Okay.  Let's go to defendants' motion to exclude the opinions of Jennifer Golbeck.

Plaintiff, I don't really see much reason to grant that.  What do you think?

**MS. FIORILLA:**  I agree that the motion to exclude --

**THE COURT:**  I'm going to start with you this time.

**MS. FIORILLA:**  -- Jen Golbeck should not be granted.

Last time we were here on experts, both parties agreed we should have a machine learning expert because these are complex systems.

**THE COURT:**  You did agree on that.  Right?  I mean, I thought --

**MS. FIORILLA:**  We did agree on that.

**THE COURT:**  -- that was -- yeah, okay.

**MS. FIORILLA:**  And then what Jen Golbeck did is she -- in light of her machine learning experience, she synthesized documents describing where data's stored, how it's processed, how data from the SDK goes into Google's other systems, and walks through that life cycle in a way a jury can understand,

based on what the documents actually show how the systems actually work.

THE COURT:  And why will that be helpful to the jury?

MS. FIORILLA:  Because -- well, it's actually interesting.  Google kind of seems to complain that there's not one document that really says everything that the Flo Health data is used for machine learning.  That's why we needed Jen Golbeck, is because it's not just one document.  It's not like, "Hey, Jury, look at this."  You need an expert who understands this technology and can synthesize it and explain it in a way that they understand.

THE COURT:  Okay.  Defendant?

MR. HUR:  Thank you, Your Honor.  Ben Hur for Google.

A few points, Your Honor.  First, on page 43, Section C of Dr. Golbeck's report -- that's Exhibit 1 to the Hur declaration -- Dr. Golbeck argues that Flo app data could plausibly be used to serve ads to users.  "Plausible."  "Could have been."  She does not cite a single document in support of that position.  Plaintiffs also did not oppose that argument in response to Google's motion to strike.  So at least for page 43, Section C, the motion should be granted.

Second, Your Honor, with respect to the Fabric SDK, Fabric was a company that Google purchased years ago.  The product was deprecated in 2020.  Dr. Golbeck does not opine that Flo app data was used by the Fabric SDK.  In her initial report, she

didn't even -- she barely mentioned it, and conceded at deposition that she wasn't opining on it.

In her 2024 report, she adds a reference to Fabric; but then in her deposition in 2024, Your Honor, she concedes that she has no factual basis to argue that Fabric, that is different than Google Analytics, that the Fabric SDK used Flo app data.

So, Your Honor, with respect to page 43, Section C, and Fabric, those should be out.

**THE COURT:**  Okay.  Plaintiff?

**MS. FIORILLA:**  If you go to page 43 of Jen Golbeck's report, she internally cites to the sections right above it. So the sections before that cite documents and explain her basis for all of her opinions.

And when you get to page 43, she says:  Based on everything I just cited above, this is my conclusion.

So it's just an internal reference to what she said paragraphs right before that.  It's not that it's an unsupported paragraph.

For instance, like, if you go to page 39, she walks through a Google flow diagram explaining how the data from the SDK goes into a ton of other systems.  Then she explains how she looked at documents relating to those systems, and it shows that those systems are machine learning systems.  So it is supported.  You just have to go to the internal reference.

With respect to Fabric, Google's right.  It was deprecated.  We do know that Fabric worked pretty much the same way as Google Analytics.  It was used to transmit custom app events.  It included identifiers.  It was data that was shared with third parties.

So Jen Golbeck's opinion is, since it's pretty much doing the same thing that Google Analytics did, it would have been used in the same way.

**THE COURT:**  All right.  The motion to exclude Golbeck is denied.  Much of defendants' criticisms focus on the suggestion that she should be excluded under Rule 702 because she cannot point to a smoking gun document to support specific conclusions.

However, quote, "An expert's job is to consider existing data and make inferences, hypotheses, and extrapolations," closed quote; and they are, quote, "permitted wide latitude to offer their opinions," closed quote.

*Klein v. Meta Platforms*, F.Supp.3d, is coming, not yet.  But the Westlaw cite is 2025 Westlaw 489871 at *8, N.D. Cal., February 13th, 2025, internal citations omitted.

The evidence of how Google's data sharing and machine learning environments function, which is evidence that Golbeck relies on, provided, quote, "sufficient factual grounds on which to draw her conclusions," closed quote.

*Elosu*, E-l-o-s-u, 26 F.4th at 1026, internal citations

omitted.

There's also the fact that Google itself has something of a black box nature to some of its machine learning technologies. To the extent Golbeck has had to do deal with that, she can't be faulted or excluded on that ground.

I do believe that the defendants have also mischaracterized and to some extent unfairly underplayed the evidence on which Golbeck relies to conclude that the data restrictions did not prevent Google's machine learning technologies from using Flo app data. But in any event, all these criticisms go to the weight, not to the admissibility. And that is true even when, quote, "shaky but admissible evidence is to be attacked by cross-examination, contrary evidence, and attention to the burden of proof, not by exclusion," closed quote. I'm not saying it's shaky, but to the extent someone believes it's shaky, shakiness is not enough.

That's *Primiano*, P, as in "Paul," r-i-m-i-a-n-o, *v. Cook*, 598 F.3rd 558, pincite 564, Ninth Circuit 2010.

And our closing motion, the exclusion -- defendants' motion to exclude David Hoffman, Plaintiffs, I'm having trouble seeing why Hoffman should be allowed to testify.

**MS. FIORILLA:** Sure. So David Hoffman is a rebuttal expert who rebuts Amalia Miller and Lorin Hitt.

So as we discussed, Lorin Hitt, before, opines that

there's no market and there's no demand for this data.

What David Hoffman does is looks at comparable data, so data brokers like Exact Data, HealthAd, SafeGraph, and compares that to the custom app events in this case to show there is a market.  Then David Hoffman looks at evidence in the record, so evidence we cited on class certification, that Flo was selling access to custom app events to say not only is there a market, but Flo is a participant in the market, so to rebut Lorin Hitt and say there is actually a market; there is actually demand.

THE COURT:  Well, he makes comparisons to what he calls health data and just says, "Well, it's just like custom app events," but he just says that.  There's no evidence other than him declaring it.  There's nothing that supports that link.

MS. FIORILLA:  So I don't think that's necessarily true.  For instance, with Health Ads, he explains that that was pregnancy-related data, which is sufficiently comparable to the custom app events we're dealing with here.  He also explains that the data that's sold by these data brokers are accompanied by a unique mobile identifier, just like the identifiers that accompany the custom app events.  So --

THE COURT:  Well, but he's talking --

MS. FIORILLA:  -- they are sufficiently comparable.

THE COURT:  -- in generalities; he's not really tied it to the facts of this case or the evidence within this

record.

I mean, I just -- he's flying at 45,000 feet over the earth, and it's just too far up.  I don't see much of a link between what he's going to say and the evidence in this case.

**MS. FIORILLA:**  Sure.  I think --

**THE COURT:**  And it's just not really useful for a jury.

**MS. FIORILLA:**  Sure.  I think at a minimum, how Lorin Hitt says there's no evidence in the record that supports that there is market and value, that David Hoffman explains this evidence does exist, which then, under Lorin Hitt's theory, would prove it has value because you have market and demand.  That's perfectly acceptable as a rebuttal.  He's allowed to poke holes in Lorin Hitt's analysis and say why the claims that there is no evidence and, therefore, no market and demand are just wrong based on the existing record.

**THE COURT:**  All right.  Defendant?

**MR. YALE:**  Good morning, Your Honor.  This is Theodore Yale for defendant Flo again.

Let me begin by responding to that point about evidence in the record.  So, first, as we just discussed a little while ago, again, that is not what Professor Hitt is doing. Professor Hitt is not just talking about what's in the record. He's talking about the universe of available material.

However, I do want to respond to that --

**THE COURT:**  Professor Hoffman.

**MR. YALE:**  I'm sorry.

**THE COURT:**  Who are we --

**MR. YALE:**  Professor Hitt and Mr. Hoffman.

**THE COURT:**  Oh, Hitt.  The other --

**MR. YALE:**  Mr. Hoffman is a lawyer.

**THE COURT:**  Okay.  I got it.

**MR. YALE:**  Professor Hitt has a Ph.D. in economics.

**THE COURT:**  Wait a minute.  I --

**MR. YALE:**  Because he's -- because Mr. Hoffman is a rebuttal to Hitt, to Dr. Hitt.

**THE COURT:**  Okay.  All right.  Go ahead.

**MR. YALE:**  But I wanted to address that point about the record evidence.

A point that Mr. Hoffman makes and which plaintiffs make in their brief is that they say, "Well, there is evid-" -- as Your Honor pointed out, there is no connection between health evidence that has -- health data that has value and the data in this case.  That is the missing link.  That is what *Joiner* prohibits.

Now, the response -- plaintiffs' response to that is they say, "Well, there's evidence in the record that Flo was selling data to Bayer and Procter & Gamble."  Now, that's a mischaracterization of that evidence, as I'm happy to explain.

But I want to just read one exchange from Mr. Hoffman's

deposition [as read]:

"**QUESTION:** What data did Flo sell to Bayer and Procter & Gamble?

"**ANSWER:** I don't think I've ever seen the exact data elements that were sold.

"**QUESTION:** Do you know whether that data included the specific 12 custom app events at issue in this case?

"**ANSWER:** I don't recall."

So Mr. Hoffman is not even opining on this data that Flo sold and saying, "This is comparable to the custom app events." He's just relying on plaintiffs' representation that Flo got money for data, which is inaccurate, and leaping to the conclusion that that's the same as custom app event data, which is completely unfounded. It's only connected by his say-so. And, again, as Your Honor rightly pointed out --

**THE COURT:** Let me just --

**MR. YALE:** -- that's exactly what's --

**THE COURT:** I denied the motion to exclude Hitt. So I don't understand what you're saying with respect to Hitt.

**MR. YALE:** I'm sorry, Your Honor. I didn't mean to create any confusion.

Plaintiffs were saying Hoffman should be in because he's rebutting Hitt, and I was just explaining why that doesn't provide a basis for Hoffman's inadmissible --

**THE COURT:** All right. Let's just forget --

**MR. YALE:**  -- evidence.

**THE COURT:**  -- about Hitt.

Okay.  Go ahead.

**MR. YALE:**  That's it, Your Honor.  If Your Honor has any more questions, I'm happy to address them.

**THE COURT:**  All right.  Plaintiff, any closing thoughts?

**MS. FIORILLA:**  No, Your Honor, not -- nothing beyond just emphasizing, again, that Hoffman's the rebuttal to Hitt and pokes holes in Hitt's analysis.

**THE COURT:**  Okay.  The motion to exclude Hoffman is granted.

Federal Rule 702 -- Federal Rule of Evidence 702 requires that testimony is the product of reliable principles and methods and that the opinion reflect a reliable application of the principles and methods.  Neither has been demonstrated with respect to Hoffman's proposed opinions about the data -- about the financial data and value of the data.

Hoffman says that certain information can be deemed health data that has financial value and that the information conveyed by the custom app events is similar enough to that kind of data, but that conclusion is really no more than his own *ipse dixit*, which is not allowed for admissibility before a jury.

See *Klein*, 2025 Westlaw 489871 at *7.

In the absence of a clear tether and link between his opinions and the data and evidence in this case, they are not only untethered to anything that would be useful to the jury, but may also end up being confusing and misleading.  And so he is out.

So I think that takes care of all the experts.

**MS. FIORILLA:**  It does.

**THE COURT:**  All right?

Anything else for today, Plaintiffs?

**MR. LEVIS:**  I don't think we have anything else pending, other than the defendants' motions.

**THE COURT:**  I did not understand a word of what you just said.  What did you say?

**MR. LEVIS:**  Oh.  I said -- you said, "Anything else?" And I said --

**THE COURT:**  Anything else for today, Plaintiffs?

**MR. LEVIS:**  No.

**THE COURT:**  Okay.  Anything else for today, Defendants?

**MR. SADUN:**  Yes, Your Honor.  This is Ben Sadun for Flo Health.

We have pending motions for summary judgment, both from Meta and Flo Health.

**THE COURT:**  Oh, no.  I told you that's coming.  We're not doing that today.

**MR. SADUN:**  We're not hearing oral argument, Your Honor?

**THE COURT:**  No.  I do it on the papers.  That and class certification are coming.

**MR. SADUN:**  Your Honor --

**THE COURT:**  Class certification will come first. That's just the way the timing has worked out.  But I don't need oral argument.  The papers are fine.

**MR. SADUN:**  Understood.

With that in mind, can I lodge one thing, which we only just obtained after significant effort --

(Reporter interrupts to clarify the record.)

**THE COURT:**  It's really not productive to walk away and talk.

**MR. SADUN:**  I apologize, Your Honor.

But we have the in-question *Wall Street Journal* article. It's the front article, top, above the fold, that put folks, according to us, on inquiry and constructive notice.

**THE COURT:**  Yes.  That's in your papers.

**MR. SADUN:**  But we didn't have the physical copy.  I was offering to hand you --

**THE COURT:**  I don't need that.  Thank you.

**MR. SADUN:**  Understood.

**THE COURT:**  Okay.

**MS. JOHNSON:**  Your Honor, Michele Johnson from Meta.

We do have slides that we exchanged with the other side that does have pictures that explains the arguments in our summary judgment motion, if I could be heard for two minutes.

**THE COURT:**  Oh, I don't need -- no, we're not taking -- I don't need argument.  Submitted on the papers.

Okay.  Anything else?  What I mean by that, anything --

**MR. LEVIS:**  No.

**THE COURT:**  Anything happening I should know about?  Trial is coming up.

**MR. LEVIS:**  No, I don't think so.  I think the only thing with regard to the trial is, on the class cert order, you mentioned, I think, we're going to have to do class notice in advance of that.  So we'll just --

**THE COURT:**  We'll see what happens.

**MR. LEVIS:**  See what happens.

**THE COURT:**  Anything like that, Defendants?  No?

Okay.  Good.

Thanks for coming in.

**MR. LEVIS:**  Thank you.

**THE COURTROOM DEPUTY:**  All rise.  Court's in recess.

(Proceedings adjourned at 11:22 a.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Sunday, May 18, 2025

*Ana Dub*

_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter