James M. Wagstaffe (95535)
**ADAMSKI MOROSKI MADDEN**
**CUMBERLAND & GREEN LLP**
P.O. Box 3835
San Luis Obispo, CA 93403-3835
Tel: (805) 543-0990
Fax: (805) 543-0980
wagstaffe@ammcglaaw.com

*Counsel for Plaintiffs Erica Frasco*
*and Sarah Wellman*

Christian Levis (*pro hac vice*)
Amanda Fiorilla (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com

*Proposed Co-Lead Counsel for Plaintiffs and*
*the Proposed Class*

Carol C. Villegas (*pro hac vice*)
Michael P. Canty (*pro hac vice*)
Danielle Izzo (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
mcanty@labaton.com

*Proposed Co-Lead Counsel for Plaintiffs and the*
*Proposed Class*

Diana J. Zinser (*pro hac vice*)
**SPECTOR ROSEMAN & KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611
dzinser@srkattorneys.com

*Proposed Co-Lead Counsel for Plaintiffs and*
*the Proposed Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERICA FRASCO, et al., individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>v.<br><br>FLO HEALTH, INC., META PLATFORMS, INC., GOOGLE, LLC, and FLURRY, INC.,<br><br>    Defendants. | Case No.: 3:21-cv-00757-JD<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT META PLATFORMS INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>Date: April 24, 2025<br>Time: 10:00am<br>Judge: Hon. James Donato<br>Courtroom: 11-19th Floor, SF |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

I.      INTRODUCTION ....................................................................................................... 1

II.     FACTUAL BACKGROUND ......................................................................................... 2

        A.      The Meta's Tracking Technology, the SDK, and Custom App Events ................... 2

        B.      Meta Deliberately Intercepted the Contents of Users' Communications with
                Flo ......................................................................................................................... 3

        C.      Meta Uniquely Identifies Each Flo App User ....................................................... 5

        D.      Meta Intercepted Private Flo App Data Without Users' Consent ........................... 6

        E.      Meta Knew and Intended to Receive Health Data From Flo Despite its Terms ......... 6

        F.      Meta Used Flo App Users' Data for its Own Purposes ......................................... 9

III.    STANDARD ............................................................................................................. 10

IV.     ARGUMENT ............................................................................................................ 11

        A.      Plaintiffs Establish Each of the Elements for Their Wiretapping Claims ............... 11

                1.      Meta Intercepted Plaintiffs' Answers to Flo Health's Questions ................. 11

                2.      Meta is Not a Party Under Any Exception ................................................. 14

                3.      Meta Contemporaneously Intercepted Plaintiffs' Communications ............. 16

                4.      Meta Intentionally Intercepted Plaintiffs' Communications with Flo .......... 18

        B.      Plaintiffs Did Not Consent to Meta's Interception of Their Health Data ................ 20

        C.      Plaintiffs Establish Claims Under CDAFA ........................................................... 22

        D.      Plaintiffs' Aiding & Abetting Claim Should Go to the Jury .................................. 24

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*B.K. v. Desert Care Network*,
No. 2:23-CV-05021, 2024 WL 1343305 (C.D. Cal. Feb. 1, 2024)............................................ 20

*B.K. v. Eisenhower Med. Ctr.*,
721 F. Supp. 3d 1056 (C.D. Cal. 2024).................................................................................... 15

*Backhaut v. Apple Inc.*,
148 F. Supp. 3d 844 (N.D. Cal. 2015).................................................................................... 18

*Brodsky v. Apple Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020).................................................................................... 23

*Brown v. Google, LLC*,
685 F. Supp. 3d 909 (N.D. Cal. 2023)................................................ 10, 13, 20, 24

*Bunnell v. Motion Picture Ass'n of Am.*,
567 F. Supp. 2d 1148 (C.D. Cal. 2007).................................................................................. 18

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024)................................................................................................ 21

*Cantu v. Guerra*,
No. SA-20-CV-0746-JKP, 2023 WL 5217852 (W.D. Tex. Aug. 11, 2023)............................. 20

*Claridge v. RockYou, Inc.*,
785 F. Supp. 2d 855 (N.D. Cal. 2011).................................................................................... 23

*Clemons v. Waller*,
82 F. App'x 436 (6th Cir. 2003).............................................................................................. 15

*Cody v. Boscov's, Inc.*,
658 F. Supp. 3d 779 (C.D. Cal. 2023) .................................................................................... 16

*CTI III, LLC v. Devine*,
No. 2:21-CV-02184-JAM-DB, 2022 WL 1693508 (E.D. Cal. May 26, 2022)......................... 23

*D'Angelo v. FCA US, LLC*,
726 F. Supp. 3d 1179 (S.D. Cal. 2024)................................................................................... 17

*Doe I v. Google LLC*,
741 F. Supp. 3d 828 (N.D. Cal. 2024)............................................................................... 15, 20

*Doe v. FullStory, Inc.*,
712 F. Supp. 3d 1244 (N.D. Cal. 2024)................................................................................... 17

*Esparza v. Kohl's, Inc.*,
  723 F. Supp. 3d 934 (S.D. Cal. 2024)..................................................................24

*Forsyth v. Barr*,
  19 F.3d 1527 (5th Cir. 1994)...........................................................................20

*G&C Auto Body Inc. v. GEICO Gen. Ins. Co.*,
  552 F. Supp. 2d 1015 (N.D. Cal. 2008)............................................................20

*Garcia v. Enter. Holdings, Inc.*,
  78 F. Supp. 3d 1125 (N.D. Cal. Jan. 23, 2015)................................................22

*Gladstone v. Amazon Web Servs., Inc.*,
  739 F. Supp. 3d 846 (W.D. Wash. 2024)..........................................................12

*Global Imaging Acquisitions Group, LLC v. Rubenstein*,
  No. 14-C-0635, 2017 WL 11673437 (E.D. Wis. Aug. 16, 2017)......................20

*Gonzales v. Uber Techs., Inc.*,
  305 F. Supp. 3d 1078 (N.D. Cal. 2018)............................................................16

*Griffith v. TikTok, Inc.*,
  No. 5:23-cv-00964-SB-E, 2024 WL 5279224 (C.D. Cal. Dec. 24, 2024)..........18

*Hammerling v. Google LLC*,
  No. 22-17024, 2024 WL 937247 (9th Cir. Mar. 5, 2024)..................................22

*Henning v. Fry's Elecs., Inc.*,
  No. 5:12-CV-06146, 2014 WL 6679514 (N.D. Cal. Nov. 24, 2014) .................11

*In re Carrier IQ, Inc.*,
  78 F. Supp. 3d 1051 (N.D. Cal. 2015)..............................................................17

*In re Facebook, Inc. Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020).............................................................................13

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
  806 F.3d 125 (3d Cir. 2015)..............................................................................15

*In re Meta Pixel Healthcare Litig.*,
  647 F. Supp. 3d 778 (N.D. Cal. 2022)....................................................11, 15, 21

*In re Meta Pixel Tax Filing Cases*,
  724 F. Supp. 3d 987 (N.D. Cal. 2024)..............................................................21

*In re Novatel Wireless Sec. Litig.*,
  830 F. Supp. 2d 996 (S.D. Cal. 2011)...............................................................20

*In re Pharmatrak, Inc.*,
  329 F.3d 9 (1st Cir. 2003)................................................................... 12, 13

*In re Zynga Priv. Litig.*,
  750 F.3d 1098 (9th Cir. 2014)................................................................... 12

*India Price v. Carnival Corp.*,
  712 F. Supp. 3d 1347 (S.D. Cal. 2024)........................................................ 17, 18

*Katz-Lacabe v. Oracle Am., Inc.*,
  No. 22-cv-04792-RS, 2024 WL 1471299 (N.D. Cal. Apr. 3, 2024)........................................... 16

*Konop v. Hawaiian Airlines, Inc.*,
  302 F.3d 868 (2002)................................................................... 18

*Lloyd v. Facebook*,
  No. 23-15318, 2024 WL 3325389 (9th Cir. July 8, 2024)........................................... 22

*Mata v. Zillow Grp., Inc.*,
  No. 24-CV-01095-DMS-VET, 2024 WL 5161955 (S.D. Cal. Dec. 18, 2024) ........................... 19

*Noel v. Hall*, No. CIV.,
  No. 99-649-AS, 2006 WL 2129799 (D. Or. July 28, 2006) ........................................ 12

*Nowak v. Xapo, Inc.*,
  No. 5:20-CV-03643, 2020 WL 6822888 (N.D. Cal. Nov. 20, 2020) ........................... 23

*Pena v. GameStop, Inc.*,
  670 F. Supp. 3d 1112 (S.D. Cal. 2023)................................................................... 15, 16

*R.S. v. Prime Healthcare Servs., Inc.*,
  No. 5:24-CV-00330, 2025 WL 103488 (C.D. Cal. Jan. 13, 2025)........................................... 14

*Rogers v. Ulrich*,
  52 Cal. App. 3d 894 (Ct. App. 1975)................................................................... 16

*Sanders v. Robert Bosch Corp.*,
  38 F.3d 736 (4th Cir. 1994)................................................................... 20

*Silver v. Stripe Inc.*,
  No. 4:20-cv-01896-YGR, 2021 WL 3191752 (N.D. Cal. July 28, 2021)................................. 22

*Smith v. Facebook, Inc.*,
  262 F. Supp. 3d 943 (N.D. Cal. 2017)................................................................... 22

*Smith v. LoanMe, Inc.*,
  11 Cal. 5th 183 (Cal. 2021)................................................................... 12

PLAINTIFFS' OPPOSITION TO META'S MOT. FOR SUMMARY JUDGMENT - CASE NO. 3:21-CV-00757-JD

*Sunbelt Rentals, Inc. v. Victor*,
    43 F. Supp. 3d 1026 (N.D. Cal. 2014) ............................................................. 18, 23

*Thomasson v. GC Servs. Ltd. P'ship*,
    321 F. App'x 557 (9th Cir. 2008) ............................................................. 16

*Turner v. Nuance Commc'ns, Inc.*,
    735 F. Supp. 3d 1169 (N.D. Cal. 2024) ............................................................. 16

*United States v. Christensen*,
    828 F.3d 763 (9th Cir. 2015) ............................................................. 19

*Valenzuela v. Keurig Green Mountain, Inc.*,
    674 F. Supp. 3d 751 (N.D. Cal. 2023) ............................................................. 18

*Valenzuela v. Nationwide Mut. Ins. Co.*,
    686 F. Supp. 3d 969 (C.D. Cal. 2023) ............................................................. 11

*Welenco, Inc. v. Corbell*,
    126 F. Supp. 3d 1154 (E.D. Cal. 2015) ............................................................. 23

**Statutes**

18 U.S.C. § 2510(4) ............................................................. 11

18 U.S.C. §§ 2510, 2511 ............................................................. 16

Cal. Pen. Code §§ 502(c)(3), (7), & (e)(1) ............................................................. 22

Cal. Penal Code § 631(a) ............................................................. 16, 17

**Rules**

Fed. R. Civ P. 56(a) ............................................................. 10

**Regulations**

45 C.F.R. § 164.502 ............................................................. 15

## I.     INTRODUCTION

This case is just the latest example of Big Tech's overreach into individuals' private lives. For years, Meta extracted private health information about tens-of-millions of womens' menstrual cycle and pregnancies from the Flo App. This was not an accident. The Software Development Kit ("SDK") that captured and transmitted users' answers to highly personal health questions like—"when did your last period start?" or what week of pregnancy are you in?—was built by Meta for precisely that purpose. Indeed, Meta's SDK was part of a broader initiative to feed its multi-billion-dollar advertising machine with third-party data reflecting interactions between users and apps Meta did not own or operate. Meta's efforts succeeded in the worst way. Not only did Meta receive the Flo App Users' health information, it also indiscriminately used that information for multiple commercial purposes, including to target users with ads based on health-related events (e.g., whether they wanted to get pregnant), to "optimize" ads to Flo App Users, and to develop new products and services. This exploitation continues to this day, as the Flo App User data in Meta's algorithms can never be removed.

Unable to escape the weight of the evidence, Meta's Motion deploys a series of arguments that turn on misstatements of fact and law. None of these arguments withstand basic scrutiny.

Meta's interception argument—which claims that it was always a lawful party to communications containing Plaintiffs' health information—is disproven by the record. It also runs contrary to controlling precedent, and a growing number of district courts, rejecting similar arguments regarding nearly identical tracking technologies.

Meta's technical challenges—which attack the timing or location of its interception of Plaintiffs' data—fail for similar reasons. Flo's source code conclusively shows that Meta's SDK captures Plaintiffs' answers to health question in real time as they interact with the Flo App, not after the fact from some storage location. Meta arguments to the contrary mischaracterize the evidence and at best presents fact and expert questions that cannot be resolved on this motion.

Meta's consent arguments are even worse. Given Flo's affirmative promises that it would *not* share users' health information with third parties, Meta cannot meet its burden to show that Plaintiffs agreed to the interception of their data as a matter of law. Meta's attempt to avoid this result by relying

1   on its own generic terms—which never mention Flo, the Flo App, or health data—fails.

2       Finally, Meta's challenges to Plaintiffs' CDAFA and privacy claims simply recycle arguments

3   that rely on inaccurate facts or law from earlier in its brief and fail for the same reason.

4       The Court should deny Meta's Motion for Summary Judgment (ECF No. 527-2) ("SJ") and

5   allow this case to proceed to trial.

6   **II.    FACTUAL BACKGROUND**

7       **A.    The Meta's Tracking Technology, the SDK, and Custom App Events**

8       Meta promotes its SDK as a free tool developers can use to help analyze their user's behavior.

9   *See* ECF No. 330 at 2-3. However, its true purpose (as reflected in Meta's own documents) was to

10  provide Meta with access to "third party" data—i.e., communications, actions, and information

11  exchanged between the app developer and their users—that Meta otherwise would not be privy to for

12  use in its advertising business. *See* Ex. 1 at '797. [1] Meta referred to this as its "Signal & Identity

13  mission" which was designed specifically to "understand people and all their activities" on mobile

14  apps through its SDK offering. *See id*. Meta's plan was to target "all business with an app

15  presence" to developer a "deep & rich understanding of people's in-app behavior" including

16  their "interactions/transactions" on "apps" so that Meta can "deliver highly relevant ads and

17  business content." *Id*. at '798. A core part of this "strategy" was to "[e]xtract down-funnel

18  signals from ***custom events***" sent by app developers through its SDK. *Id*.

19      Custom App Events ("CAEs") are a type of first-party data that encompass information or

20  actions unique to a specific app (e.g., the text entered in a specific text box or click of a particular

21  button).  ECF No. 477-19 at '973. Once enabled by a developer, CAEs are collected automatically

22  when triggered. *See* ECF No. 478-6 ¶¶ 54-57, 60 (Expert Report of Serge Egelman, Ph.D., explaining

23  the CAEs are "intercepted contemporaneously" with the user completing the corresponding action);

24  Ex. 2 at '867 (diagram showing once the event is "triggered" on the mobile device it is "transmitted

25  to Facebook"). CAEs include two components: (1) a title or name, and (2) one or more data

26  parameters. ECF No. 478-6 ¶¶18-20. The parameter(s) associated with that description reflect the

27

28  [1] "Ex.___" refers to Exhibits attached to the Declaration of Christian Levis in Support of Plaintiffs'
    Opposition to Meta's Motion for Summary Judgment.

1  result of an action within the app. ECF No. 477-19 at '973; ECF No. 478-6 ¶¶19-20. Other than basic

2  formatting requirements, there are no restrictions on what data a CAE can contain. *See* Ex. 3 at '107.

3       **B.**    **Meta Deliberately Intercepted the Contents of Users' Communications with Flo**

4       Throughout the Class Period, Flo enabled the Meta SDK to capture CAEs, including 12 CAEs

5  reflecting answers to health questions asked during the Flo App's mandatory onboarding process. *See*

6  ECF No. 478-9; ECF No. 478-6 ¶¶ 40, 52, 81-90. As Meta's own diagram shows, the CAEs are

7  "triggered" on the users' device and then immediately "transmitted" directly to "Facebook." *See* Ex.

8  2 at '867.

9                               **FIGURE 1**



Event triggered on mobile device         Event data transmitted to Facebook over TLS

14       Here, each CAE Meta's SDK captured was triggered in real time by a user answering a

15  question from Flo. For example, one of the first questions Flo asks users is their "goal" for using the

16  App. ECF No. 478-6 ¶ 40. The left side of Figure 2 (below) is an example of what this looked. The

17  screen presents two responses to the question "How can we help you?": (i) "I want to get pregnant;"

18  or (ii) "I just want to track my cycle." There is no option to skip this question; users must select an

19  answer and press "next." *See* ECF No. 478-6 ¶ 41 (noting onboarding survey was mandatory). This

20  triggers an immediate cascade of functions within the Flo App source code that are reproduced on the

21  right side. *See, e.g.*, FLO-00156917-18; FLO-00156828; FLO-00158195; FLO-00158196. As part of

22  this chain (which takes milliseconds) the Meta SDK captures the CAE, R_CHOOSE_GOAL, and

23  sends it to Meta's servers with a parameter containing the user's answer: I want to "get_pregnant" or

24  I want to "track_cycle". ECF No. 478-6 ¶ 60. Each version of the Flo App contains a similar code

25  resulting in Meta acquiring R_CHOOSE_GOAL. ECF No. 478-6 ¶ 3.

26

27

28

PLAINTIFFS' OPPOSITION TO META'S MOT. FOR SUMMARY JUDGMENT - CASE NO. 3:21-CV-00757-JD

**FIGURE 2**



Meta's contemporaneous collection of CAEs like this one occurs throughout the onboarding survey. Each of Flo's survey questions triggered a transmission by the Meta SDK to Meta's servers. ECF No. 478-6 ¶ 81. As part of the transmission process, the Meta SDK performs buffering and other optimizations common with digital communications (e.g., to comply with Internet Protocols) that may slightly delay the transmission of information it intercepted back to Meta's servers. ECF No. 478-6 ¶¶ 87-88. However, once the Meta SDK initially acquires the user's data immediately upon their selection, no one—not even Flo—can stop Meta from receiving it. *See id*.; ECF No. 478-10 ¶ 17-18. There is no evidence in the record that shows any user took such extraordinary steps (e.g., shutting their device off at the precise instance they pressed a button) to try and prevent the transmission of data. Nor is there evidence that Flo modified the default functionality of the Meta SDK to prevent transmission. *See* ECF No. 530-3 at 127:7-16.

The amount of health data Meta intercepted from Flo App Users through its SDK is staggering. Meta intercepted twelve CAEs from the Flo App's onboarding survey alone (ECF No. 478-3 at 4 (showing events intercepted) and received each CAE, including "R_CHOOSE_GOAL," millions of times. ECF No. 478-21. This includes data from Plaintiffs. Although Meta deleted the underlying CAE data associated with each person, Plaintiffs each (1) used the Flo App at the time it incorporated Meta's SDK and (2) completed Flo's onboarding survey, triggering the events described

PLAINTIFFS' OPPOSITION TO META'S MOT. FOR SUMMARY JUDGMENT - CASE NO. 3:21-CV-00757-JD

1    above. *See* ECF No. 479-4 at 13 (Meigs); ECF No. 479-6 at 13 (Frasco); ECF No. 479-8 at 12 (Chen);

2    ECF No. 479-10 at 12 (Wellman); ECF No. 479-12 at 13 (Gamino); Ex. 4 at 13 (Pietrzyk); Ex. 5 at

3    13 (Ridgway); Ex. 6 at 13 (Kiss).[2] Meta has not presented any evidence otherwise.

4        Meta does not dispute that it received Flo App User data. This is because it can't. Meta's own

5    documents confirm: (1) the names of the CAEs Meta intercepted from Flo App Users; and (2) how

6    many times it received them. *See* ECF No. 478-21 (listing the "Event Name" and number of "Unique

7    Individuals Associated with [each] Event" between December 2017 and December 2019). Meta's

8    interception of 12 onboarding survey CAEs is also corroborated by Dr. Egelman's testing of the Flo

9    App and review of Flo's source code (*see* ECF No. 478-6 ¶¶ 40-40, 81-89), as well as Flo's production

10   to the FTC, which includes a chart listing many of the CAEs that were sent to Meta and the actions

11   in the Flo App that trigger them. ECF No. 478-8; Ex. 7 at '926 (Flo confirmed to the FTC that ECF

12   No. 478-8 represents the "outer bounds" of what it shared with "Facebook").

13       **C.    Meta Uniquely Identifies Each Flo App User**

14       The CAEs Meta intercepted from Flo App Users were transmitted alongside a series of

15   persistent, unique identifiers designed to track specific users or devices. *See* ECF No. 478-6 ¶¶ 27-28

16   (explaining Meta intercepted AAIDs which are persistent identifiers that "allow an individual—or

17   device—to be uniquely identified"); Ex. 32 at '060 ("explaining Advertising ID" and "similar

18   information" about Flo App Users was "transmitted" to Meta). Because these identifiers uniquely

19   identify an individual, they are considered "personal information" under CCPA, COPPA, HIPAA,

20   GDPR, and GLBA. *See* ECF No. 478-6 ¶ 27. Meta intercepted these identifiers from all Flo App

21   Users during the Class Period regardless of whether they had a Facebook account. *See* ECF No. 477-

22   38 at 39-40 (Flo acknowledging that Meta received "advertising ID").

23       In addition to unique identifiers, Meta also collected *other* identifying information about Flo

24   App Users. *See* ECF No. 478-31 at 11. While Meta claims to longer have this data, it confirmed it

25   may have also received Flo App Users' email addresses, full names, phone number, dates of birth,

26   and location data along with the CAEs. *Id.* Meta used these this identifying information to perform

27   ────────────────────────────
     [2] This is also reflected in Flo's data, which shows Plaintiffs were able to use the Flo App and thus
     completed the Flo onboarding survey. *See* ECF No. 478-55 (Chen); ECF No. 478-56 (Frasco); ECF
28   No. 478-57 (Gamino); ECF No. 478-58 (Meigs); ECF No. 478-59 (Wellman); Ex. 30 (Pietrzyk); Ex.
     31 (Ridgway). Flo did not produce data for Plaintiff Kiss.

1  *additional* "identity matching." Specifically, Meta used the data it received about Flo App Users to

2  locate their individual Facebook profiles and "associate[]" the CAEs with their account. *See id.*

3  (explaining Meta would "match" the Flo CAE data to "individual Facebook users."); ECF No. 478-

4  32 at '148 (explaining IDFA is a "unique identifier" that Meta uses to "connect App events" to "FB

5  users"); ECF No. 478-14 at 171:5-23 (explaining that Meta used "hashed contact information for

6  identity matching" using IDFA and AAID); *id.* at 172:9-14 (confirming "Meta was performing

7  identity matching on the Flo App event data that it received").

8  **D.    Meta Intercepted Private Flo App Data Without Users' Consent**

9       Nearly every version of Flo's Privacy Policies assured Flo App Users that their health

10  information, including survey results, would not be shared with third parties. *See* ECF Nos. 477-98,

11  477-99, 477-100, 477-101, 477-102, 477-103, 477-104; 477-105, 477-106, 477-107, 477-108, 477-

12  109; 477-110, 477-111 (Flo's policies between June 15, 2016, and Feb. 27, 2019).[3] None of these

13  policies made any exception for Meta or its SDK. And Meta itself did not take any steps to separately

14  inform users that Flo's privacy policies were inaccurate.

15  **E.    Meta Knew and Intended to Receive Health Data From Flo Despite its Terms**

16       Meta argues a boilerplate term in its Business Tools Terms allegedly prohibits app developers

17  from sending Meta health information. SJ at 14. But these terms are meaningless as Meta did not have

18  any mechanisms to enforce or ensure compliance with this provision until after the Class Period. *See*

19  ECF No. 478-14 at 154:1-11 ("Q: Before December of 2019, Meta did not do anything to prevent the

20  ingestion of potentially health-related information received in the form of custom app events through

21  the Facebook SDK; is that correct? . . . A: That's right. At -- before that, our integrity system was

22  focused on PI and credit card information and other -- other information listed in the previous

23  paragraph."); Ex. 8 at '771 (explaining "enforcement of privacy policies in the ads recommendation

24  system . . . wasn't historically built to have built-in understanding and enforcement of data use

25  restrictions"); Ex. 9 at '537 (Meta employees discussing in February 2019 that it was "not possible to

26  ───────────────
   [3] Flo's policies between June 15, 2016 and July 12, 2017 represented only anonymous and aggregated
27  data would be shared, which necessarily excludes the identifiable CAEs at issue in this case. *See* ECF
   Nos. 477-98, 477-99, 477-100, 477-101, 477-102, 477-103. Its policies between February 23 and 27,
   2019 stated Flo either would either "never" share "Personal Information" which was defined to
28  include health data (ECF No. 477-110) or would not do so without "explicit consent," which it did
   not obtain. ECF No. 477-111.

delete data" on Meta's systems sent via events and parameters once its received). Indeed, the only reason Meta ever *bothered* to develop this system was because the WSJ and regulators discovered its interception of health data from the Flo App in February 2019. *See* Ex. 29. And even *then*, Meta acknowledged there *still* was an "existing gap between the spirit of [its] health data policy" and its actual enforcement of this policy. *See* Ex. 10 at '467-68 (explaining in 2022 there is a "big fear of aggressive enforcement" because advertisers may "pull their spend" and advising that warnings to developers should use ***"soft language" and not "aggressively demand businesses to stop sending us [this data]" and present it as a "recommend[ation]")*** (emphasis added); *see also* Ex. 11 at '474 (explaining in April 2019 Meta's "business terms (for ads use) does not necessarily prohibit sensitive data, as we don't define sensitive data").

Meta *itself* knew it was receiving health data from Flo—and other app developers—long before any journalist or government regulators uncovered this conduct. For instance, email communications from March and May of 2018 show that several Meta employees were aware Meta was "crawling sensitive user data" from its "SDK". *See* ECF No. 478-53 at '101 (Wei Lui asking in March 2018 if there are "concerns on crawling sensitive user data in SDK."); Ex. 12 at '741 (Meta employees acknowledging in April 2018 that they "discovered that advertisers are sending [Meta] PII/sensitive data" through "custom fields" and that "downstream" copies are being "used" as well as the "immediate revenue impact" in "dropping" these events); ECF No. 478-52 (Meta acknowledging in May 2018 that "advertisers can inadvertently (or intentionally) send sensitive information" including "health info" and "PII" in "custom data fields via . . . app and offline events" and that "[t]his poses risk as we are unable to cleanly delete data as well as policy and PR issues"). These concerns were largely ignored, even after the WSJ article. *See* Ex. 13 at '606 (Meta employee downplaying the conduct covered by the WSJ article as just "fitness apps sending us data like user height and weight. ***Nothing wrong, just useful data on product usage***" and attaching a follow-up WSJ article referencing Flo).

Meta undoubtedly knew that one of the apps from whom it was receiving health data was the Flo App. Flo is one of Meta's largest advertising clients (Ex. 14 at '915 (Meta acknowledging Flo is a "Health&Fitness CEE client[] with ███████████████")), and

advertising is the core of Meta's business model. Ex. 15 at '624-25 (explaining 98% of Meta's revenue in 2017 is from advertising). Given this relationship, Meta and Flo worked together to ensure Flo had configured its SDK and events so that Meta could receive them and use them for ad campaigns. *See* Ex. 16 (November 2018 email from Facebook employees to Flo containing a guide to "[s]et up new App Events"); Ex. 17 at '164 (Meta guide explaining to Flo how to incorporate the "code snippets" so it "can log the[] events"); Ex. 18 (Flo informing Meta (in Russian) in November 2018 that the events were sent and campaigns will be up early next week); Ex. 19 (English translation of same email); Ex. 20 at '819 (Flo explaining to Meta in January 2019 that it already has a relationship with two Meta employees who were "working on allocating dedicated support to [Flo's account]"); *id.* at '817 (Meta setting up a call in January 2019 with Flo's Head of UA to discuss Flo's "plans for long-distance" and how Meta "can help them"); Ex. 21 at '890 (Meta acknowledging in June 2019 that it already "know[s] Flo and closely interacted with Maksin, [Flo's] Head of UA").

Flo's substantial ad spend also explains why, even when Meta "flagged" Flo for sending health information through CAEs through the Class Period, it never prevented it from doing so and stopped the receipt of that data. *See* Ex. 22 at '771-772 (Meta flagging in December 2018 that Flo's "App" was sending data that violates its terms which prohibited "health" information); Ex. 23 (same in January 2019). Thus, Meta's "Integrity Team" may have felt inclined to flag Flo because they knew it was sharing health data, but Meta's Ads team certainly did not want this conduct to stop.

In fact, Flo was such a large client that when backlash from the February 2019 WSJ article threatened to upend their relationship, Meta was concern it would negatively impact other clients and ad campaigns. *See* Ex. 24 at '064 (Meta employee raising concerns following the WSJ story that "[i]f Facebook SDK and other event trackers are removed from the apps, <u>advertisers can't advertise their products with us so they stop all campaigns</u>" and asking if there is anything to share with "sales team" to address the issue) (emphasis in original). Meta discussed with Flo, as well as internally, about what they would each do to address the situation. *See* Ex. 14 at '915 (Meta employees discussing in February 2019 that "Flo", a "Health&Fitness CEE client[] with ███████████████", that Flo had "mentioned" that Apple raised concerns over its

use of the Facebook SDK, and asking "what actions [Meta] [is] going to take here[.]); *id.at* '914 (Meta employee explaining in June 2019 that "Flo" was "making changes to what data they collect via SDK" and that Meta will "be monitoring [the] situation" and provide an update).

As it turns out, despite their initial concerns about the WSJ article and the government investigations that it spurred, neither Flo nor Meta had any plans on stopping their misconduct—they simply got better at hiding it. Following the WSJ article, Meta and Flo discussed alternative ways to facilitate their data sharing and settled a sever-to-server integration through a third party (i.e., AppsFlyer). As Flo recognized in emails to Meta, this would create "fewer questions" from "reporters" since the data transfers would be virtually undetectable. *See* Ex. 25 at '168 (Flo explaining to Meta that not directly integrating the Facebook SDK means "fewer questions" from "reporters"). Flo adopted this server-to-server (i.e., "S2S") integration with AppsFlyer in March 2019. Ex. 26 at '769; Ex. 27 at '419 (explaining the server-to-server integration sends "events . . . to the server through [the] Push API from appsflyer" and Flo then "send[s] them to the [Facebook] pixel"). Thus, Meta and Flo continued sharing Flo App Users' health data and using the data to serve targeted ads. *See* ECF No. 478-89 at '052-03 (Meta and Flo discussing in January 2020 using Meta's algorithm for targeting "pregnant" and "period tracking" app users, which is the information transmitted through the R_CHOOSE_GOAL event); ECF No. 478-90 at '181 (Flo asking Meta in May 2020 to "launch" "3 campaigns" regarding "pregnant women"); Ex. 28 at '728 (internal Flo email from February 2020 discussing "[t]ransferring data" sorted by "TTC, Pregnant, [and] Track" to "traffic sources" to "create the Lookalikes").

### F.    Meta Used Flo App Users' Data for its Own Purposes

It wasn't just ad spend that motivated Meta to continue receiving health data via CAEs from Flo both during and after the Class Period. The data *itself* was immensely valuable.[4] Meta used this data to improve its algorithms and machine learning processes, which is the core of its advertising model. *See* Ex. 1 at '798 (explaining Meta has a "deep & rich understanding of people's in app behavior via getting high-value & accurate app event data" and that "Ads revenue tracked and

---

[4] Indeed, the entire reason Meta offers a "free" SDK it not because Meta simply wishes to help app developers, but because it wants to get its hands on data it otherwise would be unable to access.

PLAINTIFFS' OPPOSITION TO META'S MOT. FOR SUMMARY JUDGMENT - CASE NO. 3:21-CV-00757-JD

optimized with app events grow to a significantly bigger share") *id.* at '97-98 (explaining as early as 2017 Meta was "[e]xtract[ing] down-funnel signals from custom events" through its SDK and its "goal" was to "increase the volume" of these events and "bring high-value app event data to Facebook" to "active it" and "achieve meaningful business results"); Ex. 8 at '770 (Meta acknowledging its "Ads recommendation models **heavily rely** on the **learning from user behavioral data** collected from both 3rd party (3PD) surfaces" and "Meta's own product surfaces (1st party or 1PD)"); *see also* ECF No. 478-68 at 20-25, 27-34. Meta also had a plethora of other uses for this data. It also uses event data for (1) "re-targeting" (i.e., targeting users who seemed interested in a product but did not complete a purchase or download); (2) "attribution" (i.e., to determine when a purchase or download is attributable to a Meta ad); (3) for "Lookalike Audience[s]" (i.e., to find similar users); (4) for discovering "user features" aka profiling (i.e., using the events to uncover "the user's interest or recent interest" for "ML models"; and (5) for "A/B testing" (i.e., to figure out how "effective" ad campaigns are versus alterative campaign options). *See* ECF No. 478-91 (explaining there are "many more ways" Meta uses event data and "downstream" versions of this data).

Here, Meta used the Flo CAEs in its advertising models as well as for research and development. *See* ECF No. 478-68 at 20-25, 27-34; ECF No. 478-31 at 13 (Meta admitting Flo App event data was "used to improve, through machine learning, the accuracy of content delivery, including delivery of advertisements from advertisers besides Flo Health."); ECF No. 478-66 at 114:3-8 (same); ECF No. 478-67 at '161 (Meta made Flo data "available for [its] Core Data Science research and development team, or other engineers" to improve its other products like its "ads delivery systems" or to "identify potential opportunities to develop new products.").

## III.    STANDARD

"Summary judgment is appropriate only when 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Brown v. Google, LLC*, 685 F. Supp. 3d 909, 922 (N.D. Cal. 2023) (citing Fed. R. Civ P. 56(a)). In making this determination, "the [C]ourt must view all evidence in the light most favorable to the nonmoving party and draw all justified inferences on its behalf." *Id.*

# IV.    ARGUMENT

## A.    Plaintiffs Establish Each of the Elements for Their Wiretapping Claims

Plaintiffs assert wiretapping claims under two statutes: the Federal Wiretap Act ("ECPA") and the California Invasion of Privacy Act ("CIPA").  The analysis for both claims are similar except that California law requires that all parties consent to the interception of the content of their communications.  *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 797 (N.D. Cal. 2022)

Meta argues that its conduct cannot violate either statute for three reasons: (i) it was a party to the communication; (ii) it did not intend to intercept communications; (iii) if it did, the data was not "in transit" at the time and, as a result, does not qualify as "wiretapping." Each of these arguments involves multiple disputed facts and rely on highly technical expert testimony will need to be resolved at trial.  *See Henning v. Fry's Elecs., Inc.*, No. 5:12-CV-06146, 2014 WL 6679514, at *5 (N.D. Cal. Nov. 24, 2014) (denying summary judgment where "[r]esolving these disputes will require crediting the testimony of one expert over the other" because "the court cannot properly weigh credibility at the summary judgment stage").  Accordingly, summary judgment is improper.

### 1.    Meta Intercepted Plaintiffs' Answers to Flo Health's Questions

Under the ECPA and CIPA, "interception" means the acquisition of the contents or meaning of a communication. *See* 18 U.S.C. § 2510(4) (defining "intercept" to mean "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device"); *In re Meta Pixel*, 647 F. Supp. 3d at 795 (explaining the "Ninth Circuit has construed" the term "acquisition" to mean the "act of acquiring, or coming into possession of");  *id*. at 798 (recognizing the analysis for CIPA is "the same").

Here, the record demonstrates that Meta's SDK acquired the contents of Plaintiffs' responses to Flo's health questions immediately when users entered this information in the Flo App.  *See* Section II.B. This is sufficient to prove an "interception." *See* ECF No. 485 at 6-7 (this Court sustaining ECPA and CIPA claims as to Google who used SDKs to transmitted Flo users' health data in real-time); *Valenzuela v. Nationwide Mut. Ins. Co.*, 686 F. Supp. 3d 969, 979 (C.D. Cal. 2023) (explaining embedding code in a website that transmits users' chat messages to an unauthorized third party in real-time is a plausible "interception"); *In re Pharmatrak, Inc.*, 329 F.3d 9, 22 (1st Cir. 2003) (holding

on summary judgment that the use of "code" embedded on a website that "transmit[s]" a user's "personal information" through a "get" request reflecting their browsing on the internet is an interception under the ECPA); *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1107 (9th Cir. 2014) (discussing *Pharmatrak* and noting it "correctly concluded" the defendant violated the ECPA).

According to Meta, there was no interception because there were really two separate communications: (1) Plaintiffs' communication of health information to Flo; and (2) the CAEs triggered *by users inputting their health information*, which created a "new and different communication" from Flo to Meta. SJ at 9. Meta argues that because it only intercepted the latter, which Plaintiffs were not parties to, it did not violate either statute. *Id.* This is wrong.

**First**, Meta cites no authority supporting its position that the CAEs it intercepted are communications between Flo and Meta.[5] The only cases it cited— *Noel v. Hall*, No. CIV. 99-649, 2006 WL 2129799 (D. Or. July 28, 2006) and *Smith v. LoanMe, Inc.*, 11 Cal. 5th 183 (Cal. 2021) (SJ at 10)—do not concern modern electronic communications at all. *Noel*, 2006 WL 2129799, at *11 (involving the creation of written transcripts while listening to "completed conversations" on old cassette tapes); *Smith*, 11 Cal. 5th at 203 (explaining the defendant's phone call to plaintiff where there was a notable "beep" indicating a recording did not violate CIPA). As several courts have acknowledged in cases about analogous technology, an entity who uses tracking technology on a web property they do not own to intercept users' communications with the web property owner—or data reflecting the same—not a party and violates CIPA and the ECPA. *See, e.g., Gladstone v. Amazon Web Servs., Inc.*, 739 F. Supp. 3d 846, 853-54 (W.D. Wash. 2024) (explaining "a growing number of district courts which have" found that interlopers, like Meta, who gain access to communications through software tracking tools are not parties to those communications).

*In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) is instructive. There, Plaintiffs alleged that Meta had incorporated an invisible "plug-in" on various websites they visited. *Id.* at 596. When Plaintiffs interacted with these websites, i.e., by entering URLs to visit a

---

[5] Meta's argument also contradicts by later sections of its brief that rely on it being ***a third party*** to the communication. SJ at 16. Specifically, Meta relies on the Facebook Terms of Service, which it claims provide consent to collect "activity on third-party apps" as opposed to first-party activity involving Meta as a direct party. *Id*. at 16. Meta cannot have it both ways.

PLAINTIFFS' OPPOSITION TO META'S MOT. FOR SUMMARY JUDGMENT - CASE NO. 3:21-CV-00757-JD

webpage or clicking on links, etc., this "create[d]" and "generate[d]" a "GET request" that included the specific URL they visited, which Meta's "plug-in" then copied, duplicated, and transmitted to its own servers. *Id.* at 603-05. In that instance, the Ninth Circuit categorically rejected Meta's argument that it is "a party to the communication" because it was "engag[ing] in the unauthorized duplication and forwarding of unknowing users' information" *even though* it intercepted a "duplicate" of the initial "GET request" sent to the website owner. *Id.* at 608.

The facts here are analogous. Meta's SDK was secretly incorporated in the background of the Flo App (i.e., like the Facebook "plug-in" in *Facebook Tracking)*. When Flo App Users input health information in the onboarding survey, such as their "goal" of getting pregnant this creates an event (R_CHOOSE_GOAL) with a parameter ("get_pregnant") which Meta's SDK immediately possesses and transmits to its own server, akin to the "GET requests" triggered in *Facebook Tracking. See* Section II.B. In no instance does Meta transform from an "unseen auditor"[6] to a *party* to a separate communication simply because the users' inputs are intercepted in the form of a CAE. 956 F.3d at 608 (explaining even "simultaneous, unknown duplication and communication of GET requests" that correspond to the webpages viewed by the user constitutes an unlawful interception).

Meta's attempt to distinguish *Facebook Tracking* by claiming nothing it received was a "duplication" of what was transmitted to Flo. SJ at 11. But *Facebook Tracking* does not hold that Meta and the website developer needed to receive *the same communication* of users' inputs to the website, only that Meta intercepted the "contents" of *a communication* to which it was not a party.[7] *Facebook Tracking*, 956 F.3d at 608; *see also Pharmatrak*, 329 F.3d at 22 (explaining "intercept" under the ECPA "merely require[s] that the acquisition occur at the same time as the transmission; they do not require that the acquisition somehow constitute the same communication as the transmission"). But in any event, Flo *does* receive the same information—both in the app itself and

---

[6] Meta's status as "unseen auditor" is further demonstrated by the absence of any disclosure that its SDK was intercepting Plaintiffs' answers to health survey questions. *See* Section II.D.

[7] As numerous courts (including the Ninth Circuit) have explained, <u>content</u> means information that "divulge a user's personal interests, queries, and habits on third-party websites." *See Facebook Tracking*, 956 F.3d at 605; *Brown*, 685 F. Supp. 3d at 920, 936 explaining ("content" includes information that reveals what "the user was searching for" or how they "interact with a website, for example, [what] they saw . . . [or] querie[d]"). Here, the CAEs that Meta received reflect exactly what users' entered—health information. *See* Section II.B.

on its servers—as required for the app to function. *See, e.g.*, ECF No. 478-10 ¶ 20 (Dr. Egelman's testing showing Flo received users' survey responses); ECF No. 478-6 ¶ 86 (his testing showing Flo sent the R_CHOOSE_GOAL event as well as its parameter "get_pregnant" to Meta); *id*. ¶ 69 (explaining Flo "calculated [users'] cycle [] based on their responses during the onboarding survey"); *id*. ¶ 76, Figure 13 (showing Flo provided a function for users to "Restore Data").[8]

Meta also attempts to distinguish *Facebook Tracking* by claiming there is no "simultaneous" transmission also fails for the reasons set forth in Section IV.A.3. The interception is simultaneous because, as soon as users enter information, Meta's SDK takes possession of it. *See* Section II.B. Meta's claim that there is "no dispute" that the communications were "sent to Meta after they were **stored**" and are not "simultaneous" is false and simply a mischaracterization of the record. *Id.*

**Second**, Meta's dual communication argument fails as a matter of fact because Flo **does not transmit anything** to Meta. The CAEs each reflect interactions between the user and Flo, within the Flo App running on a user's device. *See* Section II.B. It is Meta's wiretapping software that captures these communications and transmits them **from the users' device to Meta's severs**. *See id*., Fig. 1 (showing Meta's SDK does the transmission). Thus, both legally and factually, Meta's argument that there is no interception—and it is somehow just "opening mail" that was "addressed to Meta" that Flo sent to "Meta's own mailbox" (SJ at 9)—is wrong.

### 2.    Meta is Not a Party Under Any Exception

Having explained why the communications Meta intercepted are not its own (above), Meta's claim that it is exempt from wiretapping liability under the ECPA and CIPA party exception are easily disposed of. *See* SJ at 9-11. Meta is liable under both statutes.

**ECPA.** Meta does not fall under the ECPA one-party consent rule because of the ECPA crime-tort exception. *See R.S. v. Prime Healthcare Servs., Inc.,* No. 5:24-CV-00330, 2025 WL 103488, at *4 (C.D. Cal. Jan. 13, 2025) (finding the crime-tort exception of ECPA consent applies where a defendant "had the purpose to disclose private health information without [plaintiff's] consent"). Here, there is no doubt Flo and Meta wanted to disclose Plaintiffs' private health data—despite

---

[8] Meta's claim that Plaintiffs' expert said the data received by Flo and Meta may differ is wrong. What they actually cite is their own expert's misleading characterization of Plaintiffs' expert report. *See* SJ at 11 (citing ECF No.527-3 at 720-23).

knowing it was prohibited—as they sought to (and did in fact) use it for their own commercial benefit. *See* Sections II.E-F. This violates several laws, including those alleged in this case (such as CMIA and CDAFA), as well as HIPAA. *See* ECF No. 478-3 at 14-16; Section IV.C; *see also* 45 C.F.R. § 164.502 (HIPAA prohibiting "use or disclos[ure]" of "protected health information" without proper authorization). Nor is there any question that Flo did not obtain consent to share Plaintiffs' health information in compliance with either statute, as none of Flo's policies disclosed it would ever share health data, and an overwhelming majority expressly stated it would not. *See* Section II.D.

The cases Meta cites are distinguishable. For instance, in *Doe I v. Google LLC*, 741 F. Supp. 3d 828 (N.D. Cal. 2024), plaintiffs' theory was <u>*not*</u> that the website developer or Google sought to share unlawful health data without users' consent (and therefore implicated the crime-tort exception), but that the website developer was <u>*duped*</u> by Google to hand this data over without comprehending the consequences of their action. *Id.* at 842-43 (finding no "exception" to ECPA's one-party consent rule applied because plaintiffs' allegations that the pixel provider "*induced*" healthcare providers to share health data without their knowledge were "vague") (emphasis added). Plaintiffs' theory here, by contrast, falls firmly within this exception: Flo and Meta knew, and intended, to share health data for (at least) targeted advertising, but never bothered to inform Flo App Users or obtain consent before doing so. *See* Sections II.D-F. The other cases Meta cites are equally inapt. *See* SJ at 10-11, 19 (citing *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 145, 152 (3d Cir. 2015) (no discussion of crime-tort exception); *Katz-Lacabe v. Oracle Am., Inc.*, No. 22-cv-04792-RS, 2024 WL 1471299, at *4 (N.D. Cal. Apr. 3, 2024) (same); *Clemons v. Waller*, 82 F. App'x 436, 440-41 (6th Cir. 2003) (explaining that even though "Lee" was "impersonating Clemons" he was nonetheless a "party" to the communication even though he "pretend[ed] to be someone else"); *B.K. v. Eisenhower Med. Ctr.*, 721 F. Supp. 3d 1056, 1065 (C.D. Cal. 2024) (defendant was the website operator and plaintiff did not dispute they were a party to the communication); *Pena v. GameStop, Inc.*, 670 F. Supp. 3d 1112, 1119-20 (S.D. Cal. 2023) (rejecting application of the exception where "the tortious conduct" was solely "the alleged wiretapping itself" and not the "use of the interception's fruits")).

**CIPA.** CIPA is a two-party consent statute requiring consent from both Flo and Plaintiffs. *See In re Meta Pixel*, 647 F. Supp. 3d at 797. There is only **one** limited exception under CIPA (if you can

15

call it that) for third parties who intercept data but function as a mere "tape recorder" for one of the parties to the communication and *nothing else*. *See Turner v. Nuance Commc'ns, Inc.*, 735 F. Supp. 3d 1169, 1184 (N.D. Cal. 2024) (finding party exception does not apply where defendant "is capable of using intercepted data for purposes other than furnishing the data back to the client"). This exception does not apply to Meta, who never intended to simply store Flo App Users' health data for Flo's own safekeeping, and monetized it for its own benefit. *See* Section II.F. This distinguishes *Cody*, where the third party who intercepted the data did nothing with it beyond providing it back to the website developer. *See* SJ at 10 (citing *Cody v. Boscov's, Inc.*, 658 F. Supp. 3d 779, 782 (C.D. Cal. 2023) (failure to plead "future use beyond simply supplying this information back to Defendant")).

Meta's other cases involve communications that were actually between two parties without any third-party interloper like Meta. *See* SJ at 10 (citing *Thomasson v. GC Servs. Ltd. P'ship*, 321 F. App'x 557, 559 (9th Cir. 2008) (explaining "[t]here were only two parties" to the communications and "[n]o third party listened in"); *Gonzales v. Uber Techs., Inc.*, 305 F. Supp. 3d 1078, 1089 (N.D. Cal. 2018) (finding no interception where "Uber collected data from messages Lyft sent to Uber, acting as a Lyft rider"); *Rogers v. Ulrich*, 52 Cal. App. 3d 894, 897, 125 (Ct. App. 1975) (involving one person's use of tape recorder on another); *Pena*, 670 F. Supp. 3d at 1119 (plaintiff pleaded that defendant "was the intended receiving party" and no other parties were involved).

### 3.    Meta Contemporaneously Intercepted Plaintiffs' Communications

To violate the ECPA, Meta must have acquired Plaintiffs' communications with Flo contemporaneously. *See* 18 U.S.C. §§ 2510, 2511. To violate CIPA, Meta must have either acquired the communication while (1) "in transit" or "passing over any wire, line, or cable" or (2) while its "being sent from[] or received at any place within" California. *See* Cal. Penal Code § 631(a). There is no doubt these requirements are satisfied.

Here, Plaintiffs satisfy both requirements because Meta received the CAE's "contemporaneously with" the "ordinary transmission" of Flo App User's health information. *See India Price v. Carnival Corp.*, 712 F. Supp. 3d 1347, 1359 (S.D. Cal. 2024). As described in Section II.B, Meta's SDK executed in real time (i.e., immediately) as Flo App sers communicated with Flo through a series of questions and answers in the onboarding survey. *See also* ECF No. 478-6 ¶¶ 87-

88. It is hard to imagine a better example of a "contemporaneous" or "in transit" interception. *See D'Angelo v. FCA US, LLC*, 726 F. Supp. 3d 1179, 1198 (S.D. Cal. 2024) (confirming similar interceptions through the web-based equivalent of SDKs that cause communications to be "routed" to a third party in "real time" constitute an actionable interception under CIPA). *Jones v. Peloton Interactive, Inc.,* No. 23-CV-1082-L-BGS, 2024 WL 3315989, at *4 (S.D. Cal. July 5, 2024) (similar).

Plaintiffs also separately allege viable CIPA claims because Meta "received" and "read" or "learn[ed] the contents" these communications in California, as that is where its headquartered and used the data for its own benefit. *See* Cal. Penal Code § 631(a); *Doe v. FullStory, Inc.*, 712 F. Supp. 3d 1244, 1260 (N.D. Cal. 2024) ("interception" element of CIPA is satisfied by plaintiff's allegations that "the practice, the interception, and the use of the data" occurred "in California" where the company is based). Thus, independent of whether Plaintiffs' communications were intercepted while "in transit" within California, Meta still nonetheless violated CIPA.

Despite these facts, Meta argues that Flo App Users communications are not intercepted while "in transit" because they are "stored on each Flo app user's device before any subsequent transmission to Meta." SJ at 12. This is misleading but fails regardless for at least two reasons.

***First***, and critically, Meta conflates *interception*, which merely requires "collection . . . occur[ing] contemporaneously with its ordinary transmission," (*see India Price*, 712 F. Supp. 3d at 1359 )), with the completed ***receipt*** of data to Meta's servers. As explained above, Meta's SDK collects the CAEs—i.e., it intercepts them—as they are triggered in real time. *See* Section II.B. The separate act of confirming receipt by Meta's severs involves a separate step unrelated to the point of interception. *See In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1081-82 (N.D. Cal. 2015) (rejecting defendant's argument that there was no contemporaneous interception where the data is temporarily stored "on [p]laintiffs' mobile devices" because it was already "en route").

***Second***, even if Meta were correct on how to evaluate the timing of an interception (and it is not), Meta omits that ***it is the Meta SDK*** that captures the information it already intercepted in a pre-transmission "cache" prior to sending that information to Meta's servers. *See* Section II.B. This is unsurprising as it is all internet communications work. *See* ECF No. 478-10 ¶¶ 33-34. Meta's own

expert explains the insignificance of "caching" to the actual transmission: under Meta's "default settings" CAEs are only "cached" for longer than a few seconds if a "user" triggers CAEs "100 times in 15 seconds" (a near impossibility) or if the user has connectivity issues, such as setting their phone to "airplane mode" for a "cross-country flight." ECF No. 527-3 at 509. In either case, Meta's interception is contemporaneous under its own definition because it receives the communication at the same time it would "ordinar[ly]" under the circumstances (e.g., when the user regains Internet connectivity, or the cache clears). *See India Price*, 712 F. Supp. 3d at 1359 (explaining "interception" only requires the "collection . . . occur contemporaneously with its ordinary transmission"). In any event, Meta has no evidence a single user ever had these speculative connectivity issues.

The cases Meta cites highlights the distinction between limited "cach[ing]" and actual storage, as they each involve instances where data was already received at its intended destination and then forwarded.[9] *See* SJ at 12-13 (citing *Sunbelt Rentals, Inc. v. Victor*, 43 F. Supp. 3d 1026, 1031 (N.D. Cal. 2014) (no interception because plaintiffs' "text messages" had already been "received" on his iPhone before his employer had allegedly reviewed them); *Konop v. Hawaiian Airlines, Inc.*, 302 F.3d 868, 885 (2002) (no interception where the information was already posted to a public website before it was accessed); *Bunnell v. Motion Picture Ass'n of Am.*, 567 F. Supp. 2d 1148, 1150, 1154 (C.D. Cal. 2007) (no interception when someone "hacked" an email address to "cop[y] and forward[]" all received emails); *Griffith v. TikTok, Inc.*, No. 5:23-CV-00964, 2024 WL 5279224, at *2 (C.D. Cal. Dec. 24, 2024) (no interception because date was sent "server-to-server" and thus was already received by the "website owner" before being sent "to Defendants").[10]

### 4.    Meta Intentionally Intercepted Plaintiffs' Communications with Flo

The wiretapping laws apply to anyone who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic

---

[9] Plaintiffs are unaware of any court to adopt Meta's position that software running on a device cannot intercept digital communications stored in memory.

[10] The remaining two cases Meta cites were dismissed for reasons that cannot readily be discerned (because of heavy redactions) or because of inadequate pleadings. *See* SJ at 12-13 (citing *Backhaut v. Apple Inc.*, 148 F. Supp. 3d 844, 849 (N.D. Cal. 2015) (heavily redacted) (appearing to find no interception because there was no evidence the iMessage was "redirect[ed]" to anyone other than the intended recipient); *Valenzuela v. Keurig Green Mountain, Inc.*, 674 F. Supp. 3d 751, 758-59 (N.D. Cal. 2023) (dismissing complaint for conclusory allegations that "code" intercepted data because it did not explain "how" or contain any "level of specificity" to meet the plausibility standard).

communication." *United States v. Christensen*, 828 F.3d 763, 774 (9th Cir. 2015); *Mata v. Zillow Grp., Inc.*, No. 24-CV-01095, 2024 WL 5161955, at *5 (S.D. Cal. Dec. 18, 2024) ("The analysis for a violation of CIPA is the same as that under the federal Wiretap Act."). This does not require proof of "a particular evil purpose," only that "one's conduct or the result of one's conduct . . . is one's conscious objective." *Christensen*, 828 F.3d at 775.

In *Christensen*, the Ninth Circuit explained intent was satisfied because the defendant "knew or had reason to know that *the design* of [the mechanical or other] device rendered it primarily useful for the purpose of the surreptitious interception of wire, oral, or electronic communications." *Id.* at 792. Here, the entire purpose of Meta's SDK is to acquire event data from within apps (like Flo) that Meta would not otherwise have access to. Ex. 1 at '98 (explaining the "goal" of Meta's SDK was to "[e]xtract down-funnel signals from custom events" so it can "deliver highly relevant ads"); *see* Section II.F. Because interception of CAEs was the "conscious objective" of Meta's conduct in designing, building, and distributing its SDK, the element of intent is satisfied for the same reasons as in *Christensen*. 828 F.3d at 791.

Meta's argument that Plaintiffs must show it specifically "intended to 'intercept' health information" or even more precisely, the "communications at issue"—i.e., CAEs—to demonstrate intent, misstates *Christensen* and must be rejected. SJ at. 13-14. The Ninth Circuit has never adopted such a circumscribed view of intent. Just the opposite, it has rejected it. *Christensen*, 828 F.3d at 791 (explaining a party does not need to know their technology is being used for an unlawful purpose).[11] But even if this were the law (and it is not), Meta's motion would still fail because there is ample evidence demonstrating Meta knew it was collecting and using CAEs, including health information from Flo, for its own commercial benefit but continued to do so. *See* Section II.F.

All Meta can conjure up to dispute this evidence is a lone citation to an unenforced policy.[12] SJ at 14. But whether this singular document (which the record shows was *never* enforced (*see* Section II.E) overrides a clear and consistent record of violating users' privacy by intercepting their health

---

[11] For the same reason, Meta's argument (Mot. at 3, 14) that it intended its technology to be used legally also fails. *See Christensen*, 828 F.3d at 791 (rejecting defendants' argument that intent to provide software to law enforcement for legal wiretapping excused ECPA violation).

[12] Meta also references its integrity system, which was not developed until after the Class Period and therefore is not indicative of Meta's earlier intent. *See* MSJ at 14; *see* Section II.E. The record also shows that Meta continues to serve health-based ads for Flo *despite* this systems existence. *See id.*

for years on end is a quintessential fact issue for the jury to decide. *See In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1020-21 (S.D. Cal. 2011) (denying summary judgment in part and finding that "[w]hether defendants had [the requisite] knowledge . . . is an issue of fact"); *G&C Auto Body Inc. v. GEICO Gen. Ins. Co.*, 552 F. Supp. 2d 1015, 1022 (N.D. Cal. 2008) (denying summary judgment where the evidence obtained in discovery "create[d] a genuine disputed issue of fact regarding [defendant]'s intent that must be placed in the factfinder's hands").

The cases Meta cites are equally unavailing. For instance, plaintiffs in *Doe I*, 741 F. Supp. 3d 828 were dismissed on the pleadings because there was no support for their allegation that Google's policies claiming it did not want health data were actually a "ruse." *Id.* at 841. *B.K. v. Desert Care Network*, No. 2:23-CV-05021, 2024 WL 1343305 (C.D. Cal. Feb. 1, 2024) involves similar facts, in which the plaintiff "repeatedly" pled Meta had a policy stating it did not want to receive health data and did not include plausible allegations that this policy was not enforced or mere pretense. *Id.* at *7. Here, this case is well beyond the pleadings and the record overwhelmingly shows Meta, not only did not enforce its policies (*see* Section II.E)—including *after* the WSJ article—but actively provided Flo with ads based on health data despite this provision. *Id.* Its other cases involve actual accidents that are not comparable to Meta's intentional and persistent conduct here. SJ at 15 (citing *Sanders v. Robert Bosch Corp.*, 38 F.3d 736, 742–43 (4th Cir. 1994) (no intent because the interception was caused by a microphone "design defect" that was "not known"); *Forsyth v. Barr*, 19 F.3d 1527, 1535–36 (5th Cir. 1994) ("Appellants conceded at oral argument that the appellees did not install any device or listen to any conversations[.]"); *Cantu v. Guerra*, No. SA-20-CV-0746, 2023 WL 5217852 at *23 (W.D. Tex. Aug. 11, 2023) (lacking evidence of any device capable of recording let alone intent to record); *Global Imaging Acquisitions Group, LLC v. Rubenstein*, No. 14-C-0635, 2017 WL 11673437 at *12 (E.D. Wis. Aug. 16, 2017) (finding defendant was a party because *plaintiff* caused his messages to be forwarded to defendant by failing to "unsync" his device in defendant's possession).

### B.    Plaintiffs Did Not Consent to Meta's Interception of Their Health Data

Consent is an affirmative defense on which Meta bears the burden of proof. *See Brown*, 685 F. Supp. 3d at 933. This requires Meta to show that Plaintiffs each consented "'to the particular conduct, or to substantially the same conduct' and if [that Meta] did not exceed the scope of that

consent." *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147 (9th Cir. 2024) (internal quotations omitted). This is evaluated considering the facts "as a whole" under reasonable person standard. *Id.* As this Court has already found "consent is typically a fact-bound inquiry," which cannot be resolved at summary judgment, especially where, as here, there are "disputes of fact about the scope of the information that [Defendants] obtained . . . and the uses of that data[.]" *See* ECF No. 485 at 3.

Meta cannot meet its burden by citing a general Data Policy applicable to all Facebook users. SJ at 16. The Ninth Circuit recently rejected a similar argument in *Calhoun*—a case conspicuously absent from Meta's motion. 113 F.4th at 1151. In that case, Google argued that its general Privacy Policy established consent to collect browsing data through Chrome based on disclosures similar to Meta's here. *Id.* at 1145 (stating "We collect information about the services that you use . . . like when you . . . visit a website that uses our advertising services."). The Court rejected this argument because there were "more specific representation" in a policy specific to "Chrome" and a "reasonable user" viewing these "disclosures might think" that their Chrome browsing data was not collected. *Id.*

The reasoning in *Calhoun* compels the same result. The more "specific representation" in this case is *Flo's* actual privacy policy, nearly all of which affirmatively stated "survey" and "health" data would never be shared with third parties. *See* Section II.D. Thus, even if Plaintiffs agreed and were aware of Meta's general terms (which Meta has not shown), no "reasonable user" viewing these disclosures as a "whole" would think Meta received their identifiable health data.

Meta's argument separately fails because its disclosures (even standing alone) are insufficient to establish consent to collect Plaintiffs' identifiable health data through their use of the Flo App. *See In re Meta Pixel*, 647 F. Supp. 3d at 793-94 (rejecting argument that Meta's privacy policy established consent because a "reasonable user" likely would not have "understood" from this policy that Meta was "collecting protected health information" through tracking technology on third party websites); *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1002–04 (N.D. Cal. 2024) (same regarding "sensitive financial data"). Meta does not dispute that it is relying on the same terms rejected in both these cases. *See* SJ at 18. Instead, Meta argues these cases are *distinguishable* because the data here is not actually "sensitive[.]" *Id*. This is false. The data here is identifiable health information (*see* Sections II.B-C), as recognized by several laws. *Id*. It is hard to imagine a more "sensitive" type of

data. Its reliance on *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017) is a red herring because that case did not involve identifiable health data (like here) and only "general health information that is accessible to the public at large" (e.g., information on public blogs, etc.).

The only other cases Meta cites involve clear disclosures unlike the vague statements in Meta's Data Policy, which say in the most general terms that it collects "information" (what information?) about "apps [] visit" (what apps?) and using "[s]ervices" (what services?). *See, e.g.*, ECF No. 527-3 at 33; *see also* SJ at 17-18 (citing *Hammerling v. Google LLC*, No. 22-17024, 2024 WL 937247, at *2 (9th Cir. Mar. 5, 2024) (finding plaintiff consented to data collection from their Android device because Google's policy stated it collected data from the "Android operating system"); *Silver v. Stripe Inc.*, 2021 WL 3191752, at *4–5 (N.D. Cal. July 28, 2021) (policy disclosed that defendant would collect "credit card data" and "identifiers" through "partners")).[13]

Finally, Meta's footnote argument that Plaintiff Chen's data was "anonymous" (and therefore non-sensitive) because she did not have a Meta account is baseless.[14] *See* SJ at 16 n.2. Meta's own interrogatories confirm it collected persistent identifiers associated with Plaintiff Chen. *See* Section II.C. Such data is not "anonymous" under any definition of the word. And in any event, the deposition testimony Meta cites states that Plaintiff Chen has a Facebook account but simply does not use it. *See* SJ at 16 n.2 (citing ECF No. 527-3 at 243-44).

### C.    Plaintiffs Establish Claims Under CDAFA

As the Court held in its prior summary judgment order, "CDAFA provides a private cause of action against any person who '[k]nowingly accesses and without permission uses or causes to be used computer services' or 'accesses or causes to be accessed any computer, computer system, or computer network.'" *See* ECF No. 485 at 4 (citing Cal. Pen. Code §§ 502(c)(3), (7), & (e)(1)). Here, Plaintiffs identify explicit evidence that Meta "knowingly accesse[d]" their devices to obtain their

---

[13] Meta cites two other cases that do not discuss whether certain terms are sufficient to establish consent. *See* SJ at 17-18 (citing *Garcia v. Enter. Holdings, Inc.*, 78 F. Supp. 3d 1125, 1135–37 (N.D. Cal. Jan. 23, 2015) (plaintiff did not dispute the "accuracy" of defendant's privacy policy but claimed "he never agreed to it"); *Lloyd v. Facebook, Inc.*, No. 23-15318, 2024 WL 3325389, at *1-2 (9th Cir. July 8, 2024) (dismissing ADA claim for failure to show "intentional discrimination" in "public accommodations")).

[14] As support, Meta cites one document referring to its *extensive* efforts to further identify app users. SJ at 16 n.2 (citing ECF No. 527-3 at 120-22). But this document does not mention how these efforts are unnecessary when Meta ***directly*** receives identifiable information.

PLAINTIFFS' OPPOSITION TO META'S MOT. FOR SUMMARY JUDGMENT - CASE NO. 3:21-CV-00757-JD

1  private, in-app communications with Flo without their consent.  *See* Sections II.D-E. As described

2  below, Meta's arguments that Plaintiffs' CDAFA claim fails misconstrues the facts and law.

3        **First**, Meta claims there is "no evidence Meta 'actively participated' in 'hacking'" and that

4  Meta did not "knowingly" participate in hacking because it "simply made its SDK publicly available"

5  and had no "awareness" about what Flo "told its users with respect to data collection." SJ at 19-20.

6  This is wrong. A far cry from a "passive" observer, Meta knowingly participated in hacking because

7  its *Meta's technology* that performed the interception and *Meta* who ultimately uses the fruits of this

8  unlawful activity to provide ads and improve its ad targeting capabilities. *See* Sections II.B, E-F. Meta

9  cannot deny it knew its SDK was incorporated in the Flo App or how its own technology functioned.

10  *See id*.  Whether Meta separately knew what *Flo* told users is entirely irrelevant. *CTI III, LLC v.*

11  *Devine*, No. 2:21-CV-02184, 2022 WL 1693508, at *4 (E.D. Cal. May 26, 2022) (explaining CDAFA

12  "merely requires knowing access[]" *not* that the access is "unauthorized").

13        The cases Meta cites either support Plaintiffs' argument or actually involve truly passive

14  conduct. *See* SJ at 20 (citing *CTI III*, 2022 WL 1693508, at *4 (sustaining CDAFA against individual

15  who "accessed" a system and "improperly copied, then used the[] data" but dismissing claim against

16  the individual's employer who did not ratify or otherwise participate in the CDAFA violation);

17  *Claridge v. RockYou, Inc.*, 785 F. Supp. 2d 855, 863 (N.D. Cal. 2011) (finding no CDAFA violation

18  by simply failing to adopt reasonable data security that could be accessed by actual "hackers"); *Nowak*

19  *v. Xapo, Inc.*, No. 5:20-CV-03643, 2020 WL 6822888, at *1 (N.D. Cal. Nov. 20, 2020) (similar);

20  *Welenco, Inc. v. Corbell*, 126 F. Supp. 3d 1154, 1170 (E.D. Cal. 2015) (refusing to base CDAFA

21  claim on merely "[w]ithholding a password for two hours"); *Sunbelt Rentals*, 43 F. Supp. 3d at 1033

22  (finding no CDAFA violation where defendant merely reviewed text messages plaintiff himself

23  "inadvertently" sent to defendant)).

24        **Second**, Meta's consent defense fails for the reasons stated in Section IV.B. *Brodsky* does not

25  support its position because, there, plaintiff could not dispute he gave "authorization" for Apple to

26  access his "login activities" and only complained that he disliked *how* Apple went about doing so.

27  *See Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 130–32 (N.D. Cal. 2020). Here, it is not that Meta

28  used "means" that Plaintiff disapproved of—Meta had no authorization at all.

***Finally***, Meta's argument that there is no "damage or loss" (SJ at 21-23) has already been rejected in the Court's prior summary judgment order. ECF No. 485 at 5 (explaining "[P]laintiffs have adduced evidence from which a reasonable jury could conclude that the information obtained by [Defendants] 'carried financial value' that amounts to damage or loss suffered by [P]laintiffs."); *see also* ECF No. 478-86 at 37-42 (Hoffman explaining the CAEs have financial value); ECF No. 478-31 at 13 (Meta used Flo CAEs "to improve . . . delivery of advertisements from advertisers besides Flo Health"). Similar to Google, the record shows Meta *itself* recognized the financial value of this data, which is precisely why it sought out app developers to obtain this information through its SDK and CAEs. Ex. 1 at '98 (explaining the "goal" of Meta's SDK was to "[e]xtract down-funnel signals from custom events" so it can "deliver highly relevant ads"); *see also* Section II.F. The record also shows there are active markets for this data, as Flo was selling this data directly to third parties for cash. *See* ECF No. 351-21 at '429 (Flo employee discuss with Bayer its "data sharing with Bayer" using "3rd party SDK"); ECF No. 478-25 at 3 (showing Bayer and P&G paid Flo more than ███████ to access the data). Meta cites no evidence to the contrary, and simply citing cases before other judges that reached a different conclusion, on different facts, is not a basis to reconsider the Court's prior holding. *See* SJ at 22. Indeed, plenty of judges have also *agreed* with this Court's sound reasoning. *See* SJ at 22 (citing *Esparza v. Kohl's, Inc.*, 723 F. Supp. 3d 934, 945 (S.D. Cal. 2024); *Brown*, 685 F. Supp. 3d at 940).[15]

### D.   Plaintiffs' Aiding & Abetting Claim Should Go to the Jury

While the Court previously found that there was insufficient evidence to find *Google* liable for aiding and abetting, the same reasoning does not apply to *Meta*. The record shows that—during the Class Period—Meta knew it intercepted health data through its SDK and had flagged Flo *specifically* for sharing this type of information. *See* Section II. E. It also shows that these "warnings" (if you can call it that) were in name only, as Meta nonetheless continued to receive this data and provide targeted ads. *Id.* Meta's conduct ***after*** the WSJ article further corroborates that Meta was a

---

[15] That these cases reference the Ninth Circuit's discussion of standing in *Facebook Tracking*, 956 F.3d at 598 does not make them "wrongly decided." SJ at 22; *see also Brown*, 685 F. Supp. 3d at 940 (explaining this is "beside the point"). Its separate claim that *Facebook Tracking* requires showing Plaintiffs retain a stake in the profits is just incorrect. SJ at 23. The language it cites was referring to the legal right to disgorgement under California law.

1  knowing participant in this intrusion, as it worked directly with Flo to devise a *new* mechanism to

2  continue data sharing that would avoid scrutiny from journalists. *Id.* These actions are not consistent

3  with Meta's claim that it lacked knowledge and never sought to "aid[]" Flo. SJ at 23-25.

## CONCLUSION

5        Plaintiffs do not contest dismissal of their UCL claim. The remainder of Meta's SJ should be

6  denied.

7

8  Dated: March 6, 2025                              */s/ Christian Levis*

9                                                    Christian Levis (*pro hac vice*)
                                                     Amanda Fiorilla (*pro hac vice*)
10                                                   **LOWEY DANNENBERG, P.C.**
                                                     44 South Broadway, Suite 1100
11                                                   White Plains, NY 10601
                                                     Tel: (914) 997-0500
12                                                   Fax: (914) 997-0035
                                                     clevis@lowey.com
13                                                   afiorilla@lowey.com

14                                                   *Proposed Co-Lead Counsel*
                                                     *for Plaintiffs and the Proposed Class*

15                                                   Carol C. Villegas (*pro hac vice*)
                                                     Michael P. Canty (*pro hac vice*)
16                                                   Danielle Izzo (*pro hac vice*)
                                                     Gloria J. Medina (*pro hac vice*)
17                                                   Michael Hotz (*pro hac vice*)
                                                     **LABATON KELLER SUCHAROW LLP**
18                                                   140 Broadway
                                                     New York, NY 10005
19                                                   Tel: (212) 907-0700
                                                     Fax: (212) 818-0477
20                                                   cvillegas@labaton.com
                                                     mcanty@labaton.com
21                                                   jbissell-linsk@labaton.com
                                                     dsaldamando@labaton.com
22                                                   dizzo@labaton.com
                                                     gmedina@labaton.com
23                                                   mhotz@labaton.com

24                                                   *Proposed Co-Lead Counsel*
                                                     *for Plaintiffs and the Proposed Class*

25

26                                                   Diana J. Zinser (*pro hac vice*)
                                                     Jeffrey L. Kodroff (*pro hac vice*)
27                                                   Icee N. Etheridge (*pro hac vice*)
                                                     Cary Zhang (*pro hac vice*)
28                                                   **SPECTOR ROSEMAN & KODROFF, P.C.**
                                                     2001 Market Street, Suite 3420

25

Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611
dzinser@srkattorneys.com
jkodroff@srkattorneys.com
ietheridge@srkattorneys.com
czhang@srkattorneys.com

*Proposed Co-Lead Counsel*
*for Plaintiffs and the Proposed Class*

James M. Wagstaffe (95535)
**ADAMSKI MOROSKI MADDEN CUMBERLAND & GREEN LLP**
P.O. Box 3835
San Luis Obispo, CA 93403-3835
Tel: 805-543-0990
Fax: 805-543-0980
wagstaffe@ammcglaw.com

*Counsel for Plaintiffs Erica Frasco*
*and Sarah Wellman*

Ronald A. Marron (CA Bar 175650)
Alexis M. Wood (CA Bar 270200)
Kas L. Gallucci (CA Bar 288709)
**LAW OFFICES OF RONALD A. MARRON**
651 Arroyo Drive
San Diego, CA 92103
Tel: (619) 696-9006
Fax: (619) 564-6665
ron@consumersadvocates.com
alexis@consumersadvocates.com
kas@consumersadvocates.com

*Counsel for Plaintiffs Jennifer Chen and Tesha Gamino*

Kent Morgan Williams (*pro hac vice*)
**WILLIAMS LAW FIRM**
1632 Homestead Trail
Long Lake, MN 55356
Tel: (612) 940-4452
williamslawmn@gmail.com

William D. Harris, II (*pro hac vice*)
**HARRIS LEGAL ADVISORS LLC**
3136 Kingsdale Center, Suite 246
Columbus, OH 43221
Tel: (614) 504-3350
Fax: (614) 340-1940

will@harrislegaladvisors.com

*Counsel for Plaintiffs Leah Ridgway and Autumn Meigs*