**Pages 1 - 64**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

| | |
|---|---|
| ERICA FRASCO, et al., ) | |
| individually and on behalf of ) | |
| all others similarly situated, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| VS. ) | **NO. 3:21-CV-00757 JD** |
| ) | |
| FLO HEALTH, INC., META ) | |
| PLATFORMS, INC., GOOGLE, LLC, ) | |
| and FLURRY, LLC, ) | |
| ) | |
| Defendants. ) | |
| _____) | |

San Francisco, California

Thursday, June 26, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

      LOWEY DANNENBERG, P.C.
      44 South Broadway, Suite 1100
      White Plains, New York 10601
   BY: **CHRISTIAN LEVIS, ATTORNEY AT LAW**

      SPECTOR ROSEMAN & KODROFF, P.C.
      Two Commerce Square
      2001 Market Street, Suite 3420
      Philadelphia, Pennsylvania 19103
   BY: **DIANA J. ZINSER, ATTORNEY AT LAW**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported by:  Ruth Levine Ekhaus, RDR, RMR, FCRR, CCG
      CSR No. 12219, Official  United States Reporter

**APPEARANCES**:  (CONTINUED)

For Plaintiff:
                            LABATON KELLER SUCHAROW LLP
                            140 Broadway
                            New York, New York 10005
                    BY:  **JAKE BISSELL-LINSK, ATTORNEY AT LAW**
                            **CAROL C. VILLEGAS, ATTORNEY AT LAW**
                            **MICHAEL P. CANTY, ATTORNEY AT LAW**

For Defendant Flo Health, Inc.:
                            DECHERT LLP
                            US Bank Tower
                            633 West 5th Street, Suite 4900
                            Los Angeles, California 90071-2032
                    BY:  **BENJAMIN M. SADUN, ATTORNEY AT LAW**
                            **ALLISON OZUROVICH, ATTORNEY AT LAW**

                            DECHERT LLP
                            Cira Centre
                            2929 Arch Street
                            Philadelphia, Pennsylvania 19104-2808
                    BY:  **THEODORE E. YALE, ATTORNEY AT LAW**

                            DECHERT, LLP
                            One International Place
                            100 Oliver Street
                            Boston, Massachusetts 02210
                    BY:  **BRENDA R. SHARTON, ATTORNEY AT LAW**

For Defendant Meta Platforms, Inc.:
                            LATHAM & WATKINS
                            555 Eleventh Street, NW, Suite 1000
                            Washington, D.C. 20004
                    BY:  **ANDREW B. CLUBOK, ATTORNEY AT LAW**

                            LATHAM & WATKINS LLP
                            650 Town Center Drive, 20th Floor
                            Costa Mesa, California 92626
                    BY:  **MICHELE D. JOHNSON, ATTORNEY AT LAW**

                            LATHAM & WATKINS LLP
                            505 Montgomery Street, Suite 2000
                            San Francisco, California 94111
                    BY:  **MELANIE M. BLUNSCHI, ATTORNEY AT LAW**

            (APPEARANCES CONTINUED ON FOLLOWING PAGE)

**APPEARANCES**:   (CONTINUED)

                        GIBSON, DUNN & CRUTCHER LLP
                        One Embarcadero Center, Suite 2600
                        San Francisco, California 94111-3715
                   BY:   **ELIZABETH K. McCLOSKEY, ATTORNEY AT LAW**
                         **ABIGAIL A. BARRERA, ATTORNEY AT LAW**

For Defendant Google, LLC:
                        WILLKIE FARR & GALLAGHER LLP
                        333 Bush Street
                        San Francisco, California 94104
                   BY:   **BENEDICT Y. HUR, ATTORNEY AT LAW**
                         **TIFFANY M. LIN, ATTORNEY AT LAW**

                        COOLEY LLP
                        Three Embarcadero Center
                        20th Floor
                        San Francisco, California 94111
                   BY:   **SIMONA A. AGNOLUCCI, ATTORNEY AT LAW**


Also Present:   **Nikki Sokol, Meta Platforms, Inc.**

**Thursday - June 26, 2025**                                    **1:35 p.m.**

**P R O C E E D I N G S**

---o0o---

THE CLERK:  All rise.  This Court is now in session. The Honorable James Donato presiding.

THE COURT:  Good afternoon.

ALL:  Good afternoon, Your Honor.

THE CLERK:  Please be seated.

Calling Civil 21-757, Frasco vs. Flo Health.

Counsel.

MR. CANTY:  For the plaintiffs and the class, Michael Canty from Labaton Keller Sucharow.  Good afternoon, Your Honor.

MR. LEVIS:  Christian Levis for the plaintiffs.

THE COURT:  Everybody at the table, please.

MS. ZINSER:  Diana Zinser, Spector Roseman & Kodroff for the plaintiff.

MS. VILLEGAS:  Good afternoon, Your Honor.  Carol Villegas from Labaton Keller Sucharow for the plaintiffs.

MR. BISSELL-LINSK:  Jake Bissell-Linsk from Labaton for the plaintiffs.

THE COURT:  Okay.

MS. SHARTON:  Good afternoon, Your Honor.  Brenda Sharton for Flo.

MS. AGNOLUCCI:  Good afternoon, Your Honor.  Simona

Agnolucci, Cooley LLP for Google.

**MR. SADUN:**  Good afternoon, Your Honor.  Benjamin Sadun for Flo.

**MR. YALE:**  Good afternoon, Your Honor.  Theodore Yale also of Dechert, also for Flo.

**MR. HUR:**  Good afternoon, Your Honor.  Ben Hur from Cooley for Google.

**MR. CLUBOK:**  Good afternoon, Your Honor.  It's Andrew Clubok from Latham & Watkins LLP on behalf of Meta.  We're here today with our client, Nikki Sokol from Meta, and my colleagues, who will introduce themselves.

**MS. JOHNSON:**  Good afternoon, Your Honor.  Michelle Johnson, Latham & Watkins, on behalf of Meta.

**MS. BLUNSCHI:**  Good afternoon.  Melanie Blunschi also from Latham on behalf of Meta.

**MS. BARRERA:**  Good afternoon.  Abbey Barrera from Gibson Dunn & Crutcher on behalf of Meta.

**MS. McCLOSKEY:**  Good afternoon.  Elizabeth McCloskey of Gibson Dunn on behalf of Meta.

**MS. OZUROVICH:**  Good afternoon, Your Honor.  Allison Ozurovich from Dechert LLP on behalf of Flo.

**MS. LIN:**  I think I'm the last one.  Tiffany Lin from Cooley LLP on behalf of Google.

**THE COURT:**  Okay.  Let's get organized for trial.

All right.  First of all, what's happening with

notice.

Plaintiffs?  Class notice?

**MR. LEVIS:**  Sure.  Well, I think the last update indicated that we've followed with the plan that was proposed by the administrator.  Notice has been distributed on both print and digital means.

Flo can speak about the efforts to send push notifications and display the banners.  And, I think, based on Your Honor's last order about the banners remaining up, that that has been -- I assume it's been taken care of, but someone from Flo can speak to that.  But, yes.

I don't know if you have any specific questions --

**THE COURT:**  It's your class.  I'm expecting you to make this happen.  Don't --

**MR. LEVIS:**  Yeah.

**THE COURT:**  Don't just say:  You know, it's up to Flo.  It's your class.

**MR. LEVIS:**  No.

**THE COURT:**  I'm a little disturbed that you're saying things like, "I don't know, ask Flo."

I'm holding you responsible for the notice.

**MR. LEVIS:**  I -- no, I appreciate that.  We did --

**THE COURT:**  And when you're talking to me, don't raise your hand up like this.

**MR. LEVIS:**  Okay.

**THE COURT:** Okay?  You don't get to do that to me. You should know that.

**MR. LEVIS:** Sorry.

**THE COURT:** Now, you're responsible for notice.  It's going to live or die based on what you do to protect the class. You are the counsel appointed for the class so don't tell me: I guess the banners are up.  I don't know, ask Flo.

That is the wrong answer.

Now, you take it from the top and you tell me where we are.

**MR. LEVIS:** The only reason I brought the banners up was because, while we had mentioned or raised that issue with Flo about the banners --

**THE COURT:** I asked you to take it from the top and tell me where we are.

What is the status of notice and is there any concern that notice is not adequate or in any way not getting through?

**MR. LEVIS:** We do not currently have concerns that notice is not adequate or --

**THE COURT:** And why is it?

**MR. LEVIS:** -- not getting through.

**THE COURT:** Tell me why.

**MR. LEVIS:** The notice plan that was outlined by the administrator has been carried out.  The impressions that were purchased for digital media notice have been served.  The print

ads have been distributed.

Flo has placed the banner ads on their website.  It was still up as of this morning.  We checked it ourselves from our devices this morning.  We could still see it.  So that complies with Your Honor's latest order about leaving the notice in place during the period prior to trial.

The push notifications, we did not receive them ourselves, so I cannot validate that because I would not have received one; but our understanding is that those have been also distributed in accordance with the Court's order.

**THE COURT:**  I don't want your understanding.  I want evidence.

**MR. LEVIS:**  Okay.

**THE COURT:**  Sit down.  Next time you come in here, which is going to be one week from today, I want a full report based on facts.  Not on your understandings, not on your beliefs, not on what you checked on the fly.

Is that clear?

**MR. LEVIS:**  Sure.

**THE COURT:**  You're giving me considerable pause about your handling of this.

**MR. LEVIS:**  Okay.

**THE COURT:**  There is a lot hanging in the balance.  I have worked extraordinarily hard to get this case up to trial and that trial is only a month away.  Don't blow it.

I put my trust in you as class counsel.  Don't make me regret that.  I'm starting to have some doubts right now.

Now, you be here next Monday or -- yeah, next Monday. I'm going to specially set you and you're going to come in and you're going to tell me exactly what's going on.  Is that clear?

**MR. LEVIS:**  Yes.

**THE COURT:**  I do not want to hear from you your understandings or your beliefs.  I want facts and evidence.

**MR. LEVIS:**  Okay.

**THE COURT:**  All right.  Defendant, what's going on with notice?

**MR. SADUN:**  Benjamin Sadun for Flo Health.

As described by Mr. Levis, the parties have worked together on notice and with the TPA.  It's included, not just banners on Flo's website and Flo's app, but also push notifications to the users --

**THE COURT:**  Tell me about that.  What's going on with that?  I'm a little unclear about who's getting them and how many people -- and how are they getting them.

**MR. SADUN:**  They received in-app push notifications, as ordered by the Court, approximately nine days ago.

**THE COURT:**  Who was that?

**MR. SADUN:**  The people who were users of the Flo app during the relevant time period from November 1, 2016, through

February 28th, 2019.

THE COURT: That's the 9 percent you told me at one point?

MR. SADUN: Correct, Your Honor. They have all received in-app push notifications. In addition, they have all separately received an in-app banner that's there on the app.

In addition, there is a banner for everyone --

THE COURT: But the in-app banner is for everyone to see? It's just on the app. If you just -- if you dialed in today as a new user, you would see that?

MR. SADUN: The in-app banner, I believe -- in fact, I know is for the 9 percent as prescribed by, Your Honor.

THE COURT: It's not just on the website?

MR. SADUN: Sorry. The website, it is for everyone, yes.

THE COURT: That's what I'm saying.

MR. SADUN: Apologies. I thought we were talking about the app still. For the website, it is absolutely everyone, yes.

THE COURT: Slow down for a moment.

The banner is on the website?

MR. SADUN: Yes, Your Honor.

THE COURT: Anybody who just woke up this morning and never heard of Flo before and logged in would see that banner?

MR. SADUN: Anyone in the United States, yes.

THE COURT:  Okay.  Great.  Okay.

So all right.  That's up.  The push has gone out.

What else is happening?

MR. SADUN:  We also had e-mails to all people from the class who registered with an e-mail.

THE COURT:  From the class itself?

MR. SADUN:  From the class itself, yes, Your Honor.

THE COURT:  Now, what's been the hit rate on finding those e-mails?

MR. SADUN:  Your Honor told us to get it done.  You said no excuses, so we worked overtime.  We brought in all the necessary resources, and we got them done as ordered by your Court -- Your Honor.

THE COURT:  All of it?

MR. SADUN:  Every single person who registered with an e-mail from the class, yes.

THE COURT:  Okay.

MR. SADUN:  None were lost.

THE COURT:  Really?  You know that --

MR. SADUN:  That is our understanding working with the engineers at Flo.

THE COURT:  Okay.  That's good.  But e-mails may have changed, right?  I mean --

MR. SADUN:  Of course.

THE COURT:  What's the start date for the class?

MR. SADUN:  2016, November 1.

THE COURT:  All right.  Okay.

So what are we doing about -- is there anything that can be done about stale e-mail?

MR. SADUN:  Well, Your Honor, I believe that's the purpose of the banners on the websites, the print notification in the New York Times, as well as banners on 12 other periodicals of wide publication and circulation.

THE COURT:  Do you have any concerns about the adequacy of the notice?

MR. SADUN:  We believe the notice is more than necessary in terms of adequacy of notice.

THE COURT:  Good answer.  All right.

You don't have to come in.  Next time, you be in the position to say those things; is that clear?  You're the shepherd of the class.

Remind me of your name again.

MR. LEVIS:  Christian Levis.

THE COURT:  Levis.  Levis?

MR. LEVIS:  Yes.

THE COURT:  Oh.  It's Christian Levis?

MR. LEVIS:  Yes.

THE COURT:  I have you down as Christine.  Christian.  All right.

You need do that next time.  Okay?

All right.  Let's get ready.  Here's what we're going to do.  Good.  So that puts my mind to rest about the adequacy of notice.

Let's go through our action items, starting with -- where is my sheet?  Oh, okay.  Okay.

Trial is going to start on the 21st of July.  I'm going to send out a -- we do this written questionnaire now that has all of the demographic information on it.  I'm going to seat eight jurors.

I'm going to call in probably about 55 people.  When I say "call in," those are the people who will get the questionnaire, how many are actually in court will be a subset of that.

Now, the questionnaire is going to cover all of the nuts and bolts, prior jury service, are you married, education levels.  I'm going to put in a couple of questions -- I only use a couple -- tailored for this case.  And that will be distributed.  They'll fill them out online, the venire pool.

I should get those back on approximately the 14th.  And what I'm going to do is we're going to have a conference; we're going to do it by Zoom, you don't have to come back in court.  We'll do it by Zoom.  On September -- I'm sorry -- July 16th, and we'll go over the questionnaires.  Now you'll get all of them before -- at least a day or two before.

Now, here's what we're going to do at that conference.

It is not an exercise of peremptory challenges.  It is not an exercise for cause.  We're just looking for things that I would not want to call someone in for.

For example, they may say, "I have major medical things scheduled on July 22nd."  That's one of the questions; or, you know, "I currently work at Google," or something like that.  Okay.  That's all we're going to do.  We're just going to screen that out, narrow the pool down.  There will be no cause challenges, no peremptory challenges.  Then we'll call in.

Now, when you get this, you're going to get them in a numerical set.  You get them by e-mail.  Ms. Clark will take care of the details, who to get -- who to send it to.

Please go through it before you get on the call with me.  Okay?  This is not an opportunity to say -- you know, I'm going to ask you very, very quickly to go through 50 or so responses, and I'm going to say:  Is there any concern?

This is not the time to flip through the nine pages to look for a concern.  Have it all done ahead of time.  Okay?

So we'll do that -- we'll do that by Zoom.

Now, in terms of trial time, I'm going to give -- these are not meant to parse -- three defendants.  These are guidelines for the defense side but, you know, you're each going to have 15 hours per side.  Okay?

Now, the way I've envisioned this is ten hours for Flo

and plaintiffs, and then five hours for Flo and the -- Google and Meta.  Okay?  So just, you know, work it out.  But that -- those will be the trial times.

You have 30 minutes to open, which is not counted against your 15 hours.  That's an extra 30 minutes.

And, you know, I've really been wanting to experiment with this because the 45-minute closings are just getting to be too much, but I'll give you 45 minutes but please try to beat that.  Okay?

Now, in terms of opening, I'm sure that the Google and Meta people are going to want to say something that's different from Flo, so you'll get extra time.  Okay?  It's not -- you're not part of the 30 minutes.  But you can -- I don't want -- let me -- who is with Google and Meta here?

Let me just ask you about the SDK.  Go ahead, you know, up to the microphone, please.

So, I mean, are the SDKs, do they kind of operate basically the same way between both companies?

MR. HUR:  Your Honor, they operate -- it's Ben Hur for Google.

They operate similarly, but not entirely in the same way.

THE COURT:  Okay.  That's what I thought.  So don't -- just don't reproduce the -- don't -- in each of your two openings, don't say, "Let me tell you what an SDK is."

Work together a little bit so that we don't plow the same ground.  Okay?

**MR. HUR:**  Yes, Your Honor.

**THE COURT:**  All right.  That would be good.  Okay.

Okay.  So Monday through Friday are my trial days.  We will be dark -- I have a preexisting commitment that I need to argue.  We will be dark on July 28th and July 29th.  That's a Monday and a Tuesday.

Now, once the evidence comes in, it will be Monday through Friday.  Okay?  So there'll be no dark days for closings or for jury deliberations.  So, for example, if we close -- if the end of evidence is on a Thursday, you will close the following Friday.

It's only during trial, I won't take testimony on a Friday.  You probably won't have more than two of those given how this will stretch out.  So -- but once we're done with evidence, deliberations and closings will all happen Monday through Friday.

Trial days are 9:00 a.m. to about 2:30.  There's no lunch break.  Now, I start at 9:00 because our venire -- our jury pool goes all the way up to the Oregon border.  Now, we typically don't ask people to drive it that far because that's too burdensome, but we have a giant pool.  It goes all the way down to Monterey County, and then inland to the nine Bay Area counties.

It's too hard for people with families and other obligations in the morning to get here before 9:00, so we start at 9:00.  And I'd really like to have people out and on the Bridge and wherever they need to go by 2:30, 3:00.  Okay?

Now, this is not carved in stone.  If there's a witness who's got 10 or 15 more minutes, we'll finish it -- or maybe even half an hour.  So we're not going to have that be disruptive, but it's basically 9:00 to 2:30, barring a little leeway on the back end.

There's no lunch.  You get two 20-minute breaks.  And that's basically it.

Now, despite all my best efforts, that usually means we still rarely -- rarely get in more than about four and a half hours of testimony.  That's just the way it happens to work.  So you can use that to calculate number of days.

Okay.  Now, here's how we seat jurors.

So after we go through the questionnaire screening, we'll have the pool come in, and they'll sit over there.  I'll have voir dire questions ready.  I do the voir dire.  It will be a list that we jointly develop.  I do the follow-up voir dire.

Two voir dire questions that happen in this -- will happen in this case and happen in every case is you will introduce yourselves, and you will introduce your clients, and there will be questions about does anybody know anybody, or, in

the case of the corporations, have a financial -- any kind of financial interest in the corporations.  Those will be the first two questions.

And then I'm also going to read a list of all the potential witnesses.  All right?  Experts, laypeople, whoever you might call, it's potential.  It's meant to be overbroad. You're going to give me that list a couple of days in advance so I have it ready to ask the jurors.

By the way, all of this is going to be in the pretrial order, so you don't have to kill yourself writing it down.

Now, they're going to come in.  They'll be randomly seated.  I'll put eight in the box and I will then ask the voir dire questions.

Now, although I'm focusing on the eight in the box, all the other members of the jury pool are going to be in the gallery with a pad and a pen.  I'm -- they're going to write down each question number.  I'm going to tell them to do this very carefully and make sure they listen.  They're going to write down each question number and then make a note to themselves if they have an answer.

Now, I do this so that when we replace individuals in the jury, I don't have to repeat all of the voir dire questions.  Okay?

Then after we do that, we'll have a sidebar over here for any peremptories or challenges for cause.  Just one lawyer

per party, please; and please spring up when I say:  I'm going to talk to the lawyers now.

Sometimes paralysis, for some reason, sets in -- in the lawyers.  Just spring up and walk right over there.  Okay?  And we'll take care of all that.

It typically takes me 90 minutes, 9-0 minutes, to seat a jury.  All right?  This has happened in every case from the two-party insurance case I just tried in January to my very largest multidistrict litigation antitrust cases; and you will be the same.  So be prepared to open on Monday the 21st.  Be prepared to call your witnesses on Monday the 21st.

With respect to witnesses, you must have your next-in-order witness available at all times.  Now, if there's a choice between having a witness wait in the hallway for seven hours or have the jury go home early, the choice will be made in favor of letting the witness wait.

The jury time is like platinum.  It's the most precious thing in the world.  We're not going to waste a minute of it.

If you do not have your next-in-order witness ready, you will be deemed to have rested.  Okay?  Your presentation of evidence will be over.  And that's going to be repeated in the pretrial order, but I want to be very clear about this:  Do not stand up at 1:15 on any trial day and say, "Your Honor, our next witness isn't here" -- or you can do that, but you're

going to rest immediately afterward when you do that.  Okay?  I want to be crystal clear about that.  Jury time is too precious to squander.

Okay.  Now, also with respect to the juries, I like to have them take notes -- so just do this cooperatively -- but both sides are going to prepare a -- we didn't bring a sample of it, but just like a 1-1/2-inch binder.  Not 2 inches, that's too big.  1-1/2-inch.  Maybe even 1.  No smaller than that.  1 to 1-1/2-inch.  Put in 50 pages of school paper, you know, lined paper with three-hole punches in it.  That's going to be their notepad.

And put about seven tabs in there because they're going to be able to put in -- I'm going to give them the preliminary jury instructions and any other things that get handed out, which are namely going to be witness photos.

So every time a witness comes in, you're going to have a headshot, okay, just like you're a Hollywood agent.  You're going to have a headshot with the -- in color, witness dressed exactly the way he or she is going to look on the stand.  If they wear glasses, with glasses.  If they have a tie on, same color tie, everything else.  And then the name in, like, 15- or 16-inch font at the bottom.

That's it.  Nothing else.  Okay?  Color headshot with the name.  Pre-hole-punched so they can put it in the binder.  It really helps the jurors remember who testified.  So you have

to have that for each witness, and that's what's going to go into the binder.

I allow the jury members to ask questions.  You know, they will submit it in writing.  I'll take a look at it.  Typically, I just resolve it on my own.  If there's something to talk about, we'll have them walk out and we can discuss it.

You know, it really depends on the jury.  I have had cases where the jurors were, you know, asking questions like talk show hosts.  I've had other cases where the entire trial goes by and there isn't a single question.  So who knows but they will have the option to do that.  And typically, in my experience, the questions have been extraordinarily good.

Now, of course, they're only going to ask clarifying questions.  An example would be:  You said that this happened in June of 2017, but then you also mentioned something about October 2018.  You know, what's the right date?

You know, things like that.  No, other types of questions will be permitted.  But we'll see if we get any.

So that's it for -- oh, you get three -- you're going to get your statutory peremptories, so three per side.

Anything so far?  Any questions from anyone?  Plaintiffs?  Defendants?  Anyone?

Yes?

He stood up first.

**MR. CANTY:**  I don't have any questions.

**THE COURT:** Oh, no questions. Okay.

Yes. Go ahead.

**MR. CLUBOK:** Thank you. Andrew Clubok again for Meta.

I think I understood everything except I may not have caught on the openings, will Google and Meta be allowed the same 30 minutes? Understanding we can't repeat anything and we will not be cumulative --

**THE COURT:** You can, but I really would encourage you to not take 30.

**MR. CLUBOK:** That's helpful. I agree with that. Thank you.

**THE COURT:** As long as it's not cumulative --

**MR. CLUBOK:** It will not be.

**THE COURT:** Now, just on that subject, I don't like interrupting openings, so work out -- if you're going to use demonstratives, just work them out. Nothing is secret anymore. Okay? There are no surprises. You all know what you all know.

So if you're going to use a demonstrative, make sure everybody signs up. I really do not like to have any disruptions of openings or closings. All right? So just -- you know, I'm sure you're going to hate everything the other person says. That's not a grounds for standing up and being disruptive. Let's just get it done. All right? Just make it happen.

And I really rarely, if ever, get involved in

resolving demonstrative disputes, so please don't walk in on Monday morning, July 21, when we have jury selection and everything else and say:  Your Honor, there's a line on one of their demonstratives that we object to.

Just get it worked out.  All right?  If there's something you can't solve, I'll be happy to do it, but make those limited in number.

Now, here is how the jury is going to be selected. We're going to go through that, we'll have the eight in the box.  You will tell me who you would like me to excuse on a peremptory basis or for cause, and then I'll excuse them.

So if you have eight people, let's say Jurors 2 and 6 will be excused in that first round.  Anyone you pass over is seated.  That juror is done.  You cannot go back in a second round and say:  Well, we now -- we've thought about it and we'd like to get rid of Number 4 as well.

Okay?  You have to do it one and done.  That's it.  So if at the end of the first round only Jurors 2 and 6 are excused, only two new people will be called up.  All right? And that's it.  You have already seated six people.

So keep that in mind.  All right?  It's sometimes called a six-pack method for reasons I've never understood, but that is -- that is how we do it.

Okay.  Oh, yes, your technology.  You're going to make a date with Ms. Clark to come in and set up whatever you need

to do.  It's usually the Thursday before trial day.  Or if you need more time than that, you can.

Now, remember things that get broadcast there on those giant monitors.  And the whole courtroom was just redone to make everything electronic, so I'm assuming you know this but everything is electronic; right?  No passing out paper.

Unless there's some extraordinarily good reason for it, no passing out papers or particle boards or things like that.  If you want to use a particle board for demonstratives or to help you do your presentation, that's fine, but not as exhibits.

At the end of the trial, the jury will have, in the jury room, a dedicated isolated laptop.  It has no Internet connectivity and no ability to do anything other than function on its own brick pad basis.  And they're going to get a USB stick that will have all the admitted exhibits.  Okay?  And you're going to work that out with Ms. Clark.  But that's how the evidence will go to the jury that it admitted during trial.

Okay.  Any questions so far?  Any additional questions?

Yes, please.  Yeah.

Ask now because we're not going to go over this again, so don't hesitate to ask.  Yeah.

**MR. CLUBOK:**  Just a technical question.

**THE COURT:**  Yes.

MR. CLUBOK:  If there are eight jurors in the box and I understand we -- do we go all the way through for cause first and then the peremptories?

THE COURT:  Always.

MR. CLUBOK:  But, in other words, do you Juror 1, either cause or peremptory or you've passed?

THE COURT:  No, no, no.  I'm just going to -- I'm going to say, okay -- usually I start with the plaintiffs because they've got the burden of proof -- what do you want to do?

And you say Juror Number 6 for cause, Juror Number 2 for peremptory.  It's by round; right?  It's not by juror.

MR. CLUBOK:  Okay.  Thank you.  That's helpful.

THE COURT:  Okay.

MR. CANTY:  Your Honor, I had a question.

THE COURT:  Yes.  Go.

MR. CANTY:  Michael Canty for the plaintiffs.

On the, you know, remove and replace, are we to assume that 7 and 8 will be the alternates then, or will they move into a seated juror if --

THE COURT:  There's no alternates in federal civil juries.

MR. CANTY:  No alternates.  So we're having eight jurors?

THE COURT:  There are no alternates in federal civil

juries.

**MR. CANTY:** Okay.

**THE COURT:** There are only in federal criminal cases.

**MR. CANTY:** Thank you, Your Honor.

**THE COURT:** All jury -- all federal verdicts have to be unanimous.  There are no alternates.  Okay?

The statutory minimum number of jurors is six.  So any -- jurors is six, so, you know, eight will deliberate in civil cases.  Alternates are only in criminal cases in federal court.

**MR. CANTY:** Understood, Your Honor.

**THE COURT:** Okay.  And, you know, you typically lose a juror a week so that's why I'm thinking eight.  I wouldn't say typically, but it's not uncommon.

Let's see.  Oh.

You want to exclude witnesses before they testify?

**MR. CANTY:** That would be our preference, Your Honor, yes, for the plaintiffs.

**MR. CLUBOK:** My knee-jerk response is yes, but I think maybe we should discuss, just in case it makes sense for efficiencies not to.

**THE COURT:** That's fine.  Only one side has to say yes and I have to do it.

**MR. CANTY:** I will -- we'll work with defense counsel and come up with a decision.

**THE COURT:** Okay. Yeah.

Look, I'll just tell you, it's totally up to you. You should make your own call. You're experienced lawyers. I don't see any reason why people do it, but sometimes people do it. So just -- you can work it out.

If you do do it, just please handle party representatives and all that, too. You know, they're entitled to have -- everybody is entitled to have one party representative who is also a witness, if that's the case. And just work all that out. Okay?

**MR. CANTY:** Yes, Your Honor.

**THE COURT:** But you don't have to let me know any time soon. Just remind me on, maybe, Monday morning the 21st what you want to do. Okay?

**MR. CLUBOK:** Thank you, Your Honor.

**THE COURT:** If I don't hear from you, we'll just let them in.

**MR. CLUBOK:** Yup.

**THE COURT:** Okay. All right.

Let's see. What else?

Oh, please, no -- I do not allow motions to be filed during trial unless you ask me first. All right? No zinging in things all night long with your staff of a hundred associates. If you ask me first and then, if it's something I want you to brief, I'll do it; but anything filed without my

permission during trial will be stricken.

Oh, objections.  You must stand up and say it.  I can't see and hear.  Okay?  It's not because I love formality.

I can't see and hear during the heat of a trial when someone is at the table and they mutter "Objection."  Stand up and say "Objection."  And then just tell me what it is by a word.  One word or a rule cite.  Okay?  Preferably a word because the rule cites can be ambiguous.  Just say "Hearsay" or whatever.  All right?

No form objections.  You all know this, but let me just be clear.  No "asked and answered."  No, you know, "inconsistent with prior testimony."  No -- I mean, "foundation" is fine.  That's a perfectly fine one.  But, please, none of the depo-style obstructionist things.  All right?

**MR. CANTY:**  Yes, Your Honor.

**THE COURT:**  It's just not good to do.

If there are -- I mean are you anticipating any major evidentiary issues?

**MR. CANTY:**  I hope not.  I will say, Your Honor, we've worked pretty collaboratively with defense counsel over the past few weeks on the exhibits.

**THE COURT:**  Okay.  Good.

**MR. CANTY:**  We're still working on that.

It's been productive.  We had a meeting before we met

in court today.  We had Zooms all last week.  So we're working to try to streamline this pursuant to the Court's orders that we try to get the case before the jury as soon as possible.

THE COURT:  Let me suggest that you do a preadmitting everything you possibly can.  Okay?  So it's a lot easier for me and for you and makes your trial time go a lot faster.  Because it eats up your clock if you're going to fight about it.  Sounds like you won't, which is great.  But just say, "We've already agreed this can be admitted."

MR. CANTY:  I'm happy to report we had a discussion about that today.  I noticed that the Court wants them marked as trial exhibits.

THE COURT:  They're TX exhibits.

MR. CANTY:  Correct.  And we're going to work next week on the ones that we've agreed on so we have those already premarked.

THE COURT:  If you can.  I know you have a lot to do.  I understand that.  If you can, on Monday when you come in, give me a list -- okay? -- of premarked exhibits that you have no problem with.

MR. CLUBOK:  The Monday of the trial?

THE COURT:  The 21st of July.

MR. CLUBOK:  Oh, we intend to that.  We'll get that done.

THE COURT:  If you can do that.

**MR. CLUBOK:** Yeah.

**THE COURT:** If there's some things you can't do, I would prefer to have you raise them like maybe at 8:30, before the jury comes in, rather than waiting for -- you should know at that point -- right? -- if you can't agree on something. So --

**MR. CANTY:** I'm optimistic we'll be able to agree, Your Honor, but --

**THE COURT:** I understand. But if there are five documents or something, you know, you can't work out, just tell me outside of the jury time so we don't burn up a lot of time.

I also don't like having people walk in and out all the time.

**MR. CANTY:** Yes, Your Honor.

**THE COURT:** Good. That'd be great. Glad to hear that.

Oh, how many -- I hate to ask. How many depositions do you plan to play?

**MR. CANTY:** Our understanding is that the witnesses from the defendants that we intend to call are all available. If --

**THE COURT:** Every one, live?

**MR. CANTY:** Well, we haven't -- I shouldn't say all. We've meet with two of the three defendants. We're still discussing that with Flo. To the extent that they're not

available, we may have to, obviously, play the depositions, but that's another area that we're working collaboratively with the defendants to try to get resolved.

THE COURT: All right. Defendants, what about you? What do you think about your witnesses?

MR. CLUBOK: Just on behalf of Meta, Your Honor, I don't anticipate having to using depositions. It's possible there's one or two. But I agree with Mr. Canty, we're trying to work all that out and avoid it as much as possible.

THE COURT: Flo?

MS. SHARTON: Brenda Sharton for Flo.

We would anticipate that plaintiffs that they're not calling -- and I know they've dropped a couple of the plaintiffs and held them in reserve. But if they're not calling them as witnesses, we would anticipate playing those depositions. Designated parts.

THE COURT: How many --

MS. SHARTON: But if the witnesses are live, we would not.

THE COURT: Yeah. So all I'm asking is -- I'm sure you know this from your own experience -- they're hard for jurors to listen to because they're just not typically really made for being played in court. So try to keep it to a minimum. All right?

Now, if a witness is available, we don't play the

deposition unless there's a party testimony exception that might apply -- okay? -- where you can just use the deposition for any purpose.  But really work hard to minimize.

And also to your discussions about documents, include any deposition exhibits.

MR. CANTY:  Yes, Your Honor.

THE COURT:  Objections, too.  Okay.  Just work all that out.

So if you can get that down to just a couple of people, that would be fantastic; it makes the trial a lot better.

Okay.  That's it for the groundwork.

Any nuts-and-bolts questions?

MR. CLUBOK:  Very small one, Your Honor.

Just on the -- we understand and appreciate your guidance on form objections.  In terms of leading, though, is that what you would consider to be -- if it gets to be -- not small things to move the case along, but if it becomes a, you know, significant --

THE COURT:  If it's significant problem, yes.

Look.  Leading questions are actually often efficient so, please, you know, it's fine.  I mean, but if someone is -- if a lawyer is crossing the line and basically testifying, sure.

MR. CLUBOK:  Okay.

**THE COURT:** That is sort of my thing. But, you know, if someone is just trying to speed the exam along because it's 2:05 and they're trying to -- you know, that's fine.

**MR. CLUBOK:** Thank you.

**THE COURT:** Be judicious.

Plaintiffs, any other questions?

**MR. CANTY:** Nothing from the plaintiffs. Thank you, Your Honor.

**THE COURT:** All right. Now, we're going get to the motions in limine in a moment.

Jury instructions, are going to be redone. Here's what you're going to do. I'm going to put this in the pretrial order, but you're going to have two sets. There's a preliminary set and then there's a final set. And the preliminary set I'm going to read on the Monday morning we start trial.

You're going to slavishly copy -- that word is used intentionally -- slavishly copy, word for word, the preliminary jury instructions that I have crafted very carefully over many, many years of trials. And you're going to find an exemplar in my *Google Play Store* antitrust case. I'll give you the cite for it. All right?

There should be no reason to vary those except with respect to things related to the parties. Okay?

And I've spent a lot of time making those

understandable but also consistent with the model instructions.

Now, when you do the preliminary instructions, it's going to be a separate set.  That's Set 1.  Set 2 is the final.  Totally different sets.  Don't stuff a lot of things in there that you don't think you're going to need.  If you're not going to plan to use interrogatory answers, don't put that in there.  Just take that one out.  Okay?

I will tell you, in 11 years of trials, I've had interrogatories used once.  So don't think:  Maybe we need it.

If it actually happens on the fly, something happens, we'll put it in at the end.  But I don't want to put a lot of that stuff in the beginning unless you know with a reasonable degree -- reasonable degree of confidence it's going to happen.

If you're not going to use a chart and summary that's not submitted into evidence, don't use that instruction.  Okay?  It just gets to be too much for the jury.

So you're going to redo that.  That's Set 1.

Set 2, you're going to -- I'm going to give you the final instructions in *Google*, too, you're going to slavishly copy those to the full extent that you can.  I only do form instructions.  I do not do custom work.  Okay?  Just use the form.  So use CACI, or whatever the state form is going to be, and that's it.

Now, if there's -- if one of these things is so new, you know, maybe one of these statutes is new enough there's

no -- I'll take a look at it.  But that's -- I will not vary or give -- I will not vary from a form or give an instruction that is not in the form if there is a form instruction.  All right?

So that's the template.  Okay?

MR. CANTY:  Yes, Your Honor.

THE COURT:  Now, I want you to have those done -- redone for me by July 9th.  This is going to take some time for me to work on that.  And I'll give you the cites for that.

Also, you're going to have to redo the verdict form. I'll give you an exemplar.  A verdict form should be very, very short, and I'll give you the exemplar from the *Google Play Store* litigation as well.

Okay.  I think that's it so far.

Okay.  Let's go to you motions in limine.

Let me ask you a question, Plaintiffs.  What is the basis for the idea of exemplary damages?

MR. CANTY:  I'm sorry.

THE COURT:  Exemplary --

MR. CANTY:  Punitive damages?

THE COURT:  -- what's the basis?

MR. CANTY:  Well, Mr. Levis is going to handle the motions in limine --

(Reporter interrupts for clarification of the record.)

MR. CANTY:  I apologize.  I've been hearing this my whole career.  I apologize.  I talk too fast.

We are not seeking punitive damages.

With respect to the specifics of the motions in limine, Mr. Levis was going to handle --

THE COURT:  You're not seeking them at all?

MR. CANTY:  Correct.

THE COURT:  Oh, I didn't think you were --

MR. CANTY:  I wanted to be the one to give you the good news.

THE COURT:  The briefing was full of punitive damages references.

MR. CANTY:  That's correct, Your Honor.

THE COURT:  None at all?

MR. CANTY:  No.

THE COURT:  That makes life easy.  Okay.  That's all I needed to know.  That's perfect.  All right.

Oh, one other thing.  Experts.  I stack them.  Okay?  So they're back-to-back.  All right?

Actually, two other things with respect to witnesses.

So just example -- well, who's your first expert likely to be?  I'm not tying your hands but --

MR. CANTY:  Dr. Egelman.

THE COURT:  Okay.  That would be on what issue?

MR. CANTY:  He would talk about how -- do you want to talk specific --

THE COURT:  No, no, no.  Just -- just make something

up if you have to.  What would he talk about?

**MR. CANTY:**  He's going to talk about the technical aspects of how the information is conveyed from the app to the SDK, and then ultimately to --

**THE COURT:**  Perfect.  Once he's done -- it's a man?  Male?

**MR. CANTY:**  Egelman.

**MR. LEVIS:**  Man.

**THE COURT:**  Male, yeah.

**MR. LEVIS:**  Male, yes.

**THE COURT:**  Once he's done, you have your expert who is the response expert.  Okay?

**MS. SHARTON:**  Understood.

**THE COURT:**  It's just back-to-back.  No, you know, one expert on Tuesday and the next one on Friday or Thursday.  Okay?

**MR. CANTY:**  Yes, Your Honor.

**THE COURT:**  So just have them back-to-back.  Now, I'm going to let you two work that out.

Now, maybe there's a whole day when that's just sort of what you're going to do.  I'll leave it up to you.  But I want them -- it really significantly aids the jury's comprehension of expert testimony when they are back-to-back like that.

The other thing with witnesses is it's one and done.

It doesn't matter who calls the witness.  Okay?  We're not going to get hung up on direct, redirect.

Now, you can certainly call a hostile witness and lead, that's fine; that's a different thing.  But when you call someone in, just do it.  That witness is done.  There's no case in chief, you know, plaintiff calls on Tuesday and then the defendant does their side of it the following week.

It's just one and done.  Just get them up, get them done, ask whatever you want.  Okay?

**MR. CANTY:**  Yes, Your Honor.

**THE COURT:**  Now, I just want to be clear about that. I don't want people coming back.  Okay?  All right.

Okay.  Well, I mean, that certainly changes the position of all the motions in limine, doesn't it?  A lot of these objections were based on punitive damages.

Okay.  Let me just go through and tell you what the dispositions are.

Okay.  For Plaintiffs' Motion in Limine Number 1, it's Docket Number 653, I just need to hear the evidence.  I can't decide that right now.  So that's deferred pending trial.

Plaintiffs' Motion in Limine Number 2, Docket Number -- oh, it's also Docket Number 653.  That one is for -- okay.  Number 1 is for aggregate damages.  That's deferred until trial.

Docket Number 2 is for misstating the standard for

intent.  That's really a jury instruction issue.  We'll work it out then.  So that's kind of denied as moot.

I'll just say terminated.  Terminated as moot. Terminated in favor of jury instructions.

Plaintiffs' Motion Number 3 with respect to Meta's proposed witness Steve Satterfield, why don't you -- just take his deposition.  I mean, you've got plenty of time.

Do you want to take his deposition?

**MR. LEVIS:**  I think our preference was just to -- since there was already an -- what we viewed as an overlapping cumulative witness that we'd already deposed, we thought adding an additional witness, when we previously tried to depose this person, was a bit unnecessary and kind of another late addition.

**THE COURT:**  Well, I don't know if it's cumulative yet, I haven't heard anything.  So do you want to depose -- I'm giving you a chance.  Do you want to depose him before trial or not?

**MR. LEVIS:**  Sure.  If he's going to be allowed to testify, we'd like to depose him.

**THE COURT:**  If what?

**MR. LEVIS:**  I said, yes, if he's going to be allowed to testify, I think it makes sense -- we have enough time to do it, we can schedule a deposition.

**THE COURT:**  I don't like excluding witnesses.  I mean,

I don't know what happened with the discovery.  It's too late to go hash through it.  So just make him available.  Okay?

Now, if he's not deposed, for some reason that the defendants caused, he will not be allowed to testify.  All right?  But you two work out the details.  Okay.

MR. LEVIS:  Thank you.

THE COURT:  Plaintiffs' Motion in Limine Number 4, limit source code and data not produced in discovery.  It goes without saying, anything that was not produced before the discovery cutoff will not come in.  What that may be, I don't know, but that's the rule.  So you all can work out the details.  That's granted in principle.

Plaintiff's' Motion in Limine Number -- you know, your motions didn't print well for some reason.  They came out with weird -- none of the numbers are on them.

What is this, Number 4, I guess?  To exclude evidence or argument that Flo adhered to industry best practices. I guess that must be number -- that's Number 5.

MR. LEVIS:  I think it's 5.

THE COURT:  Plaintiffs' Number 5.

I don't have any problem with a witness who has the right foundation saying:  You know, we did what we could do based on our understanding of what people in this business do.

That's fine.  What's wrong with that?  I mean, I don't see any reason that can't happen.

**MR. LEVIS:**  I think there were two things.  One was this was related to expert testimony that was from Mr. Karkanias, whose testimony was excluded in part.

**THE COURT:**  No, he can't -- he can't say that.  But if they have a Flo engineer who says -- you know, the question is: Well, why did you do X?

And he says:  Well, because, you know, we looked at what our requirements were in the field and we know that this is a good practice.

That's perfectly fine.  I don't have any problem with that.

**MR. LEVIS:**  Yeah.  I think it was more the expert issue of compliance with industry standards, as I mentioned.

If the -- there are standards and someone's going to testify factually to what Flo did, I agree with Your Honor.  I don't know that that's an issue.  The only issue we had was in some of the other certifications or standards were kind of post-class period developments that had happened that we thought were outside the scope.

**THE COURT:**  All right.  Well, Flo?

**MR. YALE:**  Hi, Your Honor.  This is Theodore Yale for Flo again.

We agree with Your Honor that the Flo employees should be able to testify based on their experience.  I just want to be clear --

**THE COURT:** Yeah, you've got to lay a foundation.  You can't just start singing like canaries.  You've got to make sure that they have some reason to say what they're saying.

**MR. YALE:** Of course, Your Honor.

**THE COURT:** Okay.

**MR. YALE:** I do want to be clear about the issue with Flo's expert, Chris [sic] Karkanias.  The Court's prior order did not exclude his opinions about industry standards and practices.  Mr. Karkanias has decades of experience designing health technology and software for Microsoft and for Merck.

The Court excluded his affirmative opinions on the technical operation of the app.  It was -- right? -- to use Your Honor's words -- it wasn't expert-y enough.  It seemed to be an issue of helpfulness to the jury on that particular point.

But Mr. Karkanias' other affirmative opinions were not excluded.  And also his rebuttal opinions Your Honor deferred to trial, and those opinions are also relevant to rebutting plaintiffs' expert Dr. Egelman.

**THE COURT:** Well, I don't remember.  So we'll -- I'll take a look.  But anything excluded is not going to be allowed.  That's all I'm saying.

**MR. YALE:** Right.

**THE COURT:** Okay.  All right.

**MR. YALE:** Thank you, Your Honor.

THE COURT: Okay. Plaintiffs' Motion in Limine Number 6 about Flo's charitable contributions. Well, there's no punitive damages claim so there's really no reason to get into that; right?

MS. OZUROVICH: Good afternoon, Your Honor. Allison Ozurovich for Flo.

The only thing -- the only nuance I would say to that is, to the extent that we want to give background about the Flo app and the development of the app, certain of the -- Flo's mission statement, things like that, are relevant to establishing the background of the Flo app.

THE COURT: Well, I mean, mission statement is different from "We gave money to the volleyball team" or whatever it is they want to say; right?

MS. OZUROVICH: Certainly different, Your Honor, but --

THE COURT: Can you give me an example of what you might -- what is it you want to say?

Look, here's the thing: If you open the door to character evidence, it's open. So if you start talking about, we're the best people in the world, they're going to be able to say: Here are ten reasons why you're the worst people in the world.

Right now they can't do that, but if you do that, they can do it. So it's up to you. Okay?

**MS. OZUROVICH:**  I think that's -- we can live with that, Your Honor.  Thank you.

**THE COURT:**  All right.  Okay.  That is -- all right. That's the disposition for that one.

Plaintiffs' Motion in Limine Number 7, to preclude evidence or argument about other apps and websites.  I wasn't really quite understanding, Plaintiff.

What is the issue here?

**MR. LEVIS:**  Sure.  So our anticipation is that defendants will point to either other apps that are not Flo for the purpose of showing either plaintiffs' use of those apps being indicative of their views on privacy or the information relevant in this case, or to use those apps as comparators to show how those apps operate and use them as an example either of -- I think defendants' examples in their opposition were of their own intent or how the SDKs work.

Our view is that because this case is really about the Flo app, how the Flo app functions, the information that plaintiffs entered into the Flo app, that information or evidence or argument about these other apps, which are not part of the case --

**THE COURT:**  What are the other apps?  Are there any examples?

**MR. LEVIS:**  Well, we don't really know the other apps. We know from some examples of what defendants have done during

discovery in terms of, you know, asking plaintiffs about, you know, posts elsewhere or if they used other health and fitness trackers, that we anticipate that's what they would use to, you know, say:  Hey, someone used a fitness tracking app here so that means they don't care about the privacy of their menstrual information in the Flo app.

We just don't think that that moves the needle on that issue.

**THE COURT:**  Okay.  Flo?

**MS. BARRERA:**  Yes.  So there's two --

(Reporter interrupts for clarification of the record.)

**MS. BARRERA:**  Abbey Barrera on behalf of Meta.

There's two main reasons why we think this evidence is relevant.

**THE COURT:**  Well, I thought -- I thought Flo was going to do it?  Is it -- Meta is going to do it?  Who's --

**MS. BARRERA:**  I'm speaking on behalf of Meta and codefendants.

**THE COURT:**  Meta and who?  Everybody.  Talking for every -- all the defendants?

**MS. BARRERA:**  Yes, that's right.

**THE COURT:**  Oh, okay.  All right.  Go ahead.

**MS. BARRERA:**  So we want to be able to provide evidence generally of how these SDKs are offered by Google and Meta, and that they're used by a wide range of apps and

websites generally.

And this is relevant to the intent of Google and Meta in part because the standard under CIPA is that Meta had -- and Google, that they -- the question is not whether Google and Meta intended to collect any communication, but whether they intended to collect the kinds of communications at issue in this lawsuit specifically.

So we're arguing that Meta and Google offered these tools generally to a wide range of apps and websites, and that they didn't specifically intend to receive any information that may constitute health information or sensitive information.

And so we want to be able to provide that evidence generally of how these tools are offered to a wide range of apps and websites, and that's relevant to the intent of Meta and Google.

THE COURT:  Well, okay.  But your colleague here is saying you want to talk about the plaintiffs' personal apps.

MS. BARRERA:  So that's a second point that I wanted to make, Your Honor, which is that in addition to that, plaintiffs' reasonable expectation of privacy, what's relevant to that is community norms, customs, and practices.

So whether these kinds of SDKs are used by a wide variety of apps and websites, and whether plaintiffs understand that to be the case is relevant to their privacy claims both as to CIPA and the confidentiality of the communications at

issue --

**THE COURT:**  How is a plaintiff going to know that the app is using an SDK?

**MS. BARRERA:**  So our evidence that we will provide is that these are very standard tools, that a lot of people understand that they're being used, that they're common across the industry, and that community norms are such that those apps and websites are, you know, generally using such tools for advertising and analytics purposes, and that a lot of people understand that both because of terms and privacy policies of these companies, but also because they understand that sometimes they take a certain action --

**THE COURT:**  Well, what does that have to do with the plaintiffs?

What are going to ask the plaintiff?

Give me an example of what you would ask the plaintiff.

What are you going to ask one of named plaintiffs?

**MS. BARRERA:**  Yeah.  So the other point, Your Honor, is that plaintiffs also, if they shared their information broadly with a number --

**THE COURT:**  Let's answer my question first.  What are you going to -- give me an example of a question you're going to ask a plaintiff about her apps.

**MS. BARRERA:**  Yeah.  So one question we would ask is

whether they shared the same type of information with a wide variety of apps and websites, which goes to their expectation of privacy of the information --

THE COURT:  What's the same information?  Their --

MS. BARRERA:  -- at issue.

THE COURT:  Their menstruation cycles and pregnancy cycles?

MS. BARRERA:  Yes.  So a number of the named plaintiffs in this case did post publicly on Twitter and other websites, including sharing the information directly with Meta about their menstruation cycles, about their pregnancies, and other information that's at issue in these cases -- this case.

THE COURT:  I don't -- I mean, that's fine.  If you want to ask them if they, you know, shared the information voluntarily, I think that's okay.  But this whole SDK thing, they're not going to know anything about an SDK.  They're just people using an app.

MS. BARRERA:  Yes, but it's about the information that they shared broadly with apps, and also the way that this technology works generally, and that's it not solely for the purpose of sharing health information, for example.

THE COURT:  I don't know.  We'll have to wait for trial.  That -- I mean, I'll just tell you, I don't have a problem with the defendants saying, you know:  You were on a public website telling about everybody about your menstruation

cycle.

That's okay.

I mean, look, it's objective standard for privacy, but it's fair for the jury to hear if the plaintiffs -- I don't know if they are, but if a plaintiff is sharing all this information on Twitter and then claiming here that it was a great offense that it got shared, the jury should hear that.

But other than that, I can't really decide anything else.

MR. LEVIS:  I think --

THE COURT:  Go ahead.

MR. LEVIS:  I think our concern is these are different apps with different policies, different screens, different disclosures.  They use different tools.  We're going to have to get into kind of a separate trial on each other app if they're going to go down the road about what happened with this app and --

THE COURT:  Well, they're going to have to lay a foundation that bears some relevance to the case.  Okay?

So that's their burden.  They just can't start talking about apps.  They're going to have to say, "Here's why it's relevant."

And you can jump up and say "Relevance" or "Foundation."  Okay?  But I can't really do it in the abstract.

We're not going to go too far with all of this.  There

does have to be some tie to the case.

Okay.  That takes care of plaintiffs' motions.

Defendants' Motion in Limine Number 1 is the Docket Number 640.  References to a Wall Street Journal article and related reporting.

Well, you know, certainly, they're not being admitted for the truth.  There's no problem with that.  But if you need them for dating -- you want to date -- you want to date limitations from that; right?

MS. OZUROVICH:  Allison --

THE COURT:  You're going to introduce them; right?  You're going to do it?

MS. OZUROVICH:  Yes.

THE COURT:  You're going to have a giant Wall Street -- didn't somebody walk in here --

MR. SADUN:  That was me, Your Honor.

THE COURT:  I'm sure you're going to see that at trial.  That's perfectly fine, but not for the truth.

Now, look, let's just be careful with it.  No covert truth publication.  No reading from it, you know, and say, "Oh, Your Honor, it's just notice."

It's like state of mind.  No.  Don't try to smuggle things in under, you know, rubrics, state of mind, or notice.  Okay?

That's perfectly fine, but not -- you know, obviously,

it's hearsay content.  So that's granted in principle.

Defendants' Motion in Limine Number 2, Docket Number 645, for something about binding admissions.

I don't know.  If you want to impeach someone, that's fine; if you don't, I mean, that's all I can tell you.  So...

It's got to be adequate impeachment information.

Defendants' Motion in Limine Number 3, with respect to 12 -- more than the -- something other than 12 onboarding events.

Plaintiffs have some leeway.  They can -- if there are -- whatever you want to do as long as it's consistent with the claims in the complaint.  Perfectly fine.

You can amend the complaint according to proof at trial, if we have to get there.  I don't think we have to be that formal about it.  But if it's 13 or 15 or 8, whatever it is, that's fine.

**MS. BLUNSCHI:**  Your Honor, Melanie Blunschi from Meta.

**THE COURT:**  Yes.

**MS. BLUNSCHI:**  I think what we're concerned about is following the class certification order, it's only the 12 custom app events that are at issue as far as data being shared with Google or Meta.

And we're concerned that, as plaintiffs set forth in their opposition, that they're going to introduce evidence about other information that was entered in the app that was

not shared, and that that is potentially sensitive and inflammatory information.

In their opposition, they mentioned vaginal discharge, sexual intercourse, all sorts of things that were not part of the 12 custom app events.

**THE COURT:** You can just do it in cross-examination. Say, you know: These were never reported.

So that's how you take care of that.

So if they go too far, you just cross. Okay?

I can't exclude anything right now. I just don't know what's going to happen.

Okay. Defendants' Motion in Limine Number 4, with respect to government investigations and lawsuits, Docket Number 659. That's granted. None of that's going to come in.

Plaintiffs' -- I'm sorry. Defendants' Motion in Limine Number 5, with respect to irrelevant business transactions, Docket Number 642, I -- what's an irrelevant business transaction, Defendants?

**MR. SADUN:** Your Honor, Benjamin Sadun for Flo Health.

For four and a half years, we've heard this case is about 12 custom app events sent from individual devices to SDKs. And now, at the 11th hour, they're slipping in evidence about Bayer and Proctor & Gamble getting different data, the aggregate dashboards returned from the SDKs to Flo.

It's the definition of a mini trial on a tangential issue, and it has nothing to do with what this case is about, which is about SDKs and the individual app event data --

THE COURT:  What's the business transaction you think is irrelevant?

MR. SADUN:  There are contracts with Bayer and Proctor & Gamble to sponsor educational content in the Flo app.

THE COURT:  Bayer and Proctor & Gamble?

MR. LEVIS:  Correct.  And the information that we're talking about is the sale of access to the same information that was received through the SDKs that are in the app.

We think that the contracts and the existence of deals where they sold access to that information directly contradicts Flo's public statements in its policies that it would not sell or rent that information, which is what they say, under any circumstances; and the jury should be able to hear that because it goes directly to how offensive the conduct in this case is.

MR. SADUN:  Your Honor, we don't need to speculate about what might have been sent.  The contracts are Exhibits A, B, and C to our motion.  They concern completely different data and it specifically says aggregates, dashboards, the total numbers.

This case, according to plaintiffs, is about individual data being sent from devices.  It has nothing to with the allegations of this case.  It also identifies the

types of data to be sent.  It's zero overlap with the 12 custom app events.  It's completely unrelated, and it's a sideshow.

MR. LEVIS:  I think our disagreement is about the factual content of the contracts and the communications that discuss them, and that is why we would like to put the evidence forward so the jury can hear how Flo describes that it needs these events --

THE COURT:  Who is going to testify about Bayer and Proctor & Gamble?

MR. LEVIS:  Well, we intend to call a Flo witness that is going to testify about it.

THE COURT:  Flo?

MR. LEVIS:  Yes.

THE COURT:  What's that person going to say, roughly?

MR. LEVIS:  It's their contract, so I don't know what they will say, but our intent is to --

THE COURT:  You took their -- did you depose the person?

MR. LEVIS:  Yes.  Well, I guess it depends on who is going to be the witness for Flo at this point.  I don't think we have it nailed down as to who the person would be.  But the intent is to ask them about the contents of the contract and the e-mails.  We know --

THE COURT:  So what do you want to do with Bayer and Proctor & Gamble?

**MR. SADUN:**  Your Honor, it's a fishing expedition.

**THE COURT:**  Just one second.

Plaintiffs, what is it you want to do with Bayer and Proctor & Gamble?

**MR. LEVIS:**  We don't want to do anything with Bayer and Proctor & Gamble's -- like, individually, specifically.  We want to question someone -- our intent is to question someone from Flo about the contract and their communications discussing this contract that shows that the contract relates to the sale of the same type of information.  It is the Google Analytics data that they had transmitted through the SDK.

**MR. SADUN:**  Your Honor, that is incorrect.

They have to make a threshold showing of relevancy, and these contracts are about educational content, not the sale of data.  It says, for verification purposes they need to provide aggregate dashboards, and total percentages.

**THE COURT:**  Educational data?

**MR. SADUN:**  Yes -- no, it's not educational data, Your Honor, educational content in the Flo app.  So they sponsored medical articles.

**THE COURT:**  Oh, okay.

**MR. SADUN:**  It has nothing to do with the allegations in this case.  And the contract very specifically states the type of information for verification, the total number of people that saw the article.  That's what the -- is the

so-called data that's being sent.  That is not --

THE COURT:  You're saying, Plaintiffs, you think that these contracts show that Flo is selling the same data to Proctor & Gamble -- selling to Proctor & Gamble and Bayer the same privacy data they told users they would not transmit to third-parties?

MR. LEVIS:  Correct.

MR. SADUN:  Your Honor, it's not a factual dispute if they haven't identified a single contractual provision that states that it allows for the sale of individual data.  It's a theory with zero evidence that they're pointing to.

THE COURT:  You can rip them apart in cross, but right now I can't think of a reason -- I mean, look, if it doesn't sound right, we'll stop, but I'm not going to bar it right now.

Okay.  Defendants' Motion in Limine Number 6, to exclude -- oh, yes, *Dobbs* and *Roe*, Docket Number 641.

I don't see any reason to get into that.

You okay with that?

I'm not going to get into that.

MR. LEVIS:  The only reason this came up is defendants had questioned one of the plaintiffs about why she was concerned with the conduct here, and she mentioned that she thought that disclosure of this type of data could put women at risk in states where abortion was now illegal.

THE COURT:  Well, she could certainly say that.

**MR. LEVIS:** Sure. And we're not intending to, like, offer the *Dobbs* decision into evidence, but we just --

**THE COURT:** Well, you're not going to.

**MR. LEVIS:** No.

**THE COURT:** What's wrong with that? That's what she was thinking --

**MS. AGNOLUCCI:** Well, Your Honor, the question -- I'm sorry. Simona Agnolucci for Google.

The question that the plaintiff was asked at the time was: Would you object if somebody learned that you downloaded the app at all?

And that's when she went into: Well, yes, I would because in this day and age, you never know if your information is going to be safe. There are states where abortion isn't legal, and women have been criminally prosecuted.

That type of testimony is totally far afield from this case. Including --

**THE COURT:** She can do that, as long as it's confined to that. Okay? So that's denied.

Okay. Defendants' Motion in Limine Number 7, with respect to advertisements, Docket Number 644.

I mean, it seems okay if there's a foundation laid.

I mean, what's wrong with that, Defendants?

**MR. YALE:** So, Your Honor, the issue --

**THE COURT:** I mean, they have to have a personal

foundation.  They have got to lay a foundation.

What's wrong with that, otherwise?

**MR. YALE:**  All right.  This is Theodore Yale for Flo.

So, Your Honor, it's already clear that there is no foundation.  We've deposed these witnesses, we've asked them these exact questions about if they could see any ad that they attribute to Flo.

This is -- just to be very clear about what this motion is about, this is about plaintiffs' personal testimony and their personal knowledge.  Plaintiffs have no personal knowledge of how or why ads get served.

**THE COURT:**  Then it will be easy.  They'll lay a foundation, you'll say "Object," and I'll let you know.

So that's deferred pending trial.  But, I mean, it's not conceptually bad, but just get a foundation or I'm going to say no, and that will be it.

Okay.  Oh, we're back to the plaintiffs.  All right.  That's it for the defendants.

Okay.  Fred Leach and Goksu Nebol-Perlman.

**MR. LEVIS:**  Well, before you move on, there was one more motion in limine.

**THE COURT:**  Which one?

**MR. LEVIS:**  It was, I think, Plaintiffs' 8.  It was related to documents about two of the plaintiffs, Tesha Gamino and Jennifer Chen.

**THE COURT:** Wait. What document number is this?

**MR. LEVIS:** I don't...

**THE COURT:** It was a defendants' or plaintiffs'?

**MR. LEVIS:** It was ours --

**THE COURT:** Oh, I may have missed it.

**MR. LEVIS:** Yeah. I didn't want to interrupt the flow of --

**THE COURT:** Which number is it?

**MR. LEVIS:** Filed -- do you know what document number it is?

**THE COURT:** Well, no. Just is it -- what number did you put on it? Number 2? Number 5?

**MR. LEVIS:** It would be Number 9? 6? 7? I'm trying to find it.

**MS. BLUNSCHI:** It's Number 8.

**MR. LEVIS:** 8.

**THE COURT:** Number 8.

**MS. BLUNSCHI:** It's Plaintiffs' Number 8.

**THE COURT:** Plaintiff's Number 8. Okay.

**MS. BLUNSCHI:** Oh. Melanie Blunschi for Meta.

**MR. LEVIS:** And it's Docket 674.

**THE COURT:** All right. Go ahead.

**MR. LEVIS:** This was a motion that might actually not be necessary, given changes to the witness list, but I just wanted to bring it up.

The motion was to exclude defendants from using what we considered to be certain harassing exhibits about these plaintiffs', certain, I think, nude photos or other things about them.

The two witnesses that it relates to are not going to be part of our case-in-chief.  We don't plan to call them.

THE COURT:  Well, what's harassing about the photographs?

MR. LEVIS:  The photographs don't relate to an issue that is part of the case, and so we thought that showing these types of photographs or, for example, there were news articles unrelated to something in this case about the plaintiff in a dispute, I think, with -- she had with the father of her children that appeared on defendants' witness list that we thought were unrelated and sought to exclude.

We don't seek to call these people affirmatively, so it might not be an issue unless --

THE COURT:  All right.

MR. LEVIS:  -- defendants plan to call them during their case.

THE COURT:  Defendants?

MS. BLUNSCHI:  Yes, Your Honor.  The photographs and articles that Mr. Levis is referring to are exclusively documents that are -- were either publicly posted by the plaintiff herself or report on her public posting.

**THE COURT:** But they're not -- they're not calling these people, so --

**MS. BLUNSCHI:** So if they're not calling that particular witness, then it won't be necessary to use those --

**THE COURT:** Okay.

**MR. LEVIS:** It's -- that resolves our motion.

**THE COURT:** Okay.

**MR. LEVIS:** And, again, it was only there because, at the time, we had anticipated, but we're not anymore, so...

**THE COURT:** All right.  Yeah.

**MS. BLUNSCHI:** Yeah.  I don't know if -- if some of it may be already subject to deposition testimony that would be a party admission would be the only place that that could come up.

**THE COURT:** Work on -- work on something for that.  If they're not going to be call her, it shouldn't be shown.  Okay.

Okay.  Docket Number 595, plaintiffs' motion to exclude Fred Leach and Goksu Nebol-Perlman.  All right.

**MR. LEVIS:** Yeah.  This issue, I think, is relatively straightforward.  It was about, you know, two years after the discovery closed that Meta sought to add additional witnesses to the --

**THE COURT:** Oh, yes.  Okay.

**MR. LEVIS:** -- list that had not been disclosed previously.

**THE COURT:**  Yeah.

**MR. LEVIS:**  We just sought to exclude them because it was --

**THE COURT:**  Hold on.  Let me just jump in here.

**MR. LEVIS:**  Sure.

**THE COURT:**  Meta, when did you disclose these witnesses?

**MR. CLUBOK:**  In February of this year, Your Honor.

**THE COURT:**  All right.  And when did discovery close?

**MR. CLUBOK:**  Discovery had closed -- fact discovery had closed a little over two years ago.  I think, April 2023.

**THE COURT:**  All right.  Well, you missed the boat.

**MR. CLUBOK:**  We're out of luck.

**THE COURT:**  All right.

**MR. CLUBOK:**  We understand.

**THE COURT:**  Okay.

**MR. CLUBOK:**  Just so you note for the record, Your Honor, the reason is is because about half of the witnesses that we had disclosed left the company.

As soon as we approached trial, towards the end -- the beginning of this year, we looked at that, some had just left at the end of last year.  So we were trying to replace them with people who are now able to do it.  We also thought it would streamline the trial.

We understand, though, Your Honor.  But I just want

Your Honor to know, it's not like we were sandbagging.  This is purely because witnesses that we had disclosed, many of them have now left the company, and we were just trying to streamline the presentation.

And there are -- we identified ten witnesses we could eliminate if we could call these two.  We, obviously, given the time, Your Honor has given for trial --

THE COURT:  Well, you two can negotiate that but, you know, it's a day late and a dollar short.  Next time you can ask me, but you can't just sort of slip them in.  Okay.

MR. CLUBOK:  Thank you, Your Honor.

THE COURT:  I mean, you can still talk about it.  Maybe if you want to -- you've got 15 hours, so if you want to save some time, maybe you've got something to talk about.  I don't know.

MR. CLUBOK:  It may end up being helpful.

THE COURT:  You can depose them.  If you haven't deposed them, and you decide to make a deal, they have to be made available so, you know, there won't be blind crosses.  But otherwise, they're out.

Okay.

MR. CLUBOK:  Thank you, Your Honor.

THE COURT:  Okay.  I think that's it.

Anything else, Plaintiffs?

MR. CANTY:  No.  Thank you, Your Honor.

THE COURT:  That's it?  Okay.

Defendants?

MR. CLUBOK:  Nothing from Meta, Your Honor.

THE COURT:  All right.  See you on the 16th. All right.

THE CLERK:  All rise.  Court is in recess.

(Proceedings adjourned at 2:42 p.m.)

---oOo---


**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    Saturday, June 28, 2025


_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court