Volume 1

Pages 1 - 167

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

ERICA FRASCO, et al.,               )
individually and on behalf of  )
all others similarly situated, )
                                    )
          Plaintiffs,          )
                                    )
VS.                                 )      **NO. 3:21-CV-00757 JD**
                                    )
FLO HEALTH, INC., META         )
PLATFORMS, INC.,               )
                                    )
          Defendants.          )
_____)

San Francisco, California
Monday, July 21, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:
                    LOWEY DANNENBERG, P.C.
                    44 South Broadway, Suite 1100
                    White Plains, New York 10601
               BY:  **CHRISTIAN LEVIS, ATTORNEY AT LAW**

                    SPECTOR ROSEMAN & KODROFF, P.C.
                    Two Commerce Square
                    2001 Market Street, Suite 3420
                    Philadelphia, Pennsylvania 19103
               BY:  **DIANA J. ZINSER, ATTORNEY AT LAW**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported by:  Ruth Levine Ekhaus, RDR, RMR, FCRR, CCG
              CSR No. 12219, Official  United States Reporter

**APPEARANCES**:  (CONTINUED)

For Plaintiff:

                       LABATON KELLER SUCHAROW LLP
                       140 Broadway
                       New York, New York 10005
         BY:  **CAROL C. VILLEGAS, ATTORNEY AT LAW**
             **MICHAEL P. CANTY, ATTORNEY AT LAW**
             **GLORIA J. MEDINA, ATTORNEY AT LAW**

For Defendant Flo Health, Inc.:

                       DECHERT LLP
                       US Bank Tower
                       633 West 5th Street, Suite 4900
                       Los Angeles, California 90071-2032
         BY:  **BENJAMIN M. SADUN, ATTORNEY AT LAW**

                       DECHERT LLP
                       Cira Centre
                       2929 Arch Street
                       Philadelphia, Pennsylvania 19104-2808
         BY:  **CLARE P. POZOS, ATTORNEY AT LAW**

                       DECHERT, LLP
                       One International Place
                       100 Oliver Street
                       Boston, Massachusetts 02210
         BY:  **BRENDA R. SHARTON, ATTORNEY AT LAW**

For Defendant Meta Platforms, Inc.:
                       LATHAM & WATKINS
                       555 Eleventh Street, NW, Suite 1000
                       Washington, D.C. 20004
         BY:  **ANDREW B. CLUBOK, ATTORNEY AT LAW**

                       LATHAM & WATKINS LLP
                       650 Town Center Drive, 20th Floor
                       Costa Mesa, California 92626
         BY:  **MICHELE D. JOHNSON, ATTORNEY AT LAW**

                       LATHAM & WATKINS LLP
                       505 Montgomery Street, Suite 2000
                       San Francisco, California 94111
         BY:  **MELANIE M. BLUNSCHI, ATTORNEY AT LAW**

        (APPEARANCES CONTINUED ON FOLLOWING PAGE)

**APPEARANCES**:  (CONTINUED)

                        GIBSON, DUNN & CRUTCHER LLP
                        One Embarcadero Center, Suite 2600
                        San Francisco, California 94111-3715
                   BY:  **ABIGAIL A. BARRERA, ATTORNEY AT LAW**


**Also Present:  Anjali Dahiya**

**I N D E X**

Monday, July 21, 2025 - Volume 1

|  | PAGE | VOL. |
|---|---|---|
| Jury Voir Dire | 9 | 1 |
| Preliminary Jury Instructions | 71 | 1 |
| Opening Statement by Ms. Villegas | 90 | 1 |
| Opening Statement by Ms. Sharton | 102 | 1 |
| Opening Statement by Ms. Johnson | 122 | 1 |

**PLAINTIFFS' WITNESSES** ... PAGE ... VOL.

**WELLMAN, SARAH**

| | PAGE | VOL. |
|---|---|---|
| (SWORN) | 145 | 1 |
| Direct Examination by Mr. Canty | 146 | 1 |

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| A | | 152 | 1 |
| B | | 152 | 1 |
| C | | 152 | 1 |
| D | | 152 | 1 |
| E | | 152 | 1 |
| F | | 152 | 1 |
| G | | 152 | 1 |
| H | | 152 | 1 |
| I | | 152 | 1 |
| J | | 152 | 1 |
| K | | 152 | 1 |
| L | | 152 | 1 |
| M | | 152 | 1 |

## <u>I N D E X</u>

### <u>E X H I B I T S</u>

| <u>TRIAL EXHIBITS</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|
| N | | 152 | 1 |
| O | | 152 | 1 |
| Q | | 158 | 1 |
| R | | 158 | 1 |
| S | | 158 | 1 |

<u>Monday - July 21, 2025</u>                              <u>9:11 a.m.</u>

P R O C E E D I N G S

---oOo---

THE COURTROOM DEPUTY:  All rise.

(Proceedings were heard out of the presence of the jury.)

THE COURTROOM DEPUTY:  This Court is now in session, the Honorable James Donato presiding.

THE COURT:  Good morning.

ALL:  Good morning, Your Honor.

THE COURTROOM DEPUTY:  Please be seated.

THE COURT:  Best day of the week.  Trial day.

THE COURTROOM DEPUTY:  Calling Civil 21-757, Frasco versus Flo Health, Inc.

Counsel.

MR. CANTY:  On behalf of the plaintiffs, Michael Canty for Labaton Keller Sucharow.  Good morning, Your Honor.

THE COURT:  Do you have that sheet?

THE COURTROOM DEPUTY:  It's up there.  Oh, this.

MS. VILLEGAS:  Good morning, Your Honor.  On behalf of the plaintiffs, Carol Villegas from Labaton Keller Sucharow.

MS. MEDINA:  Good morning, Your Honor.  On behalf of the plaintiffs, Gloria Medina from Labaton Keller Sucharow.

MS. ZINSER:  Good morning, Your Honor.  On behalf of plaintiff, Diana Zinser from Spector Roseman & Kodroff.

MR. LEVIS:  Good morning, Your Honor.  Christian Levis

from Lowey Dannenberg for the plaintiffs.

**MS. SHARTON:**  Good morning.  Brenda Sharton for Flo Health from Dechert LLP.

**MR. SADUN:**  Good morning, Your Honor.  Benjamin Sadun for Flo Health.

**MS. POZOS:**  Good morning.  Clare Pozos from Dechert on behalf of Flo Health.

**MR. CLUBOK:**  Good morning, your Honor.  Andrew Clubok, Latham & Watkins, LLP, on behalf of Facebook/Meta.

**MS. JOHNSON:**  Good morning, Your Honor.  Michele Johnson, Latham & Watkins, on behalf of Meta Facebook.

**MS. BARRERA:**  Good morning, Your Honor.  Abby Barrera with Gibson, Dunn & Crutcher on behalf of Meta.

**MR. CLUBOK:**  And, Your Honor, we're joined at counsel table by a representative of our client, Anjali Dahiya.

**MS. SHARTON:**  Your Honor, I just -- our colleague, Clare Pozos -- her motion pro hac is pending, so I just wanted to let you know that.

**THE COURT:**  All right.  Ms. Clark will handle that.

All right.  I got some comments on the post preliminary instructions, which I've made.  And you also sent something in yesterday.  I don't see how this is different from what I did earlier.

How is this different?

**MR. CLUBOK:**  Your Honor, there were three -- oh, I'm

sorry.

Ms. Blunschi can explain it better than I, I think.

THE COURT:  All right.

MS. BLUNSCHI:  Good morning, Your Honor.  Apologies for that submission yesterday.

Melanie Blunschi from Latham on behalf of Meta.

The parties, upon reviewing your preliminary instructions, had a few minor clarifications.

THE COURT:  I took all of them, but then -- you told me on Thursday and I did it, and then you did something on Sunday.  How is the Sunday one different from the Thursday one?

MS. BLUNSCHI:  There's only one difference in the Sunday one, and that's --

THE COURT:  I'm looking at the Sunday one.  Where is the difference?

MS. BLUNSCHI:  If you look at Instruction 10, renumbered paragraph 16 with the list of custom app events at issue, the last one originally said "session_cycle_day," which was the Google event.  It was edited to say "SESSION_CYCLE_DAY_FIRST_LAUNCH," which is --

THE COURT:  Okay.  So the last bullet point?

MS. BLUNSCHI:  That's right.

THE COURT:  SESSION_CYCLE_DAY_FIRST_LAUNCH.  That's what it should say?

MS. BLUNSCHI:  Yes.  That's the only change.

THE COURT:  Okay.  I'll do it.

MS. BLUNSCHI:  Thank you.

THE COURT:  We're going to get the venire panel -- everybody on that side, out of that space and go to the left please.  That's where the jury pool is going to sit.

And I'll see you back in a little bit.

THE COURTROOM DEPUTY:  All rise.

Court is in recess.

(Recess taken at 9:15 a.m.)

(Call to order at 9:17 a.m.)

(The prospective jurors enter the courtroom.)

(Proceedings were heard in the presence of the prospective jurors.)

**JURY VOIR DIRE**

THE COURTROOM DEPUTY:  Good morning, ladies and gentlemen.  My name is Lisa Clark, and I am the courtroom deputy for the Honorable James Donato.  At this time I'm going to take roll, so if you could indicate your presence by saying "here" when I call your name.  And I'm going to apologize up front for mispronouncing some of your names.

(Roll was called.)

THE COURTROOM DEPUTY:  Is there anyone I did not call?

(No response.)

THE COURTROOM DEPUTY:  Great.

(Recess taken at 9:26 a.m.)

(Proceedings resumed at 9:43 a.m.)

(The prospective jurors enter the courtroom.)

(Proceedings were heard in the presence of the prospective jurors.)

THE COURTROOM DEPUTY:  All rise.  This Court is now in session.  The Honorable James Donato presiding.

THE COURT:  Good morning.

ALL:  Good morning, Your Honor.

THE COURT:  Including the jurors and everyone else.

THE COURTROOM DEPUTY:  Please be seated.

Calling Civil 21-757, Frasco versus Flo Health, Inc.

Counsel, please go to the podium and state your appearances for the record.

MR. CANTY:  Good morning, Your Honor.  My name is Michael Canty from the law firm of Labaton Keller Sucharow on behalf of the plaintiffs and the class.  Plaintiffs join us in the courtroom here today, Sarah Wellman --

THE COURT:  We're not doing that now.  Just you. Just --

MR. CANTY:  Okay.  Just me.  Michael Canty for the plaintiffs, Your Honor.

THE COURT:  Okay.  Thank you.

MS. VILLEGAS:  Good morning, Your Honor.  Carol Villegas from Labaton Keller Sucharow for the plaintiffs.

MS. ZINSER:  Good morning, Your Honor.  Diana Zinser,

Spector Roseman & Kodroff, on behalf of plaintiffs.

MR. LEVIS:  Good morning, Your Honor.  Christian Levis from Lowey Dannenberg for the plaintiffs.

MS. MEDINA:  Good morning, Your Honor.  Gloria Medina from Labaton Keller Sucharow for the plaintiffs.

MS. SHARTON:  Good morning.  Brenda Sharton from the law firm of Dechert on behalf of the defendant, Flo Health, Inc.

MR. SADUN:  Good morning.  Benjamin Sadun on behalf of Flo for Dechert LLP.

MS. POZOS:  Good morning.  Clare Pozos from Dechert on behalf of Flo Health.

MS. JOHNSON:  Good morning, Your Honor.  Michele Johnson from Latham & Watkins on behalf of Meta.

MR. CLUBOK:  Good morning, Your Honor.  Andrew Clubok, also from Latham & Watkins, on behalf of Meta.

MS. BLUNSCHI:  Good morning, Your Honor.  Melanie Blunschi from Latham & Watkins on behalf of Meta, formerly Facebook.

THE COURT:  Okay.  Is that it?  All right.  All right.

Ladies and gentlemen who are going to be our prospective jury, let me tell you what we're going to be doing and what the schedule will be and what you can expect to happen today and, if you are selected as a juror, the next couple of days.

Now, you're going to hear a lot more about this case and a

little bit more this morning, and if you're a juror, you're going to hear a lot more.  But I'll just tell you what it is.  It's a civil case, not a criminal case.  It's a civil lawsuit, and it's -- the defendant is, as you just heard, a company called Flo, which supports a women's health app online, and Meta, the company formerly known as Facebook.  And you'll hear more about the individuals who are the plaintiffs in a moment.

Now, just to help you understand what we're doing and why you're here, this is the Northern District of California.  This is the federal court in which all federal cases, civil and criminal, are heard that arise in any of the coastal counties from the Oregon border to Monterey, and then all of Silicon Valley and the nine Bay Area counties.  So all those civil and criminal cases that are federal come to this courthouse.

Now, I'm going to be selecting eight jurors today, and we're going to go through a process of having a few additional questions here in court and I'm going to ask all of you, in addition to the written questionnaire that you filled out which we all have and we have all reviewed.

It's going to take about 90 minutes, roughly, based on my historical past practices.  No guarantee of future performance, but based on my past practices, it takes about 90 minutes, 9-0 minutes, to select a jury.

And we will get started today.  There'll be a short break after all the jurors are seated, the eight of you are seated.

Get yourself oriented, situated, get a little snack, hydrate, and then we're going to do opening statements and hear our first witnesses.

So it's going to be a brisk ride, and that's intentional. The parties have worked very hard to get this case focused, out of respect for your time, and I have done my best to help them get to the point where we are not going to waste a minute of your time -- literally not a minute.  That is something that I take very seriously, and I know the parties do too.

Now, before we get into the details, I just want to take a moment.  You've had a busy morning.  Let's just clear our minds.  Just take a breath for a moment and let's just focus on the big picture about what we're doing.

You're going to be a jury in the United States District Court, the trial court for the United States court system.

This is one of our most fundamental civil rights.  This is not a duty; this is your civil right.  It is the same right in terms of weight and importance as your right to free speech, your right to own firearms, your right to have all sorts of things that are guaranteed by the Bill of Rights exercised in your favor.  It's a precious right, and we are the only country -- the only country in the history of the world -- that calls on its fellow citizens to come in and decide the disputes that parties are having.

It is no coincidence that we are also the freest country

and the country with the longest history of liberty and freedom for all of its citizens.  Much of that, in my view and the view of my federal trial judges, is attributable to one thing:  Our federal jury system.

So it's an important duty.  It's a weighty duty.  And I'm going to tell you something that may surprise you:  It's a fun duty.  You, I'm sure, have watched television series where you see people deliberating in jury rooms and trial lawyers running around courtrooms and all sorts of things happening.  You're now going to get the live the reality.  Okay?

It's something I wish I had done.  I have begged to be a juror my entire life, and I have never even been called in.  Okay?  So I envy you.

You're going to have a good time, and it's also going to be a time -- here's the schedule.  Let me tell you what the schedule is.

My trial days are 9:00 a.m. to about 2:30 p.m.  All right?  I think it's important for people to have some space in the morning to get things done.  Maybe you have dependents you need to get out of the house, whatever it is.  But we'll start at 9:00 on the dot, and then we end at 2:30 because I want people to get home across the bridge or whatever without getting into too much traffic.

There is no lunch break, but there will be two 20-minute breaks, and you'll be able to refresh yourself more than

adequately, in my experience, during those two 20-minute breaks.

Now, 2:30 is a guideline.  If we have a witness who needs another 10 minutes or so to finish, or maybe 15 minutes, we'll do that.  Part of it is just making sure that we don't break things up too much, but you can count on departure 2:30 to 3:00 on the trial days.  That's the days when we're here in court hearing witnesses and hearing evidence.

When you start deliberating, that day will be 9:00 to 5:00.  All right?  So once the evidence is done and the case is in the jury's hands, those eight jurors should plan on staying 9:00 to 5:00 until a verdict is reached.

I'm going to remind you of all of this later, but I just want to give you a preview of the schedule.

The trial days are Monday through Thursday.  I have to use Fridays for other cases.  And in this case I wanted to tell you that Monday, July 28th, and Tuesday, July 29th, will also be dark.  Okay?  I have some other obligations that I could not move that I have to attend to.  So this week we'll have trial Monday through Thursday, and then we'll pick up again Wednesday of next week.

Now, it's a live show, okay?  Things happen.  Unexpected developments happen.  I'm going to do my best, as I promise you, to respect your time.

I expect -- and you cannot hold this against me.  This is

not a promise.  But I expect that we will be done with evidence next week.  All right?

So it will be in the jury's hands most likely by the end of next week, and that's when deliberations will start.

So be approximately -- it will be this week and next week and then however long deliberations take after that. All right?  This is not a multi-multi-week trial.  By federal standards, it's highly efficient and relatively brief.  Okay?

So that's the basic outline.  What we're going to do now is randomly call eight of you to sit in the jury box.  And, you know, during COVID we started spacing people out and we just kind of kept doing it.  So Ms. Clark, my courtroom deputy, will seat you in kind of a staggered fashion.  Just kind of a legacy.  I'm not worried about anything, but that's the way it will work out.

Now, let's do that first, and then I'll tell you what we're going to do with questions.

Are you going to swear everyone in, Ms. Clark?

**THE COURTROOM DEPUTY:**  Yes.

Will all the prospective jurors please rise and raise your right hand.

(The oath was administered.)

(All prospective jurors answer in the affirmative.)

**THE COURTROOM DEPUTY:**  Thank you.  You can be seated.

Ready?

**THE COURT:** Yup.

**THE COURTROOM DEPUTY:** Okay.

Katherine Mendoza-Jung.  M-E-N-D-O-Z-A, J-U-N-G.  Come forward.

Take the first seat in the back row.

**THE COURT:** Oh --

**THE COURTROOM DEPUTY:** No, this one right here.

**THE COURT:** Yeah, okay.  Thank you.

**THE COURTROOM DEPUTY:** Stacy Alsterlind. A-L-S-T-E-R-L-I-N-D.  Please take Seat Number 3.

Noe Cook, C-O-O-K.  Please take Seat Number 5.

Sarah Sherdil, S-H-E-R-D-I-L.  Please take the last seat in the front -- in the back row.

Radha Murakami, M-U-R-A-K-A-M-I.  Please take the first seat in the bottom row.

Christopher Carsey, C-A-R-S-E-Y.  Please take the third seat.

Manita Rawat, R-A-W-A-T.

And Matthew Wohl, W-O-H-L.

Please take the last seat in the front row.

**THE COURT:** Okay.  So for the eight candidates in the jury box and for all of you in the gallery, here's what's going to happen next.  I'm going to ask a handful of questions.  I'm going to be focusing on you eight.  All right?  There's going to be a handheld mic.

As I read the question, if you have an answer, just raise your hand if you'd like to share.

Okay.  Now, before I explain the process, I'm going to share with everybody -- all of you and everyone in the gallery -- none of these questions are meant to make you uncomfortable or embarrassed or anxious or in any way unhappy with the experience.  So if there's something you'd like to share that you would prefer not to share in a large courtroom but just with me and the lawyers, that's fine.  Just let me know.  Okay?

There will be many occasions when I will just do that on my own, but if you have something that you'd like to share that you just want to keep a little bit quieter, just let me know and we can make that happen.

Now, for all of you in the gallery, you should have a pen and a pad.  And here's why you're going to have that:  I'm going to go through about 11 questions with the jurors.  I'm going to give the question number and then I'm going to read the question.  You all in the gallery need to listen to it and write down the question number if you have an answer.  All right?  So if I'm going through the questions and we get to Question 4 and you have something you'd like to share with me on that, you need to write down "4" and put a little note to yourself of what you'd like to say.

The reason I'm going to do that is because we're going to

be having people coming in and out of the jury box as we get to our final eight, and I don't want to have to reread these questions a million times, so just take a note to yourself so that we can -- not have to repeat the questions again.

Okay.  So those are the -- those are the guidelines for the voir dire questions that I'm going to ask, and we're going to start with this one, Question Number 1.  And we're going to have the lawyers for the plaintiff introduce themselves and their clients, and then I'm going to ask you if you know anybody.

MR. CANTY:  Thank you, Your Honor.

Ladies and gentlemen, good morning.  My name is Michael Canty, and I represent the following five plaintiffs in this case:  Sarah Wellman --

THE COURT:  You should just kind of raise your hand if you can.  That's good.  Thanks.

MR. CANTY:  -- Jennifer Chen, Autumn Meigs, Tesha Gamino, and Erica Frasco.

THE COURT:  Okay.  Let's pause right there.

Does anyone recognize those five individuals?

(No response.)

THE COURT:  Okay.  Go ahead.

MS. VILLEGAS:  Good morning, everyone.  My name is Carol Villegas, and I also represent the plaintiffs.

MS. ZINSER:  Good morning. My name is Diana Zinser,

and I also represent plaintiffs.

MR. LEVIS:  Good morning.  My name is Christian Levis, and I also represent the plaintiffs.

MS. MEDINA:  Good morning.  My name is Gloria Medina, and I also represent the plaintiffs.

THE COURT:  That's it?

Okay.  Do you recognize any of the lawyers?

(No response.)

THE COURT:  Okay.  That was Question 1.

Question 2, we're going to do exactly the same side -- the same thing for the other side.  Okay?

So let's hear the defendants and their clients.  Go ahead.  This is Number 2.

MS. SHARTON:  Good morning.  My name is Brenda Sharton, and I represent Flo Health, Inc., a defendant in the action.  And Flo Health -- there are a number of personnel from Flo Health that I want to ask you if you know.

Roman Bugaev.  Let's see.  Dmitry Gurski.

THE COURT:  Where are they?  You're just introducing anybody who's with you here today.

MS. SHARTON:  Oh, from the company, not the witnesses?

THE COURT:  The company is Flo.  Do you have a client representative?

MS. SHARTON:  I do, Your Honor.

THE COURT:  Go ahead.  Do that.

MS. SHARTON: Timofei Savitski is here from Flo Health.

THE COURT: Where is he?

MS. SHARTON: Can you stand up?

THE COURT: He doesn't want to sit up here?

MS. SHARTON: It was a little crowded, but we can move him up.

THE COURT: Do you all see that individual? Do you recognize any of the Flo lawyers or the Flo people?

(No response.)

THE COURT: Okay. Meta, please.

Oh, wait. There are more Flo lawyers, right?

MS. SHARTON: My colleague Benjamin Sadun and my colleague Clare Pozos.

Thank you.

THE COURT: Okay. Good? All right.

Okay. Meta.

MS. JOHNSON: Good morning. Michele Johnson, Latham & Watkins, on behalf of Meta, which was formerly called Facebook.

I'm here with my colleagues Andrew Clubok, Melanie Blunschi, and Elizabeth McCloskey, and on behalf of Meta, senior director Anjali Dahiya.

THE COURT: Okay. Recognize any of the lawyers?

(No response.)

THE COURT:  All right.  That was Question 2.

Now I'm going to do some subparts.  Okay?  This is subpart -- this is part of Question 2, because the defendants are corporations, so I just want to make sure that we are clear on any relationship you might have with the corporation.

So here's is Question 2B, B as in boy:  Are you personally acquainted with an officer, director, or employee of Flo Health, Inc.?

(No response.)

THE COURT:  All right.  Question 2C:  Have you or anyone close to you had any financial dealings with Flo Health, Inc., including stock ownership or investment?

(No response.)

THE COURT:  All right.  Question 2D, D as in David.

Question 2D:  Are you personally acquainted with any officer, director, or employee of Meta Platforms, Inc.?

(Hands raised.)

THE COURT:  You are?  Okay.  Who do you know?

There should be a little microphone.  Perfect.  Now, it's kind of 1986.

PROSPECTIVE JUROR MURAKAMI:  Radha Murakami.

THE COURT:  Who do you know at Meta?

PROSPECTIVE JUROR MURAKAMI:  I know Sean Douirani, who is an employee of Meta.

THE COURT:  And what does that person do at Meta?

**PROSPECTIVE JUROR MURAKAMI:**  I'm not sure.

**THE COURT:**  Okay.  Is this a super close friend?  A relative?

**PROSPECTIVE JUROR MURAKAMI:**  Yeah, he's a friend.

**THE COURT:**  Okay.  But you don't know --

**PROSPECTIVE JUROR MURAKAMI:**  Maybe in products.

**THE COURT:**  Maybe products, but you don't know anything more past that?

**PROSPECTIVE JUROR MURAKAMI:**  No.

**THE COURT:**  Someone else?  Yes, please.  If you don't mind, I'm still learning everyone's name, so just tell me right off.

**PROSPECTIVE JUROR RAWAT:**  Manita Rawat.  I have a very close friend who works for Meta.

**THE COURT:**  What does that person do at Meta?

**PROSPECTIVE JUROR RAWAT:**  She is in the quality team. Not sure, but like engineering quality team.

**THE COURT:**  Okay.  Do you know for which product?

**PROSPECTIVE JUROR RAWAT:**  Not really, no.

**THE COURT:**  You don't know which product?  Okay? All right.

Anyone else?

(No response.)

**THE COURT:**  All right.  Okay.  This is Question 2E, E.

Have you or anyone close to you had any financial dealings

with Meta Platforms, Inc., including stock ownership or investment?

Now, don't worry about mutual funds.  If it's a stock in a mutual fund, I'm not worried about that.  If you own individual stock or have had other investments in Meta, that's what I'm asking for.  Anyone?

(No response.)

THE COURT:  No?  Good.

Oh, where's the witness list?  I need your joint witness list.

(Pause in proceedings.)

THE COURT:  Okay.  You're supposed to have a joint witness list for me to read.  Someone should be leaping up to give it to Ms. Clark.

(Pause in proceedings.)

MR. CLUBOK:  He's adding one, apparently.

THE COURT:  Just hand it to me.  We've got to get going.  I'm not sure why there's a -- why is there a delay here?

MR. CANTY:  Your Honor, we confirmed the list with Meta earlier today.

MR. CLUBOK:  We're fine with it.  I think Flo added a name.

THE COURT:  All right.  I'm going to read you a rather -- oh.  Okay.  Shorter than I expected.

I'm going to read you a list of witnesses who may testify. It's not a promise that they will. The idea again is just to let me know and let us know if you recognize any of these names. Okay?

And I do my best to say them correctly, but it's 50/50.

Okay. Anna Klepchukova. This is Question Number 3, jurors. Anna Klepchukova, Roman Bugaev. Anh Bui, Jennifer Chen, Anjali Dahiya, Sergei Egelman, Tesha Gamino, erica Frasco, one of the plaintiffs. I think we already covered her. Okay.

Jennifer Golbeck, Dmitry Gurski, Lorin Hitt, Jim Karkanias, Madeline Kiss, Alex Lapitski, Laure Lydon, Autumn Meigs, Tamara Orlova, Leia Ridgeway, Steven Satterfield. Suzanne Schumacher, Max Grobov, Eugene Tiunovitch, Sarah Wellman, Tobias Woolridge.

(No response.)

**THE COURT:** No? Good. Okay.

All right. Question Number 4. Oh, yes. Can I ask you to get the mic and give me your name, please.

**PROSPECTIVE JUROR COOK:** I know a Julie Schumacher and I believe her wife might have been a Suzanne, but I'm not a hundred percent sure. She was a client of mine.

**THE COURT:** Suzanne Schumacher?

**PROSPECTIVE JUROR COOK:** Possibly.

**THE COURT:** Who's Suzanne Schumacher?

**MS. SHARTON:**  Your Honor, she's a former head of privacy at Flo Health, and she lives --

**THE COURT:**  The what?

**MS. SHARTON:**  The former head of privacy at Flo Health, and she lives in Scotland, so I don't think it's --

(Laughter.)

**THE COURT:**  No, okay.

**MS. SHARTON:**  One other just tweak, Your Honor.  You said Jim Karkanias.  It's actually Chris Karkanias.

**THE COURT:**  I can't hear you.

**MR. SADUN:**  Chris Karakanias is the name.  Jim's his nickname.  Just for the sake of completeness.

**MS. SHARTON:**  For the sake of completeness.  It said Jim Karkanias.

**THE COURT:**  Chris Karkanias?  Well, okay.  Every hand will shoot up.  Oh, Chris, yes.

(Laughter.)

**THE COURT:**  Okay.  Okay.  All right.  Now, here's Question Number 4, Number 4 for everyone -- and taking notes, too:  Have you or anyone close to you ever worked for a tech or social media company?  Yes.  Microphone, please.

**PROSPECTIVE JUROR MURAKAMI:**  Radha Murakami.  My husband has worked for several social media and tech companies.

**THE COURT:**  Okay.  When was the last time he worked

for a company?

**PROSPECTIVE JUROR MURAKAMI:**  He's currently employed for NextDoor -- with NextDoor, which is a neighborhood social networking site.

**THE COURT:**  Currently?  He's at NextDoor right now?

**PROSPECTIVE JUROR MURAKAMI:**  Correct.

**THE COURT:**  What does he do just generally at NextDoor?

**PROSPECTIVE JUROR MURAKAMI:**  He works in user support as well as moderation, so moderating conversations and communication that occur.

**THE COURT:**  Okay.  And roughly how long has he been at NextDoor?

**PROSPECTIVE JUROR MURAKAMI:**  Here, it's been a couple of months.  Since, I think, April.

**THE COURT:**  New job?

**PROSPECTIVE JUROR MURAKAMI:**  New job, yeah.

**THE COURT:**  Where was he before NextDoor?

**PROSPECTIVE JUROR MURAKAMI:**  He worked for Tunein, which is a music streaming app company.

**THE COURT:**  What's it called?

**PROSPECTIVE JUROR MURAKAMI:**  Tunein.

**THE COURT:**  Okay.  How long was he at Tunein?

**PROSPECTIVE JUROR MURAKAMI:**  Eight years.

**THE COURT:**  What did he do at Tunein?

**PROSPECTIVE JUROR MURAKAMI:**  User support.

**THE COURT:**  That's a long time.  I'll just ask before Tunein, where was he?

**PROSPECTIVE JUROR MURAKAMI:**  Before Tunein, he was -- he was at another music --

**THE COURT:**  Music thing?

**PROSPECTIVE JUROR MURAKAMI:**  -- music streaming company.

**THE COURT:**  Okay.  So he's doing user support and moderation mainly on all these jobs?

**PROSPECTIVE JUROR MURAKAMI:**  Correct.

**THE COURT:**  Okay.  Good.

Someone else have a hand up?  Yes.

**PROSPECTIVE JUROR COOK:**  My good friend Sean worked at Twitter for like five years.  He's now at Uber, and I have another friend who --

**THE COURT:**  Let's stop with Sean.  He's currently at Uber?

**PROSPECTIVE JUROR COOK:**  Currently at Uber.  He does like acquisitions.  He buys tons of computers and like systems setup equipment for new offices.

**THE COURT:**  Okay.  So what I might say, he might be on the procurement side --

**PROSPECTIVE JUROR COOK:**  Procurement side.

**THE COURT:**  -- at Uber?  Yes?

PROSPECTIVE JUROR COOK:  Yeah.

THE COURT:  Did he do the same thing at Twitter?

PROSPECTIVE JUROR COOK:  He did the same thing at Twitter, yes.

THE COURT:  Okay.  Do you know roughly how long he's been at Uber?

PROSPECTIVE JUROR COOK:  Four years, I believe, now.

THE COURT:  And how long at Twitter, just roughly?

PROSPECTIVE JUROR COOK:  About three.

THE COURT:  Okay.  Good knowledge of your friend's employment history.

PROSPECTIVE JUROR COOK:  I try.  I try.

THE COURT:  All right.  That's fantastic.

Anyone else?

PROSPECTIVE JUROR COOK:  Another buddy of mine works at Apple.  He's been a product manager there for about 15 years.

THE COURT:  15 years at Apple?  Okay.  Do you know what product he works on?

PROSPECTIVE JUROR COOK:  He did iPad, iPhone, and then he was on another, I think --

THE COURT:  Okay.  You said product manager?

PROSPECTIVE JUROR COOK:  Product manager.

THE COURT:  Do you know roughly at a high level what he did there?

PROSPECTIVE JUROR COOK:  No, but I know he oversaw like iPhone 6.

THE COURT:  IPhone 6?

PROSPECTIVE JUROR COOK:  Yeah.  And then I believe he's worked his way up to different products.

THE COURT:  Okay.  Great.  Thank you.

Anyone else?  Okay.  Yes, please.

PROSPECTIVE JUROR SHERDIL:  My name is Sahra Sherdil. My husband currently works at DocuSign as an account executive. And before that he worked at Salesforce and he was also an account executive there.  And then before that he worked at Proofpoint, which is a --

THE COURT:  Let me just ask this:  How long has he been at DocuSign?

PROSPECTIVE JUROR SHERDIL:  At DocuSign, he's been there for about seven months.

THE COURT:  And you said he's an account executive?

PROSPECTIVE JUROR SHERDIL:  Yeah.  He works in sales.

THE COURT:  And where before DocuSign?

PROSPECTIVE JUROR SHERDIL:  At Proofpoint, which was also in sales, and that's a network security company.

THE COURT:  How long was at Proofpoint?

PROSPECTIVE JUROR SHERDIL:  A year -- almost two years.

THE COURT:  Okay.  Also in sales?

**PROSPECTIVE JUROR SHERDIL:**  Also in sales.

**THE COURT:**  And before Proofpoint?

**PROSPECTIVE JUROR SHERDIL:**  He worked at Salesforce, and he was an account executive there as well.  And he worked there for a year and a half.

**THE COURT:**  Okay.  All right.  And then maybe do you remember anything before Salesforce?

**PROSPECTIVE JUROR SHERDIL:**  Before Salesforce, he worked at Domo, which is a real estate sort of software.  He also did sales there.

**THE COURT:**  All right.  So he's been in product sales basically the whole time?

**PROSPECTIVE JUROR SHERDIL:**  Yes.  And then I also have another very close friend who works at Palo Alto Networks.  He works on software engineering side, and he has been there for like three years.

**THE COURT:**  Okay.  But he's a software engineer?

**PROSPECTIVE JUROR SHERDIL:**  Yes.

**THE COURT:**  At Palo Alto Networks?

**PROSPECTIVE JUROR SHERDIL:**  Yes.

**THE COURT:**  Great.  Thank you.

Yes.

**PROSPECTIVE JUROR WOHL:**  My name is Matthew Wohl, and my brother used to work at YouTube.

**THE COURT:**  When was that?

PROSPECTIVE JUROR WOHL:  Around about 2010 to 2012.

THE COURT:  Okay.  So at least 13 years ago?

PROSPECTIVE JUROR WOHL:  That's correct.

THE COURT:  Okay.  And did your brother go on into any other tech company after that?

PROSPECTIVE JUROR WOHL:  No.  He no longer works in tech.

THE COURT:  Great.

Okay.  Anybody else?  Yes?  This is life in Silicon Valley.

PROSPECTIVE JUROR RAWAT:  Yeah.  I have a lot of techie friends.  But then there's one very close friend works for Apple, but she's on the corporate social responsibility compliance, and she's been with them for years.  Like I think 17 or more years.

THE COURT:  So she's doing compliance work?

PROSPECTIVE JUROR RAWAT:  Yeah, more like social responsibility side, yeah.  Audits.

THE COURT:  All right.  Anyone else you'd like to --

PROSPECTIVE JUROR RAWAT:  There were several, but I don't know their history like that.  But, yeah, I mean, in my close group there are many.  Her husband also is a techie.  He works for WD, but now it's been acquired, taken, so I don't remember.  But then another one who worked for Meta that I just -- yeah.

THE COURT:  What's WD?

PROSPECTIVE JUROR RAWAT:  They make the chips.

THE COURT:  They're a chip manufacturer?

PROSPECTIVE JUROR RAWAT:  Yeah.

THE COURT:  So he's making hardware?

PROSPECTIVE JUROR RAWAT:  Yeah.

THE COURT:  All right.  I'm looking more for --

PROSPECTIVE JUROR RAWAT:  Yes.  So Apple and Meta.

THE COURT:  Looking more for the social media online world.  Anyone else there?  Okay.  Good.

All right.  That was Number 4.  Here is Number 5.

Do you or anyone close to you have experience, education, or training in data privacy or protection?

(No response.)

THE COURT:  Number 6.  Question Number 6:  Have you or anyone close to you been involved in a dispute about data privacy or protection?

(No response.)

THE COURT:  Okay.  Number 7:  Have you or anyone close to you ever worked for -- ever worked for an app company? A-P-P, app company.

Yes.

PROSPECTIVE JUROR MURAKAMI:  Radha Murakami.

Just what I shared earlier.  My husband works for the NextDoor app.

THE COURT:  Yes.  Same answer you gave earlier?

PROSPECTIVE JUROR MURAKAMI:  Yes.

THE COURT:  Good.

Anyone else work for an app company?

Yes, please.

PROSPECTIVE JUROR CARSEY:  Christopher Carsey.

The company I currently work for has apps, does like water data management, so we gave our clients apps to work with.

THE COURT:  Okay.  Are you involved in creating or operating or programming those apps?

PROSPECTIVE JUROR CARSEY:  No.  I'm just a finance intern there.

THE COURT:  You're a finance intern?

PROSPECTIVE JUROR CARSEY:  Yeah.

THE COURT:  Okay.  So you're totally not involved in the --

PROSPECTIVE JUROR CARSEY:  But we do have the --

THE COURT:  Okay.

Anyone else on an app?

(No response.)

THE COURT:  Okay.  Question Number 8:  Have you or anyone close to you ever used the Flo period and ovulation tracker app?

(Hands raised.)

THE COURT:  Oh, okay.  Let's start down here and we'll

go down the line.

PROSPECTIVE JUROR ALSTERLIND:  Stacy Alsterlind.

THE COURT:  Did you have -- can we start there and let's kind of move down.

PROSPECTIVE JUROR MENDOZA-JUNG:  I've used -- I can't actually remember the name of it, but it's on my phone -- for several years.

THE COURT:  It's on your phone right now?

PROSPECTIVE JUROR MENDOZA-JUNG:  Yeah.

THE COURT:  Do you want to take a peek at it?

PROSPECTIVE JUROR MENDOZA-JUNG:  I can.

THE COURT:  Right now I'm looking for Flo.  Flo, yeah.

PROSPECTIVE JUROR MENDOZA-JUNG:  Sorry.  I turned my phone off.

THE COURT:  Oh, it's dead?  We've got plenty of time. Don't worry.

PROSPECTIVE JUROR MENDOZA-JUNG:  Looks like it's called PTracker.  I don't know -- or Period Tracker.  I don't know --

THE COURT:  All right.  But it's not F-L-O, Flo?

PROSPECTIVE JUROR MENDOZA-JUNG:  No.

THE COURT:  And you're Ms. Mendoza-Jung --

PROSPECTIVE JUROR MENDOZA-JUNG:  Katherine Mendoza-Jung.

THE COURT:  Okay.  Okay, yes.  And I think next is

Ms. Alsterlind?

**PROSPECTIVE JUROR ALSTERLIND:**  Yeah.  I've also used a couple apps for that, but I don't think it's Flo.

**THE COURT:**  It's not Flo?

**PROSPECTIVE JUROR ALSTERLIND:**  No.

**THE COURT:**  All right.  Someone else had -- oh, yes.  Let's go down that same row, please.

**PROSPECTIVE JUROR COOK:**  Noe Cook.  My girlfriend may use that.  I know she's always like tracking stuff.  I'm not sure which one it is, though.

**THE COURT:**  You don't know?

**PROSPECTIVE JUROR COOK:**  No, but possibly.

**PROSPECTIVE JUROR SHERDIL:**  Sahra Sherdil.  I do use Flo and PTracker.

**THE COURT:**  How long have you been using the Flo app?

**PROSPECTIVE JUROR SHERDIL:**  For like a year.

**THE COURT:**  And you're currently on it right now?

**PROSPECTIVE JUROR SHERDIL:**  Yes.

**THE COURT:**  Okay.  And Mr. Carsey?

**PROSPECTIVE JUROR WOHL:**  No.  My name is Matthew Wohl.

**THE COURT:**  I'm sorry.  Go ahead.  Yeah.

**PROSPECTIVE JUROR WOHL:**  I'm not a hundred percent sure, but I believe my wife uses the app Flo.

**THE COURT:**  The Flo app?

**PROSPECTIVE JUROR WOHL:**  I believe so.

THE COURT:  Okay.  Anyone else?

(No response.)

THE COURT:  All right.  That was Question Number 8.

Here's Question Number 9:  Do you have any difficulty understanding English or reading documents in English?

(No response.)

THE COURT:  Number 10:  Have you read or heard anything about this case other than what you have heard in court today?

(No response.)

THE COURT:  And Question Number 11:  Is there anything that I have not asked you that you would like to share with me that you believe might affect your ability to serve as a fair and impartial juror in this case?

(No response.)

THE COURT:  Okay.  Great.  Now I'm going to talk with the lawyers for a few minutes and I'll be back.

Just one person from each party, please.

(The following proceedings were heard at the sidebar:)

MR. CANTY:  One lawyer from each party.

THE COURT:  You're the plaintiff; right?  Who's doing Meta?

MR. CLUBOK:  Okay.

THE COURT:  Who is doing -- you two can go away.

Okay.  Plaintiff?

**MR. CANTY:**  Are we starting with challenges for cause, Your Honor?

**THE COURT:**  Do either one.

**MR. CANTY:**  I have no challenges for cause.

**THE COURT:**  Peremptory?  You don't have to, but --

**MR. CANTY:**  I didn't know if we were going to take challenges for cause to defendants first.

We would remove Mr. Carsey.

**THE COURT:**  Who?

**MR. CANTY:**  Mr. Carsey.  That's Juror Number 2.

**THE COURT:**  Okay.

**MR. CANTY:**  And --

**THE COURT:**  You only get three.

**MR. CANTY:**  That's it for this round.

**THE COURT:**  Flo?

**MR. SADUN:**  Noe Cook should be struck on cause, Your Honor.

**THE COURT:**  Which one?

**MR. SADUN:**  Noe Cook.

**THE COURT:**  That's Flo.  Okay.

**MR. SADUN:**  Sherdil, as well.  Juror Number -- I think, sitting at the top left corner -- uses Flo.

**MR. CLUBOK:**  Current Flo app user.

**THE COURT:**  I'll do her for cause.

**MR. CANTY:**  Your Honor, may I -- may I make a record

on that?

The witness indicated that she started using it year ago. That's almost five years after the end of the class period. She's not a class member.

THE COURT:  Oh.  Ms. Sherdil, can you join us for a moment?

That's a good point can't and -- hold on.

What is that stop date again?

MR. CANTY:  2019, December.

THE COURT:  Trying to put a finer point on your Flo use.  When did you start use it?

PROSPECTIVE JUROR SHERDIL:  Probably like April of last year.

THE COURT:  April of last year.  And you didn't use it at all before?

PROSPECTIVE JUROR SHERDIL:  Correct.

THE COURT:  Okay.  But you're on it today?

PROSPECTIVE JUROR SHERDIL:  And I do currently use it.

THE COURT:  Are you free or did you buy?

PROSPECTIVE JUROR SHERDIL:  I had like two months where I bought it, but back to free now.

THE COURT:  Back to free.  Okay.  Good.

Do you use it every day or do you check it a lot?

PROSPECTIVE JUROR SHERDIL:  I use it like -- yeah, I use it often.

**THE COURT:** You do.  Okay.  Thank you.  You can go back.  Okay.

**MR. SADUN:** She uses it every day.  We think that should be --

**MR. CLUBOK:** She can't help but use her personal knowledge about this.  And they're going to be introducing -- and this is one of our objections -- information about continued use after the class period.  It's going to be directly in evidence --

**THE COURT:** I'm going to excuse her for cause.

**MR. CANTY:** Your Honor, defendants raised a for-cause challenge against Mr. Cook.  I don't believe a record has been made.

**THE COURT:** No, no.  That was a peremptory.

**MR. SADUN:** Noe Cook is for cause, Your Honor.  He specifically said he thinks his girlfriend may be using the Flo app, and there's significant communications between Flo and: Apple in this case, and he says he has a very close friend who worked for Apple.

**THE COURT:** I'm not going to excuse him for cause.  If you want to use a peremptory --

**MR. SADUN:** We would use a peremptory on Noe Cook.  We have a --

**THE COURT:** You have got one left.

**MR. CLUBOK:** We've only used one peremptory.

THE COURT:  I changed that one.

Anybody else for this round?  Remember anyone you passed over is seated.

MR. CLUBOK:  We understand.  I just two confirm they struck KC.

(Conferring.)

MR. SADUN:  I just need one more minute, Your Honor.

THE COURT:  Okay.  Last call.

MR. SADUN:  We would also strike -- I'd like to confer with him.

THE COURT:  Which one?

MR. CLUBOK:  We're going to wish to strike Ms. Rawat. You got two left.  You got one left.  All right.  Good.  Thank you.

MR. CANTY:  Great.

(Proceedings heard in open court.)

THE COURT:  Mr. Cook, Ms. Sherdil, Mr. Carsey, and Ms. Rawat, you can go back to the jury room, please.  Thanks for coming in.

THE COURTROOM DEPUTY:  Put your --

THE COURT:  If you could, yeah, just, please.

THE COURTROOM DEPUTY:  In the box, please.  Thank you.

THE COURT:  We recycle them.  Thank you.

Let's get our next four, please.

THE COURTROOM DEPUTY:  Jennifer Barnes, B-A-R-N-E-S.

Please take Seat Number 3.

Michael Pintor, P-I-N-T-O-R.  Please take seat Number 4.

Mohit Sudhir, S-U-D-H-I-R.  Please take seat Number 6.
One more down.  Thank you.

And Laura Van Munching, V-A-N M-U-N-C-H-I-N-G.  Would you
please take seat Number 7.

Right there.  Thank you.

THE COURT:  Okay.  So for our four new members, I'm
just going to go down the questions by number and you can just
let me know if you have any answers.

Question Number 1?

(No response.)

THE COURT:  Any response to Question Number 2?  Oh,
okay.  Let's start with Mr. Sudhir.

PROSPECTIVE JUROR SUDHIR:  I said yes for 2E.

THE COURT:  2B, as in boy?

PROSPECTIVE JUROR SUDHIR:  Oh, no.  E, as in elephant.

THE COURT:  Okay.  Yes.  You own Meta stock?

PROSPECTIVE JUROR SUDHIR:  Yeah, I do.

THE COURT:  As an individual stock?

PROSPECTIVE JUROR SUDHIR:  Yeah.

THE COURT:  Okay.  Can I just ask you -- I'm not going
to ask you for dollars or anything, but is it a substantial
portion of your investment portfolio?

PROSPECTIVE JUROR SUDHIR:  Probably about like

20 percent.

THE COURT:  20 percent.  Okay.  Great.  Thank you.

I think there was one more answer from Ms. Van Munching.

PROSPECTIVE JUROR VAN MUNCHING:  Yes, Your Honor.
It's about 2D and E, stock in Flo Health and Meta.  I cannot
tell you if I own stocks in Flo Health -- I can't tell you if I
own stocks in Flo Health and Meta.  I have a portfolio.  It is
managed by a portfolio manager, and I just don't know the
individual stocks.

THE COURT:  Okay.  But you don't know whether you own
any of those stocks?

PROSPECTIVE JUROR VAN MUNCHING:  No.  But Meta is so
large, I would not be surprised.

THE COURT:  All right.  Anybody else?

(No response.)

THE COURT:  Okay.  That was Question Number 2.

Question Number 3, list of witnesses.  Anybody know
anyone?

(No response.)

THE COURT:  All right.

Question Number 4, tech or social media experience.

Yes.  Okay.  Mr. Sudhir?

PROSPECTIVE JUROR SUDHIR:  I said yes.  I work in tech
and most of my friends, my dad, and my brother also work in
tech.

THE COURT:  What do you do?

PROSPECTIVE JUROR SUDHIR:  I'm an AI and software engineering intern and -- yeah, that's it.

THE COURT:  Oh, okay.  And where are you working or interning?

PROSPECTIVE JUROR SUDHIR:  I'm working at a company called Censia.

THE COURT:  Called what?  Sense ID?

PROSPECTIVE JUROR SUDHIR:  Censia, C-E-N-S-I-A.

THE COURT:  What's the product?

PROSPECTIVE JUROR SUDHIR:  They're like an HR tech company, so they have like a -- they provide a service for recruiter to find candidates.

THE COURT:  Okay.  Just generally, what do you do there?

PROSPECTIVE JUROR SUDHIR:  I work on some of their products.

THE COURT:  Like the engineering side?

PROSPECTIVE JUROR SUDHIR:  Yeah.

THE COURT:  And are you coding, basically?

PROSPECTIVE JUROR SUDHIR:  Yeah.

THE COURT:  Okay.  What about any other experiences before this place?

PROSPECTIVE JUROR SUDHIR:  No.

THE COURT:  All right.  And when you say you're an

intern, is it a paid summer position or something else?

**PROSPECTIVE JUROR SUDHIR:** It's paid for the summer, I work full-time, and then they -- like I also work part-time during the school year.

**THE COURT:** Remind me where you're in school? I know it's on your thing.

**PROSPECTIVE JUROR SUDHIR:** I got to Arizona State University.

**THE COURT:** When do you graduate?

**PROSPECTIVE JUROR SUDHIR:** December 2026.

**THE COURT:** Oh, okay. Now, what about your dad? You said your dad worked --

**PROSPECTIVE JUROR SUDHIR:** Yeah. My dad's worked in quite a few tech companies. He currently works at Cornerstone, and then before that he's worked at Ring Central, VMware, Cisco --

**THE COURT:** Okay. What does your dad do?

**PROSPECTIVE JUROR SUDHIR:** -- and a couple more.
He's -- I believe his most recent role is as a senior director.

**THE COURT:** Okay. Is he a -- is he on the engineering side or the business side?

**PROSPECTIVE JUROR SUDHIR:** He's a senior director in business architecture.

**THE COURT:** All right. Does he do any of the

engineering work that you know of?

PROSPECTIVE JUROR SUDHIR:  Not that I know of.

THE COURT:  Okay.  So he's more on sales and product marketing kind of a thing?

PROSPECTIVE JUROR SUDHIR:  I think so, yeah.

THE COURT:  Anyone close to you that you want to tell me about?  Anyone else like your dad, brother, uncle, sister, mother?

PROSPECTIVE JUROR SUDHIR:  Yeah, mostly just like in engineering.

THE COURT:  Okay.

PROSPECTIVE JUROR SUDHIR:  Yeah.

THE COURT:  Thanks.

Someone else have an answer?

(No response.)

THE COURT:  No?  Okay.

All right.  Questions 5 and 6 about data privacy and protection.

(Hands raised.)

THE COURT:  Yes, Ms. Van Munching?

PROSPECTIVE JUROR VAN MUNCHING:  Does this include if you've gotten a notice that you've been hacked, your account has been hacked?

THE COURT:  I'm looking more for a dispute.  So have you filed a complaint with anyone or --

**PROSPECTIVE JUROR VAN MUNCHING:** No, but you get the postcards that say that there's a settlement.

**THE COURT:** Okay. Anybody else? No?

Oh, yes, Mr. Sudhir.

**PROSPECTIVE JUROR SUDHIR:** Was Number 5 about --

**THE COURT:** Training, experience, or education in data privacy or protection.

**PROSPECTIVE JUROR SUDHIR:** Then, yeah, I guess. In some of my college classes, I've taken data security classes and database management.

**THE COURT:** Okay. And just at a very high and short level, what you did learn in those classes?

**PROSPECTIVE JUROR SUDHIR:** Just like common practices with like database management and like more cybersecurity, like relations to data.

**THE COURT:** Okay. Would it be fair to say that that class focused mainly on things like anti-hacking, anti-piracy?

**PROSPECTIVE JUROR SUDHIR:** Yeah.

**THE COURT:** All right. Okay.

Anyone else on -- all right.

Number 7: Work for an app company. I already have your answer, Mr. Sudhir. I think it's an app -- it has an app too?

**PROSPECTIVE JUROR SUDHIR:** My company?

**THE COURT:** Yeah.

**PROSPECTIVE JUROR SUDHIR:** I don't believe we have an

app, but I did say yes to the question.

THE COURT:  All right.  Let's hear that one, yeah.

PROSPECTIVE JUROR SUDHIR:  So no one I know has directly worked on the app, but like my brother and my dad, both, companies they've worked for have -- or those companies have apps.

THE COURT:  Yes.  That's -- that, I appreciate.  But did either of those individuals actually work on the app?

PROSPECTIVE JUROR SUDHIR:  No.

THE COURT:  Anyone else on apps?  No.

Okay.  And then anybody use Flo?

PROSPECTIVE JUROR SUDHIR:  Oh.  All right.  So you've packed a lot in the 20 questions.

(Laughter.)

PROSPECTIVE JUROR SUDHIR:  So my girlfriend uses Flo, and I also --

THE COURT:  I'm sorry.  Who uses Flo?

PROSPECTIVE JUROR SUDHIR:  My girlfriend uses Flo.

THE COURT:  You're sure about that?

PROSPECTIVE JUROR SUDHIR:  Yeah.

THE COURT:  Okay.  How long has she used it?  Do you know, roughly?

PROSPECTIVE JUROR SUDHIR:  For as long as I've known her, so like a little over a year.

THE COURT:  Okay.

**PROSPECTIVE JUROR SUDHIR:**  And I also have the app just like -- she's added me as -- like I can just like see her stuff.

**THE COURT:**  Okay, that's fine.  Do you ever go on it?

**PROSPECTIVE JUROR SUDHIR:**  Not regularly, but I just have the app.

**THE COURT:**  But you're familiar with how it works and what it does?

**PROSPECTIVE JUROR SUDHIR:**  Yeah.

**THE COURT:**  Do you know if your -- you said girlfriend?

**PROSPECTIVE JUROR SUDHIR:**  Yeah.

**THE COURT:**  Do you know if she's the free level or is she the premium level?

**PROSPECTIVE JUROR SUDHIR:**  I'm not sure.

**THE COURT:**  Okay.  All right.  But it's been about a year?

**PROSPECTIVE JUROR SUDHIR:**  Yeah.

**THE COURT:**  Do you have any information that she may have used it more than a year ago?

**PROSPECTIVE JUROR SUDHIR:**  I don't know about that, but I think so.

**THE COURT:**  All right.

Okay.  Someone else had a -- yes.  Ms. Barnes?  Is that Ms. Barnes?

**PROSPECTIVE JUROR BARNES:**  Yes.  So I have used an app in the past.  I'm not sure which one it is, but based on what you're -- the features you're talking about, I don't think it was the Flo app, unless it was -- unless I used an earlier version.  If you showed me the icon, I would know.

**THE COURT:**  When roughly do you recall using it?

**PROSPECTIVE JUROR BARNES:**  Like in 2011 to 2018.

**THE COURT:**  2011 to 2018.  All right.  And not since 2018?

**PROSPECTIVE JUROR BARNES:**  Probably not, no.

**THE COURT:**  Okay.  And you don't know whether it was Flo or some other app?

**PROSPECTIVE JUROR BARNES:**  That's correct.

**THE COURT:**  All right.  Do you remember whether you paid for it or was it a free one?

**PROSPECTIVE JUROR BARNES:**  I'm pretty cheap, so it was probably free.

**THE COURT:**  What's that?

**PROSPECTIVE JUROR BARNES:**  I'm pretty cheap, so it was probably free.

**THE COURT:**  All right.

Anyone else on Flo app use or use?

(No response.)

**THE COURT:**  No.  Okay.

And the last two were:  Have you heard anything about the

case; or is English a problem for anybody?

And is there anything else you want to share with me about your ability to be a juror in the case?

(No response.)

THE COURT:  No?  Good.  All right.  I'm going to chat with the lawyers and be right back.

(A sidebar discussion was held at the bench as follows:)

THE COURT:  So it's just these four now.  So, Plaintiff?

MR. CANTY:  Yes, Your Honor.  We challenge Mr. Sudhir for cause.  He indicates that he's using the Flo app --

THE COURT:  Which one?

MR. CANTY:  Mr. Sudhir.  He uses the app.  His girlfriend uses the app.

THE COURT:  Yeah, okay.  I let the other one go for that reason so, yeah, he'll be for cause.

MR. SADUN:  No objection, Your Honor.

THE COURT:  Nothing?

MR. SADUN:  No, I'm saying to Sudhir.

MR. CLUBOK:  And Meta agrees for cause.

THE COURT:  You keep saying "cause".  I'm asking peremptories.

MR. CLUBOK:  No.

THE COURT:  You're down.

MR. CANTY:  We'll move.

MR. CLUBOK:  I'm sorry.  Okay.  I thought he --
all right.  Passed.

THE COURT:  We go back and forth.

MR. CANTY:  We would challenge Mr. Pintor.

THE COURT:  Mr. Pintor?

MR. CANTY:  Yeah, for peremptory challenge.

THE COURT:  Plaintiff peremptory.  Okay.

MR. CANTY:  And you guys want to keep a lawyer?

MR. CLUBOK:  What?  Do you want to use your challenge?

MR. CANTY:  That's fine.

MR. SADUN:  We passed.  It's your turn.

THE COURT:  You each got one left.

MR. CLUBOK:  We're not challenging anymore in this
round.

MR. CANTY:  So what do we have?

THE COURT:  Mr. Pintor and Mr. Sudhir.  Mr. Sudhir is
for cause and Mr. Pintor is plaintiff's peremptory.

MR. CANTY:  We'll remove Ms. Van Munching,
Mrs. Van Munching.

THE COURT:  Oh.  All right.

MR. CANTY:  And we're done.

MR. CLUBOK:  We have one more strike.

THE COURT:  You're done.

MR. CANTY:  And we now have five jurors?

THE COURT:  No, we have six.  Oh, yes, five.  That's

five.  Yeah.  What did you say?  You have a peremptory?

MR. CLUBOK:  We're retaining our peremptory.

THE COURT:  Oh.  Yeah.  Okay.

(Proceedings heard in open court.)

THE COURT:  All right.  Ms. Van Munching, Mr. Sudhir, and Mr. Pintor, you can return to the jury room.

And let's get our next three, please, Ms. Clark.

THE COURTROOM DEPUTY:  Jonathan Wang, W-A-N-G.

Put your notebooks in the box back here.

Hello?

Thank you.

Seat Number 4, Mr. Wang.

Kirsten Petrie, P-E-T-R-I-E.  Seat Number 6.

It's all the way down here.  Second seat over.  Right there.  Thank you.

Wenishou Horng, H-O-R-N-G.  Take seat Number 7, second seat in.

Thank you.

THE COURT:  Okay.  Welcome to our three new members.  So let's go down the list again.  I'll use the question numbers as I did that last round, and you can just let me know if you have any answers.

Number 1?

(No response.)

THE COURT:  2?

(No response.)

**THE COURT:**  Number 3.

(No response.)

**THE COURT:**  Number 4.

Yes.  Let's start with you, please.  Ms. Petrie?

**PROSPECTIVE JUROR PETRIE:**  Yes.

**THE COURT:**  Okay.

**PROSPECTIVE JUROR PETRIE:**  Yes.  I also have friends in the tech industry.  Two of them specifically work for Salesforce, one used to work for Salesforce, and one is still -- she's been there for 10 years as a writer.

**THE COURT:**  You have to put --

**PROSPECTIVE JUROR PETRIE:**  She's a writer at Salesforce.

**THE COURT:**  Is this a good friend?

**PROSPECTIVE JUROR PETRIE:**  Yes.

**THE COURT:**  So your friend has been at Salesforce for 10 years as a writer?

**PROSPECTIVE JUROR PETRIE:**  Yeah, like a user -- I don't know.

**THE COURT:**  Manuals and things?

**PROSPECTIVE JUROR PETRIE:**  Or the dialogue between users and the code?  I don't know.

**THE COURT:**  Oh, okay.

**PROSPECTIVE JUROR PETRIE:**  And then another friend, an

old roommate, worked at Salesforce and doesn't anymore, but...

THE COURT:  And when was the old roommate there?

PROSPECTIVE JUROR PETRIE:  She was there probably three years ago.

THE COURT:  How many?

PROSPECTIVE JUROR PETRIE:  Three.

THE COURT:  Not since then?

PROSPECTIVE JUROR PETRIE:  Uh-uh.

THE COURT:  Okay.  Anyone else?

PROSPECTIVE JUROR PETRIE:  No.

THE COURT:  Okay.  Yes.

PROSPECTIVE JUROR WANG:  Jonathan Wang, and I have a friend who works as a software engineer for LinkedIn for about seven years, since about 2018.

THE COURT:  LinkedIn?

PROSPECTIVE JUROR WANG:  Mm-hmm.

THE COURT:  Actual software engineering work?

PROSPECTIVE JUROR WANG:  Yes.  And I also had a friend who was previously employed at Google for about seven years but was laid off earlier this year.

THE COURT:  All right.  What did that person at Google do?

PROSPECTIVE JUROR WANG:  Also software engineering.

THE COURT:  Do you know what product at Google?

PROSPECTIVE JUROR WANG:  I don't.  I'm sorry.

**THE COURT:** All right. You're not an engineer, are you?

**PROSPECTIVE JUROR WANG:** No.

**THE COURT:** Okay. When you were visiting with your friend from Google, did you ever talk about work much?

**PROSPECTIVE JUROR WANG:** Yes.

**THE COURT:** The technical side of work, like the engineering side?

**PROSPECTIVE JUROR WANG:** No, no.

**THE COURT:** Okay. All right.

And you said your friend got laid off from Google when?

**PROSPECTIVE JUROR WANG:** I would say maybe three months ago.

**THE COURT:** Three months ago. Okay. All right. Anything else, Mr. Wang?

**PROSPECTIVE JUROR WANG:** No. Thank you.

**THE COURT:** Okay. Thank you.

And any other responses to Number 4 from the new three people?

(No response.)

**THE COURT:** Okay. 5 and 6, data protection and privacy. Any responses?

(No response.)

**THE COURT:** No.

7. Work for an app, any of you?

Yes, Mr. Wang.

**PROSPECTIVE JUROR WANG:**  Jonathan Wang again.  So from 2017 to 2018, I worked for a telehealth company called Reliant MD as a lab technician and app tester.

**THE COURT:**  Reliant?

**PROSPECTIVE JUROR WANG:**  Yes, Reliant MD.

**THE COURT:**  Telehealth?

**PROSPECTIVE JUROR WANG:**  Yes.

**THE COURT:**  What did you do for that year?

**PROSPECTIVE JUROR WANG:**  So I tested solutions for like UTIs on pieces of paper, took photos of them, and then their app team would detect whether or not that sample had a UTI, and then I would use the app to test again to see if that was correct as a control.

**THE COURT:**  And that job ended in 2018?

**PROSPECTIVE JUROR WANG:**  Yes, sir.

**THE COURT:**  And you've done nothing like that since?

**PROSPECTIVE JUROR WANG:**  I still work in biotech, but nothing related to apps.

**THE COURT:**  Okay.  Great.

Any other app work for our three new people?

Okay.  Flo period and ovulation tracker user.  Okay.  Yes.

**PROSPECTIVE JUROR PETRIE:**  My teenage daughter just recently downloaded several apps, and I think the Flo app is one of them.

THE COURT:  Okay.  Now, you personally are not a user?

PROSPECTIVE JUROR PETRIE:  No.

THE COURT:  And your daughter just started doing it? Do you know last month?  Two months ago?

PROSPECTIVE JUROR PETRIE:  Maybe in the last six months.

THE COURT:  Last month?

PROSPECTIVE JUROR PETRIE:  Six months.

THE COURT:  Okay.  But you're not sure if it's Flo?

PROSPECTIVE JUROR PETRIE:  I believe one of them is Flo.  She's downloaded several to see which one worked best for her.

THE COURT:  Have you ever gone on it with her and looked at it?

PROSPECTIVE JUROR PETRIE:  I have not.

THE COURT:  Does she share access with you?

PROSPECTIVE JUROR PETRIE:  No.

THE COURT:  Have you used it at all on her behalf?

PROSPECTIVE JUROR PETRIE:  No.

THE COURT:  Okay.

Anybody else on the Flo app?

(No response.)

THE COURT:  Okay.

Then reading and writing English.  Everybody good?  Okay, please, Mr. Horng.

**PROSPECTIVE JUROR WEN-HORNG:**  My name Wenishu Horng. If people speak too quick, I may miss it, and then I'm afraid lose out on key information.

**THE COURT:**  Well, you sound pretty good.  But as long as it's not too fast, you're comfortable?

**PROSPECTIVE JUROR WEN-HORNG:**  Yeah.

**THE COURT:**  And how about reading, just regular like e-mails and --

**PROSPECTIVE JUROR WEN-HORNG:**  No problem.

**THE COURT:**  No problem.  Thanks.

Okay.  Anybody hear about this case before today?

(No response.)

**THE COURT:**  Anything you want to share with me about your ability to serve as a juror?

(No response.)

**THE COURT:**  Okay.  Good.  Let me just meet with the lawyers and I'll be back.

(A sidebar discussion was held at the bench as follows:)

**THE COURT:**  Oh, Plaintiff.

**MR. CANTY:**  I don't have any left, Your Honor.

**THE COURT:**  Right.

**MR. CLUBOK:**  We doing cause first?

**THE COURT:**  You can do whatever you want.

**MR. CLUBOK:**  So no cause, Mike?

**MR. CANTY:**  No.

**MR. SADUN:**  We would challenge Jonathan Wang for cause.  During a relevant time period, specifically, testing applications exactly at the relevant time and was a medical health app.

**THE COURT:**  You can use a peremptory if you'd like.

**MR. CLUBOK:**  We'll use a peremptory for him.

**THE COURT:**  That's your last one.

**MR. CLUBOK:**  That's our last one.  Thank you.

**THE COURT:**  Great.  Thank you.

(Proceedings heard in open court.)

**THE COURT:**  Okay.  Mr. Wang, thanks for coming in, and you can go back to the jury room.

And let's call our next person, please, Ms. Clark.

**THE COURTROOM DEPUTY:**  Monish Ullal, U-L-L-A-L.

**THE COURT:**  Okay.  Do we have the mic there?  Could you say your last name for me.

**PROSPECTIVE JUROR ULLAL:**  Ullal, U-L-L-A-L.

**THE COURT:**  Okay.  I see you're a physician.  What's your practice area?

**PROSPECTIVE JUROR ULLAL:**  I work in internal medicine and addiction medicine.

**THE COURT:**  Do you do anything for pregnancy, fertility, OB/GYN?

**PROSPECTIVE JUROR ULLAL:**  The clinic I work in is called Bridge Clinic at Highland Hospital in Oakland.  We do a

great deal of family planning there, so there's a lot of
fertility planning, kind of contraception, things like that.

THE COURT:  Okay.  Are you familiar with the Flo app?

PROSPECTIVE JUROR ULLAL:  No.

THE COURT:  You are?

PROSPECTIVE JUROR ULLAL:  I'm not.

THE COURT:  You're not.  Okay.

Any responses to questions -- do you have any responses --
did you write any numbers down?

PROSPECTIVE JUROR ULLAL:  Yes.  2D, as in delta.

One of my good friends is named Ilya Mironov.  He's a --
he works in kind of privacy security at Meta, and before that
he was at Google.

THE COURT:  Online cybersecurity?

PROSPECTIVE JUROR ULLAL:  Privacy security.

THE COURT:  At Meta?

PROSPECTIVE JUROR ULLAL:  Yes.

THE COURT:  Do you know how long that person has been
there?

PROSPECTIVE JUROR ULLAL:  He's been there about
six years.

THE COURT:  Okay.  And is -- I'm sorry.  Did you say
"he"?

PROSPECTIVE JUROR ULLAL:  Yes.

THE COURT:  Is he an engineer or doing something else?

**PROSPECTIVE JUROR ULLAL:**  He's like in research science, and his training was in cryptography.

**THE COURT:**  Oh, okay.  Is that kind of what he's doing for Meta, as far as you know?

**PROSPECTIVE JUROR ULLAL:**  I think so.  He works in like privacy and security of data there in some way or another.

**THE COURT:**  All right.  Any other responses?

**PROSPECTIVE JUROR ULLAL:**  I'm not sure if it applies, but I have training in private health information as a physician, just in part of as a -- as a routine part of my specialty.  And I help manage the clinic and we use a telehealth platform called Dialpad that interacts with patients.  And so we have learned a lot about health privacy and using that software at our health institution.

**THE COURT:**  Okay.  That's good to know.  Anything else?

**PROSPECTIVE JUROR ULLAL:**  I think that was it.

**THE COURT:**  Okay.  Let me talk with the lawyers and be right back.

(A sidebar discussion was held at the bench as follows:)

**THE COURT:**  Dr. Ullal, can you join us here for a moment?

I may not be remembering this, Doctor, correctly, but I think you're the physician who said you're serving low-income or disadvantaged communities.

PROSPECTIVE JUROR ULLAL:  Yes.

THE COURT:  Your practice -- that would be about two weeks of time.

PROSPECTIVE JUROR ULLAL:  Yeah.

THE COURT:  Except for Monday and Tuesday of next week, did you say that was a big problem for you?

PROSPECTIVE JUROR ULLAL:  I can't imagine how the clinic would survive for that long.

THE COURT:  Say more about why.

PROSPECTIVE JUROR ULLAL:  We don't have a lot of staff physicians.

THE COURT:  Physicians.

PROSPECTIVE JUROR ULLAL:  Physician staff.  And I see a lot of patients.  It's a walk-in clinic, and so it's not a matter of rescheduling patients.  It's just patients show up at the door and we have about an average of 120, 130 patients scheduled a day, and 70 to 80 are seen a day, Monday through Friday.

THE COURT:  Is this primarily homeless displaced families?

PROSPECTIVE JUROR ULLAL:  Yeah.  About 70 percent of our patients are homeless.

THE COURT:  Is it, they come in, there's no guarantee they're going to come back.  You've got to see them as they come.

**PROSPECTIVE JUROR ULLAL:**  Exactly.  Especially in addiction medicine.

**THE COURT:**  Thanks.

I'm going to excuse him.

**MR. SADUN:**  We agree.

**MR. CLUBOK:**  We think he should be excused.

**THE COURT:**  Okay.  Thanks.

(Proceedings heard in open court)

**THE COURT:**  Okay.  Thank you, Doctor.  You can return to the jury room, please.

And who do we have next, Ms. Clark?

**THE COURTROOM DEPUTY:**  Armando Sainz, S-A-I-N-Z.  Seat Number 4.

**THE COURT:**  Lisa.

**THE COURTROOM DEPUTY:**  Yes.

(Conferring.)

**THE COURT:**  Is it Sainz?

**MS. ZINSER:**  Yes.

**THE COURT:**  Mr. Sainz, welcome.  Any questions, numbers?

**PROSPECTIVE JUROR SAINZ:**  I will say mostly no to all of them, but I do have a friend who once sold an app to Meta.

**THE COURT:**  Sold an app?  Okay.  Do you know when that happened?

**PROSPECTIVE JUROR SAINZ:**  Years ago.  The app is

WhatsApp.

THE COURT:  Do you know if it was more than five years ago?

PROSPECTIVE JUROR SAINZ:  I'm not really sure about that.

THE COURT:  Do you know what the app did or does?

PROSPECTIVE JUROR SAINZ:  It's WhatsApp.

THE COURT:  Oh, WhatsApp.

PROSPECTIVE JUROR SAINZ:  I think it's Brian Acton.

THE COURT:  Who did you know at WhatsApp?

PROSPECTIVE JUROR SAINZ:  About him?  He's my friend.

THE COURT:  Okay.  What did he do there?

PROSPECTIVE JUROR SAINZ:  I do notarize documents for him.

THE COURT:  Okay.  I'm not sure -- what does that mean?  What do you do for him?

PROSPECTIVE JUROR SAINZ:  I go to his house and notarize documents, legal documents.

THE COURT:  Oh, you're a notary?

PROSPECTIVE JUROR SAINZ:  Yes, I am.

THE COURT:  I'm sorry.  I was thinking of something else.

Okay.  So you notarize documents, but you're not involved in the business in any way?

PROSPECTIVE JUROR SAINZ:  No, but I know he's one of

the creators of WhatsApp, and then he sold it to Meta.

THE COURT:  Yeah.  That was a while back.

Do you still see your friend?

PROSPECTIVE JUROR SAINZ:  Yes.

THE COURT:  What is he doing now?

PROSPECTIVE JUROR SAINZ:  He's doing -- making money. He gets a lot of money.

(Laughter.)

THE COURT:  I thought you were going to say he's enjoying his money.

PROSPECTIVE JUROR SAINZ:  A little piece of that, yes.

THE COURT:  Any other questions?

PROSPECTIVE JUROR SAINZ:  No, that will be all.

THE COURT:  Okay.  I'll visit the lawyers and be right back.

(The following proceedings were heard at the sidebar:)

MR. CANTY:  Nothing, Your Honor.

MR. CLUBOK:  In his questionnaire, he was asked in Question 19 whether religious views might affect his jury service.  He said he would be guilty -- basically the person on trial and strong feelings were on he said the getting into a civil case.

I'm sorry -- in his Question 19 and 20 regarding the religious views and strong feelings regarding money, he evidences a biases that basically says if you're on trial

you're guilty.  If you're in a civil case, you should get money and he those are the answers he gave.

MR. SADUN:  He said guilty of any --

THE COURT:  Mr. Sainz.

MR. SADUN:  The statement, he'll be guilty of any is a quote, because the person will be on trial.

THE COURT:  Put that away.

PROSPECTIVE JUROR SAINZ:  Hello.  How are you doing, guys?

MR. CANTY:  Fine I like your shirt.

THE COURT:  No talking until I get there.

(Pause in proceedings.)

THE COURT:  Okay.  Mr. Sainz, this is that written -- the written one you filled out.  I'm just wondering about this answer.  So you need your glasses?

PROSPECTIVE JUROR SAINZ:  Yeah.

THE COURT:  Okay.

PROSPECTIVE JUROR SAINZ:  Sadly I need glasses.

THE COURT:  I get it.

Do you have any strong feelings.  Then you said it was the least you can get.

Can you tell me what you meant by that?

PROSPECTIVE JUROR SAINZ:  Sometimes when I went through a situation like that and someone hit my car, then I was -- and I also get some money.  That's why.

**THE COURT:** Okay. But you --

**PROSPECTIVE JUROR SAINZ:** That was drunk driver hit my car head on. I almost died, so that's why I'm answering that.

**THE COURT:** Okay. But that was your case.

**PROSPECTIVE JUROR SAINZ:** Yeah.

**THE COURT:** You realize, in other cases, there's no guarantee.

**PROSPECTIVE JUROR SAINZ:** I just speak for myself.

**THE COURT:** Okay. Not other cases.

**PROSPECTIVE JUROR SAINZ:** Yeah.

**THE COURT:** Also, you had some religious views, I believe, he'd be guilty. It's not a criminal case --

**PROSPECTIVE JUROR SAINZ:** I was thinking on a criminal case, not on a civil case.

**THE COURT:** Okay. Thanks.

**PROSPECTIVE JUROR SAINZ:** I'll go right back to you.

**THE COURT:** I'm not doing a for-cause challenges. Any peremptories.

**MR. CLUBOK:** I think we're all out.

**THE COURT:** Okay. That's our jury.

**MR. CANTY:** Thank you, Your Honor.

(Proceedings heard in open court.)

**THE COURT:** Okay. Everyone in the gallery, please, throw your notebooks in the box and return to the jury office.

**THE COURTROOM DEPUTY:** And counsel standing at the

door, if you could hold the door open while they leave.  Thank you.

(The remaining prospective jurors were excused.)

**THE COURT:**  And you eight are going to be seated on our jury.

So what will happen now is we're going to swear you in. You'll take a break, go back to the jury room, refresh, unpack, and we'll come out and get the trial started.

Yes?

**PROSPECTIVE JUROR BARNES:**  You talked a little bit about the duration of the trial.

**THE COURT:**  I'll tell you what.  Just come over here. Okay?  Yeah.

Tell them not to send anyone home yet.

**THE COURTROOM DEPUTY:**  Okay.

(A sidebar discussion was held at the bench as follows:)

**PROSPECTIVE JUROR BARNES:**  I just wanted to confirm, I have been on a three-month jury before --

**THE COURT:**  This is not going to be anywhere close to that.

**PROSPECTIVE JUROR BARNES:**  So I was summoned through Thursday.  I do have a trip planned Friday and Monday.

**THE COURT:**  You'll fine.

**PROSPECTIVE JUROR BARNES:**  I do have travel scheduled August 8th and the 11th.

THE COURT:  You'll be fine.

PROSPECTIVE JUROR BARNES:  Will I be fine?

THE COURT:  Unless a meteorite hits, we're good.

Are you good?

PROSPECTIVE JUROR BARNES:  I'm good.

THE COURT:  Okay.

(Proceedings heard in open court.)

THE COURTROOM DEPUTY:  Will the eight jurors please stand and raise your right hand.

(The oath was administered.)

ALL:  Yes.

THE COURTROOM DEPUTY:  Please be seated.

THE COURT:  All right.  Ms. Clark is going to take you back, and we'll start again at 11:30.

THE COURTROOM DEPUTY:  All rise.

(The jury leaves the courtroom.)

(Proceedings were heard out of the presence of the jury.)

THE COURTROOM DEPUTY:  You may be seated.

(Recess taken at 11:03 a.m.)

(Proceedings resume at 11:38 a.m.)

(Proceedings were heard out of the presence of the jury.)

THE COURTROOM DEPUTY:  All rise.  Court is now in session, the Honorable James Donato presiding.

THE COURT:  Okay.  Bring out the jury, please.

THE COURTROOM DEPUTY:  All rise.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

**THE COURTROOM DEPUTY:**  Please be seated.

We're back on the record in Civil 21-757, Frasco versus Flo Health, Inc.

**THE COURT:**  Okay.  Members of the jury, we're going to get started.  Now, first thing we're going to do is I'm going to give you what are called the preliminary instructions for the case.

You have a binder there with some note paper and some dividers, and you should have a copy of something that looks like jury instructions.  Okay?

This is -- I'm going to read these to you.  We're going to take a moment.  We'll clear our minds.  I'm going to read them to you.  You are perfectly free to read along with me or listen, but please, it's very important you do one or both of those things because this is going to tell you what you're going to be thinking about as we get into the trial -- all right? -- and will help orient you on how to handle the next steps.

So let's get started with Number 1.

**THE COURT:**  You are now the jury in this case.  I want to take a few minutes to tell you about your duties as jurors and to give you some preliminary instructions before the testimony starts.

At the end of the trial I will give you the detailed written instructions that will control your deliberations. These are the introductory instructions to help you understand the principles that apply to civil trials and to help you understand the evidence as you listen to it.

You will be allowed to keep this set of instructions and refer to it throughout the trial.  These instructions are not to be taken home, and must remain in the jury room when you leave in the evenings.

At the end of the trial, these instructions will be collected and I will give you a final set of instructions.  It is the final set of instructions that will govern your deliberations.

It is your duty to find the facts from all the evidence in the case.  To those facts you will apply the law as I give it to you.  You must follow the law as I give it to you, whether you agree with it or not.

You must not be influenced by any personal likes or dislikes, opinions, prejudices, or sympathy.

You should also not be influenced by any person's race, color, religion, national ancestry, or gender.  All this means is you must decide the case solely on the evidence before you. Please keep in mind you took an oath to do so.

Do not read into these instructions or anything I may say or do that I have an opinion about the evidence or what your

verdict should be.  That is for you to decide.

Now, to help you follow the evidence, I'm going to give you a brief summary of the parties' positions.

The plaintiffs are Erica Frasco, Sarah Wellman, Jennifer Chen, Tesha Gamino, and Autumn Meigs.

The defendants are Flo Health and Meta.  During the time period relevant to this case, Meta was also known as Facebook. Documents and witnesses may use the names Meta and Facebook interchangeably.

All five plaintiffs have claims against Flo Health in connection with their use of the Flo period and ovulation tracker app for women, which we're going to call the Flo app. Three plaintiffs, Chen, Gamino, and Wellman, also have claims against Meta.

Plaintiffs allege that Flo Health shared Flo app users' menstrual and sexual health information with Meta and violated the California Confidentiality of Medical Information Act, invaded their privacy, and breached the terms of its privacy policy.

Plaintiffs Chen, Gamino, and Wellman also allege that Meta violated the California Invasion of Privacy Act.

Plaintiffs have the burden of proving each claim by a preponderance of the evidence as to each defendant.

Flo Health denies all of the plaintiffs' claims.

Flo alleges as affirmative defenses that the users

consented to the alleged information sharing and that users did not file their lawsuit within the time permitted by the statute of limitations.

Flo has the burden of proving each affirmative defense by a preponderance of the evidence.

Meta denies the claims of plaintiffs Chen, Gamino, and Wellman.  Meta alleges as an affirmative defense that these plaintiffs did not file their lawsuit within the time permitted by the statute of limitations.

Meta has the burden of proving its affirmative defense by a preponderance of the evidence.

Now, this lawsuit has been brought as a class action.  A class action is a lawsuit that has been brought by one or more persons called class representatives on behalf of a large group of people who have similar legal claims.  All of these people together are called a class.

A class action lawsuit allows the claims of many persons to be resolved at the same time, rather than requiring each person to sue separately.

Not everyone in the class will testify, but you may assume that the evidence admitted during trial applies to all class members unless I tell you otherwise.

The fact that this case is proceeding as a class action does not mean any decision has been made about the merits of the case, and you must not infer anything about the merits of

this case based on the fact that it is a class action.

Now, you should decide the case as to each defendant separately.  Unless otherwise stated, the instructions apply to all parties.

Now, the parties in this case are corporations.  All parties are equal before the law, and a corporation is entitled to the same fair and conscientious consideration by you as any party.  Under the law, a corporation is considered to be a person.  It can only act through its employees, agents, directors, and officers.  Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of their authority.

An act is within the scope of a person's authority if it is within the range of reasonable and foreseeable activities that an employee, agent, director, or officer engages in while carrying out that person's business.

Now, when a party has the burden of proving any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence regardless of which party presented it.

The evidence that you are to consider in deciding what the facts consistent -- what the facts are consists of:  One, the sworn testimony of any witness; two, the exhibits that are

admitted into evidence; three, any facts to which the lawyers have agreed; and, four, any facts that I may instruct you to accept as proved.

Now, in reaching your verdict, you may consider only the testimony and exhibits received into evidence.  Certain things are not evidence and you may not consider them in deciding what the facts are.  I will tell you what these things are:

One, arguments and statements by lawyers are not evidence. The lawyers are not witnesses.  What they may say in their opening statements, closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence.

If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or my ruling on it.

Testimony that I exclude or strike or that you are instructed to disregard is not evidence and must not be considered.

In addition, some evidence may be received only for a limited purpose, and when I instruct you to consider certain evidence only for a limited purpose, you must do so, and you

may not consider the evidence for any other purpose.

And, four, anything you may see or hear when the court is not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

Now, evidence can be direct or circumstantial. Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is proof of one or more facts from which you can find another fact.

You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give any evidence.

Now, the parties have stipulated to a number of facts. I'm going to read them to you. These facts are carved in stone. You don't have to decide if they're true or not. The parties have agreed that this is a fact in the case that you may consider.

Now, a lot of this is going to sound detailed and technical because you haven't heard much about the case yet, but just go through it with me and keep this list handy as you need it during the trial.

1. Plaintiff Erica Frasco is a citizen of the state of New Jersey who downloaded the Flo app.

2. Plaintiff Sarah Wellman is a citizen of California who

downloaded the Flo app.

3.   Plaintiff Jennifer Chen is a citizen of California who downloaded the Flo app.

4.   Plaintiff Tesha Gamino is a citizen of California who downloaded the Flo app.

5.   Anna Meigs [sic] is a citizen of Ohio who downloaded the Flo app.

6.   Defendant Flo Health, Inc. -- which we're calling "Flo" -- is the developer of the Flo app.

7.   Defendant Meta Platforms, Inc. -- which we're calling "Meta" -- is a technology company that, among other things, offers free tools like a Facebook SDK -- you'll hear all about this in the trial, just go with it now -- Facebook SDK to allow businesses to build unique and customized solutions to serve their clients.

8.   Plaintiffs first filed a lawsuit against Flo based on reported injuries arising from the use of the Flo app on January 29, 2021.

9.   Plaintiffs first filed a lawsuit against Meta based on purported injuries arising from their use of the Flo app on June 7, 2021.

10.  Flo was created in 2015, and launched the Flo app in 2016.

11.  During the class period, the Flo app was available for download on the iOS and Android app stores.

12.   The Flo app is a mobile application that can be used to track periods and pregnancy.

13.   Plaintiffs Chen, Frasco, Gamino, and Meigs downloaded the Flo app to track their menstrual cycles.  Plaintiff Wellman downloaded the Flo app to track her menstrual activity and figure out the best day to get pregnant.

14.   During the class period, Meta offered a Facebook SDK to app developers.

15.   Flo incorporated code from a Facebook SDK into the Flo app throughout the class period.

16.   The custom app event names at issue in this lawsuit -- now, this is where you're going to hear more, but just take it in right now -- custom app event names at issue in this lawsuit are R_CHOOSE_GOAL, R_SELECT_LAST_PERIOD_DATE, R_SELECT_CYCLE_LENGTH, R_SELECT_PERIOD_LENGTH, R_AGE_CHOSEN_PERIODS, R_AGE_CHOSEN_PREGNANCY, R_AGE_CHOSEN_PREGNANCY_METHOD, R_PREGNANCY_METHOD, R_PREGNANCY_METHOD_DATE, R_PREGNANCY_WEEK_CHOSEN, R_PREGNANCY_WEEK_CHOSEN_UNKNOWN, and SESSION_CYCLE_DAY_FIRST_LAUNCH.

And finally, 17.  Flo shared the custom app events in paragraph 16 that I just read to you with Meta.

All right.  So those are the facts that you can bank on as having been proved by the parties' agreement.

Now, there are rules that control what can be received in

evidence.  When a lawyer asks a question or offers an exhibit in evidence and the lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object.

If I overrule the objection, the question must be answered and the exhibit will be received.  If I sustain the objection, the question may not be answered and the exhibit will not be received.

Whenever I sustain an objection to a question, you must ignore the question and must not guess about what the answer might have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence.  That means when you're deciding the case, you must not consider the evidence I told you to disregard.

Now, in deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.

You may believe everything a witness says or part of it or none of it.

In considering the testimony of any witness, you may take into account the opportunity and the ability of the witness to see or hear or know the things testified to; the witness's memory; the witness's manner while testifying; the witness's interest in the outcome of the case, if any; the witness's bias or prejudice, if any; whether other evidence contradicted the

witness's testimony; the reasonableness of the witness's testimony in light of all the evidence; and any other factors that bear on believability.

Now, sometimes a witness may say something that is not consistent with something else he or she said.  Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.

You should consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.

However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.  What is important is how believable the witnesses were and how much weight you think their testimony deserves.

Now, at times during trial you may hear testimony by a witness in the form of a previously recorded deposition rather than live here in court.  A deposition is the sworn testimony

of a witness taken before trial.  The witness was placed under oath to tell the truth, and lawyers for each side asked questions.  Questions and answers were recorded.

Insofar as possible, you should consider deposition testimony presented you in court in lieu of live testimony in the same way as if the witness had been present to testify.

You will hear testimony from expert witnesses who testify to opinions and the reasons for their opinions.  This opinion testimony is allowed because of the education or experience of the witness.  Such opinion testimony should be judged like any other testimony:  You may accept it, reject it, or give it as much weight as you think it deserves considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

Certain charts and summaries may be shown to you in order to help explain the contents of books, records, documents, or other evidence in the case.  Some of those charts or summaries may be admitted into evidence while others are not.

Charts and summaries are only as good as the underlying evidence that supports them.  You should therefore give them only such weight as you think the underlying evidence deserves.

It's very important, vital, and I'm urging you to pay close attention to the trial testimony as it is given.  When you get to the verdict room, you will not get a copy of a transcript of the trial testimony.

Now, if you would like, you may take notes during trial to help you remember the evidence.  Now, your binder has lined paper in there for you to do that.

If you do take notes, please keep them to yourself until you go to the jury room to decide the case.  Don't let note-taking distract you.

Now, when you leave, your notes must be left in the jury room.  No one is going to read them.  Whether or not you take notes, you should rely on your own memory of the evidence.  Notes are only to assist your memory.

You should not be overly influenced by your notes or the notes of other jurors.

Now, I will preface this by saying I often forget to ask, so if I forget, you can do it on your own if you have something.  But when questions -- attorneys have finished examining a witness, you may propose a question to the witness to help clarify the testimony.

So if I don't ask and you have a question, just put your hand up.

A question may not be used to express any opinion about the testimony or argue with the witness.  If you propose a question, remember that your role is that of a neutral fact-finder and not an advocate.

I just want to put a little finer point on this.  Let's say the witness spoke too quickly about something.  You can ask

him to repeat it.  Let's say the witness gave two different dates for what sounded like the same thing.  You can say, I don't -- was it 2015 or 2017?

You can't ask questions like "Why are you lying" or "What's wrong with you," you know, things like that.  You can help clarify the facts if you really want me to do it.

Now, here is the procedure for this.  As I said, I'll do my best to remember to ask if you have any questions.

Now, you have a -- you should have a written form in there.  You may not have one right now, but --

Did we put the forms in?  I don't think we did.

**THE COURTROOM DEPUTY:**  I don't know.

**THE COURT:**  You can use the lined paper for right now, but tomorrow I'll give you the form for it.

You can write down your question.  Just write it down.  All right?  Do not put your name on it.  Don't sign it or put your name on it.  And I would -- at that point we'll review the questions.

Now, there are some proposed questions that I may not permit, or I may rephrase the question, depending on the wording you submitted.  I'll do this either because the rules of evidence or other legal reasons affect the question or because the question may be answered later in the case.

Now, if I don't ask one of your questions or if I rephrase it, don't try to figure out or speculate about why I did that.

Don't give undue weight to any questions that you or other jurors propose.  You should evaluate the answer to those questions in the same manner you evaluate all the other evidence.

Now, by giving you this opportunity, I'm not suggesting or in any way requiring that you ask questions.  This is totally up to you.  It will often be the case that a lawyer has not asked something that you might be curious about it because it is legally objectionable or because a later witness may be addressing the subject.

Now, I want to talk to you about your conduct as jurors in this case.

It is vitally important that you keep an open mind throughout every minute of the trial.  The testimony and the evidence is going to unfold over several days -- not weeks -- several days, and you should not reach any conclusions about the case before you have heard everything that's going to be presented here in court.

In addition, you should not be deciding what the verdict should be until you and your fellow jurors have completed your deliberations at the end of the case.  And when it comes time for you to decide the verdict, your decision must be based on the evidence received in the case and on my instructions on the law.

You must not be exposed to any other information about the

case or to the issues it involves while you're here during your duty as a juror.

So for these reasons, you must not communicate with anyone in any way, and you must not let anyone else try to communicate with you in any way about the merits of the case or anything to do with it.

This covers every possible form of communication:  In person, in writing, on the phone, a tablet, a computer, any electronic means, e-mail, text messaging, chat rooms, blogs, websites, any social media applications including but not limited to Facebook, YouTube, Twitter -- this is out of date. You understand what I'm saying.  I can't keep this list current.  But no social media, Instagram, LinkedIn, TikTok, Snapchat, anything like that.  Don't use it.

The prohibition on communication applies to everyone, including your family members.  You cannot go home at the end of the day and start talking about the case.  It includes your employer and the media or the press and anyone involved in this trial.  Anybody you see on the court staff, on -- me or any of the lawyers, any of the witnesses.

Now, you could -- it's perfectly fine for you to tell your family and your employer that you've been picked as a jury -- juror, and roughly the time frame that the case is expected to take.  That's fine.  But you cannot share with them or anyone else any other information about your jury service or the case,

and you must make sure that you don't talk with your jurors -- fellow jurors about what the verdict shall be or might be until I sent you for final deliberations.

Now, if anyone asks you about your jury service or the case, you need to tell them that I have directed you not to say anything.  If anyone takes it beyond that and starts to bother you, you let Ms. Clark know and I will take it up and make sure that gets solved.

Now, in addition -- this is equally vitally important -- you must not, for any reason, do any research or investigation on your own.  You will get all the evidence and legal instruction you may properly consider for the verdict right here in the courtroom.

Do not look anything up on the Internet or in a book or do any kind of sleuthing or investigating.  Do not visit or view any place or location that might be described during the case. Do not do any research about the law or the people involved, including the parties, the witnesses, the lawyers, or me. Don't look any of the people up.  Don't look any companies up. Don't look any research up of any sort.

Now, there may be media coverage of this case.  If you happen to stumble across that, please make sure you don't read it, you don't watch it, and you don't listen to it.  You should ignore and not get into a word of any news or media comments or accounts or commentary about the case or anything to do with

it.

If you do happen to see something that touches on this case in the media, let Ms. Clark know.  All right?  Just let her know you saw it.  But don't read anything or look at anything about the case.

I understand this is a lot of things that I'm telling you not to do, but it's vitally important for you to follow these rules.  They protect each party's right to have this case decided only on the evidence that has been presented here in court.  Witnesses take an oath to tell the truth, and the accuracy of their testimony is tested through the trial process.

If you do any research or investigation outside the courtroom or gain any information through improper communications, then your verdict may be influenced by inaccurate, incomplete, or misleading information that has not been tested by the trial process.

Each of the parties here is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will deny the parties a fair trial.

Remember you have taken an oath to follow these rules and it's crucial that you do so.

Now, a juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over.  If

any juror is exposed to any outside information, please let Ms. Clark know if you happen to hear about it.

All right.  We're ready to start the trial.  Here's what will happen next.

Each party may make an opening statement.  An opening statement, once again, is not evidence.  It is simply an outline to help you understand what that party expects the evidence will show.

A party is not required to make an opening statement, and if a party chooses not to make one, you should not hold it against them for any reason.

The plaintiffs will then start the presentation of evidence, and counsel for Flo and Meta will cross-examine witnesses.  And then Flo and Meta will present evidence and the plaintiffs will cross-examine.

And after that, after all the evidence has been presented, I will give you what I told you earlier, which would be the final jury instructions at the end of the case, and then the lawyers will make closing arguments.  And after that, you will go to the room, the jury room, and begin to deliberate on your verdict.

So those are the instructions.  You can put them in your binder.  And we will now start with opening statements by the plaintiffs.

<u>**OPENING STATEMENT**</u>

**MS. VILLEGAS:**  In 2018, our client, Sarah Wellman, made the very private and personal decision to have a second child.  She used the Flo Health app, the word's largest period and pregnancy tracking app, in order to help her get pregnant.

When she started using the app, the first question that Flo asked her was:  How can we help you?

And her answer:  I want to get pregnant.

The moment Sarah answered that question, an onslaught of data was immediately recorded by Meta, including her age, her location, a number that personally identified her, and the fact that she wanted to get pregnant.

Meta, the largest advertiser in the world with an insatiable hunger for data, exploited Sarah's personal information.  They pulled her information into their machine learning advertising algorithm.  They used it to train their algorithm.  They used it to deliver ads.

But Meta's exploitation of Sarah didn't end there, because Sarah went on to answer some additional questions that the Flo app asked her, like the date of her last period, like how long her period lasted, like how much time between periods.

Sarah answered all these questions, and the moment she answered those questions, Meta recorded whether she was ovulating.  Meta recorded where she was in her menstrual cycle.

And Sarah wasn't alone in having her privacy violated,

because Meta did this to over 30 million women.

Let me repeat that. Meta took the private health information of over 30 million women.

Ladies and gentlemen of the jury, my name is Carol Villegas, and I, along with my co-counsel, Michael Canty, Christian Levis, Diana Zinser, and Gloria Medina, we represent the plaintiffs in this case. They're sitting right there. And we represent the millions of women who used the Flo Health app between November 1st, 2016, and February 28th, 2019.

So let's talk a little bit about Flo Health. Flo Health is a health app. Their website is Flo.health. They bill themselves as a safe space for women to record intimate details about their personal reproductive health. They tell their users that they have doctors on their staff, a medical board. Their goal is to help women diagnose diseases like PCOS.

They tell women that this is going to be a place for them to be able to figure out what is going on with their bodies, to track their periods, to track their pregnancy. They even can produce a medical report for women to look at.

During this time, Flo gave assurances to the women using this app. They told the women using this app, "We will not transmit any of your personal data to third parties." But they allowed Meta to record their personal data. Why?

Let's talk a little bit about Meta. You all know Meta used to be called Facebook. Meta is the largest advertiser in

the world, and they are very good at what they do.  They're good at what they do because they collect billions of pieces of data from everyone, and then they use that data to figure out who to deliver ads to, when to deliver ads to them, how to deliver ads to them.

Where do they get this data?  They get it from Facebook.  Facebook.  They get it from Instagram.  They get it from Messenger.  They get it from websites that people visit.  And they get it from apps.  And that's what is at issue in this case.

Meta developed something called a software development kit, or an SDK.  You're going to be hearing that term a lot during this litigation.

Meta developed this software in order to help app developers build their apps.  It was a piece of code that software developers could embed into their own code, and Meta gave them this software development kit that could help them build apps for free.

Why did they give it to them for free?  Well, in exchange for the helpfulness of this software development kit, app developers would agree to share data from their app and allow Meta to record it.

In the case of Flo Health, we're talking about recording of health data.  Why is this a problem?

Well, we have at least two problems with this.  First of

all, neither Flo nor Meta bothered to ask the women who were using the app whether they agreed to have Meta record this information.  In fact, what they said was "We will not transmit any of your personal information to third parties."

Second, the law.

In coming together with this arrangement, Meta and Flo broke the law.

Let's talk a little bit about the law.  The evidence is going to show you that Flo violated the California Confidentiality of Medical Information Act.  This is a law that provides -- that applies to healthcare providers.

And when you think about a healthcare provider, I want you to think about what this law actually covers.  You don't have to be a doctor to be considered a healthcare provider.  You don't have to be a hospital.  This law applies to mobile apps that maintain medical information for the purpose of allowing the individual to manage their health information.  That is exactly what Flo does.

And when the judge explains the law to you at the end of the case, I want you to pay close attention, because what the judge is going to tell you is that this law requires specific authorization, and there are steps that Flo had to take before allowing anyone to record any health information.  And they didn't do any of it.

The evidence will also show that Flo breached their

agreement with these women.  When they told the women that they would not share their information with third parties, they lied.

The evidence will show that Flo also violated these women's privacy rights.

Let's talk a little bit about what Meta did.  Before we get there, though, I do want to talk about one more thing, because the medical information that we are talking about, why Flo is covered by that statute.

The medical information that Flo records is information about a woman's period and her pregnancy.  They also record information about symptoms like cramps, headaches, mood.  They record information about body fluids, body symptoms, ways for women to tell whether they're ovulating or not.  They record when a woman has sex.  And they record facts that are specific to the allegations here.

What we are alleging Flo allowed Meta to record are two main things:  One, whether it was a goal for a woman to get pregnant or not get pregnant; and, two, information about whether she was ovulating and where she was in her cycle.  Those are the things that Meta recorded.

So let's talk about Meta now.  Meta is accused of violating the California Invasion of Privacy Act.  We allege that Meta recorded women's private information by using that software we talked about earlier today, the software

development kit.

This code sat on the app and it recorded women's private information about their bodies, a lot like spyware would sit on a computer, listening in and recording all of the details of what a woman puts into an app.

Now, how are we going to prove our case?

We are going to prove our case through evidence.  That evidence is going to come in the form of testimony from people who take the stand and testify before you under oath.

That evidence is going to come in the form of documents.  You're going to get to see internal documents from both Flo and Meta.

You're going to get to hear from the women that are sitting right over there.  Those women represent a class of millions.  They're going to tell you the information that they put into the app.  They're going to tell you their experience using the app.  They're going to tell you how they felt when they found out that Flo Health allowed Meta to record information about their periods and pregnancy in order to use it in their advertising system.

You're also to hear from two experts, Dr. Serge Egelman and Dr. Jennifer Golbeck.  They are computer science experts who are going to help explain some of the more technical parts of this case.

But first you're going to hear from our plaintiff,

Sarah Wellman. Sarah is going to take the stand. She's going to tell you why she chose to use the app to have her second child. She's going to tell you the type of very private and personal information she entered into the app. She's going to tell you that she never gave permission for Flo to allow a third party to get her personal health information. And she is going to tell you how horrified she felt when she found out that Meta was recording information about her periods and ovulation in order to use it for advertising.

Now, we're going to walk you through the privacy policy in this case, and you're going to get to see the actual document where Flo made promises to these women, promises that they wouldn't share this information.

I'm going to read you a couple of excerpts from the privacy policy. (as read):

"We will not transmit any of your personal data to third parties unless we have asked for your explicit consent."

The evidence will show you that was a lie.

(as read):

"We may share certain personal data excluding information regarding your marked cycles, your pregnancy, symptoms, notes, and other information that you do not elect to share."

The evidence will show you that was a lie.

(as read):

    "Third parties will not have access to your
survey results."

We're talking here about the health survey that every single woman had to answer in order to use the app with questions like "How may I help you?" I want to get pregnant. "When was the date of your last period?"

(as read):

    "Third-parties will not have access to our
survey results."

The evidence will show you that was a lie.

(as read):

    "Those third parties will never use such
information for any purpose."

The evidence will show you that Meta used it for another purpose.  Meta used it to make money.

That was a lie.

(as read):

    "We will never transfer your personal data to
any third party without your prior explicit consent."

And you're going to hear from these women.  They're going to tell you they never gave anybody consent to use information about their periods or pregnancy.

Let's talk a little bit about Dr. Serge Egelman.  He is a professor at UCal Berkeley.  He's a computer scientist.  He has

tested hundreds of apps just like the Flo app at issue here. And he's going to be able to explain some of the more technical parts of this software development kit.

He's going to show you the code that Meta wrote, and he's going to be able to show you the exact code that was sent to Meta when a woman answered the question "How can I help you?"

Pay attention when he testifies, because he's going to show you that when a woman answered that question, the words "Goal: Get pregnant" were recorded by Meta.

Dr. Egelman is going to show you that when a woman like Sarah answered questions like the date of her last period, how long her period lasted, Meta recorded the cycle day.

You will see in that code.  Look for it.  You're going to see the word "ovulation."  You're going to see the number of where that woman was in her menstrual cycle.  Meta recorded that information.

Dr. Egelman is going to tell you that Meta wasn't just passively receiving information from Flo.  It was Meta's own code that recorded this information from these women and then transferred that code into Meta's systems to be used for advertising.

Dr. Egelman is also going to tell you how when a woman entered her information, personal information went along with it, like her age, her location, and a number that could personally identify her.

Again, when he talks about this, pay attention, because what Meta got was something called an IDFA.

Do you know what that stands for?  ID for advertising.

They got an ID for advertising a woman's age, her location, and the fact that she wanted to get pregnant.

And Dr. Egelman is going to testify that when Meta got that information, they could match that number, which is unique to your cell phone, to a person.  So when they got Sarah's information, they could match it to Sarah.  They didn't need her name.  They didn't need her address.  They didn't need her e-mail address.  All they needed was an IDFA.

Dr. Egelman is also going to tell you that when Meta took this information in, if the user was also a Facebook user, they could match the period and the pregnancy information to all the other information that they had collected from the Facebook user and use that to serve ads.

You are going to get to see internal documents that we uncovered in the course of this litigation.  Those documents are going to give you an insider's view into the world at Meta. You're going to get to see their systems, how they work. You're going to get to see a document from Meta where you can see the code, the health events that got sent to Meta and how many times.  You're going to see this evidence, and it's going to show you Meta got the information, periods, pregnancy, over 30 million women.

You're also going to see a document where Meta admits that it took the Flo data into its systems and that it used this data for advertising.  They admit it.  You're going to see that document.

You're also going to hear from Dr. Jennifer Golbeck. Dr. Golbeck is an artificial intelligence and machine learning expert.  She's going to explain to you how the internal Meta systems work, how they pull in the data, how they use it, how they use it to train their systems, how they use it to serve advertising.  She's going to explain to you that once this data makes its way into Meta, there's no pulling it out.  So these women have lost control of their health data.  It's somewhere inside of Meta.

She's also going to explain to you how the black box of machine learning figures out how to deliver ads.  No one at Meta will ever be able to tell you why you get one ad over another.  They don't know.  The algorithm knows, and it's very good at what it does.

So Dr. Golbeck is going to explain to you why none of our plaintiffs can tell you which ads they saw, because they don't know, but Meta knows.  And they profited off of that.

Now, you may hear some arguments that Meta didn't want this health information, that they asked people not to send it to them.  But actions speak louder than words, because you're going to see a document from May of 2018 where Meta admits they

know they're getting information from apps. (as read):

"Today advertisers can inadvertently or intentionally send sensitive information, passwords, PII -- which means personally identifying information -- social security numbers, health information -- in custom data fields via websites, apps, and offline events.  This poses risks, as we are unable to cleanly delete data as well as policy and PR issues."

So they knew they were getting this data.

And what did they do?

Nothing.  They did nothing.

You are also going to see evidence that Meta knew it was getting sensitive data from Flo.  And what did they do?

Nothing.  They did nothing.  They just kept pulling in the data.

And why?

You already know why.  Money.

When journalists started asking questions about this arrangement that Flo and Meta had, they denied it.  They denied it.  They kept sharing the data.

So these women sitting here and the millions of women that are part of our class had no idea.

This wasn't an accident.  This wasn't a mistake.  This is how Meta makes money.  This is their business.

At the end of this trial, we are going to come before you and we are going to ask you, the jury, to render a verdict for the plaintiffs.

You are the jury that gets to decide how seriously big tech takes women's privacy.  And at the end of this trial, we're going to come before you with all the evidence that we are going to present to you and we are going to go over it together, and I'm confident that you will come to the undeniable conclusion that Meta and Flo violated the privacy rights of millions of women.

Thank you.

THE COURT:  Okay.  Which defendant is going first?

MS. SHARTON:  Flo, Your Honor.

THE COURT:  All right.

OPENING STATEMENT

MS. SHARTON:  Imagine that you've read about a cool new app, say a step tracker that you use to lose weight, get fit.  And you think this seems really cool.

"I'm going to go download this app."  You open it up on your device, and you have to agree first to the privacy policy and the terms of use, and then you start to check out the app.  Right?

You go in, you say -- it says "What's your goal?"  All right.  "I want to step" -- "I want to, you know, lose weight."

"Do you want to get fit?"  You go in.  You click on the

thing.  "I want to get fit."  If you click on "lose weight," they might ask you your weight.  You may or may not -- I may or may not put in the accurate weight for that.

But you're -- that's sort of the part of opening the app.  Right?

Imagine you do that.  Am I now a patient of that app?  Is that app now a doctor?

That's basically what plaintiffs are claiming against Flo.

And I want to start by saying there's a lot of sensitive information that you saw and you said -- you know, that you were shown by Ms. Villegas, sensitive things that people put into the Flo app.  And if that had been shared with Meta, I'd be pretty upset too.  But that's not remotely what happened here.

And I want you to keep in mind as you go through and --

Can we get the next slide?

As you're thinking about, you're hearing the case, there is a huge difference between the information that people put into the app, that the users put into the app, and that Flo collects versus what was shared.  And the plaintiffs conflate those two things.  They want that confusion.

I want you to always think what is at issue here is what was shared.  And there were 12 custom app events that are at issue.  They're in paragraph 16 of your instructions that you were given.  Those are the app events that were -- that were

shared and that plaintiffs don't want you to believe, looking at all of the different survey results and things that they showed you, and mood swings and all the sensitive things that they mentioned -- that's collected by the Flo app.  That is not -- that is not what was shared and not what was at issue in this case.

Now, my name is Brenda Sharton, and I have the honor of representing Flo.  Flo is a phenomenal company.  Phenomenal. And I want to tell you a little bit about it before we get into what exactly was shared, and I promise I'm going to walk you through what was shared in this case.

The Flo app, as you've heard, was launched in 2016 to empower women with better information about their bodies.  And it's a global app.  It's available in 190 countries.  And it really revolutionized women's health and period trackers. There was nothing really quite like it, and it took off.

It -- you heard plaintiffs talk about, you know, 420 million users.  It's huge.

The period in time when this -- the conduct was at issue was November of 2016 to February of 2019.  That's it.  That's during that period of time.

And when the app was launched, it provided fertility tracking information.  It provided information about women's reproductive health.  It had -- the company had about 10 employees at the start of the class period.  By the end it had

about a hundred employees.  Small startup, still a startup.

And what you're going to hear in the evidence -- we heard this case is about money -- that Flo, during the class period, had literally, up until late 2018 right towards the end of the class period, had revenues of exactly $0.  It had profits of exactly $0.

So we know profit and revenue are two different things.  Not even any revenue coming in.  Its business model --

If you can go back one.

Its business model was not to share data, not to sell data, not to do anything like that.  The business model was: Let's build an incredibly useful app.  Let's grow the user base, and then over time, we're going to offer a premium subscription for money.

And you're going to hear evidence to that effect.  It wasn't, you know:  Let's sell data for advertising.

That never happened.  The allegations that you heard in the plaintiffs' statement absolutely never happened.  You're going to hear evidence to that effect.

Now, the Flo app --

If we can go to the next one.

Some of the things that it did -- I talked about how it was revolutionary.  By 2017, Flo was partnering with the United Nations, and that continues to this day.  And they had a partnership with the United Nations where they could bring this

information, raise awareness around the globe about female reproductive health, reduce the stigma, and they had this partnership, and they go out with the United Nations all over the globe.

Now, they also work with scientists. In partnership with the scientists at Stanford University, Harvard University, they provide statistical information to support groundbreaking research on women's health. You're going to hear about some of that work that they do.

And this is because this is an information app. It's a fertility tracker for sure, and it does provide information. And just like a step tracker, when you go into the app for the first time, in order to --

THE COURT: I'm sorry to interrupt.

Why does this thing keep flashing?

MS. SHARTON: I don't know.

THE COURT: Well, can you fix it? Because it's not great.

(Pause in proceedings.)

THE COURT: Okay. See if that works.

MS. SHARTON: All right. Sorry about that technical difficulties.

They partnered with Stanford, with researchers around the world, and they provide like big, sweeping statistical data. Like, you know, 80 percent of women this, went to this part of

the app or 80 -- 20 percent of people read this article on a certain disease, and then they provide information to scientists not about any individual users, of course, but just big, sweeping statistical information.

And they provide reproductive and fertility information of -- and an opportunity for women to -- in the community, on a blog to share information, ask questions of each other.

So it really has -- became just an incredibly popular app.

But that mission of helping women, empowering women around the globe, you're going to hear about that from some of the Flo witnesses.

Let's go a little further and let's talk about the evidence in this case and what the plaintiffs claim.

Now, plaintiffs claim that Flo shared -- that Flo shared plaintiffs' health information.

That's absolutely not the case.  That was never shared.

And I'm going to walk you through what was shared, but it was deidentified information and on these 12 custom apps, absolutely no advertising, nothing like that was shared, and no health information was shared.

Let's look at the second thing.  Plaintiffs claim and they must prove that Flo breached its contract with plaintiffs.

What the evidence actually will show is that plaintiffs agreed that Flo could share data to maintain and improve the app's performance.

I think we're still blinking a little bit here.

And on the breach of contract one, what is a contract between an app and its users?

You're talking about the privacy policy. You're talking about the term of use. That's the one thing the plaintiffs and the defendants in this case agree on is that that was a contract between Flo and its users. And I'm going to show you that Flo -- Flo's privacy policy is -- expressly stated exactly what they were going to do with this data, and they followed it to a T, the plaintiffs consented.

Now, the third claim, Flo sold plaintiffs' health information and allowed others to use it for ads. What the evidence actually will show is that Flo never sold data or allowed anybody to use the data that -- at issue for ads. That never happened. And you will hear expert testimony on that as well.

So let's -- we're going to walk through those three claims and what the evidence actually will show.

But first, there's a threshold question that you would -- be asked to decide, and I call it a threshold question because if you decide in Flo's favor on this question, you don't even need to get to the other three.

And that is plaintiffs claim that they filed their claims in a timely fashion. And you're going to see the evidence.

There was something called -- in the terms of use in the

Flo app, there was a one-year -- statute of limitations is one way to look at it, but a very express provision that said you have to bring any claims within one year.  You're going to hear evidence that they waited years to bring these claims.

Let's take the first claim first.  Flo shared plaintiffs' health information.  That never happened.

Let's go to the next one.  You heard about SDKs and software development kits, and I think it was couched as, you know, this secret agreement between Flo and Facebook analytics.

SDKs, as you're going to hear from expert witnesses, could not be more ho-hum.  Nearly every single app uses SDKs, or software development kits.  And during the period, nearly all apps used an analytics SDK, and, of course, one of the most popular one's Facebook's SDK for analytics.  And analytics SDKs provide the app developer with performance information on the app.  They analyze how is it doing, is it working, what's popular about the app, you know, where are people going on the app navigationally.

And those -- that software development kit is a little bit like a part that you would put into a car.  So the app developer is like the car manufacturer.  They are not going to reinvent the wheel.  They're going to buy their tires from Goodyear or get their airbags from Takata or a stereo from Bose and put it in.  It would make no sense if you're building a car to go ahead and get -- you know, create that.

They use these software development kits, prepackaged SDKs, for analytics of their app.  They put that code into the app, and then they have an opportunity to name some of the app events.  They're called custom app events.  And those are unique to the app.

So those are things that say these are different parts of the app that are unique to Flo as opposed to all other apps which -- you know, standard ones, which are just kind of opening the app and things like that.

So you're going to hear testimony from Chris Karkanias, an expert witness.  Mr. Karkanias is a phenomenal expert, kind of like a godfather of health technology.

When a little company by the name of Microsoft decided they wanted to create a health technology division, guess who started it?

So Mr. Karkanias -- you're going to hear about that.  He has over a hundred patents in the categories of mobile apps, health, and privacy, and he's been published in Nature and Science magazines, two of the most prestigious and top magazines in this space.

Now, he's going to talk to you about -- and you're going to also hear testimony from another expert, Dr. George Zervas, and they looked at the actual source code of the Flo app back in the time -- back in the time period.

They're going to tell you -- or Mr. Karkanias is going to

tell you that nearly all apps incorporate SDKs.  He's going to look at Flo's use of the Facebook analytics SDK and testify it did not reveal any health information, that the data transmitted to Facebook was deidentified and that Flo's privacy policies were accurate, clear, and easily understandable.

Let's go to the next one.

So I told you I would walk you through what exactly gets sent.  So you can see on the left there's a device.  This is how the SDK works.  I go into the app.  I hit the first things to open up the app.  You have to hit -- on my step tracker you've got to hit, you know, "get fit," and that might bring me to articles on fitness and exercise.

But you just hit the -- hit a navigational button.  You just hit the button, and what that does is it causes some snippets of code to be sent to Facebook analytics division.  They get these snippets of code.  We're going to drill down and look what's in it.  And then --

Go back one.

Then what ends up happening is the app developer then gets the thing on the right, with all the little people and the colors on the graph.

They go into a portal.  It doesn't even get sent to them.  They get to go into a portal, and what they get back is information on how the app is doing.  And what that information is, is just the name of the app event and numbers next to it.

So it might have the app event name and it would say 1,364,000 people went to this part of the app this week, and then another number, aggregate number, went to another one of these events, so that the app developer can see what parts of the app are popular, what are working, what isn't working.  If you see no numbers on a particular app event, it might tell the app developer that part of the app isn't working or it isn't popular, so they can adjust their app.

So that's exactly what got sent.  And let's drill down a little further on that and look at what was transmitted, because you heard that it was so intrusive.

Now, what exactly gets sent was for these 12 app events.  That's it, just the 12 at issue.  The very first time someone went onto the app and navigated, hit a button, the device calculated it.  It calculated that a user's device went to a certain spot.

And this is all that got transmitted.  I call it the code gobbledygook.  And in it, it would have, as an example, select last period date.  It did not send the date.  It sent "known" or "unknown."  If you said -- if the user entered a date, it would come up "known."  If the user didn't enter a date, it would come up "unknown."  All that was recorded was that a device went to that part of the app, only the first time for these 12 custom app events.

So think about it.  For my step tracker, I went in, hit

the button, hit "lose weight," that's the only time it would ever go on these 12 custom app events, one time, the first launch questions.  And this is what would get sent -- not what I put in, not any of the specifics, but just "known" or "unknown."

Now, what didn't get sent, no health information, no names, no contact information, no e-mails, no birth dates, nothing.  Just this device identifier.  And you're going to hear from Mr. Karkanias and the experts in this case that that's actually a privacy-saving device, those device identifiers, and it only recorded whether a device went and where that device navigated on the app, and then these big aggregate numbers came back.

Now, plaintiffs have tried to shoehorn this into the -- the CMIA.  It's probably easier for you to call it that.

And the plaintiffs showed you one part of the statute, but they didn't show you the part of the statute that talks about -- this part of the statute that talks about whether someone is even subject to the CMIA.

And if you look at it, this is the actual language of the statute.  And I'm not going skip over the parts I didn't highlight, like plaintiffs' counsel did.  We're going to look at the privacy policy in that way in a minute (as read):

"A provider of healthcare, healthcare service plan, or contractor shall not disclose medical

information regarding a patient of the provider of

healthcare or an enrollee or subscriber of a

healthcare service plan without first obtaining an

authorization."

So a provider of healthcare regarding a patient.

Does that sound like an app?  You've got to think about that as you listen to the evidence.

What is medical information?

This, again, is right from the statute.  This is the statute 2016 to 2019, as it existed (as read):

"Medical information means any individually

identifiable information in electronic" -- you're

welcome to read the whole thing -- "or physical form

in possession of or derived from a provider of

healthcare" -- goes on to say -- "regarding a

patient's medical history, mental or physical

condition, or treatment."

So that's the CMIA.

Now, Flo, not a doctor.  Its users, not a patient.  Yes, they have doctors -- an advisory board, you know, people that help them make sure that the information that was provided on the app was accurate, that their articles were good, that the information that was in there was good.  This does not make it a healthcare provider or a doctor in any way, shape, or form.

But just does in case, they went ahead right in the terms

of service -- and this was in every single terms of service that the app had. And it's Number 2. It's right up front in big, bold letters: "Medical services disclaimer" (as read):

"The company is not a licensed medical care provider" -- sorry for the flashing here -- "and the app is not intended to replace professional medical advice or diagnose, treat, or manage any illness or medical condition."

And it goes on to say: Always consult with your healthcare professional if you have any questions or concerns.

Duh. I mean, basically it's a little like taking a Superman costume and saying "If you wear this, you won't fly." It is clear that you don't become a patient of an app. And I want you to keep this in mind and this disclaimer in mind. It was expressly told to the users of the app in every terms of service -- remember the contract between them -- that it's not medical advice. Please check with your medical care provider.

Now, the second claim the plaintiffs have brought is that Flo breached its contract with plaintiffs. Again, this is the privacy policies and the terms of service. And you're going to have those in the jury room with you. We're constrained a little on the time in these statements, and we're showing you provisions, but you're welcome to look at them all yourself and see these provisions.

And let's look at what the plaintiffs agreed to. The

plaintiffs agreed that Flo could share data to maintain and improve the app's performance.  That's what that analytics SDK does.

Let's look at some of the -- what the plaintiffs said under oath.  They -- all plaintiffs agreed they -- all plaintiffs agreed to Flo's privacy policies, and you're going to see evidence of that.  Every single one of them.

And from day one, this is a privacy policy.  If you notice the date on it, June 15th, 2016, that's even before the class period.  It starts November of 2016.

This is what the privacy policy said, and you can see in big, bold letters "Sharing data with third-parties."  This is one part of the privacy policy that opposing counsel didn't show you.

It says (as read):

"We may share information including personally identifying information with our affiliates, companies that are part of our corporate groups of companies, including but not limited to Facebook."

It says it right in the very first privacy policy.  We're going to share this with Facebook to help provide, understand, and improve our application, i.e., analytics.

And you noticed with Ms. Villegas in her opening statement, she only read part of that provision she kept reading to you and skipped the part that said (as read):

"...except if it is required to provide services to you, e.g. technical service providers, and unless we have asked for your explicit consent."

So it said it right from the very first privacy policy. In every single one, there was something very similar, very similar provision.

But in May of 2018, May 25, 2018, the privacy policy got updated. All companies update their privacy policies. You may have heard in May of 2018, there was a law passed called GDPR, the General Data Protection Regulation, in Europe, a very strict privacy law. I mentioned that Flo operates globally, 190 countries for that app.

And so they updated to the very strict European privacy law, and this is what their privacy policy says now, and it's even more explicit. It says (as read):

"Facebook" -- Facebook and Google. "We use Facebook analytics and Google analytics, tools to track installs of our app. Normally, Facebook and Google collected only non-personally identifiable information, though some personal data like device identifiers may be transferred to Facebook and Google. Read more about analytical services" -- analytical services -- "provided by Facebook here." And there's a link.

And so if anyone had looked at what they agreed to, they

would have seen not only that it was specifically called out, "We're going to send device identifiers to Facebook," but if -- you can also go and look and see what the Facebook term said if you clicked on it.

Now, let's -- you know, crystal clear, very clear, understandable, not legalese, saying:  We provide certain information to Facebook for analytics.  We provide device identifiers for that purpose.

Now, let's look and see another allegation:  Flo sold plaintiffs' health information and allowed others to use it for ads.

Flo never sold any data.  Nobody was allowed to use health information for ads.

Now, these 12 custom app events, as you're going to see, the code gobbledygook where nobody had -- Facebook did not have any sort of key to understand that, and you're going to hear testimony about that, but it is undisputed that none of those custom app events -- you're going to hear testimony that there was never any advertising off of those 12 custom app events.

Now, what did Flo get for using these custom app events? Zero.  $0 for its users.  It's a free app.  You're going to hear testimony that none of the plaintiffs ever paid for the app; they all used the free version -- and that all the way up to October of 2018, the company didn't have a single dollar of revenue.

You'll hear that it was a startup. And like most startups, it operated off of early investor money or venture capital money to keep the company going while they built the app. And their goal was to really build a phenomenal app that was useful to women, that was helpful to women's health. And that's what they did, and they got $0 from Facebook analytics. Certainly there was no money coming back that way. And they had zero money revenue, period.

Now, I also told you that -- about a threshold question that we want you to take a look at as you're hearing the evidence. And, again, this is the statute of limitations type of argument as a provision in the terms of service that says you have to bring suit within one year.

Plaintiffs' claims came years later. They filed suit years later.

Here's the Flo term of service, March 13th, 2017. This was -- every single terms of service had this one provision. It is big bold (as read):

"Any cause of action you may have with respect to your use of the app must be commenced within one year after the claim or cause of action arises."

Now, this was a short terms of service. It was just like four pages. It wasn't long. You could look through it easy. And it isn't some lawyers' technicality. Like this "bring claims within one year," those things exist for a reason.

People move on from companies.  Information is fresher.  And you have an opportunity to, within one year, bring a claim.

And what happened here is the -- the plaintiffs used -- waited years to bring these claims.  And let's take a look.  All the plaintiffs agreed to this terms of service.  If you look at when each of them started using the app, the -- December 2016 for Ms. Gamino; 2017 for Ms. Chen; September 2017 for Ms. Frasco; Ms. Meigs, April 2018; and Ms. Wellman, July 2018.

That was when they agreed to this terms of service.  It says one year you've got to bring a claim.  They did not.

Now, let's look and see when they filed the suit.  Ms. Gamino, four-years later; Ms. Chen, four-years; three and a half years; three years; two and a half years.

Now, lawyers are pretty notoriously bad at math, and I'm one of them, but two and a half is longer than one year.  And they waited years, way too late to file these claims, and the claims are barred just for that reason alone.

But there's more.  In 2019, there was what was called bombshell news.  There was an article in the Wall Street Journal that talked about Facebook and apps and whether they were data sharing.  That got syndicated and sent all over to news organizations all over the country.

So in February of 2019, the plaintiffs were on notice -- they were from the privacy policy and the terms of service,

certainly, that this was happening, but even in 2019, they didn't bring a claim.  They waited two more years.

And so these claims are barred by that provision in the terms of service.

Now, the one thing my opposing counsel and I agree on is: Actions speak louder than words.

And you're going to hear testimony -- she talked about they're upset.  They were harmed.  This was really intrusive.

Every single one of the plaintiffs kept using the app even after they had filed suit.

I want you to think about that as we walk through the evidence in this trial.

Now, we talked about the breach of contract claim.  We talked about the CMIA claim.  Flo is certainly not a healthcare provider.  Its users certainly aren't patients.  They're trying to shoehorn into that statute.

We -- they also had claims for invasion of privacy. You're going to hear that what happened had to be highly offensive for it to be an invasion of privacy.  The conduct that was consented to, that's what we're talking about here.

And then also breach of contract, invasion of privacy, and the CMIA.  But if you hit that threshold question and you say the claims are way too late, more than one year after the fact, you don't need to decide anything else.

Now, I'm going to come back to you after this trial is

over and ask you to return a verdict for Flo.

Keep in mind as you go through:  Is Flo a provider of healthcare?

If I open an app, and I'm just checking it out and I hit one of the buttons and it fires off once to Facebook analytics, am I now a patient?  Is that now my doctor, the fact that I'm using this app?

The answer is no.

Are Flo's user its patients?  No.

Did plaintiffs file their claims on time?  No.

And did plaintiffs agree to Flo's privacy policy?  Yes. You're going to hear the undisputed evidence on that.

I'll be asking you to return a verdict for Flo when we speak to you -- when I speak to you next in closing argument.

Thank you.

THE COURT:  Okay.  Next.

MS. JOHNSON:  Your Honor, just a suggestion to take a break, make sure the monitors be fixed.

THE COURT:  How long will that take?

MS. JOHNSON:  We don't know, but it should be addressed, we would submit.

THE COURT:  Let's just see how it goes.  If it's a problem, we can do something.

OPENING STATEMENT

MS. JOHNSON:  Good morning.  Michele Johnson on behalf

of Meta, and I'm here with my colleagues Andrew Clubok, Elizabeth McCloskey, and our client, Anjali Dahiya from Facebook.

And now I'm going to switch the mic.

You heard about a lot of claims for Flo, but for Meta, which was known as Facebook at the time, there is one question.

One question for Meta, which was called Facebook at the time, so we will commonly refer to it as -- we'll get there.

Did Facebook intentionally eavesdrop upon or record plaintiffs' confidential communications without consent?

When plaintiffs' counsel stood up here and talked about this particular claim, she left out some of the elements, and I don't want to leave anything out. I want to show you exactly what the statute requires, what it prohibits, and what happened here based on not argument, but the evidence, the facts.

What is "eavesdrop upon" or "record"?

It's kind of a commonsense term. If we have two people having a conversation and a third person intentionally uses a device to eavesdrop upon or record their confidential communication, that's eavesdropping or recording.

Let's say the woman in pink -- we can call her Flo -- says, "When did your last period start?"

And the woman responds, "June 3rd." And the device is eavesdrop upon or recording that confidential communication. Eavesdropping or recording. What will the evidence show you

what happened here?

Flo asks, "When did your last period start?" and the woman answers, "June 3rd."

There is no recording of that confidential conversation or communication.  Instead, the first woman walks over and has a different communication with, in this case, Facebook.  "R_SELECT_LAST_PERIOD_DATE value known."  It's a separate communication.  It's second.  It's separate.  It is not that communication.

Now, think about eavesdropping or recording.  Even if that woman in pink had said, "I just talked to someone and their last period date was June 3rd," that's still not recording by Meta, by Facebook, by that third person.  It's a repetition of a conversation.  It may not be a good idea for other reasons, but the statute that plaintiffs are seeking to shoehorn these facts into is very specific, and it specifically says "intentionally eavesdrop upon or record" with that device.

And we'll talk about the technology, so you can see for yourself and the experts will explain.  You can see for yourself how that technology works.

But that's what happened here.  A second communication by Flo according to the programming of the app, which we'll look at.

So what is exactly prohibited by the statute?  I want to look at its actual elements.  It's a bit long, but I will try

to break it down so we can talk about what it prohibits.

"Eavesdrop upon or record," as we say.  What plaintiff left out intentionally and without consent of all the parties.

So what is the evidence going to show about each of those parts of the statute?

Did Facebook eavesdrop upon or record the confidential communication, the plaintiffs' confidential communication? Facebook never even received plaintiffs' confidential communication, didn't even receive it, let alone eavesdrop upon or record.

Did Facebook act intentionally?  You'll see that Facebook made Flo, just like every other app developer, promise in writing to make sure its users knew about data sharing and, in any event, never to send health information.  Made every app developer who uses that SDK, that software development kit, promise:  Inform your users so that we're not receiving any confidential communication as to Facebook, and in any event, don't send health information.

And as to consent, the plaintiffs agreed -- and you haven't seen these policies yet.  The plaintiffs agreed that Facebook could receive the data that Flo sent, that coded data that Flo sent.

So those are the three keys to the case.  And let's talk about the first one.

Never even received plaintiffs' communication.

Now just one note about Facebook.  We probably all know what is it.  Founded in 2004.  By the period that we're talking about in this case, the 2016 to 2019, Facebook had revolutionized the way we communicate with each other.  By 2016, they had Facebook, Instagram, WhatsApp, and Messenger. And for the first time in human history, you could communicate with anyone across the world for free.  That's what Facebook was at the time.

And what is a software development kit?  We have to understand the technology in order to understand whether this fits within the statute that the plaintiffs are trying to use.

It's lines of computer code and other resources that are used by app developers.  An app developer can write all of its code or it can go to other providers of these kits that it can use to develop code.

And it's not just Facebook.  It's Amazon.  It's Google. It's LinkedIn.  It's Venmo.  It's PayPal.  All sorts of companies have these kits that allow app developers to help write their apps.

Why would they do that?  First, because it's reliable, well-maintained code.  It's been used.  It's reusable code. For example, if you wanted an app -- if you wanted to put the Facebook "Like" button on your app, you could use the software development kit to take that code and put it in.  It's commonly used.

You might also want easier integration between the apps. If you wanted, for example, your Facebook ID to log in to work on the app, you'd use the SDK to provide that functionality.

It shortens development time.  And, of course, you get reusable code to help build your app, and it's potentially more secure -- potentially, because if you're typing everything yourself, you could introduce bugs, and so those kits are potentially more secure.

So you'll hear from Tobias Woolridge and Ms. Dahiya about why use Facebook software development kit for analytics.

You heard a little bit about this.  But Facebook and the other companies I mentioned are really good at statistics. That's what analytics is.  It's evaluating statistics about how people use their app, what's working, what's not working, how do I improve my app, and how do I measure performance of my apps.  That's why you would use this software development kit to send data to Facebook analytics to get them to analyze it.

It's helpful for Facebook, of course, as well because that data and that process allows the -- allows Facebook to better serve its app developers in its advertisement.  This is not talking about the Flo data; this is talking about how it works in general before we look at exactly what happened here.

And it helps Facebook users by making apps and Facebook interact seamlessly, as I mentioned, and it keeps apps and websites free.  Just like TV used to be -- broadcast TV used to

be free because of ads, the Internet and the apps are free because of ads.  That is the Internet.  That's how it works.  That's the ecosystem, and that's how software development kits fit in.

So how do app developers use analytics to analyze their apps?  This becomes important when we talk about how the software development kit works.

There are standard events that lots and lots and lots of apps want to analyze, like launching, like purchase, like add to cart, things like lots and lot of apps want to analyze how people are using their apps.

And then there are custom events, which are created by the app.  They've decided they want to analyze a certain type of information, and they create new custom app events, like reviewing a particular product or opening the app 20 times or whatever else that the developer decides they want to analyze about their own app.  It's the developer who creates it.

So what is Facebook software development kit not?

It doesn't record or eavesdrop on anything.  And we'll look at the code.  It's not a bug or a wiretap that does anything on its own.  It's, of course, not placed in the apps by Facebook.  The app developer decides to do that.  But the kit doesn't do anything about these custom app events unless it's programmed by the app source code.  It itself doesn't do or send any of the events that we're talking about.

So how does it work?  You'll hear from the expert.  I'll preview what he's going to say.  Dr. Zervas, who is an expert in computer science, is going to tell you how this technology works.

The developer begins programming their lines of code. They're programming an app.  They don't have to do it all on their own; they can go to these software development kits that are available publicly on the Internet.  It's called open source.  It's just free code that is reusable and you can go to these different websites.

You could go to the Facebook website and get it, you could go to the Google website and get it, or you could go to GitHub. And there's basically a library of these different software development kits, and the developer can choose one, download it into its app, and then go back to programming it.

Okay?  And this is what it actually looks like.  This is what the Facebook app event software development kit looks like.  There's code at the bottom and then there's sort of a manual up top.  There's sort of a -- directions, they call it.

And so it says "Log in app event with specified name and set of parameters."  If you want to analyze something about how your app works, log an event.  It can either be select an event name that's there -- that's those standard app events that we talked about -- or you can create your own.

If you create your own, you can, but you don't have to,

put parameters with it, put things to go along with the app events.  This is all up to the app developer.

And what does the code say?  You can, of course, see that it doesn't have any specifics -- no periods, no pregnancy, no cycles.  It's just the template, the open source reusable code, that app developers can choose but don't have to customize.  There's an event name it and parameters that kind of just gives the direction about how to do it.

So what happened here?  What did Flo program its code to do?

It writes -- so this is Flo's programming code -- a bunch of strings with that and a bunch of strings with those words, and you can see that Flo wrote the name of a custom app event, and Flo wrote what the parameters would be.  They were interested in analyzing information about how users use their app.  It is not -- it's not preprogrammed.  It's not in any manner written by Facebook or any software development kit provider.  It's written by Flo.

And 20 more steps, a whole number of other steps that you'll hear from Dr. Zervas, have to be programmed by the code before they can connect that code with the software development kit.  This is the software development kit that we just saw on the other slide.

Only if the Flo programmer or any app programmer connects -- it's called "calling a function."  Calling a

function connects that custom app event to the SDK code.  That is what will get sent to Facebook after a bunch of programming runs, which we'll look at.

The SDK code itself could sit on that app and not send any custom app events.  It could sit on the app and not send any standard events if the programmer has turned them off.  It is completely within their control to name it, to send it, and to ask for that data to be analyzed.

So once that program gets connected, it all becomes just one code.  It's not here's where the SDK sits and here's where the rest of the code sits.  It's one string of code that becomes the app.

So the Flo app, which someone could download and open on their phone, if they press on it, then that code, that one coherent string of code that the app developer has now programmed, will start to run.

That's how it works, and that is not fitting within that eavesdropping or recording definition.

So let's look at exactly how it works.

If a Flo user interacts with the app, let's say the question is "When did your last period start?"

And let's say the person picks February 27th and says "enter."

That starts that code, the whole app.  The whole app development code starts to run and creates a different

communication, not when did your last period start, February 27th, but a different string of code that then gets sent after enough time has passed or other -- other circumstances are meant, like the number of events.  Then the Flo program causes that separate communication to be sent to Facebook.

So now let's compare what the Flo user entered with what gets sent.

Again, "When did your last period start?"  February 27th.  The question and the answer are never sent.

It's this string of code that Facebook would have received from Flo.  And the reason I say "would have" is that this data is all long gone.  These custom app events are stored for a short period of time, maybe three to six months; and the plaintiffs, of course, sued much later.

So all of this event data is gone.  And what we're left with it the experts, plaintiffs' experts, trying to recreate what would have happened, not what any of these plaintiffs actually put into the app, not what their answers were, which, of course, never went to Facebook, but a recreation of what would have happened.

And so his recreation says that this would have gone, this long string of code.

Now, if we look at it now that we're in litigation, we can look at it and try to match it up with the question and the

answer, and what we see is that there's an event name, "R_SELECT_LAST_PERIOD_DATE," and value "known." Not the question, not the answer, but the event name that Flo had programmed and the parameter that Flo had programmed to send, not the question and not the answer. And it was sent not with a name or contact information, but with that device ID. Not tied to a profile.

And the plaintiffs' responses to these sensitive questions -- I really want to pause on that, because plaintiffs' counsel came up here and said, this app tracked when a person had sex and that information went to Facebook. Facebook somehow recorded when a person had sex.

Just look for the evidence on this. Just look at the evidence. Of course all of plaintiffs' data is gone. We don't know what they would have put in. But even the recreation of what would have happened if someone answered these sensitive questions, we can see the code. The options of what to choose are not sent. The choice, the answers, are not sent. Just a string of code with no decoder. With no decoder.

What does it mean? What does that line of code mean when you don't have what plaintiffs were asked, what Flo asked, and you don't have what plaintiffs selected? That is what was sent with no decoder at all.

So when the expert filled this out, he said "unprotected sex."

He said:  How are you?  Happy.

He logged his symptoms.  He said it logged his vaginal discharge and said other stress.  And we can see from the data that those selections were never sent to Facebook.

And the reason that's so important is that if this were really recording anything, that information would be in the logs.  If this SDK were actually recording or eavesdropping, we would know the communication.  We would know the question.  We would know the answer.  We would see it.  And none of that ever gets transmitted, even after the fact when we're trying to recreate.

So now to intent.

Facebook made Flo promise -- and we can see in the documents that we'll look at, not just Flo, but every app developer.  When you download our SDK and use us for analytics and send us information, you promise that you will tell your user that you're doing that, and you will never send us health information.

So every app, before you can download the SDK and use it, you agree to terms.

At the beginning of the class period, those terms were called "Terms for Conversion Tracking Custom Audiences, et cetera," and that document had a promise that in order to use this SDK, this software development kit, you agree and confirm that you have provided robust and sufficiently

prominent notice and obtained necessary consent from your users, meaning Facebook is saying "Don't send us anything that's confidential," as to Facebook.  "Don't send us anything that your users don't know.  We are committed to user privacy.  We are committed to getting the data that we are permitted to get.  Don't send us anything unless you have consent, sufficiently robust notice and consent."

It also said -- and Flo, just like every other app developer, agreed to it -- those same terms also said you further agree that you will not share with us any information that includes health, financial, or other categories of sensitive information.

This is a promise made by the app developers.  They're the ones that know whether this information is confidential, is sensitive.  They're the ones with the key, the decoder, to what those names mean and what those parameters mean.  It's the app developer that knows.  So get user consent.  Don't send us anything that's confidential as to Facebook.  And don't send us health, financial, or other sensitive categories.

There's a later policy.  Its name changed to "Business Tools Terms," later in the class period.  It said the same thing.  Different language, same idea.  "If you use our pixels or SDKs, you represent that you provided sufficiently prominent notice for a customer collection, and you represent and warrant that you have a lawful basis to send us.  Don't send us

confidential communications."

And they also said -- same idea -- don't send us customer data that includes health, financial, or other categories, consistent throughout the class period.

So what does plaintiff say in response?

That was a contract with all app developers.  What plaintiff says in response is that Facebook wanted that data anyway, that they -- all they want to do is gather up data, and so even though this policy was -- was specific and ubiquitous, they wanted that data anyway.

But just look at the documents and look at the evidence. There's not a shred of evidence that that is true, that Facebook wanted any sensitive, confidential, or health data. Not a single document.

What plaintiffs' counsel showed you was documents -- was an internal chat about engineers at Facebook doing the right thing, which was identifying risks.  There is a risk -- you'll see in the document that these app developers, regardless of what they promised, regardless of what we had them promise before using the SDK, there's a risk that they are inadvertently or intentionally sending us stuff, and let's work to solve this complicated problem.  Let's identify the risk and work to solve it.

And there'll be evidence of what Facebook did over time, and its systems got better and better and better, to solve for

the problem, for the risk of app developers breaching what they said they would do.

It is far -- and it will be up to you to decide.  It is far from intentionally eavesdropping on or recording that confidential communication or receiving any health data at all.

So watch for that evidence.

Now, counsel talked a lot about ads, a lot about the sending of ads by Facebook to folks.

Remember that what you heard from the stipulated facts is that only these 12 custom app events are challenged as being sent here.  The evidence -- there's no evidence -- there's no evidence that any adds were sent to any plaintiffs based on those custom app events.  Instead, the experts will explain how machine learning works and how more data is not necessarily better, how more data can actually make the system work.

But the point is there's just not evidence that these custom app events were used to send any ads whatsoever.  Not a single plaintiff.

And finally, consent.  The plaintiffs consented to Facebook's terms of service.  There are only three plaintiffs you heard from.  The court -- there are only three plaintiffs who are here suing Facebook.  They were Facebook users, and so of course they had to consent to Facebook's terms of service.

We must collect and use your personal data.

Look.  Go to our data policy.  And what does that data

policy say?

Advertisers, app developers, and publishers can send us information through the Facebook business tool terms, including SDKs, and these partners provide information about your devices, websites, purchases, the ads you see, and how they use their services, right there in the policy that plaintiffs agree to.

It goes on.  (as read):

"We use the information we have, including your activity off our products, to help advertisers and other parties measure the effectiveness and understand the types of people who use their services."

Right there in the data policy, that each of the plaintiffs that have claims against Facebook agreed to, and incidentally, each of the other two plaintiffs agreed as well. So that because Facebook takes that user privacy so seriously, it says up front that these SDKs may be transmitting -- not collecting, but the app developers may be sending data that they create, and we will receive that information.

And finally, on the statute of limitations.  Here is just a timeline for you about when the plaintiffs, the three plaintiffs that are against Facebook and the two additional ones, when they signed up for Flo, when they agreed to those terms of service that said, "We're going to be sending data to

Facebook," that is in the timeline when they agreed.

And then the Wall Street Journal article that you heard about was February 2019. Plaintiffs themselves describe it as "a bombshell." It turned out to be full of mistakes, false statements, false allegations. We've now gone through all of the evidence. We've now gone through all of the litigation that was prompted and should have been prompted by that article.

And it wasn't just the Wall Street Journal. A number of other outlets just continued to repeat that story -- not investigate, but continued to repeat those stories.

And plaintiffs waited more than two and a half -- almost two and a half years to even bring suit.

They were at least on notice by the Wall Street Journal article and all the other articles that came out. They were likely all the way back to when they signed up to the policies, that's when they should have evaluated their claims, and they waited way too long.

Why does it matter? The statute that plaintiffs are trying to sue under says you have to sue within one year. They didn't bring it, and that forestalls their one claim against Facebook. And you'll see the evidence.

So those are the three keys to the case. The one question you'll be asked to answer about Facebook is: Did they intentionally eavesdrop upon or record?

The way this software development kit works and the technology that you'll hear about and the fact that Facebook never got the plaintiffs' communications with the Flo app will prove to you that Facebook did not eavesdrop upon or record. Certainly no evidence that they did so intentionally. Certainly no evidence that there was an intent to receive or -- not eavesdrop or record, but even receive that confidential communications. And it was not without the consent of the plaintiffs.

So at the end of the trial, we'll ask you to answer the one question "no."

Thank you.

**THE COURT:** Okay. We're going to take a break until 2:00. We'll start our first witness and wrap up our day at about 2:30.

**THE COURTROOM DEPUTY:** All rise.

(The jury leaves the courtroom.)

(Proceedings were heard out of the presence of the jury.)

(Recess taken at 1:35 p.m.)

(Proceedings resumed at 2:03 p.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:** All rise.

This court is back in session. The Honorable James Donato presiding.

**THE COURT:** Okay. You have something?

**MR. SADUN:** Yes, Your Honor. The parties met and conferred yesterday on the exhibits plaintiffs intend to use with this first witness, including Exhibit A to the FTC order.

As you'll recall, Your Honor, you granted our motion in limine --

**THE COURT:** I need to have it. Why don't you hand it to me and I can take a look at it.

**MR. SADUN:** It's trial Exhibit 50.

**THE COURT:** Who is the next witness, by the way?

**MR. CANTY:** Sarah Wellman, Your Honor.

**THE COURT:** Do I have a binder?

Always just -- before the witness comes out, just hand a binder to Ms. Clark for me and that way I'll have it.

Okay. What is this?

**MR. SADUN:** It's Exhibit A to the FTC order. It's the required notice to users following Flo's settlement with the FTC. You'll see it's sent five and a half months after plaintiffs filed this lawsuit. It is clearly hearsay. It is clearly barred by Rule 408. It's a settlement with the FTC.

And Your Honor said with regard to the FTC, quote (as read):

"That's granted. none of that is going to come in."

And in your order you wrote (as read):

"Plaintiffs may not introduce evidence of or

refer to government investigations" --

THE COURT:  All right.  If it came from here I've got it.

MR. SADUN:  Got it.

THE COURT:  What are you planning to use this for?

MR. CANTY:  Your Honor, this is the first I'm hearing about this.  They wanted to discuss this.  We had offered to redact the document.  We proposed redacting all but the first sentence in the second paragraph and all of the first paragraph.  This is an e-mail that Sarah Wellman --

THE COURT:  I'm sorry.  You want to use this solely for the sentence starting "We do not currently"?

MR. CANTY:  No.  It would be the first full paragraph and then the first sentence of the second paragraph.

THE COURT:  Okay.  All right.  Wait.  But I told you no FTC.

MR. CANTY:  This is not, Your Honor.  This is an e-mail that Sarah Wellman received in her inbox from Flo.

THE COURT:  It says "Subject line:  Recent settlement with FTC."

MR. SADUN:  On top of which, Your Honor, this is --

THE COURT:  You don't say anything, please, until I turn to you.

MR. CANTY:  Your Honor, if I can approach, I have a proposed redacted copy that I can present to the Court.

THE COURT:  Why don't you hand it to Ms. Clark.

It still says "legal."

So who got this?

MR. CANTY:  Sarah Wellman, the witness who's about to testify.

THE COURT:  That her e-mail address?

MR. CANTY:  Yeah.  David Sonova, yes, at Gmail.

THE COURT:  There's her personal e-mail address?

MR. CANTY:  Yes.

THE COURT:  Okay.  You've got to take the -- just take the whole subject line out.

MR. CANTY:  Yes, Your Honor.

THE COURT:  Let me read the first paragraph.

Okay.  So you just want this to show that Flo was assuring users they don't share information; is that right?

MR. CANTY:  This is a statement that they told Sarah Wellman that between those two dates, they sent identifying information related to her and information about her period and pregnancy to companies to help us measure and analyze trends, usage --

THE COURT:  No, I understand.  But it's not having to do anything with the settlement?

MR. CANTY:  Correct.

THE COURT:  Take out the whole subject line.  And she cannot say anything about FTC settlement investigation, can't

say any of that.  Can't say, you know:  How did you get this letter?  What was it about?

Just say:  I received this notice.

MR. CANTY:  That's right.  Just received the e-mail.

THE COURT:  Okay.  Thank you.  That's fine.

MR. SADUN:  Your Honor, it's literally Exhibit A, word for word, this entire e-mail.  I feel it's been slightly misrepresented by plaintiffs' counsel.  I'm sure it's by accident.

THE COURT:  I only have this.

MR. SADUN:  May I hand up the FTC order?  You'll see it's word-for-word the entire e-mail.

THE COURT:  No, I don't need to see that.

MR. CANTY:  Your Honor, I'm not referring to any exhibit.

THE COURT:  Please, please.  I think I've got it.  But can you fix that?  Take out the subject line right now.

MR. CANTY:  We're doing that right now.

THE COURT:  What was up with all the flickering?  It was actually painful to watch.  One of jurors was cringing.

Do you have that fixed?

MS. JOHNSON:  Your Honor, yes, I do.

THE COURT:  Okay.  Let's bring them in.

Make sure you establish that was her personal e-mail.  The names are not the same.

MR. CANTY:  Yes, Your Honor.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

THE COURTROOM DEPUTY:  All rise.

You may be seated.

We're back on the record in Civil 21-757, Frasco versus Flo Health.

THE COURT:  All right.  Who do we have as the first witness?

MR. CANTY:  Your Honor, the plaintiffs call Sarah Wellman.

THE COURT:  Okay.  Come on up.

(Sarah Wellman steps forward to be sworn.)

THE COURTROOM DEPUTY:  Please take the witness stand.

THE COURT:  Headshots for every witness.  You're going to get an 8 1/2-by-11 1/2 color shot with the name on it, just to help you remember who the witness is.

THE COURTROOM DEPUTY:  Please stand and raise your right hand.

SARAH WELLMAN,

called as a witness for the Plaintiffs, having been duly sworn, testified as follows:

THE WITNESS:  Yes, I do.

THE COURTROOM DEPUTY:  Thank you.  Please be seated.

Please state your full name for the Court and spell your

last name.

THE WITNESS:  Sarah Wellman.  Last name is W-E-L-L-M-A-N.

THE COURTROOM DEPUTY:  Thank you.

DIRECT EXAMINATION

MR. CANTY:  Your Honor, may I inquire?

THE COURT:  Yes, please.

BY MR. CANTY:

Q.   Good afternoon, Ms. Wellman.

Can you tell the jury how old you are?

A.   I'm 41.

Q.   And where do you live?

A.   In Santa Rosa, California.

Q.   How long have you lived in California?

A.   Since 2007.

Q.   Are you married?

A.   Yes.

Q.   And do you have any children?

A.   Yes.

Q.   How many kids do you have?

A.   Two kids.

Q.   And how old are they?

A.   They are six and almost nine.

Q.   Can you please describe your educational background for the jury.

**A.**   Yes.   I went to college and then I went to law school.

**Q.**   And what is your current occupation?

**A.**   I'm an attorney.

**Q.**   Can you tell the jury how you became involved in this case?

**A.**   Yes.   A friend of mine, who's also an attorney, made a Facebook post in 2021 and said, Hey, does anyone I know -- have you used this app, Flo?

And I wrote back and said, I did.   And then -- so then he sent me a private message or called me or something and introduced me to my lawyers.

**Q.**   And what is your understanding about what this case is about?

**A.**   The case is about women who use the Flo Health app.   We gave it a lot of our personal health information, and against their policy and without our permission, Flo Health shared our information with other parties, our health information.

**Q.**   And was one of those other parties Facebook?

**A.**   Yes.

**Q.**   After learning about this case, why did you decide to become involved?

**A.**   Because I could.   I know that it affects a lot of people, but what -- first of all, I fit the -- you know, I used it during the time period when our data was being shared, and I was able to do it.   And that's why.

Q.   And do you know who you are representing as a class representative in this case?

A.   Yes.

Q.   Who is that?

A.   All of the women who used the Flo Health app during the time period.  It's sometime in 2016 to 2019.  And that's nationwide, and then there's also a subpart of that class in California.

Q.   And you're representing the California women that used the Flo app in a case against Meta?

A.   Yes.

Q.   So you used the Flo Health app?

A.   Yes.

Q.   Do you remember signing up for the Flo Health app?

A.   Yes.

Q.   Approximately when did you sign up for the app?

A.   The summer of 2018.

Q.   Can you tell the jury why you decided to use the Flo Health app in the summer of 2018?

A.   I wanted to get pregnant, and so it was going to track my menstrual cycles and use other information to tell me when the best time to get pregnant was.

Q.   Do you recall if you signed up for the app on a computer or if you used your phone?

A.   Phone.

Q.   And what kind of phone were you using at the time?

A.   An iPhone.  I don't remember which version.

Q.   And did you share that phone with anybody?

A.   No.

Q.   And is that phone password-protected?

A.   Yes.

Q.   When you signed up for the Flo Health app, did you put a password-protected number to protect the app as well?

A.   Yeah.  I think you had to do a username and password.

Q.   Do you recall if you immediately started using the app after you signed up?

A.   Yes.

Q.   Do you recall when you stopped using the app?

A.   After I got pregnant in the fall of 2018.  And then there was one other day in 2022 that I opened it and looked at it.

Q.   And so from 2018 to 2022, did you effectively stop using the app?

A.   Yes.

Q.   And do you remember why that one day in 2022 you went on the app or what you did on the app?

A.   I don't remember exactly, but I remember that I did it.  I think I was curious because of this lawsuit.  And also, Flo had said they already weren't sharing that kind of information anymore.  I went in, had a look, thought about the lawsuit again, and decided I did not want to use the app.

Q.   So is it fair to say you effectively stopped using the app after you got pregnant?

A.   Yeah.

Q.   Now, I'd like to turn back to 2018 when you first started using the app.

What was your understanding about how the health information that you provided to Flo Health would be used?

A.   I would give it information about me, and then it would help me figure out when I was ovulating.  So if I wanted to get pregnant, it would tell me which day was the best day.

Q.   Did you consider the health information that you provided to the Flo app to be -- to be private?

A.   Yes.

Q.   And why did you consider that information to be private health information?

A.   I don't share that kind of thing with anyone except my doctor and my husband.  It's about like my menstrual cycle and what my body feels like, all the things that they showed on the screen earlier.

Q.   All right.  I'd like to back up now to after you downloaded the app in the App Store.  Did you have to provide answers to specific questions that the Flo Health app asked you?

A.   Yes.

Q.   Do you recall, as you sit here today, what was the first

question the Flo Health app asked you?

**A.**   Paraphrasing, but why do you want to use it or what's your goal.

**Q.**   And what did you tell the Flo Health app what your goal was?

**A.**   That I wanted to get pregnant.

**Q.**   Did you complete a reproductive healthcare questionnaire survey before starting to use the app?

**A.**   Yeah.  It did ask me some onboarding questions, yes.

**Q.**   What were those onboarding questions?  Do you recall?

**A.**   I can remember some of them.  They wanted to know the year that I was born, did I know information about my previous cycle, my name.  Yeah, I think -- yeah.

**Q.**   Do you recall if there were any questions that were -- you were asked about the length of your period?

**A.**   Oh, yes.  All the things about my cycle.  When I had the last one, how long it lasted, and I think like how -- what was my average cycle length maybe between periods or from beginning to end.

**Q.**   And did you accurately answer all those questions on the Flo Health app?

**A.**   Yes, to the best of my knowledge.  I also wanted to start tracking it for me so I wouldn't have to remember it.

**Q.**   Now, in July of 2018, what was your understanding of how this health information that you provided in the onboarding

survey would be kept and maintained?

A.   Just between me and Flo.  It's not like a social sharing app or anything, so you put in your data and then Flo helped me predict things.  But I didn't think I was giving it to anyone but the app.

Q.   When you signed up for the app and answered those sensitive health questions, were there any pop-up ads that alerted you to the fact that some of your answers would be transmitted to Meta or Facebook?

A.   No.

        MR. CANTY:  Your Honor, I ask what's been marked as Plaintiffs' Exhibit -- excuse me -- Trial Exhibit 611 A through O be presented to the witness.

        THE COURT:  All of them?

        MR. CANTY:  They are single screenshots, Judge.

        THE COURT:  All right.  Any objection?

        THE DEFENDANT:  No objection.

        THE COURT:  Okay.  611 A through O are admitted.

     (Trial Exhibits 611 A through 611 O received in evidence.)

        MR. CANTY:  Okay.  So we have them on the screen.

     Your Honor, actually, I think I am going to move, if you don't mind, so I can see the screen.

        THE COURT:  That's fine.

        MR. CANTY:  Thank you.

     Can we scroll through 611 A through O, please, for the

witness.

If we can.

**BY MR. CANTY:**

Q.   Ms. Wellman, do these screenshots look familiar to you?

A.   Yes.

Q.   I'd like to now direct your attention to 611 B.

Can you read for the jury what three options were presented to you when you -- when you downloaded the Flo Health app?

A.   It says "Track my cycle," "I want to get pregnant," or "I'm pregnant."

Q.   And do you recall what you chose?

A.   "I want to get pregnant."

MR. CANTY:   Okay.   Can we go to Trial Exhibit C, please, and now D.

**BY MR. CANTY:**

Q.   And after you selected "I want to get pregnant," did you consider that answer to the question that you entered in the Flo Health app to be private health information?

A.   Yes.   I wasn't going to tell anybody else about that.

Q.   Why did you consider it private?

A.   Well, I tell my husband and my doctor, but -- I don't know.   At least for me, when I wanted to get pregnant, it was not something I would probably share until I actually knew for sure I was pregnant, until I definitely wanted to tell my

employer about it.  And you never know how long it's going to take, so -- probably I kept it definitely to myself until probably like a third of the way into my pregnancy.

MR. CANTY:  Okay.  Can we take a look at Exhibit 611 E, please.

BY MR. CANTY:

Q.   Do you recall being asked -- seeing this screen?

A.   Yes.

Q.   And what did it ask you?

A.   "When did your last period start?"

Q.   And do you recall whether or not you answered that question?

A.   Yes, I did.  This is the main purpose of that app.

Q.   And did you consider your answer to that question to be private health information?

A.   Yes.

Q.   Why?

A.   Because I don't share that with anyone but my doctor and probably my husband.

MR. CANTY:  Can we move to the next slide, please. This is 611 F.

BY MR. CANTY:

Q.   Did you, in fact, make a selection in the Flo Health app?

A.   Yes.

Q.   And the selection that you made, did you consider that to

be private health information that you were sharing only with the Flo Health app?

A.   Yes.

        MR. CANTY:  Next screen, please.

BY MR. CANTY:

Q.   Do you recall seeing this screen?

A.   Yes.

Q.   And what did this screen ask you?

A.   "On average, how long is your period?"

Q.   Do you recall whether or not you answered that question?

A.   Yes.

Q.   Did you consider your answer to this question to be private health information that you were sharing confidentially with the Flo Health app?

A.   Yes.

        MR. CANTY:  Next slide.  Next slide.

BY MR. CANTY:

Q.   Do you see this screen?  This is 611 I, for the record.

A.   Yes.

Q.   Do you recall seeing this screen when you were answering the questions on that onboarding survey?

A.   Yes.  It does look a lot like the other one, but, yeah.

Q.   What was the question here?

A.   "On average, how long is your cycle?"

Q.   And you answered that question?

**A.**   Yes.

**Q.**   And did you consider that information to be private health information?

**A.**   Yes.

MR. CANTY:   Can we go to J, please.   And now K.

BY MR. CANTY:

**Q.**   Do you recall seeing this screen that's marked Trial Exhibit 611 K?

**A.**   Yes.

**Q.**   Do you recall answering that question?

**A.**   Yes.

**Q.**   And what did you put in?

**A.**   1984.

MR. CANTY:   Next slide, please.   Can we go to M, please.

BY MR. CANTY:

**Q.**   Do you recall seeing a screen that said it was going to predict -- something that says "predicting your cycles"?

**A.**   Yes.

**Q.**   All right.

**A.**   Yeah.

MR. CANTY:   Next screen.   N, please.   And O.

BY MR. CANTY:

**Q.**   Now, we're looking at what's been marked Trial Exhibit 611 O and it says "Period in 10 days."

Do you recall the specific message you received from the Flo Health app when you went on when you got to this screen?

A.    Not exactly, no.

Q.    Do you recall the Flo Health app sharing with you sensitive health information about where you were in your cycle when you got to this page?

A.    Yeah.  That's what I wanted it to tell me.

MR. CANTY:  Can we go to the next screen, please.

That's it.  Okay.

BY MR. CANTY:

Q.    Now, was it your understanding that you had to answer all the questions that we just went through in order to start using the Flo Health app?

A.    Yes.  For some of them you can pick "I don't remember," but if you want the app to work, you have to give it as much data as you can -- I think, was the idea.

Q.    Were there additional screens that asked you questions about your sex and sex drive or what -- how you were feeling?

A.    Yes.  Those are the ones you use every day.

Q.    And did you enter any information in answering those questions while using the Flo Health app?

A.    Yes, I did.

Q.    Do you recall what information you entered?

A.    You could go in daily and update your information with facts about your mood, different things about how your body was

feeling, what kind of vaginal discharge you had, maybe another category too.

MR. CANTY:  Your Honor, I'd ask what's been marked as Trial Exhibit 611 Q through S be moved into evidence.

THE COURT:  Okay.  Any objection?

THE DEFENDANT:  No objection.

THE COURT:  All right.  611 Q through S are admitted.

(Trial Exhibits 611 Q through 611 S received in evidence.)

BY MR. CANTY:

Q.  Do you see this screen?

A.  Yes.

Q.  Does this screen look familiar?

A.  Yes.

Q.  Can you tell the jury what we're looking at here?

A.  This is a screenshot of the app, and it has sections with different colored buttons, and it asks you to record for that day health information.  So sleep, weight, and water. Questions about sex and sex drive.  It says questions about your mood and then symptoms.  It says, you know, cramps, tender breasts, headache.

Q.  I'd like to turn to the -- right below weight, sleep, and water, there's a section that says "Sex and sex drive."

Do you recall entering information with respect to the questions that was asked in that section?

A.  Yes.  Yes, I did.

Q.   Did you consider your answers to those questions to be private?

A.   Yes.

Q.   And did you consider those to be private health questions that you were being asked?

A.   Yes, because if it's to be -- if it's for -- to get pregnant, yeah.

Q.   Now, looking down to the next text section where it says "How are you?" did you enter any information in this section?

A.   Yes.

Q.   Do you recall what you -- in particular you answered?

A.   Depends on the day.  You can say happy, angry, normal, frisky, or mood swings.

Q.   As you sit here today, do you recall any answers that you gave while you were using the Flo Health app?

A.   I probably used them all at some point.

Q.   And did you consider that to be health information you were providing to the Flo Health app?

A.   Yeah, I think so.  Maybe not the one that says "normal."

Q.   And did you consider that to be private?

A.   Yes.

Q.   Now, looking down to the next section where it says "Log symptoms," it says everything is fine, cramps, tender breasts, headache, and acne.

     Do you recall ever entering any information with respect

to those symptoms?

A.   Yes.

Q.   And did you consider your answers to those questions to be private?

A.   Yes.

Q.   And did you consider your answers to those questions to be private health information?

A.   Yes.  Those are all about my body.

Q.   Now, I'd like to introduce --

MR. CANTY:  Go to 611R.

BY MR. CANTY:

Q.   This is a question that asks about logging vaginal discharge.  Do you recall seeing that on the Flo Health app when you went on it?

A.   I do.  I remember it because I had never been asked those questions before.  Never really thought about it.

Q.   Now, I'm not going to ask you what you specifically put, but do you recall answering questions with respect to your vaginal discharge?

A.   Yes.

Q.   And did you consider questions about your vaginal discharge to be health information?

A.   Definitely, yes.

Q.   Did you consider that information about your vaginal discharge to be private health information?

A.    Yes.

Q.    Were you aware that in answering questions in the Flo Health app, some of the materials that you answered would result in your data being recorded by Facebook and then sent to Facebook?

A.    No.

Q.    Were you aware that the information transmitted through what is known as a software development kit went to Facebook?

A.    No.

Q.    Have you ever seen the specific data showing that your private health information was sent to Facebook?

A.    Only because of this lawsuit.  I've seen some stuff.

Q.    Okay.  And who, if ever -- excuse me.

When, if ever, did you give Facebook permission to record the answers that you gave on the Flo Health app?

A.    I did not give permission.

Q.    Were you aware that the Flo Health app shared and allowed Facebook to collect your specific answer when you entered your goal of "get pregnant," that that was specifically sent to Meta?

A.    No.

Q.    Did you give Meta permission to collect that information?

A.    No.

Q.    Was there ever a pop-up asking for your consent to provide that information to Meta?

**A.**   No.

**Q.**   Did you consider that information to be private?

**A.**   To get pregnant?

**Q.**   Yes.

**A.**   Yes.

**Q.**   We saw that you were asked a number of other questions about your menstrual cycle, and after answering those questions, you were provided with information about where you were in your cycle.  For example, if you were ovulating or a few days away from your period.

Do you remember that screen?

**A.**   Yes.

**Q.**   Did you consider that information that Flo provided to you to be private health information?

**A.**   Yes.  I wasn't sharing it elsewhere.

**Q.**   Did you ever give Facebook permission to collect that information about where you were in your menstrual cycle?

**A.**   No.

**Q.**   Did you consider that to be private health information?

**A.**   Yes.

**THE COURT:**   Okay.  Is that a new topic?

**MR. CANTY:**   It's a natural break.  I could stop.

**THE COURT:**   Okay.  It's been an action-packed day. We're going to stop right on time today, but we might go a little bit longer in future days.

Here's what you're going to do:

You're going to put your notebooks in the jury room, please, and you're going to walk out.  You're going to clear your mind.  You're going to forget that you're a juror.  You're not going to think about this case, definitely not going to talk about this case.  You're not going to do any research of any kind, any kind, about this case.  And you're going to come back tomorrow morning at about 8:50, 8:45, so we can check you in and get started on time.

Okay?  Thank you.

**THE COURTROOM DEPUTY:**  All rise.

(The jury leaves the courtroom.)

(Proceedings were heard out of the presence of the jury.)

**THE COURT:**  Okay.  When are the experts going to go?

**MR. CANTY:**  Our intent is to call the named plaintiffs and then call Dr. Serge Egelman, at which time defendants will call Mr. Karkanias, who rebuts Mr. Egelman.

**THE COURT:**  We're going to do, what I asked for the expert, back-to-back expert testimony.

**MR. CANTY:**  Yes.  There's an additional expert the plaintiffs intend to call at the end of our case.  The expert that rebuts that witness also rebuts Mr. Egelman, so he will testify just once, but he will rebut two witnesses after the second expert.

**THE COURT:**  Okay.  All right.

Keep -- I can say this because I used to be one for five short months before I went to law school. Keep the legal assistant activity to an absolute minimum. I don't want people running around with files and handing documents and sharing things. All right? When a witness testifies, it's all eyes on the witness. I don't want anything in the background. Okay?

MR. CANTY: One additional thing I want to bring to the Court's attention.

I had discussions with Meta. Mr. Woolridge is not available this week, and I had conversations with defense counsel. He will be available next week. And in lieu of doing deposition designations, Meta has agreed, and I believe Flo has agreed as well, that in the event we finish our case before next Wednesday that we would rest. They would continue with their case-in-chief, and then we would take Mr. Woolridge out of order for the plaintiffs, just so we're not playing deposition testimony.

And I just wanted to run that by the Court and make sure the Court is okay with that.

THE COURT: Why is he not available this week?

MR. CLUBOK: Excuse me, Your Honor. It's been a long-scheduled issue. We've talked about it for weeks, so we had always agreed that he would testify on Thursday. We agreed -- he's not here in this area. We're bringing him here even though he's outside the subpoena power.

THE COURT:  Who is he?

MR. CLUBOK:  Mr. Tobias Woolridge.

THE COURT:  But who is he?

MR. CLUBOK:  He's an engineer at Facebook.  He works outside the jurisdiction in Seattle.  So he's going to -- he's planned a trip to come here when we were originally planning for the trial, you know, several weeks ago.  The trial is now a little shorter than we had all anticipated, but he's locked in those plans for a long time.

So -- and also, Your Honor, of course, the plaintiffs asked for us to bring him in their case-in-chief.  We said we'll accommodate that, and we will do that, even though I don't believe we have an obligation to do that.  And then once we said that, then they said, well, now it looks like our case-in-chief might be done by Wednesday or Thursday.  And we said, well, no good deed goes unpunished --

THE COURT:  Wednesday or Thursday?

MR. CANTY:  There's a possibility we could finish our case this week.  Yes, Your Honor.

THE COURT:  Okay.  Well, I mean, it's fine, but I'm not going to wait.  And we're not going to stop next Wednesday at 1:00 because he's not available or something like that.

MR. CANTY:  He is available first thing Wednesday, I'm sure.

MR. CLUBOK:  We're trying to accommodate plaintiffs by

agreeing to bring him in their case-in-chief, but we can't do that at the expense of his long-planned schedule.  So we said we'll bring him for your case-in-chief.  If you have to go out of order, we'll even accommodate that.  We're just trying to be accommodating, but we're still going to bring him at their request.

THE COURT:  Don't pat yourself on the back too hard.  You're going to dislocate something.

(Laughter.)

THE COURT:  Okay.  Just work it out, but no extra time.  If you have to play the tape, play the tape.

MR. CANTY:  Understood, Your Honor.

MR. CLUBOK:  And, Your Honor, we have to put one quick thing on the record that's very simple, which is the parties have all agreed that if an attorney objects orally during testimony, one defendant, it counts for both.  We've agreed to that.

THE COURT:  That's fine.

MR. CLUBOK:  We had to put it on the record, so they say.

THE COURT:  That's fine.

Also, one attorney per witness.  All right?  That's the way it's going to work.

MS. SHARTON:  Given what Mr. Canty just said about when they might expect to end their case, we have one witness,

Your Honor, that we were hoping for a visa to come through, and we've been waiting every day and it just hasn't come through. And we'd like her to testify remotely from London and that may be at the start of our case.  I didn't think it was going to come up this quickly.

THE COURT:  You don't have her on deposition?

MS. SHARTON:  No, she was not deposed in this case.

THE COURT:  Okay.  Talk about it later.

MS. SHARTON:  Okay.

THE COURT:  I'm not thrilled one other time I did that it was a complete disaster.  So we'll talk about it later wasn't deposed at all.

MS. SHARTON:  No, no.  Yeah.  She wasn't deposed and --

MR. CANTY:  I don't know who they're talking about.

THE COURT:  Please meet and confer before you say anything to me.  Okay.  So -- your colleague here doesn't know who you're talking about.  I certainly don't.

MR. CANTY:  We have provided our entire list and the order in which we're calling our witnesses to defense counsel.

THE COURT:  Work out and you can tell me tomorrow okay.  Thank you.

(Proceedings adjourned at 2:38 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    Monday, July 21, 2025

_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court