Volume 2

Pages 168 - 411

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

ERICA FRASCO, et al.,            )
individually and on behalf of    )
all others similarly situated,   )
                                 )
          Plaintiffs,            )
                                 )
VS.                              )    NO. 3:21-CV-00757 JD
                                 )
FLO HEALTH, INC., META           )
PLATFORMS, INC.,                 )
                                 )
          Defendants.            )
                                 )

San Francisco, California
Tuesday, July 22, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:
For Plaintiffs:
                    LOWEY DANNENBERG, P.C.
                    44 South Broadway, Suite 1100
                    White Plains, New York 10601
               BY:  **CHRISTIAN LEVIS, ATTORNEY AT LAW**

                    SPECTOR ROSEMAN & KODROFF, P.C.
                    Two Commerce Square
                    2001 Market Street, Suite 3420
                    Philadelphia, Pennsylvania 19103
               BY:  **DIANA J. ZINSER, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:  Ruth Levine Ekhaus, RDR, RMR, FCRR, CCG
              CSR No. 12219, Official  United States Reporter

APPEARANCES:   (CONTINUED)

For Plaintiff:
                         LABATON KELLER SUCHAROW LLP
                         140 Broadway
                         New York, New York 10005
              BY:  CAROL C. VILLEGAS, ATTORNEY AT LAW
                   MICHAEL P. CANTY, ATTORNEY AT LAW
                   GLORIA J. MEDINA, ATTORNEY AT LAW

For Defendant Flo Health, Inc.:
                         DECHERT LLP
                         US Bank Tower
                         633 West 5th Street, Suite 4900
                         Los Angeles, California 90071-2032
              BY:  BENJAMIN M. SADUN, ATTORNEY AT LAW

                         DECHERT LLP
                         Cira Centre
                         2929 Arch Street
                         Philadelphia, Pennsylvania 19104-2808
              BY:  CLARE P. POZOS, ATTORNEY AT LAW

                         DECHERT, LLP
                         One International Place
                         100 Oliver Street
                         Boston, Massachusetts 02210
              BY:  BRENDA R. SHARTON, ATTORNEY AT LAW

For Defendant Meta Platforms, Inc.:
                         LATHAM & WATKINS
                         555 Eleventh Street, NW, Suite 1000
                         Washington, D.C. 20004
              BY:  ANDREW B. CLUBOK, ATTORNEY AT LAW

                         LATHAM & WATKINS LLP
                         650 Town Center Drive, 20th Floor
                         Costa Mesa, California 92626
              BY:  MICHELE D. JOHNSON, ATTORNEY AT LAW

                         LATHAM & WATKINS LLP
                         505 Montgomery Street, Suite 2000
                         San Francisco, California 94111
              BY:  MELANIE M. BLUNSCHI, ATTORNEY AT LAW


          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

**APPEARANCES**:   (CONTINUED)

                        GIBSON, DUNN & CRUTCHER LLP
                        One Embarcadero Center, Suite 2600
                        San Francisco, California 94111-3715
                  BY:   **ELIZABETH K. McCLOSKEY, ATTORNEY AT LAW**
                        **ABIGAIL A. BARRERA, ATTORNEY AT LAW**


**Also Present:  Anjali Dahiya**

<u>**I N D E X**</u>

Tuesday, July 22, 2025 - Volume 2

| **PLAINTIFFS' WITNESSES** | **PAGE** | **VOL.** |
|---|---|---|
| **WELLMAN, SARAH (RECALLED)** | | |
| (PREVIOUSLY SWORN) | 178 | 2 |
| Direct Examination by Mr. Canty | 178 | 2 |
| Cross-Examination by Ms. Sharton | 192 | 2 |
| Cross-Examination by Ms. Johnson | 216 | 2 |
| Redirect Examination by Mr. Canty | 226 | 2 |
| | | |
| **CHEN, JENNIFER** | | |
| (SWORN) | 228 | 2 |
| Direct Examination by Ms. Villegas | 229 | 2 |
| Cross-Examination by Ms. Pozos | 234 | 2 |
| Cross-Examination by Ms. Johnson | 259 | 2 |
| Redirect Examination by Ms. Villegas | 260 | 2 |
| | | |
| **MEIGS, AUTUMN** | | |
| (SWORN) | 265 | 2 |
| Direct Examination by Mr. Canty | 265 | 2 |
| Cross-Examination by Ms. Pozos | 270 | 2 |
| Cross-Examination by Ms. McCloskey | 284 | 2 |
| Redirect Examination by Mr. Canty | 288 | 2 |
| | | |
| **GAMINO, TESHA** | | |
| (SWORN) | 289 | 2 |
| Direct Examination by Mr. Canty | 289 | 2 |
| Cross-Examination by Ms. Sharton | 294 | 2 |
| Cross-Examination by Ms. McCloskey | 314 | 2 |
| Redirect Examination by Mr. Canty | 319 | 2 |
| | | |
| **FRASCO, ERICA** | | |
| (SWORN) | 322 | 2 |
| Direct Examination by Ms. Villegas | 322 | 2 |
| Cross-Examination by Ms. Pozos | 329 | 2 |
| Cross-Examination by Ms. McCloskey | 372 | 2 |
| Redirect Examination by Ms. Villegas | 374 | 2 |
| | | |
| **EGELMAN, SERGE** | | |
| (SWORN) | 382 | 2 |
| Direct Examination by Mr. Levis | 382 | 2 |

<u>**I N D E X**</u>

<u>**E X H I B I T S**</u>

| <u>**TRIAL EXHIBITS**</u> | <u>**IDEN**</u> | <u>**EVID**</u> | <u>**VOL.**</u> |
|---|---|---|---|
| 29 | | 204 | 2 |
| 30 | | 204 | 2 |
| 44 | | 238 | 2 |
| 50 | | 182 | 2 |
| 55 | | 211 | 2 |
| 66 | | 185 | 2 |
| 70 | | 217 | 2 |
| 93 | | 242 | 2 |
| 132 | | 240 | 2 |
| 133 | | 244 | 2 |
| 147 | | 338 | 2 |
| 189 | | 359 | 2 |
| 594 A | | 396 | 2 |
| 604 A | | 392 | 2 |
| 604 B | | 392 | 2 |
| 604 C | | 392 | 2 |
| 604 D | | 392 | 2 |
| 604 E | | 392 | 2 |
| 604 F | | 392 | 2 |
| 604 G | | 392 | 2 |
| 604 H | | 392 | 2 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 604 I | | 392 | 2 |
| 605 A | | 393 | 2 |
| 610 S | | 324 | 2 |
| 610 T | | 324 | 2 |
| 610 U | | 324 | 2 |
| 610 V | | 324 | 2 |
| 610 W | | 324 | 2 |
| 610 X | | 324 | 2 |
| 610 Y | | 324 | 2 |
| 610 Z | | 324 | 2 |
| 610 AA | | 324 | 2 |
| 610 AB | | 324 | 2 |
| 610 AC | | 324 | 2 |
| 610 AD | | 324 | 2 |
| 610 AE | | 324 | 2 |
| 610 AF | | 324 | 2 |
| 610 AG | | 324 | 2 |
| 610 AH | | 324 | 2 |
| 610 AI | | 324 | 2 |
| 610 AJ | | 324 | 2 |
| 610 AK | | 324 | 2 |

**I N D E X**

**E X H I B I T S**

| TRIAL EXHIBITS | IDEN | EVID | VOL. |
|---|---|---|---|
| 611 V |  | 393 | 2 |
| 611 W |  | 393 | 2 |
| 611 Y |  | 393 | 2 |
| 615 A |  | 395 | 2 |
| 618 A |  | 395 | 2 |
| 627 A |  | 395 | 2 |
| 628 A |  | 395 | 2 |
| 628 B |  | 395 | 2 |
| 630 A |  | 395 | 2 |
| 641 A |  | 395 | 2 |
| 642 A |  | 395 | 2 |
| 674 A |  | 396 | 2 |

**Tuesday - July 22, 2025**                                    **9:07 a.m.**

P R O C E E D I N G S

---o0o---

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:**  All rise.  This Court is now in session, the Honorable James Donato presiding.

**THE COURT:**  Morning.

**ALL:**  Good morning, Your Honor.

**THE COURTROOM DEPUTY:**  Please be seated.

Calling Civil 21-757, Frasco versus Flo Health.

Counsel.

**MR. CANTY:**  On behalf of the plaintiffs, Michael Canty from Labaton Keller Sucharow.  Good morning, Your Honor.

Would it be easier if I just put all the appearances on?  Is that easier for the Court?

**THE COURT:**  I like to see everyone and give them their chance to speak in court.

**MS. VILLEGAS:**  Good morning, Your Honor. Carol Villegas from Labaton Keller Sucharow for the plaintiffs.

**MR. LEVIS:**  Good morning, Your Honor.  Christian Levis from Lowey Dannenberg for the plaintiffs.

**MS. ZINSER:**  Good morning, Your Honor.  Diana Zinser from Spector Roseman & Kodroff, also for the plaintiffs.

**THE COURT:**  This thing suddenly went off.  It was good a moment ago.  Did it go off?  I heard you.

MS. ZINSER:  You heard me?  Okay.

THE COURT:  Thanks.

MS. MEDINA:  Good morning, Your Honor.  Gloria Medina from Labaton Keller Sucharow for the plaintiffs.

MS. SHARTON:  Good morning.  Brenda Sharton from Dechert for Flo Health, Inc.

MS. POZOS:  Good morning.  Clare Pozos on behalf of Flo Health from Dechert.

MR. SADUN:  Good morning, Your Honor.  Benjamin Sadun from Dechert LLP for defendant, Flo.

MS. JOHNSON:  Good morning, Your Honor.  Michele Johnson, Latham & Watkins, for Meta.

MR. CLUBOK:  Good morning, Your Honor.  Andrew Clubok, also from Latham for Meta.

MS. BLUNSCHI:  Good morning.  Melanie Blunschi, also from Latham for Meta.

MS. McCLOSKEY:  Good morning, Your Honor, Elizabeth McCloskey of Gibson Dunn on behalf of Meta.

THE COURT:  Okay.  One of the cardinal rules that I gave you at the pretrial conference is nothing will be filed unless I approve it first.  So Flo filed a declaration and a motion I did not approve.

Don't do that.  Okay?

I will not look at them until I ask for them.  So consider it stricken.  This is a hard-and-fast rule.  Do not file

anything during trial unless you clear it with me first.  It will be disregarded and taken off the docket.  Okay?

All right.  Anything before the jury comes in?

MR. CANTY:  No, Your Honor.

THE COURT:  Okay.  Let's call them in.

MS. BLUNSCHI:  Your Honor, we have one thing that's not --

THE COURT:  All right. Okay. Yes.

MR. CLUBOK:  It's only going to be germane to an expert that's testifying later, after the named plaintiffs, so if you you'd like me to just bring it up later -- or whatever you prefer.

THE COURT:  The expert is next?

MR. CANTY:  We have four of the named plaintiffs first before we call our expert.

THE COURT:  Are they going to happen today, though, do you think?

MR. CANTY:  I don't know how long the crosses of the plaintiffs are going to be.

THE COURT:  All right.  We'll wait until it's little bit later.

MR. CLUBOK:  Thank you, Your Honor.

THE COURT:  All right.  Let's bring them in, please.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

THE COURTROOM DEPUTY:  Please be seated.

THE COURT:  All right.  Continuing with Ms. Wellman.

MR. CANTY:  Yes, Your Honor.  Thank you.

THE COURT:  All right.  Let's bring her up, please.

(Sarah Wellman steps forward to resume the stand.)

**SARAH WELLMAN**,

called as a witness for the Plaintiffs, having been previously duly sworn, testified further as follows:

**DIRECT EXAMINATION**

MR. CANTY:  May I inquire, Your Honor?

THE COURT:  Yes.

MR. CANTY:  Thank you.

BY MR. CANTY:

Q.   Ms. Wellman, do you know what an IDFA is?

A.   I do now because of this case.

Q.   And were you aware that while you -- while you used the Flo app on your phone that your IDFA was being recorded by Facebook along with your private health information?

A.   I was not aware when I was using the app.

Q.   Were you aware that your location and age were also being recorded with your IDFA by Facebook?

A.   No.

Q.   At the time, who else besides the Flo app did you have conversations with about your menstrual health and pregnancy information?

A.   My doctor.

Q.   When you made the decision to try to get pregnant at that time, did you tell anyone else besides your doctor?

A.   My husband.

Q.   Going back to Exhibit 611, in evidence, with respect to the onboarding questions that we went over yesterday, who else has asked you those questions in your life?

A.   My doctor.

Q.   Ms. Wellman, when was the first time that you learned that your sensitive health data was being recorded by Facebook?

A.   When I learned about this lawsuit.

Q.   When did you learn about this lawsuit?

A.   In 2021.

Q.   And can you tell the jury how you learned about the fact that Flo was allowing your sensitive health data to be collected by Meta?

A.   Yes.  How I learned about the lawsuit?

Q.   Yes.

A.   A friend of mine made a Facebook post that said:  Hey have any of my friends used this app, Flo Health?

And I said:  I did.

And then I don't remember if he sent me a text or called me or how we talked after that, but that's when he told me about the lawsuit, because he had a friend who was at the law firm, I think.

Q.    And how soon after you learned of this fact did you file your lawsuit?

A.    My lawyers filed it, but that year.

Q.    Within a few weeks?

A.    Yes.

Q.    Okay.

A.    Whenever they filed it.

Q.    Now, did you ultimately hear from Flo Health about the allegations in this case?

A.    I did.

Q.    Okay.  I have what's been marked as Trial Exhibit 50 in evidence.

        THE COURT:  Can we pull that up, please?

    We preadmitted that one?

        MR. CANTY:  We discussed that yesterday.  I will move it -- I'll lay the foundation and move it in, Your Honor, if it's not stipulated to at this point.

        THE COURT:  You said it was in evidence.  It's not in evidence.

        MR. CANTY:  Okay.  May I have it --

        THE COURT:  Put it in yesterday.

        MR. CANTY:  Yes, Your Honor. I'll mark it for identification.

        THE COURT:  Go ahead.

        MR. CANTY:  Thank you.

Your Honor, may I approach the witness with a copy?

THE COURT:  It doesn't look like the one I have in my binder, right, which has the subject lines and things?

MR. CANTY:  No, it should have been updated, Your Honor.

THE COURT:  Looks like this?  Okay.  You can use this one.

BY MR. CANTY:

Q.   Ms. Wellman, do you recognize what's been marked as Trial Exhibit 50 for identification?

A.   I don't have it in front of me.

Q.   Okay.

THE COURT:  Just hand her a copy.

MR. CANTY:  Sure.

(Counsel approaches witness.)

THE COURT:  Members of the jury, until I decide whether it's going to be admitted or not, you can't see it. But the witness has to do a little bit to help me decide that. So it's not a mystery.  You'll either see it or you won't in a couple of minutes.

BY MR. CANTY:

Q.   Ms. Wellman, do you recognize what's been marked as Trial Exhibit 50 for identification?

A.   Yes.

Q.   What do you recognize this to be?

A.    This is an e-mail sent to me by Flo.

Q.    And how do you know that this is an e-mail that was sent to you?

A.    It was sent to my e-mail address.

Q.    And what was your e-mail address?

A.    Davidsonova@gmail.com.

Q.    Can you just tell the jury why your e-mail address is Davidsonova?

A.    Yes.  My maiden name is Sarah Davidson, and so the Davidson is from my maiden name, and then "ova" is -- if you live in a Slavic country, which I was visiting for studying abroad at that time, you add "ova" to the end if you're a woman in.  So when I e-mailed people, I wanted it to say Davidsonova.

Q.    Ms. Wellman, does this e-mail -- the copy of this e-mail fairly and accurately reflect the e-mail that you received from Flo Health on July 2nd, 2021?

A.    Yes.

      MR. CANTY:  Your Honor, I'd ask what's been marked as Trial Exhibit 50 for identification be moved into evidence.

      THE COURT:  Okay.  Any objection?

      MS. SHARTON:  No objection, Your Honor.

      THE COURT:  All right.  It's admitted.

   (Trial Exhibit 50 received in evidence.)

      MR. CANTY:  Your Honor, may I have Trial Exhibit 50 published to the jury?

THE COURT:  Yes.

MR. CANTY:  Thank you.

THE COURT:  Once it's admitted, you can just pop it up.  You don't have to ask.

MR. CANTY:  Thank you, Your Honor.

BY MR. CANTY:

Q.   Ms. Wellman, can you read starting with "Dear Flo User" from Trial Exhibit 50, please?

A.   Yes (as read):

"Dear Flo User:  Between June 30, 2016, and February 23, 2019, the company that makes the Flo period and ovulation tracker app sent an identifying number related to you and information about your period and pregnancy to companies that help us measure and analyze trends, usage, and activities on the app, including the analytics divisions of Facebook, Flurry, Fabric, and Google.  No information was shared with the social media divisions of these companies.  We did not share your name, address, or birthday with anyone at any time.  We do not currently and will not share any information about your health with any company unless we get your permission."

MR. CANTY:  And if we could scroll to the top of that e-mail, please.

BY MR. CANTY:

Q.   Do you see that -- the "to" line, that e-mail address?

A.   Yes.

Q.   And that is your e-mail address?

A.   Yes.

Q.   And who does it indicate that it's from?

A.   Flo.

Q.   Thank you.

Ms. Davidson [sic], how did it make you feel when you received this e-mail?

A.   Well, I already knew about the lawsuit, so I guess I didn't feel surprised.  Maybe surprised that they were telling me about it.

Q.   Okay.  Did you know about any of the conduct that Flo and Facebook engaged in prior to your discussions with your lawyer in 2021?

A.   No.

Q.   What was your expectation of privacy with respect to --

Well, let me ask you this:

During the pendency of this litigation, have you had the opportunity to review the privacy policy that was in effect when you were using the Flo Health app?

A.   Yes.

MR. CANTY:  Your Honor, ask what's been marked as Trial Exhibit 66 for identification be presented to the

witness.

THE COURT:  Okay.

While that's happening, Jury, you're going to see a lot of documents with big black lines on them.  Pay them no mind. Just ignore them.  There's a lot of stuff that you don't need to see because it's irrelevant to the case.  That's all that it is.  There's nothing secret or hidden.  Don't try to speculate what's under the lines.  It doesn't matter.

Okay?  All right.

Okay.

MR. CANTY:  Your Honor, on stipulation, I'd ask that what's been marked as Trial Exhibit Number 66 for identification be moved into evidence.

THE COURT:  All right.  Any objection?

MS. SHARTON:  No objection.

THE COURT:  All right.  66 is admitted.

(Trial Exhibit 66 received in evidence.)

MR. CANTY:  Your Honor, may I approach the witness?

THE COURT:  Yes.

(Counsel approaches witness.)

THE COURT:  It's also on the screen, but okay.  That's fine.

MR. CANTY:  Thank you, Your Honor.

BY MR. CANTY:

Q.   Ms. Wellman, will you please take a look at the privacy

policy that I just handed up to you that's been marked as Trial Exhibit 66.

A.    Yes.

Q.    Did you accept this privacy policy when you used the Flo Health app?

A.    Yes.  I had to start using the app.

Q.    And did there come a time when you ultimately reviewed the privacy policy?

A.    Not that I recall, until this lawsuit.

Q.    And when you finally had the opportunity to review it, was there any language in this privacy policy that gave you assurances about the privacy of your health information that you gave to Flo Health?

A.    Yes.

Q.    I'd like to turn to page 3, which is the second page -- excuse me.  This is 153, the previous page.

Ms. Wellman, I'd like to direct your attention to the middle of the page where it says "Your Consent."

Can you read from "Your consent" and then down to -- start reading Roman numeral Number III.

A.    Okay.  (as read):

"We will not transmit any of your personal data to third parties except if it is required to provide the service to you, e.g., technical service providers, unless we have asked for your explicit

consent."

Q.   What did you understand this to mean?

A.   That Flo would not transmit any of my data unless it was required to operate the app unless they asked me first.

Q.   And did you ever give Flo Health your explicit consent to share any of your private health data with third parties?

A.   No.

Q.   Okay.  If we could turn to page Bates Number 155, please.

I'd like you to take a look at the section that starts with Number 4, "Sharing your personal data and information."

Under Number 1, can you please read that to the jury.

A.   Yes.  It says (as read):

"Personal data we share with third parties.  We may share certain personal data, excluding information regarding your marked cycles, pregnancy, symptoms, notes, and other information that is entered by you and that you do not elect to share with third-party vendors who supply software applications, web hosting, and other technologies for the app."

Q.   Okay.  With respect to that language, what was your understanding of what that language meant?

A.   That even if they shared some personal data, it would exclude anything about my cycles, pregnancy, and symptoms that I put in.

Q.   All right.  Can you continue down to the sentence that begins "Third parties will not have access."

     Do you see that?

A.   Yes.

Q.   Can you read that, please.

A.   (as read):

          "Third-parties will not have access to our
     survey results and we will not reveal information
     about which articles you view."

Q.   What did you understand that promise to mean?

A.   That third parties are not going to have access to the survey results.  I think the survey is the information I gave it when I joined.

Q.   And can you read down to the bottom of the paragraph that begins "Those -- those third parties will never use."

     Do you see that sentence?

A.   Yes.

Q.   Can you read that, please.

A.   (as read):

          "Those third parties will never use such
     information for any other purpose except to provide
     services in connection with the app."

Q.   What did you understand that to mean?

A.   That they would never use my information unless it was providing services for the Flo app.

Q.   Were you aware that Facebook recorded the information when you said you wanted to get pregnant?

A.   No.

Q.   And were you aware that Facebook recorded that information regarding where you were specifically within your cycle?

A.   No.

Q.   How does that comport to the promises that you were made in the privacy policy by Flo Health?

A.   Breaks the promises.

Q.   When, if ever, did you provide your prior explicit consent to allow that information to be shared?

A.   I did not consent.

Q.   When you were using the app, did you ever see a pop-up or an alert that Flo Health was going to share your answers with Facebook?

A.   No.

Q.   All right.  Let's turn to Flo 156, same document, please.
     Under Number 3, where it says "Facebook and Google."
     Do you see that?

A.   Yes.

Q.   Can you read the first -- top of page Number 3.

A.   (as read):

          "Facebook and Google.  We use Facebook Analytics
     and Google Analytics tools to track installs of our
     app.  Normally Facebook and Google collect only

non-personally identifiable information, though some personal data like device identifiers may be transferred to Facebook and Google."

Q.   Did you understand this language to mean that Facebook could record your personal health data, like the fact that you wanted to get pregnant, and use it?

A.   Well, it says they just track installs, so no.

Q.   And to be sure I understand, does any of the privacy policy language about the use of Flo Health data lead you to believe that your personal health data could be collected and recorded by Facebook?

A.   Not my health data, no.

Q.   Did anything in this privacy policy lead you to believe that you had given Flo permission to release your private health data to third parties?

A.   No.

Q.   I'd like to go back to the first page -- or the second page of this document.

That's Roman numeral III.

A.   Yes.

Q.   Where it says "We will not transmit any of your personal data to third parties, except if it is required to provide a service to you, unless we have your explicit consent."

Just to be clear, did you consider this to be a promise that Flo made to you?

**A.** Yes.

**Q.** Ms. Wellman, can you just describe to the jury the harm that you suffered as a result of Flo Health allowing your personal health data to be collected by Meta?

**A.** Well, it's the most private information that I have, and I think violation of privacy is pretty big harm.

**Q.** And can you describe what harm you suffered as a result of Facebook recording and using your personal health data for their own benefit?

**A.** Yeah. They -- they shouldn't be using my -- this kind of health information -- I don't think I have to say what it is again -- for anything.

**Q.** Did you ever give Facebook permission to record your communications with the Flo app, ever?

**A.** No.

**Q.** If we could turn back to Trial Exhibit 611 in its entirety, all of those documents.

Sarah, have you had the opportunity to look at 611 A through O, and 611 Q through S?

Do you remember looking at those documents yesterday?

**A.** Yes.

**Q.** Do these documents fairly and accurately depict the Flo Health app and the screens that you saw when you signed up for the app?

**A.** Yes.

MR. CANTY:  Your Honor, I'd ask what's been marked as Trial Exhibit 611 A through O, and Q through S be admitted into evidence.

THE COURT:  They were admitted yesterday.

MR. CANTY:  I don't know if I laid the proper foundation yesterday, so this is just belt-and-suspenders.  I want to make sure that we admitted that.

THE COURT:  There's no objection, so they're in. You're in.

MR. CANTY:  Thank you.

No further questions, Your Honor.

THE COURT:  Okay.  Pass the witness.

### CROSS-EXAMINATION

BY MS. SHARTON:

Q.   Good morning, Ms. Wellman.

A.   Good morning.

Q.   I'm Brenda Sharton.  I represent Flo.

A.   Yes, I remember.  Hi, Brenda.

Q.   I want to talk to you first about your background.

You're an attorney; right?

A.   Yes.

Q.   Okay.  And you know -- you used to be an attorney at a company by the name of Indiegogo; correct?

A.   Yes.

Q.   And that's a crowdfunding website?

A.   Yes.

Q.   Okay.  A tech company?

A.   Yes.

Q.   You're familiar with privacy law; right?

A.   Yes.  I wouldn't say I'm an expert, but yes.

Q.   Okay.  And in your role at Indiegogo, you actually worked on the Indiegogo privacy policy yourself; right?

A.   Yes.

Q.   Okay.  And in addition, on your LinkedIn profile, you described yourself as a "contract enthusiast"?

A.   Yes.  I don't think it says it anymore, but it did when we did the deposition.

Q.   Okay.  And by "the deposition," you mean in -- on January 11th, 2023, you gave some prior testimony in this case; right?

A.   Yes.

Q.   Okay.  We had an opportunity to ask you questions, and you responded to them under oath?

A.   Yes.

Q.   Okay.  Now, as a contract enthusiast, Ms. Wellman, you would define a contract as an agreement between two-parties; right?

A.   Yes.

Q.   Okay.  And that -- you would include an agreement between a company and a user of an app; right?

A.    Yes.

Q.    Okay.  You understand you have a breach of contract claim in this case; right?

A.    Yes.

Q.    Okay.  And the contract that we're talking about is the privacy policy?

A.    Yes.  I don't remember if this privacy policy is incorporated with the terms of use, but you know what I'm saying.

Q.    And the terms of use?

A.    Yes.

Q.    Okay.  Both of them?

A.    Yes.

Q.    Okay.  Now, yesterday you said you believed that Flo had shared your information with other parties against their policy and without your permission; right?

A.    Yes.

Q.    Okay.

        MS. SHARTON:  Let's pull up Exhibit 611.  I think we were just talking about it, and which you testified about it yesterday.

    It's already been admitted.

BY MS. SHARTON:

Q.    Thank you.  I'm a little old school.  I'm used to the paper.

Okay.  So let's look at Exhibit 611, and in particular 611 D.

Okay.  You said this was the -- this is the screen that you testified yesterday that looked familiar to you; right?

A.   Yes.

Q.   And that you saw when you first started using the Flo app?

A.   Yes.

Q.   Okay.  Underneath those three buttons, you see that it says "If you continue, you agree to the privacy policy and the terms of service."  Right?

A.   Yes, I do.

Q.   Okay.  And then right where we're looking, there are links to that privacy policy; right?

A.   Yes.

Q.   And to the terms of service?

A.   Yes.

Q.   Okay.  And you continued to use the -- to scroll through the screens, as your attorney asked you about; right?

A.   Yes.

Q.   Okay.  All right.

And you know that if you click on those links, it takes you right to the privacy policy?

A.   I will assume that.

Q.   Okay.  And same with the terms of service?

A.   Yes.

Q.   Okay.  And they're even in a different color than the rest of that sentence?

A.   Yes.

Q.   Okay.  Now, let's look at Exhibit 30 first.  This is Flo's terms of service effective as of June 22nd, 2018.

And do you see a Number 2, where it says "Medical Services Disclaimer?"

A.   Yes.

Q.   Do you see that?  That was right in the terms of service; right?

A.   Yeah.

Q.   Okay.  And it says (as read):

"The company is not a licensed medical care provider, and the app is not intended to replace professional medical advice or diagnose, treat, or manage any illness or medical condition."

Did I read that correctly?

A.   That is what it says.

Q.   Okay.  You never considered Flo to be your healthcare provider; right?

A.   No.

Q.   Okay.  And you never used Flo to make a doctor's appointment or anything like that; right?

A.   No.

Q.   Never had any laboratory tests run by Flo?

A.   No.

Q.   Okay.

And if you read an article online, let's say about a health condition, do you become that website's patient?

A.   I don't think so.

Q.   Okay.

Now, if you turn to page 8 near the bottom of the page -- thank you -- there's a sentence that says (as read):

"Any cause of action you may have with respect to your use of the app must be commenced within one year after the claim or cause of action arises."

I read that correctly; right?

A.   Yes.

Q.   Okay.  That means you have one year to bring a lawsuit; correct?

MR. CANTY:  Objection.

THE COURT:  Overruled.  Go ahead.

He's asking about your understanding.

THE WITNESS:  That is what it says, yes.

BY MS. SHARTON:

Q.   That was your understanding, reading that section -- that sentence?

A.   Yes.

Q.   Okay.  And you didn't -- you started using the Flo app in 2018; right?

A.   Yes.

Q.   Okay.  July of 2018?

A.   Yes.

Q.   All right.  You didn't file this lawsuit until 2021;
right?

A.   That's correct, but I'm guessing it's not that simple
since we're all here at trial.

MS. SHARTON:  Your Honor, if I could strike that.

BY MS. SHARTON:

Q.   That's more than one year; right?

A.   From 2018 to 2021?  Yes.

Q.   Yeah.

Now, let's look at Exhibit 29.

THE COURT:  I don't have a binder from you, and we're
not going to examine witnesses if I don't have the exhibits in
advance.

MS. SHARTON:  Thank you.

Your Honor, we may I approach the witness with a binder as
well if she needs one?  I thought we were popping it up on the
screen, so...

THE COURT:  Yes.

MS. SHARTON:  Okay.

BY MS. SHARTON:

Q.   Let's look at Exhibit 29.  It's been admitted.  It's the
privacy policy from May 25th, 2018.

If we turn to page 5 and look at Number 3 right at the top of the page, do you see where it says "Facebook and Google"?

A.   Yes.

Q.   Okay.  And I think you just read this before (as read):

"We use Facebook Analytics and Google Analytics tools to track installs of our app.  Normally Facebook and Google collect only non-personally identifiable information, though some personal data like device identifiers may be transferred to Facebook and Google."

Did I read that correctly?

A.   Yes.

Q.   Okay.  And you were talking earlier about an IDFA.

Do you remember that, with your attorney?

A.   Yes.

Q.   That's another word for device identifier; right?

A.   Yes.

Q.   Okay.  Now, if you read the -- had read this policy back when you -- in 2018, when you first started using the app, you would have known this; right?

A.   I don't remember if I read the policy when I signed up for the app.

Q.   And you read this -- if you had read this policy, you would have known --

You don't remember one way or the other, right, whether

you read it?

A.   No.

Q.   Okay.  If you had read this policy, you would have known that Flo was using Facebook Analytics; right?

A.   Yes.

Q.   Okay.  Let's pull back up just for one minute -- and you can put that aside for right now.

        MS. SHARTON:  But if we pull back up Exhibit 611D.

BY MS. SHARTON:

Q.   And this is that welcome screen that we looked at earlier.

     That screen only came up the first time you opened the Flo app; right?

A.   Yes.

Q.   Okay.  And for you, that would have been about seven years ago?

A.   Yes.

Q.   Okay.  And you testified -- well, strike that.

     After you saw that screen, you continued on into the app; right?

A.   Yes.

Q.   Okay.  And if you looked at -- and we looked at some of the questions yesterday that came up afterwards; right?  You testified that you put in information.

     If we could look at pages 6, 7, and 8, "When did your last period start?"

And if you keep going, "How long was your period?"

And "On average, how long was your period?"

You testified that you entered information at that time; right?

A.   Yes.

Q.   Okay.  You remember that now -- later, seven years later?

A.   Yeah.  I mean, you can't really use the app without giving information.  Otherwise, it doesn't help you.

Q.   Okay.  And it's your understanding, Ms. Wellman, that the answers that you put in to these questions were shared with Facebook?

A.   So, actually, my understanding is that once I gave all the answers, then Flo made a prediction of my next time of ovulation, and that was shared.

Q.   My question was a little different, which is:  Is it your understanding that the answers that you gave to these questions were shared with Facebook?

A.   I don't know if this exact screen.

Q.   Okay.  Let's pull up page 16, which you testified about yesterday.  This is some very intrusive questions here about sex and sex drive and symptoms.

Do you see those?

A.   Yes.

Q.   Okay.  And you said these were the kinds of things you input into the Flo app; right?

A.    Yes.

Q.    Okay.  And it was your understanding, Ms. Wellman, that when you answered these questions about sex and sex drive and so on that your answers were shared with Facebook?

A.    I don't know exactly which answers on this page were shared.

Q.    But do you even think some of them were?

A.    I think that my understanding is that once Flo used these to make predictions about my ovulation, that information was shared.

Q.    Okay.  I'm asking you was it your understanding that your answers were shared with Facebook.

A.    I'm not sure about this page specifically.

Q.    Okay.  You downloaded the Flo app in approximately July of 2018; right?

A.    Yes.

Q.    Okay.  And you downloaded the app to track your menstrual activity; right?

A.    Yes.

Q.    Okay.  You -- you have a couple of kids; right?

A.    Yeah.

Q.    Okay.  When you first started using the Flo app, you weren't pregnant?

A.    No.  I had one kid.  I used this for my second kid.

Q.    Okay.  And in July of 2018, you weren't pregnant?

**A.**   No.

**Q.**   Okay.  You found that out in October of 2018, right, the happy news about your second?

**A.**   Yes.

**Q.**   Okay.

Now, you testified that you -- strike that.

Ms. Wellman, you testified -- correct me if I'm wrong -- that you used this -- strike that.

Did you use this in "get pregnant" mode?

**A.**   Yes.

**Q.**   Okay.  And let's -- we talked about the deposition that we had in 2023, January of 2023, the testimony you gave under oath.

I want to ask you to turn -- I'm going to hand you a transcript of that --

**A.**   Okay.

**Q.**   -- so you have a chance to read along, and then we're going to look at it on the screen if that's okay.

**MS. SHARTON:**  Your Honor, if I may approach with a transcript?

**MR. CANTY:**  Objection, Your Honor.

**THE COURT:**  Hand it to me first.

We didn't move 29 and 30 into evidence, so we need to do that.

You didn't put 29 and 30 into evidence.  You need to do

that.

MS. SHARTON:  Okay.  Your Honor, I would admit Exhibits 29 and 30 into evidence.

THE COURT:  Any objection?

MR. CANTY:  No objection, Your Honor.

THE COURT:  Okay.  They're admitted.  You've got to do that each time.  I want to know what's happening.  And do it in advance of asking the questions, please.

(Trial Exhibits 29 and 30 received in evidence.)

BY MS. SHARTON:

Q.   And, Ms. Wellman, if you could turn to page 121, lines 4 through 6.

MS. SHARTON:  And if we could, with Your Honor's permission, just have clip 121 A played.

MR. CANTY:  Objection, Your Honor.

THE COURT:  Oh.  What's the objection?

MR. CANTY:  We have a live witness.  There's no --

THE COURT:  Well, a deposition of a party can be used for any purpose.

THE WITNESS:  What exhibit number is it?

THE COURT:  Yes, I could use that too.  What number was that?  121?

MS. SHARTON:  This is not an exhibit number.  It's the transcript of our deposition, and it's page 121.

THE WITNESS:  Which number is that in my binder?

**BY MS. SHARTON:**

**Q.** It's the thing I handed you just now.

Did I not bring it up?

**A.** No.

THE COURT: No.

Okay. 121. Which line?

MS. SHARTON: Line 4 through 6.

THE COURT: Okay.

**BY MS. SHARTON:**

**Q.** And I asked you at that deposition, Ms. Wellman, if you had ever used the app in the "get pregnant" mode.

MS. SHARTON: If we could play clip 121 A.

**BY MS. SHARTON:**

**Q.** Okay. I'll do it old school.

On line 121, I asked you --

(Video played but not reported.)

**BY MS. SHARTON:**

**Q.** So that was the question and that is your testimony in 2023; right?

**A.** That is what I just -- that's what the recording says, yeah.

**Q.** Okay. And you don't know, Ms. Wellman, if you ever used the app in pregnancy mode; right?

**A.** I mean, I clicked "get pregnant." It doesn't say "pregnancy mode" on the app, so maybe I didn't understand your

question, but I only used it to get pregnant with my son.

Q.   I'm asking a different question now.  We talked about the "get pregnant" mode.  I'm asking you:  You don't know if you ever used the app in pregnancy mode; right?

MR. CANTY:  Objection.

THE COURT:  Overruled.

Go ahead.

THE WITNESS:  Now that I've been shown the app mode again, you can only go one way or the other.  You say you -- it says "track my period," "I don't want to get pregnant," or "I want to get pregnant" -- or "get pregnant."

I know that I wanted to get pregnant at the time.  That's the only reason I downloaded the app.

So whatever it's called, "get pregnant" or "pregnant mode," that's what I was using it for.

MS. SHARTON:  Okay.  So if we could play --

BY MS. SHARTON:

Q.   If you could follow along page 121, lines 8 through 10.

MS. SHARTON:  And if we could play clip 121 B, please.

(Video played but not reported.)

BY MS. SHARTON:

Q.   So I asked you:  Do you remember if you ever used the pregnancy mode?

And you answered:  I don't know.

Right?

A.    Yes.

Q.    Okay.

A.    That means after I got pregnant; right?

Q.    So you downloaded the app, Ms. Wellman, in July 2018, and you testified yesterday that you stopped using the app in 2018; is that right?

A.    Yes.

Q.    Okay.  You previously have testified that you also used the app in 2019; right?

A.    I -- I don't remember.

Q.    Okay.  Maybe we can refresh your memory.

      If we could play clip SW100 C, please.  And this is page 100 of your transcript.

            (Video played but not reported.)

BY MS. SHARTON:

Q.    That was your testimony in 2023; correct?

A.    That is what I remembered at the time, yeah.

Q.    And you previously testified that you made some entries in early 2020; correct?

A.    I don't remember.

      MS. SHARTON:  Okay.  We can play clip 101 D, please.

            (Video played but not reported.)

BY MS. SHARTON:

Q.    Now, that was your testimony in 2023; correct?

A.    That's me.

Q.   Okay.  Now, yesterday you testified that you only looked at the app in 2022 because you were curious; right?

A.   Yes.  I think I also testified that I pressed something in the app.

Q.   Okay.  So you input data into the app in 2022 as well; right?

A.   Yeah.  I think I input one thing.

Q.   Okay.  So yesterday when you testified -- you testified that you stopped using the Flo app in 2020 -- 2018, actually, you were using it in 2019 and 2020 as well; right?

A.   I don't have a good memory of what I did after I got pregnant with my son, but I'm sure somebody knows the answer to that.

Q.   And you logged your period in the app at least once in 2022, as we just saw; right?

A.   Yeah.  I think logged one calendar date, but I'm not a hundred percent sure.  I opened it, pressed something, and I did not open it again.

Q.   Okay.

A.   I opened it and then I closed it, and I only opened it on one day.

Q.   And, Ms. Wellman, you sued Flo in February of 2021; right?

A.   Yeah.  I'm not sure of the date.  My lawyers did that.

Q.   2021, though?

A.   Yes.

Q.   Okay.  And you've purchased pregnancy-related products online; right?

A.   Yes.

Q.   And you've used other apps for health-related purposes; true?

A.   Yes.

Q.   And you've not looked into whether any of those other apps that you used shared the information you input in them; right?

A.   No.

Q.   Okay.  You've used the BabyCenter app?

A.   I think so.  There's a couple different ones that like compare your baby to like different fruits and stuff.  I can't remember if it was BabyCenter or not.

Q.   And you don't remember ever reviewing the privacy policy for BabyCenter; right?

A.   No.

Q.   And you never reviewed the terms of use for the BabyCenter app; right?

A.   I don't think so.  When you're pregnant and you have a two-year-old, that's like not -- I probably did not focus on that at that time.

Q.   You also used the What to Expect pregnancy and baby tracker app; right?

A.   Probably.  I think, in the end, I just picked one, but I'm seeing which ones -- which one I liked the best.

Q.   And you didn't look at the privacy policy or the terms of use on that app either; right?

A.   Not that I recall.

Q.   You don't know whether What to Expect shared your information with third parties; right?

A.   I don't know.

Q.   Okay.  And you don't have any evidence, sitting here today, that any single ad was ever served to you based on data that you input into the Flo app; right?

A.   No.

Q.   Okay.  You said you worked on Indiegogo's privacy policy; right?

A.   From 2021 to 2024.

Q.   You were a company lawyer?  In other words, you worked at the company; right?

A.   Yes.

Q.   Okay.

        MS. SHARTON:  Let's look at Exhibit 55.  Not to be published yet to the jury.  I don't know if it's in.

        THE COURT:  Okay.  Any objection to 55?

        MR. CANTY:  Yes, Your Honor.

        THE COURT:  What's the objection?

        MR. CANTY:  This is a privacy policy the witness worked on after she used the Flo Health app.  There's no --

        THE COURT:  Okay.  That's not the objection.  What's

the rule number?

MR. CANTY:  Relevance, Your Honor.

THE COURT:  Okay.  Overruled.  It's admitted.

(Trial Exhibit 55 received in evidence.)

BY MS. SHARTON:

Q.   And this is in your binder, Ms. Wellman, if that's easier, as Trial Exhibit 55.

A.   Yes.

Q.   We can pull it up on the screen too, just to be helpful.

A.   It's harder for me to read on the screen.

Q.   Yeah.  You have it both ways if you'd like, but --

You recognize this privacy policy, though; right?

A.   Yes.

Q.   Okay.  And there's a section -- it's -- says "Information We Collect."

It's on page 2, and then there's a numeral 6 that states "Internet, Network, and Device Information."

Do you see that?

A.   Yes.

Q.   Okay.  And then sub-numeral 4, think it is, it says "Usage, Viewing, Technical, and Device Data."

A.   It does.

Q.   Okay.  You're aware, of course, that Indiegogo collected usage, viewing, technical and device data, including device identifiers, for visitors to its site; right?

A.    Yes.

Q.    Okay.  And you didn't find Indiegogo's collection of this type of information to be objectionable; correct?

A.    I think I have attorney/client privilege with my employer on that question.

Q.    Let's play -- let's look at what you testified earlier on that subject.  And it's page 166, lines 1 through 15.

        MS. SHARTON:  And if we could pull up --

        THE COURT:  Just wait a second.

        MS. SHARTON:  Of course, Your Honor.

        THE COURT:  What line?

        MS. SHARTON:  166, lines 12 through 15.

                (Pause in proceedings.)

        MS. SHARTON:  And it's just the same clip, Your Honor, of --

        THE COURT:  Okay.  That's fine.

        MS. SHARTON:  166, please.

                (Video played but not reported.)

BY MS. SHARTON:

Q.    Okay.  Indiegogo used analytics tools as well; right?

A.    Yes.

Q.    Okay.  Let's see -- let's look at page 3 of that policy.

      Do you see the header that says "How we share your information with third parties"?

A.    Yes.

Q.    Okay.  And again --

A.    I'm sorry.  What page?

Q.    I'm sorry.  Page 3, I believe.

A.    Okay.  I see it.

Q.    And, again, this is the Indiegogo privacy policy that you worked on for the company; right?

       And I'm going to direct you --

A.    Yes.

Q.    -- to sub-numeral 8, if that's easier.

A.    Okay.

Q.    It states (as read):

       "We may also share aggregate or deidentified information with third parties for research, marketing, analytics, and other purposes, provided such information does not directly identify you."

       Right?  Did I read that correctly?

A.    Yes.

Q.    Okay.  You knew that Indiegogo used and shared aggregate and deidentified data; right?

A.    Yes, after I joined Indiegogo in 2021.

Q.    Okay.  And you didn't do any independent investigation into the facts other than what your attorneys told you; right?

A.    No.  That's why I have attorneys.

Q.    Okay.  And you became aware that there was a lawsuit against Flo -- I think we've talked about this a couple of

times -- when your friend Brent Douglass made a Facebook post asking for people that used the Flo app; right?

A.   Yes.

Q.   And your friend Brent is an attorney as well; right?

A.   Yes.

Q.   And then Brent connected you with Ms. Villegas, sitting here from Labaton, for the plaintiffs?

A.   I don't remember if she was the first point of contact, but yes.

Q.   Okay.   Eventually you got to Labaton; right?

A.   Yes.

Q.   Through Brent, your friend?

A.   Yes.

Q.   Okay.  And you were told you didn't have to pay any fees for this case; right?

A.   That's right.

Q.   Okay.  So you didn't approach -- you didn't approach an attorney because you were upset about anything Flo did; right?

A.   Well, I -- once they told me what happened, I was upset, yeah.

Q.   And you didn't have any reason to do that until you saw Brent's post; right?  That's your testimony?

A.   That's right.

Q.   Okay.  Do you know -- did Mr. -- Brent Douglass tell you if he had any fee arrangement for connecting you with

Ms. Villegas and Labaton?

A.   I don't remember, but -- if he told me at the time.

Q.   Okay.  But he had a fee arrangement where he got a cut as well; right?

A.   I think so.

Q.   So --

A.   Yeah.  I think it's a referral fee.

Q.   I'm sorry.  Did you finish?

A.   Isn't that like -- I think it's an attorney referral fee.

Q.   Right.  So he got an attorney referral fee; right?

A.   Well, I don't think he's gotten anything yet.

Q.   Right.

A.   I don't think anyone's gotten anything.

Q.   Not yet; right?

A.   Yeah.

Q.   But if the plaintiffs win this case, your friend Brent gets a payday; right?

          MR. CANTY:  Objection.

          THE COURT:  Sustained.

          MS. SHARTON:  Withdrawn.

          THE COURT:  Next question, please.

          MS. SHARTON:  No further questions.

          THE COURT:  Okay.  Any brief redirect?

     I'm sorry.  Yeah, Meta.

     I'm sorry.  Go ahead.

**CROSS-EXAMINATION**

MS. JOHNSON:  May I proceed, Your Honor?

THE COURT:  Yes.

BY MS. JOHNSON:

Q.   Good morning, Ms. Wellman.

A.   Good morning.

Q.   Let me ask you just a few follow-up questions specific to Facebook.

You signed up for Facebook in 2004; is that right?

A.   Yes.

Q.   And you were an active Instagram user in 2018; right?

A.   Yes.

Q.   When you signed up for the Flo app?

A.   Yes.

Q.   Okay.  If you could turn in your binder to Exhibit 70.

Do you see that Exhibit 70 is called "Data Policy" and it discusses Facebook and Instagram?

A.   Yes.

THE COURT:  All right.  Is there any objection to 70?

MR. CANTY:  No, Your Honor.

THE COURT:  All right.  70 is admitted.

Let's do the housekeeping first, please.

MS. JOHNSON:  I was laying the foundation until --

THE COURT:  We'll do it my way.

MS. JOHNSON:  Thank you, Your Honor.

THE COURT:  Okay.  Go ahead.

(Trial Exhibit 70 received in evidence.)

BY MS. JOHNSON:

Q.   On the first page, it says "Data Policy."

Do you see that?

A.   Yes.

Q.   And "Facebook, Instagram, Messenger, and Other Products"?

A.   Yes.

Q.   All right.  Let's turn to page 3.

Do you see the heading at the top that says "Information from Partners"?

A.   Yes.

Q.   And under that heading, the policy says (as read):

"Advertisers, app developers, and publishers can send us information through Facebook business tools being used, including our social plug-ins, such as the Like button, Facebook login, our APIs, and SDKs, or the Facebook pixel.  These partners provide information about your activities off Facebook, including information about your device, websites you visit, purchases you make, the ads you see, and how you use their services, whether or not you have a Facebook account or are logged into Facebook."

Do you see that?

A.   Yes.

Q.   You understand this statement to mean that other parties that have information about your activities off of Facebook can send it to Facebook using Facebook's tools; right?

A.   Yeah.  It's pretty broad.

Q.   So you consented to Facebook receiving information through the Facebook business tools about the activities you engage in off of Facebook, as listed in this paragraph; right?

A.   Does that work like the way the Flo app does?  Like if I log into Instagram, it says "I accept the terms"?

Q.   In the data privacy policy, it says that; right?

A.   Yeah.  I just don't know where it says that I -- like when I was presented with the policy.

Q.   But you did consent to Facebook receiving information through the business tools about the activities you engage in as listed in that paragraph; right?  You consented?

A.   By using the app?  Is that how the consent works?

Q.   I'm asking for your answer about whether you consented. We can look at the deposition if you like.

     Did you consent to this paragraph?

A.   If you're required to consent to use the app, then yes, I did.

Q.   All right.  Let's put -- direct your attention to page 304, 2 to 7, in your deposition.

          MS. JOHNSON:  And permission to play clip 304.

          THE COURT:  What page?

MS. JOHNSON:  304, lines 2 through 7.

THE COURT:  Okay.

(Video played but not reported.)

BY MS. JOHNSON:

Q.   All right.  Let's continue looking at the Facebook data policy and turn to page 4, the bottom bullet under the section that says "Ads and Other Sponsored Content."

Do you see that?

A.   Yes.

Q.   And it says (as read):

"We use the information we have about you, including information about your interests, actions, and connections, to select and personalize ads, offers, and other sponsored content that we show you."

Do you see that?

A.   Yes.

Q.   And then under the heading "Provide measurement and analytics," a little bit lower on that page, do you see that it says (as read):

"We use the information we have, including your activity off of our products such as the websites you visit and ads you see, to help advertisers and other partners measure the effectiveness and distribution of their ads and services and understand the types of

people who use their services and how people interact with websites, apps, and services."

Do you see that?

A.   Yes.

Q.   And then it includes a hyperlink there that says "Learn how we share information with these partners."

Do you see that?

A.   I do.

Q.   And you don't recall ever clicking on that link?

A.   No.

Q.   All right.

You don't have a breach of contract claim against Facebook; right?

A.   No.  Yeah, there -- there's a lot of different claims.  I don't think so.  Okay.  No.

Q.   No.  Thank you.

All right.  You testified on direct about using the Flo app in July of 2022; right?

A.   Yes.

Q.   And from the discussion you had with Flo's counsel, you said you just input one thing; right?

A.   Yeah, I think so.

Q.   That one thing that you put in was you input that you had your period; right?

A.   Yeah.

Q.    So was that information truthful?

A.    Yeah, I think so.

Q.    After you filed the lawsuit, you continued to enter truthful information about when you had your period into the Flo app?

A.    Well, I did it one time, and Flo had already sent me an e-mail saying they weren't sharing that kind of information. And I think I was curious because of the lawsuit.  I went in and then I decided that maybe I really shouldn't be doing that because of the lawsuit.

Q.    You continued to enter information in 2021 as well, didn't you?

A.    I don't remember using it in 2021.

Q.    You filed your lawsuit in February 2021; right?

A.    Yeah.  That's what everyone is saying.

Q.    And you just testified that that was a few weeks after learning about the lawsuit from your friend; right?

A.    I honestly don't know if I was added to the lawsuit after it was originally filed or not.  I don't know all the timeline in 2021.

Q.    You just testified on direct that it was a few weeks later.  Do you recall that?

A.    I don't know about the dates, the weeks in 2021.  I talked to my lawyers, I agreed to do the lawsuit, and after they filed things, they'd let me know.

Q.   So you're not sure whether it was a few weeks after learning about the lawsuit?  Is that your testimony?

A.   Sure.  Can you just tell me what the days were?

Q.   You testified -- I can show you the complaint.

You testified that it was a few weeks after learning about it from your friend.  Is that still true or do you not remember?

A.   Sure.  I also testified I don't remember exactly when the lawsuit was filed.  Just everyone says it's filed February 2021.  Okay.

Q.   Yeah, but you can look in your binder, the binder that Flo's counsel handed to you.  It's Exhibit 46.  We won't publish it.

Does that -- are you there?

A.   Yeah.

Q.   Did that refresh your recollection that you filed your lawsuit on February 12th, 2021?

A.   Yes.

Q.   And you did not file that complaint against Facebook, right, just against Flo?

A.   Yes.

Q.   And in the weeks prior to February 12th, 2021, you went into the app and logged activities, didn't you?

A.   I didn't think I did, no.

Q.   Okay.  If you had logged activities in that time period,

would your answers have been truthful?

MR. CANTY:  Objection.

BY MS. JOHNSON:

Q.   The information in the app?

THE COURT:  We're not going to guess.  Ask something more specific, please.

MS. JOHNSON:  Okay.

BY MS. JOHNSON:

Q.   Let me briefly show you Exhibit 50 that's in evidence. And I want to focus on the date, July 2nd, 2021.  We've just seen that you filed your lawsuit in February 2021, so this is some five months after you're already in the litigation; right?

A.   Yeah.

Q.   And this exhibit states that the company that made the Flo app sent certain information to the analytics divisions.

Do you see that?

A.   Yes.

Q.   Nowhere in this does it say that Facebook recorded confidential information; right?

A.   This e-mail does not say that, no.

Q.   Okay.  Your understanding of what Facebook did and did not do comes entirely from your lawyers and their paid experts; right?

A.   Yeah.  It's pretty technical, actually.

Q.   And you don't have a view on the technical aspects of this

case; right?

A.   No.

Q.   Okay.  You are aware that a Wall Street Journal article was published in February of 2019 that had similar allegations to the allegations that you're bringing here?

MR. CANTY:  Objection.

THE COURT:  Overruled.

THE WITNESS:  I have heard about the article because of this lawsuit.

BY MS. JOHNSON:

Q.   In this case, in fact, you allege that the Wall Street Journal article was a bombshell; right?

A.   Yes.

Q.   And you allege in this case that the Wall Street Journal released a bombshell report on February 2019 that shared that Flo was sending intimate data to entities like Facebook; right?

MR. CANTY:  Objection.

THE COURT:  Sustained.

THE WITNESS:  I became aware --

THE COURT:  You don't have to answer.

THE WITNESS:  Oh, thank you.

MS. JOHNSON:  Thank you, Your Honor.

BY MS. JOHNSON:

Q.   By the way, in that litigation, you also alleged that Facebook eavesdropped on or recorded information.

Do you know that?

A.    Yes.

Q.    You were here for opening statements?

A.    Yes.

Q.    You heard your counsel say "record but not eavesdrop"?

Do you remember that?

MR. CANTY:  Objection.

THE COURT:  Just asking what you remember.  Go ahead. You can answer that.

THE WITNESS:  I don't remember everything she said in the opening statement, if she said a particular word or not.

BY MS. JOHNSON:

Q.    All right.  I'm asking for your understanding about your claims.

Is it your understanding that you're not claiming that Facebook eavesdropped on confidential communications?

A.    I don't know.

Q.    And that's because everything you know about this case comes directly from your lawyers; right?

MR. CANTY:  Objection.

THE COURT:  Overruled.

THE WITNESS:  That's because these specific words have specific meanings in the laws that are being applied, and I am not -- my lawyers are handling those claims.  I'm not trying this as my -- yeah.

BY MS. JOHNSON:

Q.   So is that a "yes" to my question?

A.   Can you repeat the question?

Q.   Everything you believe about this case comes directly from your lawyers?

A.   And my own experience.

Q.   You did not conduct any investigation about this case before filing it; instead, everything you believed about the lawsuit came from your lawyers; isn't that correct?

A.   Yes.  I'm not trying this case.  Just here as a witness.

        MS. JOHNSON:  Thank you, Ms. Wellman.

        THE COURT:  Okay.  Any brief redirect?

        MR. CANTY:  Yes, Your Honor.

                    REDIRECT EXAMINATION

BY MR. CANTY:

Q.   Ms. Wellman, you testified on cross-examination about seeing a "get pregnant" mode.

     Do you ever remember seeing the words "get pregnant mode," "activate get pregnant mode" on the app?

A.   No.  My understanding is, once you go in, like it's kind of like there's a fork in the road and you've got to pick the way you're going.  I don't know if you can like switch modes.

Q.   And when you first entered the app, what did you choose?

A.   "Get pregnant."

Q.   With respect to your work at Indiegogo and the information

that Indiegogo collects, they are not a healthcare company; correct?

A.   No.

Q.   And they don't collect any sensitive healthcare information about women; correct?

A.   They did not when I worked there, no.

Q.   Do you have the Facebook data policy in front of you?

A.   Yes.

        THE COURT:   Let's use the exhibit number for clarity.

        MR. CANTY:   Yes, Your Honor.   That would be Exhibit 70.

BY MR. CANTY:

Q.   Is there anything in that data policy that led you to believe that it was okay for Facebook to record and collect your sensitive health information?

A.   No.

Q.   And regardless of when you stopped using the Flo Health app, at any time did you give Flo permission to share your sensitive health data with third parties?

A.   No.

Q.   And regardless of when you stopped using the Flo Health app, did you ever give Meta permission to collect and record your sensitive health information?

A.   No.

        MR. CANTY:   No further questions.

THE COURT:  Okay.  You may step down.  Careful on the way down.  It's a little bit steep.

(Witness excused.)

THE COURT:  Let's remove this witness's binders, please.

And who do we have next?  Who is next?

MR. CANTY:  Your Honor, the plaintiffs call Jennifer Chen.

THE COURT:  Okay.  While she's coming up, let's -- I'd like to take a little stretch break.  Stand up.  Do a little jury box yoga.  Kind of stretch and make yourself comfortable for a minute.

(Jennifer Chen steps forward to be sworn.)

THE COURT:  Okay.  Please.

THE WITNESS:  Okay.  Thank you.

(Pause in proceedings.)

THE COURTROOM DEPUTY:  Please stand and raise your right hand.

JENNIFER CHEN,

called as a witness for the Plaintiffs, having been duly sworn, testified as follows:

THE WITNESS:  I do.

MS. VILLEGAS:  Thank you, Your Honor.

THE COURTROOM DEPUTY:  Please be seated.

THE COURT:  Thank you.  Go ahead.

THE COURTROOM DEPUTY:  Please state your full name for the court and spell your last name.

THE WITNESS:  My name is Jennifer Chen, and my last name is spelled C-H-E-N.

THE COURTROOM DEPUTY:  Thank you.

### DIRECT EXAMINATION

BY MS. VILLEGAS:

Q.   Hi, Jennifer.

A.   Hello.

Q.   Thanks for being here today.

A.   You're welcome.

Q.   Where do you live?

A.   I live in Orange, California.

Q.   Do you understand your role in the case?

A.   I do.

Q.   And what is your role in this case?

A.   My role is to be a class representative for all the other ladies that aren't able to speak on their own behalf.

Q.   Why are you involved in this case as a plaintiff?

A.   Because I wanted to be a voice for those women, and I'm -- I have a situation where I'm able to do that.

Q.   What do you understand this case to be about?

A.   I understand this case to be about my private, personal, very sensitive information being shared without my explicit consent.

Q.   Did you use the Flo Health app?

A.   Yes.

Q.   What did you use it for?

A.   To prevent being pregnant.

Q.   When did you start using it?

A.   Approximately early 2017.

Q.   Do you still use it?

A.   No.

Q.   Why not?

A.   I'm in menopause.

Q.   When you first signed up for the Flo app, do you remember answering some questions?

A.   I do.

Q.   About how many questions were there, if you recall?

A.   Approximately 10.

Q.   And what kind of questions did Flo ask?

A.   They asked my age, my name, the length of my cycle, when my last period was, and the reason that I was using their app.

Q.   Did you answer all of Flo's questions?

A.   I did.

Q.   What other kinds of information did you enter into the Flo app?

A.   I entered information about -- embarrassingly -- my mucus, because that's very important for dates of ovulation.  And since I was not wanting to get pregnant at all, those are the

type of things I needed to put in to get the information back.

Q.   Any other types of questions that you answered?

A.   I answered questions regarding breast tenderness, how I was feeling, my mood, and the days I had sex.

Q.   Did you consider the answers you gave to the Flo Health app to be private?

A.   Absolutely.

Q.   Did you consider the answers you gave to the Flo Health app to be medical information?

A.   Yes.

Q.   What was your understanding about how the information you entered would be used, if at all?

A.   I thought that the information would be used to give me back information with regard to what day I would be ovulating and which days were not safe to have unprotected sex.

Q.   Did there come a time when you found out that this information was being recorded by Facebook?

A.   Yes.

Q.   And when was that?

A.   It was approximately 2021.

Q.   Was that the earliest that you found out?

A.   Yes.

Q.   And once you learned about Flo's conduct and Facebook's conduct, how long after that did you file your lawsuit?

A.   Within a few months.

Q.   Did you ever give Facebook permission to record that you were using the Flo app to track your cycle?

A.   Absolutely not.

Q.   Did you ever give Facebook permission to record whether you were ovulating?

A.   No.

Q.   Did you ever give Facebook permission to record where you were in your menstrual cycle?

A.   No.

Q.   Did you ever see a pop-up alert requesting such permission from you?

A.   No.

Q.   How did you learn that the information had been recorded by Facebook?

A.   After speaking with my attorneys.

Q.   Can you give us a little bit more information about that?

A.   Sure.  I must have seen an advertisement with regard to who are users of the Flo app.  I responded that I was a user, and then I received information from the Marron law firm that my personal private health information had been shared without my explicit consent.

Q.   And that was in 2021?

A.   That's correct.

Q.   And how long after that did you file the lawsuit?

A.   Within several months.

Q.   At any time before your involvement in the case in 2021, did the topic of Flo app's data sharing ever come up for you at all?

A.   Never.

Q.   Did you see any news articles about it?

A.   I did not.

Q.   And is it your understanding that the specific health information that Flo allowed to be recorded by Facebook is information about your period and ovulation?

A.   That's correct.

Q.   How did it make you feel when you found out that Facebook was recording this information?

A.   Embarrassed, and I felt violated.

Q.   Why is that?

A.   Because that's information that is private to me, and I thought that by using the app that it would be kept private. So to find out that it was shared feels like something that you would tell your best friend and trust your best friend to never tell anybody and then they'd turn around and do it.  And that really hurts and it feels like a violation.

Q.   Is this the type of information that you would share with your doctor?

A.   Yes, only my doctor.

        MS. VILLEGAS:  Nothing further, Your Honor.

        THE COURT:  Okay.  Pass the witness.

**CROSS-EXAMINATION**

**MS. POZOS:**  May I proceed, Your Honor?

**THE COURT:**  Yes.

BY MS. POZOS:

Q.   Hi, Ms. Chen.  My name is Clare Pozos, and I represent Flo.

A.   Nice to meet you.

Q.   Nice to meet you too.

So, Ms. Chen, you testified on direct you came to be a plaintiff in this case because you received an e-mail from the law offices of Ronald Marron; right?

A.   I received an advertisement that I responded to.

(Reporter interruption for clarity of the record.)

**THE COURT:**  It's too late anyway.  So go ahead.  Yeah.

BY MS. POZOS:

Q.   And you responded to the law firm's e-mail advertisement by answering some questions; right?

A.   That's correct.

Q.   Okay.  And after you responded to the e-mail, you received a phone call from the law firm; right?

A.   Yes.

Q.   Okay.  And as a result of that phone call, you became a named plaintiff in this action; right?

A.   That's correct.

Q.   And you continued to use the Flo app after the phone call;

right?

A.   Yes.

Q.   Okay.  And you never had contact with Ronald Marron prior to the e-mail or ad that you had received; right?

A.   I don't believe so.

Q.   And, in fact, you hadn't had contact with anyone at The Law Offices of Ronald Marron prior to receiving that ad or e-mail; right?

A.   I believe that's true.

Q.   Okay.  So when you received the e-mail or ad, you didn't know how The Law Offices of Ronald Marron had your e-mail or knew to contact you, did you?

A.   I did not know.

Q.   Okay.  And you did not do any independent investigation into the claims in this case; correct?

A.   That's correct.

Q.   So your sole understanding of what the lawsuit was about came from the attorneys; right?

A.   That's right.

Q.   Now, Ms. Chen, you first downloaded the Flo app in March 2017; is that correct?

A.   Yes.

Q.   And you started using the Flo app for natural family planning?

A.   Correct.

Q.   And you continued using the Flo app until October 2022; correct?

A.   Yes.

Q.   Okay.  And you used the app consistently from when you downloaded it in 2017; right?

A.   I did.

Q.   Okay.  Now, the class action complaint in this lawsuit was filed in September 2021; correct?

A.   I believe so.

Q.   Okay.  So to be clear, after suing Flo, you continued to use the app; right?

A.   Yes.

Q.   Okay.  And you logged your period month in and month out after you sued Flo; correct?

A.   I did.

Q.   Okay.  Now, your reason for stopping using the Flo app after October 2022 was because you stopped having a period; right?

A.   That's right.

Q.   And you haven't told anyone in your family not to use the app; right?

A.   No.

Q.   No, you have not told anyone that; correct?

A.   No, I have not told anybody.

Q.   And, in fact, it wasn't just your family.  You've never

told anyone -- is that what you just testified -- to stop using the app?

A.   That's right.  I never told anyone to stop using the app. I don't believe anybody that I know uses it.

Q.   Thank you very much.

A.   Yeah.

Q.   Okay.

So to be clear, at no time did you pay any money or pay for a subscription to use Flo; right?

A.   That's correct.

Q.   Okay.  So you haven't lost any money as a result of using the Flo app; right?

A.   No.

Q.   And your reputation hasn't been harmed as a result of using Flo; right?

A.   No.

Q.   And you don't know whether you got advertising because of anything you put in the Flo app; right?

A.   That's right.

        MS. POZOS:  Now, let's pull up Trial Exhibit 44, which has been agreed upon and I believe is in evidence, although if it's not I will move it into evidence now.

        MS. VILLEGAS:  No objection.

        THE COURT:  No objection?

Okay.  It's admitted.

MS. POZOS:  Thank you.

(Trial Exhibit 44 received in evidence.)

BY MS. POZOS:

Q.   So showing you on your screen Exhibit 44.

Now, Ms. Chen, this looks familiar; correct?

A.   Yes.

Q.   Okay.  The bottom of the screen says (as read):

"If you continue, you agree to the privacy

policy and the terms of service."

Right?

A.   It does.

Q.   And both of those are in bright colors; right?

A.   They are on the screen.

Q.   And they're in -- there are links; right?

A.   That's correct.

Q.   Okay.  You did not click on either of those links, did

you?

A.   No.

Q.   And you continued beyond this screen on the Flo app;

correct?

A.   Yes.

Q.   So to be clear, you told Flo that you agreed to its

privacy policy and terms of service; right?

A.   Yes.

Q.   You did not read the Flo privacy policy before you started

using the app; is that right?

A.    That's correct.

Q.    And you had an opportunity, at any point from 2017 to the time of your deposition earlier in this case in 2023, to read the Flo privacy policy; right?

A.    Correct.

Q.    And you never checked the Flo privacy policy for any updates in all the time that you used the Flo app; right?

A.    Right.

Q.    So prior to suing Flo, you had never read Flo's privacy policy; right?

A.    Correct.

Q.    You also didn't read Flo's terms of service before you started using the app; right?

A.    I don't believe so.

Q.    So from March 2017, when you first began using the app, to your earlier testimony in this case at your deposition in 2023 under oath, you had the opportunity to read Flo's terms of service; right?

A.    Sure.

Q.    But you declined to read the terms of service; right?

A.    That's right.

        MS. POZOS:    Okay.    Now, let's pull up -- thank you for that exhibit.

        Let's pull up Trial Exhibit 132, which if it has not been

entered into evidence, it's agreed upon, and I would move into evidence.

THE COURT:  Any objection?

MS. VILLEGAS:  No objection, Your Honor.

THE COURT:  All right.  132 is admitted.

(Trial Exhibit 132 received in evidence.)

MS. POZOS:  Let's put up Exhibit 132 on the screen.

Thank you.

BY MS. POZOS:

Q.   This is a copy of Flo's privacy policy effective March 14, 2017.

Do you see the date on the screen?

A.   Yes.

Q.   Let's look at page 2, at the heading entitled "Section 3: Disclosure of Information."

Do you see that?

A.   Yes.

Q.   Okay.  And let's look at Subsection 1, which says "Information we share with third parties."

Do you see that?

A.   I do.

Q.   Okay.  And the first sentence right below that says (as read):

"We may share certain personal information with third-party vendors who supply software applications,

web hosting, and other technologies for the app."

Did I read that correctly?

A.   Yes, you did.

Q.   So you agreed that Flo could share your personal information with third-party vendors; right?

A.   I agreed to that, but I didn't agree that you could share my personal private health information.

Q.   So the question was:  You agreed that Flo could share your personal information with third-party vendors; right?

A.   Probably my name, my date of birth, that type of thing, which is personal; but that doesn't say that you're sharing my personal private health information.

Q.   So I'm just asking a yes-or-no question.

You agreed that Flo could share your personal --

THE COURT:  She can answer the question as she chooses.  You don't get to set her answer for her.

THE WITNESS:  Thank you, Your Honor.

BY MS. POZOS:

Q.   So let's look to Subsection 2 below, and it says "Aggregated Information."

Do you see that?

A.   Yes, I do.

Q.   Okay.  So the subsection says (as read):

"We may also share aggregated, anonymized, or deidentified information which cannot reasonably be

used to identify you.  For example, we may share, including without limitation, in articles, blog posts, and scientific publications general age demographic information and aggregate statistics about certain activities or symptoms from data collected to help identify patterns across users."

Did I read that correctly?

A.   You did.

Q.   Okay.  So you agreed to Flo sharing data about your aggregated, anonymized, or deidentified information; right?

A.   Yes, but I did not agree to sharing my personal private health information, and that's the issue here.

Q.   Okay.

MS. POZOS:  So now let's pull up Trial Exhibit 93, which has not been -- I don't believe has been entered into evidence but has been agreed to.

THE COURT:  All right.  Any objection?

MS. VILLEGAS:  No objection, Your Honor.

THE COURT:  All right.  93 is admitted.

(Trial Exhibit 93 received in evidence.)

MS. POZOS:  Thank you, Your Honor.

Let's publish Exhibit 93.  Thank you.

BY MS. POZOS:

Q.   Now, let's look at the heading on the bottom of page 2, which reads "How we use your information."

Do you see that?

A.   Let me flip the page.  Sorry.

Q.   That's okay.  It should be right there.

A.   Yes, mm-hmm.

Q.   So let's scroll to page 3 and look at the second paragraph from the top.  And we'll take a second for it to get there.

Okay.

So the first sentence of that paragraph on your screen says (as read):

        "We share your personal information with
        employees, affiliates, vendors, partners, and
        third parties as required to offer the services
        provided."

Did I read that correctly?

A.   You did.

Q.   Okay.

Let's now look at the paragraph just above that.  Okay.

And it reads (as read):

        "Beyond this, we may share your personal
        information with third parties in an aggregate and
        anonymous format combined with the information we
        collect from other users."

Did I read that correctly?

A.   You did.

Q.   Okay.

MS. POZOS:  Now, let's pull up Trial Exhibit 133, which is a copy of Flo's terms of service that were in effect in March 2017, which has been agreed upon, so if not already in evidence, I would move it into evidence.

THE COURT:  Any objection?

MS. VILLEGAS:  No objection.

THE COURT:  All right.  133 is admitted.

(Trial Exhibit 133 received in evidence.)

MS. POZOS:  Thank you.

BY MS. POZOS:

Q.   This is 133 on the screen.  This is Flo's terms of service that were in effect in March 2017.

So let's look at the very first sentence.  It says (as read):

"These terms of service, this agreement, is a legal agreement."

Did I read that correctly?

A.   Yes, you did.

Q.   Okay.  Now let's look at the second sentence.  Under the bolded heading with capitalized words, it says "Acceptance of Terms."

Okay.  This sentence says (as read):

"By creating an account or accessing or using the app, you acknowledge you that you accept and agree to be bound by the terms of this agreement."

Did I read that correctly?

A.   You did.

Q.   So when you hit "continue" into the app, you agreed to be bound by this document; correct?

A.   That's right.

Q.   And you continued to use the app after March 2017; right?

A.   That's right.

Q.   Okay.  So now let's move on to second page and look at header 6, which is entitled "Medical Services Disclaimer."

Now, this section is in all caps; is that right?

A.   It is.

Q.   Every word; right?

A.   That's correct.

Q.   Okay.

Underneath the header it says (as read):

"The company is not a licensed medical care provider, and the app is not intended to replace professional medical advice or diagnose, treat, or manage any illness or medical condition."

Did I read that correctly?

A.   You did.

Q.   So when you consented to the terms of service, had you read Flo's terms of service, you would have understood that Flo was not a licensed medical care provider; right?

A.   That's right.

Q.    And you agree today that Flo is not a licensed medical provider; right?

A.    That's correct.

Q.    And you understand that Flo is not intended to replace professional medical advice; right?

A.    Correct.

Q.    And while you were using Flo, you certainly went to see doctors; right?

A.    Yes.

Q.    Okay.  You saw a cardiologist; is that right?

A.    Probably, yes.

Q.    Okay.  And you also saw a gynecologist or OB/GYN?

A.    Yes.

Q.    Okay.  And you saw a gynecologist or OB/GYN on many occasions during the five-plus years you used the Flo app; right?

A.    That's correct.

Q.    And you never used the Flo app to make a medical appointment; right?

A.    No.

Q.    And you never used the Flo app to contact a doctor; right?

A.    No.

Q.    And you never used the Flo app to obtain a prescription; right?

A.    That's correct.

Q.   Okay.   And, Ms. Chen, you worked for many years as a legal assistant; right?

A.   Yes.

Q.   So you're familiar with statutes of limitations; right?

A.   Yes.

Q.   And you're aware that there's a one-year statute of limitations in the Flo terms of service; right?

A.   That's correct.

Q.   And you started using the Flo app in 2017; right?

A.   That's right.

Q.   And you didn't file your complaint until March 2nd, 2021; is that right?

A.   That's right.

Q.   So you didn't file your complaint within one year of your use of the app; correct?

A.   No.   I used it within one year of the date of my first knowledge that something had happened.

Q.   But not within one year of your use of the app; is that right?

A.   Right, but my understanding of the statute of limitations begins running from the date --

        MS. POZOS:   Your Honor, this is beyond the scope.

        THE COURT:   Let her finish her answer.

    Go ahead.   Take it from the top.

        THE WITNESS:   Okay.   My understanding with regard to

the statute of limitations begins running from the date of the knowledge of the act that you -- let me rephrase that.  I apologize.

My understanding of a statute of limitations is it starts running from your date of knowledge that something had happened.  So my date of knowledge that something had happened would have been 2017, and the lawsuit was filed within 2017, so that's within the one-year statute.

BY MS. POZOS:

Q.   So the lawsuit was filed in 2021; correct?

A.   Oh, I'm sorry.  Yes, 2021.

Q.   You're not a --

A.   I -- I was incorrect about that.  Yeah.

Q.   And you're not a lawyer; right?

A.   No.

Q.   Okay.  Now, just in turning to apps that you've had, you've had about a hundred apps on your phone; right?

A.   I'm not sure.

Q.   Well, do you remember testifying previously in this case about how many apps you have on your phone?

A.   Yes.

Q.   Okay.  Do you remember testifying that you had probably a hundred apps on your phone at the time?

A.   If I testified to that, then that would have been accurate.

THE COURT:  Thank you.

MS. POZOS:  May I approach, Your Honor?

THE COURT:  Yes.

(Counsel approaches witness.)

THE WITNESS:  Thank you.

BY MS. POZOS:

Q.   So you remember testifying in a deposition in this case under oath; right?

A.   Yes.

Q.   And that took place January 20th, 2023; is that correct?

A.   Correct.

Q.   Okay.  And I would turn your attention in the transcript that I just handed you of your deposition to page 134, lines 21 to 22.

A.   Okay.

Q.   And I'll let you get there.  So that's page 134.

A.   Okay.  134.

Q.   Yeah.

A.   This is a condensed version, so give me a second.

Q.   Would you like a larger version?  I also have that?  Would that be more helpful?

A.   Okay.  This is okay.  No, no, no.  This is fine.  This is fine.

Q.   Okay.

A.   Okay.  I see it.

Q.   So I'd turn your attention --

MS. POZOS:  And I'd ask the Court's permission to play the corresponding clip, video clip, of page 134, lines 21 to 22, and page 135, lines 1 through 4, which is JC134.

THE COURT:  That's fine.

MS. POZOS:  Thank you.

Could you please play that **clip**.

(Video played but not reported.)

BY MS. POZOS:

Q.   Okay.  And that was your testimony at your deposition under oath; right?

A.   Yes.

Q.   Okay.  And you use apps that are related to your health; right?

A.   I do.

Q.   Okay.  And you don't know what information you're sharing with the hundred apps that you have installed on your phone; right?

A.   With regard to the health apps, those would be apps that I need to communicate with my doctors.

Q.   Okay.

A.   Or to make laboratory appointments.

Q.   So I just asked -- my -- to repeat my question again, because it's not exactly what I had asked you.

A.   Okay.

Q.   So you don't know what information you're sharing with the hundred apps that you have installed on your phone; right?

A.   That's right.

Q.   Okay.  And so some of the apps you've used include YouTube, Snapchat, Pinterest, FollowMyHealth, MyChart, MyUCDavisHealth, Blue Shield of California, MyQuest, Cedars-Sinai, and Teladoc; correct?

A.   That's correct.

Q.   I know that was a lot of apps, so let me -- let's just walk through a few.

A.   Sure.

Q.   And I'll start with MyQuest.

So you use the MyQuest app to view your lab results; right?

A.   Yes.

Q.   And you use the MyQuest app to also make appointments for lab tests; right?

A.   That's correct.

Q.   And when you signed up for an account with MyQuest, you did not read the MyQuest privacy policy; right?

A.   I don't believe I did.

Q.   Okay.  And, in fact, you -- you've testified previously that you did not; correct?

A.   Okay.  Yes, then that would be correct.

Q.   Okay.  And so you do not know whether MyQuest shares your

personal information; right?

A.  When you go to a doctor in California or any laboratory, you're given a HIPAA disclosure, which states that they will not use your medical information for certain things or they will use it for certain things.

Q.  So it's not exactly what I asked, so I just want to repeat the question again.

A.  Okay.

Q.  So you do not know whether the MyQuest app shares your personal information; right?

A.  Not specifically.

Q.  Okay.  And you don't know what information about you the MyQuest apps shares with advertisers; right?

A.  I do not.

Q.  Okay.  So you don't know one way or the other whether you were shown advertisements because MyQuest shared your information; right?

A.  There's no way for me to know that.

Q.  Okay.  So let's move on to another app.

So you used MyChart; correct?

A.  Yes.

Q.  And the MyChart app can also be used to view your medical information; correct?

A.  That's right.

Q.  You did not read the MyChart privacy policy when you

signed up for MyChart; right?

**A.** That's right.

**Q.** And you don't know whether the MyChart app shared your personal information; right?

**A.** Well, they do share my personal information with my doctor, but are you saying beyond that?

**Q.** You don't know whether MyChart shared your personal information with anyone; right? You don't know, sitting here today?

**A.** That's right.

**Q.** And you have no idea whether MyChart shared your information with advertisers; right?

**A.** That's right.

**Q.** Now, you also have a Gmail account; right?

**A.** I have a Gmail account, yes.

**Q.** And you've written Google reviews; right?

**A.** I have.

**Q.** And your Google reviews can be seen by anyone; right?

**A.** That's right.

**Q.** So they're publicly available to the world; right?

**A.** Yes.

**Q.** And you've previously posted Google reviews about your health; right?

**A.** Yes.

**Q.** Okay. And you've also searched Google for OB/GYNs or

gynecologists; right?

A.   Yes.

Q.   And you've also searched on Google for information about periods; right?

A.   Yes.

Q.   Okay.  And you've searched information for menopause; right?

A.   Yes.

Q.   And you've searched on Google for information about menstrual pain and home remedies for menstrual pain; right?

A.   That's correct.

Q.   And relief from period symptoms; right?

A.   Yes.

Q.   And you've also purchased products related to reproductive health from CVS in the past; right?

A.   Yes.

Q.   And you don't know whether CVS shared the fact that you used products related to reproductive health with third parties; right?

A.   That's correct.

Q.   Okay.  You never contacted CVS to ask that they not share the information they learned about you; right?

A.   That's right.

Q.   So you don't know if you saw ads because of the information you shared with CVS; right?

A.   That's right.

Q.   And you've also purchased products related to reproductive health from other places, like Costco, Walmart, and Target; right?

A.   Yes.

Q.   And you don't know whether any of those retailers shared the fact that you purchased these products with third parties; right?

A.   That's right.

Q.   And you never contacted any of those retailers either to ask whether they shared information that they learned about you; right?

A.   Right.

Q.   Okay.  And you never looked up any of those retailers' policies on sharing customer data; right?

A.   That's right.

Q.   Okay.  So you don't know if you saw ads because of the information you shared with those retailers; right?

A.   That would be true.

Q.   And you've never chosen not to shop at one of those retailers because of their policies on customer data; right?

A.   That's right.

Q.   Okay.  Now, you also have a YouTube account; right?

A.   I do.

Q.   You did at the time of this lawsuit; is that correct?

A.   Yes.

Q.   Okay.  And you've viewed videos related to health on YouTube; right?

A.   Yes.

Q.   Okay.  So you don't know what information you believe Flo shared with advertisers or Facebook that you didn't yourself share with retailers; right?

A.   Could you rephrase that or repeat it?  Thank you.

Q.   Of course.

A.   Okay.

Q.   Of course.

You are unaware -- you don't know what information that you believe Flo shared with advertisers or with Facebook that you didn't yourself share with retailers; correct?

You just don't know?

A.   No, there's no way to know.

Q.   Okay.  So whether or not you used the Flo app, advertisers and retailers could also reasonably conclude, based on your age, that you might be experiencing symptoms of menopause; correct?

A.   Yes.

Q.   Now, Ms. Chen, your husband is a lawyer; right?

A.   He is.

Q.   Okay.  And he's a plaintiffs' lawyer; right?

A.   No.  He's a defense attorney.

Q.   Okay.  But he has previously represented plaintiffs in litigation; correct?

A.   Most likely.

Q.   Okay.  Could we -- I'll turn your attention to your deposition transcript on page 62.

A.   Sure.

Q.   And that would be page 62, lines 12 through 14.  I'll wait for you to get there.

A.   62, lines 12 through 14.  Okay.  I see that.

Q.   Okay.

         MS. POZOS:  And so I'd ask to play JC62.

               (Video played but not reported.)

BY MS. JOHNSON:

Q.   Okay.  And that was your testimony under oath; right?

A.   That's right.

Q.   Okay.  And he's represented plaintiffs in litigation including for personal injury claims; right?

A.   Yes, for friends and family.

Q.   Okay.  And you know how that works; right?  The lawyer fronts the fees and expenses in the case, and they hope to win; right?

A.   If they do it on a contingency basis.

Q.   So they're not paid up front, but they'll get paid later --

A.   That's correct.

Q.   -- is that right?

A.   Yes.

Q.   Okay.  So you aren't paying any of the plaintiffs' lawyers' fees here; correct?

A.   No.

Q.   Okay.  Or any of the plaintiffs' lawyers' expenses; right?

A.   That's correct.

Q.   And, in fact, you don't know who's paying the fees and expenses of your lawyers in this case; right?

A.   That's correct.

Q.   Okay.  And you're aware that plaintiffs' lawyers find people to sue companies; right?

MS. VILLEGAS:  Objection.

THE COURT:  Sustained.

Let's wrap up this avenue, please.

MS. POZOS:  Okay.

THE COURT:  What else do you have?

MS. POZOS:  Almost finished, Your Honor.

BY MS. POZOS:

Q.   In this case, you received all your information from your attorneys; right?

A.   Yes.

Q.   Okay.  And even with the information from your attorneys, you still continued to use the app; right?

A.   Yes.

Q.   Okay.

        MS. POZOS:  Thank you.  I have no further questions.

        THE COURT:  Okay.  Yeah, go ahead.  Sorry.

                        CROSS-EXAMINATION

BY MS. JOHNSON:

Q.   Good morning, Ms. Chen.

A.   Good morning.

Q.   I just have a few brief questions, and they're mostly about dates.

A.   Okay.

Q.   Okay.  So you had a Facebook account in 2010; right?

A.   Yes.

Q.   And you had that Facebook account -- you used that Facebook account for about a year; right?

A.   That's right.

Q.   And you stopped using your Facebook account after about that one year; right?

A.   Yes.

Q.   And you've never had an Instagram account?

A.   That's right.

Q.   Okay.  And you started using the Flo app in March of 2017; right?

A.   Yes.

Q.   And the first device on which you used the Flo app was an iPhone 6, right?

A.   Yes.

Q.   Okay.  So you didn't have that iPhone 6 when you were using Facebook for about a year in 2010; right?

A.   No.

Q.   So you used one device to access Facebook and a different device to access the Flo app; right?

A.   Yes.

        MS. JOHNSON:  And that's all I have.  Thank you.

        THE COURT:  Okay.  Any brief redirect?

        MS. VILLEGAS:  Yes, Your Honor.

        THE COURT:  All right.

                    REDIRECT EXAMINATION

BY MS. VILLEGAS:

Q.   Hi, Jennifer.

A.   Hi, Carol.

Q.   Did you ever tell Costco your ovulation cycle?

A.   No.

Q.   Did you ever tell CVS your ovulation cycle?

A.   No.

Q.   Did you ever tell Target your ovulation cycle?

A.   No.

Q.   I want to go back to the dates of when you found out about this lawsuit.

    Can you please tell the jury when you found out about Flo and Meta's conduct?

A.   I found out in 2021.

Q.   And when did you file this lawsuit?

A.   In 2021.

Q.   Why did you think Flo would keep your medical information private?

A.   Because the law is that they cannot disclose that information.  That's private and personal health information to me, so I trusted that they were abiding by that.

Q.   Can you turn to Trial Exhibit 132.

A.   Yes.  Give me a second.

     I have 93 and 94 here.  Exhibit -- what is the exhibit number?  Sorry, Carol.

Q.   Trial Exhibit 132.  It should be in the binder that the defense lawyer handed to you.

A.   Oh, I'm looking in the wrong one.

Q.   It's okay.

                    (Pause in proceedings.)

A.   I see that.

Q.   Could you please read the first line to the jury starting with "We are committed."

A.   Which page is that?

Q.   The page ends in 183.

A.   And it's which one, Carol?

Q.   So if you go up to the top of page do you see where it says "privacy policy"?

**A.**   Oh, yes.

**Q.**   Can you read the first sentence that starts "We are committed"?

**A.**   Yes.   (as read):

> "We are committed to respecting your privacy and providing transparency about our data practices. This privacy policy," and in parentheses, "This, quote, 'privacy policy,' unquote, explains how OwHealth Inc.," which is identified as "the company" here, "or we or us collects, stores, uses, and discloses personal information from our users," in parentheses and quotes, "'you,' in connection with the Flo mobile application and related services," in parentheses, collectively the, quote, app."

**Q.**   Let's start with a first sentence, we are committed to representing your privacy and providing transparency and data practice.

Do you feel like Flo respected your privacy?

**A.**   No.

**Q.**   What about transparency; do you feel like this document gives you transparency about what Flo's going to do with your data?

**A.**   No, it doesn't.   There is nothing in this that is crystal clear that they're going to share my personal and private health information.

Q.   Lets go to trial Exhibit 93.  It's in that same binder.

A.   Yes, I have it here.

Q.   Could you go to the page ending 2818.

A.   The Bates label?

Q.   Yes.

A.   I see it.

Q.   Do you see at the top where it says "beyond this"?

A.   I do.

Q.   Can you please read that to the jury.

A.   (as read):

        "Beyond this we may share your personal

    information with third parties in an aggregate and

    anonymous format combined with the information we

    collect from other users."

Q.   You understand now that an ID for advertising with your
personal health data was sent to Meta; right?

A.   I do.

Q.   And that this ID for advertising could be used to identify
you?

A.   Yes.

Q.   So you would agree with me that that's not accurate, what
you just read; right?

A.   That's right.

Q.   We heard a little bit about some of the health apps that
you use.  You would expect those health apps to keep your

information private; right?

**A.**   Absolutely.

**Q.**   And that's because it's your medical information; right?

**A.**   Yes.

**Q.**   The same way you expected Flo Health to keep your medical information --

**A.**   Exactly.

**Q.**   -- private?

Jennifer, who has the right to control your personal health data?

**A.**   Only me.

**MS. VILLEGAS:**  Thank you.

**THE COURT:**  Okay.  Careful on the way down okay.

**THE WITNESS:**  Thank you, Your Honor.

(Witness excused.)

**THE COURT:**  We'll take our morning break and come back at 11:20.

**THE COURTROOM DEPUTY:**  All rise.

(Recess taken at 10:53 a.m.)

(Proceedings resumed at 11:22 a.m.)

(Proceedings were heard out of the presence of the jury.)

**THE COURTROOM DEPUTY:**  All rise.

**THE COURT:**  Bring the jury in, please.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

THE COURTROOM DEPUTY:  You may be seated.

We're back on the record in Civil 21-757, Frasco versus Flo Health, Inc.

THE COURT:  Okay.  Our next witness, please.

MR. CANTY:  Your Honor, the plaintiffs call Autumn Meigs.

(Autumn Meigs steps forward to be sworn.)

THE COURTROOM DEPUTY:  Please stand and raise your right hand.

**AUTUMN MEIGS**,

called as a witness for the Plaintiffs, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Please be seated.

Please state your full name for the Court and spell your last name.

THE WITNESS:  Autumn Meigs, M-E-I-G-S.

THE COURTROOM DEPUTY:  Thank you.

**DIRECT EXAMINATION**

MR. CANTY:  Your Honor, may I inquire?

THE COURT:  Yes.

BY MR. CANTY:

Q.   Ms. Meigs, can you tell the jury where you live?

A.   I live in Fredericktown, Ohio.

Q.   And did you come here to court with anybody here today?

A.    Yes, with my mother.

Q.    Do you understand what your role is in this case?

A.    Yes.

Q.    What is your understanding of what your role is?

A.    I'm a named plaintiff in a nationwide class action lawsuit.

Q.    And who did you understand that case is against?

A.    Flo.

Q.    Why are you involved in this case as a plaintiff?

A.    Because my data was shared, and I'm standing up for women like me, the other women who are here with me, and women who are all over the world who have no idea about this.

Q.    Did you use the Flo Health app?

A.    Yes.

Q.    What did you use the Flo Health app for?

A.    I wanted to keep track of my inconsistent periods and keep all of my reproductive health information in one app.

Q.    When did you start using the Flo Health app?

A.    I was 15 or 16, so it was either early 2017 or early 2018.

Q.    When did you stop using the app?

A.    In 2021, after I filed my lawsuit, but there was an unexpected sync with, I believe, like my Apple Health and Flo, and that was in 2022.

Q.    Why did you stop using the Flo Health app in 2021?

A.    Because of the lawsuit.

Q.   When you first signed up for the Flo Health app, do you recall answering a number of questions?

A.   Yes.

Q.   Do you recall the exhibit we saw yesterday with the onboarding questions?

A.   Yes.

Q.   Did those questions look familiar to you?

A.   Yes.

Q.   And did you answer those questions?

A.   Yes.

Q.   What kind of questions did Flo ask you?

A.   Things about may period.  Like obviously my goal, which was that I wanted to track my cycle.  Information about like my discharge, how heavy my flow was, things like cramps, period symptoms.

Q.   And did you answer all of those Flo questions honestly?

A.   Yes.

Q.   And did you consider your answers to those questions that you were asked by Flo to be private?

A.   Yes.

Q.   Did you consider the questions you were asked by Flo to be private health information?

A.   Yes.

Q.   Can you tell the jury what your understanding was of what Flo was going to do with the data that you provided and the

answers you provided them?

A.   I believed that it would be kept in the app so it would give me information about my periods and that I could like understand my periods better, when my period might start.  So I thought it would be kept in the app.

Q.   Did there come a time when you found out that Flo allowed your information to be collected by third parties?

A.   Yes.

Q.   And when was that?

A.   Shortly before I filed my lawsuit.

Q.   Can you tell the jury how you found out that your information had been shared with third parties?

A.   Through conversations with my lawyer.

Q.   And once you learned about Flo sharing your information with Facebook, how long after that did you file the lawsuit, if you recall?

A.   Within a month or two.

Q.   Was that the earliest you found out about the conduct?

A.   Yes.

Q.   You're not a computer scientist, are you?

A.   No.

Q.   Do you know how to read code?

A.   No.

Q.   So you had no idea, until 2021, that that information was being shared improperly?

**A.**   Correct.

**Q.**   Did you ever give Facebook permission to record the day of your menstrual cycle?

**A.**   No.

**Q.**   Did you ever give Facebook permission to use your period and ovulation information for its advertising purposes?

**A.**   No.

**Q.**   While using the Flo app, when, if ever, did you see a pop-up that alerted you that your information would be shared with Facebook?

**A.**   No.

**Q.**   And can you tell the jury what your understanding was about --

Well, let me ask you this:

At any time before your involvement in the case, did the topic of Flo Health sharing your information with Meta ever come up?

**A.**   No.

**Q.**   Did you see any reporting on that?

**A.**   Nope.

**Q.**   And can you just tell the jury how, if at all, this has affected you, knowing that Flo has shared your sensitive health data with third parties?

**A.**   I felt very betrayed.  It's also really embarrassing and has caused a lot of anxiety because I was a young girl entering

such like private information about my reproductive health, thinking that it was going to be kept private, and now -- I'm a very private person and now I'm put in the spotlight, and everybody here knows who I am and that I was a young girl entering such private information about myself and my health.

Q.   And with respect to that private information, what is your understanding about what specific information that you put into the Flo Health app that was shared with Facebook?

A.   My goal, which was to track my cycle, and then where I was at in my cycle.

MR. CANTY:   Thank you.

No further questions, Your Honor.

THE COURT:   Okay.  Pass the witness.

### CROSS-EXAMINATION

MS. POZOS:   May I begin, Your Honor?

THE COURT:   Yes.

MS. POZOS:   Thank you.

May I have the -- my colleague approach with a binder for Ms. Meigs?

THE COURT:   Yeah.

THE WITNESS:   Thank you so much.

(Counsel approaches witness.)

BY MS. POZOS:

Q.   Good morning, Ms. Meigs.  My name is Clare Pozos.  I'm from Dechert, and I represent Flo.

**A.**   Good morning.

**Q.**   So your sister and brother-in-law connected you with your lawyers in this case; right?

**A.**   I was -- my sister was the one who knew a lawyer and was able to like let me know that there was this case, and I was able to get into contact with my lawyer.

**Q.**   And your brother-in-law knows your lawyer through work; right?

**A.**   I don't know exactly the -- I don't really talk to my brother-in-law about all sorts of his work, but yes.

**Q.**   So he does know your lawyer through work; yes?

**A.**   I don't believe they work together, but they know each other through some -- through their -- I don't know.

**Q.**   Okay.

        **MS. POZOS:**  Your Honor, may I approach with a transcript for the witness?

        **THE COURT:**  Sure.

                (Counsel approaches witness.)

        **THE WITNESS:**  Thank you.

BY MS. POZOS:

**Q.**   So you remember testifying under oath previously in this case; right?

**A.**   Yes.

**Q.**   Okay.  And that was in early January 2023?

**A.**   Yes.

Q.    Okay.  And I draw your attention in the second transcript that I handed you to page 248, if you could flip there.  I'll let you get there.

Okay.

And just direct your attention to lines 21, 24.

MS. POZOS:  And I'd ask to play clip M2.5.

THE COURT:  What's happening?  Nothing.

THE COURTROOM DEPUTY:  Did you say yes?  She could play it?

THE COURT:  Oh, yeah.  Sorry.

MS. POZOS:  Play clip M2.5.  Thank you.

(Video played but not reported.)

BY MS. POZOS:

Q.    And that was your testimony under oath; correct?

A.    Correct.

Q.    And your lawyers contacted you?  You didn't contact them; right?

A.    I don't recall, but I know we got in contact with each other.

Q.    Okay.  So I turn your attention to the first transcript, page 33.  And that first transcript, page 33, lines 4 through 7.

MS. POZOS:  And if you could please play clip M.1.

(Video played but not reported.)

\\\

BY MS. POZOS:

Q.   That was your testimony; right?

A.   Yep.

Q.   Okay.  And your understanding of this case comes from your lawyers; right?

A.   Yes.

Q.   You didn't do any independent investigation into anything that happened in this case; right?

A.   Correct.

Q.   That's correct?

A.   I did not.

Q.   I just didn't hear you.  Thank you.

     And you want to receive money in this case; right?

A.   I didn't say that.

Q.   Okay.  I turn your attention to page -- your -- the second transcript, to page 242, and on page 242, that's lines 14 to 16.

          MS. POZOS:  Please play clip M2.4.

               (Video played but not reported.)

BY MS. POZOS:

Q.   Okay.  So you did say that previously; correct?

A.   I see that.

Q.   Okay.  Thank you.

     Now, you first downloaded the Flo app in February 2017; right?

A.   Either 2017 or early 2018, yes.

Q.   Okay.  So I would turn your attention to the first transcript, page 58, lines 7 to 8.

MS. POZOS:  And ask to play clip M.6, please.

(Video played but not reported.)

BY MS. POZOS:

Q.   And you don't recall --

That was your testimony, correct, at your deposition?

A.   Yes.

MR. CANTY:  Objection.

BY MS. POZOS:

Q.   Okay.  And you don't recall Flo's terms of service when you first signed up for the Flo app, do you?

A.   I don't recall.

Q.   And, in fact, you have no memory of ever having reviewed Flo's terms of service before suing Flo; right?

A.   I don't recall.

Q.   Okay.  You don't recall reviewing them; right?

A.   Could you repeat your question again, the first one?

Q.   Sure.

So you have no memory of ever having reviewed Flo's terms of service before suing Flo?

A.   I don't recall.

Q.   You don't recall reviewing -- I'm just --

You don't recall reviewing the terms?  Is that what you're

saying?

A.    Correct.

Q.    Okay.  Thank you.

And you don't recall reviewing Flo's privacy policy when you first signed up for the Flo app, do you?

A.    I don't recall.  Yes, correct.  I don't recall.

Q.    Sorry.  You don't recall reviewing the terms; is that right?

A.    Yes.

Q.    Okay.  Thank you.

And you don't recall considering Flo's privacy policy when deciding whether or not to use Flo; right?

A.    I don't know.

Q.    You don't know whether you considered Flo's privacy policy when you used the app?

A.    I don't recall.

Q.    You don't recall reviewing it, though; correct?

A.    Correct.

Q.    And you don't recall considering it before you used it; right?

A.    I don't recall.

Q.    In fact, you don't recall ever having read Flo's privacy policy prior to suing Flo; right?

A.    I don't recall.

Q.    You don't recall reviewing it; correct?

A.   Correct.

Q.   It's possible that you never reviewed Flo's terms of service or privacy policy; right?

A.   I don't recall, so I -- it's possible.

Q.   Okay.  And, in fact, you don't recall one instance prior to this litigation where you read any privacy at all, do you?

A.   Any privacy policy?  Like for Flo or just --

Q.   At all.

A.   I don't recall.

Q.   You don't recall reading any privacy policy; correct?

A.   Correct.

Q.   Okay.  Now, please take a look at Trial Exhibit 44, which is in your binder and previously admitted.

This is --

A.   Is it in the Meigs -- the white blinder or the black binder?

Q.   It's in the --

A.   The one --

Q.   My colleague just handed it to you, yes.  Thank you very much.

So this is the Flo consent screen that's appearing on the screen in font of you as well?

THE COURT:  Is this in evidence?

THE COURTROOM DEPUTY:  Yes, Your Honor.

MS. POZOS:  Yes, it is.  I believe so, Your Honor.

THE COURT:  All right.  Just tell me.

MS. POZOS:  Will do.  Thank you.

THE COURT:  "Previously admitted."  That's all you've got to say.

Okay.  Go ahead.

BY MS. POZOS:

Q.   The bottom of the screen reads (as read):

     "If you continue, you agree to the privacy policy and the terms of service."

     Do you see that?

A.   Yes.

Q.   Okay.  And you continued beyond this screen in using the Flo app; correct?

A.   Correct.

Q.   So you told Flo through this consent screen that you agreed to its privacy policy; right?

A.   Yes.

Q.   And you also told Flo that you agreed to its terms of service; correct?

A.   Correct.

Q.   Now, you signed up for the Flo app, you testified on direct, to track your cycle; right?

A.   Correct.

Q.   You never paid any money for the Flo app; right?

A.   No.

Q.   It's fair to say that the Flo app was not your doctor; right?

A.   Yes.

Q.   You weren't using the Flo app as a replacement for your doctor's medical advice, were you?

A.   No.

Q.   Now, when you last testified in this case in January 2023, you still had the Flo app on your phone and were continuing to open the Flo app; right?

A.   I did have it, but I don't recall if I still opened it or not.

Q.   Okay.  I turn your attention to page 60 of the first transcript, and that's line 25, and then page 61, line 1.

        MS. POZOS:  And please play clip M.8.

              (Video played but not reported.)

BY MS. POZOS:

Q.   So just to review, the question there was:

     "Do you continue to open the Flo app?"

     And your answer was:  "Yeah."

     Is that correct?

A.   Correct.

Q.   And your deposition was in early January 2023; correct?

A.   Correct.

Q.   Okay.  And you never told your friends, at least at that time, at your deposition, to not use Flo, did you?

A.    No.

Q.    Now, you've entered information into other apps to track your menstrual cycle; right?

A.    Yes.

Q.    You used Apple Health to track your menstrual cycle; right?

A.    I don't recall if Apple Health was actually to track my mental -- sorry -- my menstrual cycle or if that was when it accidentally synced.

Q.    Okay.  So I turn your attention to the first transcript, page 133, lines 3 through 6.

MS. POZOS:  And please play clip M.18.

(Video played but not reported.)

BY MS. POZOS:

Q.    That was your testimony; correct?

A.    Correct.

Q.    Okay.  You don't recall reviewing the terms of service for Apple Health, do you?

A.    No.

Q.    And you don't recall reviewing the privacy policy for Apple Health; right?

A.    No.

Q.    So you don't know whether the Apple Health app shares your information with third parties, do you?

A.    I don't know.

Q.   Now, you also have used the app Period Diary ovulation tracker; is that right?

A.   That's what I've said in this document, yeah, but I don't recall.  I was -- I mean, this all happened almost like a decade ago, so it seems like a lifetime ago, so...

Q.   That's a long time ago; right?

A.   Very long time ago.

Q.   I understand.

So let's -- just to refresh your recollection of what you've used previously, let's turn to transcript 1, page 133, lines 10 to **11**.

MS. POZOS:  And I'd asked to play clip M.19.

(Video played but not reported.)

**BY MS. POZOS:**

Q.   Now, this is -- the Period Diary ovulation tracker was another period tracker that you had downloaded on your phone; right?

A.   Yes.

Q.   You don't know whether the information you shared with the Period Diary ovulation tracker had been shared with advertisers; correct?

A.   I don't know.

Q.   And you don't know whether the information you shared with the Period Diary ovulation tracker had been shared with any analytics; correct?

A.    I don't know.

Q.    Okay.  And you don't know what information the Period Diary ovulation tracker collected about you or your device; right?

A.    I don't know.

Q.    You don't recall any additional information that you shared with Flo that you did not also share with the Period Diary ovulation tracker, do you?

A.    I don't recall.

Q.    Okay.  You don't recall any information that you shared with one and not the other; is that correct?

A.    Yeah.

Q.    Okay.  You never investigated whether the Period Diary ovulation tracker was sharing information about you to third parties; right?

A.    No.

Q.    Now, let's turn to the Clue period and cycle tracker.  You also downloaded this app onto your phone; correct?

A.    Is this in the -- or is this just like -- are you just asking or is this in here?

Q.    I'm just asking you for the moment.

A.    Okay.  I don't recall.

Q.    Okay.  So now let's turn to the second transcript, page 269, line 19, through page 270 at line 4.

        MS. POZOS:  And I'd ask to play clip M2.7.

(Video played but not reported.)

**MS. POZOS:**  That stopped a little early, so I'm going to just keep going with the transcript.

**BY MS. POZOS:**

Q.   If you look to page 270, lines 2 to 4.

**"QUESTION:**  You downloaded all these apps onto your phone; correct?

**"ANSWER:**  Yes."

Did I read that correctly?

A.   Yes.

Q.   Okay.  And that's your prior testimony?

A.   Yes.

Q.   Okay.  Now, you don't know what information the Clue period and cycle tracker collected, do you?

A.   I don't know.

Q.   You don't know if the information you shared with the Clue period and cycle tracker had been shared with advertisers; correct?

A.   I don't know.

Q.   And you don't know whether the information you shared with the Clue period and cycle tracker had been shared with any analytics; correct?

A.   I don't -- I don't know.

Q.   You can't tell me what information you shared with Flo that you did not also share with Clue period and cycle tracker;

correct?

MR. CANTY:  Objection.

THE COURT:  You can answer.  Go ahead.

THE WITNESS:  I don't recall.

BY MS. POZOS:

Q.   Okay.  You don't know of any; right?

A.   Right now, I can't recall, so I don't want to say -- if I can't recall it, I'm not going to give you the answer because I don't -- I can't recall.

Q.   Understood.

And you didn't ever investigate what information about you that the Clue period and cycle tracker was sharing with third parties, did you?

A.   No.

Q.   Now, you also had the app Period Tracker by GP Apps on your phone; right?

A.   Yeah.

Q.   Okay.  And you don't know what information the Period Tracker by GP Apps collected; correct?

A.   Correct.  I don't know.

Q.   And you don't know whether the information you shared with the Period Tracker by GP Apps has been shared with advertisers or analytics or third parties; right?

MR. CANTY:  Objection.

THE COURT:  You can answer.

THE WITNESS:  I don't know.

BY MS. POZOS:

Q.   You don't know if the Period Tracker by GP Apps sold your personal information to third parties; correct?

A.   I don't know.

Q.   And you can't tell me what information you shared with Flo that you did not also share with Period Tracker by GP Apps; right?

A.   Right.  I can't recall.

Q.   Okay.  And you don't recall investigating what information Period Tracker by GP Apps was sharing with third parties, do you?

A.   No.

Q.   And you have no memory of ever having done any investigation whether any of these third-party apps shared your personal information; correct?

A.   Right.

Q.   Okay.

MS. POZOS:  Thank you.  No further questions.

THE COURT:  Okay.  Next.

CROSS-EXAMINATION

BY MS. McCLOSKEY:

Q.   Good morning, Ms. Meigs.

A.   Good morning.

Q.   My name is Elizabeth McCloskey.  I'm an attorney for

Facebook.

You and I haven't met before; correct?

A.   I don't recall meeting you.

Q.   On your direct exam, you testified that you're asserting a claim against Flo in this trial; is that right?

A.   Yes.

Q.   And you're not asserting a claim against Facebook in this trial; correct?

A.   I don't know.

Q.   You don't know.  Okay.  Let me hand you --

You were in court yesterday; correct?

A.   Correct.

Q.   You were sitting right over there?

A.   Mm-hmm.

Q.   And do you recall that the judge read some preliminary instructions to the jury about this case?

A.   Yes.

Q.   Okay.  I'm going to put up on the screen page 3 from the preliminary instructions.

Do you see that there in front of you?

A.   Yes.

Q.   Okay.  And do you see where it says (as read):

"All five plaintiffs have claims against Flo Health in connection with their use of the Flo period and ovulation tracker app for women.  Three

plaintiffs, Chen, Gamino, and Wellman, also have claims against Meta."

Do you see that?

A.   Yes.

Q.   So in this case -- in this trial, you're not asserting a claim against Facebook, against Meta; correct?

A.   Yeah.  Flo.

Q.   Just against Flo; right?

A.   Yeah.

Q.   Okay.  You've signed up for a Facebook account; correct?

A.   Correct.

Q.   And what year were you born, Ms. Meigs?

A.   2001.

Q.   What is your birth date?

A.   July 4th.

Q.   When -- what year?

A.   2001.

Q.   When you signed up for a Facebook account, you gave Facebook your birth date; correct?

A.   I don't -- I don't recall.

Q.   Do you get messages on Facebook relating to, you know, happy birthday messages from your friends?

A.   Yes.

Q.   Okay.  So fair to say that Facebook has information about when your birth date is; correct?

A.   Correct.

Q.   Okay.  When you last testified at your deposition in January of 2023, you were using Facebook at least once a day; correct?

A.   I don't recall.  Is this -- is there -- like can I look back at the --

Q.   Sure.  Of course.

A.   -- the deposition transcripts, please.

Q.   It's in your second deposition transcript.

        MS. McCLOSKEY:  Let's play clip 207.  That's page 207, lines 11 through 13.

                (Video played but not reported.)

BY MS. McCLOSKEY:

Q.   Does that refresh your recollection that at the time of your deposition, you looked at Facebook at least once a day?

A.   Yes.

Q.   And at the time of your deposition, you'd never permanently deleted any Facebook account; correct?

A.   Correct.

Q.   You've also signed up for an Instagram account; is that right, Ms. Meigs?

A.   Yes.

Q.   And you've never personally deleted an Instagram account; correct?

A.   Correct.

Q.   You've never deactivated your Instagram account; correct?

A.   Permanently or --

Q.   Yes.  You've --

A.   Never permanently.

          MS. McCLOSKEY:  Okay.  Great.

     I have no further questions, Ms. Meigs.  Thank you.

          THE COURT:  Okay.  Any brief redirect?

                    REDIRECT EXAMINATION

BY MR. CANTY:

Q.   Ms. Meigs, you were asked questions about a number of different apps that you used to track your cycle.

     Who gets to control your personal health information?

A.   I do.

          MR. CANTY:  No further questions, Your Honor.

          THE COURT:  All right.  Step down.  Careful on the way down.

                    (Witness excused.)

          THE COURT:  Who do we have next?

          MR. CANTY:  The plaintiffs call Tesha Gamino.

          THE COURT:  All right.

     (Tesha Gamino steps forward to be sworn.)

                    (Pause in proceedings.)

          THE COURTROOM DEPUTY:  Stand and raise your right hand.

\\\

**TESHA GAMINO**,

called as a witness for the Plaintiffs, having been duly sworn, testified as follows:

THE WITNESS:  Yes, I do.

THE COURTROOM DEPUTY:  Please be seated.

Please state your full name for the court and spell your last name.

THE WITNESS:  Tesha Gamino.  Gamino, G-A-M-I-N-O.

THE COURTROOM DEPUTY:  Thank you.

MR. CANTY:  Your Honor, may I inquire?

THE COURT:  Yes.

**DIRECT EXAMINATION**

BY MR. CANTY:

Q.   Ms. Gamino, where do you live?

A.   Riverside, California.

Q.   And how long have you lived in California?

A.   My whole life.

Q.   Tell the jury why you're here today.

A.   I'm here because I used the Flo app and my privacy was violated.

Q.   What do you understand your role to be in this case?

A.   I am one of the lead plaintiffs for a class action lawsuit.

Q.   Are you also a lead plaintiff in a subclass for California users of the Flo Health app?

A.    Yes.

Q.    And what do you understand your role to be with respect to being a class representative?

A.    Just standing up for the other women that used the app.

Q.    And why did you decide to get involved in this case?

A.    Because I've used the app since 2016, and that was within a year of them launching it, so why not help.

Q.    You said you used the Flo Health app.  Can you tell the jury what you used the Flo Health app for?

A.    To track my period.

Q.    When did you start using the Flo Health app?

A.    2016.

Q.    And how old were you at the time?

A.    I was about 28.

Q.    And do you still use the Flo Health app?

A.    I do.

Q.    When you first signed up for the Flo Health app, do you recall answering a number of questions before you could use the app?

A.    Yes.

Q.    Do you recall yesterday seeing Exhibit 610 that lists a series of questions that you were asked about your menstrual cycle?

A.    Yes.

Q.    Did you answer those questions?

**A.**    Yes.

**Q.**    Can you describe to the jury what types of questions you were asked?

**A.**    I was asked my age and when my last menstrual cycle was, how long my period lasts, and how many days are in my cycle.

**Q.**    When you answered those questions, you considered your answers to be private information?

**A.**    Yes.

**Q.**    And did you consider the answers that you gave to the Flo Health app to be private health information?

**A.**    Yes.

**Q.**    What was your understanding of how that health information would be taken care of once you entered it into the Flo Health app?

**A.**    That it would be kept private between Flo and I.

**Q.**    Did there come a time where you found out that some of the information that you had entered was recorded and collected by Meta without your permission?

**A.**    Yes.

**Q.**    When was that?

**A.**    It was early -- it was either late 2020 or early 2021.

**Q.**    And was that the first time you found out that Flo had allowed your private health information to be collected by third parties?

**A.**    Yes.

Q.   What did -- how soon after you found out about that did you file your lawsuit?

A.   Shortly after.

Q.   And what was your understanding about the specific health information that Flo allowed third parties to record?

A.   That I was trying to track my period and the stages that my period was in.

Q.   And once you learned about Flo and Facebook's conduct, did you come in contact with attorneys to bring a lawsuit against them?

A.   Sorry.  Can you repeat the question?

Q.   Yes.  Once you found out, just tell the jury how you went from finding that information out to bringing the lawsuit.

A.   So I was sent an e-mail, and then my attorneys filed it shortly after that.

Q.   Did you ever give Facebook permission to record that you were using the Flo Health app to track your cycle?

A.   No, I did not.

Q.   And did you ever give Facebook permission to record where you were specifically within your menstrual cycle?

A.   No, I did not.

Q.   And did you ever give Facebook permission to use your period and ovulation information for their advertising purposes?

A.   No, I did not.

Q.   While using the app, did you ever see a pop-up or an alert letting you know that your private health information was going to be shared with Meta?

A.   No, I did not.

Q.   At any time before your involvement in this case, did the topic of Flo allowing third parties to collect and record your information, your health information, ever come up?

A.   No.

Q.   And prior to learning about it in 2021, did you know that that information was being improperly collected by Meta?

A.   No.

Q.   Are you a computer scientist?

A.   No, I'm not.

Q.   Do you know how to read computer code?

A.   No, I do not.

Q.   So the first time you knew about this information being collected was in 2021?

A.   Yes.

Q.   You testified earlier that you still use the Flo Health app.  Can you tell the jury why you still use the app?

A.   I feel like my information was already shared, so what would be the purpose of me downloading another app to have it happen worse later on.

Q.   And thinking about what had occurred between 2016 and 2019, can you tell the jury how you felt -- how you feel about

your private health information being released by Flo and collected by Facebook?

A.   It's pretty embarrassing, especially the fact that I enter stuff in the notes section and just the stuff about my reproductive and my sexual information being just out there just for everyone.

Q.   And do you consider that private health information?

A.   Yes.

     MR. CANTY:   Thank you, Your Honor.

     I have no further questions.

     THE COURT:   Okay.  Pass the witness?

                        CROSS-EXAMINATION

     THE COURT:   Go ahead.

BY MS. SHARTON:

Q.   Hello, Ms. Gamino.

A.   Hello.

     MS. SHARTON:   May we approach the witness with the binder?  And I think let's do the transcript too while we're at it, if you could.

                (Counsel approaches witness.)

BY MS. SHARTON:

Q.   Good morning.  Ms. Gamino, you started use the Flo app in December 2016; right?

A.   Yes.

Q.   So you've been using it for almost a decade at this point;

right?

A.   Yes.

Q.   And that's every single month, month in and month out?

A.   Correct.

Q.   Okay.  You downloaded the Flo app primarily to track ovulation and period dates; right?

A.   Yes.

Q.   Okay.  And you filed this lawsuit, as we've all heard, in February of 2021; right?

A.   Correct.

Q.   Okay.  So you continued -- you used the Flo app before the lawsuit, right, and continued to use it after the lawsuit?

A.   Yes.

Q.   All the way 'til today?

A.   Yes.

Q.   Okay.  Now -- and you never stopped for any period of time; right?

A.   No.

Q.   Every single month?

A.   Yes.  Correct.

Q.   And you never deleted the Flo app; right?

A.   No, I did not.

Q.   Okay.  In fact, you used it on a weekly basis; is that right?

A.   Yes.

Q.    Okay.  And three to five times a week; right?

A.    I mean, yes, I guess so.

Q.    Okay.  And you gave a deposition in this case as well.

Do you recall that?

A.    Yes, I do.

Q.    And we keep using that word, but just a fancy way to say we had an opportunity to ask you questions and you answered under oath.  Remember that?

A.    Yes, I remember it.

Q.    And your deposition was in December of 2022?

A.    Yes.

Q.    Okay.  Let's look at -- maybe this will help refresh your recollection, but the transcript that you have -- yeah, the big thick one that you got.  It's page 133.

A.    Okay.

Q.    Lines 22, and then it goes a little bit over on the next page.  But we can play the clip as well.

       MS. SHARTON:  It's TG133 A, please.

       THE WITNESS:  You said line 22?

       MS. SHARTON:  Yes, of page 133.

    And if we have the clip, that would be great.

       MR. CANTY:  Brenda, can you indicate which package --
they both start with Number 1, unless these are the same copy.
Okay.  I thought we had two versions.  Okay.

       MS. SHARTON:  We have a clip, just to make it easier.

MR. CANTY:  Thank you.

MS. SHARTON:  Okay.  We need --

(Video played but not reported.)

BY MS. SHARTON:

Q.   I'll continue old school, and you can read along with me, but the transcript -- you were asked:

"QUESTION:  How many times a week on average do you think you use the Flo app?"

And you answered:

"ANSWER:  I would say three to five times a week."

Do you see that?

A.   Yes, I see that.

Q.   Okay.  Did I read that correctly?

A.   Yes, you did.

Q.   All right.

Now, since December 2016, generally you said you tracked period or ovulation; correct?

A.   Yes.

Q.   Okay.  And your use didn't change after you learned about the allegations in this case; right?

A.   No.

Q.   All right.

You've recommended the Flo app to others; right?

A.   I don't remember.

MS. SHARTON:  Okay.  If we could play --

And this is page, for you, page 307, lines 23 to 25.

And if we could play clip TG307B, please.

(Video played but not reported.)

**BY MS. SHARTON:**

Q.   Okay.  That was your testimony in 2022; right?

A.   Yes, this was correct, but this was, obviously, I recommended it before I knew about these allegations.

Q.   Okay.  And you've recommended the Flo app to family; right?

A.   Yes.  That's what I just said, yes.

Q.   Okay.  Friends?

A.   Yes.

Q.   Okay.  And you never paid any money to Flo to use their services; right?

A.   No, I did not.

Q.   Okay.  And by the way, you never told any friends to stop using the Flo app, right, after you filed the lawsuit?

A.   I mean, I -- I don't follow up with friends to see if they've downloaded it or not, so...

Q.   But just to answer my question, you never told any of your friends to stop using the Flo app after you filed suit; right?

A.   No, I did not.

Q.   You never paid any money to Flo to use the app; right?

A.   No, I didn't.

Q.   You never got a premium subscription; right?

**A.**   No, I didn't.

**Q.**   Just the free version of the app?

**A.**   Yes; correct.

**Q.**   And you found it very useful; right?

**A.**   I did.

**Q.**   Yeah.

You have to consent to the terms of the Flo app before you -- well, strike that.

You have to consent to the terms of an app before you start using it; right?

**A.**   Yes.

**Q.**   And that was true of the Flo app too; correct?

**A.**   Yes.

**Q.**   Now, you browsed over the Flo privacy policy, but you didn't read it before you started using the app; right?

**A.**   I don't remember browsing over it or not.

**Q.**   Okay.

        **MS. SHARTON:**  Let's play clip TG120.

And it's page 120, Ms. Gamino, line 15.

                (Video played but not reported.)

**BY MS. SHARTON:**

**Q.**   Okay.  You agreed to its terms; right?

**A.**   Yes.  That's what I said.

**Q.**   And you had every opportunity to review the privacy policy if you had chosen to; right?

A.    Yes.

Q.    Okay.  Nothing was stopping you from reviewing it; right?

A.    No.

Q.    Okay.  Ms. Gamino, let's take a look at Flo's privacy policy effective May 15th, 2018.

A.    Is it in the binder?

Q.    Yes.

        MS. SHARTON:  And this has already been admitted, Your Honor.

        THE COURT:  Okay.

        MS. SHARTON:  It's Exhibit 29.

BY MS. SHARTON:

Q.    Okay.  You were -- you used the app for a long period of time; right?

A.    Yes.

Q.    Yeah.  And over time, privacy policies change.  We understand that; right?

A.    Yes.

Q.    Okay.  And you had an opportunity at any time to read the privacy policy for Flo; right?

A.    Yes.

Q.    It's always available on the app; right?

A.    Yes.

Q.    And it's always available on Flo's website; right?

A.    I've never been on the website, so --

Q.    Okay.

A.    -- I couldn't tell you.

Q.    And you were using the app in May of 2018?

        MS. SHARTON:  I think we can take that exhibit down, please.

BY MS. SHARTON:

Q.    And, Ms. Gamino, you were using the app -- well, let's go back.  I'm sorry.  Exhibit 29.  My fault.

    Let's just take a look.  It had a date of May 25th, 2018, and if you go down and read the last paragraph -- okay?

A.    Mm-hmm.

Q.    (as read):

        "If you continue to use the app after any

    effective date" -- well, it will indicate your

    acceptance of the privacy policy as modified.

    And if you look at the second paragraph, it says (as read):

        "We reserve the right to change the privacy

    policy from time to time."

    Right?  Privacy policy?

A.    Yes.

Q.    Okay.  And, Ms. Gamino --

        MS. SHARTON:  You can take that down now, please, the exhibit.  Thanks.

\\\

BY MS. SHARTON:

Q.   We're going to turn to another part of it.

A.   Okay.

Q.   And, Ms. Gamino, you were using the app May 2018, so let's turn to the fourth page.

     Do you see the heading entitled "4.  Sharing and your personal data and information"?

A.   Yes.

Q.   Okay.  And you can see on the page, that's big and bold, right, that title?

A.   Yes.

Q.   Okay.  And the heading font size is larger than that of the surrounding text; right?

A.   Yes.

Q.   Okay.  It's something even I can see, which is amazing with my -- without my reading glasses.

     But it says "Sharing your personal data and information."

     And do you see the sentence after the Subsection 1?  It says "Personal data we share with third parties."

     Do you see that?

A.   Yes.

Q.   And you see the sentence after the first paragraph that says (as read):

          "Among others, we may share your personal data

     with the following third-party services."

Do you see that?

A.   Yes.

Q.   Okay.  And Number 3, if you scroll to the next page, it calls out in particular Facebook; right?

A.   Yes.

Q.   Facebook and Google?  Do you see that?

A.   Yes, I can see that.

Q.   Okay.  So that's -- it's disclosed right here in the privacy policy that was on the app in 2018, that the data, among others, may be shared with Facebook and Google Analytics -- Analytics; right?

A.   It says only nonpersonal identifiable information, but yes.

Q.   And it calls out, if we look at the third line down -- go back, please.

If it -- it calls out device identifiers; right?

A.   Yes.

Q.   And that's in -- right before that, it says (as read):

"Though some Personal Data" -- and it's P -- capital P, capital D -- "like device identifiers may be transferred to Facebook and Google."

Do you see that?

A.   Yes, I see that.

Q.   Okay.  So that's the personal data it calls out, device identifiers; right?

**A.**    Yes, that's what it says.

**Q.**    Okay.  Now, Ms. Gamino, you have somewhere between 50 and 75 apps on your phone; right?

**A.**    Sure, yes.

**Q.**    You did as of 2022, I should say.

**A.**    Okay, yeah.

**Q.**    You agree with me?

**A.**    Yeah.

**Q.**    Okay.  You may have more now?

**A.**    Maybe have less.  I don't even know.

**Q.**    Okay.  You have apps that are health focused on your phone; correct?

**A.**    As of today?  I'm not really sure.

**Q.**    Okay.  You used the pregnancy app Glow; right?

**A.**    Well, I did when I was pregnant.

**Q.**    Okay.  But you've used that in the past; right?

**A.**    Yes.

**Q.**    Okay.  And you used the Glow app, G-L-O-W, for the nine months that you were pregnant for each of your first two pregnancies; right?

**A.**    I don't remember if I used if for both, but I believe I used it for one.

**Q.**    Okay.

Let's take a look at your transcript, page 231, line 13 through 26.

MS. SHARTON:  And we can play clip 231, please.

(Video played but not reported.)

BY MS. SHARTON:

Q.   Okay.  That was your testimony in 2022?

A.   Yes.

Q.   Okay.

A.   That's --

Q.   And you would read articles on the Glow app; right?

A.   Yes.

Q.   Okay.  You shared your due date and your e-mail with the Glow app; right?

A.   I did.

Q.   Okay.  And you don't know or -- whether Glow shared your data with any third parties; right?

A.   No, I don't.

Q.   And you don't remember if you reviewed Glow's terms of service when you signed up for the Glow app; right?

A.   I don't remember.

Q.   And you don't remember if you even reviewed Glow's privacy policy when you signed up for the Glow app; right?

A.   I don't remember.

Q.   Okay.  Another of -- you have the app called Pacer; is that right?

A.   Yes.

Q.   Okay.  And the Pacer app tracks the distance of how long

you ran or walked; right?

A.   Yes.

Q.   And your weight that goes with that; right?

A.   Yes.

Q.   Okay.  You don't know whether Pacer shares your information with third parties; right?

A.   No, I do not.

Q.   Okay.  You don't remember whether you reviewed Pacer's terms of service when you signed up for that app; right?

A.   No, I don't remember.

Q.   And you don't remember whether you reviewed Pacer's privacy policy when you signed up; right?

A.   I wasn't concerned about someone seeing how long I ran, so no.

Q.   You used What to Expect in 2015 for one of your pregnancies; right?

A.   I believe so, yes.

Q.   Okay.  And that's an app as well; right?

A.   Yes.

Q.   Okay.  Now, Ms. Gamino, just switching gears slightly.
     You started or tried to start a clothing company called Mom Club; is that right?

A.   Yes.

Q.   Okay.  And you were running that business through your personal Facebook page; right?

A.   That's why I started a Facebook.  Yes.

Q.   Yeah.  So you've advertised on Facebook; right?

A.   Yes.

Q.   And you've paid Facebook to place advertisements for Mom Club; right?

A.   I believe I did so once.

Q.   And Mom Club has a website; right?

A.   It did.  I no longer have the business.

Q.   Right.  But it did when you were running it?

A.   Yes, it did.

Q.   Okay.  And you remember receiving location information about anyone who visited that website; right?

A.   I don't remember.

Q.   Okay.  Now, Ms. Gamino, you have not paid any fees to date in connection with this lawsuit; right?

A.   No, I have not.

Q.   Okay.  And you found out about joining this matter because you received an e-mail from a law firm; right?

A.   Yes.

Q.   Okay.  The e-mail came from the law firm to you; right?

A.   Yes.

Q.   Okay.  You don't know how they had your e-mail address; right?

A.   No, I do not.

Q.   Okay.  And you responded to that e-mail because it said

your privacy rights were violated; right?

A.    Correct.

Q.    Okay.  You didn't know what privacy rights it was talking about; right?

A.    No.

Q.    And you responded to the e-mail?

A.    Yes, I did.

Q.    Okay.  This isn't the first time that you've responded to an e-mail about a class action; right?

A.    No.

Q.    You subscribe to an e-mail list called Top Class Actions; is that right?

A.    Yes.

Q.    Okay.  And you read the e-mails that you get -- receive from Top Class Actions every now and then; right?

A.    I'd say possibly, yes.

Q.    Okay.  Let's take a look at your transcript.  It's page 105, lines 11 through 14.

          MS. SHARTON:  And clip 105A, please.

                (Video played but not reported.)

BY MS. SHARTON:

Q.    Okay.  That was your testimony in 2022?

A.    Yes.

Q.    Okay.  And you looked to see if Top Class Actions mention a product you've used or a company that you've dealt with;

right?

A.    Yes.

Q.    And if you see that e-mail, you'll open it and read it?

A.    Yes.

Q.    And then fill out a form for whatever they ask for?

A.    Yes, if it's something I used.

Q.    Okay.  And you always fill out the form or whatever it is for the product that you've used of a company that you've interacted with; right?

A.    Yes.

Q.    Okay.  And you testified at your deposition in 2022, you'd filled out between 3 and 30 of these forms relating to class actions in just the past year; right?

A.    Yes, I believe so.  I don't remember.

Q.    So you responded back to about 30 e-mails from this Top Class Actions solicitation that you got?

A.    I -- if that's what I said in my deposition, then -- I did.

        MS. SHARTON:  So let's play the clip.  It's page 108, lines 4 through 12, and the clip is 108, please.

            (Video played but not reported.)

BY MS. SHARTON:

Q.    Okay.  So you've attempted to become a plaintiff -- a named plaintiff in a class action or at least started the process to do that between 3 and 30 times?

**A.**   3 and 30 times could be 4 times --

**Q.**   Okay.

**A.**   -- so, I mean -- yes.

**Q.**   Okay.  And this one landed?

**A.**   So technically, for a lead plaintiff, no.  I was filling out forms for a class action lawsuit.

**Q.**   Now, you didn't undertake any independent investigation of the facts here before filing the complaint; right?

**A.**   No, I did not.

**Q.**   Okay.  You believe that Flo sold your data; correct?

**A.**   Yes.

**Q.**   Okay.  And it's your understanding and I heard you testify on direct that you were upset that the notes that you put into the Flo app got shared with Facebook?

Do you remember saying that?

**A.**   Yes, I remember saying that.

**Q.**   Is that your understanding, Ms. Gamino?

**A.**   It's my understanding that everything I put into the app was shared.

**Q.**   Yeah.  And you believe that Flo sold your data; correct?

**A.**   Possibly.  I don't know.

**Q.**   Let's look at the transcript, page 311, line 8 and 9.

            **MS. SHARTON:**  And play clip 311A, please.

                  (Video played but not reported.)

\\\

**BY MS. SHARTON:**

**Q.**   And then you believed --

Was that your testimony?  I can read it --

**A.**   Sorry.  I didn't --

**Q.**   I think it got cut off, so let rephrase it for the court reporter.

So, Ms. Gamino, you were asked at your deposition whether Flo sold your data, and you responded "correct"?

**MR. CANTY:**  Objection, Your Honor.  If we're going to cite the transcript, could we have line and question?

**MS. SHARTON:**  Yeah.  It's line --

**THE COURT:**  Hold on.  What page are we on?

**MS. SHARTON:**  Line 311.

**THE COURT:**  What page?

**MS. SHARTON:**  Page -- I'm sorry.  Page 311.

**THE COURT:**  311.  Okay.

**MS. SHARTON:**  Line 8 and 9.

**THE COURT:**  Line 9?

**MS. SHARTON:**  Line 8 and 9, and then it goes on to --

**THE COURT:**  Just read the question and answer as it's written.

**MS. SHARTON:**  The question was, one, that Flo sold your date -- sold data, your data; correct?  And she responded "correct."

**THE COURT:**  All right.  Go ahead.

BY MS. SHARTON:

Q.   And then -- that was your testimony under oath; correct?

A.   Yes.

Q.   Okay.

A.   That's what I said.

Q.   And then you believe that Flo received money for your data; correct?

A.   Yes.  At the time, that's what I believed.

Q.   Okay.  And you believed that -- so originally -- let me just stick with that for a moment.

     Your understanding was completely from your lawyers; right?  You said that.

A.   I wouldn't say that it was from my lawyers.

Q.   Not of that issue.  You just testified a minute ago that your understanding of the allegations here was completely from your lawyers.

A.   Yes.

Q.   Okay?

A.   That is correct.

Q.   And you also testified in 2022 that you understood or you thought that Flo sold your data and received money for it; right?

A.   That is what I thought, but I'm not saying that that's what came from my lawyers.

Q.   Okay.  That isn't the case; right?

A.   What isn't the case?

Q.   That's -- well, strike that.

You believe that Flo shared all of the data that you put into the app; right?

A.   Yes.

Q.   Okay.  And you still believe that today?

A.   I mean, we won't ever know because they deleted the -- the files, so...

Q.   That's your understanding?

A.   That is my understanding.

Q.   Okay.  You believed that the data -- that the data was shared was associated with your name; right?

A.   Correct.

Q.   Okay.  And if you also -- well, strike that.

If those things were not true, turned out to be not true, you wouldn't be suing Flo; right?

A.   I mean, I don't think we would all be here today if it wasn't.

Q.   Okay.  You were asked that at your deposition, and you testified under oath if those things were not true, you would -- you would not be suing Flo Health; right?

And you responded.  "There wouldn't be a reason to sue if it wasn't true"?

        MR. CANTY:  Objection Your Honor.  Could we have the line and page number, please.

MS. SHARTON:  Sure.  It's page 313, line 3 through 7.

And I believe we have a clip if we can play it.  It's 313.

(Video played but not reported.)

MS. SHARTON:  Okay.  Thanks, Ms. Gamino.

Nothing further from Flo.

THE COURT:  Okay.  Next?

**CROSS-EXAMINATION**

BY MS. McCLOSKEY:

Q.   Good morning, Ms. Gamino.  I guess it's almost good afternoon.

A.   Good afternoon.

Q.   My name is Elizabeth McCloskey.  I'm an attorney for Facebook.  I'm going to just ask you a couple of questions this morning.

A.   Okay.

Q.   You and I have never met before; correct?

A.   We have not.

Q.   Okay.  You have a Facebook account; correct?

A.   Correct.

Q.   And you've had that account since about June of 2018?

A.   I don't remember when I first downloaded it.

Q.   Does 2018 sound correct to you?

A.   Possibly.

Q.   Okay.  What year were you born?

A.   1986.

Q.   And what is your birth date?

A.   September 25th, 1986.

Q.   When you signed up for Facebook, did you give Facebook your date of birth?

A.   I believe I did.

Q.   You also have a number of Instagram accounts; correct?

A.   I do.

Q.   I believe four.  Does that sound right?

A.   As of right now, I'm not sure, but I know I have three.

Q.   And at least one of your Instagram accounts is public; correct?

A.   Correct.

Q.   You maintain Instagram accounts today, to the present day?

A.   Yes.

Q.   At some point you posted on your Instagram a picture of your sonogram showing that you were pregnant; correct?

A.   I believe so, yes.

Q.   That post you made on March 30th of 2018; is that correct?

A.   Yes.

Q.   Okay.  And you were 13 weeks pregnant at the time you posted that picture; does that sound accurate?

A.   Possibly.  I don't -- I don't remember.  It was --

Q.   Sure.  Let me show you Exhibit 19 on your screen.

        MS. McCLOSKEY:  And I'll just be showing it to the witness, not admitting it.

BY MS. McCLOSKEY:

Q.   Has it come up for you, Ms. Gamino?

A.   Not yet.

Q.   One moment.  Let me know when you can see it.

        MR. CANTY:  It's not in the binder.

        MR. CLUBOK:  It's in the binder.

        MR. CANTY:  It's not in my binder.

        MS. McCLOSKEY:  It's not in the binder.  I'm just asking for a date --

        THE COURT:  Okay.  Just one person you talk to in the courtroom, and that's me.

        MS. McCLOSKEY:  Sure.

        THE COURT:  What is the problem, Counsel?

        MR. CANTY:  Your Honor, it's not been published, and I have don't a copy of the exhibit that's being shown to the witness.

        THE COURT:  What are we looking at?

        MS. McCLOSKEY:  I'll just keep going, Your Honor.

        THE COURT:  That's a good idea.  Okay.

BY MS. McCLOSKEY:

Q.   Does it sound about right that you were 13 weeks pregnant when you posted your sonogram on March 30th of 2018?

A.   I don't remember.

Q.   Okay.  And at the time you posted your sonogram, you were announcing publicly that you were pregnant with a baby;

correct?

A.   I -- I don't remember if I -- if I can't see anything, I don't remember.  That was so long ago.

Q.   Well, you posted a picture of your sonogram; correct?  You testified to that --

A.   Yeah, but I don't remember how many weeks is what I'm saying.

Q.   Right.  I've moved on from that.  So at the time you posted the picture of your sonogram, you were announcing -- making a public announcement, as many people do --

A.   Well, of course, if I posted a sonogram.

Q.   Now, at the time you posted that picture, did you have any evidence -- let me rephrase that question.

     Do you have any evidence that before you posted a public picture of your sonogram, Flo had told Facebook that you were pregnant with a baby?

A.   Can you repeat the question?

Q.   No problem.

     At the time you posted your sonogram picture on March 30th of 2018, do you now have any evidence that Flo had told Facebook that you were pregnant with a baby before that date?

A.   I don't have evidence, no.

Q.   Now, you downloaded Flo to track period information and ovulation information; correct?

A.   Correct.

Q.   And as we just established, you've been pregnant before; right?

A.   Correct.

Q.   You don't remember if you used the Flo app to track any information related to any of your pregnancies; correct?

A.   Oh, no, I do.

Q.   Okay.

MS. McCLOSKEY:  Let's play TG -- clip TG135B.  That's pages 135, 17 to 21, of Ms. Gamino's deposition.

(Video played but not reported.)

BY MS. McCLOSKEY:

Q.   Ms. Gamino, you also don't remember if you used the "get pregnant" mode in the Flo app; correct?

A.   So I have been pregnant since then, since my deposition, so yes.

THE COURT:  Lets go ahead and play clip TG153A. That's page 153, line 6 to 7 of Ms. Gamino's deposition.

(Video played but not reported.)

BY MS. McCLOSKEY:

Q.   Now, Ms. Gamino, I think you testified a moment ago that you didn't undertake any independent investigation of the facts relating to this case before you filed this lawsuit; correct?

A.   Correct.

Q.   Your understanding of what Flo Health did is solely based on what your attorneys and their paid experts have told you;

correct?

A.    Yes.  I trust them.

Q.    You yourself have no evidence whether any sensitive information was, in fact, shared by Flo with any third parties; correct?

A.    I mean, I don't have a specialty to do so, so no, I don't.

Q.    Okay.

        MS. McCLOSKEY:  Thank you.  No further questions.

        THE COURT:  Okay.  Any redirect?

        MR. CANTY:  Yes, Your Honor.

    Can you pull up Exhibit 29, please.

<u>REDIRECT EXAMINATION</u>

BY MR. CANTY:

Q.    Ms. Gamino, do you remember being asked questions about the privacy policy that was in effect while you were using the Flo Health app on cross-examination?

A.    Oh, yes.  Sorry.

Q.    I'd like to direct you to the middle of the page on Subsection III, Roman numeral III.  Can you read that to the jury, please.

        MR. CANTY:  If you can scroll up, please.

        THE WITNESS:  It says (as read):

        "We will not transmit any of your personal data
    to third parties except if it is required to provide
    the service to you, e.g., technical services

providers, unless we have asked for your explicit

consent"

**BY MR. CANTY:**

**Q.**   What did you understand that to mean?

**A.**   That they would have to ask for my explicit consent before

sharing anything.

**Q.**   And if we can go to Bates Number 163.  It's two-pages

later under Number 4.  Yes.  "Sharing your data and

information."

You were asked questions about this section.

Was there an exclusion with respect to what -- what

personal data would be shared with third parties?

If you could just go ahead and read from Number 1.

**A.**   (as read):

"Personal data we share with third parties.  We

may share -- we may share certain personal data,

excluding information regarding your marked cycles,

pregnancy symptoms, notes, and other information that

is entered by you and that you do not elect to share

with third-party vendors who supply software

applications, web hosting, and other technologies for

the app."

Do you want me to continue?

**Q.**   Read the next sentence, please.

**A.**   (as read):

"Third parties will not have access to our survey results and will not reveal information about which articles you view."

Q.  Did you understand this promise to mean that Flo Health would not share any of the information that you entered in the onboarding survey with third parties?

A.  Yes.

Q.  You were just asked a question about a sonogram picture that you put up when you were pregnant.

Do you recall that?

A.  Yes, I recall that question.

Q.  Who gets to decide who shares your health information?

A.  I do.

Q.  And do you -- did you consider it a waiver of all of your health privacy simply because you told some friends that you were pregnant?

A.  No, I did not.

MR. CANTY:  No further questions, Your Honor.

THE COURT:  Okay.  You may step down.  Be careful on the way down.

THE WITNESS:  Thank you.

(Witness excused.)

THE COURT:  Who do we have next?

MS. VILLEGAS:  Your Honor, the plaintiffs call Erica Frasco.

(Erica Frasco steps forward to be sworn.)

THE COURT:  All right.

ERICA FRASCO,

called as a witness for the Plaintiffs, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Counsel, you want to come get your binders?  Are these for her?

MS. VILLEGAS:  Yes.

THE COURTROOM DEPUTY:  Those are hers.  Okay.

THE COURT:  Go ahead.

MS. VILLEGAS:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. VILLEGAS:

Q.   Good afternoon, Erica.

A.   Good afternoon.

Q.   Erica, did you use the Flo Health app between January 2016 and February 2019?

A.   Yes.

Q.   Do you remember when you started using it?

A.   Yes.  I believe it was September of 2017.

Q.   When you signed up for the Flo app, did you create an account?

A.   Yes.

Q.   And was that account password protected?

A.   Yes.

Q.   Did you share that password with anyone else?

A.   Absolutely not.

Q.   Why did you start using the Flo Health app?

A.   I do want to lead off that I am uncomfortable saying this, but I will.

I was recently just dealing with some hormone issues coming off birth control.  Obviously, it's something sensitive to talk about.  And I wanted to to be able to accurately track my period and to make sure just things were on track and running smoothly.  And I just wanted to avoid pregnancy.

Q.   Erica, what is your understanding about what this case is about?

A.   That my private health information was recorded in regards to my ovulation and period.

Q.   When you first signed up for the app, did you answer questions about your menstrual cycle in a health onboarding survey?

A.   Yes.

Q.   And I'd like to show you what's been marked as Exhibits 610 S through 610 AK for identification.

A.   Okay.  Screen or --

Q.   Yup.  Just give it a minute to pop up.

THE WITNESS:  Is this water?

THE COURT:  Yes.

Have these been admitted?

THE COURTROOM DEPUTY:  Okay.  It should be there.

THE COURT:  Have these been admitted?

THE COURTROOM DEPUTY:  No.

THE COURT:  All right.

Is there any objection?

MS. POZOS:  No objection, Your Honor.

THE COURT:  Okay.  They're all -- I'm sorry.  What was that again?

MS. VILLEGAS:  610 S through 610 AK.

THE COURT:  Okay.  610 S through 610 AK are admitted.

Go ahead.

(Trial Exhibits 610 S through 610 AK received in evidence.)

BY MS. VILLEGAS:

Q.   Erica, can you please just take a look at the screens. Just flip through them, please.

A.   Yes.

(Pause in proceedings.)

BY MS. VILLEGAS:

Q.   Just let me know when you're done.

A.   I think I saw the last one.

Q.   Do these screens accurately reflect the way the Flo Health app looked when you first started using it?

A.   Yes.

Q.   And did you answer the questions in the health onboarding survey?

A.   Yes.

Q.   Did you give Flo information about your period?

A.   Yes.

Q.   Did you tell Flo that you wanted to track your cycle?

A.   Yes.

Q.   Did you provide Flo with information about your symptoms?

A.   Yes.

Q.   Do you recall anything specific about what you entered?

A.   Within the onboarding specifically, it did not ask about symptoms, but within the app, yes, I did enter symptoms.

Q.   Could you please tell the jury -- I know it's a little uncomfortable -- if you remember any specific symptoms that you entered?

A.   Yes.  Again, I'm not too comfortable sharing this.

     But in regard to discharge, whether or not I had sex drive or not, whether or not I was feeling moody, cramps, bloating.

Q.   And did Flo give you predictions about when you were ovulating?

A.   Yes.

Q.   Did Flo give you predictions about where you were in your menstrual cycle?

A.   Yes.

Q.   Did you expect that your answers that you gave to the

Flo Health app would be kept private?

A.    Yes.

Q.    Did you believe that your answers that you gave to the Flo Health app were medical information?

A.    Yes.

Q.    When did you first learn that Facebook was recording your answers to the Flo Health app's questions?

A.    I believe it was early of 2021.

Q.    Before 2021, did the Flo data-sharing practice ever come up for you in conversation or in any news source?

A.    No.

Q.    When you first learned that Facebook was recording your data in 2021, how long after that did you file the lawsuit?

A.    It was pretty quickly.  All happened pretty fast.

Q.    And you considered your answers to the questions in the Flo onboarding survey to be private; right?

A.    Yes.

Q.    Why is that?

A.    Because it's only information that I'm sharing with my doctor.

Q.    And you considered the answers to the questions in the Flo onboarding survey to be health information; right?

A.    Yes.

Q.    And why is that?

A.    Because a woman's reproductive -- excuse me.

A woman's reproductive system is something that's extremely private information.  I mean, we all go through different things, and it -- it can be an easy thing, it can be a hard thing.  So it's just private health information.  That's not something I ever want to -- to share, to be public.

Q.   Did you ever give Flo Health app permission to share your information with Meta?

A.   Definitely not.

Q.   Did you give Meta permission to record the information you inputted into the Flo Health app?

A.   Definitely not.

Q.   What is your understanding about what Flo Health promised they would do with your information?

A.   I'm sorry.  Can you repeat that?

Q.   What was your understanding about what Flo Health would do with your information?

A.   That they -- that it wouldn't go anywhere.  That they wouldn't do anything with that information.  They would just help me track my ovulation and menstrual cycle.

Q.   Did you ever give Facebook permission to record that you were using the Flo Health app to track your cycle?

A.   No.

Q.   Did you ever give Facebook permission to record where you were in your menstrual cycle?

MS. McCLOSKEY:  Objection, Your Honor.

THE COURT:  Overruled.

Go ahead.  You can answer.

THE WITNESS:  Can you repeat the question?  I'm sorry.

BY MS. VILLEGAS:

Q.   Sure.

Did you ever give Facebook permission to record where you were within your menstrual cycle?

A.   No.

Q.   Did you ever give Facebook permission to record your period or ovulation information?

A.   No.

Q.   How did you feel when you found out that Meta had recorded this data?

A.   Disappointed.  Violated.  And honestly, it's quite frustrating, because there's a lot of other things in this world that we all have to worry about, and this shouldn't have to be one of them.

Q.   How did you come to be involved in this case?

A.   I was chatting with a friend, and she had asked if I was using the Flo app.

Q.   Why did you decide to become involved in this case as a plaintiff?

A.   Because I -- do not like that my privacy was violated, and the fact that I can sit here and represent over 30 million women is something that I feel strongly about.

MS. VILLEGAS:  Thank you, Erica.

THE COURT:  Okay.  Pass the witness?

### CROSS-EXAMINATION

MS. POZOS:  Your Honor, I'm just going to pass up a transcript of the deposition.

THE COURT:  Yes.

MS. POZOS:  May I approach, Your Honor?

THE WITNESS:  I was okay to take this?  Right?

THE COURT:  You need to take those other binders down from the other witness.  Just give them to the lawyer.

Okay.

MS. POZOS:  May I begin, Your Honor?

THE COURT:  Yes.

MS. POZOS:  Thank you.

BY MS. POZOS:

Q.   Hi, Ms. Frasco.  I'm Clare Pozos, and I represent Flo.

A.   Hi.

Q.   Now, you testified that you learned about this -- you were chatting with a friend who asked if you were using the Flo app; right?

A.   Yes.

Q.   And that friend was plaintiff's counsel Amanda Fiorilla; right?

A.   Yes.

Q.   And she's been sitting in the courtroom today; right?

**A.**   Yes.

**Q.**   And she was sitting in the courtroom yesterday; right?

**A.**   Yes.

**Q.**   Okay.  And you and Ms. Fiorilla are good friends; right?

**A.**   Yes.

**Q.**   Okay.  And you became friends because her husband and your fiance were friends; is that right?

**A.**   Yes.

**Q.**   Okay.  And you've been friends for many years; right?

**A.**   With whom?

**Q.**   With Ms. Fiorilla.

**A.**   Yes.

**Q.**   Okay.  And you attended her wedding?

**A.**   I did.

**Q.**   And you've gone out on girls' nights, and hung out with your partners as well; correct?

**A.**   I have, yes.

**Q.**   Okay.  Now, Ms. Frasco, Ms. Fiorilla asked if you wanted to be a part of the litigation, and you said yes in the same conversation in which she asked if you used the Flo app; right?

**A.**   I don't remember how the exact conversation went, but, yes, I believe so.

**Q.**   Okay.  So to refresh your recollection, if -- in your transcript that I just handed you, if you could turn to page 21, lines 14 through 18.

MS. POZOS:  And if we could please play clip EF21.

THE WITNESS:  I'm sorry.  Can you repeat what lines?

MS. POZOS:  Yes.  It is page 21, lines 14 to 18.

(Video played but not reported.)

BY MS. POZOS:

Q.   That was your testimony; correct?

A.   Yes.

Q.   And that was under oath; right?

A.   Yes.

Q.   Okay.

And that conversation you had with Ms. Fiorilla was less than five minutes; is that right?

A.   Again, I don't remember the specifics, but I believe so. Could be possible.

Q.   Okay.  So I direct your attention again to page 21, lines 14 to 18.

A.   I'm sorry.  I think I'm on the wrong pages.  Am I looking at what's in the parentheses as the page or am I looking at the number outside the parentheses?

Q.   So you're looking at page 21.  It would be the line --

THE COURT:  There's four little pages on each page. Look at the little page number.

MS. POZOS:  The little page numbers, yeah, in the --

THE COURT:  That was the question.  Okay.  Go ahead.

THE WITNESS:  Got it.  So page 21?

BY MS. POZOS:

Q.   Page 21.  You got it.

And so page 21, lines 14 to 18.  And if you can see on the transcript, I don't even think we have to play the clip.

The question, as you can read before you, is (as read):

"So in less than five minutes, she had asked you if you used Flo, wanted to be a part of the litigation.  You had indicated that you did want to be a part of the litigation; is that correct?"

And your answer was "Yes"?

A.   Yes.

Q.   Okay.  And in that same conversation, you agreed to be a named plaintiff in this litigation; right?

A.   Yes.

Q.   Okay.  And Ms. Fiorilla is actually your lawyer on the record of this litigation; correct?

A.   Yes.

Q.   Okay.  Ms. Fiorilla and her law firm; correct?

A.   Correct.

Q.   And before talking to Ms. Fiorilla, you didn't feel injured by using the Flo app; isn't that correct?

A.   Correct.

Q.   But now you're suing Flo because you believe Flo's been sharing your private health information to third parties; right?

**A.** Yes.

**Q.** Okay. Your basis for this belief is on the information presented to you in the lawsuit by your attorneys; right?

**A.** Can you repeat that question?

**Q.** Sure.

Your basis for this belief is on the information presented to you in the lawsuit by your attorneys; correct?

**A.** What do you mean by my "basis on this belief"?

**Q.** Sure.

**A.** I'm sorry.

**Q.** That's okay.

So I just asked you that you're suing because you believe that Flo has been sharing your private health information with third parties, and you said yes.

Do you remember that?

**A.** Yes.

**Q.** And you have that understanding and started this lawsuit because of information shared with you by your attorneys; correct?

**A.** Yes.

**Q.** Okay. And you didn't do any independent investigation to verify that information; right?

**A.** No. I trust my lawyers and, obviously, my friend.

**Q.** Fine.

So your lawsuit on behalf of the entire affected class is

based only on what your attorneys communicated to you; is that correct?

A.    Yes.

Q.    Okay.  Now, you used the Flo app consistently for five years; right?

A.    Yes.

Q.    You began logging your periods in the Flo app in September 2017; correct?

A.    Yes.

Q.    And you began using the Flo app, you testified, to prevent pregnancy; right?

A.    Yes, and accurately track my period.

Q.    Okay.  And you found the Flo app useful in preventing pregnancy; right?

A.    I did.

Q.    And you continued to use the Flo app through January 2023; correct?

A.    Yes.

Q.    And you filed this lawsuit with the other plaintiffs in this action in September 2021; correct?

A.    If that was the date, yes.

Q.    Okay.  So just to refresh your recollection, if we can turn to -- if you could turn to the transcript, page 99.  And again, you're right.  That's 99 in the parentheses.  And it's lines 3 through 6.

MS. POZOS:  And if we could please play clip EF99.

(Video played but not reported.)

BY MS. POZOS:

Q.   And you continued to use the Flo app even after you sued Flo; correct?

A.   Yes.

Q.   And, in fact, the risks you thought might have been associated with using the app were not enough to stop you from continuing to use the app?

A.   Well, I was made aware that my information was no longer being recorded.

Q.   So the answer is "no"; correct?

A.   Can you repeat your question?

Q.   Of course.

     The risks that you thought might have been associated with using the app were not enough to stop you from continuing to use the app?

A.   Correct, because I continued to use the app.

Q.   And even after you sued, you never told any of your friends to stop using the app; correct?

A.   No.

Q.   No, you didn't tell them that; is that correct?

A.   Correct.

Q.   And you never told any family members to not use the Flo app; correct?

A.    Correct.

Q.    You never made a post on any social media account telling your followers not to use Flo, did you?

A.    No.

Q.    Okay.  And, Ms. Frasco, you did not sign up for a paid subscription or pay money to Flo to use the Flo app; correct?

A.    Correct.

Q.    Okay.  And, of course, you haven't lost any money as a result of using Flo; right?

A.    Lost no money.

Q.    And your reputation has not been harmed as a result of using Flo; correct?

A.    My reputation, no, but --

Q.    Okay.  And in fact, you cannot identify any harm that you have suffered because of Flo's alleged data sharing; correct?

A.    Can you repeat that?

Q.    Sure.

      You cannot identify any harm that you have suffered because of Flo's alleged data sharing; correct?

A.    Well, personal harm, yes.

Q.    Okay.  So I'll direct your attention to page 73, lines -- of your deposition transcript, lines 21 to 24.

          MS. POZOS:  And I'd ask to play EF73.

               (Video played but not reported.)

\\\

BY MS. POZOS:

Q.   And that was your testimony under oath at your deposition in January of 2023; correct?

A.   Correct.

Q.   Now, you told Flo that you agreed to its privacy policy; correct?

A.   When I created an account?

Q.   Yes.

A.   It is something you have to accept to move on into the survey questions.

Q.   And you did accept it; correct?

A.   Yes.

Q.   And you also told Flo that you agreed to its terms of service; correct?

A.   Correct.

Q.   Okay.  And now, let's go to Trial Exhibit 147, which I believe is already admitted into evidence.

     Do you see at the top of that page -- this is Flo's privacy policy dated August 28, 2017.

     Do you see that date?

A.   Yes.

Q.   Okay.

     And that date is before you downloaded the app; correct?

A.   Correct.

Q.   When you first clicked on the privacy policy, when you

first opened the app, you skimmed through this policy; correct?

A.   I did.

Q.   Okay.

THE COURTROOM DEPUTY:  147 is not in.

MS. POZOS:  Oh, I apologize.  Then I move to --

THE COURT:  Is there any objection to 147?

MS. VILLEGAS:  No objection, Your Honor.

THE COURT:  All right.  It's admitted.

(Trial Exhibit 147 received in evidence.)

MS. POZOS:  Thank you, Your Honor.

BY MS. POZOS:

Q.   Now, let's look at Exhibit 147, at the second paragraph underneath the date.  And I'll read the last three sentences in the paragraph.

They say (as read):

"We encourage you to periodically review this website for the latest information on our privacy practices.  If you do not accept the terms of the privacy policy, we ask that you do not use the app. Please exit the app immediately if you do not agree to the terms of this privacy policy."

Did I read that correctly?

A.   Yes.

Q.   Yet you continued to use the app after September 2017; correct?

**A.**   Yes.

          **THE COURT:**  Okay.  We'll take our afternoon break and we'll come back at 1:20.

          **THE COURTROOM DEPUTY:**  All rise.

                    (The jury leaves the courtroom.)

                    (Recess taken at 12:53 p.m.)

                    (Proceedings resumed at 1:20 p.m.)

     (Proceedings were heard out of the presence of the jury.)

          **THE COURTROOM DEPUTY:**  All rise.  This Court is now is session, the Honorable James Donato presiding.

          **THE COURT:**  Okay.  What is the issue with the next witness?

          **MR. CLUBOK:**  Your Honor, Andrew Clubok on behalf of Facebook.

     The next witness is an expert.  This expert, obviously, like all experts, relied on certain information, inadmissible hearsay or other hearsay that experts can rely on.

     There's a particular document or interrogatory response that the plaintiffs now want to introduce into evidence through this expert, even though he has -- A, he has no foundation, but even worse, they've -- what they've done is -- it is -- the thing they want to introduce is an exhibit or an attachment to an interrogatory response to the FTC, CID that was made during the FTC investigation, and --

          **THE COURT:**  Someone handed me two things.  Which one

are we talking about?

MR. CLUBOK:  Right.  So what we have is -- I handed you Exhibit 1046B and then I think 1046C.  I think I gave you two things so that we can try to keep this all straight.

THE COURT:  All right.

MR. CLUBOK:  The original document -- this all relates to Exhibit 110.  Exhibit 110 is the document that's just the spreadsheet that the plaintiffs want to try to introduce into evidence through their expert, Dr. Egelman.  Not just say that he referred to it, but actually introduce it for the truth of the matter asserted.

Now --

THE COURT:  What's the one -- the exhibit's on the back here?

MR. CLUBOK:  It's the spreadsheet where it starts with the columns and then --

THE COURT:  Exhibit A1?

MR. CLUBOK:  Exactly.

THE COURT:  Okay.

MR. CLUBOK:  And there's actually an Exhibit A1 and there's an Exhibit A2.

The real document, Your Honor, we gave you an excerpt.  We've marked as 10046.  I'm holding it up now and I could bring you a copy.  It's a big binder.

THE COURT:  10046 C and B.

**MR. CLUBOK:** Right. So 10046A, which I'll bring up to you, is the entire spreadsheet printed out. The one I gave you was an excerpt --

**THE COURT:** All right.

**MR. CLUBOK:** -- just to make it easier.

**THE COURT:** What's wrong with this, then?

**MR. CLUBOK:** So the problem is that Exhibit 110 -- what the plaintiffs want to do is just introduce Exhibit 110 by itself through their expert, who, A, lacks the foundation --

**THE COURT:** What is Exhibit 110?

**MR. CLUBOK:** 110 is just the spreadsheet by itself without the cover page.

And that's my point. The Rule of Completeness would require you to, at a minimum, include the cover and the underlying attachment. And so it's sort of a double -- doubly misleading exhibit.

This expert wants to say, "Oh, I got this attachment and I'm now going to talk about what this attachment means," even though he's an expert and shouldn't be able to do that -- at least not introduce it into evidence.

And then, by the way, I'm going to introduce this attachment without the original cover sheet that explains what the attachment is. That's not just something -- obviously we could cross him on this, and for sure we would, but that's way more work than --

THE COURT:  All right.  Let me just pause there.

What are you planning to do?

MR. LEVIS:  Yeah.  So the document that has been referred to is actually an -- a document that is cited as the basis for Meta's sworn interrogatory response in this case to Interrogatory Number 1.

THE COURT:  I don't -- I have no idea what you all are talking about.

Is it just this Exhibit A-1?  Is that all we're talking about?

MR. LEVIS:  Correct.

THE COURT:  Okay.  So just this chart.

MR. LEVIS:  So that document is cited as a stand-alone document as the support for one of Meta's interrogatory responses to us.

The document on top of it that counsel would like to admit together is a separate document that is their response to interrogatories to the FTC.  The interrogatory that was served to us only cites the underlying spreadsheet.  We intend to question Dr. Egelman in response to defendant's arguments that the data is not identifiable --

THE COURT:  Well, who is -- what does this data represent?  What does this chart represent?

MR. LEVIS:  The chart represents a summary of app events sent from a Flo Health app to Facebook from

December 9th, 2017, through December 4th, 2019.  And the far column says that the third column reflects the approximate number of unique individuals associated with "event."  And on the left side it has the event name.

THE COURT:  Who prepared this?

MR. LEVIS:  Who prepared the underlying document?  We don't know.

THE COURT:  The Exhibit A-1.  Who prepared that?

MR. LEVIS:  Meta.

MR. CLUBOK:  Actually, Your Honor.  That's the point.  Mr. Levis just said who prepared the underlying document.  He candidly admitted they don't know, yet their expert --

THE COURT:  He said Meta.

MR. LEVIS:  As an individual person --

MR. CLUBOK:  He had a phone-a-friend comment, and his friend said Meta.  They don't know who at Meta did it.  They don't know what the circumstances are.  They're intentionally leaving out the cover page that explains it, that tells folks that it's way beyond the class period, that it's worldwide numbers, not U.S. numbers, let alone California numbers.

THE COURT:  Way beyond the class period?  It's right in the middle of the class period.

MR. CLUBOK:  The class period ends in February of 2019.

THE COURT:  So this is December 2017, so it's a little

bit past.

MR. CLUBOK:  It's a little bit past.

THE COURT:  Most of it is within the class period.

MR. CLUBOK:  Well, Your Honor, there's also a whole new SDK or whole new advertising campaign that started post-class period.  It's included here.  It's also --

THE COURT:  Who prepared -- Meta gave you this document during discovery in this case?

MR. LEVIS:  Yes.

THE COURT:  Well, you produced it.  What is the problem?

MR. CLUBOK:  Because we also produced the cover page that was --

So originally this was made to the FTC with a cover page, and that's what we've attached now, a redacted version taking out the reference to the FTC but at least explaining this is worldwide numbers and all the other issues with these columns.

They used this on opening, and it's to misleadingly suggest, A, the class is 35 million, when we all know the class is a tiny fraction of that, certainly against Facebook.

THE COURT:  Where does it say the class is 35 million on this?

MR. CLUBOK:  It doesn't, but the plaintiffs used it in their opening to suggest that was the case.  There's a total -- the total number of goals -- there were originally unique

users --

THE COURT:  I -- look.  You produced this during discovery.  I just don't see what the problem is.  You gave it to them and said:  Here's some of our evidence.

What is the problem?

MR. CLUBOK:  Because, A, it's FTC.  B, the witness --

THE COURT:  Doesn't say FTC anywhere on this document.

MR. CLUBOK:  Your Honor, we also produced the cover sheet.  They're just taking the attachment.  That's like saying we produced attachments to e-mails.  We produce e-mails.  And someone says:  Aw, gee, you produced the attachment; I don't have to produce the cover page.

That's a classic Rule of Completeness problem.

THE COURT:  No, it's not.  You're actually quite wrong.

MR. CLUBOK:  Okay.

THE COURT:  That's not true at all.  This is a bunch of data, and then you have a cover sheet that says:  Let's talk about the data.

They're not the same thing.  The data is the data.  The cover sheet is a totally different thing.

Now, we're not going to have any FTC.

What does your expert do with this Exhibit A-1?

MR. LEVIS:  The Exhibit A-1 confirms that the information is identifiable.  In Meta's interrogatory response

of, which this is one of the cited documents, Meta confirms that it uses advertising identifiers and other information to uniquely match data that it receives to users' Facebook profiles.  This document shows the approximate number of individuals whose Facebook profiles were matched.

What we told counsel -- and I agree with Your Honor that I do not think it is a Rule of Completeness issue -- is that if he has questions that he would like to ask about the document, he's free to do so with his own witnesses during his case.

But we are using this information in their interrogatory response as they provided it to us for the limited purpose of showing that the information was identifiable with this witness.

THE COURT:  How do you know any of this is the U.S.? I mean, if it's worldwide, it's possible that all the people in one column are actually outside of the U.S.  How do you account for that?

MR. LEVIS:  It is -- it is certainly possible it would include some people outside the U.S., but it does not say that it is entirely international.

THE COURT:  That's not an answer to my question.

How do you account -- this is a worldwide document.  How do you account for the fact that it is quite possible that the number 61,374 consists exclusively of people outside of the United States?

**MS. MEDINA:** Because the app identifiers that they're responding to are in response to the FTC's question. This is a document that they did produce in response to requests from the FTC.

**THE COURT:** How do you know what portion of that 61,374 number is in the United States?

**MR. LEVIS:** We -- we know that it was only -- we only know that it was in response to the FTC's request to provide information about the Flo app with regards to their U.S. investigation.

**THE COURT:** You told me that this is worldwide.

**MR. LEVIS:** No, we don't -- we don't contend that it's worldwide. Their position is that this could be worldwide. We think that it's a response to the --

**THE COURT:** Where does it say this is worldwide data, not U.S.? It would be odd for the FTC to ask for something like that.

**MR. CLUBOK:** Yes, Your Honor. I'm reading now from Exhibit -- you have to combine three different exhibits now, so I'm reading from 1046 --

**THE COURT:** Don't read from that.

**MR. CLUBOK:** Okay. I'll just tell you.

**THE COURT:** Show me where it is. I'm looking at 1046-C. Where is it here? It says this is worldwide data that's used with -- or something like that.

**MR. CLUBOK:**  Sorry.

Your Honor, may I approach and hand up another document?  There's two interrogatories response --

**THE COURT:**  I'm looking at what you're handing me.  You need to show me in this cover thing that you keep saying is Rule of Completeness -- you need to show me --

**MR. CLUBOK:**  Oh, I'm sorry.

**THE COURT:**  -- where here it says this is worldwide data.

**MR. CLUBOK:**  Well, you have Exhibit --

**THE COURT:**  What page?

**MR. CLUBOK:**  On the document that's been marked 1046B, which says "Facebook, Inc.'s response to Interrogatories 1E," it says --

**THE COURT:**  E?  The chart is attached to C.

**MR. CLUBOK:**  I understand.

**THE COURT:**  So where on C does it say that?  The chart is attached to 1C, and I'm looking at Facebook's response to 1C.

**MR. CLUBOK:**  When Facebook responded to the FTC they had subparts, and subpart 1C asked certain questions and they attached that chart.

Then get to subpart 1E, and the FTC had broken out its questions, wanted more information, and in 1E still referring to the same document -- and that's reflected in 1046B that I've

handed you in the second page -- the first page is notes. That's --

THE COURT:  Where on the second page?

MR. CLUBOK:  The first two paragraphs.  The first paragraph explains the time period.  The second paragraph says the company has provided estimated numbers of unique customers associated with each event, and it says Facebook has no reasonable way to identify lots of information about this.

In the last sentence, it says "Additionally, other than recent events data specifically for Facebook users, the company does not have a way to determine the number of U.S. customers these estimates represent."

And I just want to say Flo is in 190 countries.  The plaintiffs have said the class size nationwide is about 13 million.  There's 34 million in one place unique numbers here.

But all of this is --

THE COURT:  I don't see where it says what you just read.  I'm looking at page 2 to B, B, as in boy.  Where does it say that?

MR. CLUBOK:  146B at the last sentence of the second paragraph, where it says first --

THE COURT:  Page?

MR. CLUBOK:  First page.  I'm sorry, Your Honor.  I may have said -- I didn't --

THE COURT:  Page 1?

MR. CLUBOK:  Yes, Your Honor, page 1.  The first two paragraphs of page 1 describe what this document --

THE COURT:  All right.  Just let me read it, please.

(Pause in proceedings.)

THE COURT:  What does "recent events data specifically for Facebook users" mean?

MR. CLUBOK:  So they're the later app events that are also included in the Document 110 that they intend to submit.  So there's a host of problems.

But also, Your Honor, asking me to be honest, there are witnesses at Facebook who may testify.  Those are the witnesses that the plaintiffs should be trying to lay a foundation in asking what this document is about.  They just want their expert to speculate, pure speculation about what a document is about because they gave it to him and they say, "Oh, you looked this.  You're used to reading these very bespoke responses to the FTC and interrogatories," and somehow Dr. Egelman is going to be presented as an expert in interpreting what this means when it's clear the plaintiffs don't know what it means.

I personally --

THE COURT:  Okay.  Just give me a break.  Okay?  Just hang on.

So what are you going to do?

MR. LEVIS:  The only thing --

**THE COURT:** What are you going to do with this and the expert?

**MR. LEVIS:** We're going to ask him if it confirms his understanding that the information was identifiable and matched to individual Facebook user profiles. That's what the column says. It says the approximate number of unique individuals associated with the event.

As to the argument that some of this might be outside the U.S., the issue I have with that argument is, as I mentioned, this was produced as the underlying source material cited in a footnote response to a verified interrogatory produced to us in this case.

**THE COURT:** I understand that, but the interrogatory says we can't tell who's in the U.S.

What are you going to do to about that?

**MR. LEVIS:** But not their written response here. They relied on this stand-alone spreadsheet to support their response to the interrogatory to us.

**THE COURT:** We're not going to read grains of sand individually. So taken together, Facebook is saying this chart -- we can't tell who's in the U.S., or what is your expert going to say about that?

**MR. LEVIS:** He's just going to say that it shows the data is identifiable, that Facebook is linking information to users' Facebook profiles. They've argued that --

THE COURT:  Who are you going to -- do you have a Facebook person you're going to ask about this?

MR. LEVIS:  We were going to ask Tobias Woolridge, potentially, about this, but as you heard yesterday, he was not available to be called earlier this week.

THE COURT:  All right.  Well, you can have an expert testify to the conclusions.  Just don't show him this document.  You have to wait 'til the Meta person comes.

MR. LEVIS:  Okay.  He relied on this document, so we can ask him what he saw, but we won't publish --

THE COURT:  You say that.  He can't just read into the record the document.  Okay?  So if you want to ask him, "Did you see any evidence indicating to you" -- that's the way you would say it, you know, opinion style --

MR. LEVIS:  Sure.

THE COURT:  -- that Facebook -- I don't know -- whatever you want to say -- conceded, agreed, represented that it had unique identifiers.

And he can say sure.  Okay?  And talk a little bit about that.

But the document can't come in until you have a sponsoring witness, and that would be somebody at Meta.  All right?

MR. LEVIS:  Okay.

THE COURT:  Okay?  Please don't -- you know, don't ask him to say anything too much more than that.  All right?

MR. LEVIS:  Understood.

THE COURT:  Okay.  All right.  Are we ready for that?  I thought there was more for the last plaintiff.  Is there?

MR. LEVIS:  Yes.

MS. POZOS:  Yes, Your Honor.  All right.

THE COURT:  All right.  Let's bring the jury in.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

THE COURTROOM DEPUTY:  Please be seated.

Okay.  We're back in the record on Civil 21-757, Frasco versus Flo Health, Inc.

THE COURT:  Okay.  Go ahead.

MS. POZOS:  Thank you, Your Honor.

BY MS. POZOS:

Q.   So, Ms. Frasco, we were looking at Exhibit 147 before the break, and that can come up again on your screen.  And we're going to be looking at Section 2, "How we use information."

THE COURTROOM DEPUTY:  It's on you guys.

(Pause in proceedings.)

THE COURT:  Is that not working?

THE COURTROOM DEPUTY:  Apparently not.

THE COURT:  Can you try it again?

THE COURTROOM DEPUTY:  I just cleared the sources and set it back up.

MS. POZOS:  Thank you very much.

(Discussion held off the record.)

THE COURT:  Go ahead.

BY MS. POZOS:

Q.   All right.  So looking at Section 2 on "How we use information."

So you can see "How we use information" is in big, bold letters that are larger than the surrounding text; correct?

A.   Yes.

Q.   And let's look at the sentence immediately below the heading, which says (as read):

"We may use your information, including your personal information, as follows."

Did I read that correctly?

A.   Yes.

Q.   And below that is a bulleted list of all of the ways in which Flo can use your personal information; right?

A.   Yes, looks that way.

Q.   And the first bullet in the list of ways in which Flo may use your personal information says (as read):

"To analyze, operate, maintain, and improve the app."

Did I read that correctly?

A.   Yes.

Q.   Now, let's look at the eighth bullet point, sort of halfway down.  Hopefully we can highlight it for you.

So looking that eighth bullet point in terms of ways in which Flo can use personal information, it says (as read):

"To monitor and analyze trends, usage, and activities in connection with our app."

Did I read that correctly?

A.    Yes.

Q.    So instead of skimming it, had you read the privacy policy, you would have known that Flo could use your personal information to analyze trends, usage, and activities; correct?

A.    Yes, but this is not speaking to my personal health information that was recorded.

Q.    Now, let's look further down the same page to the header "Aggregated Information."

Do you see that on the screen?

A.    Yes.

Q.    Okay.  And that section says (as read):

"We may also share aggregated, anonymized, or deidentified information which cannot reasonably be used to identify you.  For example, we may share, including without limitation, in articles, blog posts, and scientific publications general age demographic information and aggregate statistics about certain activities or symptoms from data collected to help identify patterns across users."

Did I read that correctly?

**A.**   Yes.

**Q.**   Okay.  So the Flo privacy policy that you read when you first opened the app stated that Flo could share your personal information if it was aggregated, anonymized, or deidentified; right?

**A.**   I couldn't tell you what any of those words mean.

**Q.**   But that's what it says; right?

**A.**   That is what it says.

**Q.**   Okay.

And you agreed to that policy; correct?

**A.**   I did, yes.

**Q.**   Okay.

Now, you testified earlier on direct about some symptoms that you'd had.

Is it your understanding that those symptoms were shared with Facebook?

**A.**   It's my understanding with this lawsuit that my menstrual cycle and ovulation was recorded in -- was recorded by Meta.

**Q.**   Okay.

And you understand that from your lawyers; correct?

**A.**   Yes.  They helped me to understand that.

**Q.**   Okay.

So I'm now going to show you Trial Exhibit 29, which has previously been admitted into evidence.

This is a copy of Flo's privacy policy from May 25th,

2018.

So do you see that date, May 25th, 2018?

A.   Yes.

Q.   Prior to your deposition, you had never read this privacy policy; right?

A.   No.

Q.   And nothing prevented you from reading the privacy policy; right?

A.   No.

Q.   Okay.  Now, let's turn to page 4.  There's a heading there that says "4.  Sharing your personal data and information."

Do you see that?

A.   Yes.

Q.   Now, the beginning of paragraph 2 in that section says (as read):

"Among others, we may share your personal data with the following third-party services."

Did I read that correctly?

A.   No.  I see a different screen.

Q.   Okay.  So the beginning of paragraph 2 -- apologies.

In that section -- okay.  Now we've got it (as read):

"Among others, we may share your personal data with the following third-party services."

Did I read that correctly?

A.   Yes.

Q.   Okay.   Now let's look at Number 3 on the following page.
Okay?

You see that Number 3 on the list is Facebook Analytics;
right?

A.   Yes.

Q.   Okay.   So had you read this privacy policy, you would have
understood that Flo used Facebook Analytics; correct?

A.   Yes.

Q.   And you see there's a link to Facebook Analytics' privacy
policy in that section; correct?

A.   One could assume that's a link.

Q.   Well, you actually know it to be a link; right?

A.   I don't because I did not read this policy.

Q.   Okay.

But it appears to be a link based on the blue and the
underlining in it; right?

A.   One could assume it is a link.

Q.   And you didn't attempt to click on that link, did you?

A.   No, because, as I stated earlier, I did not read this
policy.

Q.   Okay.   Now, let's look two paragraphs below that.   You see
that there's a section in all capital letters; right?

A.   Yes.

Q.   Okay.   And it says (as read):

"By using the app, you consent that we may use

cookies and third-party services and collect your user data under a unique identifier for the purposes of tracking, analysis, and improvement of the app."

Did I read that correctly?

A.   You did.

Q.   Okay.  Now, in your binder, I'd ask you to look at -- or Trial Exhibit 189, which has been agreed to.

MS. POZOS:  And I would move to admit it.  It's a copy of Flo's terms of service from July 11th, 2017.

MS. VILLEGAS:  No objection.

THE COURT:  Okay.  189 is admitted.

(Trial Exhibit 189 received in evidence.)

THE COURTROOM DEPUTY:  189.

MS. POZOS:  Thank you for putting in on the screen.  I just was --

THE WITNESS:  Thank you.

BY MS. POZOS:

Q.   So at the time of being deposed in this case, you hadn't read Flo's terms of service before; right?

A.   As I mentioned, I had skimmed through it.

Q.   Okay.  But you hadn't read the terms of service; correct?

A.   No.

Q.   Okay.  And there was nothing preventing you from reading Flo's terms of service; correct?

A.   No.

Q.   Let's look at the header in the middle of page 1 at Section 2.  It says "Medical Services Disclaimer."

Do you see that?

A.   Yes.

Q.   Okay.  The first sentence below that says in all capital letters (as read):

"The company is not a licensed medical care provider, and the app is not intended to replace professional medical advice or diagnose, treat, or manage any illness or medical condition."

Did I read that correctly?

A.   Yes.

Q.   So you understood that Flo was not a licensed medical provider; correct?

A.   Yes.

Q.   And you understand that Flo is not intended to replace that professional medical advice from a doctor; correct?

A.   Correct.

Q.   You used Flo for five years.  You had been to see a doctor during those five years; right?

A.   Yes.

Q.   And in those five years, you never made a doctor's appointment with anyone from Flo; right?

A.   No.

Q.   You never got any medical tests that Flo ordered for you?

A.   No.

Q.   And you never received a bill from a medical appointment from Flo; right?

A.   No.

Q.   Okay.  Let's look to Section 18 of this same policy.

Section 18 says -- and we'll highlight it for you to make it larger.

The second paragraph in that section says (as read):

"Any cause of action you may have with respect to your use of the app must be commenced within one year after the claim or cause of action arises."

Did I read that correctly?

A.   Yes.

Q.   And you started using Flo in 2017; correct?

A.   Correct.

Q.   And in your allegation in this lawsuit, you allege that Flo wrongly shared your information in 2017; right?

A.   I'm sorry.  Can you repeat that?

Q.   Sure.

In your lawsuit, you're alleging that Flo wrongly shared your information in 2017; correct?

A.   Yes.  It is my understanding that during the time I was using the app when I signed up that my personal health information was being recorded.

Q.   And that was in 2017; correct?

**A.**   Yeah.   That's when I started using the app, yes.

**Q.**   But you didn't file your complaint, this cause of action, until January 29th, 2021; correct?

**A.**   If that -- I -- I don't know the exact date, but yes, it was early January of 2021.

**Q.**   So it was January in 2021?

**A.**   I believe -- yes, I believe that's when, yes.

**Q.**   Okay.   So you did not file within one year of your claim arising; correct?

        **MS. VILLEGAS:**   Objection.

        **THE COURT:**   Sustained.   You can rephrase that, please.

**BY MS. POZOS:**

**Q.**   You did not file your claim within one year of using the app; correct?

**A.**   Correct.

**Q.**   Now, Ms. Frasco, you've personally used social media; correct?

**A.**   Yes.

**Q.**   You've used Instagram, Facebook, LinkedIn, Pinterest, Tumbler, Snapchat, and We Heart It; correct?

**A.**   Yes.

**Q.**   And you currently have a Facebook account today; correct?

**A.**   Yes.

**Q.**   Okay.   And you have friends on Facebook; right?

**A.**   I hope so.

Q.   And you use your Facebook account multiple times per week?

A.   Very rarely.

Q.   Okay.  But at the time of your deposition, you were using your Facebook account multiple times per week; correct?

A.   Yes.

Q.   And your Facebook profile was public throughout the class period and through your deposition in 2023; correct?

A.   I believe so, yes.

Q.   You didn't change the audience; right?  Like who could see the posts that you were making depending on what type of post you were making; right?

A.   I don't recall exactly if I have, but I do know I do try to be more private about who can see and who cannot see.

Q.   Okay.  So I turn your attention to the transcript, page 271, lines 1 through 4.

        MS. POZOS:  And I'd ask to play clip EF271.

            (Video played but not reported.)

BY MS. POZOS:

Q.   And that was your testimony under oath in January of 2023; correct?

A.   Yes.

Q.   Okay.  And you've posted about your birthday on Facebook before; right?

A.   Probably.

Q.   So I turn your attention to the deposition transcript

100 -- page 100, lines 23 through 25.

MS. POZOS:   And if we could play EF100.

(Video played but not reported.)

BY MS. POZOS:

Q.   And you don't know how many advertisers have learned your birthday from your publicly sharing it on Facebook; right?

A.   I'm sorry.  Can you repeat that?

Q.   Sure.

You don't know how many advertisers have learned your birthday from your publicly sharing it on Facebook; right?

A.   No.

Q.   And you also follow or like pages on Facebook; right?

A.   Yes.

Q.   And you follow or like pages related to health; right?

A.   If I like it, yes.

Q.   Okay.  And you currently also have an Instagram account; right?

A.   Yes.

Q.   And there was a period where you used your Instagram account every day; right?

A.   Yes.

Q.   And you've also used dating apps before; right?

A.   I have.

Q.   And you've used the Google search engine; right?

A.   Yes.

Q.   And you've searched on Google for information about periods; right?

A.   I don't recall.

Q.   Okay.  So could I turn your attention to the deposition transcript, page 116, line 25, and page 117, through line 2.

MS. POZOS:  And ask to play clip EF116B.

(Video played but not reported.)

BY MS. POZOS:

Q.   That was your testimony under oath; correct?

A.   Yes.

Q.   And you've also searched on Google for information about home remedies for menstrual pain; correct?

A.   Most likely.  Probably.

Q.   So I'll turn your attention to deposition transcript 117, lines 19 to 21.

MS. POZOS:  And ask to play EF117.

(Video played but not reported.)

BY MS. POZOS:

Q.   And you've searched on Google for symptoms related to sex and intimacy; right?

A.   Maybe.

Q.   Okay.  I'll turn your attention to page 118, lines 13 to 15.

MS. POZOS:  To play EF118.

(Video played but not reported.)

BY MS. POZOS:

Q.   And you've also searched on Google for information about your health in general; right?

A.   Not that I can recall.

Q.   Okay.  So I turn your attention to 118, lines 22 to 24.

          MS. POZOS:  And play EF118B.

               (Video played but not reported.)

BY MS. POZOS:

Q.   So you don't know if you've received any advertisements because of all these Google searches; right?

A.   I don't know.

Q.   And you've read blogs for information about wellness or well-being; right?

A.   Yes.

Q.   Okay.  And you don't know if you've received advertisements because you've read blogs about wellness or well-being; right?

A.   I don't know.

Q.   Okay.  Now, you've used or still use the Nirvana Yoga app; right?

A.   I do not use that currently, no.

Q.   But you've used it in the past; is that correct?

A.   Yes.

Q.   And you used to work at Nirvana Yoga; is that correct?

A.   I did, yes.

Q.   And you did not read the Nirvana app's privacy policy; correct?

A.   No.

Q.   So you don't know if you received ads because you used Nirvana, do you?

A.   No.

Q.   And you don't know what Nirvana was doing with your information when you were using the Nirvana app; correct?

A.   No.

Q.   And you've also used your watch's fitness tracking; right?

A.   Yes.

Q.   And you don't know if you received ads because you used your watch's fitness tracking, do you?

A.   No.

Q.   And you've purchased contraceptives before; correct?

A.   Can you clarify what you --

Q.   Sure.  I can also just refresh your memory.

So if we could turn to transcript 125, lines 14 to 18.

     **MS. POZOS:**  To play EF125.

            (Video played but not reported.)

**BY MS. POZOS:**

Q.   And you would purchase birth control from Wayne Pharmacy in Wayne, New Jersey; correct?

A.   That's crazy that you know that.  Yes.

Q.   Well, you testified about it previously at your

Q.   deposition; right?

A.   Okay.  That's good to know.

Q.   Okay.  And you're not aware of whether Wayne Pharmacy shared the fact that you used contraceptives, or were trying to avoid becoming pregnant, with third parties; right?

A.   No.

Q.   And you don't know whether Wayne Pharmacy shared the fact that you stopped buying contraceptives with third parties, do you?

A.   No.

Q.   And you never looked up Wayne Pharmacy's policies on sharing customer data, have you?

A.   No.

Q.   And you've also purchased menstrual products before; right?

A.   Yes.

Q.   And you've purchased these menstrual products at Target or CVS; right?

A.   Whichever retailer, yes.

Q.   And those include Target and CVS; right?

A.   Sure, yes.

Q.   And you don't know whether Target or CVS shared the fact that you purchased menstrual products with third parties, do you?

A.   I don't.

Q.   And you don't know whether Target or CVS shared the fact that you had periods with third parties, do you?

A.   I don't.

Q.   And you don't know whether Target or CVS shared the frequency with which you purchased menstrual products with third parties, do you?

A.   I don't.

Q.   And you've never looked up Target's or CVS's policies on sharing customer data, have you?

A.   No, but I might after all this.

Q.   But you haven't as of today, testifying here today?

A.   No.

Q.   Even since filing the lawsuit in 2021?

A.   No.

Q.   Okay.  And you've never chosen not to shop at a retailer because of its policies on customer data, have you?

A.   No.

Q.   Now, Ms. Frasco, your birthday is in November of 1991; is that correct?

A.   Yes.

Q.   Okay.  So you were in your mid-twenties when you started using the Flo app in 2017; is that right?

A.   I'm horrible at math, but if -- yes.  Sounds about right.

Q.   Okay.  And you would agree it's not unusual or a secret for a woman in her mid-twenties to get periods; right?

**A.**   It's definitely a secret.

**Q.**   It's not unusual, is it?

**A.**   Yeah, so you don't know what anybody is going through.

**Q.**   Okay.  So I'm going to turn your attention to transcript 100.

          **MS. POZOS:**  And first we can play lines 1 to 3, which is EF100B.

          (Video played but not reported.)

**BY MS. POZOS:**

**Q.**   And I'll ask you again:  It's not any secret that most women in their twenties and thirties get periods; right?

**A.**   Again, I say the same thing that I said before.

**Q.**   Okay.  Then I'll -- let's turn to 100, 4 through 6.

          **MS. POZOS:**  And play EF100C.

          (Video played but not reported.)

**BY MS. POZOS:**

**Q.**   Okay.  And that was your prior testimony under oath; correct?

**A.**   Yes.

**Q.**   Okay.  And you were getting periods when you first started using the Flo app; right?

**A.**   Yes.

**Q.**   So simply by virtue of knowing your age and gender, people could conclude that you likely get periods; right?  At that time in your life?

**A.**   I don't know.

**Q.**   Okay.  So I'll turn your attention to transcript 100, lines 11 to 17.

          **MS. POZOS:**  If you could play EF100D.

                    (Video played but not reported.)

**BY MS. POZOS:**

**Q.**   So whether or not you used Flo, advertisers and retailers could reasonably conclude, based on your gender and age, that you experience periods; right?

**A.**   Yes.

**Q.**   Now, you don't know whether Facebook has ever served you an advertisement based on information you entered in the Flo app; correct?

**A.**   Correct.

**Q.**   And, in fact, at your deposition, you could not recall seeing any advertisements that you believe are related to Flo's alleged sharing; is that correct?

**A.**   Correct.

**Q.**   Now, you're not paying any of the plaintiffs' lawyers' fees or expenses; right?

**A.**   No.

**Q.**   And so that includes your friend Amanda, Ms. Fiorilla, right, who's -- just to be clear, is colleagues with Mr. Levis, who's sitting here at plaintiffs' counsel table; right?

**A.**   Yes.

Q.   And they're your lawyers; right?

A.   Yes.

Q.   And you're not paying them anything at the moment; right?

A.   No.

Q.   So your lawyers are advancing all of the litigation expenses and fees in this case now; correct?

A.   To my understanding, yes.

Q.   And if plaintiffs' lawyers win this case, you personally could recover money as part of any judgment; correct?

A.   Maybe.

Q.   Well -- and you are clear in your understanding that if you recover any judgment or money in your favor in this case, Ms. Fiorilla will also get a percentage of that; right?

A.   Yes.

Q.   Okay.

        MS. POZOS:  Thank you.  I have no further questions.

        THE COURT:  Okay.  Any other brief redirect?

        MS. VILLEGAS:  Yes, Your Honor.

        MS. McCLOSKEY:  Yes, Your Honor.

        MS. VILLEGAS:  Apologies.

        THE COURT:  Okay, yeah.

                    CROSS-EXAMINATION

BY MS. McCLOSKEY:

Q.   Good afternoon, Ms. Frasco.

A.   Good afternoon.

Q.   My name is Elizabeth McCloskey.  I am a lawyer for Facebook, and I will just have just a couple of questions for you.

A.   Okay.

Q.   You have a Facebook account; correct?

A.   Yes.

Q.   And you've never deleted any Facebook accounts, have you?

A.   Not that I can recall.

Q.   You've never deactivated any Facebook accounts?

A.   No.

Q.   You also have an Instagram account?

A.   I do.

Q.   And you've never deleted any Instagram accounts?

A.   Not that I can recall.

Q.   You've never deactivated any Instagram accounts?

A.   Not that I can recall.

Q.   I want to address something that your lawyer asked you during your direct examination.  She asked you over and over again about how you learned that Facebook had supposedly recorded your information.

     The sole source of your knowledge about whether Facebook did or did not record your information is what you've learned from your lawyers; correct?

A.   Yes.

Q.   There's no other investigation that you did on your own?

A.    No.

Q.    And you understand that in this case, in this trial, you're not asserting any claim against Facebook; correct?

A.    Correct.

        MS. McCLOSKEY:  Thank you.  No other questions.

        THE COURT:  Okay.  Any other brief redirect?

        MS. VILLEGAS:  Yes, Your Honor.

                    REDIRECT EXAMINATION

BY MS. VILLEGAS:

Q.    Hey, Erica.

A.    Hello.

Q.    Do you remember answering some questions about filling your birth control at Wayne Pharmacy?

A.    I don't recall answering questions.  It was a long time ago.

Q.    Today, when the defense lawyer for Flo asked you about Wayne Pharmacy, do you remember answering questions about that?

A.    Yes.

Q.    If Wayne Pharmacy had shared information about your prescription for birth control, they would have violated the law; right?

A.    Yes.

        MS. POZOS:  Objection.

        THE COURT:  Overruled.

Go ahead.

**BY MS. VILLEGAS:**

**Q.**   Did you tell CVS the date you were ovulating?

**A.**   No.

**Q.**   Did you tell Target the date you were ovulating?

**A.**   Definitely not.

**Q.**   Do you typically tell people the day you are ovulating?

**A.**   No.

**Q.**   Do you believe that searching for information about sex and intimacy gives Meta the right to record anything about your period?

**A.**   No.

**Q.**   And you entered medical information into the Flo Health app; right?

**A.**   Yes.

**Q.**   And you testified that you agreed to the privacy policy; right?

**A.**   Yes.

**Q.**   You didn't read it, though; right?

**A.**   Just skimmed.

**Q.**   But you thought your medical information would be protected by Flo?

**A.**   Absolutely.

**Q.**   Let's look at the privacy policy again.  We're going to Trial Exhibit 29.

          **MR. CANTY:**  Can we switch to plaintiffs' side

Ms. Clark, please?  Thank you.

**BY MS. VILLEGAS:**

Q.   Could you please read the first sentence to the jury on that first page.

A.   Yes (as read):

"We are committed to respecting your data privacy and providing transparency about our data practices."

Q.   Knowing what you know now about this privacy policy, do you feel like Flo was transparent about Meta recording your data?

A.   No.

Q.   Could you turn to page ending 161.

Could you read Roman numeral III to the jury, please.

A.   Yes.  (as read):

"We will not transmit any of your personal data to third parties except if it is required to provide the service to you, e.g., technical service providers, unless we have asked for your explicit consent."

Q.   Do you understand this to mean that Flo could allow Meta to record your personal health data?

A.   No.

Q.   Can you turn to page ending 163.

Do you see where it says "Sharing your personal data and

information"?

A.   Yes.

Q.   Can you please read that to the jury.

A.   Yes.  Starting with 1?

Q.   Starting with 1.

A.   Okay.  (as read):

"Personal data we share with third parties.  We may share certain personal data, excluding information regarding your marked cycles, pregnancy, symptoms, notes, and other information that is entered by you and that you do not elect to share with third-party vendors who supply software applications, web hosting, and other technologies for the app."

Q.   Okay.  Can you stop right there?

A.   Yes.

Q.   Did you understand that to mean that Flo would not share information about your periods or pregnancy with any third party?

A.   That's exactly what it says.  Yes.

Q.   Can you keep reading, please.

A.   Sure.  (as read):

"Third parties will not have access to our survey results, and we will not reveal information about which articles you view."

Q.   Okay.  Can you please explain the jury what your understanding of that is?

A.   That third parties will not have access to the survey results.

Q.   And the survey results were the health questions that you answered about your period and ovulation; right?

A.   Yes.

Q.   Could you read the last sentence to the jury, please.

A.   Sure.  (as read):

     "A part of the cases regulated by this privacy policy, we will never transfer your personal date to any third party without your prior explicit consent."

Q.   Did you give your explicit consent for Flo to allow Meta to record information about your ovulation?

A.   No.

Q.   Can you go to page 164.

     Do you see at the top where it says "Facebook and Google"?

A.   Yes.

Q.   And do you recall reading this paragraph just a few minutes ago with the defense lawyer?

A.   Yes.

Q.   Can you please read it to yourself again, and let me know when you're ready.

A.   (Witness examines document.)

     Ready.

Q.   Is there anything in that paragraph that says Flo could share information about your periods or ovulation with Meta or Google?

A.   No.

Q.   Did you understand this to mean that they could share any information about your medical health with Meta or Google?

A.   No.

Q.   Let's go to Trial Exhibit 147.

     This is another version of the privacy policy; right?

A.   Yes.

Q.   Okay.  Can you turn to page 173.

     Do you see where it says "How we use information"?

A.   Yes.

Q.   And do you remember going through that just a few moments ago with the defense attorney for Flo?

A.   Yes.

Q.   Does it say anywhere that they can use your information by allowing Meta to record it to serve advertising?

A.   No.

Q.   Do you see where it says "Number 3, Disclosure of information"?

A.   Yes.

Q.   Under that, "Aggregated information"?

A.   Yes.

Q.   You now understand that your ID for advertising can be

used by Meta to match to you; right?

A.    Yes.

Q.    You're not a software engineer, are you, Erica?

A.    Definitely not.

Q.    Would you know how to reverse-engineer the app to figure out that Meta was recording the data?

A.    No.

Q.    And you relied on your attorneys and experts to figure that out; right?

A.    Yes.

Q.    And you sued when you found out that this was going on; correct?

A.    Correct.

Q.    You also testified earlier that you didn't feel injured before talking to your attorneys; right?

A.    Right.

Q.    You didn't even know about Flo's conduct until you talked to your lawyers; right?

        MS. POZOS:  Objection.  611.

        THE COURT:  What?

        MS. POZOS:  Objection.  611.

        THE COURT:  No.

    Go ahead.  You can answer it.

        THE WITNESS:  Can you repeat the question, please.

\\\

**BY MS. VILLEGAS:**

Q.    Sure.

You didn't even know about Flo's conduct until you talked to your attorneys; is that right?

A.    Correct.

Q.    And can you please tell the jury again the harm that you felt.

A.    Yeah.  Like I mentioned earlier, it's -- it's disturbing. It's embarrassing.  It's disappointing.  Nobody wants that type of information to be shared.

Q.    And the harm we're talking about isn't a broken arm; right?

A.    Correct.

Q.    The harm we're talking about is the harm to your privacy?

A.    Yes, absolutely, a violation to my privacy.

Q.    Erica, is this about money for you or for your friend Amanda?

A.    Definitely not.

Q.    Erica, who gets to decide what happens with your personal information?

A.    Only me.

MS. VILLEGAS:  Thank you.

THE WITNESS:  Thank you.

THE COURT:  Okay.  You may step down.  Be careful on the way down.

And let's take a binders off, please, for the next witness.

(Witness excused.)

MR. LEVIS:  Plaintiffs call Dr. Serge Egelman.

(Serge Egelman steps forward to be sworn.)

THE COURT:  All right.

(Pause in proceedings.)

THE COURTROOM DEPUTY:  Please stand and raise your right hand.

THE WITNESS:  I'm sorry.

**SERGE EGELMAN**,

called as a witness for the Plaintiffs, having been duly sworn, testified as follows:

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Thank you.  Please be seated.

Please state your full name for the court and spell your last name.

THE WITNESS:  Serge Egelman, E-G-E-L-M-A-N.

THE COURTROOM DEPUTY:  Thank you.

MR. LEVIS:  May I proceed?

THE COURT:  Yes.

**DIRECT EXAMINATION**

BY MR. LEVIS:

Q.   Good afternoon, Dr. Egelman.

A.   Good afternoon.

Q.   Can you please introduce yourself to the jury.

A.   My name is Serge Egelman.

Q.   And what is your educational background?

A.   Yeah.  I received my BS in computer engineering from University of Virginia in 2004, and then my PhD from Carnegie Mellon University School of Computer Science in 2009.

Q.   Where do you currently work?

A.   At UC Berkeley.

Q.   And what do you do at UC Berkeley?

A.   I direct a research lab that studies online privacy and security as well as how people make decisions about privacy and security.  So this -- this covers everything from human subjects, research to look at people's privacy attitudes, how they use online systems to make decisions about privacy, and whether those systems allow them to accurately reflect their privacy preferences as well as technical studies to look at how online services actually handle personal information and whether they do so in compliance with their obligations.

Q.   And how long have you worked at that lab?

A.   I started my lab about 15 years ago.

Q.   And do you conduct your own research there?

A.   Yes.

Q.   What does your research focus on today?

A.   The same.  Yeah.

Q.   Have you ever been published in peer-reviewed literature

before?

**A.** Yeah. When I talk about research, I'm generally talking about peer-reviewed publications.

**Q.** Approximately how many times have you been published?

**A.** More than a hundred, with thousands of citations.

**Q.** And what topics have you been published on?

**A.** Computer security, online privacy, how people make decisions about privacy and security, human-computer interaction generally, so how people make, you know, decisions when using computer interfaces.

**Q.** Do you -- does any of your work deal with mobile applications?

**A.** Right now a large percentage of my work does. When I moved to Berkeley in, I think 2011, that's when I got serious about looking at mobile apps.

**Q.** And how many mobile applications would you say you've studied in the course of your career?

**A.** Hundreds of thousands at this point.

**Q.** Have you ever done any work with SDKs?

**A.** Yeah. Yeah, a lot of this centers on how -- a lot of the issues are due to inappropriate use of SDKs. So when developers misconfigure them. Or also, you know, malware SDKs too.

**Q.** Can you just explain to the jury briefly what an SDK is so we understand what you're talking about?

**A.**   Sure.   It stands for software development kit, and really it just refers to a third-party component that developers put in their apps.

And so this is an accepted engineering practice.   It's considered a good practice, reusing code so developers don't have to reinvent the wheel, so to speak.   And, you know, this is normal in most engineering disciplines.   So, for instance, you know, if you hire someone, you know, a contractor to build you a house, they're not manufacturing the drywall or, you know -- or the lumber; right?   They're getting those from suppliers.

Same thing when you get a car; right?   Toyota doesn't make all the components in the car.   Instead, they have a complex supply chain.

And software development is very much the same thing.   And similar to all these other engineering disciplines, you're supposed to spend a lot of time doing, you know, validation and oversight to make sure that the third-party components that you're relying on are actually functioning correctly, and a lot of developers screw this up when they skip that step.

**Q.**   How did you get involved in this case?

**A.**   Plaintiffs reached out to me.

**Q.**   And what is your understanding of the allegations here?

**A.**   The allegations are that the Flo app allowed Facebook and other third parties to record users' sensitive health

information.

Q.   And what were you asked to do in connection with this case?

A.   I did several things.  So, one, I examined several versions of the Flo app as they appeared throughout the class period.  I also examined documents that were shared with me.

Q.   Did you prepare any reports?

A.   Yes.  I wrote a report.

Q.   Are you being compensated for the work that you've performed in this case?

A.   I am.

Q.   And are you being compensated for your time here today?

A.   I am.

Q.   How much are you being paid?

A.   600 an hour.

Q.   Is any of your compensation contingent on the outcome of this litigation?

A.   It is not.

Q.   And do any of your -- does the fact that you're being compensated affect any of your opinions in this case?

A.   No.

        MR. LEVIS:  At this time, we'd offer Dr. Egelman as an expert in the field of mobile applications, software development kits, and data transmission.

        THE COURT:  He is qualified.

BY MR. LEVIS:

Q.   What did you review to come to the conclusions in the reports that you mentioned?

A.   Several different things.  So I found several versions of the app that were released throughout the class period, and after verifying that they were, in fact, you know, fair and accurate copies of the app, I tested those on my own.

Subsequently, Flo produced several versions of the app which, you know, matched the ones that I had previously tested, but I also tested them again, and that corroborated my prior findings.

I also decompiled those apps and looked at the source code that was contained with them.

Flo then separately produced source code as well, which I also went through, and that also corroborated the findings.

And then, yeah, there were documents that were shared with me, both internal ones, deposition transcripts, internal developer docs.  There's also the developer docs on Facebook's website, and the materials that they make available to their business customers -- you know, their real customers, the advertisers -- where they advertise their capabilities and talk about how those advertisers can target ads to individual Facebook users based on all of the data that Facebook collects from different sources.

Q.   Did you apply the same techniques that you would use in

conducting peer-reviewed research in conducting the analysis you did here?

A.    Absolutely.

Q.    Did you record the results of any of your testing and analysis in this case?

A.    All of the logs that were produced by the testing were shared with the defense.

Q.    And other than logs, did you record anything else of -- of the testing that you conducted?

A.    I mean, I made notes of what I input into the app.  I mean, since I -- I don't get a period, when I tested the app, I, you know, made up input to see what would happen in the app, and so, of course, I wrote down everything that I entered into the app so that I could see how it manifested in the traffic, and so those notes were also shared, I believe.

      And -- yeah, I think that's -- unless I might be missing something.

Q.    Did you capture any screenshots?

A.    I did, yes.  I also took lots of screenshots of everything I did.

Q.    I'd like to take a minute to walk through some of these documents before we go through your testing so I make sure we have all the material straight.  Is that okay?

      MR. LEVIS:  Can we switch the screen so we can show some documents just to Dr. Egelman?

(Pause in proceedings.)

BY MR. LEVIS:

Q.   I'd like to -- if you look at your screen, we'll show you what's been marked as Exhibit 767.

A.   It has not updated.

Q.   Okay.

A.   That's my CV.

Q.   Yeah.  That's an attachment.  You should have a more full version of 767 and 768.

     There you go.  Do you recognize this?

A.   Yes.

Q.   What is this?

A.   This looks like the table of -- part of the table of contents for my report.

Q.   Is this one of reports you mentioned before?

          MR. CLUBOK:  Objection, Your Honor.

          THE COURT:  We're not getting expert reports in.

          MR. LEVIS:  No, no.  I was just asking to identify it for the purpose of the report.  We're not going publish it to the jury.

          THE COURT:  Okay.

          MR. CLUBOK:  It's on the screen.

          MR. LEVIS:  I said to just show it to Dr. Egelman.  I was not -- I asked before if we could just show it to him.

          THE COURT:  Lisa, can you just -- you're not seeing

anything inappropriate, but we would have to stop at this point.  Okay?  So -- all right.

I know it's irritating when we seem to be looking at things that you can't see, but that's just the way it goes.  Okay?  All right.

You can't do it, Lisa?

THE COURTROOM DEPUTY:  I have all the other screens off except for his.

THE COURT:  I know, but can you turn all of ours on except the jury and the gallery?  Just me and the two tables.  Can you do that?  No gallery and the witness.  No gallery, no jury.

THE COURTROOM DEPUTY:  The jury should not have screens.

THE COURT:  Can you see anything?

THE COURTROOM DEPUTY:  No, they don't see anything.

THE COURT:  Can't see anything?  All right.

THE COURTROOM DEPUTY:  And neither does the gallery; correct?

THE COURT:  Okay, good.  We did it.  It's a new system.

All right.  Go ahead.

THE COURTROOM DEPUTY:  They can see it on these screens.  You need to turn your screens around so they're not facing anybody.

THE COURT:  Make sure nobody can look at your tables. This is not coming into evidence.

MR. LEVIS:  No, this is not coming into evidence.

THE COURT:  All right.  Go ahead.

BY MR. LEVIS:

Q.   Just so I can be clear, I'll repeat my question.

Do you recognize this?

A.   I do.

MR. LEVIS:  Okay.  Can you please show Dr. Egelman Exhibit 768, please.

BY MR. LEVIS:

Q.   And do you recognize this document?

A.   I do.

Q.   What is this?

A.   It's the first page of my rebuttal report.

Q.   Okay.  How many versions of the Flo app did you test in connection with your reports?

A.   I believe there were 18 that I actually ran and collected the network data from, but then there were several others where I reverse-engineered them to look at the source code to just confirm that they would have acted the same way.

Q.   And when were these versions available?

A.   Throughout the class period.

Q.   Did you use the Flo app yourself as part of your testing?

A.   Yes.  Yeah.

Q.   And did you record screenshots associated with that?

A.   Yeah.  I recorded screenshots as well as what I entered and then looked at the network traffic.

          MR. LEVIS:  If we can show Dr. Egelman what has been mark as 604 A through I, please.

          THE COURT:  Okay.  Have those already been admitted?

          MR. LEVIS:  These are several screenshots from the Flo app.

          THE COURT:  Okay.  Are they already in?

          MR. LEVIS:  I don't believe they're all in.

          THE COURT:  Okay.

     Any objection to 604 A through I?

          MR. SADUN:  No objection, Your Honor.

          THE COURT:  Okay.  Those are admitted.

     Go ahead.

     (Trial Exhibits 604 A through 604 I received in evidence.)

BY MR. LEVIS:

Q.   Do you recognize these screenshots?

A.   I do.

Q.   And what are they?

A.   They are the screenshots I took.

Q.   Okay.  I'd like to also now show you Exhibit 605 A.

          THE COURT:  Okay.  Any objection to 605 A?

          MR. SADUN:  No objection, Your Honor.

          THE COURT:  605 A is admitted.

(Trial Exhibit 605 A received in evidence.)

THE COURT:  Jurors, you're not seeing anything; right?  You are?

That one's okay.  This is going to be toggling back and forth.

But now you can see it?  Okay.  It's in.

So go ahead.

BY MR. LEVIS:

Q.   And what is this screenshot, Dr. Egelman?

A.   More of the same.  It's another screenshot from the Flo app that I took.

Q.   Is this one of screenshots you captured?

A.   Yes, it looks like it.

Q.   I'd like to show you some other screenshots.

MR. LEVIS:  Can you please show Dr. Egelman Exhibit 611 V, W, and Y.

THE COURT:  Any objections to those?

MR. SADUN:  Just a moment.  Checking.

THE COURTROOM DEPUTY:  B as in boy?

THE COURT:  V as in Victor.  V, W, Y.

MR. SADUN:  No objection, Your Honor.

THE COURT:  Those are admitted.

(Trial Exhibits 611 V, 611 W, and 611 Y received in evidence.)

\\\

**BY MR. LEVIS:**

**Q.** And can you see those on your screen?

**A.** No.

**Q.** I can't either.

**A.** Now I can.

**Q.** And just so we're clear, what is this?

**A.** This looks like another screenshot from the Flo app.

**Q.** Okay. You mentioned before that you created log files of network traffic.

How long are those log files?

**A.** What do you mean?

**Q.** In terms of length, by pages.

**A.** Oh, by pages? I don't know. I mean, I would never try to print those. I mean, we're talking, you know, megabytes or gigabytes of data -- well, I guess it depends what I did during the testing.

Some of them, you know, there was a whole tab where you could get health information and advice, and there were videos. And I think, you know, some of the testing, if I happened to watch a video, those would have -- you now, those logs would be a lot bigger.

But I think printing these out would be kind of ridiculous because that would, yes, be a lot of pages.

**Q.** I'm going to show you what has been marked as Trial Exhibit 628 A and B.

THE COURT:  Okay.  Any objections?

MR. SADUN:  Those do not appear to be in my binder.

THE COURT:  Is there an objection?

MR. SADUN:  No objection, Your Honor.

THE COURT:  Okay.  628A and B are admitted.

(Trial Exhibits 628 A and 628 B received in evidence.)

BY MR. LEVIS:

Q.   And what is this, just for context?

A.   So this is an excerpt of one of the traffic logs, and this shows data specifically going to Facebook.

Q.   I'm going to also now show you what's been marked as Trial Exhibit 615 A, 618 A, 614 A, 627 A, 630 A, and 642 A.

THE COURTROOM DEPUTY:  I'm sorry.  Go back.  614 A?

MR. LEVIS:  627 A, 630 A, and 642 A.

THE COURT:  Okay.  Any objections?

MR. SADUN:  No objection, Your Honor.

THE COURT:  All right.  Those are admitted.

(Trial Exhibits 615 A, 618 A, 614 A, 627 A, 630 A, and 642 A received in evidence.)

BY MR. LEVIS:

Q.   And what are these, Dr. Egelman -- once they're up on your screen?

A.   The same thing.  So this is another fragment of a traffic log showing a specific transmission that went to Facebook from the Flo app.

Q.   You also mentioned earlier you reviewed source code as part of your analysis.

I'm going to show you what's been marked as Exhibit 594 A.

And what is this?

A.   It's an excerpt of the source code from the Flo app.

Q.   And how long is the source code that was produced --

THE COURT:  Any objection to 594 A?

MR. SADUN:  No objection, Your Honor.

THE COURT:  All right.  It's admitted.

Go ahead.

(Trial Exhibit 594 A received in evidence.)

BY MR. LEVIS:

Q.   And I will also now show you what has been marked as Exhibit 674 A.

THE COURT:  Any objection?

MR. SADUN:  Just a moment.  I'm pulling it up.

No objection, Your Honor.

THE COURT:  All right.  That's admitted.

(Trial Exhibit 674 A received in evidence.)

BY MR. LEVIS:

Q.   And what is this, Dr. Egelman, just so --

A.   You had previously started to ask a question about the length of the source --

Q.   Yes --

(Reporter interruption for clarity of the record.)

BY MR. LEVIS:

Q.    I'm going to go back to that question.

How long was the source code that was produced?

A.    It was gigabytes.  I mean, it was also because Facebook didn't actually produce -- or I'm sorry.  Flo didn't actually product the source code.  They converted it to an image and then saved it as a PDF to make a harder to read, so that added --

MR. SADUN:  Objection, Your Honor.

THE COURT:  It's fine.  Go ahead.

BY MR. LEVIS:

Q.    For the document that's in front of you, what is this document?

A.    This is all -- this is another excerpt of the decompiled Flo source code.

MR. LEVIS:  Okay.  If we can switch back to the presentation and make it so the jury can see the screen.

THE COURTROOM DEPUTY:  What exhibit is this?

MR. LEVIS:  This is a slide that is showing Exhibits 604 A, B, C, D, E, and F, which were admitted into evidence.

BY MR. LEVIS:

Q.    Can you explain to us what we're looking at here?

A.    Yeah.  So this basically shows what the user sees when they first use the app.

The screen on the left is basically the first screen.

There might be some, you know, interstitial while it's loading, but once the app loads, the first thing that the user is asked to do is, you know, from this screen, indicate whether they're a new user using this app for the first time or if they, you know, previously used the app and, you know, I guess saved their data somewhere.  They can then, you know, wrist over that data.

For most users, they're going to click the new user button, and that's when they're going to go through on the onboarding survey, which is mandatory in order to use the app.

So the first real question you can see labeled Step 2, it asks "How can we help you?"  And there are two options:  "I want to get pregnant" or "I just want to track my cycle."

And then basically the subsequent questions are all the same regardless of those two options.  But the next one in Step 3, it asks "When did your last period start?"  And the user can select "I don't know" to indicate they don't know when their last period was, or they can use the chooser thing to select.

And then they click "next," and then that gets them to Step 4, where it asks:  "On average, how long is your period?" And again, the choices are "I don't know" or a number of days.

Then they click "next" from there and get to Step 5:  "On average, how long is your cycle?"  And, again, the options are "I don't know" or a number of days.

And then finally, it asks "What year were you born?"  And it uses that to basically calculate their age.

Q.   You testified earlier that you tested approximately 18 versions of the Flo app.

Were these screens consistent throughout the 18 versions?

A.   Absolutely.

I guess one -- one minor change in Step 2 on later versions of the app, they had added a third option to track an existing pregnancy, so -- I think that was in Version 4.  It was -- you know, the options were "I want to get pregnant," "I just want to track my cycle," or "I'm pregnant."

Q.   I want to take a moment to ask some questions about the first screen in Step 1.

Does this screen mention Meta at all?

A.   No.

Q.   Does this screen mention Facebook at all?

A.   No.  It mentions no third parties.

Q.   When you tested the app, is there a pop-up when you get to this screen asking you to agree if Meta can record the information that you entered into the Flo app?

A.   At -- in this -- no.  This screen, there was no opportunity for the user to access the privacy policy.

Q.   Was there a check box on this screen that asked you to agree to Meta recording your answers to the health questions explicitly?

A.    No.  None of that was included in the app at this point.

Q.    Did you observe any such pop-up or check box in the apps that you tested that existed during the class period?

A.    Yeah.  I believe it was the last month or so of the class period, they finally added a screen -- it didn't show the user the privacy policy or the terms and conditions, but it added a thing saying, you know -- with a link to the privacy policy and the terms and conditions, and I think those screenshots have been shown here.

        THE COURT:  With a link to whose privacy policy?

        THE WITNESS:  Flo's.

        THE COURT:  Flo's privacy?

        THE WITNESS:  Yeah.

        THE COURT:  And before that, you had not seen that link --

        THE WITNESS:  No.  It didn't exist.

        THE COURT:  Okay.

BY MR. LEVIS:

Q.    Were users required to answer these five questions before using the Flo app?

A.    Yes.

Q.    What happens after you complete the five questions shown here?

A.    It goes to another interstitial where it, you know, says "calculating" or "predicting your cycle."  And then it

basically drops you into the main screen, which is this calendar view.  And I think screenshots have been shown about that which provides information about your cycle.

So here in the screenshot you can see on the left, after answering those questions, it's computed, you know, ovulation six days, and that's what it displays in the app there.

Q.    Did each version of the Flo app that you tested have this kind of home screen in it?

A.    Yes.

Q.    And can you explain how this works?

A.    Yeah.  So, you know, this provides the information -- you know, this is the reason why the user is using the app, right, to get information about their cycles, and it puts that front and center.

And then it also encourages them to provide additional information as they use the app.  So you can see this "plus" button here.  And if they click that, then they get what you see in the center screen and the one on the right.  The one on the right is just if you scroll further down.

And at the top, you know, it says that, you know, the cycle predictions will be more accurate if you log symptoms and other health parameters regularly.

And so there are questions here about, you know, weight, sleep, nutrition.  It has questions about whether they had sex on that day, their mood, symptoms, you know, discharge.  Yeah.

Q.   Were the options available to be entered on the right two screens consistent in the different versions of the Flo app you tested?

A.   Largely.  Yeah, largely.  And the one exception is -- so sex and sex drive.  For most of the -- a lot of the versions, the only options were protected and unprotected sex.

But beyond that, I think the changes were similar -- or the screens were largely similar from version to version.

Q.   And for the screen on the left where it says "ovulation in six days," was that consistent?

A.   Yes.

Q.   Was there other information displayed there other than ovulation about a woman's cycle?

A.   Yeah, sure.  It depends on what the goal was.

So, for instance, if the goal is, you know, tracking your period, then I think you would have more information about when to expect your next period.

But, yeah, it had all sorts of information about ovulation, pregnancy, when to expect -- when you're having your period and so forth.

Q.   Is the information on this screen where it says "ovulation in six days" calculated based on the user's answers to the onboarding survey questions we just looked at?

A.   Yeah.  That's why those are required, Because otherwise it would have no basis to calculate this.

Q.   And if the screen predicted the user's period, would that also be based on the answers to the onboarding survey questions that we looked at?

A.   Yes.

Q.   Did you examine what happens behind the scenes as users engage with the Flo app?

A.   I did.

Q.   And what did you do to examine that?

A.   Well, I mean, several different things.  So one, just looking at the traffic, what got sent when they, you know, entered things into the app as well as, you know, from examining the source code to -- which just corroborated that.

Q.   I want to walk through an --

        THE COURT:  I think we're going to break for today. This sounds like a breaking point.

        MR. LEVIS:  Yes.

        THE COURT:  All right.  So 9:00 a.m. tomorrow, 8:45.

    Now, we're going to end the same way that we ended yesterday, and we'll end each day that we spend together, which is you're going to clear your mind of anything about this trial.  We're going to put everything aside that you have heard today.  You're not going to think about this.  You're not going to make any decisions about the case.  You're not going to talk to anyone about this.  You're not going to do any research or any investigation.  You're going to go home and do anything

else but this -- whatever it is you want to do.

And I hope some of it includes a walk or whatever form of exercise you like.  You've been sitting for a long time, and we're going to continue to sit for a long time, so it's good to get a little physical activity if you can.  If you can.

So we'll see you in the morning.

THE COURTROOM DEPUTY:  All rise.

(The jury leaves the courtroom.)

(Proceedings were heard out of the presence of the jury.)

THE COURT:  You can step down.

Okay.  See you in the morning.

MS. SHARTON:  Your Honor, could I ask one housekeeping -- because it affects our witness list that we have to disclose in the next half hour.

THE COURT:  Okay.

MS. SHARTON:  And yesterday you asked us to meet and confer -- and I apologize.  I thought you had invited the motion that -- my fault.

THE COURT:  The way this works is you say, "I would like to file something," and I will say yes or no.  There was no implicit invitation.  Quite the opposite.

MS. SHARTON:  All right.  My fault.

So we would like to have Anna Klepchukova testify remotely.  She would be in the Dechert London office with professional AV folks.

She was disclosed four years ago.  She was -- they never requested a deposition, so she wasn't deposed.  She was on our witness list, and she would like to testify in this case and has been unable, after incredibly diligent effort, to get a visa in this context.

She had one pending.  She reached out in May -- in April and in May to -- and let the consulate know about this particular case and that she'd like to come testify, and unfortunately, that visa hasn't come through, so she was not able to travel to the United States.  She would be in London in our office.

THE COURT:  Meta?

MR. CANTY:  Your Honor, we would object.  We repeatedly asked what witnesses they wanted to call at trial.  We were refused any witnesses remotely.  We made that suggestion.  And the first time we heard of them wanting to call this witness --

THE COURT:  What does that mean?

MR. CANTY:  We had sent a letter to defendants asking if they would make witnesses available remotely.  First they were going to be in person.  We were told they're not showing up.  And then we asked if they would make themselves available remotely.  We were told no.

Now we hear yesterday for the first time --

THE COURT:  Make who available remotely?

**MR. CANTY:**  Witnesses that we intended to call.  So now what we've done --

**THE COURT:**  From Flo?

**MR. CANTY:**  From Flo.

We've cut deposition designations.

**THE COURT:**  You asked Flo to make them available remotely and they said no?

**MR. CANTY:**  They were not available.  They're not coming.  They're not available.  That is what we were told.

**MS. SHARTON:**  That's not true.  They did not -- they asked for four specific people.  We said we will bring one of the four.  The other three weren't available.

And this particular witness -- and they had depositions, so we said play the depositions; they're unavailable.

This particular witness, they never asked for.  She has been on our list for four years --

**THE COURT:**  I'm not worried about that.  I'm worried about gamesmanship, people saying when the other side wants it, they're not available, and then you ask for all these extraordinary indulgences when you want it.

**MS. SHARTON:**  That's not --

**THE COURT:**  Let's see some documents.  Do you have a letter or anything?  You must have some e-mails or correspondence.

**MR. CANTY:**  We were told yesterday that for over a

year they've been trying to get this visa, and we never heard about that.

THE COURT:  No, no.  The exchange about it, we won't make --

MR. CANTY:  Sure.  And Your Honor, we'll say that Mr. Satterfield, for example -- Meta told us they wanted to have him.  We didn't depose him.  So we deposed him in the event that he wasn't able to show up, so we've avoided that. He's now coming, which is great.

But they could have told us at the pretrial hearing, we have a witness we're trying to get a visa for --

THE COURT:  Let's not let air every witness gripe.

So what about this one particular person?

MR. CANTY:  They want to call the witness --

THE COURT:  The one they want to do now?

MR. CANTY:  They want to call the witness themselves.

THE COURT:  So the first point is -- it's been a long date for everybody.

The first point is they said categorically no.  What's the second point?

MS. SHARTON:  That's --

MR. CANTY:  I think there's no other issue.  They -- we had asked for witnesses to be available.

My point, Your Honor, is that we've worked collaboratively with Meta on getting witnesses available or getting depositions

taken.  We had a pretrial hearing where we tried to coordinate with one another on who parties were going to call.

Yes, it was on a witness list and a disclosure list four years ago, but we were never told until last night that this witness -- they were intending to call this witness.

Had they told us a month ago, we could have proposed taking a deposition.  We could have cut the deposition transcripts.

We hear now, in the middle of trial, that they want to call this witness remotely.

**MS. SHARTON:**  Your Honor, can I be heard?

**THE COURT:**  So when did Flo first disclose this witness?

**MS. SHARTON:**  This witness was disclosed in the initial disclosures four years ago, and was also on the witness list that was submitted on June 12th.  We expect -- they never asked for her deposition.  They never asked -- this was not one of the witnesses they requested.

And Flo absolutely did not refuse to make people available.  We have followed the letter of the Civil Rules of Procedure.  After the pretrial conference, we never heard from the plaintiffs, so I reached out to them and initiated and said:  Who would you like from Flo?

Because if it -- and they said -- they wouldn't tell us at first, and then they sent an e-mail with four names.  This is

who they told us they wanted, all of whom had been deposed.

One of them was able to travel here, so we said, that's fine, you can have this witness.  Then they decided they didn't want her.

Anna Klepchukova was never requested.

THE COURT:  What is this witness going to testify about?

MS. SHARTON:  She's the chief medical officer of Flo, and she's going to talk about the app.  She's been there since 2017.  She's going to talk about the app.  She's going to talk about the programs that they have, what the app features are and why they're there.  All of this --

THE COURT:  She's the medical officer?

MS. SHARTON:  Yes.  Address the issue --

THE COURT:  You want that?

MR. CANTY:  We'd like her here in person.

MS. SHARTON:  She can't get here, so we're offering her on video from the Dechert London office, so there will be no issues.  I'm hoping their professional AV and IT staff will be attending.

THE COURT:  All right.  Just bring in tomorrow morning -- this is for next week, I take it?

MR. SADUN:  I'm sorry?

THE COURT:  This is for next week?

MS. SHARTON:  No, this would be for Thursday.  That's

why I asked now.  Potentially, if we get there.  If we got there, yeah.

THE COURT:  What is it?  A nine-hour time difference?

MS. SHARTON:  Eight hours.  She'd be there very late, but --

Potentially on Thursday would be the earliest.  And we did submit paperwork.

THE COURT:  Questions about this visa issue situation?

MR. CANTY:  I'm just a little confused because I just heard that they tried to get a visa two months ago, and representations were made to me and my co-counsel that they've been trying for a year --

MS. SHARTON:  I can explain.

THE COURT:  Let's do this:  You two talk today a little bit more.  All right?  I'd like to hear an exact timeline of just a couple of things.  You can add things, but I'd like to know when you first told -- Flo first told the plaintiff that this person --

I'm sorry.  What is her name?

MS. SHARTON:  Brenda Sharton -- oh, her name.  Anna Klepchukova.  And it's all in the brief that we submitted, including a declaration.

THE COURT:  The brief was not on file.

MS. SHARTON:  Okay.

THE COURT:  You two just meet and confer.  I don't

have time to do this during trial.

MR. CANTY:  Yes, Your Honor.

THE COURT:  You're going to meet and confer.  You're going to agree upon when you first learned.  It should be easy.  You'll have a document.  You'll say, okay.  Just be reasonable, both of you.

So when it was first communicated, and then I do want some sense of what the visa issue is, when it started, what's the problem been.

The remote things are just not -- they're just a disaster, and I'm not going to disadvantage either side.

And I'm going to have to hear a little bit more about who's going to be in the room and why and what they're going to be doing and how we're going to double-check all that.  And I'm not going to pull any triggers until I hear more about this tomorrow.

MS. SHARTON:  Okay.

MR. CANTY:  Yes, Your Honor.  Thank you.

MS. SHARTON:  Your Honor, thank you.

THE COURT:  Okay.

THE COURTROOM DEPUTY:  All rise.

(Proceedings adjourned at 2:44 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Tuesday, July 22, 2025

_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court