**Volume 5**

**Pages 908 - 1107**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

ERICA FRASCO, et al.,                    )
individually and on behalf of  )
all others similarly situated, )
                               )
            Plaintiffs,        )
                               )
VS.                            )    NO. 3:21-CV-00757 JD
                               )
FLO HEALTH, INC., META         )
PLATFORMS, INC.,               )
                               )
            Defendants.        )
_____)

San Francisco, California
Wednesday, July 30, 2025

<u>TRANSCRIPT OF PROCEEDINGS</u>

<u>APPEARANCES</u>:
For Plaintiffs:
                        LOWEY DANNENBERG, P.C.
                        44 South Broadway, Suite 1100
                        White Plains, New York 10601
                BY:  **CHRISTIAN LEVIS, ATTORNEY AT LAW**
                     **AMANDA FIORILLA, ATTORNEY AT LAW**

                        SPECTOR ROSEMAN & KODROFF, P.C.
                        Two Commerce Square
                        2001 Market Street, Suite 3420
                        Philadelphia, Pennsylvania 19103
                BY:  **DIANA J. ZINSER, ATTORNEY AT LAW**


            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported by:  Ruth Levine Ekhaus, RDR, RMR, FCRR, CCG
            CSR No. 12219, Official  United States Reporter

**APPEARANCES**:   (CONTINUED)

For Plaintiff:

                          LABATON KELLER SUCHAROW LLP
                          140 Broadway
                          New York, New York 10005
        BY:  **CAROL C. VILLEGAS, ATTORNEY AT LAW**
             **MICHAEL P. CANTY, ATTORNEY AT LAW**
             **GLORIA J. MEDINA, ATTORNEY AT LAW**

For Defendant Flo Health, Inc.:
                          DECHERT LLP
                          US Bank Tower
                          633 West 5th Street, Suite 4900
                          Los Angeles, California 90071-2032
        BY:  **BENJAMIN M. SADUN, ATTORNEY AT LAW**
             **ALLISON OZUROVICH, ATTORNEY AT LAW**

                          DECHERT LLP
                          Cira Centre
                          2929 Arch Street
                          Philadelphia, Pennsylvania 19104-2808
        BY:  **THEODORE E. YALE, ATTORNEY AT LAW**
             **CLARE P. POZOS, ATTORNEY AT LAW**

                          DECHERT, LLP
                          One International Place
                          100 Oliver Street
                          Boston, Massachusetts 02210
        BY:  **BRENDA R. SHARTON, ATTORNEY AT LAW**

For Defendant Meta Platforms, Inc.:
                          LATHAM & WATKINS
                          555 Eleventh Street, NW, Suite 1000
                          Washington, D.C. 20004
        BY:  **ANDREW B. CLUBOK, ATTORNEY AT LAW**

                          LATHAM & WATKINS LLP
                          650 Town Center Drive, 20th Floor
                          Costa Mesa, California 92626
        BY:  **MICHELE D. JOHNSON, ATTORNEY AT LAW**

                          LATHAM & WATKINS LLP
                          505 Montgomery Street, Suite 2000
                          San Francisco, California 94111
        BY:  **MELANIE M. BLUNSCHI, ATTORNEY AT LAW**
      **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

1  **APPEARANCES**:  (CONTINUED)

2                              GIBSON, DUNN & CRUTCHER LLP
                              One Embarcadero Center, Suite 2600
3                              San Francisco, California 94111-3715
                    BY:  **ELIZABETH K. McCLOSKEY, ATTORNEY AT LAW**
4                        **ABIGAIL A. BARRERA, ATTORNEY AT LAW**

5

**Also Present:  Anjali Dahiya**
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

Wednesday, July 30, 2025 - Volume 5

|                                              | **PAGE** | **VOL.** |
|----------------------------------------------|----------|----------|
| Plaintiffs Rest                              | 1093     | 5        |
| Rule 50 Motion                               | 1094     | 5        |

| **PLAINTIFFS' WITNESSES**                    | **PAGE** | **VOL.** |
|----------------------------------------------|----------|----------|
| **SATTERFIELD, STEPHEN (RECALLED)**          |          |          |
| (PREVIOUSLY SWORN)                           | 922      | 5        |
| Cross-Examination by Ms. McCloskey           | 922      | 5        |
| Redirect Examination by Mr. Canty            | 934      | 5        |
|                                              |          |          |
| **WOOLDRIDGE, TOBIAS**                       |          |          |
| (SWORN)                                      | 946      | 5        |
| Direct Examination by Mr. Canty              | 947      | 5        |
| Cross-Examination by Mr. Clubok              | 972      | 5        |
| Redirect Examination by Mr. Canty            | 1030     | 5        |
| Redirect Examination by Mr. Clubok           | 1044     | 5        |
|                                              |          |          |
| **BUGAEV, ROMAN**                            |          |          |
| By Videotaped Deposition (not reported)      | 1048     | 5        |
|                                              |          |          |
| **GOLBECK, JENNIFER**                        |          |          |
| (SWORN)                                      | 1048     | 5        |
| Direct Examination by Ms. Villegas           | 1049     | 5        |
| Cross-Examination by Ms. Blunschi            | 1084     | 5        |
| Cross-Examination by Mr. Sadun               | 1091     | 5        |
| Redirect Examination by Ms. Villegas         | 1092     | 5        |

# E X H I B I T S

| **TRIAL EXHIBITS** | **IDEN** | **EVID** | **VOL.** |
|--------------------|----------|----------|----------|
| 104R               |          | 947      | 5        |
| 110A               |          | 947      | 5        |
| 110                |          | 972      | 5        |
| 111R               |          | 947      | 5        |
| 226A               |          | 947      | 5        |

**<u>I N D E X</u>**

**<u>E X H I B I T S</u>**

| <u>TRIAL EXHIBITS</u> | <u>IDEN</u> | <u>EVID</u> | <u>VOL.</u> |
|---|---|---|---|
| 235 | | 947 | 5 |
| 404 | | 972 | 5 |
| 426 | | 972 | 5 |
| 426A | | 972 | 5 |
| 488 | | 1093 | 5 |
| 627A | | 972 | 5 |
| 1046 | | 972 | 5 |
| 1046B | | 972 | 5 |
| 1271 | | 972 | 5 |

1    <u>Wednesday - July 30, 2025</u>                              <u>9:14 a.m.</u>

2                          P R O C E E D I N G S

3                              ---o0o---

4    (Proceedings were heard out of the presence of the jury.)

5            **THE COURTROOM DEPUTY:**  All rise.  This Court is now in

6    session.  The Honorable James Donato presiding.

7            **THE COURT:**  Good morning.

8            **ALL:**  Good morning, Your Honor.

9            **THE COURT:**  Everybody is refreshed.

10           **THE COURTROOM DEPUTY:**  Please be seated.  Calling

11   Civil 21-757, Frasco versus Flo Health.

12      Counsel?

13           **MR. CANTY:**  Taking appearances?

14      Your Honor, Michael Canty on behalf of the plaintiffs.

15   Good morning.

16           **MS. VILLEGAS:**  Good morning, Your Honor.  Carol

17   Villegas on behalf of the plaintiffs.

18           **MS. ZINSER:**  Good morning, Your Honor.  Diana Zinser

19   on behalf of plaintiffs.

20           **MS. FIORILLA:**  Good morning, Your Honor.  Amanda

21   Fiorilla on behalf of plaintiffs.

22           **MR. LEVIS:**  Good morning, Your Honor.  Christian Levis

23   of behalf of plaintiffs.

24           **MS. MEDINA:**  Good morning, Your Honor.  Gloria Medina

25   on behalf of the plaintiffs.

# PROCEEDINGS

1      **MS. SHARTON:**  Good morning.  Brenda Sharton on behalf

2 of Flo Health.

3      **THE COURT:**  One second.

4      **MR. SADUN:**  Good morning, Your Honor.  Benjamin Sadun

5 for defendant Flo Health.

6      **MS. POZOS:**  Clare Pozos on behalf of Flo Health.

7      **MS. OZUROVICH:**  Good morning.  Allison Ozurovich on

8 behalf of Flo Health.

9      **MS. JOHNSON:**  Good morning, Your Honor.  Michele

10 Johnson, Latham & Watkins, on behalf of Meta.

11      **MR. CLUBOK:**  Good morning, Your Honor.  Andrew Clubok,

12 also Latham, on behalf of Meta.

13      **MS. BLUNSCHI:**  Good morning, Your Honor.  Melanie

14 Blunschi from Latham on behalf of Meta.

15      **MS. McCLOSKEY:**  Good morning, Your Honor.  Elizabeth

16 McCloskey on behalf of Meta.

17      **THE COURT:**  Okay.  Plaintiff, are you planning to rest

18 today?

19      **MR. CANTY:**  Your Honor, that's our hope, depending on

20 how long crosses go.

21    We have Mr. Satterfield to finish up.  We intend to call

22 Mr. Wooldridge and Dr. Jen Golbeck, and then rest.

23      **THE COURT:**  Okay.  All right.  Somebody wanted to ask

24 me something.

25      **MS. SHARTON:**  Yes, Your Honor.  Thank you.

1    We just had one threshold witness matter that we'd like to

2 resolve because it will affect the rest of the day's witnesses

3 for Flo.

4    Plaintiffs told us last night that they intend to move to

5 exclude our expert witness, Lorin Hitt, who you may recall

6 Professor Hitt was touching down in San Francisco about the

7 time they told us this.  This is his second trip out to testify

8 because he came last week and then we didn't get to him.  But

9 we had disclosed him last Tuesday and his exhibits and slides,

10 heard nothing from plaintiffs.  He flew in.  We didn't get to

11 him.  He went back to Philadelphia, flew in yesterday.  We

12 disclosed him again on Monday, heard nothing 'til last night.

13    So he's arrived for the second time, and as you'll recall,

14 I think, this is the third bite at maybe a *Daubert*.  On

15 May 15th you definitively ruled and said the motion to exclude

16 witness Hitt is again denied.  Hitt's report relies on

17 extensive evidence and explains the bases of his conclusions --

18    THE COURT:  Well, you're asking me -- haven't made a

19 motion yet and you're launching into a defense.

20    MS. SHARTON:  Okay.  Fair enough.

21    THE COURT:  Why don't we hear from the plaintiff

22 first, and then I can take up your point.

23    So what are you planning to do?

24    MR. LEVIS:  I appreciate Professor Hitt's travel

25 schedule.

1    The issue -- which we just received an updated slide

2  presentation this morning and why we believe a motion is

3  necessary is that defendants plan to offer Professor Hitt not

4  to testify about anything related to an economic analysis that

5  they represented at the pretrial conference.  They intend to

6  use him as an expert on notice.

7    The slide deck that they have, intends to offer testimony

8  saying that Facebook -- Flo app users did not react negatively

9  to learning about the Flo app's use of the Facebook SDK.

10  There's no scientific basis or methodology in Professor Hitt's

11  report or anywhere else that supports that conclusion.  There's

12  actually no evidence in the record that anyone saw these

13  articles.

14    We also learned from their disclosure that they intend to

15  have him testify about 62 separate articles that they believe

16  came out around the same time, again, with no evidence, no

17  methodology, no survey that would support any indication that

18  plaintiffs or class members saw it.  That's junk science that

19  needs to be excluded, and that's why we intend to move to

20  exclude --

21    THE COURT:  Well, I wouldn't say it's junk science,

22  but it's certainly not expert testimony.  An ordinary jury can

23  understand that without being spoon-fed by an expert.

24    But why don't we just wait.  You can object when he's

25  asked questions.

**PROCEEDINGS**

1    **MR. LEVIS:**  I think the concern we have about going

2    that far is that the highly prejudicial nature of this type of

3    testimony, even suggesting that people saw articles when

4    there's nothing in the record that they did, no plaintiffs were

5    questioned about these articles, and they were never produced

6    in discovery, is something we can't undo if Professor Hitt

7    starts to testify about it.  That's why --

8        **THE COURT:**  Stand up and object and I stop it.  What

9    do you think is going to happen?

10       **MR. LEVIS:**  Well, our concern is that they're going to

11   just lob this out there and then get the comment out there and

12   there's nothing we can do about it.

13       I really would not ask to file a motion if I did not think

14   it was this important and serious.  That's our serious concern.

15       He's also --

16       **THE COURT:**  Well, why don't we -- I'm very skeptical

17   that he's allowed to testify on any of these notice issues.

18   That's not expert testimony.

19       This reminds me -- I had a case -- I want to bring the

20   jury in so I don't want to tell you my story.

21       This is not expert testimony.

22       **MR. LEVIS:**  He's also -- if I may resume that issue --

23   he's offering as well as a second opinion on the subjective

24   expectation of value of privacy.  This is what Your Honor

25   excluded with defendants' expert, Molly Miller, previously, and

1    they're just trying to get that same testimony in through this

2    witness now.  That should be excluded as well.

3            MS. SHARTON:  Your Honor --

4            THE COURT:  Whatever I said earlier still goes.

5            MS. SHARTON:  Can I have one minute, just to address

6    the notice?

7        The newspaper -- nothing has changed.  I wish we were that

8    nimble.  Nothing has changed.  He's going to testify about

9    charts that were in his report.  Nothing to do with notice.

10   It's the newspaper articles -- this is an endowed chair at

11   Wharton, so it's hardly junk science, but it goes straight to

12   harm.  He's going to testify about statistical empirical

13   evidence regarding the millions of women --

14           THE COURT:  He can't say there are 62 articles that

15   plaintiffs should have read.  That's not expert testimony.

16           MS. SHARTON:  He's not going to testify to that --

17           THE COURT:  He can't do any of that.  And he certainly

18   can't summarize any articles.  He can't talk about there was

19   adequate notice.  That's not expert testimony.

20           MS. SHARTON:  He's not going to testify to any of

21   that.  He's going to say he looked at the user base before --

22   all it says is what we've said so far, like the bombshell news.

23   Nothing about the -- we're not going to use any --

24           THE COURT:  Why would he talk about any of that?

25           MS. SHARTON:  Because it's in his report.  It goes to

1    harm, which is --

2         THE COURT:  You know, there's a lot in his report

3    that's not coming in.

4         MS. SHARTON:  Yes, I understand that.

5         THE COURT:  So just saying it's in his report doesn't

6    answer the question.  Why is he going to -- I thought he was

7    here for economic issues.

8         MS. SHARTON:  He is.  It goes to the harm that the --

9    if you saw no change in the user base before or after, what

10   harm is there.  And that goes to three or -- three of the four

11   claims against Flo:  Breach of contract, invasion of privacy,

12   and he -- Serge Egelman himself opened the door to this

13   testimony.

14        THE COURT:  Harm to whom?  Harm to the users?

15        MS. SHARTON:  To the millions of women in the class

16   or -- well, millions of users in the class.  He's going to

17   testify just on economic harm.  These are, you know, squarely

18   right in the middle of an economist's opinion.

19        THE COURT:  What does the Wall Street Journal article

20   have to do with that?

21        MS. SHARTON:  The way he did his analysis or one of

22   the ways is by looking at that bombshell news and seeing what

23   happened to the user base before and after.  And so we are

24   measuring economic harm across the class if people are not

25   changing their behavior.

**PROCEEDINGS**

 1          And Serge Egelman opened the door to this testimony too.

 2     He, despite not being an expert in those areas, offered

 3     numerous opinions --

 4          THE COURT:  And I can't -- we just have to wait for

 5     the --

 6          MR. LEVIS:  If I may just --

 7          THE COURT:  He's not going to start talking about

 8     notice and things like that.

 9          MR. LEVIS:  I can illustrate this pretty briefly.

10     That's not an accurate representation --

11          THE COURT:  Let's just wait.  Let's bring the jury.

12          Let's finish, and then we have plenty of time to deal with

13     this later.

14          MS. POZOS:  Your Honor, may I just address one

15     scheduling matter?

16          THE COURT:  Yes.

17          MS. POZOS:  My understanding is -- having spoken to

18     other counsel and having worked with the Court this morning, on

19     the order of witnesses, Mr. Satterfield will finish testifying

20     and then I believe no one is opposed to our witness

21     Dr. Klepchukova, in London, testifying.  We've tested the Zoom

22     tech this morning with the Court.  She is ready and waiting.

23     Due to the time difference, I believe plaintiffs' counsel has

24     no issue with her testifying after Mr. Satterfield.

25          MR. CANTY:  Your Honor, we said we would defer to

**PROCEEDINGS**

1  the Court and the Court's convenience.  We prefer to move

2  forward with our case, but if the Court wants to take this out

3  of order --

4      **THE COURT:**  It's your case.  You can call them any way

5  you want.

6      **MR. CANTY:**  We're not calling him, Your Honor.  To be

7  clear, he's not our witness.  We're not calling them.

8      **THE COURT:**  I know, so just do your case and --

9      **MR. CANTY:**  Thank you.

10      **THE COURT:**  Do you want to put that binder back?

11  Okay.  Let's bring in the jury, please.

12      **MS. McCLOSKEY:**  Your Honor, Elizabeth McCloskey.

13  Can I just raise two quick objections to Mr. Satterfield's

14  questioning by plaintiffs' counsel on Thursday?

15  Counsel used --

16      **THE COURT:**  No retroactive objections.  You've got to

17  do them on the fly.

18  Okay.  Bring the jury out, please.

19      **THE COURTROOM DEPUTY:**  For the people sitting in the

20  gallery, there's no drinking, no use of cell phones or laptops

21  unless you are press.

22      **THE COURT:**  Where is the witness?  Bring him on up.

23  (Stephen Satterfield steps forward to resume the stand.)

24  \\\

25  \\\

1      <u>**STEPHEN SATTERFIELD**</u>,

2  called as a witness for the Plaintiffs, having been previously

3  duly sworn, testified further as follows:

4                    (The jury enters the courtroom.)

5        (Proceedings were heard in the presence of the jury.)

6           **THE COURTROOM DEPUTY:**  Please be seated.

7           **THE COURTROOM DEPUTY:**  We're back on the record in

8  Civil 21-757, Frasco versus Flo Health.

9           **THE COURT:**  All right.  Good morning.  We're going to

10  finish with this witness and full speed ahead.

11       Go ahead.

12  **BY MS. McCLOSKEY:**

13  **Q.**   Welcome back, Mr. Satterfield.

14  **A.**   Thank you.

15  **Q.**   When we left off this week, we were in the middle of

16  Trial Exhibit 1226, which has three versions of Facebook's data

17  policy which were in effect during the class period:  A version

18  from 2015, from 2016, and 2018.

19       I'd like to take a look at the first paragraph of

20  Facebook's 2018 data policy.  And, again, the data policy is

21  part of the agreement between Facebook and all its users;

22  correct?

23  **A.**   Yes.

24  **Q.**   Okay.  Can you please read for the jury the first

25  paragraph of Facebook's 2018 data policy on your screen now?

1    A.    Yes.  It says (as read):

2              "This policy describes the information we

3         process to support Facebook, Instagram, Messenger,

4         and other products and features offered by Facebook

5         (Facebook Products or Products).  You can find

6         additional tools and information in the Facebook

7         settings and Instagram settings."

8    Q.    Thank you.

9         Mr. Satterfield, what is the purpose of the data policy

10   which is a part of the agreement between Facebook and its

11   users?

12   A.    It's a detailed description of how we collect, share, and

13   store information, how we use information.

14   Q.    Okay.  Great.  Let's go to the section "What kinds of

15   information do we collect," and we'll go in that section to the

16   header "How do we use this information?"

17        I'm going to pull up the first full paragraph under "How

18   do we use this information?" called "Provide, personalize, and

19   improve our products."

20        Can you please read to the jury the highlighted portion of

21   this paragraph.

22   A.    Yes.  (as read):

23             "We use the information we have to deliver our

24        products, including to personalize features and

25        content, including your news feed, Instagram feed,

1          Instagram stories, and ads, and make suggestions for

2          you such as groups or events you may be interested in

3          or topics you may want to follow on and off our

4          products.

5               "To create personalized products that are unique

6          and relevant to you, we use your connections,

7          preference, interests, and activities based on the

8          data we collect and learn from you and others."

9          Am I just reading the highlighted portions?

10    Q.    Yes.  Thank you.

11    A.    And then it also says (as read):

12               "You can learn more about how we choose the ads

13          you see," at the very end of the paragraph.

14    Q.    Thank you.

15         Mr. Satterfield, is this paragraph one of the places where

16    Facebook informs users that it uses their data to personalize

17    features and content, including ads?

18    A.    Yes.  It's one of many places where we explain this.

19    Q.    Okay.  Great.

20         Let's turn to page 15 and take a look at another section

21    under "How do we use this information?" called "Ads and other

22    sponsored content."

23         And can you please read this paragraph to the jury.

24    A.    (As read):

25               "We use the information we have about you,

1      including information about your interests, actions,

2      and connections, to select and personalize ads,

3      offers, and other sponsored content that we show you.

4      Learn more about how we select and personalize ads

5      and your choices over the data we use to select ads

6      and other sponsored content for you in the Facebook

7      settings and Instagram settings."

8  Q.  Is this yet another part of Facebook's data policy where

9  it informs users that it uses the information it has about

10 users to select and personalize ads?

11 A.  Yes, that's what this is.

12 Q.  And you can see at the end there that there's highlighted

13 language going to Facebook settings and Instagram settings;

14 correct?

15 A.  Yes.

16 Q.  Are those links?

17 A.  Yes, they are.

18 Q.  And what do they link to?  What types of information do

19 they link to?

20 A.  Well, they link to controls that would govern your ad

21 experience and the information that Facebook uses to show you

22 ads.

23      And so, for example, we talked about the -- what we

24 sometimes call the third-party data control where if a

25 third-party app, website, sends us information through the SDK,

1  you can choose whether that information is used to advertise to

2  you.  We also have a control that allows you to choose whether

3  that information is stored with your account.

4      Those are the kinds of settings that would be available

5  behind those links.

6  Q.   Okay.  Let's look at one more section under "How do we use

7  this information?"  Let's pull up "Provide measurement

8  analytics and other business services."

9      And once again, can you please read this language to the

10 jury.

11 A.   Yes.  (As read):

12      "We use the information we have, including your

13      activity off our products, such as the websites you

14      visit and the ads you see, to help advertisers and

15      other partners measure the effectiveness and

16      distribution of their ads and services and understand

17      the types of people who use their services and how

18      people interact with their websites, apps, and

19      services.  Learn more how we share information with

20      these partners."

21 Q.   Is this one place in Facebook's agreements with users

22 where Facebook informs users that it can use the information it

23 receives from apps to provide analytic services, measurement

24 services to those apps?

25 A.   Yes.  That's what's being described here.  The analytics

1  reports that an app developer would see if they were to use the

2  SDK, that's what's being described here.

3  **Q.**   I'd like to turn to the next section of the data policy,

4  which is entitled "How is this information shared?" and pull up

5  a paragraph under "Sharing with third-party partners."

6      Thank you.

7      And, Mr. Satterfield, can you just please read the

8  highlighted sentence to the jury.

9  **A.**   (As read):

10          "We don't sell any of your information to anyone

11      and we never will."

12  **Q.**   Is this where Facebook promises users that it will never

13  share -- it will never sell user data?

14  **A.**   Yes, that's right.

15  **Q.**   Okay.  Let's turn to the very end of this section "How is

16  your information shared?" and pull up the final paragraph of

17  this section.

18      And will you just read this one sentence to the jury.

19  **A.**   Yes.  This says (as read):

20          "Learn more about how you can control the

21      information about you" --

22  I'm sorry.

23  (As read):

24          "Learn more about how you can control the

25      information about you that you or others share with

1          third-party partners in the Facebook settings and

2          Instagram settings."

3    Q.   Is this another place in the data policy where Facebook

4    gives information about how to control the use of information

5    about them?

6    A.   Yes, and these settings would have been the ones that I

7    described a moment ago.

8    Q.   And I'd like to pull up just one more portion of this data

9    policy.  Let's pull up the end of the data policy under the

10   header "How will we notify you of changes to this policy?"

11         And can you please read this language aloud.

12   A.   Yes. (As read):

13          "We'll notify you before we make changes to this

14          policy and give you the opportunity to review the

15          revised policy before you choose to continue using

16          our products."

17   Q.   Mr. Satterfield, in Facebook's data policies as well as in

18   its terms of service that we looked at last week, does Facebook

19   provide similar language about periodic updates it makes to its

20   agreements with users?

21   A.   Yes, it does.

22   Q.   And did Facebook and Instagram users who continued to use

23   those platforms agree to updated versions of these agreements,

24   the terms of service and the data policy?

25          MR. CANTY:  Objection.

1          THE COURT:  What's the objection?

2          MR. CANTY:  Calls for opinion.

3          THE COURT:  Let's see.  Why don't you reask that.

4          MS. McCLOSKEY:  Sure.

5    BY MS. McCLOSKEY:

6    Q.   Did Facebook generally notify users whenever it made

7    material updates to these agreements, the terms of service or

8    the data policies, for example, through in-app notifications

9    and then through e-mails?

10   A.   Yes.  It's our standard practice when we're making a

11   material update to the terms of service or the privacy policy

12   that we would provide in-product notice, a notice in the apps.

13   Q.   And is continued use of Facebook and Instagram subject to

14   those updated versions of the terms of service and data policy?

15   A.   Yes.  We would make that clear that your continued use of

16   the products constitutes your agreement to the revised, updated

17   terms and privacy policies.

18          MS. McCLOSKEY:  We can take that down, Mr. Johnson.

19   BY MS. McCLOSKEY:

20   Q.   Do you recall that during your testimony on Thursday,

21   plaintiffs' counsel asked you about certain documents that you

22   had never seen until plaintiffs' counsel showed them to you at

23   your deposition in this matter?

24   A.   Yes.

25   Q.   And your deposition in this matter was just two and a half

1    weeks ago; correct?

2    A.    Yes.

3    Q.    So to be clear, those documents that you were shown by

4    plaintiffs' counsel for the first time in your deposition, you

5    had never seen those documents until two and a half weeks ago

6    despite the fact that they were written years and years ago?

7         MR. CANTY:  Objection.

8         THE COURT:  Why don't you just ask a question rather

9    than lead the witness down the garden path.

10   BY MS. McCLOSKEY:

11   Q.    Had you seen those documents, which were dated from 2018,

12   2019, before your deposition two and a half weeks ago?

13        MR. CANTY:  Objection.

14        THE COURT:  You can -- he can answer.

15        THE WITNESS:  I hadn't, no.

16   BY MS. McCLOSKEY:

17   Q.    Mr. Satterfield, on Thursday, plaintiffs' counsel asked

18   you questions which tried to compare Meta to others in the

19   industry.

20        Do you believe that Meta has been an industry leader with

21   respect to protecting the privacy interests of its users?

22        MR. CANTY:  Objection.

23        THE COURT:  You can answer that.  Go ahead.  It's just

24   his view.  Meta employees can tell you about Meta.

25        Okay.  Go ahead.

1          **THE WITNESS:**  I strongly believe that we've been a

2     leader, including in some of the protections that we've talked

3     about in this case.

4     **BY MS. McCLOSKEY:**

5     **Q.**   Now, in this case, plaintiffs allege that Facebook

6     software development kit is a recording device used to record

7     confidential communications.

8          Is the software development kit a recording device?

9          **MR. CANTY:**  Objection.

10         **THE COURT:**  Sustained.

11    **BY MS. McCLOSKEY:**

12    **Q.**   Mr. Satterfield, did Facebook ever intentionally record

13    any user's communications with Flo, to the best of your

14    knowledge?

15         **MR. CANTY:**  Objection.

16         **THE COURT:**  You need to lay a foundation before

17    you ask that.

18    **BY MS. McCLOSKEY:**

19    **Q.**   Mr. Satterfield, through your work at Facebook, you have

20    become familiar with how the software development kit works;

21    correct?

22    **A.**   Yes, I have.

23    **Q.**   And you've been working in areas relating to the software

24    development kit for quite a few years now during your tenure at

25    Facebook; correct?

1    A.    Yes.

2    Q.    To the best of your knowledge, did Facebook ever

3    intentionally record any of its users' confidential

4    communications with the Flo app?

5              MR. CANTY:   Objection.

6              THE COURT:   Sustained.   The foundation is not adequate

7    for that question.

8              MS. McCLOSKEY:   Okay.

9    BY MS. McCLOSKEY:

10   Q.    To the best of your knowledge, did Facebook ever record

11   any communications using the software development kit?

12             MR. CANTY:   Objection.

13             THE COURT:   You've got to build the floor before you

14   can ask him these things.   The floor is not there, so that's

15   sustained.

16   BY MS. McCLOSKEY:

17   Q.    Mr. Satterfield, are you aware of how the software

18   development kit functions?

19   A.    Yes.

20   Q.    And you're aware that people use apps and input

21   information into those apps?

22   A.    Yes.

23   Q.    And you have become familiar through your work at Facebook

24   with how those apps send information to Facebook; correct?

25   A.    Yes.

1    Q.   Based on your knowledge of how the software development

2    kit works and how you -- people can enter information into

3    apps, is it -- are you aware of whether Facebook ever recorded

4    communications using the software development kit?

5              MR. CANTY:  Objection.

6              THE COURT:  Just for me and for the jury --

7         Now, I understood you were an attorney; is that right?

8              THE WITNESS:  I am now.  I was not an attorney for the

9    company at this point.

10             THE COURT:  No, no.  You're an attorney --

11             THE WITNESS:  Yes.

12             THE COURT:  Okay.  Are you also a software engineer?

13             THE WITNESS:  No, I'm not.

14             THE COURT:  You've never done any engineering work?

15             THE WITNESS:  I have not.

16             THE COURT:  Okay.

17        Those are sustained.  You can't ask those questions.

18             MS. McCLOSKEY:  Okay.  One moment.

19                       (Counsel conferring.)

20   BY MS. McCLOSKEY:

21   Q.   Through your work at Facebook, did you have work relating

22   to whether Facebook collects information, receives information

23   from third-party apps?

24   A.   Yes.

25   Q.   And did you ever hear through your work at Facebook in

1    words or substance that Facebook wanted to receive confidential

2    communications between any user and any app?

3            MR. CANTY:  Objection.

4            THE COURT:  That's sustained.

5            MS. McCLOSKEY:  Okay.  Thank you, Mr. Satterfield.

6            THE COURT:  Okay.  Any brief redirect?

7            MR. CANTY:  Yes, Your Honor.

8                    <u>REDIRECT EXAMINATION</u>

9    BY MR. CANTY:

10   Q.   Mr. Satterfield, you were asked questions about

11   Trial Exhibit 226; correct?

12   A.   I'm sorry.  I --

13   Q.   That's the one we were just talking about, 226C --

14   A.   Okay.

15   Q.   -- which is the 2018 data policy.

16   A.   Yes.

17   Q.   And I'd like to turn to the paragraph where it says

18   "Information from websites and apps that use our services."

19   A.   Oh.

20           THE COURT:  Can you put that up for us?

21           MR. CANTY:  Sure.

22           THE COURT:  Do you have that?

23           THE WITNESS:  I don't have it.

24           THE COURT:  I think we'll need it on the screen.

25           MR. CANTY:  That would be great.

1    I'm sorry.  1226.  Sorry.

2         **THE WITNESS:**  I have it now.

3  **BY MR. CANTY:**

4  **Q.**  Okay.  I'd like to turn to page 2, where it says -- do you

5  see where it says "Information from websites and apps that use

6  our services"?

7  **A.**  Sorry.  It's gone away, and I think we were on the wrong

8  page.

9  **Q.**  Well, let me ask you this:  You've looked at a number of

10  privacy policies and data policies, in fact, the policies that

11  we just looked at, which is 1226C, runs some nine pages; is

12  that right?

13  **A.**  I don't know how many pages it was, but that sounds about

14  right.

15         **MR. CANTY:**  May I approach the witness, Your Honor?

16         **THE COURT:**  Yes.

17              (Counsel approaches witness.)

18  **BY MR. CANTY:**

19  **Q.**  Why don't you take a look and you can count.

20  **A.**  (Witness examines document.)

21       Yes, it's nine pages.

22  **Q.**  And can you tell me where in this -- this data policy you

23  disclosed to users that you'd collect sensitive health

24  information from the Flo Health app?

25  **A.**  We didn't collect that information.  That information, we

1    told developers not to send us.

2    Q.   Well, you're aware there was testimony in this case that

3    that information was, in fact, sent to Meta?  Are you disputing

4    that that happened?

5    A.   Yes.

6    Q.   Okay.  And nowhere in that document do you see the words

7    "Flo"  -- "the Flo app;" correct?

8    A.   In the privacy policy?  The Meta privacy policy?

9    Q.   The data policy.

10   A.   No, it doesn't reference the Flo Health app.

11   Q.   It doesn't mention pregnancy apps; correct?

12   A.   It doesn't mention pregnancy apps.

13   Q.   And it doesn't mention fertility tracking apps?

14   A.   No, it does not.

15   Q.   So it's your testimony that Meta never received data --

16   custom app event and parameters from Flo?  Is that your

17   testimony?

18   A.   No, that's not my testimony.  I think there's been

19   evidence in the case that Flo did send certain information that

20   would have included things like custom app events.

21   Q.   And the parameters like a woman wanting to get pregnant or

22   tracking her cycle or that she was pregnant; correct?

23   A.   I -- I don't know enough about the specifics about what

24   was sent.  I know that custom app events were part of what was

25   sent.  I saw testimony about that.  I've heard about that.  But

1    I can't really go any deeper on the specifics of what came

2    over.

3    Q.    Okay.  And you were aware -- we went over last week that

4    there were two letters that were sent or e-mails that were sent

5    to the Flo Health app, one in December of 2018 and one in

6    January of 2019, indicating that they may have been sending

7    sensitive data through the custom app events; correct?

8    A.    Yes.  Those were -- those were notices that went out

9    because they were sending -- or they may have been sending

10   information that was triggering the PII filter that we talked

11   about.

12   Q.    But that letter specifically highlighted that they may be

13   sending information involving health data; correct?

14   A.    No, that's not what it said.

15   Q.    Let's pull up the letter.

16   A.    It cited the policy, which refers to a number of different

17   categories of information that developers are prohibited from

18   sending us.

19   Q.    And one of those was health data; correct?

20   A.    Yes, but you suggested that the notice was about their

21   having sent health data, and that's not -- that's not correct.

22   Q.    Sure.

23        With respect to that e-mail that went out, did you

24   investigate whether or not Flo had violated the business tools

25   terms?

1    A.   I wouldn't have been involved in an investigation.  I

2    wasn't involved in the investigation here, if there was one.

3    Q.   Well, you're aware that they --

4         Well, let me ask you this:  In the business tools terms,

5    you require that apps have an opt-out provision clearly

6    delineated in their terms of service or their privacy policy

7    with their users; correct?

8    A.   I think what you're referring to is the requirement that

9    apps point people to where they can opt out of having the

10   information that the developer sends used for advertising.

11   Q.   Right.  And -- or were you aware that your business tools

12   terms require that to be robust and sufficiently prominent

13   notice; right?  Isn't that what the business tools terms say?

14   A.   Yes.  Now, we're talking about two slightly different

15   things here; right?  There's notice and then there is a pointer

16   to the control for ads.  And so what you're describing is the

17   notice requirement.

18   Q.   And were you aware that that was nowhere in any of the --

19   in any of the privacy policies that Flo had put out to its

20   users?

21        MS. McCLOSKEY:  Objection.

22        THE COURT:  Why don't you rephrase that.

23   BY MR. CANTY:

24   Q.   Well, have you had the opportunity during the course of

25   this litigation to actually look at Flo's privacy policies?

A.    I -- during someone's testimony earlier this week, I saw

some excerpts, but I haven't reviewed in depth, no.

Q.    So you can't say definitively whether or not they complied

with the business tools terms that you require all your app

developers to follow; right?

        MS. McCLOSKEY:  Objection.

        THE COURT:  Well, if the question is "Do you know if

Flo complied with that policy," do you know one way or the

other?

        THE WITNESS:  I don't.

        THE COURT:  Okay.

BY MR. CANTY:

Q.    And, in fact, Meta never took any action against Flo?

They never suspended their use of the SDK; correct?

A.    So, again, I wouldn't have been involved in any

investigation or action against a particular developer like

Flo, so I couldn't -- I couldn't speak to that.

Q.    Well, as you sit here today, do you know if Meta has taken

any action against Flo for violating the business tools terms?

        MS. McCLOSKEY:  Objection.

        THE COURT:  If you know.

        THE WITNESS:  I -- first of all, I don't -- I don't

know that there's been any conclusion that they violated the

business tools terms, but I'm not aware of any sort of

investigation or action.

BY MR. CANTY:

Q.   Well, if they had sent information like where a woman was

in her ovulation or where she was in her cycle, would you --

would you believe that that would have violated the business

tools terms that required app developers to not send sensitive

health data?

MS. McCLOSKEY:  Objection.

THE COURT:  That's sustained.

BY MR. CANTY:

Q.   Well, did you consider sensitive health data with respect

to where a woman is in her menstrual cycle to be data that

should not be sent to Meta?

A.   This is a -- this is a really hard question.  It's hard to

make an -- to form an opinion about that in the abstract

without knowing exactly what data came over.

Q.   Well, as of today, you have a health -- you have a health

filter that precludes this information that you described it as

it filters it out; right?

A.   The health filter is a filter that operates by classifying

websites and apps and then is triggered by certain terms that

are health-related.  I don't have a comprehensive knowledge of

what those terms are or even which apps were classified, and I

haven't worked on this stuff for a while, so I couldn't say for

sure what would be triggered and what wouldn't.

Q.   Well, if -- if information like where a woman was in her

1   menstrual cycle were sent today, would that be information that

2   Meta would still collect through custom app events?

3           **MS. McCLOSKEY:**  Objection.

4           **THE COURT:**  Overruled.  You can answer that.

5           **THE WITNESS:**  I just don't know.  I don't have

6   enough -- I don't have a good enough knowledge of our health

7   filter today to -- to have an opinion about that.

8       And I think -- again, we talked about this last week.

9   It's very context-dependent.  Like what is sensitive and what

10  isn't?  It depends on which app is sending the information.

11      There's a lot more here to consider, so I can't just sort

12  of form a judgment, you know, sitting here today.

13  **BY MR. CANTY:**

14  **Q.**  So what does this health filter catch if it's not catching

15  sensitive information abut where a woman is in her menstrual

16  cycle?

17          **MS. McCLOSKEY:**  Objection.

18          **THE COURT:**  You can answer what your understanding is

19  of what this filter catches.

20          **THE WITNESS:**  So my understanding -- and, you know, I

21  haven't worked on this for a while, but I did work on it in the

22  early days in 2019.

23      My understanding is it does two things:  One is that it

24  tries to classify health-related websites, and then when those

25  health websites or apps send information over, there is a --

1    essentially a list.  And that list is dynamic.  It is -- you

2    know, it gets bigger over time through machine learning.  But

3    there's a list that looks for particular terms.

4        And if -- if -- if the transmissions from an app contain

5    those terms, then it could potentially -- that information

6    could be blocked or deleted, set aside.

7        I don't know what the terms are in the -- on the list.

8    You know, there are medical conditions, diseases -- I think

9    it's things like that.  I don't know how the information that

10   you were referring to would be treated by the list.

11   **BY MR. CANTY:**

12   Q.   Do you know if pregnancy is on the list?

13        **MS. McCLOSKEY:**  Objection.

14        **THE COURT:**  You can answer.

15        **THE WITNESS:**  I don't know.  I don't -- I don't know

16   whether it's on the list.

17   **BY MR. CANTY:**

18   Q.   Now, you're aware -- we went over this nine-page data

19   policy.

20        Were you aware that Mark Zuckerberg testified before the

21   United States Senate during the class period and stated, quote,

22   Long privacy policies are very confusing and that, quote, We do

23   not expect that most people will want to go through them and

24   read them; were you aware of that testimony?

25        **MS. McCLOSKEY:**  Objection, Your Honor.

1          THE COURT:  Overruled.

2      Did you know about that?

3          THE WITNESS:  I don't remember that testimony.  It

4  sounds right.  I think he's right.

5  BY MR. CANTY:

6  Q.   So do you agree with him when he says that we don't expect

7  most people --

8          (Reporter interruption for clarity of the record.)

9          THE COURT:  You had you two days off.  Relax.

10  Three days, actually.

11          MR. CANTY:  Yes, Your Honor.

12          THE COURT:  Go ahead.

13  BY MR. CANTY:

14  Q.   Do you agree with him when he says, quote, We do not

15  expect that most people will want to go through and read them?

16  A.   Again, what he was saying, if I've got this right, is that

17  he doesn't think long privacy policies are things that people

18  would want to go through and read.

19      I don't think ours is a particularly long policy.  I think

20  it's pretty economically presented.

21  Q.   Well, the United States Senate disagreed; correct?

22          MS. McCLOSKEY:  Ob- --

23          THE COURT:  That's sustained.  Forget about that part.

24          MR. CANTY:  Your Honor, just a few more questions.

25  \\\

BY MR. CANTY:

Q.   Just to be clear, the health -- the health data filtering system was rolled out in late 2019; correct?

A.   Yes.

Q.   And that was some 10 months after the end of the class period?

A.   Could you remind me about the class period?  Is it in February?

Q.   It's February 28, 2019.

A.   Okay.  So that sounds right, 10 months.

Q.   And last week you talked about a filtering system and you described it as a firewall.  I just want to be clear.

You take the data in, you classify it, and then you make a determination as to whether or not you want to use it; isn't that right?

A.   Sorry.  Are you asking me about the filtering?  I'm sorry.

MS. McCLOSKEY:  Objection.  615.

THE COURT:  Just try it again.

BY MR. CANTY:

Q.   Last week we talked about the filtering systems, and I asked whether or not you just stop all the data from coming in so you never see it and I -- I described it as a firewall, and you said, yeah, that firewall and filtering system are the same.

I just want to get clarity on this.  The filtering system

1    takes the information in, and then the filtering system makes a

2    determination as to whether or not Meta should use that or

3    exclude that data; correct?

4              **MS. McCLOSKEY:**  Objection.  602.

5              **THE COURT:**  Can you answer it?

6              **THE WITNESS:**  I can do my best.  I'm probably not --

7    I'm -- again, I'm not on the technical side.  My understanding

8    is that, you know, we have to be able to use the filtering

9    system to identify what the words are.  And so, you know,

10   that -- that -- to that extent, we would have to process that

11   information in order to make a decision about whether it gets

12   ingested into the system.

13        So there is a -- there is a filter, and that does require

14   some understanding of what those terms are, whether they're on

15   the list.

16   **BY MR. CANTY:**

17   **Q.**  And as you sit here today, you're not aware of whether or

18   not Meta took any legal action against Flo for the conduct that

19   they engaged in between 2016 and 2019; correct?

20             **MS. McCLOSKEY:**  Objection.

21             **THE COURT:**  Overruled.

22             **THE WITNESS:**  I'm not aware of any action against Flo.

23             **MR. CANTY:**  Thank you.

24        No further questions, Your Honor.

25             **THE COURT:**  Okay.  Careful on the way down.

**PROCEEDINGS**

1    And who do we have next?

2                    (Witness excused.)

3         MR. CANTY:  Your Honor, the plaintiffs call Tobias

4    Wooldridge.

5      (Tobias Wooldridge steps forward to be sworn.)

6         THE COURTROOM DEPUTY:  Just come forward.

7         THE COURT:  You should take that other binder down,

8    please.

9         THE COURTROOM DEPUTY:  Please stand and raise your

10   right hand.

11                    <u>TOBIAS WOOLDRIDGE</u>,

12   called as a witness for the Plaintiffs, having been duly sworn,

13   testified as follows:

14        THE WITNESS:  Yes.

15        THE COURTROOM DEPUTY:  Please be seated.

16      Please state your full name for the Court and spell your

17   last name.

18        THE COURT:  I'm sorry.  Do you have something?

19        MS. BARRERA:  The picture -- this is the picture,

20   right here.

21        MR. CANTY:  We have competing pictures, Your Honor.

22        THE COURT:  What?

23        MR. CANTY:  We have competing pictures.

24        THE COURT:  Well, which one looks like he's in court?

25                    (Laughter.)

1    THE COURT:  Use that one.  That looks like he's in

2  court.  Take that one back.  This is a better photo.

3    MR. CANTY:  Your Honor, before we begin the

4  examination, upon consent, the parties have agreed that --

5    THE COURT:  Ms. Clark will have to write this down, so

6  just wait a moment.

7    MR. CANTY:  Okay.

8    THE COURT:  Okay.  Go ahead.

9    MR. CANTY:  We have agreed that 226A is in evidence.

10    THE COURT:  All right.  226A.

11    MR. CANTY:  110A is in evidence with a limiting

12  instruction that the parties are working on.

13    THE COURT:  All right.

14    MR. CANTY:  111R.  235, Trial Exhibit 235.  And

15  Trial Exhibit 104R.  And that's on agreement.

16    THE COURT:  Okay.  Go ahead.

17    (Trial Exhibits 226A, 110A, 111R, 235, 104R received in

18  evidence.)

19                    **DIRECT EXAMINATION**

20  BY MR. CANTY:

21  Q.  Good morning.

22  A.  Good morning.

23    THE COURT:  All right.  Ms. Clark, I think you were

24  asking for the name.

25    THE COURTROOM DEPUTY:  Please state your full name for

1  the Court and spell your last name.

2           **THE WITNESS:**  My name is Tobias Wooldridge.  And my

3  last name is spelled W-O-O-L-D-R-I-D-G-E.

4  **BY MR. CANTY:**

5  **Q.**  Good morning, Mr. Wooldridge.

6       Are you currently employed?

7  **A.**  Yes, at Meta.

8  **Q.**  And how long have you worked at Meta?

9  **A.**  I have worked at Meta for more than 10 years.

10  **Q.**  And what is your role or title as Meta?

11  **A.**  Yeah, I am a software engineer at Meta.

12  **Q.**  And how long have you been a software engineer at Meta?

13  **A.**  For the entire ten and a half years I've been employed

14  here.

15  **Q.**  And you've previously testified in a previous proceeding

16  under oath; correct?

17  **A.**  So far as I was deposed, yes.

18  **Q.**  At a deposition?

19  **A.**  Yes.

20  **Q.**  And you understand that your deposition was under oath as

21  well; right?

22  **A.**  Yes.

23  **Q.**  Okay.  Now, your answers were in your capacity as a

24  corporate representative of Meta; correct?

25  **A.**  That is correct.

1    Q.   And your answers were equivalent as if Meta was answering

2    those questions; correct?

3    A.   Yes.

4    Q.   All right.  Mr. Wooldridge, you also signed what are known

5    as interrogatories on behalf of Meta, which are questions that

6    plaintiffs posed to Meta and that Meta answered; right?

7    A.   I did.

8    Q.   And in response to those interrogatories, Meta provided

9    formal answers; is that right?

10   A.   Yes.

11        MR. CANTY:  I'd like to turn to Trial Exhibit 220 --

12   226A, in evidence.

13        If we could go to the last page.

14   BY MR. CANTY:

15   Q.   Mr. Wooldridge, do you see your signature at the back of

16   that document?  It's also on your screen.

17   A.   I'm sorry.

18   Q.   Mr. Wooldridge, it's --

19   A.   Yeah, I see it.

20   Q.   And that is your signature?

21   A.   Yes.

22   Q.   All right.  Let's turn to page 13 where it starts "Content

23   delivery optimization."

24        Now, you're aware that once --

25        MR. CANTY:  Can we -- thank you.

BY MR. CANTY:

Q.   You're aware that once custom app events are received by Meta, Meta attempts to identify and match that data to Facebook users; correct?

A.   It attempts it, yes.

Q.   I'm sorry?

A.   It attempts it, yes.

Q.   And looking at this content delivery optimization section here, Meta's response, which you verified, Meta confirms that the Flo app event data that Meta received through the Facebook SDK was used in Meta's machine learning systems; correct?

A.   Yes.

Q.   And by this content delivery optimization, Meta is referring to using machine learning to prioritize showing ads to people that they're likely to respond to; correct?

A.   Yes.

Q.   And what does it mean when it says "Meta wants to improve the accuracy of content delivery"?

A.   Is that a quote in that document?

Q.   I'm asking you what does it mean when Meta says it "wants to improve the accuracy of content delivery"?

A.   Okay.  Yeah, so -- Meta wants to show people ads that are useful to them, essentially.  So, you know, if there's no chance or if you're not interested in a product, you probably don't want to see ads for that product.

1   Q.   And Meta uses machine learning to improve that; correct?

2   A.   Machine learning is used as part of that, yes.

3   Q.   And Meta uses machine learning system to improve delivery

4   of advertisement from advertisers other than Flo Health;

5   correct?

6   A.   Meta uses machine learning for all advertisers, yes.

7   Q.   So you would agree with me that it's fair to say that Meta

8   used the Flo app data to improve its advertising system, even

9   if no Flo app user ever got an ad directly related to the

10  information that was provided to the machine learning system;

11  correct?

12  A.   Yes.

13  Q.   So just to clarify, another user of a completely different

14  product or company could have received an advertisement due to

15  the fact that Flo app event data was being ingested into that

16  machine learning system; right?

17  A.   I don't know if I would frame the way the system works in

18  that way.

19  Q.   But information that's ingested by one app may train the

20  system to tell it that another ad for another different product

21  may be relevant to another individual that never used the app

22  where that information came from; correct?

23  A.   I wouldn't frame it in exactly that way, but loosely

24  speaking, yes.

25  Q.   Okay.  Now, you understand that Meta received both custom

1  app events and standard app events from the Flo Health app;

2  right?

3  **A.**   Yes.

4  **Q.**   And as an engineer, you -- were you aware that in

5  conjunction with the custom app events, Meta also received

6  identifiers, device identifiers, from Flo app associated with

7  that user; correct?

8  **A.**   The app could send mobile advertising device identifiers

9  along with the events it sent, yes.

10 **Q.**   So that would be an AAID for an Android device or an IDFA

11 for an Apple device; right?

12 **A.**   Yes.

13 **Q.**   And you've testified previously that the primary use for

14 the AAID and the IDFA is to match the device back to an

15 original Facebook or Instagram user; correct?

16       **MR. CLUBOK:**  Objection.

17       **THE COURT:**  What?

18       **MR. CLUBOK:**  I said "objection," Your Honor.

19       **THE COURT:**  Overruled.  Go ahead.

20       **THE WITNESS:**  So it was used to match to accounts,

21 yes.

22 **BY MR. CANTY:**

23 **Q.**   And those accounts are individual accounts; correct?

24 **A.**   Could you describe what you mean by "individual accounts"?

25 **Q.**   Well, the vast majority of Facebook users and Instagram

1    users are individuals that sign up as individuals either for

2    Facebook or Instagram; correct?

3    **A.**    Sort of.  My dog has an Instagram account.

4    **Q.**    I'm sorry?

5    **A.**    My dog has an Instagram account as well.

6    **Q.**    Okay.  But the vast majority of accounts are individuals;

7    correct?

8    **A.**    I think that's probably accurate.

9    **Q.**    Now, I'd like to turn to Trial Exhibit 110A, which is in

10   evidence.

11          **MR. CANTY:**  And, Your Honor, we have a limiting

12   instruction that --

13          **THE COURT:**  Why don't you hand it to me and I'll take

14   a look at it.  Don't put 110 up yet.

15       Did you all agree to this?

16          **MR. CLUBOK:**  Yes, Your Honor.  We've agreed to the

17   limiting instruction and also just the clarification that 110A

18   is just an excerpt of 110.

19          **THE COURT:**  Okay.  The answer was just "yes," period.

20       Do you agree to this, Plaintiff?

21          **MR. CANTY:**  We agree to it.

22          **THE COURT:**  All right.

23       Okay.  You can put -- 110A is admitted.

24       Once it goes up, I'm going to read to you what the parties

25   have agreed to.

1      Okay.  As you can see, this is a document entitled

2   "Summary of App Events."

3      The parties have agreed that this exhibit reflects

4   worldwide data and that data was received -- data that was

5   received from California is also in this, but it's not just

6   California.

7      And the parties have agreed that you can consider this for

8   the limited purpose of considering the claim against Meta and

9   only insofar as it includes data received from California

10  during the class period and that Meta associated Flo custom --

11  Flo Health custom app event names with an approximate number of

12  unique individuals during a time period that includes the class

13  period and not for any other purpose.

14     This is being admitted just against Meta, by the way, not

15  against Flo.  I'll remind you of all this when it comes time.

16  Okay?  But that's basically the gist of it.

17     Okay.  Go ahead.

18     **MR. CANTY:**  All right.  Can we go to page 3, please.

19  **BY MR. CANTY:**

20  **Q.**   Mr. Wooldridge, at the bottom of page 3 in the first

21  column, you see the custom app event R_CHOOSE_GOAL?

22  **A.**   I do see that, yes.

23  **Q.**   And the second column indicates that that was a custom app

24  event; correct?

25  **A.**   Yes.

1  **Q.**  And the third column confirms that -- one, that Meta was

2  able to individually identify those custom app event answers to

3  an individual Facebook account 34,203,828 times; correct?

4  **A.**  No.

5  **Q.**  That's not what it --

6  **MR. CANTY:**  Can we go to the top of the screen?

7  **BY MR. CANTY:**

8  **Q.**  Can you read the Exhibit A-1, what it says at the top.

9  **A.**  The title?

10  **Q.**  Yes.

11  **A.**  It says "Summary of app events from the Flo Health app,

12  app ID" -- a long number -- "to Facebook, December 9, 2017,

13  through December 4, 2019, as of December 4, 2019."

14  **Q.**  And then the third column says "Approximate number of

15  unique individuals associated with event"; correct?

16  **A.**  Yes.

17  **Q.**  So Facebook was able to identify the approximate number of

18  unique individuals associated with the event.  So if we go down

19  to the bottom of the page again.

20  That Number 4, the unique event, R_CHOOSE_GOAL, the

21  approximate number was 34,203,828; correct?

22  **A.**  That is the number, yes.

23  **Q.**  Now, this includes -- okay.  No further questions on that.

24  I'd like to look at 111R.

25  Mr. Wooldridge, you've seen this document before; correct?

1   A.   Yeah.  It's been introduced to you to me as part of this.

2   Q.   This was an internal document from Meta; correct?

3   A.   Correct.

4   Q.   And on the second page, there appears to be a data flow

5   chart.

6        Do you see that?

7   A.   I do see that diagram, yes.

8   Q.   And in your previous deposition, do you recall going

9   through this data flow chart?

10  A.   I remember discussing it, yes.

11  Q.   And it's fair to say that this represents the data flow

12  chart for Meta during the class period; correct?

13  A.   I wouldn't put it exactly that way.  This is a high-level

14  data flow diagram for a particular system within Meta.

15  Q.   Which was in effect during the class period between 2016

16  and 2019; correct?

17  A.   Yes.

18  Q.   Now, let's look at the top left-hand corner.

19       Do you see where it says "SDK events"?

20  A.   Yes.

21  Q.   That would include custom app events transmitted to Meta

22  through the Facebook SDK; correct?

23  A.   I don't know if I'd put it exactly that way.

24  Q.   Well, it says "SDK events"; correct?

25  A.   It does say "SDK events," yes.

1    Q.    And SDK events would include custom app events and

2    standard app events; right?

3    A.    In isolation, yes.  With respect to this diagram, I

4    wouldn't describe it in that way.

5    Q.    Now, it appears that there are a bunch of arrows, and

6    these arrows represent where the data flows; is that right?

7    A.    That is correct.

8    Q.    And if you follow the arrows around, there's a big arrow

9    that leads to the ads delivery system.  Do you see that?

10         MR. CANTY:  If we can pull it out just a little bit.

11   BY MR. CANTY:

12   Q.    Do you see the big orange arrow that goes all the way

13   around and winds back up at the ads delivery system?

14   A.    I do see that arrow, yes.

15   Q.    And this represents the SDK events data flowing around

16   Meta's system but ultimately ending up at Meta's ad delivery

17   system; is that right?

18   A.    This arrow isn't specific to the SDK events.  I don't know

19   if I'd describe it in that way.

20   Q.    Well, the arrows trace from the SDK events on the left

21   side.  If we follow that all the way around, it ultimately

22   winds back up at the ads delivery system; correct?

23   A.    The arrow does, but I don't think it represents what you

24   describe it to represent.

25   Q.    Well, this is a Meta document.  I'm just following the

1    arrows.

2        The arrows go from SDK events all the way around and

3    ultimately wind back up at the ads delivery system.

4        That's what this shows; correct?

5    A.   I can see the -- part of those arrows, yes.

6    Q.   And you previously testified in your deposition that

7    Meta's ad delivery system is the same team responsible for the

8    content delivery optimization system that we discussed

9    previously; right?

10   A.   Broadly speaking, yes.

11   Q.   And if we were to plug in Flo custom app event data in

12   this diagram, it would show that the Flo custom app events

13   would ultimately wind up at Meta's ad delivery system; right?

14   A.   At least as -- this diagram is a summary of the systems,

15   and it actually refers to a specific way that SDK events are

16   used.

17       Actually, as this diagram is explained, this shows SDK

18   events going to events described and then to labels.  That is a

19   particular usage for which only standard events were used.

20   Q.   I know, but I'm asking you about the custom app events.

21   The custom app events ultimately wind up at the ad delivery

22   system.  That was your testimony; correct?

23   A.   Are we still describing the diagram?

24   Q.   I'm asking in general.  Well, we can use the diagram.

25       Does the diagram show that?

1    A.    That -- I don't believe that is described on this

2    particular diagram.

3    Q.    As you sit here today, are you aware that -- that custom

4    app events are used in the ad delivery?

5    A.    Custom app events are used in the ad delivery system.

6    Q.    Thank you.

7    A.    It's just not shown on this diagram.

8    Q.    Now, were you aware --

9          Well, let me ask you something:  When were you first aware

10   that Meta may be receiving sensitive health data from the

11   Flo Health app?

12   A.    I was made aware that Meta could be receiving potentially

13   sensitive information from this particular app sometimes around

14   2019.

15   Q.    Were you aware in 2018 that there were concerns that Meta

16   generally may be receiving sensitive health data from apps that

17   were using the SDK?

18   A.    I wouldn't put it that way, no.

19   Q.    How would you put it?

20   A.    Meta had identified the risk that apps could send

21   potentially sensitive health information and have described

22   those risks.

23   Q.    They identified.  And how early did they identify those

24   risks that you were aware of?

25   A.    I mean, the business tools terms in their preceding

1  versions have always said not to send health information, so

2  presumably that long.

3  Q.  That's not what I'm asking.  When did you become aware or

4  when were you --

5     Well, let me ask you this:  When did you become aware that

6  there was a risk that Meta may be taking in through custom app

7  events sensitive health data?

8     You described there's a risk.  When did you first know of

9  that risk?

10 A.  So I became aware that -- of the risk that Meta could

11 potentially be taking in such data when there were allegations

12 that Meta may have been taking in such data.

13 Q.  Did you know as early as 2016 that there was a risk that

14 you may be taking in sensitive health data?

15 A.  I wouldn't put it that way, no.

16 Q.  What about 2017?

17 A.  Again, I wouldn't put it that way.

18 Q.  How would you put it?

19 A.  Meta was aware that there was the potential that apps

20 could send potentially sensitive information, and it took steps

21 by writing terms saying "Don't send us potentially sensitive

22 information."

23 Q.  Did anyone at Meta suggest that you look at specific apps

24 to make sure that you weren't, in fact, taking in sensitive

25 health data and profiting off of it by putting it into your

1  machine learning system?

2  **A.**   I wouldn't have been aware of such specific conversations.

3  **Q.**   But you could have said something; correct?

4  **A.**   At the time I was working on unrelated things, but I --

5  again, Meta had identified the potential that apps could send

6  this, and as we've described, it took steps by writing terms

7  that -- I think it started as a two-page or shorter document,

8  among which it included saying "Do not send us health

9  information."

10 **Q.**   Right, but my question to you is did anybody -- did you

11 ever hear anybody say, "We need to do more.  We need to

12 actually investigate whether or not we're getting this data and

13 we have to stop taking it in"?

14      Did you ever have a conversation with anybody in 2016,

15 2017, 2018, or 2019 to that effect?

16 **A.**   In 2019, as soon as somebody suggested that apps may

17 actually be sending potentially sensitive information to

18 Facebook, yes, we took action; and I believe that's been

19 discussed extensively.

20 **Q.**   But you knew as early as May of 2018; isn't that right?

21 **A.**   We're describing different things.

22 **Q.**   I'm just asking you whether or not you knew as early as

23 May of 2018 that you may be taking in sensitive health data.

24      Were you aware of that?

25 **A.**   No.

1    Q.   All right.  I have what's been marked as

2    Trial Exhibit 235, in evidence.

3         MR. CANTY:  May I have that presented to the witness.

4    BY MR. CANTY:

5    Q.   I'd like to go to the middle of the page where it says

6    Number 4, and if you look right before Number 4, one line

7    above, it indicates that this is going to you and a number of

8    other individuals at Meta; correct?

9    A.   I was mentioned on the preceding item, yes.

10   Q.   And the next line it says --

11        MR. CANTY:  If we could just scroll up to the date,

12   please.

13   BY MR. CANTY:

14   Q.   This was Charlotte Narvaez on May 4, 2018.

15        Do you see that?

16   A.   I see that.

17   Q.   Okay.  And then down below it says (as read):

18             "Context.  Today advertisers can inadvertently

19        or intentionally send sensitive information --

20        passwords, PII, Social Security numbers, health info,

21        et cetera -- in custom data fields via website, app,

22        and offline events."

23        Do you see that?

24   A.   I see that.

25   Q.   And then the next sentence says (as read):

1          "This poses risks, as we are unable to cleanly

2     delete data, as well as policy and PR issues."

3     Do you see that?

4  **A.**   I see that.

5  **Q.**   So you were made aware as early as May of 2018 that this

6  was a risk; correct?

7  **A.**   That the potential existed, yes.

8  **Q.**   Did you ever say to anybody, "If we're collecting health

9  data, it needs to stop.  We have to take affirmative steps to

10 make sure that we're not collecting this data"?

11 **A.**   I mean, as we discussed in 2019, once somebody said

12 somebody could actually be sending us potentially health

13 information, we had discussions investigating the potential and

14 addressing it.

15 **Q.**   No, that was bad press.  This was back in -- this was

16 written all the way back in May of 2018.

17      I'm asking what you did when it was only internally known

18 at Facebook, not when outside people started asking questions.

19      Did you suggest that you stop taking in health data or

20 take affirmative steps at Meta to stop the collection of this

21 health data?

22 **A.**   Sorry.  I think you're mischaracterizing this document.

23 **Q.**   Well, the document says advertisers can inadvertently or

24 intentionally send sensitive information, including medical

25 info, in custom data fields.  And then it says "This poses

1   risks, as we are unable to cleanly delete data as well as

2   policy and PR issues."

3       When you saw this, when you were made aware of this, did

4   you say it's not enough for us to simply tell these app

5   developers to not send it to us; we have to do something at

6   Meta; we cannot be collecting through the SDK these sensitive

7   health answers?

8   A.   I mean, it literally has as the next sentence, it is

9   acknowledging the potential risk that people could share

10  information with us, and it is directly saying we should build

11  systems to make sure that they don't inadvertently send such

12  information to us.

13  Q.   But that never happened with respect to health information

14  until 10 months after this class period ended in December of

15  2019; correct?

16  A.   The health system was built after that, yes.

17  Q.   Were you aware that one of the concerns about stopping the

18  collection of this type of data would have a financial impact

19  on Meta?

20  A.   I -- wouldn't characterize things in that way, no.

21  Q.   You wouldn't characterize it as that?

22  A.   No.

23  Q.   Did anybody that you know at Meta talk about the risks of

24  cutting back on collecting this data having a revenue impact on

25  Meta?

1    A.    I don't specifically recall such conversations, no.

2              MR. CANTY:  May I have a moment, Your Honor?

3              THE COURT:  Yes.

4                        (Counsel conferring.)

5              MR. CANTY:  All right.  If I can go to back to that

6    document.  This is 235.

7    BY MR. CANTY:

8    Q.    And if we go to the middle, back to Number 4.  If you keep

9    reading, it says -- do you see where it says "measure impact of

10   dropping custom data"?

11   A.    I do see that.

12   Q.    That -- did you understand that to mean that there would

13   be a financial impact on Meta if they dropped the custom data?

14   A.    It describes measuring the impact of dropping custom data.

15   It doesn't imply there's an impact.

16   Q.    Well, what kind of impact would it have?

17   A.    I wouldn't know, but it is describing something distinct

18   and different from what we've mentioned above.

19   Q.    And, in fact, if there's less information for the machine

20   learning system to ingest, it may produce information that's

21   less valuable to advertisers; correct?

22   A.    It's a complex system, but potentially.

23   Q.    Okay.

24              MR. CANTY:  May I have what's been marked as

25   Trial Exhibit 374 for identification just to be shown to the

1    witness?

2            MR. CLUBOK:  Objection.  Can the document be taken

3    down?

4            MR. CANTY:  I'm just showing it to the witness.

5            THE COURT:  What are we doing?

6            MR. CANTY:  I'm just showing this document to the

7    witness.

8            THE COURT:  Oh.  That's fine.

9    BY MR. CANTY:

10   Q.   Can you look at the second page --

11           MR. CLUBOK:  Objection to it being on the screen.

12           THE COURT:  You should take that down.

13           MR. CANTY:  It's not being shown to the jury.  Just to

14   the witness.

15           THE COURT:  Just turn that off.

16           THE WITNESS:  I have a paper copy.

17           THE COURT:  What exhibit is this?

18           MR. CANTY:  374.

19           THE COURT:  374.  All right.  Go ahead.

20   BY MR. CANTY:

21   Q.   I'd like you to take a look at page 2 at the top of the

22   page with the -- I'll just say the -- read under --

23           MR. CLUBOK:  Objection.  602.

24           THE COURT:  I thought this was on your list of --

25           MR. CANTY:  This was not agreed to.  This is just

1    marked for identification.

2            THE COURT:  Well, why don't you --

3         What are you doing with this?  Refreshing?

4            MR. CANTY:  Yes.

5            THE COURT:  Well, ask the question first and see if

6    it --

7    BY MR. CANTY:

8    Q.   Were you aware whether or not there were concerns about

9    revenue impact in dropping the custom app events back in April

10   of 2018?

11           MR. CLUBOK:  Objection, Your Honor.  602.

12           THE COURT:  Overruled.

13           THE WITNESS:  Should I be looking at the document to

14   answer that or not?

15           THE COURT:  No, no.  Just he's asking a question.

16   Just put the document aside.  Think back in your mind.

17           THE WITNESS:  Yeah.  So I don't recall such concerns,

18   no.

19   BY MR. CANTY:

20   Q.   Okay.  I'd like you to take a look at this document and

21   see if this refreshes your recollection as to whether or not

22   you had any knowledge as to whether or not there were concerns

23   about removing custom app events having an impact on revenue.

24           THE COURT:  What page are we looking at?

25           MR. CANTY:  If you look at page 2 at the top under the

1    first heading.

2           **THE COURT:**  Okay.  Don't read it.  Just read to

3    yourself and see if that helps you remember.  Maybe it does,

4    maybe it doesn't.

5                    (Witness examines document.)

6           **THE WITNESS:**  So I have only been shown this document

7    within the last week.

8           **THE COURT:**  Here's the question:  Does it help you

9    remember?  If it doesn't, you can say so.

10          **THE WITNESS:**  It does not.

11          **THE COURT:**  Okay.

12   **BY MR. CANTY:**

13   **Q.**   I'd like to look at Exhibit 104R, in evidence.

14         Mr. Wooldridge, I'd like to turn to the health data

15   integrity system.

16         That filtering system was implemented in December of 2019;

17   correct?

18   **A.**   The health filtering system launched in December 2019,

19   yes.

20   **Q.**   And that was some nine to ten months after the end of the

21   class period, which ended on February 28, 2019?

22   **A.**   Approximately, yes.

23   **Q.**   And you previously testified that this system was built in

24   response to being made aware that the Flo app was sending

25   potential health-related information to Facebook; correct?

1  **A.** It was built once Facebook was aware that apps could be

2  sharing potentially unwanted information, including potential

3  health information through the business tools, yes.

4  **Q.** As you sit here now, are you aware that Flo Health was

5  actually sending sensitive health data to Meta during the class

6  period?

7  **A.** I don't think I can make a determination on if it was

8  sensitive or not.

9  **Q.** Well, do you consider it sensitive health data?

10  **A.** Again, I don't have the -- what the context to understand

11  or interpret what it means, but so far as our systems exist

12  today, they would filter it.

13  **Q.** So your systems now would consider it sensitive health

14  data?

15  **A.** Our systems would consider it potentially sensitive data.

16  They apply, you know, a broad brush to filtering out

17  information.

18  **Q.** So I'm asking you: As you sit here today, do you consider

19  where a woman is in her menstrual cycle to be sensitive health

20  data?

21  **A.** I don't know if I'm in a position to make a determination

22  of that, but, again, our systems would filter things like that.

23  **Q.** I'm not asking about your systems. I'm asking you, as a

24  human being, sitting here today on the 30th of July, do you

25  consider whether -- where a woman is in her menstrual cycle to

1    be private health information?

2    **A.**   I don't see that being a reason to share that with

3    Facebook through the business tools.  I don't think it should

4    be.

5    **Q.**   I'm sorry.  I didn't hear your answer.

6    **A.**   I do not think such information should be shared with

7    Facebook through the business tools.

8    **Q.**   Okay.  Again, not what I asked you.  I'm just asking

9    you -- and if you can't answer it, tell me you can't answer it.

10       As you sit here today, do you consider, Tobias Wooldridge,

11   where a woman is in her menstrual cycle to be private, intimate

12   health data?

13   **A.**   I think it depends on the person.  It is their

14   information, and they can make choices as to if and how they

15   share it.

16   **Q.**   And what about if they're pregnant?  Would you consider

17   that private health data?

18   **A.**   Again, I think this is up to the person to determine if

19   and how they share such information.

20   **Q.**   Well, say a woman didn't want her employer to know that

21   she was pregnant.  She would consider that private health data;

22   right?

23   **A.**   I mean, she definitely may consider it private.  And,

24   again, it is on her to choose if and how to share it.

25   **Q.**   It's certainly confidential, though?

1   **A.**   I admittedly don't know the distinction between that and

2   the word "private."

3   **Q.**   Okay.

4       You -- as a software engineer, you -- Meta could have

5   disabled the Flo app's access to the Facebook SDK; correct?

6   **A.**   Meta has mechanisms in place that could be used to block

7   data sent through a particular app.

8   **Q.**   Okay.  But what I'm asking is Meta could have said to Flo,

9   "You're forbidden from using our SDK," at any time; correct?

10  **A.**   Yes.

11  **Q.**   And at any time during the class period -- 2016, 2017,

12  2018, 2019 -- Meta could have disabled Flo -- the Flo app's

13  access to the Facebook SDK if they determined that they were

14  failing to comply with its business tools terms; right?

15  **A.**   Potentially, though it possibly would require the

16  implementation of a system to do so.

17  **Q.**   But it can be done?  As a software engineer, you could do

18  that; right?

19  **A.**   With infinite resources, a lot of things can be done.

20  **Q.**   So it can be done?

21  **A.**   Yes.

22  **Q.**   And Meta chose not to do that at all during the class

23  period; right?

24  **A.**   Meta did not disable Flo's app from sending app events

25  during, you know, the class period.

1      **MR. CANTY:**  Thank you.

2    I have no further questions.

3      **THE COURT:**  You're up.

4      **MR. CLUBOK:**  Your Honor, we have an agreement -- and

5   I'll try to get the numbers right.  Mr. Canty will catch me if

6   I get them wrong -- to admit Exhibit 110 in its entirety.  It

7   is an electronic file, though, Your Honor, so we may either

8   have to use a native file or we have a hard copy that's very,

9   very big and unwieldy, so we may use excerpts from that.

10  That's 110.

11     We also have agreed to admit Exhibit 404, Exhibit 426, and

12  426A.  I may refer to Exhibit 536, but it's already in

13  evidence.  Exhibit 627A, we've agreed to admit.  Exhibit 1046,

14  1046B, Exhibit 1271.  And then, Your Honor, Exhibits 1241 and

15  1247 are also massive coding files which we may refer to

16  excerpts.

17     **THE COURT:**  Okay.  Any objection?

18     **MR. CANTY:**  No objection, Your Honor.

19     **THE COURT:**  All right.  Go ahead.

20     (Trial Exhibits 110, 404, 426, 426A, 627A, 1046, 1046B,

21  and 1271 received in evidence.)

22  BY MR. CLUBOK:

23  Q.   Mr. Wooldridge, start over a little bit.

24     First of all, can you tell the jury where you're from.

25  A.   I'm from Adelaide, which is a city in south Australia.

1  Q.   And you've testified you're a software engineer at Meta;

2  right?

3  A.   Right.

4  Q.   How senior are you amongst all the software engineers in

5  all of Meta?

6  A.   Yeah.  I'm senior already.  I'm within roughly the top

7  1 percent of engineers at Meta.

8  Q.   How do you know you're within roughly the top 1 percent of

9  the engineers at Meta?

10 A.   We have an internal concept called levels that don't have

11 titles but correspond to seniority.

12 Q.   And, sir, I'm going to ask -- and I'm bad at this too --

13 if you could speak as loudly and slowly as possible.  I take it

14 you weren't born -- well, you said you were from Australia;

15 right?

16 A.   Right.

17 Q.   So if you could speak loudly and slowly as possible, that

18 would be great.

19      What was your educational background?

20 A.   I have a bachelor's of software engineering with honors

21 first class.

22 Q.   Before working at Facebook, where did you work?

23 A.   Throughout high school I worked on a casual basis for a

24 web development company.  They now call themselves a startup

25 that sort of everyone does.

1      After that I did internships at IBM and Google.

2  Q.   Did you receive job offers from both of those

3  organizations?

4  A.   Yes.

5  Q.   And you were asked about your role at Facebook, and I

6  think you were asked if you have a title.  Does Facebook have

7  titles in the engineering department?

8  A.   No.  Generally, most people have the title of just

9  software engineer.

10  Q.   Is there anything that they refer you -- they refer you

11  as, if it's not even a formal title but some other description

12  of your seniority and what you do at Meta?

13  A.   Yeah.  The role I play or the archetype I have would be

14  described as uber tech lead, which roughly means tech lead of

15  tech leads.

16  Q.   So you're the tech lead of tech leads.  Can you tell the

17  jury some of the tech leads who fall your uber tech lead role?

18  A.   Yeah.  So there's various people I work with who are

19  responsible for products like the Meta pixel and conversions

20  API and all of signals integrity and various other privacy

21  initiatives we have within ads at Meta.  And in some way,

22  shape, or form, you know, I support these engineers myself.

23  Q.   Okay.  And we'll come back and explain some of those

24  phrases, but I want to ask you specifically:  Have you had a

25  tech role with respect to the SDK?

1  A.    Yeah.  Most recently I was overseeing the implementation

2  of certain signals integrity-related features to it.

3  Q.    And by overseeing implementation, do you mean actually

4  supervising engineers writing code and reviewing their code

5  that's going to go into the new version of the SDK?

6  A.    Yeah.  I was writing the technical designs and then

7  reviewing the code that people implemented.

8  Q.    Okay.  Now, you talked -- you said one of the tech lead

9  responsibilities is for signals integrity.

10     I want to -- and there was a document you were showed by

11  Mr. Canty.  I don't know if everyone caught it, but at the top

12  it said "Signals FYI."

13     Do you remember that?

14  A.    Yes.

15  Q.    Okay.  Can you explain to the jury what exactly Meta means

16  when they talk about signals?

17  A.    Within this context, signals refers to the product area

18  that owns products such as, you know, the app events

19  functionality included within the Facebook, now Meta, SDK, as

20  well the Facebook pixel and conversions API.  Essentially

21  mechanisms that, you know, advertisers and developers use to

22  transmit information to Meta.

23  Q.    Why would advertisers transmit information to Meta?  For

24  what purposes do they do that for?

25     And let's for now focus on the class period unless I say

1    otherwise, which was, again, November 1 2016, through

2    February 28, 2019.

3         During that time period, were you familiar with why

4    advertisers would send Meta signals?

5    A.   Yeah, I was.

6    Q.   Okay.  Can you tell the jury why?

7    A.   So typically people share information with Meta because

8    they want to use products and services provided by Meta and as

9    a portfolio of those in different use cases.

10   Q.   What kind of use cases would businesses have for signals

11   that are being sent to Meta?

12   A.   Yeah.  So at the time, the biggest ones would have been

13   either you want to use that information in your ads, such as,

14   you know, in ads targeting or ads measurement, or you want to

15   get analytics and insights describing how people may be using

16   your app or your website.

17   Q.   Okay.  Let's break each of those down.

18        First of all, I think you said targeting in reference to

19   ads.  What is ads targeting in this context?

20   A.   Yeah.  Ads targeting is where information -- you know, an

21   advertiser decides to say, "I want to show my ad to these

22   particular people who have these particular accounts," or "I

23   don't want to show my ads to these particular accounts."

24        So -- gosh.  The example that comes to mind is if you have

25   already installed an app -- I mean, firstly, they're probably

1   wasting their money showing ads to somebody saying "Please

2   install my app."  But secondly, you probably don't want ads

3   saying please install an app if you already have that app

4   installed.  And so that would be a use case of targeting.

5   **Q.**   And what if you did have an app installed?  What would be

6   a typical use case for advertisers to target someone who they

7   know has already installed their app?

8   **A.**   Yeah.  I mean, the simplest example is like maybe you want

9   somebody to buy something in your app, such as a premium

10  subscription or, you know, tokens in a game or a pair of

11  sneakers or something like that.

12  **Q.**   And during the class period, could app developers like Flo

13  use the signals to target audiences that they chose?

14  **A.**   Yeah.  So in that sample I just gave, they'd say, you

15  know, "I only want people who have already installed my app to

16  see the ad saying 'buy this premium service within my app',"

17  and only they could do it.

18  **Q.**   Okay.  How about measurement?  That's the second thing you

19  mentioned.  Can you explain to the jury what measurement is in

20  this context?

21  **A.**   Yeah.  Measurement is -- let's imagine I'm running a

22  billboard ad, you know, on the I5 or the 101.

23       I actually have no idea how many people are seeing that or

24  if people are actually taking any action based on that; right?

25       Measurement is where, after showing somebody an ad on

1    Facebook, an advertiser shares a signal with us saying

2    something like "This person installed this app," or "This

3    person bought this thing."  Right?

4        And then we would be able to say in ads manager, which is

5    our main ads product, you know, "Okay.  You spent a hundred

6    dollars showing your ad to these people, and off that, you

7    know, maybe 300 people installed your app."  And so you have

8    some idea that it's working and, you know, that you're not

9    wasting money.

10   Q.   To do either of these, targeting or matching, in

11   conjunction with the signals you get from app developers, does

12   Facebook try to match up device IDs?

13       Or at least during this time period, did they try to match

14   up device IDs to Facebook or Instagram user accounts?

15   A.   Yeah.  For app event data device ideas, we would have

16   tried matching those to, you know, corresponding Facebook or

17   Instagram accounts to use that to show those people or not show

18   those people those ads.

19   Q.   And did Facebook try to keep that a secret?

20   A.   No.

21   Q.   Okay.  The third thing you said that advertisers could do

22   with signals is analytics.  Can you explain what you mean by

23   that as it applies to during the relevant time period?

24   A.   Yeah.  There was a product called Facebook Analytics,

25   which -- you know, when somebody is using your app, you may --

1   you may not even know how many people are using your app.  And

2   so Facebook Analytics was a service provided by Meta where if

3   people sent events through the app events part of the SDK, they

4   would be able to see statistics and analytics describing,

5   you know, the type of person that was using the ad.  Not things

6   like, you know, "Tobias is using this app," but things like,

7   you know, here are the countries in which people are using your

8   app from.  Well, here's the rough age buckets of the people

9   using your app, or this is the type of phone people are using

10  your app on -- right? -- like the model.

11      Things like that that may help you, you know, more

12  thoughtfully design your app.

13  **Q.**   So let's be very clear.  If an app developer like Flo sent

14  a bunch of custom app event data for Facebook Analytics to

15  process, would Facebook Analytics tell back to Flo the names

16  associated with any actions of individual users?

17  **A.**   It would show the names of the actions but never show the

18  names of the users.

19  **Q.**   Thank you.

20      And instead, you'd show what?  Aggregated anonymized data,

21  like "20 percent are in Brazil" or "10 percent are in New York"

22  or whatever?

23  **A.**   Yeah, exactly like that.

24  **Q.**   We've talked about signals.  You said that you were the

25  tech lead for the signals -- or I think you currently are the

1  tech lead for the signals integrity team?

2  A.    Yeah.  I -- uber tech lead.

3  Q.    Okay.  Can you explain to the jury what the signals

4  integrity team is at Meta?

5  A.    Yeah.  There was an example given -- I was reading it in

6  the transcripts -- of how the app SDK is preaddressed envelopes

7  that are being shared to Meta.

8      The signals integrity team is a system that implements

9  technical measures to make sure that those envelopes that are

10  sent to us don't contain anything we don't want, in addition to

11  our, you know, policies and terms.

12  Q.    When was the signals integrity team created?

13  A.    People first started talking about establishing this team

14  in late 2017, and the team, you know, was created around then,

15  or early 2018.

16  Q.    So even prior to this creation of the signals integrity

17  team, were you aware of whether or not Facebook wanted

18  businesses to share sensitive data with Facebook?

19  A.    I mean, we never wanted businesses to share sensitive data

20  with us.

21  Q.    Is signals integrity work a priority at Facebook?

22  A.    Yeah.  I have personally spent the last several years,

23  you know, spending the majority of my time in this space.

24  Q.    Is it just you working on this?

25  A.    No.  There are lots of people working on this.

1   Q.   Why is signals integrity a priority for Facebook?

2   A.   We don't want potentially sensitive data.  We think that,

3   you know, there's practically no good reason to send it from

4   the perspective of our ad systems.  There is also -- you know,

5   I personally don't want to be here.  I would rather be shipping

6   valuable products for advertisers.

7   Q.   By "here," you mean in this courtroom?

8   A.   Specifically here.  But, you know, I -- we don't want this

9   information.  We think it would potentially controvert users'

10  privacy and like, you know, advertisers who share information

11  with us have a responsibility not to share, you know,

12  potentially sensitive information with us.

13  Q.   Mr. Canty kept asking you questions about the financial

14  impact of blocking all kinds of data.

15       Did anybody ever tell you stop your work, don't do it

16  because of the financial impact to Facebook?

17  A.   No.

18  Q.   Let's talk about what that work actually was.  Okay?

19  Let's talk about what specifically you did and the signals

20  integrity team did, and I'm going to try as best I can to ask

21  you to describe it chronologically.  Okay?

22       So even before the signals integrity team was established,

23  had you personally done any work to try to prevent Facebook

24  from receiving sensitive health care information through

25  signals?

1   **A.**   Yeah.  In 2017, we were launching various features for the

2   Facebook pixel, which I had oversight for at the time.

3   **Q.**   And just let me pause you there.

4        Can you explain to the jury what the Facebook pixel is in

5   general layman's terms, if you can?

6   **A.**   Yeah.  Sorry.

7        The Facebook pixel is -- it's essentially the analog of

8   the app events part of the SDK but for websites.  So you could

9   send events, like somebody purchased something, to Facebook,

10  you know, after they purchase something on, you know, the Nike

11  website or something like that.

12  **Q.**   Okay.  So continue explaining what work you were doing in

13  connection with the pixel to try to stop sensitive health care

14  data from coming to Meta.

15  **A.**   Yeah.  So at the time we were launching various features

16  for the Facebook pixel, and we made the decision for some of

17  those features not to enable them for health and other

18  categories of advertisers just out of an abundance of caution.

19  **Q.**   Is this a technical control that you yourself supervised

20  and implemented?

21  **A.**   I implemented it.

22  **Q.**   Did you ever apply this technical safeguard to the SDK?

23  **A.**   These particular features we were launching did not have

24  analogs on the app side or the SDK side.

25  **Q.**   Did that ever change?

**A.**    I think at some point after the relevant time period, yes,
one of these features may have launched in the app, and we did
extend those limitations to that.

**Q.**    Okay.  So let's get back to the signals integrity team.

It's late 2017.  They're putting a team together.  How did
you learn that this signals integrity team was being formally
launched?

**A.**    Yeah.  I mean, signals is only so big.  I -- you know, I
was working on the Facebook pixel at the time, and, of course,
people -- you know, I was mentioned in a post, mentioning the
signals -- mentioning some of the work that they would later
do.  And later I communicated with people because they would
seek me out asking questions about, you know, how do we
implement this thing for the Facebook pixel and for the signal
systems.

**Q.**    So once the signals integrity team was formally
established in late 2017 or early 2018, what was the first
project they tackled?

**A.**    So they -- sort of as we saw in that post, they had a
bunch of different things they wanted to tackle.  The first one
was probably the technically easiest from an implementation
perspective, which was -- I think it was in August of 20- --
April of 2017, that the password filter was launched.  So if --
dare I say -- thoughtless web developers installed the pixel
and for whatever the reason, generally when you submit a form

1    on a website, it doesn't actually show you the input to the

2    form in the URL.  That's one way to implement a form.

3        Another way to implement a form, like a login form

4    containing a username and password, would be to call -- to use

5    what's called "get parameters," which would appear in the URL,

6    like when you search for something.

7        If a web developer implemented that login form in this

8    way, the password could inadvertently be transmitted to

9    Facebook.  We absolutely do not want that.  And so the first

10   thing that was implemented was if people sent parameters that

11   say something like "password" to Facebook, you know, we would

12   detect and destroy that information.

13   Q.   The same way Mr. Canty said, "Well, theoretically

14   healthcare information could possibly make Facebook money,"

15   isn't it true that theoretically, password information could

16   make Facebook money if they used it in their content ad system

17   or otherwise?

18   A.   I don't know if it matters.  There is no circumstance

19   under which we would tolerate having that data.

20   Q.   And when was the password detection system launched?

21   A.   Yeah.  So that was April 2017.

22   Q.   Okay.  April 2017, you've already -- you have already

23   launched -- and you, Meta -- has already launched the password

24   detection system?

25   A.   Correct.

1   Q.   Okay.  I want to briefly show you now -- because we're

2   picking up in the timeline the document that Mr. Canty did show

3   you, and that was Exhibit 235.

4        This is a document dated May -- May 4, 2018; right?

5   A.   I see that.

6   Q.   So by the time this document is created, you've --

7   Facebook has already launched the password detection system to

8   filter out passwords from app developers who might accidentally

9   or intentionally send them; right?

10  A.   Yeah.

11  Q.   Okay.  So this says "Signals FYI."

12       And by the way, what -- there's a lot of stuff on this

13  document, a lot of names.  Can you just describe briefly what

14  this document is and how it's used at Facebook?

15  A.   I mean, this was a workplace post communicating various

16  updates on progress on various projects.

17  Q.   And if you look down, Mr. Canty tried to refer you to the

18  stuff that comes after Number 4.

19       If you look before Number 4, you see some names, including

20  yours, in the line above.  Is that where your name appears in

21  this document?

22  A.   Yes.

23  Q.   And so what is that referring to?

24  A.   Yeah.  That means I was working on the project listed or

25  like, you know, associated to the project listed in advance of

1  the one we were talking about earlier.

2  Q.   So the Number 3?

3  A.   Correct.

4  Q.   Okay.  Nevertheless, you had access to this document at

5  the time; right?

6  A.   Yeah.  I would have got a notification when it was posted.

7  Q.   Okay.  So moving on to Number 4, some -- there's

8  discussion of sensitive data detection and retention and

9  context, and then there's a brief description that Mr. Canty

10  already read into the record.

11      Do you see that?

12  A.   Yes.

13  Q.   And do you see where it says "Today advertisers can

14  inadvertently or intentionally send sensitive information," and

15  the very first concern is "passwords"?

16      Do you see that?

17  A.   Yeah, I see that.

18  Q.   So whoever writing this apparently hasn't gotten the memo

19  yet that passwords, at least, has already been addressed.

20          **MR. CANTY:**  Objection.

21          **THE COURT:**  Just ask question.

22      Hang on.  He needs to ask a question, not just read the

23  answer.

24  BY MR. CLUBOK:

25  Q.   Did anybody --

1    First of all, do you know exactly who typed in those

2  words?

3  **A.**   This -- I don't know who typed in those words, but the

4  post was made by Charlotte.

5  **Q.**   Okay.  And did -- did anyone ask you in May if you've

6  already checked off the password detection filter off the to-do

7  list?

8  **A.**   It actually mentions in the post that it was launched in

9  mid-April.

10  **Q.**   Ah.  It goes on to say -- oh, thank you.

11    So if you continue reading, it -- it's identified these

12  issues and then it goes on to say and you pointed out (as

13  read):

14        "Password detection launched mid-April."

15    Do you see that?

16  **A.**   Yeah.

17  **Q.**   Okay.  And throughout the time period from this post

18  continuing through February of 2019 and beyond, were there

19  similar discussions, either in writing or orally, about trying

20  to identify risks of sensitive information coming in?

21  **A.**   Yeah.  We continue to try to identify risks and address

22  them.

23  **Q.**   So let's talk about the next step.

24    After the password detection has been launched, what's the

25  next thing the signals integrity team --

1    And actually, let me just -- I beg your pardon.  You said

2 password detection was technically easiest because you could

3 look for the word "password" --

4 **A.**    Right.

5 **Q.**    -- is that right?

6    Does that mean it's -- just because it was technically the

7 easiest, does that mean it's the least important in the

8 determination of the signals integrity team?

9 **A.**    No.  I think we'd all be offended if, you know, web

10 developers were sending our passwords to other websites.

11 **Q.**    And by the way, were you aware specifically of a web

12 developer doing that?

13 **A.**    I was not.

14 **Q.**    But you were aware that theoretically there was a risk of

15 that, and that's why you developed the solution?

16 **A.**    I mean, I've made websites before.  I understand how you

17 can do so incorrectly in a way like I just described.

18 **Q.**    Okay.  So what's the next project the signals integrity

19 team took on?

20 **A.**    After the password filters were launched -- and, again,

21 that was an easy starting block -- the team continued to invest

22 and build the PII filters.

23 **Q.**    What do you mean by "PII filters"?

24 **A.**    So this is -- PII stands for personally identifiable

25 information.  An example of that which people could share with

1   us would be like if there was a URL or, you know, if the link

2   for the page that the pixel was firing from included somebody's

3   e-mail address.  Like we just talked about, the password.

4   Maybe there was both password and e-mail address.  We'd want

5   neither in that URL.

6   Q.   And what other sensitive data?  It talks here about "SSN."

7   What did you understand that to mean?  Did you ever use that

8   phrase, "SSN"?

9   A.   Yes.  I'm Australian, but I do work here in America, so,

10  yes, SSN is Social Security number.  It's something else which,

11  again, there's just no valid reason to send to Meta through the

12  business tools.

13       And so that -- actually, so far as the implementation is

14  concerned, I look at SSNs as PII, and it's the same system that

15  would have filtered out all of these things.

16  Q.   At the time, was Facebook -- even though they were

17  identifying these risks, did they specifically know some app

18  developer was sending it inadvertently or intentionally, Social

19  Security numbers?

20  A.   Not that I'm aware of, no.

21  Q.   Nevertheless, you identified the issue and then did what?

22  A.   We built systems to detect, and if it was transmitted to

23  us, filter it out.

24  Q.   When did you establish the filter system for -- that

25  you've just described?

1   **A.**   The PII filter launched in its expanded capacity sometime

2   around October of 2018.

3   **Q.**   And once it was launched, what was it at least intended to

4   block?

5   **A.**   Yeah.  So, again, this would have been all flavors of PII,

6   like e-mail address, you know, people's names, Social Security

7   numbers, things like that.

8   **Q.**   Did the PII filter try to block credit card numbers?

9   **A.**   I don't know if specifically it did then, but it

10   definitely does now and probably did then.

11   **Q.**   Did you -- well, that's interesting.  Did the PII filter

12   stay the same as the way it was when you launched it in October

13   of 2018?

14   **A.**   No.  We -- there's a lot of -- there's like hundreds of

15   thousands of apps and websites, probably millions, that are

16   sharing information with Meta.

17        You know, we apply the filter to all of them.  People

18   could find creative ways to do things incorrectly and send us

19   information that we don't want.

20   **Q.**   So you've launched in October of 2018.  Is there anything

21   because of the launch of this that communicates the operation

22   of this PII filter to app developers like Flo?

23   **A.**   Yeah.  So around that time we implemented e-mails that

24   said, you know, if somebody transmitted something that was

25   detected and scrubbed by our PII filter to us, we would send

1    them an e-mail guiding them to, you know, check on their

2    installation and make sure they weren't sending --

3         Like, you know, in the case of people having a website

4    where you log in and it shares password with Meta, obviously we

5    don't want that, obviously the user doesn't want that, and

6    obviously you shouldn't be doing that.  So you should check

7    your implementation and make sure you're not sharing it with

8    us.

9    **Q.**   Well, if the PII filter triggered, why didn't Meta then go

10   look at the data and try to go developer by developer to see

11   what triggered the PII filter and to see if it was fixed?  Why

12   didn't Meta do that?

13   **A.**   I mean to -- again, using that addressed-envelope analogy

14   from earlier, you can sort of reason about these filters as an

15   x-ray scanner and an incinerator.

16            **MR. CANTY:**  Objection.  Nonresponsive.

17            **THE COURT:**  What was the objection?

18            **MR. CANTY:**  It's nonresponsive to the question.

19            **THE COURT:**  Oh.  Just go ahead.

20            **THE WITNESS:**  So, I mean, after the point that the

21   data's been incinerated, you're not able to look at what it

22   originally was.  Right?  Like -- and so actually looking at

23   that data and making a determination of is this actually

24   sensitive or not, you know, would be beyond our means, because

25   we got rid of it because we didn't want it.

BY MR. CLUBOK:

Q.   So the filter triggers the data.  If it triggers one of the filters, it's deleted, destroyed?

A.   Yeah.

Q.   And then Meta has no ability then to see it, but instead they send a letter to the developer saying check your data on your side; is that right?

A.   Correct.  They're in the best position to evaluate what it actually is.

Q.   When Facebook launched this PII filter in October '18, we've heard a lot about reusable code or open source code.  Was there any open source code or reusable code available to Meta so they could just pull a PII filter off the shelf and plug that into their system?

A.   Not that I'm aware of, no.

Q.   Are you aware of any other company who, prior to Meta, installed a PII filter from any engineering conference or any of your coding friends or any open source notices about code? Ever hear of any other company doing it to prior to Meta?

        MR. CANTY:  Objection.

        THE COURT:  You can answer.

        THE WITNESS:  Not for something like this, no.

        THE COURT:  Okay.  We're going to take our morning break.  We'll be back at about 11:25.

        THE COURTROOM DEPUTY:  All rise.

1                  (The jury leaves the courtroom.)

2        (Proceedings were heard out of the presence of the jury.)

3                    (Recess taken at 11:01 a.m.)

4                 (Proceedings resumed at 11:33 a.m.)

5        (Proceedings were heard out of the presence of the jury.)

6              **THE COURTROOM DEPUTY:**  All rise.

7              **THE COURT:**  Let's bring them out.

8              **MR. CLUBOK:**  One housekeeping point.  I'm currently

9    obviously doing cross, but I'm also doing our direct.  We

10   allowed plaintiffs to call Mr. Wooldridge out of turn, and we

11   had agreed that if -- just like if I was doing direct, if

12   I needed to do a short --

13             **THE COURT:**  I get it.  I understand.  One and done.

14             **MR. CLUBOK:**  No, Your Honor.  What my --

15             **THE COURT:**  There are no constraints on the form of

16   your question except don't lead.

17             **MR. CLUBOK:**  For sure.  My point is just there's a

18   chance I might do redirect after -- so in other words, we --

19             **THE COURT:**  That's fine.

20             **MR. CLUBOK:**  We've been stopping after the third

21   examination, and I certainly don't want to, but I might do a

22   bit of fourth.

23             **THE COURT:**  All right.  That's fine.

24             **MR. CLUBOK:**  Thank you, Your Honor.

25             **THE COURT:**  Plaintiffs, is this your last witness?

1          MR. CANTY:  Your Honor, we have one expert.

2          THE COURT:  Oh, that's right.

3          MR. CANTY:  And we also have deposition designations

4     that run about 15 minutes and that's it.

5          MS. SHARTON:  Your Honor, one quick question.

6     Do you prefer a verbal motion for directed verdict right

7     when they rest?

8          THE COURT:  Yeah.

9          MS. SHARTON:  Because the jury will be here.

10         THE COURT:  They leave.

11         MS. SHARTON:  Once they leave.  That's what I mean.

12    Thank you.

13         THE COURT:  They don't hear that.

14              (The jury enters the courtroom.)

15    (Proceedings were heard in the presence of the jury.)

16         THE COURT:  Okay.  Go ahead.

17         MR. CLUBOK:  Thank you, Your Honor.

18         THE COURTROOM DEPUTY:  You may be seated.

19         THE COURT:  One second.

20         MR. CLUBOK:  Sure.

21         THE COURTROOM DEPUTY:  We're back on the record in

22    Civil --

23         THE COURT:  Okay.

24         THE COURTROOM DEPUTY:  We're back on the record in

25    Civil 21-757, Frasco versus Flo Health.

BY MR. CLUBOK:

Q.   Mr. Wooldridge, we were trying to develop the chronology.

Just to make it crystal clear, when was the password filter launched?

A.   That was in, I think, April 2018.

Q.   Okay.  And then when was the rest of or the PII filter launched?

A.   Yeah, the initial launch was around October 2018.

Q.   Okay.  And then thereafter, in November, December, I think we saw one in January, some of these letters went out if an app developer's data triggered the PII filter?

A.   Right.

Q.   Okay.  I want to talk about other implementations.  We haven't gotten yet to February of 2019.

But before we get to that, was there anything else that you can think of that Facebook did to try to block signals from coming in regarding information Facebook didn't want?

A.   Yeah.  The other system that comes to mind with respect to 2018 is -- we call it the prohibited sources filter, which is there are certain websites which have no valid or legitimate reason to use the business tools and apps.

An example would be a website advocating for violent or hate speech, or even a pornography website; right?  Like you can't run ads for that on Facebook.  We don't want people sharing data from such a website to us for a myriad of reasons,

1    and we blocked those websites from, you know, sending data into

2    our systems.

3    Q.   Okay.  We also have heard -- I think there was a question

4    or there's been questions about the device IDs that were the

5    IDFAs and the other one for Google that were sometimes

6    transmitted along with event data by app developers.

7         Do you recall those questions?

8    A.   I do.

9    Q.   And there was a question at some point that was asked,

10   I believe, to Dr. Zervas about whether or not the app developer

11   could, you know, turn off the transmission of that if they used

12   the code from the SDK.  I'm paraphrasing it.

13        But just, in your own words, can you explain what controls

14   the advertisers had during this time period to choose whether

15   or not to send the IDFA and the other device ID number along

16   with other custom -- or app event date via the SDK?

17   A.   Yeah.  Beyond the fact that the SDK is open source and

18   frankly, developers would simply be able to change the code to

19   do whatever they wanted it to do, at the end of 2018 we

20   documented a feature that would let you disable the --

21   you know, would prevent the SDK from connecting the device ID

22   to the events that it was transmitting, and this would be a

23   one-line code change that developers could implement.

24   Q.   And you implemented that when?

25   A.   It was documented at the end of 2018, so it would have

1  been implemented before that.

2  **Q.**   Okay.  So let's talk about February 2019.  Did you come,

3  in February 2019, to learn that there was an allegation that

4  Flo Health specifically may have been sending sensitive

5  information to Meta?

6  **A.**   Yes.

7  **Q.**   And prior to learning that, had you ever heard of any

8  specific developer actually sending sensitive health

9  information as opposed to the potential that you all identified

10  that it could happen?

11  **A.**   No.

12  **Q.**   And what happened after you heard about it?  What, if any,

13  action did the signals integrity team take?

14  **A.**   Yeah.  After Meta became aware that apps could be sharing

15  such potentially sensitive information with Meta, Meta took

16  steps to understand the problem and took steps to implement a

17  filter such that we wouldn't get such data.

18  **Q.**   When did Meta complete these steps?

19  **A.**   I mean, honestly, I don't think they're ever completed.

20  We continue to invest in this.

21  **Q.**   Okay.  Well, when did Meta first launch a technical

22  solution that was designed to force advertisers to comply with

23  their contractual agreements?

24  **A.**   Yeah.  The first major release of the health filter was in

25  December of that year.

1    Q.   Can you explain to the jury how the health filter worked

2    as it was originally launched in December 2019?

3    A.   Yeah.  There's sort of two components to the filter.  The

4    first one is categorizing a website.  Part of this is so that

5    we have context with which to apply the second part, and I'll

6    come back to that.  But the first one is categorizing a website

7    is -- you know, is this health-related or not.

8        The second part of this is essentially a keyword list, or

9    a block list.  We would look for words that could be --

10   potentially be sensitive and, you know, if they were

11   transmitted from an Apple website that we had categorized as

12   health-related, we would filter out that data.

13   Q.   Roughly how many words were on the word list when you

14   first implemented the health filter?

15   A.   Somewhere in the order of 70,000.

16   Q.   70,000?

17   A.   7-0 thousand.

18   Q.   Mr. Canty was asking Mr. Satterfield about particular

19   words.  I'll just ask you:  Was "pregnancy" included in that

20   70,000-word list?

21   A.   Yes.

22   Q.   "Pregnant"?

23   A.   Yes.

24   Q.   "Period"?

25   A.   Yes.

Q.    "Ovulation"?

A.    Yes.

Q.    "Menstruation"?

A.    Yes.

Q.    "Fertility"?

A.    I believe so, yes.

Q.    And even then, by December of 2019, when Facebook rolled out the healthcare side of its filter, at that point had you ever heard of any other company at that point doing anything like this either for PII or for health words?

        MR. CANTY:  Objection.

        THE COURT:  One second.

    Go ahead.  It's fine.

        THE WITNESS:  Not to my knowledge, no.

BY MR. CLUBOK:

Q.    Was there any open source code available?  Was there anyone writing about how they had done it or showing the way through code?

A.    Not to my knowledge, no.

Q.    Okay.  Did -- you said -- I take it the signals integrity team didn't stop in December of 2019?

A.    No.  I mean, we continue to invest in it.

Q.    Okay.  What other things have you done since then?

A.    Yeah.  So after -- the subsequent year, in 2020, we improved the health filtration system by implementing machine

1  learning so that for parameters that may not have been on that

2  block list, you know, we'd still filter them out.  You can

3  think you of it almost as fuzzy matching.

4  Q.  What does that mean?

5  A.  Not looking for exact matches, but rather looking for

6  things, you know, similar but not exactly like them.

7  Q.  Is that designed to make the health filter operate more

8  narrowly or more broadly or neither?

9  A.  It would make it operate more broadly.

10  Q.  And so in other words, is it designed to catch even -- or

11  overbroad in terms of its catching ability for

12  healthcare-related information?

13  A.  Yes, it is overbroad.

14  Q.  Has the signals integrity team and yourself worked on

15  other projects since to continue to impose technical

16  limitations on the ability to even accidentally get sensitive

17  healthcare information?

18  A.  Yeah.  Again, we've been investing through this day.

19  Q.  By the way, in 2020, when you added machine learning

20  capabilities to the healthcare filter, that was about -- at

21  least a year before plaintiffs had even sued Facebook; isn't

22  that right?  In 2021?

23  A.  Yeah, it was well ahead of them.

24  Q.  And so what's core setup?

25  A.  Core setup is a function which we've launched for both the

1    app events part of the SDK and the Facebook pixel -- these days

2    called the Meta pixel -- which restricts how either of those

3    products could transmit, you know, parameters and similar

4    information to Facebook.

5        So, you know, in terms of the app SDK, core setup means

6    that the app SDK will not transmit custom parameters to Meta.

7    **Q.**   Why didn't Facebook just earlier blanket-prohibit

8    healthcare-identified websites or apps from transmitting

9    information or otherwise just block out all those words earlier

10   than what it did?

11   **A.**   I mean, that would be overkill.  There's a lot of good

12   reasons that these apps could use our product.  So if we take

13   the Facebook SDK and app events in the Flo Health app as an

14   example, I don't think anybody is suggesting that it's

15   sensitive that people install that app.  And so them running an

16   ad saying, you know, "install our app" seems quite reasonable

17   to me; right?

18       And there is obviously legitimate use cases even outside

19   of this particular app.  Maybe there is a hospital doing a

20   fundraiser, or other examples, where, again, like, they're

21   health-related, but they have legitimate reasons to use these

22   products.  And, you know, it would be kind of crazy to stop

23   people from running fundraisers on the presumption that,

24   you know, they're going to send such unwanted information to

25   us.

1  Q.    Were these -- all these technical solutions that you've

2  implemented over the years, have they been easy to build out at

3  Facebook?

4  A.    No.

5  Q.    Why not?

6  A.    I mean, part of this is just the scale at which these

7  systems operate.  So, you know, when we started building these

8  systems, we were getting millions of events through either the

9  app SDK or through the pixel a second; right?  We need to apply

10  our filtration to every single parameter at every single event

11  coming into our systems.

12       And, you know, if you think about that filter, we have

13  70,000 words on a list, as an example; right?  We need to check

14  all of those, to keep that list somewhere in memory so that we

15  can consult it and check did anyone send any of these things.

16  And like for the password matching and the PII matching,

17  there's just a lot of computation there.

18  Q.    Did you ever once slow down your efforts because you

19  secretly wanted Facebook to get sensitive health data despite

20  your contractual agreements and the other technical solutions

21  you had developed?

22  A.    I mean, literally the first step we took is putting in our

23  terms "Don't send us information."

24       But no, at no point have we ever slowed down this because

25  we may -- we would never want this data.

1  Q.  Let's look at Exhibit 627A.  It's already been admitted.

2      And this is an excerpt of Dr. Egelman's logs that reflect

3  what he claimed may have been sent by Flo to Meta.

4      Do you see Exhibit 627A?

5  A.  I see it.

6  Q.  Did -- first of all, you're familiar with signals like

7  this that other -- countless other app developers were sending

8  during the same time period?

9  A.  Yes.

10 Q.  And would Facebook have received code like this with no

11 further context as to what it means?

12 A.  We would have received events submitted in this way, and

13 we wouldn't have had context to interpret what those events

14 could have mean.

15 Q.  Are you aware of Flo providing Facebook with a key or

16 definitions so Facebook could try to interpret the data and

17 what it means, like Mr. Egelman -- or Dr. Egelman claimed he

18 could do?

19 A.  No.

20 Q.  Did you ever hear of any advertisers providing Facebook

21 with a key or definitions for their custom parameters

22 associated with their custom app events that were sent via the

23 code provided about by the SDK?

24 A.  Not to my knowledge, no.

25 Q.  Dr. Egelman said that experts in the field supposedly,

1    quote, read the traffic capture and make sense of it and

2    supposedly that Meta employs people to do that.

3        Is that true?

4    **A.**    No, we don't employ people to do that.

5    **Q.**    Set aside anything that's been done in this litigation,

6    but outside the litigation world, during the class period, are

7    you aware of anybody at Facebook ever decompiling or

8    disassembling the Flo app to try to examine the source code

9    like Dr. Egelman did to try to interpret the meaning of Flo's

10   custom app events or custom parameters?

11            **MR. CANTY:**    Objection.

12            **THE COURT:**    Sustained.

13   **BY MR. CLUBOK:**

14   **Q.**    Well, are you aware of anyone at Meta during the 2016 to

15   2019 time frame, outside of litigation, trying to disassemble

16   code to try to figure out what the meanings of custom app

17   events or custom app event parameters meant?

18            **MR. CANTY:**    Objection.

19            **THE COURT:**    You can answer that.

20            **THE WITNESS:**    No, I have heard of nobody doing such

21   things.

22   **BY MR. CLUBOK:**

23   **Q.**    Can you -- did Facebook ever reverse-engineer the Flo app,

24   to your knowledge?

25   **A.**    Not to my knowledge, no.

1  Q.   Is there a department at Facebook that you're aware of

2  that does anything like that for apps or did anything like that

3  for apps either during the class period or ever?

4  A.   No.

5  Q.   Let me talk to you about Flo's advertising, because we've

6  talked about different reasons why app developers like Flo send

7  signals, and I think you said advertising, a couple different

8  versions, and analytics.  Do you remember that?

9       Let's talk about Flo, and let's look at Exhibit 426, which

10  has been admitted.

11      Can you explain to -- and can you explain to the jury what

12  Exhibit 426 is, please.

13  A.   Yeah.  This looks like a printout of public documentation

14  for app events.

15  Q.   And are these standard or custom app events?

16  A.   This is a list of the standard app events.

17  Q.   And I think you have a chart that summarized this, which

18  is Exhibit 426A.  It's also been admitted into evidence.

19      Can you explain what the jury is seeing on Exhibit 426A?

20  A.   Yeah.  This looks like a summary of all of the standard

21  app events people can show through the SDK.

22  Q.   And Facebook makes this public?

23  A.   Yeah.  It's in the documentation.

24  Q.   Did Flo utilize any of these standard app events to run

25  advertising campaigns during the class period?

1  A.    Yes.

2  Q.    Let's look at Exhibit 404.

3       And, actually, before we go to 404, do any of these

4  standard app events encourage --

5       From your perspective, were any of these standard app

6  events designed to encourage developers to send sensitive

7  healthcare information?

8            **MR. CANTY:**  Objection.

9            **THE COURT:**  Sustained.

10  BY MR. CLUBOK:

11  Q.    Sir, as part of your work in the SDK, are you familiar

12  with Facebook's practice of developing standard app events?

13  A.    Yes.

14  Q.    And are you -- have you seen the standard app events

15  before?

16  A.    Yes.

17  Q.    Do you work with the standard app events -- have you

18  worked with the standard app events throughout the course of

19  your job?

20  A.    Yes.

21  Q.    Have you supervised people who have been in charge of

22  coding the standard app events?

23  A.    I don't know if I'd say people code them, but I have

24  supervised work related to them, yes.

25  Q.    Okay.  And have you ever heard, in any of your work

1  related to the standard app events, anybody at Meta saying,

2  hey, let's use these, in words or substance, to try to get

3  sensitive healthcare data?

4       **MR. CANTY:**  Objection.

5       **THE COURT:**  Sustained.

6  **BY MR. CLUBOK:**

7  **Q.**  Let's look at Exhibit 404.

8       Let's look at what -- and what is Exhibit 404?

9  **A.**  So I described how Meta lets people create, you know,

10  targeted ads to people, like I want these people to see my ad

11  or I don't want these people to see my ads.

12       This is a list of mobile app custom audiences created by

13  Flo Health between June 2016 and 2021, which they would have

14  been able to use to say "Show my ad to people matching these

15  criteria," or "don't show my ad to people matching these

16  criteria."

17  **Q.**  Does this document show that Flo used standard events

18  to -- in connection with its advertising campaigns?

19  **A.**  Yeah.  The majority of things listed here are standard

20  events.

21  **Q.**  Can you identify the first few you see?

22  **A.**  Yeah.  I mean, like FB mobile purchase and FB mobile,

23  you know, activate app.

24  **Q.**  And if you compared 404 to 426A, the chart we just saw,

25  you could match up whether or not Flo was advertising based on

1    standard events; is that correct?

2    **A.**    We should be able to, yeah.

3         The other thing is it starts with FB_mobile, which is a

4    good suggestion it's a standard app event.

5    **Q.**    Okay.  Well, I see where in row 7 it doesn't start with a

6    FB_mobile.  It says Sessions_20.

7         Is that a Facebook standard event?

8    **A.**    No.  That's a custom event.

9    **Q.**    And is that something also, according to the information

10   Facebook has, that Flo might have or did advertise on during

11   the class period?

12   **A.**    At minimum, they created a custom audience based on it.

13   **Q.**    What's a custom audience?  Can you explain that to the

14   jury?

15   **A.**    So, again, a custom audience is -- it's sort of a rule

16   saying, you know, when you want to say "Show my ad to these

17   people" or "Do not show my ad to these people," a custom

18   audience is almost how you define "these people."  It is,

19   you know, people who have installed my app or people who have

20   purchased something in my app or, you know, other things that

21   we'd see listed here.

22   **Q.**    You've carefully reviewed Exhibit 404 in advance of today;

23   correct?

24   **A.**    Yes.

25   **Q.**    I want to show you Exhibit 1271, and I'm going to ask you

1   if you can keep 404A in mind.  Sorry.  Exhibit 1271.

2       1271 was the list of the custom app event names at issue

3   in this lawsuit, and there are 12 listed there.

4       Do you see it?

5   **A.**   I see it.

6   **Q.**   Have you endeavored to compare 1271 to 404 to see if Flo

7   ever made a custom audience to target ads based on any of these

8   12 custom app event names that are at issue in this lawsuit?

9   **A.**   Yeah.  You have seen one of these listed in that

10  spreadsheet because they didn't create such custom audiences.

11  **Q.**   Okay.  Let's talk about advertising a little more, and

12  let's talk specifically about matching.

13      Are you personally familiar with the concept of matching

14  through your work at Facebook?

15  **A.**   Yes.  This was the part of signals I worked in when I

16  started at the company.

17  **Q.**   Okay.  So explain to the jury what's matching, as Facebook

18  uses that phrase, in the context of advertising?

19  **A.**   As app events come into Meta, they come associated with

20  various identifiers, such as, you know, the Android advertiser

21  ID and the IDFA, which is Apple's equivalent.

22      When we process that data, we attempt to match it to an

23  associated or corresponding Facebook account where somebody has

24  logged in to -- you know, on that same device, as an example,

25  because that would need the same device ID, the same Facebook

1    account.  So if I log in on my device, you know, my IDFA may be

2    associated with my Facebook account today, and that would later

3    be available for matching such that when an event came in, that

4    event could be, based on that shared identifier, associated to

5    my account.

6    **Q.**   Does Facebook make these matching -- does it make this

7    matching a secret?

8    **A.**   No, it's not a secret.

9    **Q.**   Is Facebook -- if it gets a number of device identifiers

10   from an app developer, is Facebook able to match them all to

11   Facebook to individuals?

12   **A.**   Absolutely not.

13   **Q.**   Why do you say that?

14   **A.**   There's a number of different reasons.  The first one

15   would be, you know, maybe that person just doesn't use

16   Facebook.  And if nobody has ever logged in to Facebook or

17   Instagram on their phone, like how would we know that that

18   device ID is associated to their account?

19        You know, they may also just have never even created a

20   Facebook account in the first place.  Right?  And, again, like

21   there's nothing to match it to.

22   **Q.**   And to be clear, you've worked, along with others, to try

23   to improve Facebook's matching; correct?

24   **A.**   Yeah.

25   **Q.**   And are there still, despite your and others at Facebook's

1    best efforts, these kinds of limitations you've described?

2    A.    Yes.

3    Q.    So if someone had a Facebook account in 2010 that they

4    stopped using by 2011, would Facebook be able to match a device

5    ID to their account?

6         MR. CANTY:  Objection.

7         THE COURT:  You can answer.

8         THE WITNESS:  Almost certainly not.

9    BY MR. CLUBOK:

10   Q.    Why do you say that?

11   A.    I mean, frankly, I'm not even sure if such device IDs

12   existed in 2010.  But --

13   Q.    Sorry.  Do you know when device IDs were -- you started to

14   see them being used such that the numbers were coming to

15   Facebook?

16   A.    As I understand, IDFA and AID came about around 2012,

17   2013.

18   Q.    Okay.  So if somebody had stopped using their Facebook

19   account in 2011, why would it be nearly impossible for Facebook

20   to match to their account, even if they got a device ID today

21   or in 2017, let's say, that was from that same person?

22   A.    Yeah.  Facebook would not know what, you know, the device

23   IDs to that person or account are.

24   Q.    If somebody is not a Facebook user at all, does Facebook

25   have a way to match up device IDs they get from an app?

1   **A.**   No.  We match to an account.

2   **Q.**   Let's look at Exhibit -- let's move on from matching to

3   machine learning, and let's look at Exhibit 111R, which you

4   were asked about in direct examination.  Mr. Canty asked you

5   some questions about the second page of this, this kind of

6   complex chart.

7        And we'll blow it up any way that makes sense, but he

8   asked you to follow some blue arrows, and the blue arrows go

9   one way, and then he said the orange arrows go some other way.

10       Do you remember the questions he asked about all that?

11            **MR. CANTY:**  Objection.

12            **THE COURT:**  It's just table-setting.  Go ahead.

13            **THE WITNESS:**  I remember them.

14  **BY MR. CLUBOK:**

15  **Q.**   Okay.  And I just want you to explain as best you can

16  where on this chart, if at all, it shows or tries to show how

17  signals from apps are being used with the ads delivery system.

18  **A.**   This particular diagram only shows them in a very limited

19  way.

20       So on the left-hand side of the diagram, you have an arrow

21  going from pixel fires, SDK events, third-party events, to

22  something called events scribe.  And then that goes with an

23  arrow called labels into a system call Ad Logger.

24       A label within a machine learning system is sort of like a

25  true and false.  The machine learning system attempts to learn

1    patterns, and the label is sort of, you know, this is the

2    pattern you should learn or this is not the pattern you should

3    learn.

4         In this particular case, labels is a -- you know, one

5    particular usage of data, but the only possible labels that

6    could have been created from SDK events were those created from

7    standard events.

8         And so I guess giving a concrete example, we show your ad

9    to ten people.  Of those, you know, five people buy your

10   product or install your app, and five people don't.

11        When we get -- you know, for the five people that did

12   install your app would get five SDK events, which maybe we'd

13   match, maybe we wouldn't.  Let's assume we do.  And then we

14   would actually, you know, look back and say, okay, you know,

15   did any of these five people see an ad?  If they did, then

16   information surrounding the context of how that ad was shown to

17   them, you know, would be fed into the machine learning system.

18        And so this really is just saying that yes or no.  If

19   people, you know, for like after a day or longer didn't

20   actually install your, you know, app, they would what we call

21   negative labels, saying, you know, the pattern of, you know,

22   circumstances to show this ad in is people who did buy the app,

23   not people who didn't.

24   Q.   And by the way, I should have asked at the beginning.

25   Mr. Canty reminded you that in the discovery phase of this

1    case, you were designated by Meta as the person most

2    knowledgeable to talk about subjects -- many subjects that

3    relate to this case.

4        Was machine learning in the context of this case one of

5    those subjects you were designated by for the purposes of this

6    litigation?

7            **MR. CANTY:**  Objection.

8            **THE COURT:**  Overruled.

9            **THE WITNESS:**  Yes.

10   **BY MR. CLUBOK:**

11   **Q.**   Okay.  So keeping that hat on, I want to ask you:  Is the

12   machine learning -- and this -- for example, your example of

13   somebody buying sneakers.  Is the machine learning that an

14   individual person like Tom Johnson just bought blue sneakers at

15   Nike, is that what is meant by machine learning in this

16   context?

17   **A.**   No, I wouldn't describe machine learning in that way.

18   **Q.**   Why not?

19   **A.**   I mean, that is a piece of information.  When we say

20   machine learning, we generally refer to the model itself, which

21   is, again, a system to, you know, identify patterns and

22   correlations.

23   **Q.**   Could the system be queried, for example, to say, "Hey,

24   tell us what information Jennifer Chen or Tesha Gamino or

25   Sarah Wellman entered into the Flo app or any another app"?

1    **A.**    The delivery could not.

2    **Q.**    Could the system be queried to say, "Give me a list of all

3    the woman who told Flo they were pregnant when they used the

4    app"?  Does that have that functionality?

5    **A.**    I mean, all of this data stopped existing several years

6    ago, so I -- I don't think any system would be able to answer

7    such a question.

8         Facebook has retention policies that, you know, after some

9    period of time, such data would be deleted.

10   **Q.**    We've talked about how custom app event names are

11   obviously chosen by the developer.

12        Does Facebook -- does Facebook's ad delivery system

13   differentiate if that developer chooses to call things events

14   one, two, three, four, or if they choose to call an event

15   R_CHOOSE_GOAL, R_SELECT_LAST_PERIOD_DATE, or

16   R_SELECT_CYCLE_LENGTH?  Any different at all to the system the

17   way it operates?

18   **A.**    The delivery system tries to recognize patterns.  It

19   doesn't try to interpret what those event names are.

20   **Q.**    Does more data always make your machine learning model

21   more effective or more accurate?

22   **A.**    No.

23   **Q.**    Why not?

24   **A.**    I think there's a number of different problems there.

25        For example, that data may not actually be useful and may

1    take away from potentially useful features.

2        But, you know, other problems that could happen are, say,

3    overfitting where, you know, the machine learning system

4    doesn't generalize effectively because you fed it too much

5    data.

6    Q.    You mentioned overfitting, and obviously, Dr. Zervas, you

7    may know, testified about that.

8        Is that the first time you ever heard about this problem,

9    overfitting, when Dr. Zervas tried to explain it to the jury?

10   A.    No.

11   Q.    How common is that problem in your field?

12   A.    I mean, overfitting is a pretty run-of-the-mill machine

13   learning problem which, you know, as -- it's not just a

14   Facebook thing.  It's a problem across everybody doing machine

15   learning.

16   Q.    Talking about the -- getting back to the subject of

17   whether more data is always better.

18       Facebook has a lot of data about things that its own users

19   do on Facebook, like post a picture of your dog or celebrate a

20   birthday or things like that; right?

21   A.    Right.

22   Q.    What do you refer to that data as?

23   A.    We typically call that "first-party data."

24   Q.    And how do you refer to the data that you get from the

25   signals of offsite activity like app developers or websites?

1   A.   We typically call that "third-party data."

2   Q.   For the ad delivery system, are those two sources of data

3   equally valuable?

4   A.   No.

5   Q.   Can you describe why not?

6   A.   Yeah.  I mean, the example I gave earlier of you show an

7   ad to ten people and like five people buy the product or not --

8   there's actually one step higher.  I mean, first, we need the

9   information that we showed ads to people in order to possibly

10  do anything there.

11       But, actually, you know, the machine learning model kind

12  of operates in two steps when it chooses to show somebody an

13  ad.  First, what it does is it predicts the likelihood that

14  somebody's -- when presented with the ad, is going to click the

15  ad.  And all of that is first-party data; right?  It's

16  happening on Facebook while you're in news feed or whatever

17  you're doing.

18       The second part is, you know, given the probability that a

19  user clicks this ad, what is the probability that they'll

20  install the app or other things.  And so the first-party data

21  is, you know, sort of the building block and is necessary

22  before and more important than the third-party data.

23  Q.   Okay.  So let's talk about the custom app event data and

24  talk about how important that would be, generally speaking, to

25  the machine learning model.

1      Was custom -- well, first of all, was custom app event

2   data, any of it, transmitted to Meta via the code from the SDK

3   from Flo or -- and then made available to Meta's machine

4   learning model?  Does that delivery system, as far as you can

5   tell?

6   **A.**   Yes.

7   **Q.**   Okay.  But now I want to ask you more specifically:  Was

8   all the data that Facebook got from Flo put right into the

9   content delivery system?

10  **A.**   No.

11  **Q.**   Okay.  What about Flo's custom app event parameters that

12  were associated with those custom app event names?  Were those

13  delivered to the ad delivery system?

14  **A.**   No.

15  **Q.**   What about -- so, for example, for --

16         **MR. CLUBOK:**  I'm going to 1271, if we can put that up

17  again.

18  **BY MR. CLUBOK:**

19  **Q.**   These are the 12 event names at issue.  You're saying the

20  names would have been ingested or made available, I should say,

21  to the ad delivery system?

22  **A.**   I don't know if I'd say the names were made available, but

23  the custom app events and like the pattern based on these

24  names, they would have been hashed or converted into some

25  indecipherable format.  That would have been made available.

1  Q.   And what about the parameters associated with, for

2  example, R_CHOOSE_GOAL?  Whatever the responses were that were

3  then translated into the data that was then sent by Flo to

4  Meta, would that have been even made available to the content

5  ad delivery system?

6  A.   That wouldn't have been used, no.

7  Q.   Can advertisers --

8       By the way, is any of this data that you get from one

9  advertiser or one app developer or one website -- is it ever

10  made available publicly?

11  A.   No.

12  Q.   Is it ever shared with any other advertiser?  Like if you

13  get Flo's information, do you share it with Nike or anybody

14  else so that they can run their ads?

15  A.   No.

16  Q.   Can advertisers target ads based on the meaning or the

17  perceived meaning of custom app event data?

18  A.   Only so far as they are the ones who know what the meaning

19  would be and, you know, they're the ones who create custom

20  audiences, not Meta.

21  Q.   Would the machine learning -- we hear about machine

22  learning a lot.

23       The question is:  Would a machine ever learn who of

24  Flo Health's users were pregnant based on any of the

25  information that was made available to the system?

1  **A.**   We had neither machine nor people attempting to interpret

2  what this information meant.

3  **Q.**   How about fertility windows?

4  **A.**   The same applies.

5  **Q.**   Dates of periods?

6  **A.**   The same applies.

7  **Q.**   Goals?

8  **A.**   Again, the same applies.

9  **Q.**   Let's talk just a little bit more about the Facebook SDK.

10      As a -- do you understand how the -- have you reviewed the

11  code, every line of code or as much as you could, of the SDK?

12  **A.**   Not every line, no.

13  **Q.**   Okay.  How many lines are there?

14  **A.**   A lot.  The SDK also includes a lot of features that are

15  not being described today, such as things for Facebook login

16  and various other functionality.

17  **Q.**   Okay.  Let's focus on the parts of the code in the SDK

18  that have been at issue in this case, as far as you understand.

19      And by the way, you were also -- you were also identified

20  as the person most knowledgeable at Facebook to talk about

21  those issues in your deposition too; correct?

22  **A.**   Correct.

23  **Q.**   Straight up, does the SDK operate as a recording device?

24  **A.**   Absolutely not.

25  **Q.**   Why do you say that?

1  A.    It doesn't record things.  It's not writing to a CD or a

2  tape or trying to take a video or anything like that.

3  Q.    If an app incorporated Facebook's SDK during the class

4  period and they chose to send certain data to Facebook, were

5  they sending the same communication to Facebook that they had

6  with their users?

7          MR. CANTY:  Objection.

8          THE COURT:  Sustained.

9  BY MR. CLUBOK:

10 Q.    Can you describe what the SDK was doing?  Let's say

11 Sarah Wellman or Ms. Gamino or any other user typed in the

12 dates of their period and answered other questions.

13       What, if anything, would the SDK do to get that

14 information to Meta?

15 A.    I mean, the SDK wouldn't do anything.  Somebody would have

16 to write -- you know, if any information was transmitted

17 subsequent to one of those interactions to Meta, it would have

18 been because Flo had decided -- or like whichever app

19 developer, really -- had decided to transmit an app event to

20 Meta.

21 Q.    When Mr. Canty was talking to Dr. Egelman, he asked him

22 questions where he asked him, "Hey, could users, quote, stop

23 the recording by the Facebook SDK?

24       And Dr. Egelman answered no.

25       Do you agree with that characterization by Dr. Egelman?

1  **A.**  I don't think the question makes sense.

2  **Q.**  Why not?

3  **A.**  The SDK -- I wouldn't describe it as something you turn on

4  or off.  It is some lines of code that are provided to app

5  developers that they incorporate into their app, and then they

6  instruct it to do things if they want it to do those things.

7  **Q.**  Would Meta have any control over whether the SDK was

8  getting information of one nature for R_CHOOSE_GOAL and a

9  different nature for SESSION_CYCLE_DAY_FIRST_LAUNCH or any

10  other nature associated with any of the 12 custom app event

11  names at issue in this lawsuit?

12  **A.**  All of that would have been implemented by the app

13  developer, not by Meta.

14  **Q.**  Does Facebook have any way to record certain

15  communications between Flo app and its -- or Flo Health and its

16  users via the SDK -- via the lines of code in the SDK?

17  **A.**  No.

18  **Q.**  I want to end with talking about Exhibit 110.  This is a

19  document that Mr. Canty showed you a portion of, and this is

20  one that's -- if we brought it out here, it would be a couple

21  of feet, I think, high.  But we've got an electronic version,

22  so I'm going to try to ask you about questions either based on

23  the snippet that Mr. Canty provided to you or the electronic

24  version that Mr. Johnson has available and can put onto the

25  screen.  Okay?

1    So on the screen we have Exhibit 110, the full version,

2  the native version.  And you can see it's -- it's an Excel

3  spreadsheet with number of tabs.

4    Do you see that?

5  A.   Yeah, I see that.

6  Q.   And this is a document that you've worked pretty closely

7  with in the past?

8  A.   Yeah.  I've reviewed it entirely.

9  Q.   In fact, you verified interrogatories using this document

10  along with text that described this; correct?

11  A.   Yes.

12  Q.   What are we looking at on what's been marked as Exhibit

13  A-1 -- or 110A-1?  That's the first tab of Exhibit 110.

14  A.   Yeah.  So this is a tab showing a summary of app events

15  sent from the Flo Health app to Facebook.

16  Q.   And during what time period?

17  A.   So the time period is December 9, 2017, through

18  December 4, 2019.

19  Q.   And first of all, does this -- so, for example, if you

20  looked at a number on the side and you see the first one,

21  Android version, and you see 24 million, approximate, number of

22  unique individuals associated with that event, what is that

23  communicating?

24  A.   Yeah.  So for this particular event titled "Android

25  version," there was worldwide 24-and-change million unique

1  individuals associated with this event.

2  Q.   Does that mean that's 24 million Facebook users associated

3  with that event?

4  A.   No, it doesn't.  In circumstances where the event couldn't

5  be matched to a Facebook user, you know, we'd approximate the

6  rough numbers of users.

7  Q.   And by the way, is it true that this was all the data that

8  was left at Facebook by the time someone first asked them to

9  produce -- or asked you to produce data regarding what you had

10  if you could identify anything that Flo Health had sent you?

11  A.   That is correct.

12  Q.   And by the time this was prepared, looks like in December

13  of 2019, Facebook's ordinary data retention policies had

14  discarded all the original data; correct?

15  A.   That is correct.

16  Q.   And that was years before this litigation was brought;

17  right?

18  A.   Correct.

19  Q.   So in December you were tasked with trying to gather

20  whatever information you could to indicate what Facebook at

21  least had, to the best of your knowledge, at some point, and

22  this is what you came up with?

23  A.   This is what Meta produced, yes.

24  Q.   And it lists -- for example, if we were to look for

25  R_CHOOSE_GOAL, which is --

1    **MR. CLUBOK:**  Mr. Johnson, if you could type that in

2    under find R_CHOOSE_GOAL.

3    **BY MR. CLUBOK:**

4    **Q.**    If you were to search for that, it looks like row 147 it

5    says R_CHOOSE_GOAL, and it shows 34 million and some

6    approximate number of unique individuals associated with that

7    event; right?

8    **A.**    That is correct.

9    **Q.**    And can you tell the jury what that means.  What did

10   Facebook know about the data that Flo Health had sent when you

11   were asked to look in December of 2019?

12   **A.**    At the time this document was produced, there was very

13   little data left, just like counts describing how much data had

14   been transmitted to Meta, and, you know, they want breakdowns

15   for other things available to answer questions, like which

16   country were these from or how many were actually Facebook

17   users.

18   **Q.**    Does that 34 million represent 34 million people in

19   California who had used the Flo Health app during the time

20   frame?

21   **A.**    For multiple reasons, no.

22   **Q.**    What are the multiple reasons?

23   **A.**    I mean, again, like this is a worldwide number, so it's

24   not just for America, it's not just for California, and it's

25   also not just limited to Facebook users.  There is

1  approximation for the non-Facebook users.

2  **Q.**   Okay.  Let's try another one.  Let's clear the screen and

3  start again.  Let's try R_AGE_CHOSEN_PREGNANCY.  Okay?  And

4  let's see what that shows.

5      It looks like there's two rows, 145 and 146.  And I'll

6  just note that on 1271, which is the 12 custom app events at

7  issue in this case, those are two of them.

8      Sorry -- yup.  R_CHOSEN_PREGNANCY,

9  R_AGE_CHOSEN_PREGNANCY_METHOD and R_CHOOSE_GOAL are three of

10 the 12 custom app events at issue in this case; right?

11 **A.**   Right.

12 **Q.**   And for the pregnancy one, it looks like the number's more

13 likely 539,000 for one and 391,000 for the other; right?

14 **A.**   I see that.

15 **Q.**   And that's also worldwide?

16 **A.**   Yeah.

17 **Q.**   Has Facebook identified -- well, the three women or the

18 five women, I guess, who testified here -- they've all

19 testified that none of them were pregnant when they first used

20 the app; right?

21 **A.**   Okay.

22 **Q.**   Are you aware of any name, a single person, that Facebook

23 could identify today that may have been pregnant when they

24 first used the app and told Flo and therefore Facebook got that

25 information?

1  A.   No.

2  Q.   Is there any way to query the system to try to figure that

3  out, even if you wanted to?

4  A.   The data stopped existing years and years ago.  Like it

5  would not be possible.

6  Q.   Exhibit 1271 has the list of 12 custom app events that the

7  judge has said are at issue in this lawsuit.

8       Have you endeavored to look for each of these 12 in this

9  list of all the app events that Facebook could identify in

10  December of 2019 that Flo had sent?

11  A.   Yeah, I've looked for each one of those.

12  Q.   And were you able to find all 12 of these in Exhibit 110?

13  A.   No.

14  Q.   Which ones were you -- what were you not able to find?

15       MR. CLUBOK:  And let's put up 1271, if it helps you,

16  for a minute.

17  BY MR. CLUBOK:

18  Q.   On 1271, are there any of these 12 custom app events'

19  names at issue in this case that you couldn't find in

20  Exhibit 110 or anywhere in Facebook's records when you were

21  tasked in December of 2019 to try to do that?

22  A.   I was unable to find the SESSION_CYCLE_DAY_FIRST_LAUNCH

23  event.

24  Q.   The last one on the list?

25  A.   Correct.

Q.   Let's go back to 110.

     And, again, this was something you prepared to the best of your ability way back in December of 2019 to try to figure out what the scope of the issue was?

A.   This was by Meta, yes.

Q.   And let's do a fresh search now just to check. SESSION_CYCLE_DAY_FIRST_LAUNCH -- FIRST_LAUNCH.  Oops.  Okay. I'll read it slowly.  Let's lock for SESSION_CYCLE_DAY_FIRST_LAUNCH.

     MR. CLUBOK:  And let the record reflect the screen says "We couldn't find what you were looking for.  Click options for more ways to search."

BY MR. CLUBOK:

Q.   Have you --

     MR. CLUBOK:  And thank you, Mr. Johnson.

BY MR. CLUBOK:

Q.   Have you, Mr. Wooldridge, personally searched this entire database and each and every one of the tabs to see if Meta had any record that it actually ever received anything related to SESSION_CYCLE_DAY_FIRST_LAUNCH, at least based on what was available to you to check in December of 2019?

A.   Yeah, I've searched this entire file, and I did not find it.

Q.   In any of these tabs?

A.   Correct.

1    Q.    One last question -- or hopefully we'll get to it.

2          Look at Tab A2 of Exhibit 110, please.

3          Tab A2 has -- well, describe what's in A2 and why it's

4    different from A1.

5    A.    Yeah.  A2 is sort of similar to A1, but instead of showing

6    the, you know, total number of approximate individuals, it

7    shows it broken out day by day.

8    Q.    And have you looked day by day to see --

9          And it says here that there's data that continues to be

10   sent -- or through December 9, 2017, from Flo.

11         Do you see that?

12   A.    I see that.

13   Q.    Did you check, again, Exhibit 1271, the names of the 12

14   custom app events, to see the last date that any of these were

15   ever sent -- or received by, I should say, by Meta?

16   A.    I think you said December 9, 2019.

17   Q.    I apologize.  Let me try it one more time.

18         Exhibit 1271 is the list of 12 custom app events that are

19   at issue in this case.

20         Did you endeavor to check each one to see -- at least for

21   the 11 that Meta did have information it had received, to see

22   for those 11 what was the last day any of those 11 custom app

23   event names were sent to Meta?

24   A.    Yeah.  So in this file, I looked for it, and all of them

25   cut out around February 2019.

1   Q.   Shortly before the Wall Street Journal article came out;

2   correct?

3   A.   Around that time, yeah.

4        MR. CLUBOK:  Okay.  Thank you.

5        THE COURT:  Okay.  Any brief recross?

6        MR. CANTY:  Yes, Your Honor.

7                    <u>REDIRECT EXAMINATION</u>

8        MR. CANTY:  Can I have 226A pulled up, please.  And if

9   we could go to page 11.

10  BY MR. CANTY:

11  Q.   Mr. Wooldridge, this is 226A, in evidence.  This is the

12  interrogatory from Meta.

13       Can you read from the second line, beginning with "Meta is

14  able to confirm."

15  A.   Could you give me the line number?

16  Q.   2.

17  A.   Read aloud?

18  Q.   Yes, please.

19  A.   (as read):

20       "Meta is able to confirm based on the app events

21       data available from September 29, 2019, to June 1,

22       2021, described in further detail below under the

23       heading Storage of Flo App Data that the app events

24       data that Flo app sent to Meta included the

25       following."

1        Do you want me to keep reading?

2   Q.   Yes.

3   A.   (as read):

4        "Event name, event parameters, time an event was

5        logged on the device, version of an app logging the

6        event, type of device that sent the event, e.g., a

7        phone, tablet, or computer; type of operating system

8        off the device that sent an event, e.g., iOS/Android;

9        device model; client type, e.g., native app, browser,

10       Messenger; client operating system version; client

11       browser, e.g., Safari/Chrome; SDK, e.g., AppsFlyer;

12       how the app was acquired by the user, e.g., via an

13       ad; device mobile network carrier; device screen

14       dimensions; total device disk space; remaining disk

15       space on the device; and whether ad tracking was

16       enabled."

17  Q.   So you're not disputing that the parameters were sent to

18  Meta; correct?

19  A.   Developers could send parameters to Meta, yes.

20  Q.   No, I'm asking you that this is what this document that

21  Meta attested to says, that the -- that the parameters were

22  sent; correct?

23  A.   We say that Meta -- you know, app event data the Flo app

24  sent to Meta included event parameters.  I don't know

25  specifically -- you know, we don't have a record showing that

1  specific parameters were received by Meta.

2  Q.   That's not what I asked.  I asked whether or not this was

3  sworn to, that event parameters from the Flo app were sent to

4  Meta.  That's what this says; correct?

5  A.   It does say that.

6  Q.   And before, you testified that the machine learning system

7  didn't ingest the parameters.

8       I'd like to turn to page 13.  And this is --

9          MR. CLUBOK:  Objection.  Misstates the question.

10         THE COURT:  Just go ahead and ask.

11 BY MR. CANTY:

12 Q.   Under Content Delivery Optimization, can you tell us where

13 in this answer you specifically said that you didn't take in

14 those event parameters into the machine learning system?

15 A.   I don't believe it has wording for that specific effect,

16 yeah.

17 Q.   You don't put that in this answer; correct?

18 A.   This wording describes that app event data was made

19 available to be aggregated, but it doesn't go into further

20 detail on that.

21 Q.   So the first time we're hearing that you didn't take in

22 parameters was today in court; right?

23         MR. CLUBOK:  Objection.

24         THE COURT:  Overruled.

25         THE WITNESS:  I wouldn't say "take in parameters,"

1  just because you're describing whether it was used in the

2  machine learning model or whether it was received by Meta.

3  Could you maybe ask that more precisely?

4  **BY MR. CANTY:**

5  **Q.**   Sure.  It was definitely received by Meta.  We can agree

6  on that; right?

7  **A.**   Event parameters were presumably received by Meta.

8  **Q.**   Well, you say "presumably," but you swore to it in an

9  interrogatory response that it was sent.  Are you taking that

10  back?

11  **A.**   "Event parameters" is a pretty broad term that -- I'm

12  happy for us to say that event parameters were transmitted to

13  Meta.

14  **Q.**   I want you just to tell the truth.  If that's the truth,

15  tell us that it was said.  Were event parameters sent from Flo

16  to Meta?

17          **MR. CLUBOK:**  Objection, Your Honor.

18          **THE COURT:**  Overruled.

19          **THE WITNESS:**  As I understand, yes.

20  **BY MR. CANTY:**

21  **Q.**   And -- okay.

22          Now, the SDK was rolled out in 2015; correct?

23  **A.**   There were various iterations of the SDK.

24  **Q.**   And the Facebook SDK -- you were aware as early as --

25          **MR. CANTY:**  This is yours, by the way.

1    MR. CLUBOK:  Thank you.

2  BY MR. CANTY:

3  Q.   You were aware as early as 2015 and 2016 that there were

4  risks that you may collect sensitive data, including PII,

5  health data, Social Security numbers, and passwords; right?

6  A.   We always prohibited sending those in the terms, yes.

7  Q.   So nothing precluded you with rolling out all these

8  protections that you developed in 2019 when you rolled out the

9  SDK in 2015?  You could have waited until you had those

10  protections in place and put them out together with the SDK;

11  correct?

12  A.   We didn't launch the health filter at that time, no.

13  Q.   That's not what I asked.

14    What I'm asking is:  Nothing precluded you from putting in

15  these safety precautions when you decided to roll out the SDK?

16  You could have made a decision as a business we're going to

17  make sure we get this right --

18    (Reporter interruption for clarity of the record.)

19    MR. CANTY:  Sorry.  I'm going to slow down.

20  BY MR. CANTY:

21  Q.   We're going to make sure we get this right.  We're going

22  to make sure we're not collecting this data.  We're going to

23  own it, take responsibility for it, and make sure we have these

24  integrity systems set up before we release it to app

25  developers.  You could have done that.  Meta could have done

1    that; correct?

2    **A.**    Meta did launch it with protections, including the terms.

3    **Q.**    In 2019?

4    **A.**    No.  The terms always prohibited sharing potentially

5    sensitive information with Meta.

6    **Q.**    No, no, no.  Your rules told app developers not to send

7    it.  I'm asking you what Meta did.

8        You could have set up the programs you have in place now

9    that you set in up 2019, where you actually took the

10   affirmative step to try to protect yourself from getting this

11   data?  You can have done that when you rolled out the SDK in

12   2015; correct?

13   **A.**    Sorry.  We did take an affirmative step.  The terms didn't

14   write themselves.  We said do not send us sensitive

15   information.

16   **Q.**    I'm not talking about the terms.  I'm talking about not

17   what you said, but what you did.

18       In 2019, you set up this program, the end of 2019, that

19   you've testified about that filtered out sensitive health data.

20   Nothing precluded you from doing that in 2015 when you rolled

21   out the SDK; correct?

22   **A.**    Putting aside the terms, which, you know, we did have out

23   there.

24   **Q.**    I know you want to talk about the terms.  I want you to

25   answer my question.  We'll get back to the terms.

1    Nothing precluded you from setting up the parameters and

2  protections that you set up in 2019?  You could have done that

3  in 2015, but you made a decision not to; correct?

4  **A.**   I don't know if I'd characterize it that way, no.

5  **Q.**   Well, you didn't do it in 2015; right?

6  **A.**   We did it in 2019.

7  **Q.**   And you also said that one thing you wanted to protect,

8  you never want passwords, and you say, well, passwords are not

9  valuable to advertisers; correct?  Do you remember that

10  testimony?

11        **MR. CLUBOK:**  Objection.  Misstates the --

12        **THE COURT:**  Overruled.  Go ahead.

13        **THE WITNESS:**  I don't believe that's how I framed it.

14  **BY MR. CANTY:**

15  **Q.**   Well, why wouldn't you want passwords?

16  **A.**   We don't want passwords shared through the app SDK

17  because, I mean, one, we prohibit that.  We say don't send

18  sensitive information to Meta.

19    But two, like Meta uses and advertisers do not want that

20  shared via the app events part of the SDK to Meta.

21  **Q.**   Right.  There's no -- there's no market for advertisers to

22  want people's passwords; right?

23  **A.**   Advertisers already have the passwords because they're the

24  ones creating the app.

25    The problem comes when they share that with Meta?

1    Could you repeat your question?  Sorry.

2  **Q.**  Yeah.  We can agree that the only real market for

3  passwords would be like the black market for people wanting

4  those passwords; right?  It wouldn't be useful to an

5  advertiser; right?

6  **A.**  I mean, presumably these businesses have authentication

7  flow, so it might actually be useful to them, but not for

8  advertising purposes, no.

9  **Q.**  But you would agree with me that knowing if somebody was

10  pregnant would be useful to advertisers; correct?

11  **A.**  It might be.  I could only speculate about that.

12  **Q.**  You don't -- well, let's -- let me ask you.

13    You don't think that advertisers may say, "Hey, I want to

14  know if I can advertise to women between the ages of 25 and 35

15  that are pregnant," that may be useful to an advertiser;

16  correct?

17  **A.**  Again, this is speculation, but potentially.

18  **Q.**  That's speculation that that may be a target audience that

19  somebody may want to market ads to?

20  **A.**  I mean, Facebook at that time did not offer in its

21  detailed targeting and interest targeting options the ability

22  to target pregnant women.

23  **Q.**  Well, with respect to the word list that you described,

24  you've now said that the word "pregnant" and "pregnancy" is on

25  that list; correct?

1   **A.** It was on that list, yes.

2   **Q.** Do you now concede that those are sensitive health terms

3   and health information that you don't want and don't want to

4   collect?

5   **A.** I wouldn't characterize it in that way.

6   **Q.** Now, with respect to the machine learning, the chart that

7   we looked at before, you talked about specific ads that

8   Flo Health targeted because of specific custom app events.

9       Do you remember looking at that list?

10  **A.** Are you referring to the machine learning chart that was a

11  diagram on the table?

12  **Q.** Let me withdraw that question.

13      There was a list of specific ads.  I think it was custom

14  ads that Flo Health --

15  **A.** Do you mean the mobile app custom audiences?

16  **Q.** The mobile app custom audiences.  Thank you.  Yes.

17      You saw that list; right?

18  **A.** I do remember seeing that.

19  **Q.** Where is the list of ads that were improved based on the

20  information that was ingested into the machine learning system?

21  Where is that list?

22  **A.** I mean, this is a list of custom audiences, not a list of

23  ads.

24  **Q.** I'm not talking about custom audiences.  I'm talking about

25  you used data that you collect through custom app events to

1  improve your machine learning system to improve ads; right?

2  A.   Roughly speaking, yes.

3  Q.   Where is the list of those ads?

4  A.   I don't think we have such a list.

5  Q.   You don't keep a list of the ads that were improved

6  because you used the data from the women that used the Flo

7  Health app?

8  A.   I don't think we would keep such a list.

9  Q.   And, in fact, we looked at the list -- you talked about

10 deleting the underlying data.  Do you remember that?  You said,

11 Well, I can't even see what the -- whether the data had any

12 meaning to Meta because, for example, R_CHOOSE_GOAL -- all that

13 data for those individually identifiable women, is deleted.  I

14 can't find it; right?

15 A.   As our filtration systems reply to data, it does remove

16 said data.

17 Q.   Okay.  You -- but you did that search after the class

18 period?

19 A.   Which search in particular?  Sorry.

20 Q.   The search as to what information was related to those

21 custom app events that we just looked at.

22 A.   As in the list of information that was shared with Meta by

23 Flo?

24 Q.   R_CHOOSE_GOAL -- remember that one?

25 A.   I remember that.

1  **Q.**  34 million, and you were asked whether or not you could

2  identify the individual accounts that were associated with

3  these, and you said that's all been deleted.  You don't have

4  that; right?

5  **A.**  Right.  Facebook has data retention policies, and it

6  deletes data received through the business tools after certain

7  amounts of time.

8  **Q.**  And the reason why you couldn't look at it is because it

9  had already been deleted?

10  **A.**  Yeah.  This was years and years and years ago.

11  **Q.**  But at the time that it was entered, that information was

12  available to Meta; correct?

13  **A.**  Sorry.  Before the data was deleted, you're saying the

14  data wasn't deleted.  Yes, that's --

15  **Q.**  Okay.  That's what I'm asking, that at some point when you

16  identify it with a Facebook account, you know who that Facebook

17  account is, and that is ascertainable.  I know you're saying

18  now it's been deleted, but at some point that was known and

19  ascertainable to somebody at Meta; correct?

20  **A.**  I don't think anyone was looking at that time, but the

21  data may have existed in that format.

22  **Q.**  So somebody -- if somebody wanted to, they could look that

23  up?

24  **A.**  Potentially, yes.  There are limitations to it.

25  **Q.**  Now, back to the machine learning system.  You talked

1    about overfitting.  Do you remember that testimony?

2    A.    I do.

3    Q.    How does Facebook deal with overfitting?  Walk us through

4    that process.

5    A.    I mean, there's a bunch of things related to overfitting

6    this is --

7          Again, this is not just a Facebook-specific problem and

8    just -- frankly, isn't just a problem specific to, you know,

9    the ad systems.

10   Q.    That's what I asked.  I asked how -- Facebook's on trial

11   here, so let's keep it focused on Facebook.

12         How does Facebook deal with overfitting?

13   A.    I mean, among other things, like limiting the number of

14   parameters for a given model so that it doesn't overfit would

15   be one approach.

16   Q.    So you get the parameters and then you decide that you

17   want to narrow those parameters; right?

18   A.    When we use the term "parameters" here, I am referring to

19   inputs to the model, not parameters as we've been describing

20   with respect to the SDK.

21         But limiting them is, you know, one way.

22   Q.    You also said -- you were asked questions about whether or

23   not anybody at Facebook had the code or the decoder to

24   ascertain the meaning of this information that came in through

25   the custom app events and the parameters associated with that.

1    Do you remember those questions?

2  **A.**   I recall questions like that.

3  **Q.**   Is it your position that somebody needs a decoder or some

4  sort of key to understand what "get pregnant" means?

5  **A.**   I think it depends on the context.  Yes.

6  **Q.**   What about "pregnant"?  You think that you need a code to

7  figure out what the word "pregnant" means?

8  **A.**   "Pregnant" could mean multiple things.  Before, as you

9  were saying that sentence, that was -- you know, it's a

10  synonym, but that was a pregnant pause before you said that

11  word.  So, again, it depends on the context.

12  **Q.**   So -- so your machine learning system that gets

13  information from a fertility app gets the term "get pregnant,"

14  and your position is it may interpret that to mean a pause?

15  **A.**   It doesn't attempt to interpret the custom event names or

16  custom parameters, so it actually wouldn't attempt to interpret

17  it at all.

18  **Q.**   And with respect to the last custom app event,

19  SESSION_CYCLE_DATE_FIRST_LAUNCH, again, that information, what

20  you looked up on that spreadsheet -- your search occurred after

21  the class period ended; correct?

22  **A.**   Correct.

23         **MR. CANTY:**  Your Honor, may I have one moment?

24         **THE COURT:**  Yes.

25              (Pause in proceedings.)

1    **MR. CANTY:**  Your Honor, I'm just pulling up deposition

2    testimony from Mr. Wooldridge, if I may have a moment.

3                        (Pause in proceedings.)

4    **MR. CANTY:**  This is --

5                        (Counsel conferring.)

6    **MR. CANTY:**  Your Honor, I'd like to read from --

7    **THE COURT:**  I don't have it.

8    **MR. CANTY:**  Okay.

9    **MR. CLUBOK:**  Your Honor, I object to --

10   **THE COURT:**  Don't object until I read it.

11   What page and line, please?

12   **MR. CANTY:**  This is page 263 -- 262 and 263.

13   Actually, I believe it begins on the beginning of page 263,

14   line 2, question beginning with the word "so."

15   **THE COURT:**  263, line 2, through what?

16   **MR. CANTY:**  Through line 7.

17   **THE COURT:**  That's fine.

18   BY MR. CANTY:

19   Q.   Mr. Wooldridge, do you recall being asked these questions

20   and giving these answers?

21   **MR. CLUBOK:**  Objection.  Improper impeachment.

22   **THE COURT:**  I said it's fine.  Go ahead.

23   BY MR. CLUBOK:

24   Q.   (as read):

25   **"QUESTION:**  So am I understanding correctly that the

1    custom data gets sent along with the custom app event?

2    "ANSWER:  The two things are sent as part of the same, the

3    same app event to Meta."

4    Do you recall being asked that question and giving that

5 answer?

6 A.   App event parameters are sent as part of app events, yes.

7 Q.   My question is:  Do you remembering being asked that

8 question and giving that answer?

9 A.   Yes.

10 Q.   Okay.

11         MR. CANTY:  No further questions, Your Honor.

12         THE COURT:  Okay.  Very, very, very brief redirect.

13         MR. CLUBOK:  Yeah.

14                    <u>REDIRECT EXAMINATION</u>

15 BY MR. CLUBOK:

16 Q.   Let's go right to that question.

17    If you could put 263 from his deposition.  If you could

18 make it available to you, Mr. Wooldridge.

19    That question that you were asked at your deposition --

20    And frankly, thinking about your entire deposition that

21 was conducted by plaintiffs, were you ever asked details like

22 did standard parameters get made available to the custom -- to

23 the content delivery system?

24 A.   No.

25 Q.   Were you ever asked if custom parameters for standard

1    events were made available to the machine learning system?

2    **A.**    No.

3    **Q.**    Were you ever asked if custom parameters to custom app

4    events were made available to the machine learning system?

5    **A.**    No.

6    **Q.**    Other than that one question that Mr. Canty asked, is that

7    where it ended, on that subject, as far as you can recall?

8    **A.**    I cannot recall the full --

9    **Q.**    Okay.  And now, even live here, if we turn back to

10   Exhibit 226A, which he put in front of you, and if we could

11   turn to page 11.

12       Right in front of this jury, Mr. Canty put this in front

13   of you and asked you to look at the text above the black part.

14       Do you remember that?

15           **MR. CLUBOK:**  If we could blow up the top paragraph.

16           **THE WITNESS:**  Yeah.

17   **BY MR. CLUBOK:**

18   **Q.**    Right?  And he asked you -- first of all, this

19   interrogatory said that Meta was able to confirm a lot of

20   different information, including client type and client

21   operating system version and client browser and all this other

22   stuff that we see here on the top of page 11 of Exhibit 226A;

23   right?

24   **A.**    I see that.

25   **Q.**    Were you ever asked to go through each one of those

1   individual pieces of data to ask if they would somehow -- if

2   they were made available to the ads delivery system, if every

3   single one of them was?

4   A.   No, I was not.

5   Q.   Is there more than one listed there that's not made

6   available to the ad delivery system?

7   A.   Yeah, there's a number.

8   Q.   And did Mr. Canty, either today or back in the deposition,

9   ever ask you to detail which ones were made available and which

10  ones weren't?

11       MR. CANTY:  Objection.

12       THE COURT:  Let's go ahead.  It's fine.

13       THE WITNESS:  No.

14  BY MR. CLUBOK:

15  Q.   I wrote down the question he asked.  I think I got it

16  right.

17       In front of this jury, he said, "Isn't it true that event

18  parameters were sent by Flo to Meta?"

19       Do you remember he asked you that question in front of the

20  jury?

21  A.   I believe so, yes.

22  Q.   And the answer to that question, simply?

23  A.   Event parameters would have been -- I mean, as I

24  understand, Flo did sent event parameters to Meta.

25  Q.   Okay.  And were all the event parameters that Flo sent to

**PROCEEDINGS**

1    Meta made available to the ads machine learning system?

2    **A.**    No.

3    **Q.**    Okay.  Which ones were and which ones weren't?

4    **A.**    As I understand, event parameters that were sent alongside

5    standard events may have been made available to the machine

6    learning model in certain circumstances, but event parameters

7    that were sent alongside custom events were not.

8    **Q.**    And are you certain of that?

9    **A.**    Yes.

10   **Q.**    Thank you.

11          **THE COURT:**  Okay.  You may step down.

12   Who do we have next?

13                        (Witness excused.)

14          **MR. CANTY:**  Your Honor, the plaintiffs intend to play

15   deposition designations.

16          **THE COURT:**  You can go.

17          **THE WITNESS:**  Oh, can I?

18          **THE COURT:**  Yeah, that's what that means.

19   Who's next?

20          **MR. CANTY:**  We intend to play deposition designations,

21   Your Honor.

22          **THE COURT:**  All right.  This is going to be on the

23   screen.  This is on tape.

24          **MR. CLUBOK:**  Your Honor, may we proceed?

25          **THE COURT:**  Sure.

PROCEEDINGS

1    **MR. CANTY:**  Thank you.

2              (Video was played but not reported.)

3         **THE COURT:**  Is that it?

4    **MR. SADUN:**  Your Honor, one question lagged out, and

5    would the Court allow me to read the question and answer?  It

6    froze and the answer wasn't read aloud.

7         **THE COURT:**  That's fine.

8         **MR. SADUN:**  The question was (as read):

9    **"QUESTION:**  I'll make this simple.  Has Flo at any time

10   shared health information with any analytics company?

11   **"ANSWER:**  Privacy is very important to us, so we never did

12   share Flo Health data with any analytical systems or

13   companies."

14        **THE COURT:**  Okay.  Who's next?

15   **MR. CANTY:**  Your Honor, for the record, that was Roman

16   Bugaev, B-U-G-A-E-V.

17        At this time, the plaintiffs call Dr. Jennifer Golbeck.

18        (Jennifer Golbeck steps forward to be sworn.)

19        **THE COURT:**  Want to stand up for a moment and stretch

20   a little bit?

21        **THE COURTROOM DEPUTY:**  Please raise your right hand.

22                        **JENNIFER GOLBECK,**

23   called as a witness for the Plaintiffs, having been duly sworn,

24   testified as follows:

25        **THE WITNESS:**  Yes, I do.

1        THE COURTROOM DEPUTY:  Please be seated.

2        THE WITNESS:  Thank you.

3        THE COURTROOM DEPUTY:  Please state your full name for

4   the Court and spell your last name.

5        THE WITNESS:  Dr. Jennifer Golbeck, G-O-L-B-E-C-K.

6        THE COURTROOM DEPUTY:  Thank you.

7        THE COURT:  Okay.  Go ahead.

8                    **DIRECT EXAMINATION**

9        MS. VILLEGAS:  Your Honor, we have Trial Exhibit 2050,

10  which is going to be a demonstrative that Dr. Golbeck walks

11  through, and I understand there's no objection.

12       THE COURT:  Okay.  Do you have a copy for me?

13       MS. BLUNSCHI:  No objection.

14  BY MS. VILLEGAS:

15  Q.   Good morning, Dr. Golbeck.

16  A.   Good morning.

17  Q.   Could you please explain what is your understanding of

18  this case?

19  A.   Yeah.  My understanding is that Flo had a period tracking

20  app, as we've all heard, and data that people entered in that

21  was received by Facebook, and Facebook used it in their machine

22  learning systems to target ads.

23  Q.   What kind of materials have you reviewed while forming the

24  opinions that you offer in this case?

25  A.   A whole bunch.  I looked at answers to interrogatories,

1  which we've seen; internal and public documents from Facebook;

2  some deposition transcripts; some of the diagrams that we've

3  seen here.

4  **Q.**  Are you getting paid for the work that you're doing for

5  the plaintiffs here?

6  **A.**  I am.

7  **Q.**  How much?

8  **A.**  $550 an hour.

9  **Q.**  Is your payment for your time today or any of the work

10  that you've done in this case -- is it contingent on the

11  results that we get in this case?

12  **A.**  No.

13  **Q.**  How did you first learn about this case?

14  **A.**  I was contacted by a company that helps people who are

15  trying cases find expert witnesses, so they reached out to me

16  and asked if I would be interested in talking to you about

17  this.

18  **Q.**  And what were you asked to do in this case by the

19  plaintiffs?

20  **A.**  I was asked to look at all those documents that we talked

21  about and offer my opinion about whether that data from Flo was

22  used in Facebook's machine learning algorithms.

23  **Q.**  Were you asked to produce a report in this case?

24  **A.**  I was.

25  **Q.**  How many reports did you actually write?

1  **A.**   Basically two, one original and one responding to some of

2  their experts.

3  **Q.**   And did you sign each of those reports?

4  **A.**   I did.

5  **Q.**   And do you still stand by the opinions that you offered in

6  those reports?

7  **A.**   Yes, I do.

8  **Q.**   Can you briefly describe your educational background for

9  the jury?

10 **A.**   Sure.  I went to the University of Chicago, so I did

11 undergrad there.  I have a bachelor's degree in computer

12 science and economics.  I stayed there for a master's degree in

13 computer science and then went to the University of Maryland in

14 College Park.  I got a Ph.D. in computer science, and then

15 recently went back and got a master's degree in psychology from

16 Harvard.

17 **Q.**   And you've also authored multiple books and peer-reviewed

18 articles.  Can you tell us a little bit about that?

19 **A.**   Yeah.  I've written about 200 peer-reviewed articles about

20 machine learning, artificial intelligence, particularly focused

21 on social media privacy and like bad things people do on the

22 Internet.

23 **Q.**   And have you presented on this research?

24 **A.**   Yes.  So in computer science, which you may have heard

25 from some of the other experts, we go to conferences.  It's a

1  primary way that we publish.  So I have presented talks there,

2  but I also talk a lot to industry groups.  I'll go to like

3  realtor conferences or credit union conferences and talk to

4  kind of them as the public about this.

5  **Q.**  And you've done TED Talks on this?

6  **A.**  Six, I think.  Six TED Talks.

7  **Q.**  What classes do you teach?

8  **A.**  I teach a whole bunch of different classes.  I teach

9  machine learning.  I teach a class on what we call social media

10  feed algorithms, the kind of stuff we've been talking about

11  here, how do we personalize content for people.  I teach

12  programming, machine learning, which I might have said, social

13  network analysis.  I teach a class on how to be an influencer

14  on social media.

15  **Q.**  Have you developed machine learning projects yourself?

16  **A.**  I have.

17  **Q.**  Can you tell us a little bit about that?

18  **A.**  Sure.  So as one example of the kind of research we do in

19  my lab, I'm really interested in being able to use social media

20  data with AI and find out what things that tells us about

21  people that they might not know.  So one example project that

22  we did was we went on Twitter and we looked at everyone who

23  announced they are going to their first Alcoholics

24  Anonymous meeting.  This, of course, takes the "anonymous" out

25  of it, so who knows how that biased our data.  But we made sure

1  these were people who legitimately were saying:  I'm drinking

2  too much, I'm going to go to my first AA meeting tomorrow.

3       And then we followed them after that to see if they made

4  it 90 days sober, which is a good like early addiction recovery

5  marker.  And we made sure they kind of said explicitly, so

6  maybe it was a year later they celebrated a year of sobriety

7  and we knew they had also made it 90 days.

8       And then what we did was build a model, build an

9  algorithm, to analyze everything they did on Twitter up until

10 that day they announced they were going to their first AA

11 meeting to predict:  Would they make it 90 days sober?

12      So essentially, on the day you say "I'm going to go to my

13 first AA meeting tomorrow," we can push a button, look at what

14 you did on Twitter, and predict if you'll stay sober.  Our

15 algorithm is right 85 percent of the time.

16      It scares me too.

17 Q.   It's a little surprise there.

18      You've also done work for the Department of Defense; is

19 that right?

20 A.   That's right.  They fund a lot of my research.

21 Q.   Are you allowed to tell us what you do for them?

22 A.   Yes.  I generally don't do any classified research.

23      So I work primarily on, you know, social media data,

24 largely on Americans.  I do most of my work on English

25 datasets.  But, for example, I study extremism and

1    radicalization, so I look at kind of apolitical groups.  I have

2    a big project now, not political radicalization, but these

3    groups that become violent online.  They're American.  They're

4    not political.  The DOD doesn't care about them.

5        But you can take those insights and apply it to things

6    like radicalization in other countries that does become a

7    threat to U.S. national security.  So that's why they're

8    interested in a lot of the work I do.

9    Q.   You wrote a peer-reviewed article titled "User Perception

10   of Facebook App Data Access."

11       Can you tell the jury a little bit about that one?

12   A.   Yeah.  Yeah, just to sort of go back.  I think it was

13   2015, maybe.

14   Q.   Yup.

15   A.   So there is this very creepy video that came out.  You

16   could kind of log in with Facebook to this video and it would

17   make this 90-second thing of some stalker looking you up, and

18   it would pull, using what was then the API, all this data from

19   your profile, and it would show up.  So it was like a custom

20   video with a stalker guy tracking you down.  It was a viral

21   sensation at the time it came out.

22       And so that paper was to study does this video actually

23   make people more aware of what data Facebook -- these are

24   Facebook apps we're talking about, so that's stuff like that

25   you would use inside the Facebook platform, what kind of data

1   did those have access to?

2       So we ran this study comparing -- we just asked people:

3   Here's a list of all these data points.  Which ones do you

4   think a Facebook app could get access to?

5       And then we had some of them read the terms of service,

6   like the privacy policy.  We had some of them watch this video.

7   And then we gave them a list again, and we were like:  Now

8   which ones do you think they can get access to?

9       Every single person in that study underestimated how much

10  of their data was getting out.  And that was true afterwards

11  also.  I don't -- it's been a while since I looked at it.  I

12  don't think anybody got it all right, but the people who

13  watched the creepy video were better than the people who read

14  the privacy policy, which was interesting.  It kind of gave you

15  a more visceral understanding.

16  **Q.**   So you've researched and written about Facebook and

17  Twitter extensively; is that right?

18  **A.**   Definitely.

19  **Q.**   And you've also researched and written about social media

20  extensively; is that right?

21  **A.**   Yes.  It's the focus of my work.

22  **Q.**   You've also given a talk about the economic value of using

23  machine learning to do things, particularly with Amazon.

24      Could you tell the jury a little bit about that?

25  **A.**   Yeah.  I think it's important to recognize there are

1　really good uses of doing machine learning on people's data,

2　and often that comes in places where we have to find

3　information when we're kind of overwhelmed with options.

4　　So Netflix would be one example; right?  They have all

5　these shows and movies.  How do you find the ones that you

6　want?  Well, they'll recommend them to you.  Same thing on

7　Amazon.  How do you find the product that you want?  They

8　recommend them to you?

9　　And that's really successful.  It's really helpful to us

10　and it's very profitable to them.

11　　So at the time I kind of pulled the statistic that I use

12　in my talks about this.  Amazon said that 35 percent of their

13　total revenue came from their recommender system.  That's

14　essentially the algorithm that suggests stuff that you want to

15　buy.  Under the hood, that's very similar to the kind of

16　algorithms we're talking about with social media where we kind

17　of get an understanding of what you like and then suggest

18　stuff.

19　**Q.**　You mentioned a recommender system.  Can you explain to

20　the jury what that is?

21　**A.**　Yeah.  A recommender system is like the academic term for

22　basically artificial intelligence that looks at data that we

23　have about you and what you like and then recommends or

24　suggests things that you might want.  So that can be

25　recommending movies.  That's a really classic example.  I did

1    that in my dissertation 20 years ago.  It can be products on

2    Amazon.

3         But, yeah, absolutely, it can be social media posts or

4    ads.  The field as a whole is how do we model, kind of use AI,

5    to understand what people want and then suggest them things

6    that are going to be useful.

7    Q.   And you're written and lectured extensively on recommender

8    systems; right?

9    A.   I have.

10   Q.   You've also written and lectured on artificial

11   intelligence extensively?

12   A.   Yes.

13        MS. VILLEGAS:  Your Honor, I'd move to qualify

14   Dr. Golbeck as an expert in the areas of computer science and

15   machine learning.

16        THE COURT:  All right.  Any objection?

17        MS. BLUNSCHI:  No objection.

18        THE COURT:  All right.  The witness is qualified.

19        We're going to take our afternoon break, and we'll be back

20   at 1:25.

21        THE COURTROOM DEPUTY:  All rise.

22             (The jury leaves the courtroom.)

23             (Recess taken at 1:07 p.m.)

24            (Proceedings resumed at 1:26 p.m.)

25      (Proceedings were heard out of the presence of the jury.)

1      THE COURTROOM DEPUTY:  All rise.

2      THE COURT:  Let's bring in the jury.

3           (The jury enters the courtroom.)

4      (Proceedings were heard in the presence of the jury.)

5      THE COURTROOM DEPUTY:  Please be seated.  We're back

6  on the record in Civil 21-757, Flo versus Frasco -- Frasco

7  versus Flo.

8      MS. VILLEGAS:  Thank you.

9  BY MS. VILLEGAS:

10  Q.   Dr. Golbeck, in layperson's terms, can you explain to the

11  jury what artificial intelligence is?

12  A.   It's complicated.  In layperson's terms, the basic idea is

13  like regular computation, right, two plus two, you have a

14  correct answer, but there's a lot of times where you don't know

15  what the right answer is either because there's like too many

16  options to try to figure it out or it's just uncertain; right?

17  Are you going to like this ice cream or not?  We don't really

18  know.

19       And so artificial intelligence is essentially a way of

20  computing an answer when it's uncertain what the exact right

21  one is.

22  Q.   Is AI the same thing as machine learning?

23  A.   Machine learning is a type of AI.  There's a lot of

24  different kinds of artificial intelligence.  ChatGPT is one.

25  That's also called a large language model.  ChatGPT is just a

1  brand of that.  That's not machine learning, really.  It's a

2  different thing.  And there's a bunch of different kinds of

3  ways to do artificial intelligence.  Machine learning is one

4  kind.

5  **Q.**  Can you tell us a little bit more about how machine

6  learning works to make predictions?

7  **A.**  Yeah.  Basically, there's two stages, and we've heard some

8  of the terms for this over the course of the last couple weeks.

9       So you have a training phase and then what you might call

10 a testing phase or a deployment phase.

11      In the training phase, you take a whole bunch of data with

12 the right answer, so if we're talking about ice cream, here's a

13 bunch of data about the person who tried it and then did they

14 like it or not.  And you give those examples over and over and

15 over again to your algorithm that's going to try to figure out

16 how to estimate, if I give you some new data, what's the answer

17 going to be.

18      That's called the training phase, where it's learning how

19 to make that estimate, and that produces a model.  And once you

20 have the model, you could deploy that.  If you're a company

21 like Facebook, and use it to target ads, or if you're an

22 academic like me, you could take some new data, put it in

23 there, and test how well you perform.

24 **Q.**  Did Meta have machine learning systems as some part of

25 their business?

1   A.   They did.

2   Q.   And you heard testimony from Tobias Wooldridge today that

3   Meta did use machine learning systems as part of their

4   business; right?

5   A.   That's right.

6   Q.   Did you see any technical documentation from Meta that

7   provided schematics for Meta's machine learning system?

8   A.   Yes.

9   Q.   I'm going to ask you more specific questions in a moment,

10  but if you had to summarize the opinion that you provided in

11  your expert report, what is it?

12  A.   Very simply, Facebook received data from the Flo app and

13  it used that in its machine learning algorithms to target ads.

14  Q.   Based on your review of the materials you mentioned

15  earlier and your experience, have you formed that opinion to a

16  reasonable degree of scientific certainty regarding the nature

17  of Meta's use of the data they received from the Flo Health

18  app?

19  A.   I have.

20  Q.   Today, would you still come to the same conclusion that

21  you reached in your report?

22  A.   I would.

23  Q.   So can you explain to the jury just how a machine learning

24  system is used for advertising?

25  A.   Yeah.  So I talked through this training phase and then

1    the deployment.  So instead of doing that with ice cream or

2    some simple example, instead you would have a bunch of data

3    about people and what their interests are and tons and tons of

4    information about them, actually.

5         And then, as we actually heard in testimony earlier today,

6    whether or not they clicked on an ad or bought a product from

7    the ad, did whatever people were trying to do, those become

8    your training examples.  And so your algorithm is going to look

9    at, okay, for this person with all this data, did they buy

10   something from this ad, and then the next, and the next, and

11   the next, until it builds a model.

12        So if a new person -- if I come along and you haven't seen

13   me before, you get all my data and you could make a guess about

14   whether I would buy the thing.

15   Q.   Can you give us an example of how this works?

16        And I'm just going to move on and get my --

17   A.   Do you have my slides?

18        Yes.  I've made a very simple example to kind of talk us

19   through.  We're going to do artificial artificial intelligence.

20   You get to be the algorithm here, basically.

21        So what I have in this table is some data about whether or

22   not I'm going to the beach.  So we have the conditions:  Is it

23   sunny, cloudy, or raining, and the temperature.

24        And then we have the right answer:  Did I go to the beach

25   that day or not?

1    And I'm just going to talk you through this and you're

2  going to, without even thinking about it, be able to make a

3  model in your head, and that's essentially the human version of

4  what AI does.

5    If you go to the next slide, I made it a little easier.  I

6  color-coded this so the sunny days are yellow, the cloudy days

7  are gray, and the raining days are blue.  And then I sorted the

8  right answers, so we have the "yes" beach days at the top and

9  the "no" beach days at the bottom.

10   And if you just look at this, if I made it your job to say

11  "When does Jen like to go to the beach," you probably will see

12  that all those raining days are in the "no" column.  There's

13  never a "yes."  There's no blue ones up there at the top.

14   And if you were to look at the temperature numbers,

15  there's only yeses if it's over 75.  There's no cold days up

16  there.  There are some warm days that are a "no," but there's

17  never a cold day that's a "yes."

18   And so you've kind of trained a model in your head, so I

19  could give you a hypothetical -- and we may have this on the

20  slide -- and say, okay, let's say it's 83 degrees and sunny.

21  Am I going to the beach or not?

22   There's no row in here that has those conditions.  There's

23  no sunny and 83.  But you probably have a good guess in your

24  head right now because you have this model of what it means.

25  You're probably going to say "yes."

1    And that's essentially what machine learning does.  You've

2    done it in your head, and it's trying to imitate the thing that

3    you do really naturally by looking at a bunch of examples and

4    building that model.

5    Q.   Let's go to the next slide.

6         Can you explain a little bit what you're depicting here?

7    A.   Yeah.  It's just that you don't necessarily have to have

8    these very clearly labeled pieces of data.

9         So here we've made them look a little more like the labels

10   we've been talking about in this case.  But even if I changed

11   all of this, so I were to put the conditions in some foreign

12   language or I were to give them a numerical coding, one, two,

13   and three, and if I changed the temperature to some scale that

14   none of us intuitively understand, you'd still be able to pick

15   up on these patterns.  You know, you'd be able to see, okay,

16   all those yellow ones, even if they say "three" instead of

17   "sunny," those are all yeses.  The blue ones are nos.  And

18   whatever scale the temperature is, you'd probably, especially

19   if you were a computer, be able to say, huh, well, it's always

20   above this value.

21        So even if these things aren't super human-understandable,

22   you can still build that same model, and that's definitely true

23   for computers who are just looking for statistical connections.

24   Q.   Dr. Golbeck, you were here last week when Mr. Satterfield

25   from Meta testified; right?

A.    Yes.

Q.    And you remember him testifying that data is important to any machine learning system.

Do you agree with that?

A.    I do.

Q.    Could adding more data help a model like this?

A.    Sure.  So if we just stick with this simple example we're looking at here about going to the beach, I gave you this question:  If it's 83 and sunny, am I going to the beach?

And you probably guessed yes.  But it could be the answer is no.  That happens all the time in machine learning and in life, you know?

And maybe the answer is no because I had the flu that day, but you don't have any data here about whether I'm sick.  And so if we were to ad a column that says whether I'm sick, you would have a more accurate model, because then even though the conditions look great, you could be like, okay, but she has the flu and she doesn't go to the beach when she has the flu.

And then maybe even if I don't have the flu, the answer is still no and that's actually because I'm out of town, but you don't know that.  And so if we add another column that says whether or not I'm in town, we can get a more precise model.

And so that's why generally the more data you have and the more -- we're talking about columns, but also the more rows you have, the more accurately you can build a model.

1  Q.   Do machine learning models process data in tables like the

2  one that we're looking at right here?

3  A.   They're a lot more complicated than this, but you could

4  take this and put it into a machine learning system and build a

5  simple example.

6  Q.   Let's take a look at the next slide here.

7       Can you explain what this means to the jury?

8  A.   Only a little.

9       This is a neural network.  This is a kind of machine

10 learning algorithm.

11      So I said there's artificial intelligence; machine

12 learning is one kind of artificial intelligence.  There's a

13 bunch of different ways to do machine learning, but probably

14 the most popular is with something called a neural network.

15 This is a diagram of kind of how that works.

16 Q.   So just giving the example that you gave before about

17 whether, you know, you go to the beach, where would that show

18 up in this system?

19 A.   So we've got this color-coded.  The yellow dots in here

20 are inputs, so that would be, in this example we've been doing,

21 the conditions:  Is it sunny or cloudy or raining.  The second

22 one would be the temperature.

23      This actually is three dots there; right?  So maybe we put

24 in whether or not I'm sick.  Those are our three inputs.

25      The red dot on the right side is our output.  That's going

1  to be the "yes" or the "no."

2      And those hidden layers, these green dots in the middle,

3  are the kind of magic of how neural networks work.  And I will

4  tell you generally what happens there.  It's a lot of calculus.

5  It's a semester-long course to get like the intro to how to do

6  it.

7      But basically what you're doing is you take those inputs

8  and you convert them to numbers, and then you follow those

9  lines out of the yellow dots in the next column of green dots.

10     For each green dot, look at those lines coming in.  You do

11 a weighted average of all those numbers from your inputs.  You

12 do that at each of the green dots.  And then those values,

13 those weighted averages, will go to the next column.  They get

14 a weighted average of each of those green dots, and then the

15 same thing for the next column.  And then at your output layer,

16 they also do a weighted average to get the answer.

17     The training phase that we've been talking about is

18 extremely complicated calculus that -- basically it tells you

19 how to update those weights.  So if you get the wrong answer,

20 you go, oh, well, maybe I need to change how I'm weighting

21 things over here.  That's about as clearly as I can explain it.

22 These are incredibly complicated systems.

23 Q.  Why are the green dots called the hidden layers?

24 A.  So the input is stuff that we create.  That's our data.

25 And the output is the answer that we look at.

1    But the hidden layers, we don't really have any control

2  over that.  We can kind of program what happens there, but

3  that's not stuff that we're putting in.  That's the internals

4  of what's happening inside the algorithm.

5  **Q.**   Does anyone know what's happening in the green layers?

6  **A.**   Not really.  This is a thing that like if you pay

7  attention to news about machine learning, they call it a black

8  box or they say, well, we don't really know.

9    We've spent, I think, like since the 1990s looking at

10  neural networks and trying to explain how did it come to that

11  decision and trying to undo what's going on in those hidden

12  layers, and we just can't really do it.  We can't come up with

13  a reasonable explanation because the math it just so

14  complicated in there.

15  **Q.**   Does Meta use this kind of predicted modeling or neural

16  networks in their advertising business?

17  **A.**   They do.

18  **Q.**   How do you know they use this kind of predictive modeling?

19  **A.**   They say they do.

20  **Q.**   I want to ask you about how all this applies to Meta's

21  relationship with Flo Health and data from Flo Health app

22  users.

23    What did Meta -- what kind of data did Meta use to run

24  predictive models?

25  **A.**   They use a lot of data, but from Flo in particular, they

1    used both the -- both types of app events.

2    Q.   Well, stepping back, let's talk about a lot of data.   What

3    kind of data do they use besides the Flo Health app data?

4    A.   So they have all kind of data about how you've used their

5    products, Facebook and Instagram.   That includes things like

6    your profile data, what you put in there, who your friends are,

7    what your social connections are, who you've liked and

8    interacted with and commented on, pages that you've liked,

9    things that you've shared, how long you watch videos.

10       All of those are the kinds of data they have about you

11   from using their systems, and then, as we've heard in other

12   testimony, they have data from things like pixels how you're

13   using websites.   Those are kind of third-party pieces of data.

14   And then SDK data as well, like we've been talking about in

15   this case.

16   Q.   So SDKs as in software development kits?

17   A.   Correct.

18   Q.   What kind of data does Meta get generally from software

19   development kits like the one that Flo installed on their app?

20   A.   So they're going to get standard app events that we've

21   been hearing about.   These are things like did someone launch

22   the app, things that people would do in any app.

23       And then they'll also receive custom app event data,

24   which, again, we've been seeing over the course of the last

25   couple weeks, are apps that the app makers define along with

1    values that get sent from the people who created the apps.

2    Q.   Dr. Golbeck, we're going to look at marked

3    Trial Exhibit 111R.  I believe it's in your binder, if you want

4    to pull up the document.

5         Do you recognize this document?

6    A.   Yes.

7    Q.   Was this one of the documents you relied upon when forming

8    your opinions in the case?

9    A.   It is.

10   Q.   What is this document?

11   A.   I think we've all seen this one.  This is journey -- The

12   Journey of an Ads Ranking Model.  This is an internal Facebook

13   document about how ads ranking works.

14   Q.   Could you read the first sentence out loud to the jury,

15   please.

16   A.   Sure.  (as read):

17        "At Facebook, ads is breadmaker and contributes

18        around 99 percent of company revenue in Q1 '19."

19   Q.   Is this surprising to you?

20   A.   No.  I think most of us who pay attention to this space

21   know that ads are how companies that do this sort of

22   advertising, make the vast majority of their money.

23   Q.   And can you read to the jury the next highlighted line,

24   starting "Ads ranking system."

25   A.   (as read):

1          "Ads ranking system is to recommend the most

2      matched ads candidate to user to maximize our revenue

3      growth.  The ranking decision is powered by hundreds

4      of large-scale models trained offline from billions

5      of samples."

6  Q.    Can you explain your understanding of that to the jury?

7  A.    Yeah.  So essentially what the ads ranking system is doing

8  is trying to basically find the best ad to show you, so that if

9  you're using Facebook, for example, there's a little slot

10 there, what ad do we put into that slot?  And they want to pick

11 the best one because that helps them make the most money.

12 That's the first sentence.

13     The way that they do that is using a whole bunch of

14 models.  That's the output of the machine learning algorithms.

15 They train those offline.  That's that training phase we've

16 been talking about.  Offline just means it's not happening like

17 as you're picking -- you know, as you're on Facebook and

18 they're picking the ad to show you.  They train them first.

19 And the billions of samples is all the data they have.  You can

20 think of those samples as like rows in that table we were

21 looking at in my simple beach example.

22 Q.    Lets go to the next page.

23     Have you seen this diagram before?

24 A.    Yes.

25 Q.    And what is this diagram?

1   **A.**   We've all seen this diagram.  This is the very complicated

2   diagram of how data moves through the Facebook machine learning

3   system, including the ads delivery system.

4   **Q.**   And where in this diagram does the SDK data enter into

5   Meta's system?

6   **A.**   Over on the left -- that's right, right there -- we see

7   SDK events listed there.

8   **Q.**   And this is an internal Meta document that you reviewed;

9   correct?

10  **A.**   That's right.

11  **Q.**   At a high level, can you explain what this diagram

12  represents?

13  **A.**   Essentially, what it's doing is showing how that data

14  comes into the system and then flows through both the training

15  and then the deployment phase, the ads delivery system within

16  Facebook.

17  **Q.**   Can you tell where the training happens?

18  **A.**   So they have an online training section.  I don't think we

19  see it in the zoomed-out part here, but if -- yeah, if we're

20  looking at the bigger one, along that blue arrow that's going

21  through, you can see it says "online training" there.  So

22  there's training happening there as well.

23  **Q.**   How important is the training phase for a model like this?

24  **A.**   It's -- it's the most important thing.  Training is how

25  you figure out what that model is, so if your training is bad

1  and then you put your model out in the world, it's not going to

2  be very good.  I think just like anything, right, you have to

3  train more to get better.

4  Q.   Is it your understanding that SDK events are used to train

5  this model?

6  A.   Yes.

7  Q.   And Meta's interrogatory responses were another document

8  that you considered in reaching your conclusions; is that

9  right?

10  A.   Yes.

11        MS. VILLEGAS:  We're going to look at

12  Trial Exhibit 22A, previously admitted.  Sorry.  226A,

13  previously admitted.

14  BY MS. VILLEGAS:

15  Q.   Dr. Golbeck, were these some of the interrogatory

16  responses that you considered?

17  A.   Yes.

18  Q.   Let's look at the part where it says "Flo app data

19  transmitted to Meta."

20        Can you read that out loud to the jury and then tell us

21  what your understanding is of this statement that Meta made?

22  A.   Read this whole paragraph?

23  Q.   Sure.

24  A.   Sure.  (as read):

25            "During the relevant time period, Flo Health

1    chose to integrate the Facebook SDK into the Flo app,

2    created app events to capture certain actions users

3    took in the Flo app, and used the SDK to subsequently

4    transmit its developer-created app events to Meta.

5       "Flo created and sent via the SDK two forms of

6    app events:  Meta-defined and Meta-named standard app

7    events that captured common actions users take in an

8    app, and the Flo Health-defined and Flo Health-named

9    custom app events that measured user app interactions

10   unique to the Flo app.  The Flo app sent to Meta data

11   in connection with these app events, collectively,

12   app events data."

13  **Q.**   Based on your experience, what is your understanding of

14  what this paragraph means?

15  **A.**   Basically, just to sort of shorten it down a little bit,

16  that Flo used the SDK and Facebook received the standard app

17  events that they get from everybody who uses that and the

18  custom app events that Flo used and -- or that Flo created, and

19  then for the rest of the answers they're going to refer to

20  these collectively as "app events data."

21       **MS. VILLEGAS:**  Ilan, can you pull up Trial Exhibit

22  226A, page 11, please.

23  **BY MS. VILLEGAS:**

24  **Q.**   This is another portion of the interrogatory responses

25  given by Meta that you reviewed; correct?

1   **A.**   Yes.

2   **Q.**   Could you please read to the jury starting on the second

3   line, "Meta is able to confirm."

4   **A.**   Sure.  Oh, thank you.  (as read):

5        "Meta is able to confirm based on the app events

6        data available from September 29, 2019, to June 1,

7        2021, described in further detail below under the

8        heading Storage of Flo App Data, that the app events

9        data that Flo app sent to Meta included the

10       following:  event name, event parameters."

11       Do you want me to read the whole list?

12  **Q.**   You can stop right there.  There's a lot more information

13  there; right?

14  **A.**   There is.

15  **Q.**   Is it your understanding that the app event data that the

16  Flo app sent to Meta included the event name and the event

17  parameter, based on this statement made by Meta?

18  **A.**   That's right.  They say exactly that here.

19  **Q.**   Okay.

20       **MS. VILLEGAS:**  Ilan, can we go back to the

21  presentation, please?

22  **BY MS. VILLEGAS:**

23  **Q.**   So I'm going to ask you another question about this

24  interrogatory response that was made by Meta.  We're going to

25  look at page 13 where it says "Content Delivery Optimization."

1       Can you also read that to the jury, please.

2  **A.**   Sure.  (as read):

3           "Content delivery optimization.  During the

4       relevant time period, app events data that Meta

5       received from the Flo app were made available to be

6       aggregated along with billions of other pieces of

7       data collected from other developers or otherwise

8       collected on Meta's services and used to improve

9       through machine learning the accuracy of content

10      delivery including the delivery of advertisements

11      from advertisers besides Flo Health."

12 **Q.**   And we just saw a document where Meta made the statement

13  that app events data included event names and event parameters.

14      Do you remember that just a minute ago?

15 **A.**   Yes.

16 **Q.**   What is your understanding of this section on content

17  delivery optimization?

18 **A.**   Yeah.  So this is on page 13.  The quote under that that I

19  read first is on page 10.

20      And that page 10 part, they say when they say "app events

21  data," that means the standard and the custom app events.

22      And so when we're looking at this page 13-1, they say "app

23  events data," which includes both.  Meta receive app events

24  data and they use that data in their machine learning

25  algorithms to improve the delivery of advertisements?

1    And this last part from advertisers besides Flo Health

2   means we're not talking about Flo advertising to their own

3   customers; we're talking about other companies who come in and

4   place ads.  This data is used to improve the way their ads are

5   targeted also.

6        MS. VILLEGAS:  Can we go to Exhibit 1271.

7   BY MS. VILLEGAS:

8   Q.   So let's talk a little bit about the custom app event in

9   this case.

10       You understand what the 12 custom apps are in this case;

11  is that right?

12  A.   I know that there's 12.  I have seen this list, yeah.

13  Q.   Based on your understanding of the documents that we just

14  looked at, the statements made by Meta, is it your

15  understanding that the custom app events, along with the

16  parameters or the answers, were received by Meta?

17  A.   That's right.

18  Q.   Do you also understand this to mean that Meta used the

19  custom app events at issue in this case to improve their

20  advertising business?

21       MS. BLUNSCHI:  Objection.  Foundation, scope.

22       THE COURT:  Go ahead.  You can answer.

23       THE WITNESS:  Sorry.  Could you repeat the question?

24  BY MS. VILLEGAS:

25  Q.   Sure.  Do you also understand, based on the evidence that

1  you reviewed, that Meta used the custom app events at issue in

2  this case to improve its advertising business?

3  **A.**  Yes.

4  **Q.**  And what do you base that on?

5  **A.**  So they've said so.  We've just read that in the previous

6  interrogatories.  But we've seen it in the testimony that we've

7  seen in court this week too.

8  **Q.**  When you say that Meta used the app event data in its

9  advertising business, do you mean that you can specifically

10  identify specific ads that were sent to, say, Sarah Wellman or

11  anyone else?

12  **A.**  No.

13  **Q.**  Why not?

14  **A.**  So if we just stick with that really simple example that I

15  gave about going to the beach, if you make a decision -- right?

16  I give you a new set of data:  It's 83 and sunny; are we going

17  to go -- which data point in that list is the one that's

18  responsible for you making that decision?

19      It's really a combination of all of them.  And some of

20  them were probably more helpful than others, but all of them

21  together are the way that you learned that model.

22      And because with these neural networks, these machine

23  learning systems, they're very complicated inside, we can't

24  really take an output, like "Here's the ad that I'm going to

25  show you," and trace it back and say, "Aha, it is this specific

1  data point that's the reason that that got shown." It's a

2  combination of everything together.

3  Q.  But it's your opinion that Meta received this custom app

4  data; correct?

5  A.  Absolutely.

6  Q.  And it's your opinion that Meta used this custom app data;

7  is that right?

8  A.  Yes.

9  Q.  Were you able to determine whether plaintiffs' data in the

10  form of the custom app events was used to train any of the

11  machine learning models operated by Meta?

12  A.  Yes.

13  Q.  And how did you determine that?

14  A.  So we can see in that very complicated diagram that we

15  keep looking at that there's a training phase in there, and

16  then that's also something in Meta's internal documents.

17  Q.  You were here last week when Mr. Satterfield talked about

18  the difference between using app event data for targeted

19  advertising and then training in the machine learning model.

20      Do you remember when he talked about that?

21  A.  I do.

22  Q.  Even if data wasn't used for targeted advertising, could

23  it still be useful to Meta?

24  A.  Yes.

25  Q.  How?

**A.** So if we -- just to make sure I'm understanding your question -- say we're not doing advertising at all, is it still useful to have that date?

**Q.** Yes.

**A.** That was the question?

Sure. Yeah, absolutely, because content delivery optimization does include advertising, and that's how they make most of their money, but it also includes just delivering regular content. Here's Instagram posts that you want to look at. Here's Facebook posts that you want to look at.

If they were really bad at that, you wouldn't spend as much time on Facebook and Instagram, and the more time you spend scrolling, the more ads you see. And so even if they didn't use any of that data to target ads and they only used it to help pick what Instagram or Facebook post to show you, if they keep you engaged on the platform longer, it's still useful for them because then they can show you ads with whatever data they would use and make money that way.

**Q.** Dr. Golbeck, you were also here last week when Dr. Zervas testified; right?

**A.** Yes.

**Q.** And you saw his presentations with the vegetables and the water?

**A.** I did.

**Q.** Can you explain to the jury your thoughts on that?

1   **A.**   So Dr. Zervas is right in a way that overfitting is a

2   problem that we have to worry about.  He, of course, picked a

3   very simple example.  I think he oversimplified when we need to

4   worry about that.

5       But he was really showing that example to make an argument

6   that this idea that more data is better isn't necessarily

7   right, and I think he's wrong about that.

8   **Q.**   Can you tell the jury why?

9   **A.**   So there are cases where if you have a ton of data, you

10  can end up in a place where you have overfitted.  That's true.

11      But everybody knows this, and we heard that just before I

12  came on the stand.  We know that this is a problem.  And so

13  anybody who's building machine learning algorithms has

14  techniques that they use to avoid overfitting, because you know

15  that you can do it.

16      So it's not like, oh, we have all this data; we'd better

17  not use it.  If that were the case, right -- if, say, using all

18  this SDK data from all of these apps really caused a problem,

19  Facebook could just not use it.  But they are using it, and

20  they know how to manage that, and we heard that from their

21  engineers that they have things that they do to manage the

22  overfitting problem.

23  **Q.**   Does Dr. Zervas' presentation on the vegetables or the

24  water change your opinions at all in this case?

25  **A.**   No.

1  Q.   Do you know if Meta had any systems in place during the

2  time period that we're talking about here, November 1, 2016,

3  through February 28, 2019, to prevent the specific information

4  at issue, this health-related information, from being used in

5  their advertising system?

6  A.   My understanding is they did not.

7  Q.   And what did you base your understanding on?

8  A.   They have talked about the fact that they introduced that

9  later.  They did have some -- as we've heard, some early

10  systems in place for part of -- I think part of the class

11  period that would filter out very sensitive personal

12  information that they labeled, like Social Security numbers or

13  passwords.  But they really talk about it being much later when

14  they started filtering this kind of sensitive health

15  information.

16  Q.   So just to be clear, during the time frame that affects

17  the women in this case, Meta did not have any systems to weed

18  out health information; correct?

19  A.   That's what I understand.  They haven't said anything that

20  would indicate otherwise.

21  Q.   Where is the plaintiffs' data now?

22  A.   From what Facebook has said, the actual data like in the

23  table is deleted.

24  Q.   What about the data that made its way into the machine

25  learning model to train?  Is it somewhere in there?

1  **A.**   This is sort of hard to say.  Facebook is -- from what I

2  understand from their documents, goes through a process of

3  trying to improve those machine learning algorithms, and they

4  retrain them.

5       So we don't know.  Are there systems in place that still

6  have been trained on some of that old data that are still

7  working?  They could be there, in which case that data could

8  still be influencing ad decisions that are made.  Maybe all

9  those old models have been deleted and it's not -- it has never

10  been used in any system that's now active at Meta, but we don't

11  know.

12       **MS. VILLEGAS:**  Can you go back to the presentation,

13  Ilan?

14  **BY MS. VILLEGAS:**

15  **Q.**   So I know you also put together this example for the jury

16  to explain why training is so important.

17       Can you walk us through this?

18  **A.**   Yeah.  So I sort of had made this comment before that

19  training for anything like we, as humans, want to do is

20  important.  The more you practice, the more you train, the

21  better you get at it.

22       But there's this question of like how much does this --

23  say if we're training machine learning, how much does this

24  particular data point actually matter?  And it's really hard to

25  tease that out.

1    So I already talked through that with the table of going

2    to the beach, but I think another example that maybe makes it

3    easier to understand is if you think about -- so you're

4    practicing free throws, you're going to do lots and lots of

5    free throws over and over again.  And if I ask you how much did

6    that one free throw you took on Thursday impact whether or not

7    you made that basket that you just shot, how do you answer that

8    question?

9    Maybe it was super helpful.  Right?  Maybe it's a free

10   throw that you had a breakthrough and changed everything and

11   suddenly you're way better at it.  Maybe it's really impactful.

12   Maybe it had basically no impact.  It was some -- you

13   threw it over your head just as a joke and didn't make it in

14   and it doesn't matter.

15   But it's hard to pull out one training example and say:

16   Here's how much of an effect this had on this particular

17   outcome.  Did I make that basket right now that I just shot?

18   That's sort of what it's like.  I mean, this is obviously

19   a very simplified example, but that's sort of what it's like if

20   you try to say:  How much did this data point influence a

21   particular decision that a machine learning algorithm made?

22   Q.   So can the lessons that the machine learning model learned

23   from plaintiffs' custom app data -- can that sort of be pulled

24   out of the model?

25   A.   Generally, no.  If you really wanted to understand how

much of an impact does certain data have, you could train your

models with the data and train your models without the data,

deploy them, test how well they work, and then you kind of get

a sense of how valuable is that data.

My understanding is that Meta never did that, and it's not

common to do that.  Typically, we throw the data in and we make

the algorithm run as best as we can and hope that we get more

accurate results.

Q.   Can you summarize your key findings for the jury just one

more time?

A.   Yeah.  My findings are that Flo had these custom app

events and standard app events, that Facebook received those

and they used those to train and deploy their machine learning

algorithms that targeted people with ads.

Q.   And do you hold your opinion to a reasonable degree of

scientific certainty?

A.   I do.

        **MS. VILLEGAS:**  Thank you, Dr. Golbeck.

        **THE WITNESS:**  Thank you.

        **THE COURT:**  Okay.  Pass the witness.

                    <u>**CROSS-EXAMINATION**</u>

BY MS. BLUNSCHI:

Q.   Good afternoon, Dr. Golbeck.  I'm Melanie Blunschi for

Meta.  It's nice to meet you.

A.   You too.

1  **Q.**   You've got in your binder in front of you copies of your

2  depositions and reports and one other document that we may need

3  to refer to today.

4  **A.**   Okay.

5  **Q.**   How much has plaintiffs' counsel paid you for the work

6  that you've done for them in this case up until this point?

7  **A.**   I think -- I think it's about $130,000 over four years

8  since 2022.

9  **Q.**   And that's more or less up through today?

10  **A.**   Yeah.  I haven't billed for this month of trial, so there

11  will be -- I have no idea how many hours I've worked this

12  month.

13  **Q.**   Now, let's turn to your -- the scope of your opinions

14  here.

15      You're not offering any opinions on Meta's intentions in

16  this case, are you?

17  **A.**   So assuming you don't mean any legal term I don't

18  understand by "intentions" -- no.  So I'm saying they intended

19  to put this data in their machine learning algorithm.

20  **Q.**   Would you turn in your binder to the first tab, 2023

21  deposition, page 235, lines 13 through 18.

22      **MS. BLUNSCHI:**  And, Your Honor, I'd like to ask

23  permission to play that clip.

24      **THE COURT:**  Which ones?

25      **MS. BLUNSCHI:**  235 -- page 235, lines 13 through 18.

1    **THE COURT:**  Okay.  That's fine.

2    **MS. BLUNSCHI:**  All right.

3    Mr. Johnson, could you play the clip, 235A.

4    (Video played but not reported.)

5  **BY MS. BLUNSCHI:**

6  **Q.**  So you were asked that question previously, and you gave

7  that answer under oath?

8  **A.**  Yeah.

9  **Q.**  Okay.  You also did not try to quantify the value that

10  Facebook derived or may have derived from its use of machine

11  learning, did you?

12  **A.**  That's correct.  I did not.

13  **Q.**  And you're not offering any opinion that Facebook gained

14  any particular dollar amount of revenue through the use of data

15  that's at issue in this case, are you?

16  **A.**  That's right.  I'm not offering that opinion.

17  **Q.**  Okay.  In fact, it's not even possible to determine after

18  the fact the value or significance of any given piece of

19  Flo app data that may have gone into Facebook's machine

20  learning systems; is that right?

21  **A.**  I wouldn't know.  I certainly wouldn't be a person who

22  could offer an expert opinion on that.

23  **Q.**  And you'd agree it's not feasible to make an

24  after-the-fact determination of whether the Flo app resulted in

25  any particular ads being delivered to any particular users; is

1  that right?

2  **A.**   I'm sorry.  Could you just say that question again?

3  **Q.**   Sorry.  That was a lot of words.

4       And sorry to Ruth for that too.

5       You'd agree that it's not feasible to make an

6  after-the-fact determination of whether the Flo app data

7  resulted in any particular ads being delivered to users; is

8  that right?

9  **A.**   Yeah, I think that's right.

10 **Q.**   Okay.  And you couldn't say how much weight, if any,

11 Meta's machine learning system put on data that Flo may have

12 shared with Facebook; is that right?

13 **A.**   I -- I certainly couldn't with -- with the data that was

14 made available to me in this case.  Could there be something

15 internal to Meta in their models that might tell you the

16 weight?  Maybe, but I didn't see anything like that.

17 **Q.**   But in this case, you're not offering any opinion about

18 how much weight, if any, the Flo app data was given in the

19 machine learning systems; is that right?

20 **A.**   Yeah, I understand.  No, I'm not offering any opinion

21 about that.

22 **Q.**   And, in fact, it's possible that Meta's machine learning

23 systems gave Flo app data a weight of 0; is that fair?

24 **A.**   That's fair, yeah.

25 **Q.**   Perhaps due to some of the protections against overfitting

1  or other aspects of the system?

2  **A.**   I would -- before I can agree with you on that, I would

3  really need to see like what is happening internally.

4  Theoretically, one could not use -- I don't know.  I don't -- I

5  don't think you've quite got it right with that overfitting

6  thing, but I will agree that it's possible that it could have

7  ended up with a weight of 0.

8  **Q.**   All right.

9       And you haven't analyzed how Meta's models may have

10  impacted delivery of any advertisement to particular users; is

11  that right?

12  **A.**   That's correct.

13  **Q.**   Now, before I ask the next few questions, I want to make

14  sure we agree on a definition of semantic meaning.  I think

15  that's a phrase you've used in your reports.

16       Would you agree that to know the semantic meaning of a

17  piece of data is to know what the words or symbols in that data

18  mean?

19  **A.**   We can agree that that's the definition.

20  **Q.**   Thank you.

21       So, for example, to know the semantic meaning of the word

22  "period," you'd need to know whether it's referring to a period

23  of time, a menstrual period, punctuation, or just happens to be

24  six random letters that correspond to a human word?

25       Is that fair to say?

**A.**    Are you talking like from the human perspective of

understanding the semantic meaning?

**Q.**    Any perspective of understanding the semantic meaning.

Like what the words refer to.

**A.**    Yeah, sure.  So for like a human to understand that, it's

an ambiguous term; right?  So to understand if something had

had that label "period" on it, then, yeah, we would probably

want what we would call disambiguation to understand the --

like which way you're using the term.

**Q.**    And unlike our -- unlike us simple humans, machine

learning systems do not need to understand the semantic meaning

of the words or symbols in data; is that right?

**A.**    Yeah, typically they don't need to understand it.

**Q.**    But human semantic understanding of "period" --

punctuation, menstrual period, things like that -- that's not

relevant to how machine learning uses that data; is that right?

**A.**    Again, typically, I think that's right.  I mean, I have

built machine learning systems that like analyze semantic

meaning as -- we would call this like feature engineering.

It's like the beginning phase when I'm determining what's the

data that's going to go into those training phases.

    I just don't want to be super doctrinal that like never is

semantic meaning considered.  But like within the neural

network that I gave the diagram of, typically in that you're

working with numeric values, and there's not an analysis step

1  in there to like find the definition of the terms.

2  Q.   Sure.  So whether the data is composed of English words or

3  random strings of letters and numbers, that doesn't matter to

4  the machine learning model; is that right?

5  A.   For the kind of system we're talking about here, I think

6  that's right, yes.

7  Q.   For example, I think you've previously explained that a

8  dataset containing a term like "sex" is no more useful to a

9  machine learning system than arbitrary sets of letters and

10  numbers; is that fair?

11  A.   Yeah, that's fair.

12  Q.   And your opinions in this case about Meta's use of Flo app

13  data would be the same whether the custom app event information

14  had the titles it did or whether it was purely random strings

15  of letters and numbers; is that fair?

16  A.   Yes, my opinions would be the same.

17  Q.   In your work in this case -- well, all that you reviewed

18  here -- you didn't any evidence that Facebook utilized a

19  machine learning system that would use the semantic meaning of

20  the app event titles; is that right?

21  A.   Sorry.  Can you just restate the beginning part of that?

22  Q.   Yeah, yeah, absolutely.

23     You haven't seen any evidence up until this point that

24  Facebook utilized a machine learning system that would use the

25  semantic meaning of the app event titles; is that right?

1  **A.**   That's right.  I haven't seen any evidence that they're

2  doing that.

3  **Q.**   And you personally do not believe that there are some

4  humans at Facebook analyzing the names of the billions of

5  points of data -- of app data that Facebook receives; is that

6  right?

7  **A.**   I -- I don't believe there is a team of humans.

8  **Q.**   Analyzing the data?

9  **A.**   There is definitely a team of humans, that's right.

10  But -- or reading the names of things.

11       I guess it's possible.  I -- I mean, that wasn't part of

12  my analysis, but I'd be surprised if they were, yeah.

13  **Q.**   And you haven't seen any evidence suggesting that Flo

14  shared an app event description key with Facebook outside of

15  this litigation; is that right?

16  **A.**   That's right.  I haven't seen evidence of that.

17            **MS. BLUNSCHI:**  Thank you for your time, Dr. Golbeck.

18            **THE WITNESS:**  Thank you.

19            **THE COURT:**  Okay.  Any brief redirect?

20            **MR. SADUN:**  Your Honor, Flo Health has some.

21            **THE COURT:**  Okay.

22                          <u>**CROSS-EXAMINATION**</u>

23  BY MR. SADUN:

24  **Q.**   Nice to see you again, Dr. Golbeck.

25  **A.**   You too.

1  Q.   You're not offering an opinion on Flo's conduct itself,

2  correct?

3  A.   I'm not.  My opinions are just about Facebook.

4       MR. SADUN:  Thank you.

5       THE WITNESS:  Sure.

6       THE COURT:  Okay.  Any brief redirect?

7       MS. VILLEGAS:  Very briefly, Your Honor.

8                    REDIRECT EXAMINATION

9  BY MS. VILLEGAS:

10  Q.   Dr. Golbeck, is the fact that a machine translates the

11  Flo app data into code machines understand -- does that change

12  that women entered health data into the Flo Health app that

13  Meta recorded and used?

14       MS. BLUNSCHI:  Beyond the scope.  This expert was not

15  qualified on what health data is.

16       THE COURT:  Go ahead.  You can answer.  Overruled.

17       THE WITNESS:  My opinion is, no, it does not change

18  the nature of that data.

19       MS. VILLEGAS:  Thank you.

20       THE WITNESS:  Thank you.

21       THE COURT:  Okay.  You may step down.  Careful on the

22  way out.

23     Plaintiff?

24       THE WITNESS:  Thank you.

25                         (Witness excused.)

**PROCEEDINGS**

1    **MR. CANTY:**  Your Honor, with respect to the deposition

2  designation we played before, plaintiffs seek to move into

3  evidence Trial Exhibit 488.  I believe that's on stipulation.

4         **THE COURT:**  All right.  Any objection?

5         **MR. SADUN:**  No objection.

6         **THE COURT:**  Okay.  That's admitted.

7      (Trial Exhibit 488 received in evidence.)

8         **MR. CANTY:**  Your Honor, the plaintiffs rest.

9         **THE COURT:**  Okay.  Members of the jury, we're going to

10  break today right now.  See you tomorrow morning.

11        Now, start planning tomorrow -- this is less likely, but I

12  can't rule it out -- start planning 9:00 to 5:00 tomorrow, as I

13  mentioned last week, definitely for Friday and into next week

14  until a verdict is reached.  Okay?

15        So I'll see you in the morning.

16        Oh, yes, I forgot.  Don't forget our closing admonition.

17  We talked about this every day.  I'm going to repeat it to you

18  again.

19        You're going to clear your mind and do anything and

20  everything other than think about this case.  You're not going

21  to talk to anyone.  You're going to reflect.  You're not going

22  to decide any issues.  You're not going to do any research.

23  You're not going to do any investigation.  And you're going to

24  attend to life, and I'll see you tomorrow morning.

25        **THE COURTROOM DEPUTY:**  All rise.

1    (The jury leaves the courtroom.)

2    (Proceedings were heard out of the presence of the jury.)

3         **THE COURT:**  All right.  I'll be back in a few minutes.

4         **THE COURTROOM DEPUTY:**  You may be seated.

5              (Recess taken at 2:15 p.m.)

6              (Proceedings resumed at 2:33 p.m.)

7    (Proceedings were heard out of the presence of the jury.)

8         **THE COURTROOM DEPUTY:**  Remain seated.  Come to order.

9         **THE COURT:**  Okay.

10        **THE COURTROOM DEPUTY:**  We're back on the record in

11   Civil 21-757, Frasco versus Flo Health.

12        **THE COURT:**  All right.  Plaintiffs have rested.

13   Are there any Rule 50 motions from the defendants?

14                        **<u>RULE 50 MOTION</u>**

15        **MS. SHARTON:**  Yes, Your Honor.  Flo Health moves for

16   judgment on -- as a matter of law on plaintiffs' CMIA claim,

17   and this is based on -- I know you've ruled on this a couple of

18   times in the past, summary judgment and class cert.

19        The evidence has come in and there's also newly discovered

20   legislative history that the Court has not seen, presumably,

21   previously, at least it hasn't been submitted to you.

22        And I'd like an opportunity to move verbally, and if

23   Your Honor so would like, I could -- we could file a brief on

24   it.

25        **THE COURT:**  No briefs, but all right.  So you move to

1   dismiss CMIA for lack of evidence on which -- sufficient for a

2   jury to return a reasonable verdict?

3           **MS. SHARTON:**  Correct, yes.

4           **THE COURT:**  Okay.  Plaintiff?

5           **MR. CANTY:**  Your Honor, without going through all of

6   the evidence, we've made out each and every element.  If you

7   accept the evidence in the light most favorable to the

8   plaintiffs, we believe we've made out each and every element of

9   the CMIA claim and believe that this is a question for the

10  jury.

11          (Reporter interruption for clarity of the record.)

12          **MR. CANTY:**  My apologies again.

13          **THE COURT:**  Okay.  Okay.  I have to say I have

14  listened quite attentively in general and specifically with an

15  eye towards the claims, and I have some doubts about CMIA.

16  I'll tell you what they are.

17      I have been reading the definitions, and in Civil Code

18  Section 56.05, I have not seen any evidence that Flo fits the

19  definition of provider of healthcare, that the Flo users fit

20  the definition of patient, or that medical information as

21  defined in Section 56.05, which is premised in substantial

22  measure on those two others definitions, the patient and

23  provider of healthcare, is an issue here.

24      So why don't you help me with that.

25          **MR. CANTY:**  Yes, Your Honor.  With respect to the

1 provider of healthcare, under 56.06(b) of the CMIA, a provider

2 of healthcare includes any business that offers software or

3 hardware to consumers, including a mobile application or other

4 related device that is designed to maintain medical information

5 in order to make that information available to the individual.

6     **THE COURT:** That's 56.06. I'm talking about .05. So

7 I don't see how you fit those definitions. I'm talking about

8 the definitions.

9     **MR. CANTY:** Yes. My understanding, Your Honor, is

10 under the CMIA that that is the definition of a provider of

11 healthcare.

12     **THE COURT:** Well, you know, healthcare provider

13 typically means someone who is a treating physician or a

14 doctor. There's definition of that also.

15     Let's see. Where is that?

16     Licensed healthcare professional, which is Subsection H.

17 And Subsection J, which is the medical information also refers

18 to provider of healthcare.

19     And here it. It's M as in Mary: Provider of healthcare

20 means any person licensed or certified -- and so on.

21     Okay. I also don't see how the definition of a patient

22 for purposes of medical information, so Subsection J of 56.05

23 defines medical information with respect to a patient's medical

24 history.

25     Subsection K defines a patient as any natural person who

1    received healthcare services from a provider of healthcare.

2         And then Subsection M defines provider of healthcare to

3    mean any person licensed or certified.

4         No evidence about any of those things.  I don't think you

5    can meet any of those elements.

6         Now, look, let me just tell you.  I don't typically grant

7    Rule 50 motions.  I think it's usually better to let the jury

8    decide.  There are rare occasions, and I think this is one of

9    them, where it's going to potentially be confusing and highly

10   unproductive to let a claim for which I see virtually no

11   evidence -- in fact, probably zero evidence -- to go forward.

12        So tell me how -- what evidence -- what evidence is

13   established, for example, that the users are patients within

14   the meaning of 56.05?

15        **MR. CANTY:**  Well, certainly the five plaintiffs that

16   testified here in trial, Your Honor, indicated that they

17   provided private, sensitive healthcare information for the

18   purpose of getting health services.  In fact, telling them when

19   they -- was best -- the best time for them to get pregnant, for

20   example, Sarah Wellman.

21        Yes, there are traditional definitions of "healthcare

22   provider" and "patient," but they certainly believed that they

23   were getting health services from the Flo app when they entered

24   that information.  And according to the definition under 56.06

25   with respect to "healthcare provider," it includes these types

1   of apps that collect, store, and maintain this information so

2   that the patient can go back and look at that information in

3   the future and gain essentially health services from the site.

4        Here, one of the allegations is under the

5   SESSION_CYCLE_FIRST_DAY, the information they got back was when

6   was the best time for you to get pregnant.  Where are you in

7   your menstrual cycle.  That's healthcare.  They were a

8   healthcare provider providing specific healthcare information

9   to these women.

10       And with respect to the definition under the CMIA, again,

11   I'll read it again.  It describes any business that offers

12   software or hardware to consumers, including a mobile

13   application.  That's exactly what Flo Health is.

14       **THE COURT:**  But I -- look, when you read the

15   statute -- and I'm going to foreshadow the -- some of the jury

16   instructions here.

17       All of this is read with commonsense ordinary meaning.

18   All of it.  Okay?

19       So, for example, you're going to see that I'm denying most

20   of those requests for interpretation of plain language that

21   some of you, I think mainly the defendants, raised in

22   connection with the jury instructions.

23       We don't do that.  We're talking about consumers.

24   Consumers read things in a plain and ordinary manner.

25       So -- but that applies to you too on the plaintiffs' side,

1    and that is when you look at 56.06 and 56.05, it seems plain as

2    day to me what the legislature was addressing as something that

3    I, and perhaps you, use in ordinary life, which is when I go to

4    my doctor, I now have this electronic file that I can access.

5    It's called MyChart.  It just seems to be the generic name that

6    everybody uses.  I have it for several healthcare providers.

7    It all says, you know, Dr. X MyChart or UCSF MyChart, Stanford

8    MyChart.

9         So that's what they're talking about.  I go in there.  My

10   test results are there.  My notes from my doctor are there.  I

11   send my doctor e-mails saying my back hurts.  You know, he

12   gives me some diagnoses.  I get a prescription.  It's all my

13   thing, my physician.

14        That's what 56.06 and 56.05 are intended to address, and I

15   think those definitions that I highlighted -- "patients,"

16   "medical information," and "provider of healthcare services"

17   make that pretty plain.

18             **MR. CANTY:**  Well, Your Honor --

19        **THE COURT:**  I'd be happy to have a -- but there's just

20   no evidence that I've heard that a reasonable jury could make a

21   finding in your favor on.

22             **MR. CANTY:**  I respectfully disagree, Your Honor.

23        **THE COURT:**  I know you do.  I want you to tell me why.

24             **MR. CANTY:**  Sure.  I think that -- you know, we live

25   in 2025, where individuals get healthcare from a myriad of

1  sources.  And these women went to the Flo Health app, who holds

2  themselves out as a healthcare app, to get healthcare services.

3  They talk about how this is a free service for a lot of women.

4  They may not have the opportunity to go see a doctor.

5      I understand the example you gave, Your Honor, with

6  respect to a portal, and certainly that covers the definition,

7  but I don't think it is exclusive to a portal that has every

8  single test, chart, analysis, test result.  It also applies to

9  mobile apps as the statute intended that collects sensitive

10  healthcare data.  And these women talked about --

11      **THE COURT:**  MyChart is a mobile app.

12      **MR. CANTY:**  Understood.

13      **THE COURT:**  That's what I'm using.

14      **MR. CANTY:**  As is Flo Health.

15      **THE COURT:**  I understand.  But, you know, yes, it is

16  true -- and look, we're in Northern California.  Okay?  I'm

17  basically a native of Northern California.  People here consult

18  shamans, tarot cards, soothsayers, obscure religious traditions

19  for healthcare.  They're not within the meaning of the statute.

20  That's what matters.

21      You can solicit healthcare from anyone, but you do have to

22  provide it to be liable under CMIA within the definition of

23  what the legislature says.

24      **MR. CANTY:**  I don't disagree, and we're not talking

25  about a tarot card reader app.  We're talking about an app that

 1  provides -- that touts itself as a healthcare provider and

 2  provides specific health information to women, not --

 3      More importantly, they store sensitive healthcare

 4  information of these women, and they all testified to that.

 5  They put in when their cycle began, when it ended, how long

 6  their period is, how long their cycle usually lasts.  They went

 7  back and they put in sensitive data.  And I know it's not part

 8  of the case, but I think it goes to whether or not it's a

 9  healthcare app.  Whether they had vaginal discharge, what kind

10  of symptoms they were having while they were on their period to

11  seek advice.  There was advice that they could get based on

12  that information.

13      **THE COURT:**  Let me just jump in.

14      Your invasion of privacy claim and everything else is

15  going to go forward, okay, including CIPA.  This is the only

16  one I'm very likely not to let you go forward on.

17      So I agree with you.  Those are all maybe private things

18  that the jury will be called upon to decide whether that was

19  invasive or not and all -- for all those other purposes.

20      But for this particular one, you do have to operate within

21  the plain language of the statute, and I just don't think

22  you're there.

23      Anyway, anything, Flo, you'd like to add on that?

24      **MS. SHARTON:**  No.  I think Your Honor is spot on, and,

25  in fact, we don't even have to guess.  In 2013 after drafting

1   Section 56.06(b) and before its passage, the drafters stated,

2   quote (as read):

3         "The intent of the CMIA was to protect medical

4         information that originated with medical

5         professionals...  This is why CMI defines 'medical

6         information' to only include information in the

7         possession of or derived from healthcare service

8         providers.  CMIA was not intended to protect all

9         medical information broadly construed that is created

10        by the individual."

11      This came up -- and I have copies of that legislative

12  history.  This came up because while we may live in 2025, the

13  statute we should be looking at is the one that was in effect

14  from 2016 to 2019.

15      **THE COURT:**  I agree from the 2016 perspective.

16      **MS. SHARTON:**  Exactly right, Your Honor.  And what --

17  the reason for that legislative history is when the law was

18  going to be passed, app developers who had like step trackers,

19  things like that, wanted to make crystal clear that things that

20  users input into an app wasn't going to be covered by the

21  statute, and they went back and that was clarified.  And that's

22  what Flo is:  It's all input.

23      I would also add that all the plaintiffs -- I asked them

24  and they said "Flo was not my healthcare provider."  That

25  testimony is in the record.  And I didn't see anything that

1 | would support.

2 |     And Your Honor's reading of the definitions we -- it's

3 | spot on.  They're talking about like the MyCharts the MyLabs,

4 | insurance platforms that actually have EHR, not a Flo -- not

5 | the Flo app.

6 |          **THE COURT:**  Okay.

7 |          **MR. CANTY:**  Your Honor, briefly.

8 |          **THE COURT:**  Final thoughts, yes.

9 |          **MR. CANTY:**  With respect to that, the question was:

10 | Are they your healthcare provider?

11 |     I think the witnesses understood that to mean the primary

12 | healthcare provider for those individuals.

13 |     I hear Your Honor.  I believe this is a very important

14 | issue.

15 |     This is the one issue I think having the opportunity to

16 | submit a brief to the Court, a brief -- brief brief -- on the

17 | issue is important.  We've put the case in over the past week

18 | and a half.  We have a fundamental disagreement as to whether

19 | or not certain portions of the statute apply, and we'd like to

20 | be heard.  I think it's important that --

21 |          **THE COURT:**  I've got to get the jury instructions

22 | done.

23 |     There's nothing you're going to tell me that's -- I've

24 | heard all the evidence.  It's not arguing the statute.  It's

25 | arguing what the evidence is in the case.  Okay?

1    The statute is plain as day.  I have no ambiguity in my

2  mind about what those definitions require under Section 56.05.

3    The problem you have, and it is in my view an

4  insurmountable problem, is that you have no evidence to meet

5  any of those definitions on patients, on provider of

6  healthcare, and on medical information, which is premised on

7  those two prior definitions.

8    So if you want to submit five pages by 9:00 a.m. tomorrow

9  morning, that's fine, but don't bother if it's not based on

10  actual evidence that the jury will use to make a reasoned and

11  reasonable decision in your favor.  I just don't see it being

12  there.

13    **MR. CANTY:**  Understood, Your Honor.

14    **THE COURT:**  I fully expect we're going to be closing

15  on Friday, so I need to get the jury instructions done, and

16  I -- if you want to say something, that's fine, but no more

17  than five pages saying:  Here is the evidence that satisfies

18  all the requirements of 56.05 and 56.06.

19    **MR. CANTY:**  Your Honor, is it the plaintiffs'

20  understanding that you will not be charging the jury that a

21  provider of healthcare includes any business that offers --

22    **THE COURT:**  The CMIA will be dismissed.  It's not

23  going to the jury.

24    **MR. CANTY:**  I understand.  But, for example, if we

25  were to convince you, is it our understanding that this is the

1  definition of the "provider of healthcare" that will go to the

2  jury?

3  **THE COURT:**  .05 and .06 will be read together, but .05

4  cannot just be blanked out.  It is a definition of "provider of

5  healthcare services."  I know you prefer the .06 version, which

6  you think is broader, but they both are overlapping and

7  conjoined and they need to be read together in a way that

8  harmonizes, as you do in statutory interpretation, both

9  sections of the statute.  And -- but don't even bother -- don't

10 bother with that.

11 **MR. CANTY:**  I will focus on the evidence.

12 **THE COURT:**  You are stumbling on the starting block,

13 which is there's no evidence in the case that would support a

14 reasoned and reasonable verdict by a jury on the CMIA.  That's

15 where you have a problem.  It's not the language of the

16 statute.  It's not a legal issue; it's an evidentiary issue.  I

17 want to be plain as day:  It's an evidentiary issue.

18 **MR. CANTY:**  Understood, and we will scour the

19 evidentiary --

20 **THE COURT:**  Five pages.  That's it.

21 **MR. CANTY:**  Yes, Your Honor.

22 **THE COURT:**  There really shouldn't be any more than:

23 See this document, see this testimony -- and, you know, do it

24 like that.

25 **MR. CANTY:**  Yes, Your Honor.

1     THE COURT:  Make my life easier by anything you cite,

2   you attach to the back so I don't have to flop around through

3   the record.

4          MR. CANTY:  Yes, Your Honor.

5          THE COURT:  Do not file a response unless I call for

6   it.

7          MS. SHARTON:  Understood.  Thank you.

8          THE COURT:  All right.  Is that it?

9          MR. CLUBOK:  Your Honor, two --

10         THE COURT:  Yes.

11         MR. CLUBOK:  Your Honor, Andrew Clubok on behalf of

12  Meta.

13      Two orders of business.  One, we would -- we would bring

14  our 50(a) motion at the close of all evidence if time is going

15  to permit that.

16         THE COURT:  That's fine.  If you want to do that,

17  that's fine.

18         MR. CLUBOK:  Thank you, Your Honor.

19      The other thing is in terms of the jury instructions, will

20  there be a charging conference or are you --

21         THE COURT:  Yes.  We'll probably do that tomorrow

22  afternoon.

23         MR. CLUBOK:  Terrific, because we may have some

24  additional things based on the way the evidence is coming in as

25  well.

1     **THE COURT:**  Be prepared to close on Friday.  Okay?

2     **MR. CLUBOK:**  All right.  Thank you, Your Honor.

3     **THE COURT:**  Okay.  See you then.

4     **MS. McCLOSKEY:**  Your Honor, we'd request leave to file

5   an extremely short brief, shorter than five pages, to follow up

6   on two objections that I made during Mr. Satterfield's

7   testimony.

8     **THE COURT:**  Didn't you try this this morning?  I

9   already told you there are no retroactive objections.  Either

10   do it when time is there or it's gone.

11     So no.  Permission denied.

12     See you in the morning.

13     **THE COURTROOM DEPUTY:**  All rise.  Court is in recess.

14           (Proceedings adjourned at 2:50 p.m.)

15                     ---o0o---

16

17

18

19

20

21

22

23

24

25

<u>**CERTIFICATE OF REPORTER**</u>

     I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Wednesday, July 30, 2025

_____
Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court