Volume 7

Pages 1156 - 1246

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

ERICA FRASCO, et al., )
individually and on behalf of )
all others similarly situated, )
)
        Plaintiffs, )
)
VS. )    NO. 3:21-CV-00757 JD
)
FLO HEALTH, INC., META )
PLATFORMS, INC., )
)
        Defendants. )
_____)

San Francisco, California
Friday, August 1, 2025

<u>TRANSCRIPT OF PROCEEDINGS</u>

<u>APPEARANCES</u>:
For Plaintiffs:

        LOWEY DANNENBERG, P.C.
        44 South Broadway, Suite 1100
        White Plains, New York 10601
    BY: **CHRISTIAN LEVIS, ATTORNEY AT LAW**

        SPECTOR ROSEMAN & KODROFF, P.C.
        Two Commerce Square
        2001 Market Street, Suite 3420
        Philadelphia, Pennsylvania 19103
    BY: **DIANA J. ZINSER, ATTORNEY AT LAW**

(APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported by:  Ruth Levine Ekhaus, RDR, RMR, FCRR, CCG
        CSR No. 12219, Official  United States Reporter

**APPEARANCES**:   (CONTINUED)

For Plaintiff:

                   LABATON KELLER SUCHAROW LLP
                   140 Broadway
                   New York, New York 10005
        BY:  **CAROL C. VILLEGAS, ATTORNEY AT LAW**
             **MICHAEL P. CANTY, ATTORNEY AT LAW**
             **GLORIA J. MEDINA, ATTORNEY AT LAW**

For Defendant Meta Platforms, Inc.:
                   LATHAM & WATKINS
                   555 Eleventh Street, NW, Suite 1000
                   Washington, D.C. 20004
        BY:  **ANDREW B. CLUBOK, ATTORNEY AT LAW**

                   LATHAM & WATKINS LLP
                   650 Town Center Drive, 20th Floor
                   Costa Mesa, California 92626
        BY:  **MICHELE D. JOHNSON, ATTORNEY AT LAW**

                   LATHAM & WATKINS LLP
                   505 Montgomery Street, Suite 2000
                   San Francisco, California 94111
        BY:  **MELANIE M. BLUNSCHI, ATTORNEY AT LAW**

                   GIBSON, DUNN & CRUTCHER LLP
                   One Embarcadero Center, Suite 2600
                   San Francisco, California 94111-3715
        BY:  **ELIZABETH K. McCLOSKEY, ATTORNEY AT LAW**
             **ABIGAIL A. BARRERA, ATTORNEY AT LAW**


**Also Present:  Anjali Dahiya**

```
 1                        I N D E X

 2    Friday, August 1, 2025 - Volume 7

 3                                             PAGE   VOL.

 4    Preliminary Jury Instructions              1161    7
      Closing Argument by Mr. Canty              1177    7
 5    Closing Argument by Ms. Johnson            1203    7
      Rebuttal Closing Argument by Mr. Canty     1232    7
 6    Verdict                                    1239    7

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

 1   <u>Friday - August 1, 2025</u>                          <u>9:08 a.m.</u>

 2                      P R O C E E D I N G S

 3                         ---o0o---

 4          THE COURTROOM DEPUTY:  All rise.  This court is now in

 5   session.  The Honorable James Donato presiding.

 6          THE COURT:  Good morning.

 7          ALL:  Good morning, Your Honor.

 8          THE COURTROOM DEPUTY:  Please be seated.

 9      Calling Civil 21-757, Frasco versus Flo Health, Inc.

10      Counsel.

11          MR. CANTY:  Good morning, Your Honor.  Michael Canty

12   from Labaton Keller Sucharow on behalf of the plaintiffs.

13          MS. VILLEGAS:  Good morning, Your Honor.  Carol

14   Villegas from Labaton on behalf of the plaintiffs.

15          MS. ZINSER:  Good morning, Your Honor.  Diana Zinser

16   from Spector Roseman & Kodroff on behalf of plaintiffs.

17          MR. LEVIS:  Good morning, Your Honor.  Christian Levis

18   from Lowey Dannenberg for the plaintiffs.

19          MS. MEDINA:  Good morning, Your Honor.  Gloria Medina

20   from Labaton Keller Sucharow for the plaintiffs.

21          MS. JOHNSON:  Good morning, Your Honor.  Michele

22   Johnson, Latham & Watkins, on behalf of Meta.

23          MR. CLUBOK:  Good morning, Your Honor.  Andrew Clubok,

24   also from Latham & Watkins, on behalf of Meta.

25          MS. BLUNSCHI:  Good morning.  You've got Melanie

1   Blunschi, also from Latham, on behalf of Meta.

2         **MS. McCLOSKEY:**  Good morning, Your Honor.  Elizabeth

3   McCloskey from Gibson Dunn on behalf of Meta.

4         **THE COURT:**  One second.  Firing up the old judge.

5                 (Pause in proceedings.)

6         **THE COURT:**  Okay.  We're all set?  Good?

7         **MR. CANTY:**  Yes, Your Honor.  Thank you.

8         **MR. CLUBOK:**  One second.

9         **THE COURT:**  Okay.  Let's bring out the jury.

10     There will be no movement of any sort at the counsel table

11   area while I'm reading jury instructions.  No up-and-down, no

12   passing notes, no whispering, please.

13         **MR. CANTY:**  Yes, Your Honor.

14         **THE COURT:**  No in-and-out from the gallery either.

15                 (Pause in proceedings.)

16             (The jury enters the courtroom.)

17     (Proceedings were heard in the presence of the jury.)

18         **THE COURTROOM DEPUTY:**  Please be seated.

19     Calling Civil 21-757, Frasco versus Flo Health, Inc.

20         **THE COURT:**  All right.  Good morning, Jury.  We are

21   now at the final jury instruction and closing argument stage.

22     Here's what I'd like you to do:  I gave you a set of

23   preliminary instructions at the start of trial.  I want you to

24   take those out of your binder, and Ms. Clark is going to give

25   you the final instructions that are going to govern your

1  deliberations.  So I do need the preliminary set back from each

2  one of you, please.

3                      (Pause in proceedings.)

4        **THE COURT:**  Okay.  Everybody have a set of the finals?

5     All right.  Good.

6     Now, we're going to do for this final set of jury

7  instructions what we did for the preliminary set, which is I

8  want you to clear your mind and listen word for word to my

9  reading of the instructions, or follow along word for word in

10 the written text.

11    But the crucial thing is we're going to go through these

12 together.  It's our tradition in federal court to ensure that

13 you have a complete understanding of the jury instructions that

14 you're going to be applying when you get to the deliberation

15 room later today.

16    All right?  So we'll do this.  We'll have a very short

17 break after that and then have closing arguments from the

18 parties.  So let's begin.

19                **PRELIMINARY JURY INSTRUCTIONS**

20        **THE COURT:**  Members of the jury, now that you have

21 heard all of the evidence, it is my duty to instruct you on the

22 law that applies in this case.

23    You've each been given a copy of these instructions to

24 refer to during your deliberations.

25    It is your duty to find the facts from all of the evidence

1    in this case.  To those facts, you will apply the law as I give

2    it to you.  You must follow the law as I give it to you whether

3    you agree with it or not.

4        You must not be influenced by any personal likes or

5    dislikes, opinions, prejudices, or sympathy.  You also should

6    not be influenced by any person's race, color, religion,

7    national ancestry, or gender.  All this means that you must

8    decide the case solely on the evidence before you, and please

9    keep in mind you took an oath to do so.

10       Do not read into these instructions or anything I may say

11   or do that I have an opinion about the evidence or what your

12   verdict should be.  That is for you to decide.

13       I'm going to give you a brief recap of the parties'

14   positions.  You've heard a lot, but here's a brief summary.

15       Plaintiffs are Sarah Wellman, Jennifer Chen, and Tesha

16   Gamino.  The defendant now is Meta.  During the time period

17   relevant to this case, Meta was also known as Facebook.

18   Documents and witnesses may have used the names Meta and

19   Facebook interchangeably.

20       Plaintiffs Chen, Gamino, and Wellman allege that Flo

21   Health shared Flo App users' menstrual and sexual health

22   information with Meta and that Meta violated the California

23   Invasion of Privacy Act.

24       Plaintiffs have the burden of proving this claim by a

25   preponderance of the evidence.

# PRELIMINARY JURY INSTRUCTIONS

1   Meta denies the claim of plaintiffs Chen, Gamino, and

2   Wellman.

3   Now, this lawsuit has been brought as a class action.

4   Class action is a lawsuit that has been brought by one or more

5   persons called class representatives on behalf of a large group

6   of people who have similar legal claims.  All of these people

7   together are called a class.

8   A class action lawsuit allows the claims of many persons

9   to be resolved at the same time rather than requiring each

10  person to sue separately.  Not everyone in the class has

11  testified, but you may assume that the evidence admitted during

12  trial applies to all class members unless I tell you otherwise,

13  and I haven't, so you can skip that part.

14  The fact that this case is proceeding as a class action

15  does not mean any decision has been made about the merits of

16  the case, and you must not infer anything about the merits of

17  this case based on the fact that it is a class action.

18  The parties -- or the defendant, I should say -- in this

19  case is a corporation.  All parties are equal before the law,

20  and a corporation is entitled to the same fair and

21  conscientious consideration by you as any party.

22  Under the law, a corporation is considered to be a person.

23  It can only act through its employees, agents, directors, or

24  officers.  Therefore, a corporation is responsible for the acts

25  of its agents, employees, agents, directors, and officers

1  performed within the scope of authority.

2      An act is within the scope of a person's authority if it

3  is within the range of reasonable and foreseeable activities

4  that an employee, agent, director, or officer engages in while

5  carrying out that person's business.

6      When a party has the burden of proving any claim or

7  affirmative defense by a preponderance of the evidence, it

8  means that you must be persuaded by the evidence that the claim

9  or defense is more probably true than not true.

10     You should base your decision on all of the evidence,

11  regardless of which party presented it.

12     The evidence you are to consider in deciding what the

13  facts are consists of sworn testimony of any witness, the

14  exhibits that were admitted into evidence, any facts to which

15  the lawyers have agreed, and any facts that I have instructed

16  you to accept as proved.

17     We'll get to those in a moment.

18     Now, in reaching your verdict, you may consider only the

19  testimony and exhibits received into evidence, any facts to

20  which the lawyers have agreed, and any facts that I have

21  instructed you to accept as proved.

22     Certain things are not evidence, and you may not consider

23  them in deciding what the facts are.  I'm going to remind you

24  what those things are.

25     Arguments and statements by the lawyers are not evidence.

1   The lawyers are not witnesses.  What they said in their opening

2   statements and closing arguments and at other times was

3   intended to help you interpret the evidence, but it is not

4   evidence.

5       If the facts as you remember them differ from the way the

6   lawyers have stated them, your memory controls.

7       Questions and objections by the lawyers are not evidence.

8   Attorneys have a duty to their clients to object when they

9   believe a question is improper under the rules of evidence.

10  You should not be influenced by the objection or my ruling on

11  it.

12      Testimony that I exclude -- that was excluded or stricken

13  or that you were instructed to disregard is not evidence and

14  must not be considered.

15      I did that on a couple of occasions, you may recall.

16      In addition, some evidence may have been received only for

17  a limited purpose, and when I instruct you to receive that

18  evidence for a limited purpose, you must do so and you may not

19  consider that evidence for any other purpose.

20      And finally, anything you may have seen or heard when

21  court was not in session is not evidence.  You are to decide

22  the case solely on the evidence received during trial.

23      Now, evidence may be direct or circumstantial.  Direct

24  evidence is direct proof of a fact, such as testimony by a

25  witness about what that witness personally saw or heard or did.

Circumstantial evidence is proof of one or more facts from which you can find another fact.

You should consider both kinds of evidence. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give any evidence.

There are rules of evidence that control what can be received into evidence. When a lawyer asked a question or offered an exhibit into evidence and a lawyer on the other side thought it was not permitted by the rules of evidence, that lawyer objected. If I overruled the objection, the question was answered or the exhibit received. If I sustained the objection, the question was not answered or the exhibit was not received.

Whenever I sustained an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I ordered that evidence be stricken from the record or that you disregard or ignore evidence. That means that when you are deciding the case, you must not consider the stricken evidence for any purpose.

During trial you heard a couple of witnesses testify in the form of previously recorded trial and deposition testimony rather than live here in court.

A deposition is the sworn testimony of a witness taken

1　before trial.  The witness was placed under oath to tell the

2　truth, and lawyers for each side asked questions.  Questions

3　and answers were recorded.  Insofar as possible, you should

4　consider the deposition testimony presented to you in court in

5　lieu of live testimony in the same way as if the witness had

6　been present here to testify.

7　　　Now, in deciding the facts of the case, you may have to

8　decide which testimony to believe and which testimony not to

9　believe.  You may believe everything a witness says or part of

10　it or none of it.

11　　　Now, in considering the testimony of any witness, you may

12　take into account the opportunity and ability of the witness to

13　see or hear or know the things testified to, the witness's

14　memory, the witness's manner while testifying, the witness's

15　interest in the outcome of the case, if any, the witness's bias

16　or prejudice, if any, whether other evidence contradicted the

17　witness's testimony, the reasonableness of the witness's

18　testimony in light of all of the evidence, and any other

19　factors that bear on believability.

20　　　Now, sometimes a witness may have said something that was

21　not consistent with something else he or she said.  Sometimes

22　different witnesses will make -- will have given different

23　versions of what happened.

24　　　People often forget things or make mistakes in what they

25　remember.  Also, two people may see the same event but remember

1   it differently.

2       You may consider these differences, but do not decide that

3   testimony is untrue just because it differed from other

4   testimony.

5       However, if you decide that a witness has deliberately

6   testified untruthfully about something important, you may

7   choose not to believe anything that witness said.

8       On the other hand, if you think the witness testified

9   untruthfully about some things but told the truth about others,

10  you may accept the part you think is true and ignore the rest.

11      The weight of the evidence as to a fact does not

12  necessarily depend on the number of witnesses who testified

13  about it.  What is important is how believable the witnesses

14  were and how much weight you think their testimony deserves.

15      You heard the testimony from expert witnesses who

16  testified to opinions and the reasons for their opinions.  This

17  opinion testimony was allowed because of the education or

18  experience of the expert witness.

19      Such opinion testimony should be judged like any other

20  testimony.  You may accept it, reject it, or give it as much

21  weight as you think it deserves considering the witness's

22  education and experience, the reasons given for the opinion,

23  and all the other evidence in the case.

24      Now, during trial, certain charts and summaries were shown

25  to you in order to help explain the contents of books and

1   records and documents or other evidence in the case.  Some of

2   those charts or summaries may have been admitted into evidence

3   and some were not.

4       Charts and summaries are only as good as the evidence that

5   supports them.  You should therefore give them only such weight

6   as you think that the evidence supporting them deserves.

7       Now, the parties have agreed to certain facts, which I'm

8   going to read to you.  As we talked about at the beginning of

9   trial, these facts are carved in stone, and you should consider

10  them as having been proved.

11      1.  Plaintiff Sarah Wellman is a citizen of the state of

12  California who downloaded the Flo app.

13      2.  Plaintiff Jennifer Chen is a citizen of the state of

14  California who downloaded the Flo app.

15      3.  Plaintiff Tesha Gamino is a citizen of the state of

16  California who downloaded the Flo app.

17      4.  Defendant Flo Health, Inc. is the developer of the

18  Flo app.

19      5.  Defendant Meta Platforms is a technology company that,

20  among other things, offers free tools like Facebook SDK to

21  allow businesses to build unique and customized solutions to

22  serve their clients.

23      6.  Plaintiffs first filed a lawsuit against Flo based on

24  purported injuries arising from their use of the Flo app on

25  January 29, 2021.

PRELIMINARY JURY INSTRUCTIONS

1   7.   Plaintiffs first filed a lawsuit against Meta based on

2   purported injuries arriving -- arising from their use of the

3   Flo app on June 7, 2021.

4   8.   Flo was created in 2015 and launched the Flo app in

5   2016.

6   9.   During the class period, the Flo app was available for

7   download on the iOS and Android App Stores.

8   10.   The Flo app is a mobile application that can be used

9   to track periods and pregnancy.

10   11.   Plaintiffs Chen and Gamino downloaded the Flo app to

11   track their menstrual cycle.   Plaintiff Wellman downloaded the

12   Flo app to track her menstrual activity and figure out the best

13   day to get pregnant.

14   12.   During the class period, Meta offered a Facebook SDK

15   to app developers.

16   13.   Flo incorporated code from a Facebook SDK into the

17   Flo app throughout the class period, and

18   14.   The custom app event names at issue in this lawsuit

19   are R_CHOOSE_GOAL, R_SELECT_LAST_PERIOD_DATE,

20   R_SELECT_CYCLE_LENGTH, R_SELECT_PERIOD_LENGTH,

21   R_AGE_CHOSEN_PERIODS, R_AGE_CHOSEN_PREGNANCY,

22   R_AGE_CHOSEN_PREGNANCY_METHOD, R_PREGNANCY_METHOD,

23   R_PREGNANCY_METHOD_DATE, R_PREGNANCY_WEEK_CHOSEN,

24   R_PREGNANCY_WEEK_CHOSEN_UNKNOWN, and

25   SESSION_CYCLE_DAY_FIRST_LAUNCH.

 1    Finally, 15.  Flo shared the custom app events in

 2 paragraph 14 that I just read to you with Meta.

 3    Now, plaintiffs Chen, Gamino, and Wellman claim that Meta

 4 violated their right to privacy.  To establish this claim,

 5 these plaintiffs must prove all of the following:

 6    1.  That Meta intentionally eavesdropped on or recorded

 7 these plaintiffs' conversations by using an electronic device;

 8    2.  That these plaintiffs had a reasonable expectation

 9 that their conversations were not being overheard or recorded,

10 and

11    3.  That Meta did not have the consent of all parties to

12 the conversation to eavesdrop on or record them.

13    Now, a plaintiff may express consent by words or acts that

14 are reasonably understood by another person as consent.

15    A plaintiff may also express consent by silence or

16 inaction if a reasonable person would understand that the

17 silence or inaction intended to indicate consent.

18    Now, the recording of a confidential conversation is

19 intentional if the person using the recording equipment does so

20 with the purpose or desire of recording a confidential

21 conversation or with the knowledge to a substantial certainty

22 that his use of the equipment will result in the recordation of

23 a confidential conversation.

24    Now, when you begin your deliberations, you're going to

25 elect one member among you as presiding juror who will preside

1 over the deliberations and speak for you here in court.  If you

2 watch legal shows on TV, they're sometimes called the

3 foreperson.  In federal court we call them presiding juror.

4     You will then discuss the case with your fellow jurors to

5 reach an agreement if you can do so.

6     Your verdict, whether liable or not liable, must be

7 unanimous.

8     Each of you must decide the case for yourself, but you

9 should only do so after you have considered all of the

10 evidence, discussed it fully with the other jurors, and

11 listened to the views of your fellow jurors.

12     Do not be afraid to change your opinion if the discussion

13 persuades you that you should, but do not come to a decision

14 simply because other jurors think it is right.

15     Now, it's important for you to reach a unanimous verdict,

16 but, of course, only if each of you can do so after having made

17 your own conscientious decision.

18     Do not change an honest belief about the weight and the

19 effect of the evidence simply to reach a verdict.

20     Perform these duties fairly and impartially.  Do not allow

21 personal likes or dislikes, sympathy, prejudice, fear, or

22 public opinion to influence you.

23     You should also not be influenced by any person's race,

24 color, religion, national ancestry, gender, sexual orientation,

25 profession, occupation, economic circumstances, or position in

1    life or in the community.

2        It is your duty as jurors to consult with one another and

3    to deliberate with one another with a view towards reaching an

4    agreement if you can do so.

5        During your deliberations, you should not hesitate to

6    reexamine your own views and change your opinion if you become

7    persuaded that it is wrong.

8        Now, because you must base your verdict only on the

9    evidence received in the case and on these instructions, I'm

10   going to remind you that you must not be exposed to any other

11   information about the case or the issues it involves.

12       Now, except for discussing the case in the jury room with

13   your fellow jurors during deliberations, do not communicate

14   with anyone in any way, and do not let anyone else try to

15   communicate with you in any way about the merits of the case or

16   anything at all to do with it.  This includes discussing the

17   case in person, in writing, by phone or electronic means,

18   e-mail, text messaging, or any Internet social media site,

19   blog, website, or other feature.

20       This applies to communicating with your family members as

21   well and with your employer and with the media and the press

22   and anyone involved in the trial.

23       If you are asked or approached in any way about your jury

24   service or anything about this case, you must respond that you

25   have been ordered not to discuss the matter, and you must

1  report contact immediately to Ms. Clark.

2      Do not read, watch, or listen to any news or media

3  accounts or commentary about the case or anything to do with

4  it.  Do not do any research, such as consulting dictionaries,

5  searching the Internet, or using other reference materials, and

6  do not do any investigation or in any other way try to learn

7  about the case on your own.

8      The law requires these restrictions to ensure that the

9  parties have a fair trial based on the same evidence that each

10  party has had an opportunity to address.

11      A juror who violates these restrictions jeopardizes the

12  fairness of these proceedings, and a mistrial could result that

13  would require the entire trial process to start over.

14      If any juror is exposed to outside information, you must

15  also advise Ms. Clark promptly.

16      Now, some of you took notes during the trial.  Whether or

17  not you took notes, you should rely on your own memory of what

18  was said.  Notes are only to assist your memory.  You should

19  not be overly influenced by your notes or the notes of fellow

20  jurors.

21      Now, if during your deliberations you need to communicate

22  with me, you may send a note through Ms. Clark signed by any

23  one of you or -- any one or more of you.  So this time you have

24  to sign the note during the deliberations.

25      Now, no member of the jury should ever try to communicate

1  wait with me except by a signed writing, and I will respond to

2  you here in open court.  I know it says only in writing.  I

3  don't do that.  I'll have you in court and we'll talk about it.

4      If you send out a question, I will consult with the

5  lawyers before answering it, which may take a moment.  You may

6  continue your deliberations while you are waiting for the

7  answer to any question.

8      And remember, you are not to tell anyone, including me or

9  Ms. Clark, or anyone, how the jury stands, numerically or

10  otherwise, on any question submitted to you, including the

11  question of whether either -- whether a -- whether -- okay.

12  There's only one defendant left.  I should have fixed that --

13  including the question of whether the defendant is liable until

14  you have reached a unanimous verdict or have been discharged.

15      Let me put this slightly more plainly.  I've got to revise

16  this instruction.

17      Don't put anything on where you stand in terms of voting

18  on the notes.  Okay?  Don't say "We're XY and this question

19  will help us," or "We're close."  Don't say anything.  Just put

20  the question down.  No other commentary.  Okay?

21      All right.  I have to circle that one.

22      Okay.  There will be a verdict form waiting for you in the

23  jury room.  After you have reached a unanimous agreement on the

24  verdict, your presiding juror should complete the verdict form

25  recording your deliberations, sign it, date it, and advise

1   Ms. Clark that you are ready to return to the courtroom, where

2   I will read the verdict to the gallery and to the parties.

3       That's it for the jury instructions.  Let's just take a

4   moment to stand up.  We're going to have 45 minutes -- up to

5   45 minutes each per side, so we'll have a little stretch break.

6                    (Pause in proceedings.)

7       **THE COURT:**  All right.  Ready?

8   Okay.  Plaintiff?

9       **MR. CANTY:**  I just need Ms. Clark to switch over to

10  the --

11      **THE COURT:**  Oh, yes.  Sorry.

12                   (Pause in proceedings.)

13      **THE COURT:**  I want to remind everyone that there

14  should be no recording devices at all in this courtroom.  No

15  photos, no taking voice memos -- nothing.  If you see that,

16  again -- apparently something just happened -- I will keep your

17  phone.  You will not get it back.  And there may be similar

18  criminal consequences as well brought by the United States

19  Attorney's Office.  This is a sacrosanct space.  This is not a

20  space for Instagram or TikTok videos or mementos.  This is a

21  United States district courtroom.

22      Does everybody in the gallery understand that?

23      **ALL:**  Yes, Your Honor.

24      **THE COURT:**  Perfect.

25      **MR. CANTY:**  Thank you, Your Honor.

1    **THE COURT:**  Did you want to reserve time?

2    **MR. CANTY:**  Yes, Your Honor.  10 minutes, please.

3    **THE COURT:**  10?

4    **MR. CANTY:**  Seven.

5                        (Laughter.)

6    **THE COURT:**  You're going at this too hard.  Five or

7    10?

8    **MR. CANTY:**  Five is fine.  Thank you.

9                    **CLOSING ARGUMENT**

10    **MR. CANTY:**  Your Honor, counsel, and ladies and

11    gentlemen of the jury, good morning.

12        Today you get to decide how seriously big tech takes

13    privacy, because the evidence in this case showed that during

14    the class period, Meta secretly recorded millions of women's

15    confidential and private information.  And we don't have to sit

16    here and throw our arms up and say "That's just the way it is."

17    You have the opportunity today to tell Meta they don't get a

18    pass.

19        And for Sarah and Jen and Tesha, they haven't waived the

20    white flag on their privacy.  They came in here, swore to tell

21    the truth, and shared with each and every one of you very

22    private, intimate, and confidential information about their

23    lives, specifically about their reproductive health and their

24    menstrual cycle.  And when they entered that information into

25    the Flo Health app, their expectation was that information was

1    going to be private and confidential, not recorded by Meta for

2    profit.

3         My colleague stood before you a little over a week ago,

4    last Monday, and explained to you how we were going to prove

5    our case, and she told you specifically the evidence that we

6    were going to present in this case to prove that Meta secretly

7    recorded through their SDK this private and confidential

8    information.

9         I now have the opportunity to review that evidence with

10   you over the next 30 minutes or so to show you how we have made

11   our case.

12        Promises made and promises kept.  Ms. Villegas told you

13   what the evidence would show.  We presented it over the last

14   two weeks.

15        So let's start with the burden of proof in this case.

16        Preponderance of the evidence, more likely than not.  And

17   I submit to you that the evidence that we're about to go over

18   clearly demonstrates that we've met that burden.  In fact, the

19   evidence in this case demonstrates it's not even a close call.

20        So what is the one single count that you need to consider?

21   It's whether or not Meta violated the California Invasion of

22   Privacy Act.  We're going to go through the elements that we

23   needed to prove, and I'm going to show you through the evidence

24   how we've met each and every one of these elements.

25        First, that Meta intentionally eavesdropped or recorded

1  these plaintiffs' conversations using an electronic device,

2  that SDK; that the plaintiffs had a reasonable expectation that

3  their conversations were not being recorded or overheard; and

4  lastly, that Meta never had the consent of these women to

5  secretly record their conversations.

6      So let's start at the beginning.  Reasonable expectation

7  of privacy, and then we'll go into the three -- the four other

8  elements that we need to prove, which are that they recorded

9  the conversations, that Meta did so intentionally, and that

10  they never had the consent of these women to secretly record

11  the conversations.

12      What evidence have you seen that there was a reasonable

13  expectation of privacy?

14      The app itself.  It's a health app.  It asks private and

15  intimate information about a woman's reproductive health, what

16  her period is, what her goals are:  I want to get pregnant; I

17  want to track my cycle because I don't want to get pregnant; or

18  I am, in fact, pregnant.

19      They ask very sensitive questions about sex drives,

20  symptoms.

21      So certainly a reasonable person going onto the Flo Health

22  app would have expected that this information would be kept

23  private.  And, in fact, the witnesses that testified told you

24  that this was, in fact, private.

25      Jen Chen:  Did you consider the answers you gave to the

1  Flo app to be private?

2       Absolutely.

3       And how did you feel -- how did it make you feel when you

4  found out that Facebook was recording this information?

5       Embarrassed.  "I felt violated," she told you.

6       Question:  Would you expect those health apps to keep your

7  information private?

8       Her answer:  Absolutely.

9       And that's because it's your medical information, right,

10  the same way you expected Flo Health to keep your medical?

11  Exactly.

12       The same way you expected Flo Health to keep your medical

13  information?  Exactly.

14       Jen Chen wasn't alone.  All the other plaintiffs that

15  testified in this case told you they considered this

16  information to be private.  Jen Chen, Sarah Wellman, and Tesha

17  Gamino all asked the question, and they all told you that.

18       And they're not alone.  The millions of women that used

19  the app also had an expectation.  Sarah Wellman told you this

20  wasn't a social networking app.  This wasn't an app where you

21  communicated with your friends.  It was a password-protected

22  app on your phone where you entered private and sensitive

23  information about your reproductive health.

24       Flo Health also told these women that they were going to

25  keep it private.  They said, we're not going to share any of

1  your information regarding your marked cycles or your pregnancy

2  with any third parties, and we're also not going to share the

3  survey results, which you know are those first six questions

4  that each women was asked when she downloaded the app.

5       Third parties will not have access to our results, our

6  survey results.  That's what they were told.

7       So there's a mountain of evidence here that clearly

8  demonstrates that Flo promised that the conversations would be

9  kept confidential.  The women had an understanding based on the

10 nature of the app that the information would be kept

11 confidential.

12      So the communications that these women had with the app,

13 certainly a reasonable woman would have thought that these were

14 going to be private and confidential communications.

15      Now let's turn to whether or not Meta recorded the

16 plaintiffs' conversations.

17      How do you prove that?  We prove that through the

18 testimony of Dr. Egelman.  You guys all got to see Dr. Egelman,

19 and I'd like to talk a little bit about credibility of

20 witnesses, because the judge just read you his instructions on

21 how to determine whether or not you find a witness credible.

22      One thing I'll tell you about Dr. Egelman:  He loves his

23 work.  That was apparent.  And because he loves his work, he

24 went through painstaking detail to tell you about all the work

25 he did to uncover exactly what was going on here.

1    Downloaded 18 different versions of the app.  This guy

2    loves doing this testing.  I think that's apparent from his

3    testimony.  He talked to you about all the different versions

4    that he tested.  He told you how he disassembled the app to see

5    exactly how the SDK was recording the private communications of

6    the women.

7        So what did Dr. Egelman tell us?  Well, in the first

8    version, you see there are two questions that a woman

9    could ask:  I want to get pregnant; I just want to track my

10   cycle.

11       And he described this essentially as a circle.  When the

12   woman makes a decision and hits "next," a series of executions

13   occur that take her to that next page.  But in the middle of

14   that, there's the SDK.  There's the SDK recording the private

15   answer of that woman.

16       Facebook is recording that information and transmitting it

17   back to Meta.

18       And he told you that.  He showed you the code, Facebook

19   logger.  And we know that when that information goes through

20   the cycle, it's recorded and collected by the Facebook SDK.

21       And again, you don't have to take my word for it.  Look at

22   Dr. Egelman's testimony. (as read):

23       **"QUESTION:**  And the values that you're referencing, those

24       are the values related to the answers of the question on

25       the screen to the left; correct?

1    **"ANSWER:** Yeah. It records how the user answered the

2    question.

3    **"QUESTION:** And it's 'get pregnant' if the user selects 'I

4    want to get pregnant,' and it would be 'track cycle' if

5    the user selected 'I want to track my cycle'?

6    **"ANSWER:** Yeah, that's how the program internally

7    represents that information."

8    This is evidence that the Facebook SDK was recording these

9    women's answers. You heard it from Dr. Egelman.

10   Now, there's been some discussion about it's really Flo

11   talking to Meta; it's not the women talking to Meta.

12   That's absurd. You just saw the code. Dr. Egelman talked

13   to you about it.

14   And you know how quickly it happens? He told you. (as

15   read):

16   **"QUESTION:** If we could just turn back to the slide

17   briefly, the one that I just referenced, where the red

18   arrow is recording, right, is showing that the function

19   that you identified was part of the Facebook SDK. How

20   long does it take after the user presses 'next' for this

21   function to record their answer?"

22   He said: It's instantaneous.

23   He talked about highly technical speeds. Let me just say

24   it this way: It happens quicker than my voice reaches your

25   ears that that information is recorded, collected, and sent to

1    Facebook.

2        The SDK was listening, all the time, collecting that

3    information.

4        And how do we know it was the Facebook SDK?  Dr. Egelman

5    told you.  LOG_EVENT_FACEBOOK, that answer -- that's where it

6    actually invokes the Facebook SDK.

7        Com.Facebook.appevents.appslogger.  What did Dr. Egelman

8    say about that?  You can see that the function originated from

9    com.Facebook.appevents, which is the part of the Facebook SDK

10   that records app events.

11       This is the testimony where you see that the Facebook SDK

12   is recording those events.

13       What else did Dr. Egelman tell you?  That it's actually

14   the Facebook SDK, not the Flo app, that's sending that data

15   back to Meta. (as read):

16       "QUESTION:  What does this tell you about who and what is

17       sending users' answers to Flo survey questions to Meta?"

18       His answer?

19       "ANSWER:  Yeah, this is what proves Facebook's code is

20       doing the transmission and not the Flo app code."

21       At the end he said, "That's the actual transmission here,

22   not the Flo app."

23       What's really telling about this testimony is he doesn't

24   simply say:  Oh, it's the SDK and Facebook that's sending the

25   information.

1    No, no.  He references the work.  He says:  This is what

2    proves Facebook's code is doing it.

3    He's not simply just telling you.  He's backing it up with

4    the work that he did, the testing that he conducted, the hard

5    evidence that shows you, graph.Facebook.com, that it's Facebook

6    recording and collecting that information.

7    Now, we saw these slides.  When a woman goes on the app,

8    the first question she's asked is "How can I help you?"  And in

9    earlier versions there were two answers:  "Get pregnant" or

10   "track cycle."  Later versions, the user could answer that she

11   was pregnant.

12   And we know that the actual answer was recorded.  We just

13   saw the testimony on how the Facebook SDK records the answer,

14   and we know what was specifically said.  My colleague told you

15   that in her opening statement, that the specific answers -- so

16   if a woman answered "I'm pregnant," "pregnant" got recorded and

17   sent to Meta.

18   If she answered "I want to track my cycle," "track cycle"

19   was recorded by the Facebook SDK and sent.

20   If she said "I want to get pregnant," like Sarah Wellman

21   did, the minute she clicked "next," the second, the

22   millisecond, the blink of an eye, "get pregnant" was sent via

23   the recording of the Facebook SDK back to Meta.

24   And we'll talk about what they did with that data in a

25   little bit.

1    But we know that the specific answers were recorded by

2 Facebook SDK, and Dr. Egelman testified about that.

3    "And this information is also being transmitted to Meta

4 servers?"

5    "Yes."

6    Now, we also know that step three, four, and five also

7 collected information and sent it to Meta.

8    We have not disputed the fact that for those parameters,

9 it was just "known" or "unknown" that was sent.

10   But what's important is when a woman entered her last

11 period date, entered her period length, and answered her cycle

12 length, Flo did internal calculations, and they communicated

13 back.  They were having a conversation with these women.  And

14 they would say to the women, "This is where you are in your

15 menstrual cycle," with a specific day and specific activity

16 that was going on in the cycle at that point.

17   And Flo communicated that to the women, the women having a

18 reasonable expectation that that would be private.  It's on an

19 app behind a password on a phone, behind a password.  But the

20 SDK was always listening.

21   How do we know that?

22   Again, not because I say it.  The evidence shows you that.

23   Dr. Egelman told you that SESSION_CYCLE_DAY_FIRST_LAUNCH

24 is the SDK recording the specific day the woman was in her

25 cycle and what was going on and, in this example from his logs,

1    after a fertility window was recorded by the SDK and collected

2    by Facebook.

3        Now, this is just another example.  This is what the woman

4    saw from the outward appearance.  She got "ovulation in

5    six days" with the expectation that that information was going

6    to be private.  But what Dr. Egelman has showed you that if you

7    lift -- you know, pick the rock up, you see the Facebook SDK

8    was recording it, listening the whole time, collecting that

9    information from the recording and sending it back to Meta.

10       Let's talk about what Meta's explanation was, what we

11   heard from Meta and the story that they believe of what

12   happened. (as read):

13       **"QUESTION:**  You were here yesterday, or two days ago,

14       rather, during opening where counsel mentioned that the

15       only data sent was whether there were known or unknown

16       values or user -- reflecting whether a user answered a

17       question or not."

18       Do you remember that?  That was the opening.  It was just

19   "known" or "unknown."

20       Dr. Egelman told you, yeah, those were lies. (as read):

21       **"QUESTION:**  Is that accurate based on your review of the

22       transmission?

23       **"ANSWER:**  No, that's not at all accurate.  I mean, you can

24       see it right here."

25       Again, it's not Dr. Egelman just piping off on an opinion.

1    He immediately goes back to his data.  He says, "I mean, you

2    can see it right here."  He shows you in the logs, those logs

3    that we looked at.  He objectively points out where the SDK is

4    collecting, recording that information, and sending it back to

5    Meta.

6        And then the defense had this slide, right, and they

7    said -- this is the idea that it's two different recordings and

8    it's not really the information because it was only known or

9    unknown.

10       Well, we know that's not true.  In fact, what we know now

11   is this microphone -- that's the SDK.  It may not look like a

12   microphone, but in 2025, recording devices come in all shapes

13   and sizes, and the reality is that the SDK no less recorded

14   than that microphone would record, recorded the answers of

15   these women?

16       For example, if a woman had said "I want to get pregnant,"

17   the SDK recorded "get pregnant."

18       And how quickly?  Again, in the blink of an eye, that

19   information is being recorded by the SDK.

20       Now, the defense also put up this chart, and I want to

21   talk about this chart briefly to show you what's not on this

22   chart.

23       For example, for some inexplicable reason, R_CHOOSE_GOAL,

24   which is the very first question every single woman is asked,

25   they put that at the bottom.

1    And we now know that Tesha Gamino and Jen Chen actually

2  answered, so this is not one or the other; it's their specific

3  answer.  They want to track their cycle.

4    Sarah Wellman's conspicuously absent.  Well, we know what

5  that answer was.  She told you:  I want to get pregnant.

6    Sarah made the private decision to try to grow her family.

7  So we know that what was -- what was the answer she gave and

8  what was recorded by the SDK:  "Get pregnant."  That was sent

9  to Meta.

10    What else do we have on this chart?

11    Next thing we know, we have the plaintiffs responding to

12  those three questions that Flo uses to calculate where a woman

13  is in her cycle and the specific day.  They put "I don't know"

14  or "date."  "I don't know" or "date," all over.  Not true.

15  Each and every one of those women told you they answered with

16  specificity those questions.

17    So when we look at the SESSION_CYCLE_DAY_FIRST_LAUNCH --

18  remember, that's the communication from Flo, the private

19  communication from Flo back to the women -- we have question

20  marks here.  But that's not right, because if you look, what

21  was sent to Facebook?  We have "0" or "calculation."  Not so.

22    What does the evidence show us?

23    The evidence shows us that what was actually sent for

24  these women was where they were in their cycle with a specific

25  numeric date:  Ordinary, pregnancy, after fertility window,

1    period, fertility window before ovulation, or ovulation.

2        That's what was sent.

3        And lastly, we had these question marks:

4    R_PREGNANCY_METHOD, R_PREGNANCY_METHOD_DATE,

5    R_AGE_CHOSEN_PREGNANCY, R_PREGNANCY_WEEK_CHOSEN.

6        Question mark, question mark, question mark, question

7    mark.

8        Well, we know the answer to that question, because we have

9    the internal Meta documents.  We have the internal Meta

10   documents that show that when they got this information, the

11   very first thing they want to do with it when they record it,

12   they try to identify unique individuals associated with these

13   events.

14       So we know it's not a question mark.  It's somewhere

15   between 397,000 to almost 590,000, depending on the event, that

16   Facebook was able to identify unique individuals to answer

17   those questions.

18       We know R_CHOOSE_GOAL was -- which is the question that

19   every woman had to answer, whether she wanted to get pregnant,

20   whether she wanted to track her period, or she was pregnant.

21       Now, again, we didn't introduce it for the raw number.  I

22   want to be very clear.  You heard the limiting instruction.

23       But this is critical evidence, because it shows that the

24   first thing they do when they get R_CHOOSE_GOAL is they try to

25   match it.  What the exact number is for California, probably

1    not 34 million; we'll concede that.  But that's not why it's

2    important.  Why it's important is the first thing to do with

3    the information is trying to match it up with known Facebook

4    users.

5         And why is that important?  Because the defendants have

6    sat here and told you:  We didn't want the information.  We

7    told our app developers, "Don't send us this information," so

8    therefore, we didn't have the intent to collect.

9         You just saw the first thing they do when they get data is

10   they try to match it up.  So you can't say "We don't want it,"

11   and then the first thing you do is try to exploit it for your

12   own profit.

13        It's like the old saying:  Actions speak louder than

14   words.

15        You can get up here and you can have all your witnesses

16   testify over the course of two days saying "We didn't want it,

17   we had these business tools."  But when we look at the hard,

18   objective evidence, it shows that the first thing you wanted to

19   do with that data was identify who it belonged to.  You don't

20   get to come in here and credibly tell everybody you didn't want

21   it and you didn't intend to collect it.  That's belied by the

22   evidence.

23        So let's go through the evidence that shows that they

24   acted with intent.

25        First, the SDK is specifically designed to collect this

1  information.  It's the sole purpose.

2      Second, we just talked about it.  The first -- very first

3  thing Meta does is trust and match that data with known

4  Facebook users.

5      We know that they collect the data because they want to

6  use it and profit from it.

7      We know that during the class period, they knew that they

8  were getting this data and they were recording confidential

9  conversations and essentially just said:  Well, it's not our

10  problem.  We told the app developers not to send it to us, and

11  they wanted to use it.

12      And lastly, again, they took no real steps to stop

13  recording.

14      It's not just because of these individually that

15  demonstrates their intent; it's all of them collectively.  And

16  if you look at them all collectively, again, actions speak

17  louder then words.  You don't get to come in here and say with

18  a straight face you didn't have intent to collect when all of

19  the objective evidence points to the fact that you collected

20  it, recorded it, used it, exploited it, profited from it.

21      That's intent, ladies and gentlemen of the jury.  That is

22  intent.

23      So let's go through it.

24      First, Dr. Egelman told you the code associated with the

25  SDK can be used to transmit data to the SDK provider; right?

1    Yes, that's the purpose of the SDK.

2        Tobias Wooldridge.  First of all, he says:  You're

3    aware -- the question I asked -- (as read):

4        **"QUESTION:**  -- that once custom app events are received by

5        Meta, Meta attempts to identify and match that data to

6        Facebook users; correct?

7        **"ANSWER:**  Yes, it attempts it."

8        Excuse me.  (as read):

9        **"ANSWER:**  It attempts it, yes."

10       We also have the interrogatory response from -- from Meta

11   when they say when Flo app sent app events data to Meta, it

12   also sent Meta information corresponding to the app events for

13   the sole purpose of matching individuals associated with the

14   Flo app's app events data to individual Facebook users.

15       That's evidence.

16       What did Stephen Satterfield -- and let's talk about

17   Stephen Satterfield.  He got up here and could not answer a

18   question directly.  I asked him many different ways:  Can you

19   just tell us what you did?  Did you take any proact- --

20       He kept coming back to the same thing.  "We have business

21   tools.  We tell them we don't want it."  He couldn't say with a

22   straight face or answer any question I asked him, just coming

23   back to that tired response that there are business tools, that

24   they tell app developers not to send the information.

25       But what did he testify to? (as read):

1   **"QUESTION:**  And Meta's advertising business uses those

2   machine learning systems to deliver relevant ads to

3   people; is that right?

4   **"ANSWER:**  Yes, that's the goal."

5   Two days before the end of the class period, what's going

6   on?  Right?

7   They got caught.  There's -- press is now asking questions

8   about:  Hey, you guys are collecting this stuff?

9   What does Stephen Satterfield say internally at Meta?  He

10   says -- he sends out to this whole group, "One thing you should

11   know is that we," capital, "do use event data, including custom

12   events" -- the ones we went over -- "for ads."

13   This is an internal Meta document where he's admitting

14   that they're using the specific data for profit.

15   Does that sound like evidence that demonstrates they

16   didn't intend to collect this information?  Of course not.

17   That's absurd. (as read):

18   **"ANSWER:**  I think it's a fair statement to say that we

19   benefit from app event data that we receive."

20   And, in fact, look, let's state the obvious.  "At

21   Facebook, ad is the bread maker and contributes to 99 percent

22   of company revenue in 2019 Q1."

23   Not my words.  Those are their words.  Again, another

24   internal document.

25   So we know that they benefit from it.  We know they

1  collect.  We know they want to identify it.  We know that it is

2  essentially the sole and single source of ad revenue for them.

3  But they want you to believe that they didn't intend to collect

4  it.  That's crazy.  That's inconsistent with the evidence.

5      And, in fact, we know the ads ranking system only works

6  when it's trained off of billions of samples.

7      Dr. Jennifer Golbeck told you that.  She said, when asked:

8  Is this surprising to you?

9      And she says:  No.  I think most of us who pay attention

10  to this space know that ads are how companies that do this sort

11  of advertising make the vast majority of their money.

12      You got to evaluate Dr. Golbeck.  You got to see her.  You

13  heard about her experiences.  She's stating the obvious to you.

14  Her expert opinion was that it was used.  And it makes sense,

15  because this is how they make money.

16      And she also said, very simply, Facebook data received

17  from the Flo app and it used it in its machine learning

18  algorithms to target ads.

19      They also used it for another reason.  I don't know if you

20  caught this when Dr. Golbeck was testifying, but they also use

21  it to improve -- used to improve through machine learning the

22  accuracy of content delivery, including delivery of

23  advertisements from advertisers besides Flo Health.

24      Well, why is that important?

25      One, it's an admission than they're using it.

1    Two, it means that the users of the Flo Health app may not

2  necessarily get an ad -- which we've never asserted they got

3  direct ads.  But more importantly, it's for content delivery.

4  She told you why it's valuable.  It keeps eyes on the Instagram

5  page, keeps eyes on the Facebook page.

6    And what does that mean?  The longer a user is on those

7  pages, the more ads they can deliver, the more profit they can

8  make.

9    What did Stephen Satterfield tell regarding whether or not

10  Meta knew that the SDK was recording confidential

11  communications?  He was aware of the risk. (as read):

12    **"ANSWER:**  And I was aware of the risk that app developers

13    would send us certain information that we didn't want to

14    receive and that could have included health information."

15    And again, in Exhibit 1264AR, he says:  (as read):

16    **"QUESTION:**  Many of these aren't new questions, of course.

17    Been getting them for years."

18    He says the quiet part out loud.  They knew about this for

19  years and did nothing to stop it.

20    So when they tell you they didn't intend to collect it,

21  that is not credible.

22    The only reason why this got spun up was because outside

23  media were asking questions about the fact that they were

24  recording this information.

25    And how do we also know?  Well, Tobias Wooldridge, in the

1    middle of the class period, is on this document.

2         From May 4, 2018:  Today advertisers can inadvertently or

3    intentionally send sensitive information, including health

4    information, in custom fields via website, app, and offline

5    events.  This poses risks, as we are unable to cleanly delete

6    data, as well policy and PR issues.

7         Let's talk about the three.

8         One, they can't delete it, because once it gets into that

9    machine learning system, nobody can tell you what the machine

10   learning system is using that data for.

11        And secondly, we know that there were PR issues, and

12   that's the only thing that got -- got Meta motivated.  They

13   didn't have any serious concern about stopping this.  And how

14   do we know that?  Well, we asked -- I asked the question --

15        Like this isn't hard; right?  We all know this.  We use

16   our common sense, our life experiences.  If you want something

17   to stop and you have the ability to stop it yourself, you have

18   to take action yourself.

19        I asked him (as read):

20        "QUESTION:  Okay.  What I'm asking is Meta could have sent

21        to Flo 'You're forbidden from using our SDK at any time';

22        correct?

23        "ANSWER:  Yes.

24        "QUESTION:  And Meta chose not to do that at all during

25        the class period; right?

1    **"ANSWER:** Meta did not disable Flo app from sending app

2    events during, you know, the class period."

3    Again, they intended to collect this. They wanted it and

4    they used it.

5    Then I asked him specifically (as read):

6    **"QUESTION:** Do you know if Meta had any systems in place

7    during the time period that we're talking about here,

8    November 1, 2016, through February 28, 2019, to prevent

9    specific information at issue from being used in their

10   advertising system?

11   **"ANSWER:** My understanding is they did not."

12   So what does that tell you? They did nothing. They knew

13   about it and continued to collect and profit from this

14   information.

15   Now, Stephen Satterfield tells you that they finally built

16   a filtering system that's sort of -- his answer (as read):

17       "We eventually built a filtering system that

18       sort of added to the policy by letting developers

19       know that they may have sent us something that could

20       have violated our policy -- and this is what I

21       love -- as an opportunity for additional education

22       for those developers."

23   I mean, come on.

24   Like think about this. Like you -- you know you're

25   getting this sensitive data. You can't even admit that the

1  e-mail, this toothless automated e-mail is calling out these

2  app developers.  All he can say is "It was an opportunity for

3  us to provide educational information to app developers."

4      I'll tell you what it is.  It's really just an excuse to

5  come into court and say, "Well we tried.  We did something," as

6  an excuse.

7      It's -- it's meaningless, but I think it speaks volumes to

8  the intent; right?

9      If you truly wanted to stop this, you would have done what

10 I asked in the previous question to Tobias Wooldridge.

11     "You could have shut down the app at any time; correct,

12 the Flo -- from having the Meta SDK?"

13     "Yeah, of course."

14     They didn't do that.

15     Now, let's talk about the fact that Meta did not have the

16 plaintiffs' consent.

17     And the judge told you what a reasonable person, the jury

18 instructions, what a reasonable person would have thought.

19 Well, we know definitively none of the plaintiffs consented.

20 They told you that.

21     They told you that -- they all answered:  I did not give

22 my permission.  Absolutely not.  No, I did not.

23     So we know their position.  And they all told you that.

24     We also know that they were never given an opportunity to

25 even answer the question on the app because there was no pop-up

1  alerting them that Meta and the Meta SDK was recording this

2  information.  (as read):

3    **"ANSWER:**  No, there would be no way to know that."

4    When Dr. Egelman was asked about pop-ups.

5    And we know that the women had an expectation that it

6  wasn't going to be sent, because in 2021, Sarah Wellman gets an

7  e-mail from Flo Health saying, "Hey, by the way, we sent an

8  identifying number related to you and information about your

9  period and pregnancy to companies, including Facebook," in

10  contravention to -- of what her understanding was of the

11  privacy protections that Flo had in place for her.

12    Now, let's talk about what Meta says.

13    They basically say -- and this is like the last stand;

14  right -- we've got this data policy, so if you sign up for

15  Facebook or Instagram, we essentially can collect any

16  information, anywhere, any time, from any source.  That is

17  absolutely crazy.

18    Listen to the judge's instruction on consent.  Does a

19  reasonable person think that they were consenting to what

20  happened here?

21    And let's talk about what was happening here.  I encourage

22  you to look at the data policy.  Find me in the data policy

23  where it says "We can collect information from fertility apps

24  that you enter," in contravention of the privacy policy that

25  they have in place.  Show me in that data policy where it says,

1    "We can collect your private health information that you have a

2    reasonable expectation of privacy to."

3         But more critically, show me in that data policy where it

4    says, "You give us permission to secretly record your private

5    communications with the Flo Health app about your private

6    reproductive health answers."

7         I'll give you the answer right now:  None.  You're not --

8    you're never going to find that in the data policy.

9         So what does that tell you?

10        These women never consented to that.  And Facebook cannot

11   point to their data policy and say, "Oh, we've got permission"

12   because nowhere in there does it say they can secretly record

13   their private answers through the Facebook SDK of these women.

14        Now, let me say thank you, by the way -- two weeks sitting

15   here.  We appreciate the time and attention on behalf of three

16   women in the California class and the millions of women who use

17   this app.  And let me just say that you eight are in the best

18   position to determine liability here.

19        You've heard the evidence.  And you have the most

20   important tool to determine liability here, and that's your

21   common sense and your everyday experiences.  You didn't check

22   them in when you came through security this morning, and I

23   asked you to bring them to the jury room with you today.

24        Ask yourselves what makes sense.  Use your common sense

25   and I'm confident that you will return a verdict that's

1   consistent with that, and more importantly, consistent with the

2   evidence.

3       Does it make sense when Facebook tells you they didn't use

4   the data, when all the evidence proves they did?

5       Does it make sense when they tell you, "We didn't record

6   this information," when all of the objective evidence in this

7   case demonstrates that they did?  Of course not.

8       Does it make sense when they tell you it was only "known"

9   or "unknown" that was collected, when the objective evidence

10  now has shown you that that's just not the case.

11      And let's not forget, Sarah Wellman testified that she

12  made the very private and personal decision to grow her family,

13  and it was the decision she made with her husband, and her

14  expectation that it wasn't going to be shared with anybody.

15      And I want you to look at this question that I asked

16  Tobias Wooldridge. (as read):

17      "QUESTION:  As you sit here today, do you consider, Tobias

18      Wooldridge, where a woman is in her menstrual cycle to be

19      private, intimate health data?

20      "ANSWER:  I think it depends on the person.  It is their

21      information, and they can make choices as to if and how

22      they share it."

23      I actually agree with Tobias Wooldrigde with respect to

24  this answer.  The only problem is his company stole that

25  information.  His company stole that opportunity from

1    Sarah Wellman to make a decision on who and how and in what

2    nature she was going to share that information.

3        A verdict for Meta here essentially sends a message that

4    they can collect this private health information without

5    consequence, and that's not consistent with the law.

6        So today you can send a message through the evidence, in

7    holding them accountable and telling them:  This is not

8    acceptable.  This is a violation of law.

9        I'm confident that if you deliberate and listen to one

10   another, hear each other out, and most importantly, review the

11   evidence, you will come to the undeniable conclusion that the

12   mountain of evidence here demonstrates that Meta violated the

13   California Invasion of Privacy Act.

14       I ask you to hold them accountable and find them liable.

15   Thank you.

16       **THE COURT:**  Okay.  You actually have 10 minutes left.

17   Defendant?

18                        **CLOSING ARGUMENT**

19       **MS. JOHNSON:**  Thank you, Your Honor, and good morning.

20       When I stood up here in opening statement, I previewed for

21   you that there would be one question as to Meta.  At that time

22   there were a lot of claims against Flo.  There's been a lot of

23   noise that doesn't help answer that one question, so I'd like

24   to return to the evidence just about the question of whether

25   Facebook intentionally eavesdropped upon or recorded

1    plaintiffs' confidential communications without consent.

2        We looked at the statute.  It requires intentional,

3    without consent, and eavesdrop upon and record as, you know, at

4    this point; and the keys to the case is that they did not

5    eavesdrop upon or record, did not do it intentionally, and had

6    consent for the data that Flo did send.

7        And Mr. Canty's presentation of the evidence mixed a lot

8    of things together that Flo did and Flo programmed, and

9    ascribed it -- tried to ascribe it to Facebook.  But I would

10   encourage you to look at the actual evidence and recall the

11   actual testimony about what Facebook did during this time

12   period.

13       So let's look at it.

14       The jury instructions that you just heard, they're all

15   important, of course, but Number 7 specifically says that

16   attorney argument is not evidence.  It's not what we say up

17   here, but it's the actual evidence that you've received in this

18   trial, and that is what I want to go through with you.

19       Let's start with the first key, did not eavesdrop upon or

20   record.

21       And I want to put this back up because in the beginning of

22   this case, it was about eavesdrop upon or record, eavesdrop is

23   nowhere to be seen.  Now it is record using an electronic

24   device.

25       So what is "recording"?

1    There's actually a jury instruction that you just heard,

2 Number 10, that talks about depositions.  And it says

3 depositions are recorded because the question and the answer is

4 recorded.

5    That's what a recording is.  It's with a device that

6 records it, "When did your last period start," it's recorded.

7 The question is recorded.

8    Answer:  June 3rd.  The answer is -- that's the

9 commonsense definition of a recording device.

10    Did the SDK operate this way?  Is that device the same as

11 a line of code that allows for the transmission of data?  Is

12 that how it works?

13    We know that can't be true.

14    Because those answers -- those questions and answers never

15 get sent, never get recorded by Meta.  They get recorded by

16 Flo, of course.  That's the -- that's the app that people are

17 interacting with.

18    But does Facebook get those questions and answers?

19    They would have to if it's a recording device.

20    Instead, the question is answered, "When did your last

21 period start?  June 3rd."  And then Flo creates this code that

22 they use the SDK lines of code that they have incorporated into

23 their app, one seamless app at this point, they send it like a

24 self addressed -- like an addressed -- preaddressed envelope to

25 Meta.  And what is received is not the question and not the

1    answer, but rather a different coded piece of information.

2        That is the commonsense definition of "record," and we

3    know that can't be true.

4        And it's also true for the rest of the custom app events.

5    Like, let's talk right away about value "get pregnant."

6        Was the SDK somehow recording that answer?  It's not

7    possible.  The code that Flo wrote -- and we'll look at the

8    logs; we'll look at Dr. Egelman's logs, and we'll look at

9    Dr. Zervas' logs -- it was Flo who chose R_CHOOSE_GOAL and Flo

10   who chose get pregnant.  They could have picked Event 1,

11   Event 3.  They could have picked colors.  They could have

12   picked anything.

13       And we'll see how much it matters to the Facebook systems,

14   whether it matters at all, what the answer was and what the

15   event that Flo coded.  We'll see if it matters in the

16   slightest.  So we can see from the evidence that it's not

17   recording.

18       We also heard that SDKs are commonplace and actually

19   positive.  Dr. Zervas testified that there are 300,000 Android

20   apps that use the Facebook SDK and there are about as many iOS

21   apps as well.  So all over the Internet, these apps are using

22   SDKs and, in fact, an average of 18 per app.  This is

23   commonplace.

24       And it is not just Facebook.  It's a number of other SDK

25   providers that are receiving this information.  Not in the app

1    recording, receiving this information.  It's commonplace.

2        And you heard testimony that it's exactly the same for

3    this Flo app, the Facebook SDK was used exactly the same as all

4    of these other apps on the Internet.  There wasn't anything

5    specific that Meta did or Facebook did to somehow treat it

6    differently, record the information.  It's just how the

7    Internet works.

8        It is how these companies like Facebook provide ads that

9    people want to see.  There's no secret about that.  There's no

10   secret about that.

11       It's the data that provides the ability to give people ads

12   they want to see, and it gives Facebook and others the ability

13   to interact with the apps to help them improve their apps

14   through analytics.  It's not a secret.  It's not hidden.  It's

15   out there and it's how all of these work, all of these SDKs.

16       Facebook puts out the SDK.  It's the same for developers.

17   And the developers take the SDK however they find useful.

18       Now, this should not be much in dispute.  It is clear as

19   day that Flo is the one who created the custom app events and

20   named them.  Even Dr. Egelman said, yes, Flo chose the text for

21   the event names and Flo created all the parameters.  That

22   should not be in dispute.

23       Dr. Zervas says the same thing.  Flo app developers

24   incorporated the SDK.  They use it.  They control it.  That is

25   the key.  They control it.  They control what gets transmitted.

1    It's like an envelope.  An envelope sits there and doesn't

2   do anything unless someone puts something in the envelope and

3   chooses to send it.  That's the SDK.  It can sit on the app and

4   do nothing, unless the app developer reaches out, creates

5   information, then puts it in and sends it.

6    Would Meta have any -- Mr. Wooldridge said, would Meta

7   have any control over whether the SDK is getting information

8   called R_CHOOSE_GOAL or anything else?  Does Meta have control

9   over that?

10    No.  All of that would be implemented by the app

11   developer.

12    And you just saw this from Mr. Canty, this e-mail that

13   went to Ms. Wellman from Flo.  And when Flo sends out this

14   information -- and plaintiffs wanted to use it in their case,

15   against Flo -- the company that makes the Flo period and

16   ovulation tracker app sent -- not that there was some sort of

17   recording, Flo chose to send the information to a number of

18   different SDK providers, not in any manner recording.

19    And so this is the key.  This is the key Dr. Egelman

20   testimony:  Did he show you the code that proves that it was a

21   recording device?

22    Ms. Villegas, in opening statements, says he's going to.

23   Dr. Egelman is going to show you the code that Meta wrote so

24   that we can see how the app worked and whether it was the SDK

25   that was a recording device.

1    But on cross-examination, looking through all of his

2    slides, all of Dr. Egelman's presentation, the question he

3    finally answered after many tries that Mr. Clubok had to do:

4    None of the code you displayed to the jury in your

5    demonstratives was actually code written by Meta.

6    That is correct.  We did not display any code that was

7    actually written by Meta.

8    And we're going to walk through it.  He displayed the code

9    that was written by Flo app.

10    That is the code that is operating on the questions and

11    answers that people entered into the app.  He admitted in his

12    whole presentation, he doesn't even talk about the Facebook

13    code.

14    Dr. Zervas, on the other hand, showed the code.  He showed

15    the actual excerpt from the Facebook SDK code, that's here on

16    the bottom with the instructions on the top.  He walked through

17    the code that showed how Flo programmed the event parameters,

18    the event names, and connected them to the app.

19    He walked through the number of steps that occurred and

20    then he talked about this orange box.  He said this, even this

21    is coded by the Flo app.  This is where the Flo app is coded to

22    reach out to the SDK for help in transmitting whatever it is

23    that Flo coded the communication, the second communication to

24    be sent.

25    Not the question, not the answer, but what Flo wanted

1  Facebook to analyze.  The entire code that was coded by Flo and

2  then the SDK was used to transmit it, if they chose to do it.

3      Now, what does Dr. Zervas say about whether that is a

4  recording device?

5      It can't record anything because it doesn't exist

6  independently as a separate entity on your phone.

7      The Flo app developers have to use the software

8  development kit to accomplish a task transmitting custom app

9  events that they've created from the phone to Facebook.

10      And as we saw from Mr. Canty's presentation, Dr. Egelman

11  admitted the code associated with the SDK had been used to

12  transmit the information that the app developer chooses to

13  send.  That's the purpose of the SDK.  Not to record -- itself

14  record anything.

15      And then Dr. Zervas explained that the app code is a

16  single cohesive set of instructions.  Now, Flo app --

17  programmed in Kotlin; we heard testimony about that.  Flo

18  produced that code in a fairly unhelpful PDF that couldn't be

19  used.

20      So what Dr. Egelman did, he went to the file on the

21  device -- this long, single, cohesive set of instructions --

22  and he decompiled the code in order to analyze it.  He

23  converted the files to Java.  That's why you had -- seen some

24  of the Kotlin and some of the Java; that's why that happened.

25  And then both experts analyzed the decompiled code to see what

1    the code did that was written by the Flo app and what the code

2    did that was written by the SDK.

3        And this is critical.  This is his testimony, and we'll

4    walk through it quickly.

5        This is the critical point about whether it was the SDK

6    doing the recording.  He says:  Did you examine the computer

7    code?  Can you explain what happened when the person pushes

8    "next" on the app?

9        He says "it."  He goes through all these steps that -- he

10   says:  What does the code do?

11       It takes input.  It passes that input.  It calls.  It has

12   two parameters.  It passes.  It wants to log.  It records how

13   the user answers the question.  It actually goes through

14   several different functions.  It calls.  It calls.  It calls.

15   It calls.

16       What is he talking about when he's giving this testimony?

17   Is he talking about the SDK?

18       He isn't.  He's talking about the app.  This is the Flo

19   code that does all of these things.  Of course Flo is doing all

20   these things.  It's interacting with its users.

21       This is what is doing the recording and going through

22   several functions.  And then, all of these functions at this

23   point, he acknowledges, are code written by Flo.

24       And then it -- the app -- actually invokes the

25   Facebook SDK, and that's the moment he says that it's invited

1    to start recording events.  And even he can't say recording the

2    communications, the -- recording the confidential

3    communications.  He's saying events, what Flo creates and

4    chooses to send, chooses to name, chooses to send.

5        And is that a recording?  Is that a recording of the

6    confidential communications?

7        In all your years -- we asked Dr. Zervas:  In all your

8    years have you ever heard of this as a recording device that

9    anyone in your field would claim that the Facebook SDK was

10   recording in the way you heard described in this court?

11       He said:  I've never heard anyone describe it other than

12   in this courtroom.

13       It's just not a recording device.

14       And the instructions that you heard is that you may accept

15   expert opinion testimony, you may reject it, or you may give it

16   as much weight as it deserves.  That's up to you to decide.

17       Did Dr. Egelman actually show you the entire code or did

18   he show you Flo, not the SDK?

19       Mr. Wooldridge was asked -- he's the uber tech lead that

20   code -- is in charge of coding the SDK -- straight up:  Does it

21   operate as a recording device?

22       And he says:  Absolutely not.

23       Now, let's talk about SESSION_CYCLE_DAY to see if this was

24   actually recording the information that was being shared.  This

25   is one of Dr. Egelman's slides, and we saw it in Mr. Canty's

1    presentation as well.

2        Ovulation in six days, a screen that the users saw.  Did

3    Facebook ever record -- did Facebook ever even receive that

4    information?

5        Now, this is from Dr. Egelman's slides that were

6    presented.  Mr. Canty put up a different slide and we can look

7    at them both, but what we can see from both of them is that the

8    "six" never gets sent.  We've got cycle day 16.  We've got

9    value 22.  This is, in fact, the slide he did put up.  Cycle

10   day 16, value 22, after fertility window.

11       Of course ovulation in six days, is not the same as the

12   day you are in your cycle.  This is the information that Flo

13   chose to calculate from the inputs that the users put into the

14   app.  Flo choose to calculate this.

15       You can see it's not the same.  If it were a recording

16   device it would be the same.  It is different information that

17   Flo chose to code.  Cycle day 16, cycle type, and all of the

18   words that Flo chose to put in that communication.

19       And then we saw, we saw, from Facebook's records that have

20   the record of what was sent to Facebook by Flo, we have all the

21   custom app events.  And we did a search, live, here with you.

22   We searched for "session, cycle day, first launch," and ended

23   up with nothing.

24       So even if Flo intended to send this information, it

25   wasn't received, showing that it couldn't have been a record,

1    it has to be the transmission of information.

2         And this is particularly important.  We've heard in

3    opening statement, Ms. Villegas -- opening statements are a

4    promise about the evidence.  And she said the code sat on the

5    app and it recorded women's private information about their

6    bodies.  A lot like spyware -- even though this is open source

7    SDK code that is completely transparent about what it does, but

8    like spyware listening in and recording the details of what a

9    woman puts in the app, this sensitive information about sex

10   drive, et cetera.

11        But we know from the evidence in this case that that

12   didn't happen.  There was no recording of that information.

13   Dr. Egelman finally, finally admitted:  Fair to say that Meta

14   is not recording the answers to any of these questions for the

15   version of the app that you have here?

16        He says:  That's correct.

17        It makes no sense for an SDK, if it is recording, to turn

18   on and off when Meta has no control whatsoever in what gets

19   created and sent.  It makes no sense.  It's the app developer

20   deciding.  It is not the SDK recording.  We can see it from

21   these answers.

22        The truth is that they were never sent to Facebook.

23        So what about the pregnancy questions?

24        Dr. Egelman admitted that there were -- no questions about

25   pregnancy week would be asked if someone wasn't pregnant when

1    they onboarded the app.

2         Remember, these custom app events were only sent one time,

3    at the very beginning, when the people answered the first

4    launch questions.  Not throughout the time they used the app,

5    just the one time.  And we know that for these plaintiffs,

6    these three plaintiffs, they weren't pregnant at the time they

7    answered those questions.

8         Ms. Chen used the app to track her menstrual cycle.

9    Ms. Gamino used it to track her menstrual cycle as well.  And

10   Ms. Wellman used it to track her cycle and figure out the best

11   way -- day to get pregnant.  Her testimony was inconsistent on

12   this point, but this is what she says she used it for.  The

13   point is, she wasn't pregnant at the time, so we know that none

14   of those pregnancy questions or answers could have been sent

15   for these three plaintiffs.

16        And so what was sent for each of the 12 custom app events?

17        R_SELECT_PERIOD_DATE, we know that it was "known" or

18   "unknown," not the answer.  R_SELECT_LAST_PERIOD_LENGTH, same

19   thing.  R_SELECT_CYCLE, same thing.

20        For AGE_CHOSEN_PERIODS, the current year minus the birth

21   year.  For the pregnancy events, we know that none of them were

22   sent for these particular plaintiffs.

23        And that brings us to SESSION_CYCLE_DAY_FIRST_LAUNCH.

24   This calculation -- not the questions, not the answers, but a

25   calculation that the Flo app programmed an order to send to

1   Facebook, and R_CHOOSE_GOAL, "track cycle" or "get pregnant."

2       We do know that SESSION_CYCLE_DAY, there's no evidence

3   that it was ever received, which, of course, it's after the

4   fact, of course, all this data is gone, of course, it's way

5   late beyond the class period.  But the point is, the fact that

6   it's not in the records demonstrates that it couldn't have been

7   a recording.

8       So let's talk about "track cycle" and "get pregnant" for a

9   minute.

10      We had Chris Karkanias, Flo's expert, testify to the

11  illusion of accuracy.  As to the words "get pregnant," without

12  the benefit of Flo's internal documentation, or all the things

13  that we've produced in litigation, it might mean somebody

14  looking at a tutorial about pregnancy.  Now that we have the

15  benefit of hindsight, we have the illusion of accuracy.

16      But you heard even Dr. Golbeck testify that you haven't

17  seen any evidence suggesting that Flo shared it with a key

18  outside of this litigation.  So at the time, Facebook doesn't

19  have a key to what all these custom app events mean.

20      So there's no evidence that SESSION_CYCLE_DAY was

21  received, but the overwhelming evidence is that Flo defined and

22  chose to send this information, not that it was recorded.

23      All right.  Let's talk about "intentionally."

24      The argument that you just heard about "intentionally" was

25  that Facebook has a business model to collect data, so of

1    course it wants to collect data.

2        What you didn't hear is that there was some sort of an

3    intent to collect sensitive health information, confidential

4    information.  You didn't hear any evidence throughout this

5    trial that actually that's the information that Facebook wants

6    to put into its machine learning.

7        Data, that's the business model.  Collect data, use it to

8    show people interesting ads and help apps -- benefit their

9    apps, improve their apps.

10        That is the evidence.  Did you hear one thing to suggest

11    that Facebook wanted someone's confidential information or

12    their health information?

13        Not at all, and there's a mountain of evidence to the

14    contrary.  This is the slide that Ms. Villegas put up in

15    opening that left out of the word "intentionally."  I was

16    pleased to see, in the closing, they added the word

17    "intentionally," but it's a really important component of that

18    question.

19        Intentionally eavesdrop upon or record.  Not intentionally

20    have a business model that uses data, but intentionally

21    eavesdrop upon or record the confidential communication.

22        You've seen these policies.  We don't have to belabor it.

23    But at the beginning of the class period, there was a contract

24    that the app developers had to enter into with Facebook.  Not a

25    request, not a suggestion, and not a policy, but a binding

1    contract that says:  Facebook will provide this SDK that you

2    can use.  By clicking "accept" you agree you will not share

3    information that includes health.

4        We've seen these policies before.  But this is a binding

5    contract between the app developers and Facebook.

6        The same terms of conversion at that time say:  You will

7    provide prominent notice and obtain consent from your users

8    about this sharing.  Facebook may collect or receive

9    information from the app.  You have to clearly explain that to

10   your users.  We will use this information to provide

11   measurement services and targeted ads.

12       This is evidence that Facebook doesn't want confidential

13   communications without users knowing about it.  It's the

14   opposite of intent to receive confidential communications.  And

15   Flo agreed to that as well.

16       Mr. Satterfield testified about providing notice, getting

17   adequate consent, wanting the developer to provide notice about

18   where they can opt out if they didn't want their information

19   shared.

20       The 2018 policy says the same.  They're now called

21   business tool terms.

22       "Do not send us health information.  Do not send us other

23   categories of sensitive information."

24       Flo agreed to that.  And the business tool terms at the

25   end of the class period had that same language.

1    We want you -- you have contracted that you have a lawful

2  basis to collect this information.  If you use our SDKs, give

3  them proper notice, give them an opportunity to opt out.  Get

4  their consent.  Don't send us any information that could be

5  confidential.

6    Flo agreed to that as well.

7    Now, did Flo do so?  Whatever you feel -- whatever you

8  believe about the Flo policies, Ms. Wellman -- who was the

9  contract enthusiast, who worked on privacy policies for a

10 living -- she said:  If I read this policy I would have known.

11   "You would have known that Flo was using Facebook

12 Analytics; right?"

13   She says:  Yes.

14   She says:  Yes.

15   So plaintiff's story is, even though all of those

16 contracts were entered into between the app developers and

17 Facebook, actually Meta wants this information anyway, this

18 confidential health information anyway, because it took the Flo

19 data in its systems and it used it for advertising to make

20 money.  That's their theory.  It doesn't matter what they

21 agreed to, they used this information.

22   But what is the truth?  What did the evidence show?

23   The at-issue custom app events, those 12, were never used

24 for ad targeting.  The at-issue custom app event parameters

25 were not used in Facebook's machine learning.  They were not

1    used.

2        And there's no evidence that the at-issue custom app

3    events had any value at all.  Evidence on both sides shows --

4    not data in general, but these custom app events from these --

5    from this app about these plaintiffs, no value, not used, not

6    used.

7        Mr. Wooldridge explained.  Were all the event parameters

8    that Flo sent made available to ads the machine learning?

9        Some of them were.  The standard app events parameters

10   were.

11       But were the custom app events parameters sent?

12       He said:  Event parameters that were sent alongside custom

13   events were not.

14       And that makes sense.  The machine learning is not

15   reviewing information for its meaning.  The machine is looking

16   for patterns, and so the custom parameters for the custom app

17   events would not have any value, so it makes sense that they

18   were not used.

19       In fact, Dr. Golbeck agrees.  There's not any value to

20   this information.  It's possible that the machine learning

21   systems gave the Flo app data a weight of 0.  She says that's

22   fair.  There's just no evidence that this information was at

23   all valuable such that Facebook would have wanted app

24   developers to violate their contracts with Facebook.

25       And this is particularly important.  This is the heart of

1    what could possibly be the motive to -- to get this sensitive

2    information.  It's just not there.

3         Dr. Golbeck says a dataset containing a term like "sex" is

4    no more useful to a machine learning system than an arbitrary

5    set of numbers and letters.

6         She says that's fair.

7         So the same can be said about "pregnancy," about "period,"

8    about "cycle," about "ovulation."  The words that were sent

9    with these custom names, the machine doesn't care.  It's not

10   reading to understand the meaning.  The same value would exist

11   if the -- instead of "period length" it says "Event 1, 2, 3,"

12   "Event Blue."  The machine value is not in the content of those

13   words.

14        Mr. Wooldridge says the same thing.  The developer chooses

15   to call the events 1, 2, 3, 4, or these particular custom app

16   events.  The ads delivery system doesn't try to interpret.  It

17   doesn't care what the event names are.

18        That's why the motive argument makes absolutely no sense.

19   Even if they were used that we know -- we now know the

20   parameters were not, but the event names in the machine

21   learning system, even if they were used, there was zero value

22   to having them be named as they were named in this case.

23        Now, Dr. Egelman said:  Well, Meta probably has teams of

24   analysts and engineers with the skill set to try to understand

25   the data.  All I had to do was download the app and

1    reverse-engineer them.  I'm sure Facebook would be able to do

2    the same thing, so they probably did understand the meaning of

3    this data.

4         That is his speculation without a shred of evidence.  And

5    we know from the other witnesses that that's not true.

6         Mr. Wooldridge responds:  No, we don't employ people like

7    that.

8         Remember the number of apps that exist?  The hundreds of

9    thousands or millions of apps that exist?

10        No, we don't do that.

11        And even Dr. Golbeck says -- do you believe that someone

12   is out there at Facebook trying to analyze these billions of

13   points of data?

14        She says:  I don't believe there's a team of humans doing

15   that.

16        And there just isn't.  There's just no evidence that that

17   is what anyone at Facebook was trying to do, or did with this

18   app.

19        So not machines and not humans.

20        Mr. Wooldridge testified -- Would a machine ever learn who

21   of Flo Health's users were pregnant?

22        We have neither machines nor people attempting to

23   interpret what this information meant.

24        How about fertility windows?  Same.

25        Dates of periods?  Same.

1    Goals?  Same.

2    There was no motivation to get this information if it's

3    not being termed or used or read or known by the machine or by

4    humans at Facebook.

5    So then plaintiffs' story is:  Well, they should have done

6    more earlier.  They knew that this was a possibility.  They

7    were looking at risks.  They were evaluating the risks that

8    this could be sent in- -- intentionally or inadvertently, and

9    they did nothing.

10    Mr. Wooldridge testified about Facebook's continual

11    efforts to improve the protections against receiving this data;

12    not just relying on the contracts, the business tool terms, but

13    the efforts taken to protect against receiving this data.  It

14    started, of course, with the contracts that were in existence

15    since the beginning of the SDK.

16    But Mr. Wooldridge also testified way back in 2007,

17    technical controls for health advertisers, for these health

18    advertisers on the web that might be sending sensitive

19    information way back in 2017:  We don't want health

20    information.  We're going to put in technology to do that.

21    And once it was available for the SDK as well, Facebook

22    did it there.  Late 2017, signals integrity team planning.

23    Let's get a team in place to stop anyone from being able to

24    send this information.

25    Then early 2018, the team is established.  Mid-April 2018,

1  the first filter is put into place, this passwords filter.

2  Then they started working on a PII filter.

3      And you saw this document both in the opening and in the

4  closing to say, this is the effort to try to identify risks so

5  that they can be worked on and prevented.  This was the

6  document.  You know what people can send us.  Passwords,

7  they've already addressed that.  PII, Social Security number,

8  they're working on that, and health information in custom data

9  fields.

10     Plaintiffs are using this as evidence of bad faith or

11  knowing that this could happen and doing nothing about it.  And

12  both times, in the opening and closing, they left off the rest

13  of the sentence in this document.

14     And what does it say?  Systematically detect ML-based --

15  machine learning-based -- and remove sensitive information.

16     This is a work stream that was already in place to try to

17  stop this information.  Not the identification of a risk and

18  doing nothing, but rather that identification of risk and a

19  work plan to address it.  So that was underway in 2018.

20     Then prohibited sources filter blocking hate speech, the

21  PII filter was rolled out.  And Facebook was sending messages

22  to its app saying:  We have seen that something triggered the

23  PII filter.  You should check.  You should check to see if your

24  data is violating the terms.

25     So the question is:  Why didn't Facebook just do it?  Why

1   didn't Facebook check the data to see if the app developers

2   were violating the terms?

3       Because the filter incinerates the data.  The filter works

4   properly.  It gets rid of the data.  So Facebook doesn't want

5   to have it.  So that's why the notice says to the app

6   developers, please check whether this data is violating our

7   terms.

8       And this was -- never been done before.  This -- no other

9   company had put in these types of filters.  This was Meta being

10  ahead of the game.  Facebook being ahead of the game in

11  blocking.  All the other SDK providers didn't do this.  They

12  put in these filters ahead of time, ahead of the industry.

13      Then there was a -- then there was a documentation feature

14  that prevented sending device IDs.  We know that the app

15  developers can send device IDs.  They have consented to do so.

16  But what was -- what were they able to do?

17      Beyond the fact that the SDK is an open source and

18  developers would be able to change the code -- meaning, the app

19  developers can always block the sending of device IDs with the

20  data that they send -- in the end of 2018, Facebook documented

21  a feature -- meaning provided explanation for how this feature

22  works -- to prevent the SDK from connecting the device ID to

23  the events it was transmitting.

24      This was ahead of the curve with a function and feature in

25  the SDK that would allow the app developer to easily send data

1  without device IDs, allowing the app developers to make that

2  choice.  They always had the choice, but to more easily make

3  the choice to not send device IDs.

4      Then for -- work begins on the health filter.  This is

5  when the Wall Street Journal article comes out, February 2019.

6  The plan was already underway.  The Wall Street Journal comes

7  out.  They start work on the health filter.  And what does

8  Mr. Wooldridge say?  Meta took steps to understand the problem,

9  took steps to implement a filter so they wouldn't get this

10  data.

11      And are you done?

12      No.  We're never done.  We have continued to invest in

13  this.

14      Next, the health filter is rolled out.  It categorizes

15  apps.  You heard about this as health -- and blocked 70,000

16  potential health-related terms.  And then machine learning is

17  added, that these efforts continue to now.  It's the opposite

18  of intent to receive this kind of information, this kind of

19  sensitive information and health data, instead of continual

20  efforts to block it.

21      Now, were these solution easy?

22      No.  We had to build them at scale.  We're getting

23  millions of events.  We want to do this right.  The effort goes

24  in to apply our filtration to every single parameter of every

25  single event coming into our systems.

1    And he was asked:  Did you ever slow those efforts?  Was

2  there some reason that Facebook wanted to get sensitive health

3  data despite the contractual agreements?

4    He says:  We literally said "Don't send us this

5  information."  But at no point have we ever slowed down.  We

6  don't want this data.

7    Now, your jury instruction on intentionally will say --

8  and you saw this from Mr. Canty's presentation:  A recording is

9  intentional if the person using the recording equipment does so

10  with the purpose or desire of recording.

11    The person using the recording equipment.  It doesn't even

12  make sense in this context.  But -- but focusing on

13  "intentional," did Facebook do this with the purpose or desire

14  of recording of confidential information?

15    No, we never wanted businesses to share data with us even

16  if we assume somehow that the SDK was recording.

17    And the second half of the jury instruction:  Did you use

18  the recording equipment with the knowledge to a substantial

19  certainty that the equipment will result in the recordation of

20  a confidential conversation?

21    We heard that prior to the Wall Street Journal article,

22  Meta had never heard of a specific developer actually sending

23  sensitive information.  Is that a substantial certainty,

24  especially in the context of all the efforts being made to

25  block information that Facebook didn't want?

1      All right.  And onto consent.  You've seen these policies

2  as well, so I won't belabor it.  But the policies are broad.

3      Plaintiffs' counsel is saying you should have asked for

4  consent about a specific app or a specific type of information.

5  The policies are broad.  They're enforceable and they're clear.

6      Terms of service for using the Facebook app:  We must

7  collect and use your personal data, and here's how we'll tell

8  you that we do it.  When you sign up for a Facebook account,

9  you see the privacy policies.

10      Mr. Satterfield explained you need to agree to those

11  things.  And we know that all of our plaintiffs here had a

12  Facebook account.

13      What does the data policy say?  It's very specific about

14  the app developers are able to send us information, they use

15  the SDKs, we have information about your activities off of

16  Facebook, information about your device, those device

17  identifiers, and how you use their services.

18      It goes on to say we use the information we have to

19  understand the types of people who use their services, and it

20  specifically says device IDs.  That is the consent language

21  that each of these plaintiffs agreed to.

22      Dr. Egelman himself admitted that Facebook has a publicly

23  available page displaying how device IDs are used and

24  collected.  It's not a secret.  It is out there in the public

25  the way this technology works.

1       All three of the plaintiffs did agree to those policies.

2   So why is Meta here?  How did we get here?

3       Is this a harm case?  Is this these plaintiffs were harmed

4   and brought this case?

5       This lawsuit was manufactured by attorneys.  It was

6   launched, it was started by the attorneys.  Each of our

7   plaintiffs testified that they received an incoming e-mail from

8   a law firm.  Incoming from Ronald Marron.

9       Ms. Wellman:  A friend of mine who is an attorney made a

10  Facebook post -- ironically -- about this lawsuit.

11      And Ms. Frasco, who was the first plaintiff to have filed

12  this litigation, she's because -- it was because she was

13  friends with counsel here in this courtroom.

14      And why did they do so?  For fees.  For judgment.

15      Were these plaintiffs harmed or was this attorney-driven?

16      Let's look at what the plaintiffs testified to.

17      Ms. Gamino says:  You believe that Flo shared all of that

18  data that you put into the app?

19      She was told the story that all of her data, all this

20  sensitive stuff was shared, was put out there, was put out into

21  the universe.  She was told that story.  Of course that would

22  be a violation.  Of course that would be embarrassing.  But

23  that's not what happened here.  That's not what the evidence

24  shows.

25      The evidence shows that Facebook never recorded the

1    information.  It never intentionally received sensitive

2    information.  It never shared the information more broadly.

3         And plaintiffs continued to use the app.  They were told

4    this story but they continued to use the app.

5         What they were told just didn't happen.

6         And so this is the verdict form that you'll be asked to

7    fill out.  It has -- the very first question is whether

8    plaintiffs proved that Meta intentionally eavesdropped upon or

9    recorded.  That is the first two keys of the case that we

10   talked about:  Intentionally and eavesdrop upon or record.

11        We ask from all the evidence that you'll answer that

12   question no; and if you do, you can stop there and answer no

13   further questions.

14        The other two questions, if you get there, are:  Did

15   plaintiffs prove that they had a reasonable expectation that

16   their conversations were not being overheard and recorded, not

17   because of the lack of reasonable expectation in the data

18   generally, not because that -- this type of information would

19   not be reasonably expected to be private, but instead because

20   they had those policies that they agreed to that said -- the

21   Flo policy said "We will share stuff with Facebook"; the

22   Facebook policy says "We will get things from the app."

23        Not as to the world, but as to Facebook.  There was no

24   reasonable -- a reasonable person would have understood from

25   this -- these languages that they do not have a reasonable

1    expectation as to Facebook.

2        And did Meta have consent of all parties?

3        Yes, and that would be the end.

4        So as to the one question, the evidence is crystal clear,

5    not the bluster and the argument of counsel, but the actual

6    evidence that we've seen, the answer is, no.

7        And I don't have another opportunity to come talk to you;

8    Mr. Canty has his rebuttal and the ability to come up and have

9    the last word.  And I would ask you to focus on the evidence.

10   Is there going to be testimony or exhibits, evidence in this

11   trial that this could have operated as a recording device like

12   a deposition being recorded, a recording device, could it

13   possibly have operated that way?  Is there evidence?

14       Is there evidence that Facebook intentionally used an --

15   used an electronic device to record these confidential

16   communications?  Did they even want it?  Was it even valuable?

17   Did they even use it?

18       And we'd ask you to return a verdict for Facebook.

19       Thank you all.  I echo what Mr. Canty said to thank you

20   for your attention and time to this really, really important

21   matter.

22       Thank you.

23       **THE COURT:**  All right.  Plaintiffs you have 10 minutes

24   left for your rebuttal.

25       **MR. CANTY:**  Thank you, Your Honor.

## REBUTTAL CLOSING ARGUMENT

1

2      **MR. CANTY:** So the question was just asked: Is there

3 evidence?

4      And the answer is: Yes.

5      If we can pull up the Serge Egelman slides.

6      Serge Egelman, Dr. Egelman, showed you where the Facebook

7 SDK is recording that information.

8      That's evidence.

9      Now, defense counsel has told you: Well, the parameters

10 were set up by Flo, so it's really Flo's language.

11      And I really want to take that -- that comment to its

12 absurd end. You go to the doctor's office and we've all seen

13 these forms, and it asks: Do you have heart disease? Do you

14 have high blood pressure? Have you ever had surgery?

15      And that form is preprinted by a company. And somebody is

16 sitting over your shoulder recording you, and they go: Oh, no,

17 no, no. I'm not recording your answers. I'm recording

18 navigational data on when you put a check mark next to those

19 things.

20      Because you didn't actually write "heart disease." The

21 company that made the form wrote "heart disease," so that's not

22 really your words. That's essentially what the defendants are

23 telling you here. And that's crazy. That's absurd.

24      The parameters were set up by Flo. Nobody is disputing

25 that. But they only get triggered and a woman answers the

1    question.  And at that point, they become her words.  Her

2    answers.

3        And that is what the Facebook SDK is recording.  And

4    Dr. Egelman walked you through it.  This is the Facebook SDK.

5        I showed you the evidence.  You were told it wasn't there.

6    It's all Flo.  It's all Flo's language.  Dr. Egelman walked you

7    through with hard evidence and showed you exactly where the

8    Facebook SDK records that answer.

9        That's the woman's answer.  Now, it's encoded language,

10   but like checking a box on that prefab form, it's no less the

11   communication that you made.

12       So, the healthy dose of common sense, right, we talked

13   about that before.  Bring your real world experiences in and

14   really critically analyze those hypertechnical arguments

15   because they just don't hold up to the scrutiny of the

16   evidence.

17       We also heard that:  Oh, SESSION_CYCLE_DAY was not

18   independently identified on that spreadsheet.  Despite the fact

19   that R_CHOOSE_GOAL was identified 34 million times, what we

20   know Mr. Wooldridge testified that the data they put up there

21   was what was left after the class period, and that information

22   had been deleted.  So that is really of no moment.

23       Intent.  We can go through the intent slides again, but I

24   guess the argument is the machine learning system doesn't

25   distinguish between "pregnant" or Xs and Os, and it may have

1   been valued at 0, but the reality is that, in order for it to

2   be valued at 0 -- which is not what Dr. Golbeck said.  She

3   said:  Could they have given it a weighted value of 0?

4        And she said:  Sure.  They could have.

5        She doesn't know -- right? -- because nobody knows how it

6   gets weighted.  They still have to collect it.  It still has

7   value to them.  Because a weighted value of 0 would be

8   interpreted by the machine learning system and that will help

9   improve ads.

10       And now we hear, and we heard for the first time the other

11  day, Tobias Wooldridge tell you:  Oh, parameters were never

12  sent.

13       Okay.  Completely contradicted by the testimony of

14  Dr. Egelman, and contradicted by the sworn interrogatories that

15  Facebook submitted in this case.

16       I'd submit to you, it's not credible.  You heard me ask

17  him:  The first time you ever testified that parameters weren't

18  sent was here?

19       And he said:  Yes.

20       I submit to you that's just not credible evidence, because

21  it's inconsistent not only with Dr. Egelman's testing, but also

22  his own company's interrogatories -- that he signed

23  incidentally -- so he's not to be believed on that.

24       This was not -- this was not lawyer-driven.  I want to

25  comment on that quickly.  It's an insult to the women that got

1    up here and testified about this private health data.

2        They're not -- they're not computer scientists.  Yes, they

3    relied on lawyers and experts to run the tests to figure out

4    what was going on under the rock, to figure out the inner

5    workings of how the Facebook SDK was collecting their

6    information.  And, yes, they had to rely on lawyers and they

7    had to rely on experts to figure that out.  But they testified

8    under oath on how that affected them.  So this is not

9    lawyer-driven, just to be clear.

10       And defense counsel also brought up the slide that we had

11   before the signals slide where they -- where I put it before

12   you and I showed you that this was relevant because it showed

13   that they knew during the class period this was happening.

14       And we were told:  Well, there's more to it.

15       Well, let's take a look if there is more to it.

16       If you look -- scope systematically detect ML base, and

17   remove sensitive information from pixel -- not from SDK, by the

18   way -- app and offline custom data, and alert advertisers based

19   on severity.

20       Look at the last line, "Measure impact of dropping custom

21   data."  I did forget to point that out and I should have.

22       That's the risk analysis.  They know it's valuable.  They

23   know they're going to take a PR hit.  We got to measure the

24   impact of dropping this custom data because we know it's

25   valuable.  We know we shouldn't be collecting it, and we're

1   intending to do it, so we've got to do a risk analysis here to

2   figure out how it's going to affect our bottom line.

3       Nobody is here saying:  Cut the SDK access to help the

4   apps.

5       I asked that question.  They have the capability of doing

6   it.

7       Nobody said:  Stop.  This is sensitive health data.  We

8   shouldn't be collecting.

9       It's:  Let's start on pixel.  But then we've got to

10  measure the impact of dropping custom data.

11      They didn't care about this -- these women and their

12  sensitive health data.  They wanted to ultimately figure out,

13  when they finally got called out in 2019 by the press, what

14  impact it would have if they had to cut it.  Because it's all

15  about ad data.  It's all about revenue it's all about profit.

16      Now, can we pull up the verdict sheet, please?

17      Question 1:  Did plaintiffs prove by a preponderance of

18  the evidence and in accordance with the instructions given you

19  that Meta intentionally eavesdropped on or recorded their

20  conversation using on electronic device?

21      Yes.

22      How do we know that?

23      Evidence.  Dr. Egelman just pointed it out to you, how the

24  SDK recorded the conversation by using that electronic device.

25      So the answer to Question 1:  Yes.

1    Let's go to Question 2.

2    Did plaintiffs prove by a preponderance of the evidence

3 and in accordance with the instructions given to you that they

4 had a reasonable expectation that their conversation was not

5 being overheard and/or recorded?

6    You heard the testimony of the women.  What is a

7 reasonable expectation of somebody using that app, with all the

8 protections that Flo said they had put in place, with the

9 understanding that this is sensitive health data, that they had

10 a reasonable expectation that it was not going to be overheard?

11    The answer to that question, unquestionably:  Yes.

12    And the third question:  Did Meta have the consent of all

13 parties to the conversation to eavesdrop on or record it?

14    Defense counsel got up here and said:  Well, it's the

15 reasonable person that signed up for Facebook, and they -- with

16 the data policy that they know that this is going to be

17 collected and we're using this information.

18    That's absurd.  Nobody that signed up for the Flo app,

19 that put in this information, that were promised that this

20 information wasn't going to be shared with anybody, gave

21 consent to Meta to allow them to secretly record, through their

22 SDK, these private communications.

23    So we know the answer to that question:  No.

24    So it's:  Yes, yes, and no.

25    We've come full circle.  We told you what this case was

1   about in the beginning, about private sensitive health data

2   being recorded by the Meta SDK.  We put evidence before you

3   that demonstrates that Meta collected, benefitted from, and

4   used it.  The evidence is overwhelming that during the class

5   period they intended to collect it, they profited from it, and

6   they used it.

7        All the excuses end now.  They end today.

8        Because, if you look at the evidence and you apply it to

9   the law as the judge has instructed you -- as I said in the

10  beginning of my closing statement:  This is not a close call.

11       I ask you to do your duty.  Hold Meta accountable for

12  their conduct.  Tell them that privacy matters.  Tell them

13  they're not going to get away with secretly recording these

14  communications.  And find them liable for violating the

15  California Invasion of Privacy Act.

16       Thank you.

17          **THE COURT:**  Okay.  That is the end of the courtroom

18  proceedings.  You're going to go back and begin the

19  deliberations.

20          **THE COURTROOM DEPUTY:**  All rise.

21   (At 11:13 a.m., the jury retired to commence deliberations.)

22              (The jury leaves the courtroom.)

23    (Proceedings were heard out of the presence of the jury.)

24          **THE COURTROOM DEPUTY:**  You may be seated.

25       Court is in recess.

**VERDICT**

1    (Recess taken at 11:13 a.m.)

2    (Proceedings resumed at 2:34 p.m.)

3    <u>**VERDICT**</u>

4    (Proceedings were heard out of the presence of the jury.)

5    **THE COURTROOM DEPUTY:**  All rise.  This Court is now in

6    session.  The Honorable James Donato presiding.

7    **THE COURT:**  Okay.  You have a verdict.  Let's bring in

8    the jury.

9    (The jury enters the courtroom.)

10    (Proceedings were heard in the presence of the jury.)

11    **THE COURTROOM DEPUTY:**  Please be seated.

12    We're back on the record in Civil 21-757, Frasco versus

13    Flo Health.

14    **THE COURT:**  Why don't we make some appearances so we

15    can take the verdict.

16    **MR. CANTY:**  On behalf of the plaintiffs, Michael Canty

17    from Labaton Keller Sucharow.  Good afternoon, Your Honor.

18    **MS. VILLEGAS:**  Good afternoon.  Carol Villegas on

19    behalf of the plaintiffs.

20    **MR. LEVIS:**  Good afternoon.  Christian Levis from

21    Lowey Dannenberg for the plaintiffs.

22    **MS. ZINSER:**  Good afternoon.  Diana Zinser from

23    Spector Roseman & Kodroff for plaintiffs.

24    **MS. MEDINA:**  Good afternoon.  Gloria Medina from

25    Labaton Keller Sucharow for the plaintiffs.

1    **MS. JOHNSON:**  Good afternoon, Your Honor.  Michele

2  Johnson, Latham & Watkins, for Meta.

3    **MR. CLUBOK:**  Good afternoon, Your Honor.  Andrew

4  Clubok also Latham & Watkins for Meta.

5    **MS. BLUNSCHI:**  Good afternoon, Your Honor.  Melanie

6  Blunschi from Latham for Meta.

7    **MS. McCLOSKEY:**  Good afternoon, Your Honor.  Elizabeth

8  McCloskey of Gibson Dunn on behalf of Meta.

9    **THE COURT:**  Okay.  Members of jury, I understand

10  you've reached a unanimous versus; is that right?

11    **ALL:**  That's right.

12    **THE COURT:**  Okay.  Would you hand that to Ms. Clark,

13  please.

14                    (Pause in proceedings.)

15    **THE COURT:**  All right.  The jury finds unanimously as

16  follows:

17    Question 1:  Did plaintiffs prove by a preponderance of

18  the evidence and in accordance with the instructions given to

19  you that Meta intentionally eavesdropped on and/or recorded

20  their conversation by using an electronic device?

21    Answer:  Yes.

22    Question 2:  Did plaintiffs prove by a preponderance of

23  the evidence and in accordance with the instructions given to

24  you that they had reasonable expectation that the conversation

25  was not being overheard and/or recorded?

1    Answer:  Yes.

2    Question 3:  Did Meta have the consent of all parties to

3  the conversation to eavesdrop on and/or record it?

4    Answer:  No.

5    Okay.  Would anybody like to poll the jury?

6    **MR. CLUBOK:**  Yes, Your Honor.  We would like to poll

7  the jury.

8    **THE COURT:**  Okay.  This is a traditional thing we have

9  where Ms. Clark is going to ask each of you individually

10  whether this is, in fact, your verdict.  Okay?

11    **THE COURTROOM DEPUTY:**  Ms. Mendoza-Jung, is the

12  verdict read your verdict?

13    **JUROR MENDOZA-JUNG:**  Yes.

14    **THE COURTROOM DEPUTY:**  Ms. Alsterlind, is the verdict

15  read your verdict?

16    **JUROR ALSTERLIND:**  Yes.

17    **THE COURTROOM DEPUTY:**  Ms. Barnes, is the verdict read

18  your verdict?

19    **JUROR BARNES:**  Yes.

20    **THE COURTROOM DEPUTY:**  Mr. Sainz, is the verdict read

21  your verdict?

22    **JUROR SAINZ:**  Correct.

23    **THE COURTROOM DEPUTY:**  Ms. Murakami, is the verdict

24  read your verdict?

25    **JUROR MURAKAMI:**  Yes.

1           **THE COURTROOM DEPUTY:**  Ms. Petrie, is the verdict read

2  your verdict?

3           **JUROR PETRIE:**  Yes.

4           **THE COURTROOM DEPUTY:**  Mr. Horng, is the verdict read

5  your verdict?

6           **JUROR HORNG:**  Yes.

7           **THE COURTROOM DEPUTY:**  Mr. Wohl, is the verdict read

8  your verdict?

9           **JUROR WOHL:**  Yes.

10           **THE COURTROOM DEPUTY:**  The verdict is unanimous, Your

11  Honor.

12           **THE COURT:**  All right, ladies and gentlemen.  On

13  behalf of myself and all of my colleagues on the bench here in

14  the Northern District, and on behalf of the parties, thank you

15  very much for your service.  I can't tell you how grateful we

16  all are that you have literally dropped everything on that

17  Monday when you came in and taken on the task of helping these

18  parties resolve their dispute.

19      So you're now discharged.  I'm going to let Ms. Clark walk

20  out with you.  I'm going to come back and see you in just a

21  moment to help ease your transition back to real life, outside

22  of the courthouse.

23      And everyone else here, please stay until I get back.

24  Okay?

25           **THE COURTROOM DEPUTY:**  All rise.

1    (The jury leaves the courtroom.)

2    (Proceedings were heard out of the presence of the jury.)

3    (Recess taken at 2:40 p.m.)

4    (Proceedings resumed at 2:40 p.m.)

5    **THE COURTROOM DEPUTY:**  All rise.

6    (The jury enters the courtroom.)

7    (Proceedings were heard in the presence of the jury.)

8    **THE COURTROOM DEPUTY:**  Please be seated.

9    Okay.  I forgot this part, paragraph 2 of my customary

10   departure message.  And it's this:

11   Your jury service is now over.  You do not owe the time of

12   day to anyone.  So you are not obligated to answer any

13   questions about your jury service from anyone -- party, press,

14   anyone else.  Okay?

15   You say no if that's what you want to do.  And if you have

16   any problems, if you feel pressured in any way, hounded, put

17   upon, you call me; I will put an immediate stop to it.

18   All right?  So you don't have to do this anymore.

19   Now, if you do want to talk with friends, family,

20   co-workers, it's perfectly fine to talk about your experience

21   in the courtroom, but that's it.  That room, where you did your

22   deliberations, is a sacred space.  That is for you and you

23   only.  So you may not, under any circumstances, between now and

24   the end of time, share with anyone what anybody said during

25   your deliberations, what you thought during your deliberations,

1    any you know assessments of who -- who's where on what kind of

2    a question.  Nothing that happened in that room can be shared.

3    All right?

4         So if you want to talk with anybody about the trial you

5    can say things like, you know, it was interesting how the

6    screens worked in the jury box; I thought the seats were

7    comfortable.  You know, here are some of the ways the

8    evidence -- I saw a document and I had trouble reading it.

9    Things like that, all right?  But nothing more than that.

10        Okay.  Now we can go.

11            THE COURTROOM DEPUTY:  All rise.  And leave your

12   badges in the jury room so you can get paid.

13        (The jury was discharged and left the courtroom.)

14        (Proceedings were heard out of the presence of the jury.)

15            THE COURTROOM DEPUTY:  You may be seated.

16               (Recess taken at 2:43 p.m.)

17             (Proceedings resumed at 2:45 p.m.)

18            THE COURTROOM DEPUTY:  All rise.

19            THE COURT:  You can stay seated.  Thank you.

20        Okay.  All right.  Here's what we need to do.  If you want

21   to bring a JMOL motion, Meta, let's do it 10 days from today.

22   Okay?  Just have it in, and I'll take it up.

23        I am just -- I have another trial starting in a week.  And

24   I have trials all through the rest of the year.  And they're

25   all going, so we just have to get this thing ready.

1   Now, we'll do the JMOL.  Let's see what happens with JMOL.

2   I don't know.  I haven't seen it.  We'll see.  After that you

3   can start thinking about -- let's say I deny it.  You can start

4   thinking about how you want to collect.

5           **MR. CANTY:**  Yes, Your Honor.

6           **THE COURT:**  The fee -- what is it -- $5,000 per

7   incident?

8           **MR. CANTY:**  Yes, Your Honor.

9           **THE COURT:**  Just wait.  Just get through -- 10 days

10  after they file, how about, you file a response to JMOL.

11          **MR. CANTY:**  Yes, Your Honor.

12          **THE COURT:**  You're going to file a JMOL, I take it.

13          **MR. CLUBOK:**  We are, Your Honor.

14  And there's also a couple of other motions.  We're going

15  to file a Rule 50(b) motion, a Rule 59 motion --

16          **THE COURT:**  Yeah, they go together.

17          **MR. CLUBOK:**  -- and a Rule 23(c)(1) motion to

18  decertify the class.

19  Is that --

20          **THE COURT:**  10 days --

21          **MR. CLUBOK:**  -- all post-trial motions in 10 days?

22          **THE COURT:**  I will have zero bandwidth so you've got

23  to get it done in 10 days.  I -- actually, the jury wants to

24  take a picture, so I do want to kind of get them out here.

25          **MR. CLUBOK:**  Sure.  In terms of entering final

 1  judgment, there are other proceedings that we have to talk

 2  about --

 3          THE COURT:  I'm not entering anything until I get

 4  through the motions.

 5          MR. CLUBOK:  Okay.

 6          THE COURT:  I'm not entering judgment until we get

 7  through the motions.

 8          MR. CLUBOK:  Right.  And we have some issues.  We

 9  talked briefly yesterday about the process that, when following

10  a case like this.  At some point --

11          THE COURT:  You're talking about the fee, the

12  statutory fees?  Penalty?

13          MR. CLUBOK:  Well, two things.  One is assessing the

14  damages --

15          THE COURT:  It's not penalty --

16          MR. CLUBOK:  Statutory damages.  Yeah.

17      So, one, we do believe under the *Campbell* test this is a

18  process.  We understand that Your Honor may disagree.  We

19  hope --

20          THE COURT:  I don't know.  I'll look at it.  I'm not

21  going to look at it until you get past JMOL.

22          MR. CLUBOK:  That's what I want to clarify.  We'll

23  hold off on any briefing --

24          THE COURT:  Make sure the verdict stands.  Once the

25  verdict stands, if that's the way it turns out -- I don't

 1    know -- then we'll get the machinery fired up.  Okay?

 2            **MR. CANTY:**  Yes, Your Honor.

 3            **MR. CLUBOK:**  Okay.

 4            **THE COURT:**  Make sense?

 5            **MR. CANTY:**  Yes, Your Honor.

 6            **MR. CLUBOK:**  Thank you.

 7            **THE COURT:**  Okay.  Good.  Thank you.

 8        Let's clear the courtroom, please.

 9            **MR. CANTY:**  Thank you, Your Honor.

10            **THE COURTROOM DEPUTY:**  Court is in recess.

11            (Proceedings adjourned at 2:48 p.m.)

12                    ---o0o---

13            <u>**CERTIFICATE OF REPORTER**</u>

14        I certify that the foregoing is a correct transcript

15    from the record of proceedings in the above-entitled matter.

16

17    DATE:  Friday, August 1, 2025

18

19

20

21

22    _____
         Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
                Official Reporter, U.S. District Court

23

24

25