UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

ERICA FRASCO, et al.,

            Plaintiffs,

      v.

FLO HEALTH, INC., et al.,

            Defendants.

Case No.  21-cv-00757-JD

**ORDER RE POST-TRIAL MOTIONS**

      This privacy class action was tried to a jury over the course of two weeks.  The jury heard testimony from the named plaintiffs, the parties' expert witnesses, and multiple percipient witness, and received scores of admitted exhibits.  Defendants Google LLC and Flurry, Inc. settled before trial.  Defendant Flo Health, Inc. settled during trial.  Defendant Meta Platforms, Inc. (Meta) was the last defendant standing for the verdict.  The jury concluded that Meta had violated the California Invasion of Privacy Act (CIPA), Cal. Pen. Code § 632, by obtaining highly personal ovulation and menstrual period information communicated by women who used the Flo Period and Ovulation Tracker app.  *See* Dkt. No. 756.

      Meta has filed several post-trial motions that ask to overturn just about everything related to the verdict.  These motions include a request to reconsider the certification of the California plaintiffs' class, for judgment as a matter of law on the CIPA claim, and for a new trial.[1]  Dkt.

---

[1]  The Court certified two classes of consumers:  a nationwide class alleging claims against Flo, and a California subclass alleging claims against Flo, Google, and Meta.  *See Frasco v. Flo Health, Inc.*, 349 F.R.D. 557, 587-88 (N.D. Cal. 2025).  The Ninth Circuit declined defendants' request for interlocutory review of the certification under Federal Rule of Civil Procedure 23(f). Dkt. No. 669.  The nationwide class is not at issue in this order in light of Flo's settlement and so the California subclass will be referred to as the "class."

1    Nos. 765-66.  Nothing in the evidence adduced at trial or the record as a whole justifies disturbing

2    the California class or the jury's unanimous verdict.  The motions are consequently denied.

3    <div align="center">**BACKGROUND**</div>

4    **I.    THE ALLEGATIONS**

5        The Court provided the factual context of this case in prior orders.  *See, e.g.*, *Frasco v. Flo*

6    *Health*, 349 F.R.D. 557, 568-71 (N.D. Cal. 2025).  In pertinent summary, the named plaintiffs are

7    women who, between 2017 and 2019, downloaded and used the Flo App, which was marketed as

8    a sexual health and wellness app and "rated the #1 period tracker in the United States . . . and . . .

9    the #1 most downloaded health app in the Apple App Store."  *Id.* at 569, 571 & n.4; Dkt. No. 64

10    ¶¶ 115-21.  The app coached users to input personal information such as the "timing of the user's

11    menstrual cycle," "preferred birth control methods," and details about users' "sexual activity."  *Id.*

12    ¶¶ 131-33.  Flo represented to users that it would keep their sensitive health information

13    confidential, but Meta and Google obtained access to the personal information via a software

14    development kit (SDK) that each company provided to Flo for integration into the Flo App.  *Id.*

15    ¶¶ 136, 140, 165-68, 177.  Flo used "Custom Event" fields in the Flo App that captured users'

16    menstruation and pregnancy information, which the SDKs collected and sent to Meta and Google.

17    *Id.* ¶¶ 137, 139, 140-46.

18    **II.    PRETRIAL PROCEEDINGS**

19        Plaintiff Erica Frasco filed the original complaint in this case.  Dkt. No. 1.  The Court

20    subsequently consolidated several related cases.  Dkt. Nos. 23, 27, 54, 59.  The operative

21    complaint is the consolidated amended complaint, which alleged claims against Flo, Google,

22    Meta, Flurry, and AppsFlyer, Inc.  Dkt. No. 64.  Plaintiffs voluntarily dismissed AppsFlyer early

23    in the case.  Dkt. No. 171.

24        After their initial motion for certification was terminated in light of the excessive number

25    of experts and related exclusion requests, Dkt. No. 419, plaintiffs filed a revised request for class

26    certification of the claims against the remaining defendants.  Dkt. No. 477.  While the certification

27    request was pending, plaintiffs settled with Flurry on a classwide basis, which the Court

28    preliminarily approved.  *See* Dkt. Nos. 501, 597.  The Court additionally granted summary

<div align="center" style="writing-mode: vertical-rl">United States District Court<br>Northern District of California</div>

judgment to Google for plaintiffs' UCL and aiding-and-abetting claims, but otherwise denied Google's summary judgment motion.  Dkt. Nos. 485, 338.

On May 19, 2025, the Court certified two classes under Federal Rule of Civil Procedure 23(b)(3):

1.  All Flo App users in the United States who entered menstruation and/or pregnancy information into the Flo Health App between November 1, 2016, and February 28, 2019, inclusive, for the breach of contract, intrusion upon seclusion, and California Confidentiality of Medical Information Act (CMIA), Cal. Civ. Code §§ 56 *et seq.*, claims against Flo.

2.  All Flo App users in California who entered menstruation and/or pregnancy information into the Flo Health App while residing in California between November 1, 2016, and February 28, 2019, inclusive, for the invasion of privacy claim against Flo under Art. I, Sec. 1 of the California Constitution, and the CIPA § 632 claim against Meta and Google.

*See Flo Health*, 349 F.R.D. at 587-88.

The parties provided notice to the certified class during the opt-out period which ran until July 20, 2025, through a variety of means, including: (1) banner ads on social media sites such as Facebook; (2) ads and notices in print publications of wide readership; (3) push notifications through the Flo App; and (4) notifications to user email addresses stored on Flo's servers and systems for the class period.  Dkt. No. 619.  The parties agree that the pretrial class notice was adequate.  Dkt. No. 693 at 6-12.

Each side was initially allotted fifteen hours of trial time for witness examinations including cross-examinations, with additional time for opening and closing statements.  Dkt. No. 692 at 1.  The parties did not object to these time allocations.  *See* Dkt. No. 693 at 14:21-15:3. Two weeks before the start of trial, plaintiffs and Google settled in principle.  Dkt. No. 696.  The Court stayed the case with respect to Google and ordered that "each side will have 12.5 hours at trial for all witness examinations and other in-court proceedings," excluding opening statements

United States District Court
Northern District of California

1  and closing arguments.  Dkt. No. 701.  The parties again did not object.  Flo and Meta proceeded

2  to trial on the certified claims brought against them respectively.

3  **III.    THE TRIAL**

4          Trial started on July 21, 2025.  After voir dire and challenges, the Court seated eight jurors.

5  The presentation of witness testimony and documentary evidence unfolded over the next two

6  weeks and included testimony from the named plaintiffs, witnesses from Meta, and the parties'

7  experts.  *See* Dkt. Nos. 732-35, 739, 754-55.

8          At the start of the second week of trial, Flo moved for judgment as a matter of law on the

9  CMIA claim.  Dkt. No. 751 at 1094:15-1095:3.  The Court noted that plaintiffs looked to have "an

10  insurmountable problem" in that the evidence at trial did not satisfy the statutory definitions of

11  "patients," "provider of healthcare," or "medical information."  *Id.* at 1104:3-7; *see* Cal Civ. Code

12  §§ 56.05(j), (m), (p).  Plaintiffs were invited to file a short brief identifying the evidence that

13  might support the CMIA claim.  Dkt. No. 751 at 1104:8-12, 1105:11-17.

14          The parties filed instead a notice that plaintiffs and Flo had settled.  Dkt. No. 740.  The

15  Court excused Flo from trial and stayed the case as to it.  Dkt. No. 752 at 1112:11-1117:3.  This

16  left for the jury only the CIPA Section 632 claim against Meta by plaintiffs Jennifer Chen, Tesha

17  Gamino, and Sarah Wellman, as representatives of the California class.  After plaintiffs rested,

18  Meta voluntarily declined to introduce any further evidence and also rested.  Dkt. No. 752 at

19  1123:1-8, 1125:8.  Before the case went to the jury for deliberation, Meta asked for judgment as a

20  matter of law on the Section 632 claim, which the Court denied.  *Id.* at 1126:1-1129:11.

21          During the charge conference, the parties gave substantial attention and time to a statute of

22  limitations defense raised by Meta.  *Id.* at 1134:6-1135:20, 1139:13-1145:25.  Plaintiffs stated that

23  Meta had not introduced any evidence that might provide grounds for a reasonable jury to find that

24  the claims were untimely.  *See, e.g.*, *id.* at 1134:13-1135:20, 1141:6-1142:6, 1144:1-1145:5.  This

25  shortcoming was particularly notable with respect to a Wall Street Journal article published on

26  February 22, 2019, which Meta and the other defendants had tried to make much of in pretrial

27  proceedings as triggering the limitations clock.  *See, e.g.*, Dkt. No. 627-2 at 7-8 (defendants'

28

United States District Court
Northern District of California

4

1    opposition to class certification brief). Meta voluntarily withdrew the statute of limitations

2    defense. Dkt. No. 743.

3        After the Court's final jury instructions and the parties' closing arguments, the jury retired

4    to deliberate. Dkt. No. 755-1; Dkt. No. 753 at 1238:17-21. Approximately three hours later, the

5    jury returned a unanimous verdict finding Meta had violated CIPA by eavesdropping on or

6    recording plaintiffs' communications with the Flo App without their consent. Dkt. No. 756; *see*

7    *also* Dkt. No. 753 at 1239:1-1241:4. At Meta's request, each juror was polled. *Id*. at 1241:5-7.

8    The unanimous verdict was confirmed. *Id*. at 1241:8-1242:11; Dkt. No. 755-1.

**DISCUSSION**

**I.    REQUEST FOR DECERTIFICATION OR TO MODIFY CLASS DEFINITION**

        Meta asks to decertify the California class for the CIPA Section 632 claim or to modify the

class definition to narrow the scope of the class. Dkt. No. 766. Overall, Meta's request is nothing

more than an improper attempt to seek reconsideration of the certification order. Meta's

arguments have virtually nothing to do with the evidence admitted at trial and are not based on

materially new facts or law that might warrant reconsideration. *See* Civil L.R. 7-9(b). Most of its

contentions simply rehash prior arguments that were unsuccessful. This is enough to deny the

request without further discussion. Even so, the Court will explain why Meta's opposition to

certification is again misdirected.

    **A.    THE CERTIFICATION ORDER**

        A summary of the certification order is useful as background. "The salient inquiry under

Rule 23 is whether plaintiffs have adduced evidence that would permit the trier of fact to answer

the liability and damages questions for all class members on the basis of evidence common to the

class as a whole." *Flo Health*, 349 F.R.D. at 572. In opposition to plaintiffs' certification request,

the "defendants did not bother to mention, let alone discuss," Rule 23(a)'s numerosity, typicality,

and adequacy requirements, but the Court "conducted an independent analysis" and found "[t]he

record demonstrates that they have been met." *Id*. at 573-74.

        For the requirements of Rule 23(a)(2) and (b)(3), the Court assessed commonality and

predominance together, "with a careful eye toward their differences as warranted." *Id*. The Court

determined that plaintiffs' evidence was "capable of showing on a classwide basis that (1) Google and Meta intercepted and recorded users' communications with Flo via their SDKs' transmission of the Custom Events; (2) users expected those communications to be private based on Flo's representations; (3) the interception and recordings were without users' consent; (4) Google and Meta used the intercepted and recorded communications for their own commercial gain; and (5) Google and Meta intended to do so, as evinced by the design of their SDKs and their attempts to continue collecting the same information even after Flo sought to remove the SDKs." *Id.* at 586. The class certification record was substantial and included documentary and expert evidence about common privacy disclosures made to all users, SDK functioning in general, how Meta's SDK functions in the Flo App, the app's Custom Events, and how Meta used the data it collected from the SDK for its advertising business and machine learning technologies. *See id.* at 572-73.

Meta and the other defendants fired a blunderbuss of underdeveloped objections that the Court slogged through to bring "order to the question of certification." *Flo Health*, 349 F.R.D. at 569. With respect to consent, the record established that uniform privacy disclosures were made to all users, and that the handful of news articles on which the defendants relied were common proof that would permit the jury to decide the issue of consent "in one fell swoop." *Id.* at 574-76. This was so even though "[d]efendants made no effort to demonstrate that a meaningful portion of the proposed class[] might have seen or read" the articles. *Id.* at 575. The statute of limitations defense, which relied on the same evidence, was suitable for classwide adjudication for the same reasons. *See id.* at 576-77.

The record demonstrated that questions of whether the transmitted data included health information, whether it was accurate, and whether class members had reasonable expectations of privacy, were all amenable to classwide proof. *See id.* at 582-84. Defendants did not establish that "fine degrees of privacy expectations are in play" depending on users' specific answers in light of common privacy disclosures, or that the common questions and answers would be overwhelmed by "fakes," which could be identified by Flo's own classwide data. *Id.* at 582-84.

Defendants' challenges to standing were no bar to certification. Standing was "inextricably intertwined with the merits," which plaintiffs had proven could be adjudicated based

on classwide proof.  *Id.* at 579.  The record demonstrated a concrete injury to class members'
"time-honored right to control access to their private information and affairs," irrespective of
whether the misappropriated data was subsequently anonymized.  *Id.* at 579-80.

Meta did not make any further challenges to the CIPA Section 632 claim in the
certification proceedings.  *See id.* at 586-87; *see also* Dkt. No. 627-2.  Meta raised certain
substantive objections that were directed solely to the CIPA Section 631(a) claim, which were
sustained.  *See Flo Health*, 349 F.R.D. at 587.  Certification was consequently denied for the
Section 631(a) claim, and it was not submitted to the jury in any form, as only the certified claims
proceeded to trial with the parties' agreement.  *See* Dkt. No. 656 at 18.

Overall, the Court determined at the certification stage that plaintiffs had "adduced
substantial evidence demonstrating that the proposed class members saw the same privacy
representations by Flo, experienced the same Flo App and SDK practices, and have the same
alleged claims and injuries," and that, as a result, "[t]he questions posed in plaintiffs' case can be
answered on the basis of common evidence that applies on a classwide basis."  *Flo Health*, 349
F.R.D. at 569.  The Ninth Circuit declined to review the certification order on an interlocutory
basis.  Dkt. No. 669.

## B.    THE EVIDENCE AT TRIAL

What then came up at trial that might disturb the certification evidence and order?  The
answer is nothing.  To get there, a review of the trial evidence is warranted, starting with the
functionality of the Flo App and Meta's SDK.

Dr. Serge Egelman, who holds a Ph.D. in computer science and B.S. degree in computer
engineering, is the director of a research lab at the University of California, Berkeley, where he
studies "how [people] use online systems to make decisions about privacy" as well as "how online
services actually handle personal information."  Dkt. No. 748 at 383:4-18.  He testified as an
expert witness for plaintiffs on the functioning of the Flo App and the Facebook SDK.[2]

---

[2]  The relevant SDK is formally named the "Facebook SDK."  The Court will refer to it as such
while sticking with Meta for the corporate defendant.

United States District Court
Northern District of California

1    Dr. Egelman stated that an SDK is "a third-party component that developers put in their apps,"

2    much in the way a car manufacturer would use premade components from a supplier instead of

3    making all components itself.  Dkt. No. 748 at 385:1-14.  He said that using SDKs was "an

4    accepted engineering practice" and "a good practice," but that "you're supposed to spend a lot of

5    time doing, you know, validation and oversight to make sure that the third-party components that

6    you're relying on are actually functioning correctly."  *Id.* at 385:4-5, 16-19.  Flo's and Meta's

7    experts, Mr. Chris Karkanias and Dr. Georgios Zervas, respectively, agreed with this testimony.

8    *See, e.g.*, Dkt. No. 750 at 659:20-25, 662:22-663:3, 716:8-717:2, 718:18-719:3.

9         The Facebook SDK was an "open source" SDK during the class period.  Dr. Zervas stated

10   that "open source" meant it was a publicly available set of code instructions for software

11   developers to download, inspect, and modify for their own needs.  *Id.* at 723:2-13.  The source

12   code was written in a coding language that humans could understand, and would need to be

13   "compiled," meaning translated into "machine code" (*e.g.*, 1s and 0s), before it could run on a

14   device.  *Id.* at 742:20-743:4.  Dr. Zervas testified that an analytics SDK "collect[s] statistics" about

15   the app in which it is embedded to provide insights into matters like whether certain features are

16   popular or defective so that "then you can take steps to improve your app."  *Id.* at 718:20-25.

17   Analytics SDKs "can [also] be used to optimize ad campaigns."  *Id.* at 719:1-3.

18        At a "high level," the Facebook SDK was comprised of two components: the

19   "documentation," which "tells users of the SDK, app developers, how to use this particular

20   function," and "the actual code that is inside the SDK that developers can use."  *Id.* at 724:6-12.

21   When developers incorporate the Facebook SDK into their apps, they "have to decide what events

22   to log" and have freedom to tailor the event names to their particular purposes.  *Id.* at 725:19-

23   726:14.  After incorporation into an app's code, the Facebook SDK did not operate or do things on

24   its own.  *Id.* at 742:13-14.  It required a trigger to operate.  *Id.* at 742:14-18.

25        Dr. Egelman tested the versions of the Flo App that were available during the class period.

26   Dkt. No. 748 at 387:4-11.  He also "decompiled" versions of the app and examined the source

27   code produced by Flo.  *Id.* at 387:12-15; *see also id.* at 391:18-25.  Dr. Egelman testified that, for

28   earlier versions of the app, users would be greeted by an introductory screen that asked them to

United States District Court
Northern District of California

8

choose either "New user" or "Restore data." *Id.* at 397:22-398:7; Ex. 604-A.[3]  If a user selected "New user," they were taken to a second screen which marked the start of an onboarding survey. Dkt. No. 748 at 398:8-10; Ex. 604-B.  It was undisputed that the onboarding survey was mandatory for all new users of the Flo App, and there was no evidence suggesting that a user could bypass the onboarding survey during the class period.  *See, e.g.*, Dkt. No. 748 at 398:8-10, 400:19-21.

The first question the onboarding survey asked was: "How can we help you?"  Dkt. No. 748 at 398:11-13; Exs. 604-B, 605-A.  In earlier versions of the app, users were given two options: "I want to get pregnant" or "I just want to track my cycle."  Dkt. No. 748 at 398:11-13; Ex. 604-B. Later versions of the app added a third option: "I'm pregnant."[4]  Ex. 605-A; Dkt. No. 748 at 399:8-11.

In the earlier versions, whether a user selected "I want to get pregnant" or "I just want to track my cycle," all subsequent questions in the onboarding survey were the same.  Dkt. No. 748 at 398:14-15.  The second onboarding question asked, "When did your last period start?"  Ex. 604-C.  A user had the options of either "I don't know" or selecting the numerical day of the month. *Id.*; Dkt. No. 748 at 398:15-19.  Next, the app asked, "On average, how long is your period?", and users had the options of "I don't know" or selecting an integer that would indicate the number of days the user's period lasts.  Ex. 604-D; Dkt. No. 748 at 398:20-22.  Users were then asked, "On average, how long is your cycle?", and again they could pick "I don't know" or select an integer corresponding to the number of days.  Ex. 604-E; Dkt. No. 748 at 398:23-25.  For the final question, the app asked, "What year were you born?", and users were permitted to pick a particular year.  Ex. 604-F; Dkt. No. 748 at 399:1-2.

To navigate through the onboarding survey, users had to answer the prompts and then tap the "Next" button at the very bottom of the screen.  *See* Dkt. No. 749 at 421:18-422:2.  Once the

---

[3]  The admitted trial exhibits are found in Dkt. Nos. 761-64.  For clarity, the Court cites the trial exhibit number rather than the docket number.

[4]  In some later versions, it appears the introductory screen and the first onboarding question were collapsed into one, such that a user opening the app would have the option of either beginning the onboarding survey by selecting one of the three options or "Restore Data."  Ex. 605-A.

United States District Court
Northern District of California

user completed the onboarding survey, the app would generate a loading screen and then take the user to the main calendar screen, which provided information to the user about her cycle.  Dkt. No. 748 at 400:22-401:6.  Whether a user answered "I want to get pregnant" or "I just want to track my cycle," this ordering of questions and the information they requested were materially identical across all versions of the app that Dr. Egelman tested, although the screen presentation differed in ways that are not material.  *Id.* at 399:3-11, 401:7-9; *see* Exs. 604-C, 611-E, 611-F.

For later versions of the app in which "I'm pregnant" was an option, the onboarding process differed slightly if the user selected that.  Instead of asking, "When did your last period start?", the second onboarding question asked, "What is your pregnancy week?", in order to calculate the expected due date.  Dkt. No. 749 at 449:6-15; Ex. 611-W.  A user could select an integer corresponding to the pregnancy week or indicate "I don't remember," and if they indicated that they didn't remember, "the app asks other questions to try and calculate that, like whether you knew the date of conception or the date of your last period . . . to try and infer the due date.  And then, again, that culminates with entering your age."  Dkt. No. 749 at 449:16-22.

Dr. Egelman testified that the testing, and the log files he compiled by capturing the network traffic being transmitted by the Facebook SDK, revealed Meta's access to user information.  *Id.* at 586:21-587:1 ("[T]hat slide deck, it shows the traffic captures, and we went over the user agent string, which shows that it is, in fact, the Facebook SDK that's responsible for those transmission[s].");  *see also* Dkt. No. 750 at 713:13-25.  As Dr. Egelman stated, each time a user answered an onboarding question and proceeded to the next screen, a series of functions and operations would occur over the course of microseconds that would result in the Facebook SDK recording the response a user had given before sending it back to Meta's servers.  *See* Dkt. No. 749 at 426:9-20.

Dr. Egelman testified that the Flo App contained a "listener" or "callback" function that waited for when the user tapped "Next" on the screen.  *Id.* at 421:18-23, 433:10-14.  Once a user selected an answer for each question, the listener function would trigger a cascade of subsequent functions "in rapid succession" that would be "imperceptible to the user," in which the app processed the user's answer.  *Id.* at 423:13-18.  One of the functions triggered by a user's

United States District Court
Northern District of California

10

answering of an onboarding question was called "LOG_SINGLE_EVENT." *Id.* at 421:22-422:8, 433:9-19. The "LOG_SINGLE_EVENT" function would take two parameters from the operations preceding it: the "event" name that it wanted to log and the "value" for that event. *Id.* at 422:9-20; *see also id.* at 433:18-434:2. The event name logged by the "LOG_EVENT_FUNCTION" corresponded to the onboarding question to which the user responded, for example, "R_CHOOSE_GOAL" for the first onboarding question. *Id.* at 420:15-20, 421:9-14. The value would correspond to the answer the user entered, such as "GOAL:GET_PREGNANT" or "GOAL:TRACK_CYCLE." *Id.* at 420:15-24, 421:11-14, 422:9-22.

Dr. Egelman testified that the functions triggered up until this point were code written by Flo. *Id.* at 423:6-7. But the "LOG_SINGLE_EVENT" function would then "call[] several other functions in quick succession" before "eventually it calls a function that's titled LOG_EVENT_FACEBOOK." *Id.* at 423:1-5. The "LOG_EVENT_FACEBOOK" function triggered code from Meta that was written by Meta. *Id.* at 424:6-12; *see id.* at 423:19-424:10 ("[I]n Java . . . if you mouse over in developer tools, it will tell you where that part of the code came from. So here, the -- you know, the line that's highlighted, this .Facebooklogger.logevent, that comes from code that begins with com.Facebook, and that indicates that it's pulling that from the Facebook SDK. . . . [Y]ou can see that that function originated from com.facebook.appevents, which is the part of the Facebook SDK that records app events."); *see also, e.g.*, *id.* at 428:25-430:2; Dkt. No. 750 at 742:3-10 (Dr. Zervas explaining "those little greater or equal signs just below the orange box, you see how one of them says 'Facebook'? This is like a folder. The other one says 'app event.' So this is Facebook SDK code that deals with app events."); Ex. 674-A.

The calling of the "LOG_EVENT_FACEBOOK" function activated the Facebook SDK. The SDK then recorded a host of information, including the event name and value parameter corresponding to the onboarding question and the user's answer; converted the information into a "format that Meta might expect"; and then transmitted it to Meta's servers. *Id.* at 423:9-18; *see also id.* at 434:12-16. The log files to which Dr. Egelman referred in his testimony were

1    "captures" of network "traffic," meaning transmissions by the SDK to Meta's servers. *Id.* at

2    586:21-587:4, 589:6-10.

3      This "exact same series of events" occurred when a user completed each step in the

4    onboarding survey. *Id.* at 434:10-16. The things that varied between the onboarding questions

5    were the event name and value parameter. For the questions that asked about the user's last period

6    and the length of the user's cycle and period, the value parameter was either "known" if the user

7    selected an integer, or "unknown" if the user answered "I don't know." *Id.* at 433:18-434:9,

8    434:23-435:17; *see also* Exs. 614-A, 618-A. The final question about the user's age differed in

9    this regard because it had two value parameters: a single integer representing the user's age and an

10    age range, both of which were derived from the year the user selected. Dkt. No. 749 at 435:18-

11    436:3, 436:18-24. In later versions in which "I'm pregnant" was an option, a similar series of

12    operations occurred, including the recording by the Facebook SDK when a user completed the

13    onboarding questions tailored to that goal. *Id.* at 448:6-20, 449:6-451:2.

14      Once a user completed the onboarding survey, the Flo App would display information

15    about her cycle or pregnancy on the main calendar screen. Dkt. No. 748 at 400:22-401:6; *see also*

16    Exs. 610-AD, 610-AG, 611-O. On the back end, and invisibly to the user, the Flo App logged and

17    processed the information it presented to the user. Specifically, it would generate an additional

18    event name, "SESSION_CYCLE_DAY_FIRST_LAUNCH," with two parameters, labeled

19    "cycle_day" and "cycle_day_type." Ex. 615-A; Dkt. No. 749 at 437:5-11. The "cycle_day"

20    parameter took an integer value, such as "16," and the "cycle_day_type" parameter would take a

21    value such as "after+fertility+window," "ordinary," or "pregnancy," depending on the answers to

22    the questions. Exs. 614-A, 615-A, 618-A, 630-A; Dkt. No. 749 at 437:5-18. Dr. Egelman

23    analogized this to the second "half of the conversation" the user is having with the app. Dkt. No.

24    749 at 523:11-19, 524:1-7. He testified that, in these series of operations, the Facebook SDK

25    would be activated again and would record these event names and parameters logged by the Flo

26    App. *Id.* at 437:5-18, 450:3-451:7; Ex. 615-A.

27      The event names and parameters corresponding to the onboarding survey were not the only

28    information the Facebook SDK obtained. Once activated, the SDK automatically took persistent

identifiers such as device and advertising identifiers. *Id.* at 424:11-425:24, 430:6-11. This data was harvested so that Meta could match the identifier and the accompanying data to a particular individual's Facebook profile. *Id.* at 430:6-431:10. Meta wanted the data for advertising uses. *See*, *e.g.*, *id.* at 431:3-10. The Facebook SDK collected this information "indiscriminately" and without regard to whether the user in fact had a Facebook profile. *Id.* at 424:19-425:4.

In sum, during the onboarding survey, the Facebook SDK gave Meta the following information from every user: her goals for the app (getting pregnant, tracking her menstrual cycle, or tracking her pregnancy), Dkt. No. 749 at 420:3-421:14; whether she knew certain information about her menstrual cycle, *id.* at 433:18-435:17; her age, *id.* at 435:18-436:3, 436:18-24; Flo's calculation tracking her ovulation or pregnancy, *id.* at 437:5-438:8; and device and advertising identifiers that could link all the data to a particular device or Facebook profile, *id.* at 430:6-431:10.

### C. LEGAL STANDARD FOR DECERTIFICATION

"Even after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982); *see* Fed. R. Civ. P. 23(c)(1)(C) ("An order that grants or denies class certification may be altered or amended before final judgment."). "[I]f 'future decisions or circumstances' warrant, the 'district court can decertify the class.'" *In re Capacitors Antitrust Litig.*, No. 17-md-02801-JD, 2020 WL 870927, at *3 (N.D. Cal. Feb. 21, 2020) (quoting *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1276 (9th Cir. 2019)). A request for decertification is subject to the same standard as the original certification request, *see Marlo v. United Parcel Serv., Inc.*, 639 F.3d 942, 946 (9th Cir. 2011), and the Court's analysis "must be rigorous," *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 465 (2013) (cleaned up). Plaintiffs retain the burden of "demonstrating that the requirements of Rules 23(a) and (b) are met." *Marlo*, 639 F.3d at 947 (citation omitted).

The salient question is whether plaintiffs' prior demonstration of grounds for certification of a Rule 23(b)(3) class continues to hold true. "Each element of a claim need not be susceptible to classwide proof," *Schneider v. YouTube, LLC*, 674 F. Supp. 3d 704, 716 (N.D. Cal. 2023) (citing *Amgen*, 568 U.S. at 468-69), and the "important questions apt to drive the resolution of the

13

1    litigation are given more weight in the predominance analysis over individualized questions which

2    are of considerably less significance to the claims of the class," *Ruiz Torres v. Mercer Canyons*

3    *Inc.*, 835 F.3d 1125, 1134 (9th Cir. 2016).

4        Once a plaintiff has demonstrated that classwide issues are present, "the defendant must

5    invoke individualized issues and provide sufficient evidence . . . [that] rais[es] the spectre of class-

6    member-by-class-member adjudication of the issue." *Van v. LLR, Inc.*, 61 F.4th 1053, 1067 (9th

7    Cir. 2023).  To do so, a defendant must proffer evidence and facts.  "Speculation about events or

8    issues for which a defendant has not offered evidence will not do."  *Flo Health*, 349 F.R.D. at 575

9    (citing *Miles v. Kirkland's Stores Inc.*, 89 F.4th 1217, 1222 (9th Cir. 2024)).  The decision of

10    whether to decertify a class is entrusted to the Court's sound discretion.  *See Leyva v. Medline*

11    *Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013).  A "judge's decision to certify a class is not

12    normally to be evaluated in hindsight" and there is "no reason . . . not to proceed in light of the

13    evidence actually presented."  *Falcon*, 457 U.S. at 163 (Burger, C.J., concurring in part and

14    dissenting in part).

15        **D.    THE CIPA CLAIM WAS AMENABLE TO CLASSWIDE ADJUDICATION**

16        The trial evidence strongly confirms that certification of a class for the CIPA claim was

17    warranted.  The evidence established that millions of women downloaded the app, rendering

18    "joinder of all members . . . impracticable."  Fed. R. Civ. P. 23(a)(1); *see, e.g.*, Ex. 110-A.  It

19    established that plaintiffs Chen, Gamino, and Wellman saw the same privacy disclosures by Flo

20    and Meta, completed the onboarding survey, and were subject to the same SDK practices each

21    time they answered an onboarding survey question and when they received information about their

22    goal from the main calendar screen.  *See* Fed. R. Civ. P. 23(a)(3); *see also, e.g.*, Exs. 29, 30, 66,

23    93; Dkt. No. 748 at 200:10-201:8, 230:1-20, 290:5-291:8; Dkt. No. 749 at 433:5-9, 434:10-435:2,

24    437:2-24.  Their claims were typical of the class.  There was no evidence of a conflict between the

25    named plaintiffs and the absent class members, and the performance of counsel for plaintiffs

26    before and during trial amply demonstrated their ability to effectively represent the class and its

27    interests.  *See* Fed. R. Civ. P. 23(a)(4).  Meta has not meaningfully disputed any of this evidence,

28

United States District Court
Northern District of California

1    or proffered evidence that shows that decertification is warranted and a class-member-by-class-

2    member adjudication needs to be undertaken instead.

3                    **a.    When Class Members Completed the Onboarding Survey**

4            Meta's decertification arguments again focus on commonality and predominance.  It

5    believes predominance is defeated because the determination of who is in the class requires an

6    individualized inquiry of whether a Flo App user completed the onboarding survey during the

7    class period.  Dkt. No. 766 at 3-4.  Meta's only basis for this belief concerns named plaintiff

8    Madeline Kiss.  Meta says that "no one in the courtroom knew for sure when Ms. Kiss first used

9    the Flo App," and so "there is no way to pinpoint the timing, on a classwide basis, for the

10   countless absent class members who were not deposed."  Dkt. No. 766 at 4.

11           The problem for Meta is that it did not adduce any evidence at trial that might have

12   supported this speculation about the class.  *See Van*, 61 F.4th at 1067 (party opposing certification

13   must "provide sufficient evidence that the individualized issues bar recovery on at least some

14   claims.").  Even after taking Kiss's deposition, Meta did not raise this point during class

15   certification, and during trial it affirmatively chose not to introduce the deposition testimony to

16   support its allegations of individualized issues.  *See Briseno v. ConAgra Foods, Inc.*, 844 F.3d

17   1121, 1131 (9th Cir. 2017) ("[D]efendants plainly can mount such challenges as to the named

18   class representatives. . . . As the case proceeds, ConAgra will have further opportunities to contest

19   every aspect of Plaintiffs' case.").  This was a fateful decision by Meta, because after a case

20   proceeds from summary judgment to trial, claims "must be evaluated in light of the character and

21   quality of the evidence received in court."  *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011); *see also*

22   *Montera v. Premier Nutrition Corp.*, 111 F.4th 1018, 1034 (9th Cir. 2024) (reviewing certification

23   ruling in light of trial evidence).

24           Meta says "it intended to play a portion of Ms. Kiss's deposition for the jury," but it did

25   not actually do so.  Dkt. No. 766 at 4.  The decision not to play it was purely Meta's own choice.

26   *See* Dkt. No. 752 at 1122-23.  As the Court emphasized to Meta, "It's totally your call" with

27   respect to playing the deposition of plaintiff Kiss.  *Id.* at 1122:7-21.  Meta made the call not to

28   play it and said, "We'll rest."  *Id.* at 1123:1.  Meta tries to backfill the hole in its case with a

United States District Court
Northern District of California

1    reference to something plaintiffs' counsel ostensibly said outside the presence of the jury, *see* Dkt.

2    No. 766 at 4, but that was not evidence admitted at trial. As the jury was expressly instructed,

3    remarks by attorneys are not evidence, and passing comments are not substitutes for facts and

4    evidence. *See* Model Civ. Jury Instr. 9th Cir. 1.10 (2025); *see also* Dkt. No. 744 at 8 (final jury

5    instructions explaining that "[a]rguments and statements by lawyers are not evidence.").

6           Although Meta says that the onboarding point goes to a "central liability issue," Dkt. No.

7    766 at 4, it is plainly complaining about "ascertainability," namely class membership. Meta has

8    not demonstrated that any ascertainability issues will arise. In addition, plaintiffs have indicated

9    they will propose a claims-made procedure for damages, which means Meta "will have similar

10   opportunities to individually challenge the claims of absent class members if and when they file

11   claims for damages." *Briseno*, 844 F.3d at 1131. Meta says the claims administration process

12   may not suffice because of concerns about "credibility, testimony, and claimant-specific

13   documents." Dkt. No. 766 at 4. But this is pure speculation. Certainly nothing was presented at

14   trial in support of Meta's worries. To be sure, Meta is entitled to "receive a fair opportunity to

15   present its defenses when putative class members actually come forward." *Briseno*, 844 F.3d at

16   1132 (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 670 (7th Cir. 2015)). Meta did not

17   offer any evidence in the here and now that supports its request for decertification.

18          **b.   Where Class Members Were When They Completed Onboarding Survey**

19          Meta says that "determining whether a Flo App user downloaded the app and completed

20   the onboarding survey in California can be done only on an individualized basis" and that it "has a

21   right to test the evidence on that score for all class members to ensure that those outside the

22   statute'[s] protection do not stand to recover." Dkt. No. 766 at 5-6. The record again is totally

23   devoid of evidence that might warrant this concern.

24          Meta returns to Kiss as an ostensible source of evidence, *id.* at 5, which is of no moment

25   for the reasons already discussed. Meta freely elected not to present Kiss's deposition or other

26   evidence in support of this argument during trial. Consequently, nothing in the record indicates

27   that individualized issues about whether a California resident completed the onboarding survey

28   during a brief out-of-state excursion will predominate. Meta also made no effort to show why this

1    concern cannot be handled in the claims process.  *See, e.g.*, *Briseno*, 844 F.3d at 1132; *Mullins*,

2    795 F.3d at 667 (courts can combat "mistaken or fraudulent claims" by relying on "claim

3    administrators, various auditing processes, sampling for fraud detection, follow-up notices to

4    explain the claims process, and other techniques tailored by the parties and the court").

5         Meta's mention of CIPA Section 631 is misdirected.  *See* Dkt. No. 766 at 6.  Section 631

6    requires proof that a defendant read, or attempted to read, a communication "being sent from, or

7    received at any place within this state."  Cal. Pen. Code § 631.  But there was no claim at trial

8    against Meta under Section 631, and the Court denied certification of a class for Section 631 in the

9    certification order.  *See Flo Health*, 349 F.R.D. at 587.  The language of Section 632, which was

10   the claim tried against Meta, does not have the same California-centric language, and "nothing in

11   the plain text of [Section 632] suggests such a geographic limitation."  *Id.*

12        Meta's mention of a presumption against the extraterritorial application of California law

13   is equally misplaced.  *See* Dkt. No. 766 at 6.  Once again, Meta did not present evidence indicating

14   that any class members' circumstances would result in an extraterritorial application of Section

15   632.  Moreover, the class is expressly defined to consist of California residents.  *See Flo Health*,

16   349 F.R.D. at 588.  Meta simply speculates that a California resident may have signed up for the

17   Flo App while they were somewhere else, and it "has not tendered any evidence to indicate" that

18   any class member actually completed the onboarding survey while outside the state.  *In re*

19   *Facebook Biometric Info. Privacy Litig.*, 326 F.R.D. 535, 547-48 (N.D. Cal. 2018).

20                    **c.  Class Members' Expectations of Privacy**

21        CIPA Section 632 prohibits the recording of a "confidential communication."  Cal. Pen.

22   Code § 632(a).  A confidential communication is broadly defined as "any communication carried

23   on in circumstances as may reasonably indicate that any party to the communication desires it to

24   be confined to the parties thereto."  *Id.* § 632(c).  The evidence at trial included the privacy

25   disclosures Flo uniformly made to all users and that Meta made to all Facebook users.  *See, e.g.*,

26   Exs. 29-30, 66, 70, 93, 1224.  Plaintiffs Chen, Gamino, and Wellman each testified that they

27   considered the information they provided during the onboarding survey to be highly sensitive,

28   private, and not something they would otherwise freely share.  *See, e.g.*, Dkt. No. 748 at 179:23-

United States District Court
Northern District of California

1    179:4, 187:23-25, 191:2-5, 233:13-23, 294:3-8.  All three plaintiffs testified that they did not know

2    Meta would record their answers to the onboarding survey and they did not consent to such

3    recording.  *See id.* at 189:1-16, 190:4-16, 232:1-12, 292:16-293:11.

4        The disclosures are proof common to the class, and Meta did not present any evidence

5    suggesting that absent class members would have expectations of confidentiality that differed from

6    those of the named plaintiffs with respect to the type of information the onboarding survey

7    collected in light of common privacy disclosures.  There is no basis for Meta's conclusory claim

8    that "the confidentiality inquiry will devolve into individualized issues that defeat predominance"

9    because "at the very least, *some* class members would 'reasonably expect' as much given their

10   individual 'circumstance[s].'"  Dkt. No. 766 at 6 (emphasis in original) (citation omitted).  Meta

11   does not attempt to explain, let alone support with evidence, what those individual circumstances

12   might be for "some class members" that could conceivably support a finding of different

13   expectations of confidentiality.  *See, e.g.*, *In re Nexium Antitrust Litig.*, 777 F.3d 9, 31 (1st Cir.

14   2015) ("The defendants' speculation cannot defeat the plaintiffs' showing.").

15           **d.  Consent**

16       Meta's second bite at the consent issue is also unsuccessful.  To start, Meta misreads the

17   Court's summary judgment order to say that "Meta's policies do not necessarily cover the

18   collection or transmission of *sensitive* information" and consequently "Meta has a valid consent

19   defense to any class member who has *not* transmitted 'sensitive' information."  Dkt. No. 766 at 7

20   (citing Dkt. No. 608; emphases added by Meta).  But the word "sensitive" was not used in the

21   order, and the scope of the factual disputes that precluded summary judgment was not limited to

22   "sensitive" information.  The summary judgment order determined that "[d]isputes of fact abound

23   with respect to the scope of consent" generally, without regard to what might be sensitive or not.

24   *Frasco v. Flo Health, Inc.*, No. 21-cv-00757-JD, 2025 WL 1476905, at *1 (N.D. Cal. May 22,

25   2025).  In addition, Meta's focus on summary judgment is rather beside the point at this stage of

26   the case.  *See Ortiz*, 562 U.S. at 184.  What matters is the evidence at trial.

27       The jury expressly found, on the basis of the trial evidentiary record, that Flo App users

28   did not consent to Meta's conduct.  *See* Dkt. No. 756 at 3.  Even so, Meta plows ahead with the

1  suggestion that consent of some sort was necessarily granted by users, and that user data received

2  by Meta may have sometimes indicated only that a user had used the Flo App, without disclosing

3  any "sensitive" information. *See* Dkt. No. 766 at 7-8. All of this is rank speculation that is

4  completely untethered to the evidence admitted at trial. Meta did not sponsor any evidence that

5  might support its post-trial musings. This forecloses the guesswork with respect to consent. *See*

6  *True Health Chiro., Inc. v. McKesson Corp.*, 896 F.3d 923, 931 (9th Cir. 2018) ("[W]e assess

7  predominance by analyzing the consent defenses [the defendant] has actually advanced and for

8  which it has presented evidence."). It bears mention that Meta was perfectly free to request

9  limited discovery of absent class members before trial, *see Briseno*, 844 F.3d at 1131 n.10, or take

10 discovery from Flo, on its consent theories. It did not do so, and must now live with the

11 consequences. *See Nat'l Fam. Farm Coalition v. Vilsack*, 758 F. Supp. 3d 1060, 1081 (N.D. Cal.

12 2024) ("The burden is on the party to make its case in the first instance, as it sees fit." (citation

13 omitted)).

14      Meta's suggestion that "the only method of sorting the injured from the uninjured . . . is

15 through time-consuming and class member-specific inquiries into their communications," Dkt.

16 No. 766 at 8, is again not well taken this second time around. This point was not substantiated at

17 the class certification stage, and Meta's effort to recycle it here is equally unavailing. Meta's

18 mention of "sensitive" information is misdirected for the reasons stated. The cases it cites are

19 readily distinguishable in that the evidence at trial established that uniform privacy representations

20 were made to all Flo App users, and the SDK recorded information about the users' personal

21 reproductive health.

22      Overall, Meta's consent points simply rehashed its prior unsuccessful contentions. It did

23 not rely on any relevant evidence adduced at trial, which further underscores that the

24 decertification request is in reality an improper motion for reconsideration under another name.

25              **e.   Statutory Damages, Injury, and the "Campbell Test"**

26      Meta contends that (1) statutory damages are limited to persons "injured" by a violation of

27 CIPA; (2) named plaintiffs' "conclusory claim of embarrassment" is not an injury; and (3) absent

28

19

1    class members "may not even claim that much." Dkt. No. 766 at 8. The upshot of all this is said

2    to be that individualized issues predominate.

3        Meta's theory fails at every level. To start, "an actionable violation of section 632 occurs

4    the moment the surreptitious recording is made." *Lieberman v. KCOP Television, Inc.*, 110 Cal.

5    App. 4th 156, 167 (2003). A plaintiff who suffers a privacy injury from the recording of her

6    communications in violation of Section 632 need not demonstrate a further injury of some sort to

7    be entitled to statutory damages under Section 637.2. The Supreme Court of California has stated

8    that the "statute authorizes civil awards of $3000 for each violation . . . despite a party's inability

9    to prove actual injury" and that "the right to such an award accrues at the moment of the

10    violation." *Ribas v. Clark*, 38 Cal. 3d 355, 365 (1985)[5]; *see Kimmel v. Goland*, 51 Cal. 3d 202,

11    210 (1990); *Flo Health*, 349 F.R.D. at 579 (observing "privacy injury occurs at the point of

12    interception without consent").

13        Meta's dismissive treatment of the named plaintiffs' testimony about their embarrassment

14    over the disclosures of their menstrual information and other personal data is poorly taken. It is

15    not for Meta to downplay a woman's embarrassment as "conclusory" and unimportant. Nor may

16    Meta ask the Court to disregard the California legislature's intent "to accord every citizen's

17    privacy the utmost sanctity." *Ribas*, 38 Cal. 3d at 365.

18        For the damages concerns, Meta improperly merges "injury" and "actual damages" under

19    Section 637.2 in a manner the California courts have expressly rejected. *See, e.g.*, *Lieberman*, 110

20    Cal. App. 4th at 166-67. Under Section 637.2, there is no requirement of an injury independent of

21    the privacy injury caused by an unconsented recording. *See Montera*, 111 F.4th at 1033 (holding

22    that individualized questions that were irrelevant to the legal standard did not pose a problem

23    under Rule 23(b)(3)). Meta's musing about what absent class members might claim, Dkt. No. 766

24    at 8, is irrelevant. There is no threat of individualized variation in a way that matters here.

25

26    ─────────────────

27    [5] *Ribas* concerned a prior version of CIPA, in which statutory damages were $3,000 instead of
      $5,000, but it construed identical language providing that "[a]ny person who has been injured by a
      violation of" CIPA was entitled to damages. *Compare Ribas*, 38 Cal. 3d at 364, *with* Cal. Pen.
28    Code § 637.2(a)(1) (2025).

United States District Court
Northern District of California

1    So too for Meta's suggestion that an award of statutory damages will require use of a

2 discretionary multi-factor test for every claimant. Meta says statutory damages demand

3 individualized inquiries into matters like the "severity of the violation" or the "extent of any

4 intrusion into plaintiff's privacy." Dkt. No. 766 at 9 (citation omitted). This is said to be based on

5 a test derived from *Campbell v. Facebook Inc.*, 315 F.R.D. 250, 268-69 (N.D. Cal. 2016).

6    This theory is again deeply flawed, starting with the fact that the Court has already

7 considered and rejected it twice in this case. *See Flo Health*, 349 F.R.D. at 584-85 (citing Dkt.

8 No. 490-2 at 20); Dkt. No. 752 at 1150:12-13. Meta raises it for a third time as if these rulings

9 were not in the record, and without any effort to suggest that the evidence at trial provides a basis

10 for revisiting the issue yet again.

11    This roadblock aside, Meta's argument is flatly at odds with California law and the federal

12 district court case on which it relies. *Campbell* featured claims under the CIPA and the federal

13 Electronic Communications Privacy Act (ECPA, also known as the federal Wiretap Act), 18

14 U.S.C. § 2701 *et seq.* The district court said "the ECPA 'makes the decision of whether or not to

15 award damages subject to the court's discretion.'" *Campbell*, 315 F.R.D. at 268 (citation omitted).

16 The court did not say the same for CIPA. *See generally id.* The court also did not apply the

17 discretionary factors to an award under CIPA. *Id.* at 268-69. In effect, the court addressed only

18 ECPA with respect to the factors, and did not say a word along the same lines for CIPA. *Id.* Meta

19 does not suggest that this was simply an oversight or inadvertence such that the ECPA discussion

20 might be grafted onto CIPA, and nothing in the decision indicates that might be the case. The

21 better reading of *Campbell* is that the district did not conclude that the discretionary test for ECPA

22 also applies to the award of statutory damages under CIPA. It bears mention that *Campbell* cited

23 two district court decisions that also did not construe CIPA. *See id.* at 268 (citing *DirecTV v.

24 Huynh*, No. 04-cv-03496-CRB, 2005 WL 5864467, at *8 (N.D. Cal. May 31, 2005), and *Dish

25 Network LLC v. Gonzalez*, No. 13-cv-00107-LJO-SKO, 2013 WL 2991040, at *8 (E.D. Cal. June

26 14, 2013)). Meta does not say why federal district court decisions applying a federal statute that is

27 not in play in this case might be relevant to the Court's task of "ascertain[ing] and apply[ing] the

28 existing California law." *Cherkin v. PowerSchool Holdings, Inc.*, No. 24-cv-02706-JD, 2025 WL

844378, at *1 (N.D. Cal. Mar. 17, 2025) (quoting *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 889 (9th Cir. 2010)).

Even considered as a free-standing question independent of Meta's misreading of *Campbell*, the imposition of a discretionary test for statutory damages cannot be squared with the plain language of CIPA. The statute states that a plaintiff "may bring an action against the person who committed the violation for the greater of the following amounts: (1) Five thousand dollars ($5,000) per violation[;] (2) Three times the amount of actual damages, if any, sustained by the plaintiff." Cal. Pen. Code § 637.2(a)(1)-(2). "It is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered, or be threatened with, actual damages." *Id.* § 637.2(c). This plain text establishes that the California legislature intended an award of $5,000 to be the remedy for a violation of CIPA, irrespective of actual damage. *See Ribas*, 38 Cal. 3d at 365 (stating that Section 637.2 "was intended to provide those who suffer an infringement of this aspect of their personal liberty a means of vindicating their right"). There is no room here for courts to impose multi-factor tests that the language of the statute does not contemplate and the California legislature did not authorize. *See, e.g.*, *Azar v. Allina Health Servs.*, 587 U.S. 566, 581 (2019) ("[C]ourts aren't free to rewrite clear statutes under the banner of our own policy concerns."); *Brown v. City of Inglewood*, 18 Cal. 5th 33, 45 (2025) ("Courts are not authorized to 'rewrite statutes.'" (citation omitted)); *Metromedia, Inc. v. City of San Diego*, 32 Cal. 3d 180, 187 (1982) (a court cannot rewrite a statute "in the exercise of its power to interpret"). That is all the more true under principles of federalism when, as here, a federal court is construing a state statute. *See Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 925 (9th Cir. 2004) ("As we are construing a state statute, our role is to interpret the law as would the [California] Supreme Court.").

The plain language of ECPA is different in a crucial respect. ECPA provides that an aggrieved person "may in a civil action recover from the person or entity . . . which engaged in that violation such relief *as may be appropriate*." 18 U.S.C. § 2520(a) (emphasis added); *see also id.* § 2520(c)(2) ("[T]he court *may* assess as damages whichever is the greater of . . . ." (emphasis added)). As this plain text makes clear, Congress granted discretion to the district courts in

22

fashioning an award under ECPA.  Not so for the California legislature in CIPA.  Meta makes no effort to reconcile this crucial difference distinguishing ECPA and CIPA with respect to remedies.

As a closing note on damages, Meta offers for the first time a single, perfunctory sentence to the effect that individualized inquiries about whether users' statutory damages are individually excessive will predominate.  Dkt. No. 766 at 9.  The comment is not accompanied by any meaningful argument or analysis and is properly disregarded on that basis.  *See Flo Health*, 349 F.R.D. at 576.

### f.   Other Issues Meta May Raise "If an Appeal Is Necessary"

Meta makes the odd statement that it "raised various other arguments in opposing class certification" which it "will not repeat . . . here and instead will note only that those arguments may be informed by the trial evidence."  Dkt. No. 766 at 9.  The Court's standing order proscribes this sort of wholesale "incorporation" by reference of prior filings.  *See Flo Health*, 2025 WL 1476905, at *3; J. Donato, Standing Order for Civil Cases ¶ 22.  This proscription carries extra weight when the only apparent purpose is to stockpile points for an appeal without actually discussing them.  It is also entirely unclear what Meta means by "informed by trial evidence" because the decertification request was presented without any meaningful analysis whatsoever of the evidence admitted at trial.

A discussion of implied consent is warranted so that the record on this issue is clear.  As mentioned, before trial, Meta and the other defendants tried to make much of implied consent by the class on the basis of an article critical of Flo's privacy practices that was published in the *Wall Street Journal* in February 2019.  The problem for Meta is that it did not pursue this potential defense at trial.  It did not seek to introduce the news report into evidence for purposes of demonstrating consent.  And contrary to Meta's remark, Dkt. No. 766 at 10, it did not question the named plaintiffs about it in any substance.  Plaintiff Chen was asked if she saw "any news articles" generically, without reference to the *Wall Street Journal* or those other articles' contents, Dkt. No. 748 at 233:5-6, and Gamino was never asked about any articles, *id.* at 291:16-292:15.  Wellman said she heard about "a Wall Street Journal article that was published in February of 2019 . . . because of this lawsuit," but the jury never heard or saw any evidence about what that

1    mystery article had to say. *Id.* at 224:3-13; *see also id.* at 224:14-22 (sustaining hearsay

2    objection). A Meta attorney made a passing comment to the effect that the article "had similar

3    allegations" to the lawsuit, *id.* at 224:3-5, but that, of course, is not evidence. Meta also omits the

4    fact that it specifically asked the Court to exclude from trial all evidence concerning the *Wall*

5    *Street Journal* and related articles except for purposes of "establishing the date on which the

6    statute of limitations period began to run." Dkt. No. 640 at 1. Meta cannot peddle speculation

7    about individualized issues of consent based on evidence it never presented during trial and which

8    it asked the Court to limit sharply. These shortfalls add to the problem identified in the

9    certification order that there is no evidence of the article's readership or "penetration." Dkt. No.

10   752 at 1144:17-23; *see Flo Health*, 349 F.R.D. at 575.

       The statute of limitations defense also deserves clarity. Meta voluntarily elected to

12   withdraw this defense during trial and not present it to the jury. Dkt. No. 743. Consequently, the

13   door is closed to any suggestion that plaintiffs' claims were untimely or stale.

14       **E.    REQUEST TO MODIFY CLASS DEFINITION TO EXCLUDE**
              **PREGNANCY INFORMATION**

16       Meta mentions for the first time an objection to typicality and adequacy under Rule 23(a)

17   on the ground that none of the named plaintiffs were "pregnant when they completed the Flo

18   App's onboarding survey" and therefore did not "share[] pregnancy (as opposed to only

19   menstruation) information." Dkt. No. 766 at 10. A good argument can be made that this

20   ostensible concern is a day late and a dollar short, and should be disregarded. Meta had a full and

21   fair opportunity to make this point in the prior certification proceedings and did not do so. *See Flo*

22   *Health*, 349 F.R.D. at 573-74.

       Even if it were considered on the merits, it is not well taken. Typicality "focuses on the

24   class representative's claim -- but not the specific facts from which the claim arose -- and ensures

25   that the interest of the class representative 'aligns with the interests of the class.'" *Just Film, Inc.*

26   *v. Buono*, 847 F.3d 1108, 1116 (9th Cir. 2017) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d

27   497, 508 (9th Cir. 1992)). The evidence at trial confirmed the Court's prior determination that

28   (1) the named plaintiffs and absent class members would "have the same or similar injury,"

United States District Court
Northern District of California

namely the privacy injury from the surreptitious recording of onboarding communications with the Flo App that concerned their personal sexual or reproductive health; (2) the challenged conduct by Meta "[was] not unique to the named plaintiffs"; and (3) the representatives were not "preoccupied with defenses unique to [them]." *Id.* at 1116 (citations omitted). Although they were not pregnant when they used the app, plaintiffs' claims are "reasonably coextensive with those of absent class members." *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014) (citation omitted).

Adequacy asks: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 985 (9th Cir. 2011) (citation omitted). The trial evidence, and counsels' performance at trial, again confirmed that these requirements have been met. There was no evidence of a conflict of interest, and named plaintiffs' and their counsels' willingness to vigorously prosecute the case is exemplified by how they tried the case and won.

Meta says that "privacy interests implicated by information about menstruation . . . are different from those for the much narrower segment of women who are pregnant." Dkt. No. 766 at 10. What that might mean is entirely unclear, and Meta did not present any evidence at trial that might support this speculative comment. None of this was a surprise to Meta because the pregnancy status of the named plaintiffs was discussed in deposition testimony presented during certification. *See, e.g.*, Dkt. No. 490-3 at 286, 364-65, 416. It is not new evidence that might warrant a narrowing of the class.

## II. MOTION FOR JUDGMENT AS A MATTER OF LAW

### A. LEGAL STANDARD

A party that moved for judgment as a matter of law (JMOL) during a jury trial, as Meta did, may "file a renewed motion for judgment as a matter of law" after the jury returns its verdict. Fed. R. Civ. P. 50(b). "Judgment as a matter of law is appropriate when 'the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to that of the jury.'" *In re Google Play Store Antitrust Litig.*, No. 21-md-02981-JD, 2024 WL 3302068, at *3 (N.D. Cal. July 3, 2024) (citation omitted), *aff'd,* 147

1    F.4th 917 (9th Cir. 2025).  The Court "must uphold the jury's award if there was any 'legally

2    sufficient basis' to support it," *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd*, 762 F.3d

3    829, 842 (9th Cir. 2014) (citation omitted), meaning that JMOL is appropriate where "the jury

4    could have relied only on speculation to reach its verdict," *Lakeside-Scott v. Multnomah Cnty.*,

5    556 F.3d 797, 803 (9th Cir. 2009).  "In making this determination, the Court is to consider all of

6    the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party, and

7    it may not make any credibility determinations or reweigh the evidence."  *Google Play*, 2024 WL

8    3302068, at *3 (cleaned up).  "Put more plainly, the Court must 'draw all inferences in favor of

9    the verdict.'"  *Id.* (citation omitted).

### B.    META EAVESDROPPED ON AND/OR RECORDED PLAINTIFFS' COMMUNICATIONS

12       Meta starts its bid to erase the verdict by saying that it did not eavesdrop on or record

13   users' communications with the Flo App because the transmissions at issue were separate

14   communications between the app and Meta, distinct from the communications between the users

15   and the app.  Dkt. No. 765 at 2-3.  This, Meta says, made the transmissions it captured merely

16   "secondhand repetitions," which are beyond the scope of Section 632.  *Id.*

17       Not so.  There was nothing "secondhand" about Meta's recordings.  As Dr. Egelman

18   testified, when a user clicked "Next" during the onboarding survey, the Flo App would "invoke[]

19   the Facebook SDK," and the SDK would begin to record the information as it was being logged

20   and processed by the app.  Dkt. No. 749 at 421:18-423:10, 429:2-19, 433:10-22, 434:10-16.  It

21   was the code written by Meta that was listening in and recording the communication.  *See, e.g.*, *id.*

22   at 424:1-10, 429:2-3.  The evidence at trial amply supported the conclusion that Meta was directly

23   acquiring the content of the user's communications with the Flo App in real time.

24       It makes no difference that the words involved were not always literally the same.  The

25   jury saw exhibits showing what the Flo App looked like on a user's phone during certain

26   communications.  *See, e.g.*, Exs. 610-S, 610-T, 610-U, 610-V, 610-W, 610-X.  Dr. Zervas testified

27   about the code in the Flo App.  *See* Dkt. No. 750 at 726:22 ("So this is just a file from Flo's

28   programming code.").  The Flo App code in his testimony differed in appearance from the app

United States District Court
Northern District of California

26

screenshots.  *See id.* at 726:23-727:13 (describing, *inter alia*, a "long rectangle in light blue color" that is "a lot of code" and "yellow box" containing "parameters").  From this and other evidence, the jury could reasonably conclude that the behind-the-scenes code accurately reflected what was shown to the user and what the user chose in response.  Dr. Egelman testified to this very point when discussing the first onboarding question.  The software is "not going to store 'I want to get pregnant'" because it "doesn't keep track of data like that."  Dkt. No. 749 at 421:1-3.  He testified that the event names and parameters are "variable names" the app uses to log and process "which of the two buttons the user picked and, you know, how [the buttons] were labeled."  *Id.* at 421:4-8; *see also* Dkt. No. 750 at 743:1-23.  In sum, substantial evidence was introduced showing that Meta acquired exactly the content the user communicated to the Flo App with respect to her menstrual and ovulation information, pregnancy status, and the like.

The California Court of Appeal has provided useful guidance on this topic.  *Gruber v. Yelp Inc.*, 55 Cal. App. 5th 591 (2020), concluded that Section 632 applies even when the communications of only one party to the conversation are recorded.  The *Gruber* court expressly distinguished between a "'secondhand repetition' that the California Supreme Court has deemed outside the scope of CIPA," and a recording that "revealed *firsthand and in real time* [one party's] understanding of or reaction to [the other party's] words," which is prohibited by CIPA Section 632.  *Id.* at 608-09 (emphasis in original) (citing *Dietemann v. Time, Inc.*, 449 F.2d 245, 249 (9th Cir. 1971)).  The evidence at trial established that there was "one communication" and one "exchange of information" here, such as a user checking a box to communicate that she wanted to track her cycle or get pregnant.  *Id.* at 608; *see also People v. Nakai*, 183 Cal. App. 4th 499, 517 (2010) (concluding that "'communication,' for purposes of section 632, includes conduct").  The evidence permitted the conclusion that the SDK's recording of the "variable names," Dkt. No. 749 at 421:4, which the Flo App logged to process how a user interacted with and responded to a particular screen, "revealed firsthand and in real time [the Flo App's] understanding of or reaction to" the user's communicative selection.  *Gruber*, 55 Cal. App. 5th at 609 (emphasis omitted).  The same goes for the SDK's captures of the Flo App's communications back to the user, which

1    Dr. Egelman described as "the other half of the conversation."  Dkt. No. 749 at 553:10; *see*

2    *Gruber*, 55 Cal. App. 5th at 608.

3        There was sufficient evidence from which the jury could find that the Facebook SDK

4    directly eavesdropped on and recorded the communications between the Flo App and users.

5        **C.  META USED AN ELECTRONIC RECORDING DEVICE**

6        Meta's suggestion that the evidence could not establish that the SDK was an electronic

7    recording device is equally unavailing.  In Meta's view, a "device" as used in Section 632 means a

8    piece of physical equipment, and not computer code in an SDK.  Dkt. No. 765 at 3-4.

9        The point is again not well taken.  To start, the California legislature expressly intended

10   that CIPA not be tethered to any particular technology.  *See* Cal. Pen. Code § 630 (noting the

11   "serious threat" to privacy created by "advances in science and technology [which] have led to the

12   development of new devices and techniques for the purpose of eavesdropping upon private

13   communications").  A number of district courts have also so held.  *See, e.g.*, *Yockey v. Salesforce,*

14   *Inc.*, 745 F. Supp. 3d 945, 955-56 (N.D. Cal. 2024) (discussing cases).

15       Even spotting Meta an assumption that a physical device is required, there was sufficient

16   evidence for the jury to reasonably conclude that a Flo App user's phone fit the bill.

17   Mr. Karkanias, one of Meta's own expert witnesses, testified about a "laboratory environment" he

18   set up to conduct his testing.  This "included the actual hardware targeted for the app, so there's a

19   Galaxy S5 and iPhone 6 and iPhone SE.  These were the devices present during the class period,

20   and [I] used software to intercept the message traffic, as it's called, as the app was operated on the

21   device."  Dkt. No. 750 at 658:2-7.  He explained that he also had to use a "tool called Sideloadly"

22   to "load the app onto the iPhone" since the relevant versions were "no longer available on the App

23   Store," while Android devices "allow[] you to load what are called APKs, the binaries, directly on

24   the device."  *Id.* at 658:12-18.  Dr. Zervas testified that the Flo App code, once compiled into a

25   format that a computer (or phone) can read, is a "set of instructions that is run on your phone when

26   you open the app."  *Id.* at 743:3-4; *see also id.* at 723:4-9, 742:20-743:3.

27       This and similar evidence at trial established that a physical device, namely a cell phone,

28   was essential to the operation of the Flo App and the Meta SDK, and vice versa.  As each juror

United States District Court
Northern District of California

1    would also know from daily life, a phone is an unusable brick without apps and other computer

2    coding, and the apps and codes are useless unless run on a phone or other device.  *See Pac. Shores*

3    *Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1168 (9th Cir. 2013) ("Juries are expected

4    to rely on their common sense . . . [and] 'common experience of living on a populated planet.'"

5    (citation omitted)).

6        The trial evidence consequently supported the jury's conclusion that "Meta intentionally

7    eavesdropped on and/or recorded [plaintiffs'] conversation by using an electronic device."  Dkt.

8    No. 756 at ECF p. 1.  Meta's contention that a "device" must be capable of operation standing

9    alone was offered without support, *see* Dkt. No. 765 at 4, and has no merit.  Meta's final argument

10    that there was no qualifying "device" here because what was recorded was generated by Flo and

11    not the users, *see id.*, is merely a repacking of the argument rejected in Section II.B, *supra*.

12        **D.    META INTENTIONALLY USED AN ELECTRONIC DEVICE**

13        Meta's contention that it did not intentionally use an electronic device depends upon two

14    doubtful propositions: Meta did not "use" the SDK because Flo was the one who integrated the

15    SDK into its app and controlled "what (if any) data to send"; and Meta repeatedly told Flo and

16    other developers not to send "any 'health' or 'sensitive' information."  Dkt. No. 765 at 4-5.

17    Neither point is grounds for disturbing the verdict.

18        There was ample evidence from which the jury could have reasonably concluded that Meta

19    used its SDK running on users' phones to record and transmit the at-issue event names and

20    parameters.  Undisputed evidence at trial demonstrated that Meta engineered the SDK and

21    encouraged its use by making it easily available on its website and other sites that Dr. Zervas

22    analogized to "public libraries."  *See, e.g.*, Dkt. No. 750 at 718:10-11, 722:19-21; *see also, e.g.*,

23    Dkt. No. 764-11 at ECF pp. 12-13; Dkt. Nos. 764-15, 764-16.  There was substantial testimony

24    and evidence that, during the class period, Meta actively encouraged app developers to incorporate

25    its SDK into their apps because the data Meta obtained allowed it to reap massive profits from

26    analytics and advertising businesses.  *See, e.g.*, Dkt. No. 749 at 425:17-23, 430:6-431:10, 548:11-

27    14, 552:9-13; Dkt. No. 750 at 717:8-19, 719:11-19, 720:1-14, 722:24-723:1, 818:16-819:24,

28    821:4-8, 822:24-823:16, 829:20-830:9, 846:4-10; Dkt. No. 751 at 951:3-16, 1069:14-1070:21.

United States District Court
Northern District of California

1    The trial evidence also showed that the Flo App used the code as written and provided by Meta.

2    Dkt. No. 749 at 423:6-424:10, 439:3-7; Dkt. No. 750 at 741:18-21.

3         The parties agree that the SDK was on users' phones by virtue of incorporation into the Flo

4    App.  Meta takes this to mean that the SDK was "meshe[d]" with the rest of the code "to become

5    'a single cohesive set of instructions.'"  Dkt. No. 765 at 4.  The notion appears to be that Meta

6    cannot "use" the SDK within the meaning of Section 632 if the SDK no longer independently

7    "exists."[6]  The trial evidence showed otherwise.  Dr. Egelman and Dr. Zervas identified distinct

8    lines and sets of code written by Meta that performed the functions for which the SDK was

9    designed.  Dkt. No. 749 at 423:6-424:10, 439:3-7; Dkt. No. 750 at 741:18-21, 742:3-10; *see also*

10   *id.* at 776:11-14 (Dr. Zervas testimony that "I have not seen any evidence that the open source

11   code that is published and we know as the Facebook SDK was modified prior to being compiled

12   into the Flo app.").  Consequently, the jury could reasonably conclude that the SDK operated

13   within the app on users' phones, and Meta "used" it, to record and transmit user data back to Meta.

14   *See id.* at 742:8; Dkt. No. 749 at 429:2-19.

15        Meta's argument that there was no evidence that it acted "intentionally" is also without

16   merit.  Dkt. No. 765 at 5-6.[7]  The jury was presented with more than enough evidence to

17   reasonably conclude that Meta recorded users' communications with the Flo App "with the

18   purpose or desire of recording a confidential conversation," or "with the knowledge to a

19   substantial certainty that [its] use of the [SDK] will result in the recordation of a confidential

20   conversation."  *Rojas v. HSBC Card Servs. Inc*, 20 Cal. App. 5th 427, 435 (2018) (emphasis

21   omitted) (quoting *People v. Superior Court (Smith)*, 70 Cal. 2d 123, 134 (1969)).  This included

22   evidence indicating that Meta: (1) reaped substantial revenues from its advertising business;

23   (2) intended the SDK to be broadly incorporated to obtain consumer data for use in advertising

24   and machine learning models; (3) knew that it was receiving personal health information of

25

26   _____

27   [6]  Meta does not contend that "use," as used in Section 632, means anything other than its plain
     and ordinary meaning.  *See People v. Rhodius*, 17 Cal. 5th 1050, 1057 (2025).

28   [7]  Meta's contention that the jury was instructed incorrectly on the intentionality element is
     discussed in Section III.B, *infra*.

individuals via the SDK; (4) feared a loss of revenues without access to data obtained via the SDK; and (5) had the ability to stop the acquisition of personal information from apps during the class period, but declined to implement such safeguards until just after the end of the class period.

To provide some highlights, undisputed evidence established that Meta generates "a substantial portion" of its revenues from advertising.  Dkt. No. 750 at 818:16-18; *see, e.g.*, *id.* at 818:19-24, 896:14-21, 1069:14-22; Ex. 111-R.  Testimony by the parties' experts and Meta's witnesses also established that Meta used data acquired through the SDK in its advertising algorithms and machine learning models, and that the data was quite valuable to Meta's bottom line.  *See, e.g.*, Dkt. No. 750 at 819:3-820:16, 821:1-25, 823:1-16.

There also was evidence that Meta did not restrict or eliminate the acquisition of personal data for this very reason.  *See, e.g.*, Dkt. No. 749 at 526:6-14 ("Meta could absolutely just terminate service to every health-related app, every financial app, every child-directed app, but they choose not to, and instead, they litigate it . . . and that tells you that that data is probably valuable to Meta, given that they need it for their advertising business and they're spending millions of dollars to litigate it . . . rather than just turning off those transmissions that they tell the public that they don't want."); *see also* Dkt. No. 750 at 822:24-823:16, 846:4-23.  As the jury heard, Flo itself illustrates the situation.  Flo was a customer of Meta's advertising services during the class period.  *See* Ex. 404.  Flo created "custom audiences" for the advertisements it purchased from Meta, *id.*, which witness Tobias Woolridge, who has worked as a senior software engineer at Meta since 2015, described as "sort of a rule" that defines to whom the advertiser would like the ad to be shown, such as "people who have installed my app or people who have purchased something in my app."  Dkt. No. 751 at 1008:12-21; *see also id.* at 1007:9-16.  Two of those custom audiences were based on custom event data the SDK would have transmitted to Meta from the Flo App.  *Compare* Ex. 404 *with* Exs. 426, 426-A; *see also* Dkt. No. 751 at 1008:5-12.  Dr. Egelman testified that, based on his experience and understanding of "how the SDK works" and how "[Meta's] business functions," "Meta employs people to make sense of all the analytics data that they receive so that they can then use [it in] their advertising business."  Dkt. No. 749 at 552:9-19.

United States District Court
Northern District of California

The evidence indicated that Meta was far from oblivious to the personal data it was obtaining. Witness Satterfield, who was a manager and later promoted to director of privacy and public policy at Meta during the class period, *see* Dkt. No. 750 at 817:25-818:4, sent an email in March 2019 to Rob Sherman, "Meta's deputy chief privacy officer for policy," *id.* at 847:16-17. Satterfield told Sherman that Meta was "facing increasing scrutiny" about data collection from its SDK and that "[m]any of these aren't new questions, of course; been getting them for years." Ex. 1264. Satterfield acknowledged that, in his capacity as manager of privacy and policy at Meta, and as early as 2016, he was "aware of the risk" that the SDK could and would transmit sensitive or private information like "health information." Dkt. No. 750 at 837:22-838:4. Witness Woolridge also acknowledged he knew of the risk that Meta was receiving health information from its SDK as early as 2018. Dkt. No. 751 at 962:7-963:7. Documentary evidence provided additional proof that this risk was known within Meta. *See, e.g.*, Dkt. No. 750 at 837:1-8, 847:18-14, 850:1-8; Dkt. No. 751 at 974:18-22; Exs. 383-R, 1260, 1264.

Other evidence established that Meta had the ability to control the information it received from the SDK during the class period. *See* Dkt. No. 749 at 526:4-14 ("Meta receives the names of every single one of the apps that sends them data, and Meta could absolutely just terminate service to every health-related app, every financial app, and child-directed app, but they choose not to."); *see also, e.g.*, *id.* at 845:2-4, 851:8-12; Dkt. No. 751 at 940:19-24, 941:20-942:10, 983:19-23, 985:6-987:22; Ex. 104-R at 20-21. Even so, Satterfield testified that Meta took no affirmative steps to control the flow of personally identifiable information generally until 2018, and did not restrict the acquisition of health information until several months after the class period ended in 2019. Dkt. No. 750 at 843:3-845:4. The evidence indicated that Meta acted only on the heels of bad press about its practices. *See, e.g.*, *id.* at 849:21-850:8; Dkt. No. 751 at 963:23-964:16; *see also* Exs. 106, 1264.

Meta protests rather halfheartedly that this evidence showed knowledge of a "risk" as opposed to knowledge that developers "might actually" send confidential communications. Dkt. No. 765 at 6 (emphases omitted). Meta fails to explain this ostensible distinction and in any event, the jury could reasonably construe the evidence discussed above and other evidence like it as

1   proof of sufficient knowledge on Meta's part.  The evidence did not show that the SDK merely

2   "'by chance' record[ed] a confidential communication."  *Smith*, 70 Cal. 2d at 133.

3         Meta's other arguments against intentionality fail.  For its defense that it "contractually

4   forbade Flo from sending any 'health' or 'sensitive' information," Dkt. No. 765 at 5 (citing

5   Ex. 1223 at ECF p. 4), the jury was perfectly free to conclude that Meta's "[a]ctions speak louder

6   than words," as proposed by plaintiffs' counsel.  Dkt. No. 750 at 854:25-855:1.  As discussed

7   above, there was sufficient evidence at trial that Meta knew it was getting data it shouldn't be

8   getting, and it did not implement its own measures to stop that.  A rational jury could credit that

9   evidence over Meta's statements to app developers.

10        **E.    META DID NOT HAVE PLAINTIFFS' CONSENT**

11        Recycling an argument made in prior proceedings, Meta says that named plaintiffs Chen,

12  Gamino, and Wellman were Facebook users and consented to Meta's privacy policy, which

13  "clearly and broadly disclosed that Meta could receive data from third-party apps reflecting users'

14  activity on those apps."  Dkt. No. 765 at 7.  In Meta's view, this means that the jury's finding that

15  plaintiffs did not consent to Meta's conduct cannot stand.

16        Not so.  The "relevant question" is whether "a reasonable user reading them would think

17  that he or she was consenting to the data collection" after "reviewing the terms" of the privacy

18  disclosures.  *Calhoun v. Google, LLC*, 113 F.4th 1141, 1148 (9th Cir. 2024) (quoting *In re*

19  *Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 602 (9th Cir. 2020)).  There was more than

20  enough evidence at trial for the jury to conclude that Chen, Gamino, and Wellman did not consent

21  to the recording of their answers to the onboarding survey because a reasonable user could find

22  Meta's privacy disclosure too ambiguous to "'explicitly notify' users of the conduct at issue."  *Id.*

23  at 1147 (citation omitted).

24        Meta is quite vague about the language it believes "explicitly notif[ied]" users of the

25  conduct at issue.  *Id.* (citation omitted).  It refers in wholesale fashion to a dozen pages of

26  disclosures, and does not identify a clear sentence or paragraph of notice readily accessible to a

27  Facebook user.  Many portions of the pages Meta mentions have no bearing here at all, such as

28  terms telling Facebook users not to do certain things with their account.  *See* Ex. 1224 at ECF pp.

1    2-3.  Overall, Meta's own policy cites undercut the notion that its users were given fair notice of

2    the conduct at issue in this case.

3         Even the most ostensibly relevant portions of Meta's policies do not help it.  For example,

4    a Facebook 2018 policy stated that "[a]dvertisers, app developers, and publishers can send us

5    information through Facebook Business Tools they use," such as the Facebook SDK.  Ex. 70 at

6    ECF p. 3.  "These partners provide information about your activities off Facebook -- including

7    information about your device, websites you visit, purchases you make, the ads you see, and how

8    you use their services -- whether or not you have a Facebook account or are logged into

9    Facebook."  *Id.*  Meta says this fairly advised users that Meta would acquire information from

10   third-party companies about a user's in-app communications, but the quoted language says

11   nothing of the sort.  The phrase "how you use their service" did not clearly identify "the particular

12   conduct, or [] substantially the same conduct" in dispute here.  *Calhoun*, 113 F.4th at 1147

13   (quoting *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1149 (9th Cir. 2012)).

14        Meta looks for help to an unpublished memorandum disposition, *Smith v. Facebook, Inc.*,

15   745 F. App'x. 8 (9th Cir. 2018) (unpub.), Dkt. No. 765 at 7, but that case is readily

16   distinguishable.  The plaintiffs there alleged only that they had viewed information on publicly

17   available websites, and their allegations concerned navigational information.  *Id.* at 8-9.  The

18   circuit found that this information was not "sensitive," and showed "only that Plaintiffs searched

19   and viewed publicly available health information that cannot, in and of itself, reveal details of an

20   individual's health status or medical history."  *Id.* at 9.  The opposite is true here.

21        Meta's mention of Flo's own privacy policy also gives it no relief.  Dkt. No. 765 at 8.  The

22   Flo policy expressly assured its users that it would not communicate their personal information to

23   Meta in any way.  *See, e.g.*, Ex. 29 at ECF p. 4 ("We may share certain Personal Data, excluding

24   information regarding your marked cycles, pregnancy, symptoms, notes, and other information

25   that is entered by you and that you do not elect to share, with third party vendors."); Ex. 132 at

26   ECF p. 2 ("We will only provide these third parties with access to information that is reasonably

27   necessary to perform their work or comply with the law"); Ex. 147 at ECF p. 2 ("Third parties will

28   not have access to our survey results.").

34

1    The jury's finding that Meta did not have the consent of all parties, Dkt. No. 756 at ECF

2    p. 2, was more than adequately supported by the evidence at trial.

3    **F.      PLAINTIFFS' COMMUNICATIONS WERE CONFIDENTIAL**

4    Section 632 defines a "confidential communication" to mean "any communication carried

5    on in circumstances as may reasonably indicate that any party to the communication desires it to

6    be confined to the parties thereto" but that definition is subject to several express exclusions. Cal.

7    Pen. Code § 632(c). The exclusions include communications "made in a public gathering or in

8    any legislative, judicial, executive, or administrative proceeding open to the public, or in any other

9    circumstance in which the parties to the communication may reasonably expect that the

10   communication may be overheard or recorded." *Id.*

11   Meta says plaintiffs' communications in the onboarding survey were not "confidential"

12   because users knew that at least Flo was storing their answers. Dkt. No. 765 at 8 (reading Section

13   632(c) to mean no statutory violation "so long as a party reasonably expects that *someone* is

14   recording") (emphasis by Meta). The point is not well taken. It is black-letter law in California

15   that the "fundamental task" of statutory interpretation "is to determine the Legislature's intent so

16   as to effectuate the law's purpose." *People v. Gomez*, 110 Cal. App. 5th 419, 429 (2025) (quoting

17   *People v. Braden*, 14 Cal. 5th 791, 804 (2023)). The Court "[does] not view the language of the

18   statute in isolation." *MacIsaac v. Waste Mgmt. Collection & Recycling, Inc.*, 134 Cal. App. 4th

19   1076, 1083 (2005) (citation omitted). Rather, the language must be understood "in the context of

20   the statutory framework as a whole in order to determine its scope and purpose and to harmonize

21   the various parts of the enactment." *Gomez*, 110 Cal. App. 5th at 429 (quoting *Braden*, 14 Cal.

22   5th at 804).

23   Construing Section 632 as a whole, it is plain that subsection (c) refers to communications

24   in circumstances where the parties reasonably expect to be overheard or recorded by a non-party

25   to the communication. Subsection (c) is the third item in a list that specifies "public gathering[s]"

26   and "legislative, judicial, executive, or administrative proceeding[s] open to the public." Cal. Pen.

27   Code § 632(c). The unifying thread is a recording made in circumstances in which no reasonable

28   person could expect confidentiality, such as in a public meeting or other gathering. That is not the

United States District Court
Northern District of California

situation here, as evidenced by the assurances in Flo's own privacy policy. *See* Ex. 29 at ECF p.4 ("We may share certain Personal Data, excluding information regarding your marked cycles, pregnancy, symptoms, notes, and other information that is entered by you and that you do not elect to share, with third party vendors."). This conclusion is bolstered by the definition of a "person" in Section 632, which "excludes an individual known by all parties to a confidential communication to be overhearing or recording the communication." Cal. Pen. Code § 632(b). The evidence at trial established that Meta was not "known" within this definition to Flo users.

This understanding of subsection (c) accords with the legislature's intent in CIPA, which was adopted to safeguard a person's "right to control the nature and extent of the firsthand dissemination of [her] statements." *Gruber*, 55 Cal. App. 5th at 608 (quoting *Ribas*, 38 Cal. 3d at 361); *see also Flanagan v. Flanagan*, 27 Cal. 4th 766, 775 (2002) ("[A] substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor." (citation omitted)). Meta's theory with respect to subsection (c) would undercut the privacy protections mandated by CIPA in a manner wholly at odds with its purpose. *See id.* ("[T]he *Frio* definition of 'confidential communication' that we here endorse better fulfills the legislative purpose of the Privacy Act by giving greater protection to privacy interests."); *Owens v. City of Oakland Housing, Residential Rent & Relocation Bd.*, 49 Cal. App. 5th 739, 744 (2020) (statutes should not be given an interpretation that would "frustrate the manifest purposes of the legislation as a whole or lead to absurd results" (cleaned up)).

### G.    META'S EXTRATERRITORIALITY AND INJURY ARGUMENTS ALSO FAIL TO DEFEAT THE JURY'S VERDICT

Meta's last two arguments for judgment as a matter of law are repeats of arguments it made in support of the decertification request. *See* Dkt. No. 765 at 9-11 *and compare with* Dkt. No. 766 at 5-6, 8-9. They do no better here.

For extraterritoriality, Meta says there was no evidence at trial "that any named plaintiff completed th[e] onboarding process while in California." Dkt. No. 765 at 9. This is another flawed argument by Meta. To start, as discussed in connection with the decertification request,

United States District Court
Northern District of California

CIPA Section 632 does not require proof that a defendant read, or attempted to read, a communication "being sent from, or received at any place within this state," as Section 631 does. *See* Cal. Penal Code § 631 *and compare with id*. § 632.  Meta simply ignores this critical difference in the text of the statute.

But even spotting Meta the point purely for discussion, it also ignores the evidence at trial. The jury was expressly instructed to accept as proven that plaintiffs Sarah Wellman, Jennifer Chen, and Tesha Gamino were "citizen[s] of the State of California who downloaded the Flo App."  Dkt. No. 744 (Final Jury Instructions), Instruction No. 14 (Stipulations of Fact).  The jury also heard directly from each of these plaintiffs.  Gamino testified that she currently lives in Riverside, California and has "lived in California" her "whole life," and she started using the Flo App in 2016.  Dkt. No. 748 at 289:14-17, 290:11-12.  Chen testified that she lives in Orange, California and she "first downloaded the Flo app in March 2017."  *Id*. at 229:12-13, 235:20-22. Wellman testified that she lives in Santa Rosa, California and has lived in California "[s]ince 2007."  Dkt. No. 747 at 146:12-15.  She remembered signing up for the Flo App in the "summer of 2018."  *Id*. at 148:14-17.  Meta did not try to rebut any of this by asking plaintiffs where they were geographically when they downloaded the Flo App, or otherwise challenge the trial evidence of a California location.

In the absence of evidence to the contrary and in light of the affirmative evidence of plaintiffs' current and longtime presence in California, the evidence at trial permitted the reasonable inference that the plaintiffs were in California when they completed the onboarding process.[8]  The jury was also shown trial exhibits establishing Meta's own presence in California, *see*, *e.g.*, Ex. 627-A at ECF p. 5 (dispute resolution clause designating forum of "U.S. District Court for the Northern District of California or a State court located in San Mateo County"), which supported the inference that it would have received the transmissions at issue and formulated its relevant policies and practices here.  Meta has not come close to demonstrating that there are any CIPA extraterritorial application concerns which might warrant vacating the verdict.

---

[8]  As discussed, the class that proceeded to trial was expressly limited to California residents.

1        For the injury issue, Meta again tries to say that plaintiffs failed to show that they suffered

2   any actual injury under Section 637.2 or that they can satisfy *Campbell v. Facebook Inc.*, 315

3   F.R.D. 250, 268 (N.D. Cal. 2016).  *See* Dkt. No. 765 at 10-11.  These arguments miss the mark for

4   the reasons discussed above.  *See* Section I.D(e), *supra*.

5   **III.    REQUEST FOR A NEW TRIAL**

6        **A.    LEGAL STANDARD**

7        "Rule 59 permits the Court to grant a new trial on all or some of the issues, and to any

8   party, 'for any reason for which a new trial has heretofore been granted in an action at law in

9   federal court.'"  *Google Play*, 2024 WL 3302068, at *3.  Unlike a motion under Rule 50, the Court

10  is "not required to view the trial evidence in the light most favorable to the verdict" for purposes

11  of determining if a new trial is warranted under Rule 59.  *Experience Hendrix*, 762 F.3d at 842.

12  Even so, a new trial may not be granted "simply because [the Court] would have arrived at a

13  different verdict."  *Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 819 (9th

14  Cir. 2001).  "A trial court may grant a new trial only if the verdict is against the clear weight of the

15  evidence."  *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002) (citing *Silver Sage*, 251 F.3d at

16  818-19).

17       The Court cannot conclude that the verdict here was "contrary to the clear weight of the

18  evidence."  *Experience Hendrix*, 762 F.3d at 846.  A new trial is denied.

19       **B.    JURY INSTRUCTION RE INTENT**

20       There was no error in the intent instruction that warrants a new trial, as Meta suggests.  *See*

21  Dkt. No. 765 at 11-13.  The jury was instructed that a "recording of a confidential conversation is

22  intentional if the person using the recording equipment does so with the purpose or desire of

23  recording a confidential conversation, or with the knowledge to a substantial certainty that his use

24  of the equipment will result in the recordation of a confidential conversation."  Dkt. No. 744 at 19.

25  This language was drawn directly from *Rojas*, a California Court of Appeal decision construing

26  CIPA and quoting the Supreme Court of California.  Dkt. No. 741 at 19; *see Rojas*, 20 Cal. App.

27  5th at 435 (quoting *Smith*, 70 Cal. 2d at 134).

28

United States District Court
Northern District of California

38

1      Meta's suggestion that the jury instruction should have been based on the federal ECPA is

2  wholly misdirected.  There was no ECPA claim presented to the jury, and the ECPA and CIPA

3  differ in several respects, as discussed above.[9]

4      Meta also misreads California law in disputing the applicability of *Rojas*, 20 Cal. App. 5th

5  427.  Meta says there is a distinction "between a first-party use case [and] a third-party misuse

6  case," and says that *Rojas* was a first-party case because the defendant "in that case was recording

7  themselves."  Dkt. No. 752 at 1137:8-12; *see* Dkt. No. 765 at 12 (*Rojas* does not apply "when a

8  defendant merely makes a product generally available for third parties to use").  But none of the

9  CIPA cases cited by Meta draws such a line.  *See* Dkt. Nos. 699 at 46-47; 765 at 11-13.  Nor can it

10  be found in the plain language of CIPA, which applies to any "person who, intentionally and

11  without the consent of all parties to a confidential communication, uses an electronic amplifying

12  or recording device to eavesdrop upon or record the confidential communication."  Cal. Pen. Code

13  § 632(a).

14      Meta's suggestion that the jury instruction watered down the intent element again

15  misconstrues California law.  The California Supreme Court has held that CIPA's purpose is not

16  "to punish a person who intends to make a recording but only a person who intends to make a

17  recording of a confidential communication," reasoning that it would be "absurd" to conclude the

18  legislature intended to criminalize a birdwatcher who "record[s] the calls of wild birds on a game

19  reserve and at the same time accidentally pick[ed] up the confidential discussions of two

20  poachers."  *Smith*, 70 Cal. 2d at 133.  It held further that "the recording of a confidential

21  conversation is intentional if the person using the recording equipment does so with the purpose or

22  desire of recording a confidential conversation, or with the knowledge to a substantial certainty

23  that his use of the equipment will result in the recordation of a confidential conversation," on the

24  ground that "[s]uch a reading of the statute provides effective protection against 'eavesdroppers'

25

26  ───────────────

27  [9]  At the charge conference, counsel represented that Section 632 is "a state cause of action that
   the Ninth Circuit has said is modeled after the Federal Wiretap Act."  Dkt. No. 752 at 1138:3-4.
   Neither then, nor now, nor at any other time has Meta corroborated its representation with

28  authority, even after Meta was invited to "raise it in your JMOL if you need to."  *Id.* at 1138:10-
   11.

United States District Court
Northern District of California

1  without penalizing the innocent use of recording equipment." *Id.* at 134. This was the precise

2  language quoted in *Rojas* and given to the jury here. *See Rojas*, 20 Cal. App. 5th at 435.

3      The California cases that Meta pushes over *Rojas* and *Smith* do not point to a different

4  result. *See* Dkt. No. 765 at 12; Dkt. No. 699 at 46-47. In *Estate of Kramme*, the California

5  Supreme Court examined the term "intentionally" in a different statute, but in any event construed

6  it in a way that is perfectly consistent with the jury instruction here. *See Estate of Kramme*, 20

7  Cal. 3d 567, 571-73 (1978). In pertinent part, the Court reasoned that, like CIPA, the statute there

8  "specifie[d] that a particular result, rather than a particular act, must have been intended." *Id.* at

9  572; *compare with Smith*, 70 Cal. 2d at 133 ("Fairly read, the statute does not isolate the actor's

10  intent from the object to which it is directed, namely the confidential communication[.]"). And so,

11  "[f]or a result to be caused 'intentionally,' the actor must either desire the result or know, to a

12  substantial certainty, that the result will occur." *Kramme*, 20 Cal. 3d at 572-73. This matches

13  exactly the formulation in *Rojas* and *Smith*.[10]

14      Overall, the record establishes that the jury instruction on intentionality "fairly and

15  adequately cover[ed] the issues presented" and "correctly state[d] the law." *Mockler v.

16  Multnomah Cnty.*, 140 F.3d 808, 812 (9th Cir. 1998).

17      **C.    EVIDENTIARY RULINGS**

18      Meta has failed to identify any evidentiary errors that warrant a new trial. *See* Dkt.

19  No. 765 at 13-15.

20      To start, the so-called "inflammatory questions posed to Mr. Satterfield about 'opioid

21  manufacturers' and 'opioid distributors,'" Dkt. No. 765 at 14, were a non-event. Satterfield was

22  asked a single question about "opioid manufacturers or opioid distributors." Dkt. No. 750 at

23  845:10-17. He responded, "I'm not aware of that," and the examination promptly turned to other

24  topics. *Id.* at 845:22-846:2. Opioids were never mentioned again, and plaintiffs never drew any

25  ────────────────

26  [10] The second case to which Meta points held that Section 632 requires an "intent *to record a

27  *confidential communication*, rather than simply an intent to turn on a recording apparatus which
    *happened to record a confidential communication*." *Lozano v. City of Los Angeles*, 73 Cal. App.
    5th 711, 728 (2022) (emphasis in original) (citation omitted). This, too, accords with the given

28  instruction. *Lozano* expressly relied on *Smith* and *Kramme*. *See id.*

United States District Court
Northern District of California

1    attention to this single passing remark.  Even assuming for discussion purposes only that the

2    question should not have been posed, it was "more probably than not harmless."  *Obrey v.*

3    *Johnson*, 400 F.3d 691, 699 (9th Cir. 2005) (citation omitted).  A one-off question on a topic never

4    revisited at any other time during the trial is hardly a good reason to throw out the verdict.

5          So too for the objection that the "Court denied Meta's motion in limine to exclude other

6    sensitive information users may have entered into the Flo App that was *not* at issue." Dkt. No. 765

7    at 14 (emphasis by Meta).  Flo and Meta's motion in limine on this topic was denied "in principle"

8    and the Court stated that plaintiffs could introduce "within reason" such evidence "so long as it is

9    relevant."  Dkt. No. 692 at 5; *see also* Dkt. No. 693 at 52:10-11 ("I can't exclude anything right

10   now.  I just don't know what's going to happen.").  Especially when Flo was still a defendant in

11   the trial, the evidence that Meta complains of (relating to "things like 'symptoms,' 'body fluids,'

12   and 'sex,'" Dkt. No. 765 at 14) was highly relevant.  This is because the user information collected

13   by the Flo App was probative of users' expectations of privacy, the offensiveness of the intrusion,

14   whether Flo breached the terms of its contract, and whether plaintiffs were "patients" and Flo

15   shared "medical information."  It bears mention that Meta did not ask for a limiting instruction

16   after Flo settled and was excused from the trial; nor did it object to the evidence at trial.  To the

17   contrary, Meta itself introduced some of the evidence it complains about here when it examined

18   Dr. Egelman about the event names and parameters sent by the SDK.  *See, e.g.*, Dkt. No. 749 at

19   564:18-571:19; *see also id.* at 568:6-7 (counsel for Meta asking, "And pretty much for everyone in

20   the world, it's true at any moment they either did have sex or didn't have sex, right?"), Dkt.

21   No. 750 at 760:11-762:13 (similar colloquy with Dr. Zervas).  It bears mention that plaintiffs'

22   closing arguments to the jury focused on the onboarding questions only, since Flo was out of the

23   trial by that time, and did not mention the other evidence.  *See* Dkt. No. 753 at 1177:10-1203:15.

24   Overall, there was no evidentiary error on this issue that would justify a new trial.

25          Meta's argument that pregnancy-related information should not have been permitted

26   because the named plaintiffs "cannot represent a class with that injury," Dkt. No. 765 at 14-15, is

27   misguided for the reasons discussed in the decertification section above.  *See* Section I.E, *supra*.

28   Meta did not in any event object to this evidence during trial and it has failed to identify how this

evidence might have "tainted" the trial as it contends.  Dkt. No. 765 at 13 (quoting *Pau v. Yosemite Park & Curry Co.*, 928 F.2d 880, 888 (9th Cir. 1991)).

Meta's belated attempt to object to questions about jokes made by Meta employees is also poorly taken.  Intent was a hotly disputed issue at trial, with Meta putting forward the theory that it did not want to receive users' personal information via the SDK.  Witnesses Satterfield and Woolridge testified that Meta took privacy seriously and had terms of use with respect to the SDK and personal data.[11]  *See, e.g.*, Dkt. No. 750 at 875:16-22, 886:18-20, 893:20-24; Dkt. No. 751 at 981:8-12.  It was perfectly appropriate for plaintiffs to counter this testimony with evidence that Meta employees made jokes about user privacy, especially in connection with the personal information communicated by plaintiffs and the class through the Flo App.  *See, e.g.*, Dkt. No. 750 at 877:5-12 (Meta employee joked, "May the flow be with you").  This evidence was nothing like the "inherently inflammatory" evidence at issue in the cases to which Meta points, like a video of someone dying in real time.  *See* Dkt. No. 765 at 13 (citing *United States v. Davis*, No. 22-50058, 2024 WL 222271, at *2 (9th Cir. Jan. 22, 2024) (unpub.)).

The Court declines to take up Meta's suggestion that the questions lacked foundation when posed to witness Satterfield because Meta did not make the objection during the examination.[12] *See San Antonio Comm. Hosp. v. S. Cal. Dist. Council of Carpenters*, 125 F.3d 1230, 1238 (9th Cir. 1997) (objection raised at end of witness examination is "untimely" and "waived").  Objecting to foundation after the time when the other side would have had a fair opportunity to lay one is entirely improper.  *See Jerden v. Amstutz*, 430 F.3d 1231, 1236-37 (9th Cir. 2005) ("An objection

---

[11]  Despite being one of Meta's senior software engineers, Woolridge ducked questions of whether anything prevented Meta from "setting up the parameters and protections that you set up in 2019" back in 2015, by saying that Meta did so in 2019 or disputing whether "[he'd] characterize it that way."  Dkt. No. 751 at 1035:6-1036:6; *see also id.* at 961:4-964:16.  After observing Woolridge on the witness stand, the Court did not find this testimony to be credible.

[12]  The Court notes that this is the fifth time that Meta's counsel has attempted to lodge an untimely objection for witness Satterfield long after his discharge from the witness stand.  *See, e.g.,* Dkt. No. 752 at 1130:6-7 (Court admonishing Meta's attorney for popping up "four times in a row" to try to raise an impermissible, retroactive objection).  Meta's persistence in ignoring the Court's orders raises serious questions about counsels' ability to observe the standards of civility and professionalism expected of all attorneys practicing in this District.

is 'timely' if it is made as soon as the opponent knows, or should know, that the objection is applicable.") (internal quotations and citation omitted).  For Meta's professed umbrage at a question asking if Satterfield had "discipline[d]" the relevant employees, *see* Dkt. No. 765 at 13-14; Dkt. No. 750 at 877:22-25, 878:8-11, that inquiry was relevant to the hotly disputed issue of intentionality, and Meta has not demonstrated any undue prejudice from it.  *See Obrey*, 400 F.3d at 699.

### D.    SEATING OF JUROR #4

Meta suggests that Juror #4 should have been excluded from the jury for bias.  *See* Dkt. No. 765 at 15; Dkt. No. 747 at 66:23-67:2.  The objection is not well taken.

"[W]ith the exception of voting, for most citizens the honor and privilege of jury duty is their most significant opportunity to participate in the democratic process."  *Powers v. Ohio*, 499 U.S. 400, 407 (1991).  It is "an exercise of responsible citizenship by all members of the community, including those who otherwise might not have the opportunity to contribute to our civic life."  *Id.* at 402.  To deprive a citizen of this civil right, Meta must demonstrate "the existence of a state of mind that leads to an inference that the person will not act with entire impartiality."  *Fields v. Brown*, 503 F.3d 755, 767 (9th Cir. 2007).

It did not do so.  In response to the written questionnaire sent to all prospective jurors, Juror #4 indicated a belief that "'if you're on trial, you're guilty' and '[i]f you're in a civil case, you should get money.'"  Dkt. No. 765 at 15; Dkt. No. 747 at 66:23-67:21.  During the in-person voir dire for jury selection, the Court asked Juror #4 in a sidebar conference with counsel: "Can you tell me what you meant by that?"  *Id*. at 67:20-22.[13]  Juror #4 said the remark was about a situation involving a personal incident with a drunk driver, for which he believed he had been entitled to compensation.  *Id.* at 67:23-68:3.  The Court asked if he could put that view aside for this case, and Juror #4 indicated that he could.  *Id.* at 68:4-10.  When the Court asked about any religious views about guilt, Juror #4 said, "I was thinking on a criminal case, not a civil case."  *Id*.

---

[13] The Court's practice during voir dire is to explore possible issues about a juror in a sidebar conference out of hearing distance from the other potential jurors.

United States District Court
Northern District of California

at 68:11-14.  Meta did not object when the Court said, "I'm not doing a for-cause challenge," *id.* at 68:17, and did not ask for any further questions or clarification from the juror.

This is not a record establishing that a juror was improperly seated.  Even if a juror exhibits a possible bias, which has not been shown here, the Court has wide "discretion to conclude that a juror has been rehabilitated 'when that juror commits to lay aside those feelings and reach a verdict based on the evidence presented and the court's instructions.'"  *United States v. Martinez-Martinez*, 369 F.3d 1076, 1083 (9th Cir. 2004) (quoting *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1220 (9th Cir. 1997)).  "The determination of whether a juror is actually biased is a question of fact" that will only be disturbed for "manifest error."  *Fields*, 503 F.3d at 767 (citations omitted).  In the sidebar colloquy, Juror #4 expressed the ability "to lay aside those feelings" about a prior drunk-driving collision and criminal trials, *Martinez-Martinez*, 369 F.3d at 1083 (citation omitted), and the Court properly seated him as a juror.  Dkt. No. 747 at 68:17-20.  Meta has not demonstrated otherwise.[14]

## CONCLUSION

Meta's post-trial motions for decertification, judgment as a matter of law, or for a new trial are denied.  Dkt. Nos. 765, 766.

**IT IS SO ORDERED.**

Dated:  September 15, 2025

_____
JAMES DONATO
United States District Judge

---

[14]  Meta makes a passing aside that Juror #4 knew the founder of WhatsApp, Dkt. No. 765 at 15, but Meta did not pursue that during voir dire and so has waived any ostensible complaint.  *See* Dkt. No. 747 at 66:18-68:20.