Christian Levis (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com

*Co-Lead Class Counsel*

Carol C. Villegas (*pro hac vice*)
Michael P. Canty (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
cvillegas@labaton.com
mcanty@labaton.com

*Co-Lead Class Counsel*

Diana J. Zinser (*pro hac vice*)
**SPECTOR ROSEMAN & KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
dzinser@srkattorneys.com

*Co-Lead Class Counsel*

James M. Wagstaffe (SBN 95535)
**ADAMSKI MOROSKI MADDEN
CUMBERLAND & GREEN LLP**
P.O. Box 3835
San Luis Obispo, CA 93403-3835
Telephone: 805-543-0990
Facsimile: 805-543-0980
wagstaffe@ammcglaw.com

*Counsel for Plaintiffs Erica Frasco
and Sarah Wellman*

[additional counsel listed below]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERICA FRASCO, et al., individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>FLO HEALTH, INC., META PLATFORMS, INC., GOOGLE, LLC, and FLURRY, INC.,<br><br>Defendants. | Case No.: 3:21-cv-00757-JD<br><br>**CORRECTED JOINT STATEMENT ON POST-TRIAL PROCESSES RE: ECF NO. 770**<br><br>Date: September 30, 2025<br>Time: 10:30AM<br>Location: Courtroom 11, 19th Floor<br>450 Golden Gate Avenue<br>San Francisco, CA 94102<br><br>Judge: Hon. James Donato |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................... 1

I.    PLAINTIFFS' POSITIONS ...................................................................................... 1

      A.    Statutory Damages to Be Awarded ............................................................... 1

      B.    The Claims Procedure .................................................................................. 3

      C.    Injunctive Relief .......................................................................................... 8

II.   DEFENDANT'S POSITIONS ................................................................................. 9

      A.    This Court Should Enter a Partial Final Judgment in Plaintiffs' Favor to
            Facilitate an Immediate Appeal on the Merits That Might Avert the Need for
            Further Proceedings ................................................................................... 11

      B.    The Court Should Not Enter a Lump-Sum Judgment Premised on a
            Theoretical Number of Class Members That Meta Never Had an Opportunity
            to Test Before or During Trial .................................................................... 12

      C.    Any Claims Process Should Permit Meta to Meaningfully Test Whether
            Absent Class Members Are Eligible to Recover ......................................... 16

      D.    Potential Class Members Should Not Have Six Months to Make a Claim, As
            Plaintiffs Propose ...................................................................................... 22

      E.    No Injunctive Relief Is Warranted .............................................................. 23

      F.    Meta Objects to a Claims Process in Lieu of a Second Phase of Trial Before a
            Jury and/or Summary-Judgment Determinations by an Article III Judge ........ 25

**INTRODUCTION**[1]

Pursuant to the Court's August 27, 2025 Order, Plaintiffs in the above-captioned action and Meta Platforms, Inc. ("Meta") respectfully submit this joint statement addressing post-trial administration matters including "statutory damages to be awarded, a claims procedure, and injunctive relief." *See* ECF No 770. The Parties met and conferred on the issues raised by the Court, including through an in-person session on Monday, September 22, 2025, but did not reach an agreement. Each of the Party's respective positions are stated herein.

## I.    PLAINTIFFS' POSITIONS

### A.    Statutory Damages to Be Awarded

Having proved that Meta violated the California Invasion of Privacy Act ("CIPA") on a classwide basis, the amount of statutory damages to be awarded is $5,000 per violation. *See* Amended Order re Post-Trial Motions ("PTM Order"), ECF No. 775 at 22 ("This plain text [of Cal. Pen. Code § 637.2(a)(1)-(2)] establishes that the California legislature intended an award of $5,000 to be the remedy for a violation of CIPA, irrespective of actual damage") (citing *Ribas v. Clark*, 38 Cal. 3d 355, 365 (1985)).[2] Evidence at trial proved that Meta recorded each Class Member at least once when they answered Flo's mandatory health questions during the onboarding survey. Trial Tr. at 420:4-423:18 (explaining how Meta intercepted users answers to the onboarding survey questions). Therefore, the amount of statutory damages to be awarded is $5,000 for each Class Member.

Here, where Defendants also possess customer records identifying Class Members, that data can provide useful information to inform the post-judgment claim process and/or assist in determining Class Membership. For instance, evidence admitted at trial showed that Meta matched women's answers to Flo's onboarding survey questions to at least 34.2 million Facebook users' profiles. *See* Trial Ex. 110-A (showing the amount of "Unique Individuals" Meta identified for each Custom App Event); Trial Ex. 226-A at 11 (showing Meta used ad identifiers, as well as IP and physical address

---

[1] This corrected filing fixes certain formatting issues with the prior submission, removes some redundant text, and removes a footnote from Plaintiffs' statement at Defendant's request.
[2] *See also Steven Ades & Hart Woolery v. Omni Hotels Mgmt. Corp.*, 2014 WL 4627271, at *14 (C.D. Cal. Sep. 8, 2014) (weighing the "proportionality of the potential liability to the actual harm" for CIPA damages would be an abuse of discretion under Ninth Circuit precedent).

information, such as city, state, and zip code, to match Flo App Data to Facebook users).  Flo also maintains detailed records for each Flo App user capable of identifying Class Members as reflected by data it produced for the Named Plaintiffs (*see* ECF Nos. 478-43 through 478-49) and its ability to provide Plaintiffs the precise number of Flo App users in California during settlement discussions.[3]

Although not required to validate Class membership, the Court should order Meta and Flo to produce customer records identifying the California Flo App users during the Class Period to inform this process and assist in identifying Class Members.  *See Bultemeyer v. CenturyLink Inc*., 2024 WL 4817642, at *2 (D. Ariz. Nov. 18, 2024) (noting the defendant is the "party who holds information on who meets the class definition, and as such, [the] party responsible for providing that information"); *Palmer v. Cognizant Tech. Sols. Corp*., 2023 WL 4157454, at *4 (C.D. Cal. Feb. 1, 2023) (ordering defendant to "provid[e] updated [c]lass [m]ember Information").

Meta's position that the Court should enter partial judgment only as to the Named Plaintiffs and stay the case pending an immediate appeal under Rule 54(b) must be rejected.  Fundamentally, Meta ignores that the jury determined liability on a classwide basis, such that a judgment cannot be entered only for the Named Plaintiffs.  *See Abbit v. ING USA Annuity*, 2017 WL 449149, at *3 (S.D. Cal. Feb. 2, 2017) (refusing to enter judgment under Rule 54(b) on class claims separate from named plaintiff's individual claims because "the class claims are not sufficiently severable" to prevent "piecemeal appeals"); *Lopez v. Youngblood*, 2009 WL 1924788, at *5 (E.D. Cal. July 1, 2009) (finding "similarity of legal or factual issues" between subclasses "weigh[s] heavily against entry of judgment under Rule 54(b)" because it would result in "piecemeal appeals"); *see also* PTM Order at 14 (finding "[t]he trial evidence strongly confirms that certification of a class for the CIPA claim was warranted").

Nor is entry of a partial judgment warranted by Meta's insistence that Plaintiffs prove Class membership at trial. Having already established liability, any questions about who is a Class Member can and should be resolved through the post-judgment claim process.  *See Krakauer v. Dish Network, LLC*, 2017 WL 3206324, at *5 (M.D.N.C. July 27, 2017) ("[T]he trial already established all of the

---

[3] Plaintiffs separately sought the information during discovery, but Flo refused to produce it, and the Court denied Plaintiffs' motion to compel. *See* ECF No. 340. Plaintiffs also asked Flo to supplement its responses after the Class was certified, prior to trial, and it refused.

elements necessary to prove a violation . . . . Whether a claimant is a class member is a question that can be more appropriately, fairly, and efficiently resolved through a claims administration process as authorized by Rule 23."); *Bultemeyer v. CenturyLink Inc.*, 2025 WL 2337097, at *2 (D. Ariz. Aug. 13, 2025) ("Here, the jury determined that Defendant was liable and awarded per-violation statutory damages to each class member, and a judgment was entered as to that verdict. Identifying specific class members is not a separate claim or element necessary to final judgment."); *see also Lyngaas v. Curaden AG*, 2019 WL 6210690, at *17, *aff'd*, 992 F.3d 412 (6th Cir. 2021) (explaining "aggregate number" of violations need not be established at trial and can be addressed "through a claims administration process"); *Six (6) Mexican v. Ariz. Citrus Growers*, 641 F. Supp. 259, 261 (D. Ariz. 1986) (approving claims administration process to identify class members post-bench trial). To the extent Meta has challenges or questions about whether claimants are part of the Class, it can raise those questions using the claim challenge and dispute resolution process described below at the appropriate time. *See* PTM Order at 16-17 (Meta's concerns regarding whether someone is a Class Member can be "handled in the claims process"). It is not entitled (nor is it required) to have individual trials for each Claimant.

### B.    The Claims Procedure

The Court should immediately order the initiation of the attached post-judgment claims process, to "establish potential class members' identities" and ultimately distribute statutory damages to them. *See Lyngaas*, 2019 WL 6210690, at *17; *see also Six (6) Mexican Workers*, 641 F. Supp. at 261 (approving claims administration process to identify class members following bench trial); *Krakauer*, 2017 WL 3206324, at *4 (approving claims process to identify class members). Plaintiffs have specifically designed the process to balance efficiency considerations with Parties' rights and interests. *See* Exhibit C to Declaration of Carol C. Villegas ("Villegas Decl.") (Declaration of Justin Parks); Villegas Decl. Ex. A (Proposed Claims Program).[4]

**Class Notice.** The first step in the claims process is to provide notice to Class Members. Plaintiffs propose a notice plan in Exhibit C, that mirrors this Court's previously-approved Class

---

[4] References in this corrected filing to the Villegas Decl. refer to ECF No. 781-1.

3

1  Notice plan (*see* ECF No. 619), and have streamlined it to focus on California-specific notice, such

2  as displaying jewel notices to Meta's California users.  *See* Villegas Decl. Ex. C ¶14. Plaintiffs'

3  proposal also aligns with similar state-specific notice programs that have been approved in other cases

4  involving Meta. *See, e.g.*, *In re Facebook Biometric Info. Priv. Litig.*, 2020 WL 4818608, at *4 (N.D.

5  Cal. Aug. 18, 2020)(ordering "directed jewel notifications" and "notice via Facebook users' newsfeed

6  channel"). Delivering robust notice at this stage is critical to ensure all Class Members claim the

7  money they are entitled to—especially, given that once judgment is entered, they are precluded from

8  bringing other actions to recover these damages.  *See Asberry v. Money Store*, 2018 WL 3807806, at

9  *5 (C.D. Cal. Aug. 8, 2018), *aff'd sub nom., Piatt v. Money Store*, 819 F. App'x 477 (9th Cir. 2020)

10  (class action resulting in a jury verdict was "final judgment on the merits" "barring subsequent

11  litigation of claims based on the same nucleus of operative fact" brought by the plaintiff).  Because

12  Plaintiffs' proposal, in many ways, mirrors the Class Notice plan previously utilized in this case, Meta

13  should have no reason to oppose the proposal.

14       **Claim Submission.**  Claims will be handled using the attached claim form (*see* Villegas Decl.

15  Ex. B), which can be submitted either online or by mail. *See* Villegas Decl. Ex. C ¶37.  The submission

16  period will remain open for six months. *See* Villegas Decl. Ex. A ¶11.  The proposed Claim Form

17  requires each Class Member to confirm their name and contact information, which will be used to

18  validate their identity, and provide two simple attestations, under penalty of perjury, that confirm

19  Class membership: (1) that "[a]t any time between November 1, 2016, and February 28, 2019, you

20  lived in the State of California;" and (2) "[b]etween November 1, 2016, and February 28, 2019, you

21  were located in the State of California and began using the Flo Health App to enter any of your

22  menstruation and/or pregnancy information."  *See* Villegas Decl. Ex. B.

23       Plaintiffs' proposed Claim Form is based on the bedrock principle that "the claim[] process []

24  be as simple, straightforward, and nonburdensome as possible," (WILLIAM B. RUBENSTEIN, NEWBERG

25  ON CLASS ACTIONS § 12.21 (5TH ED. 2017)) and mirrors similarly simple claims forms that Courts

26  have recently approved.  *See Hubbard v. Google LLC*, No. 5:19-cv-07016 (N.D. Cal), ECF No. 341

27  at 6 (approving similarly simple claim form); *see also Krakauer*, 2017 WL 3206324, at *10

28  (explaining a "simple claim form and claims administration process is appropriate" regardless of

1   "uncertainties about the identification of some class members and their addresses and the passage of

2   time"); *Andrews v. Plains All Am. Pipeline, L.P.*, 2022 WL 18143936, at *1 (C.D. Cal. Sept. 20, 2022)

3   (finding a claim form is appropriate as long as it is "sufficiently detailed to verify membership in the

4   Classes" and should "avoid[] requiring information that is burdensome").

5          By contrast, Meta's proposed claim form is both unduly complex and burdensome in a way

6   that deviates from the well-accepted legal principles favoring simplicity, and purposefully designed

7   to prevent Class Members from recovering statutory damages. Indeed, many of the sixteen questions

8   Meta demands Class Members answer request information that does not exist or is irrelevant to this

9   case. For instance, while Meta asks users to submit the name, phone number, or email address they

10  "provided to Flo . . . when signing up for the app," there is *no evidence* that Flo ever *required* users

11  to submit this information, or even register to use the app. *See* PTM Order at 8-10, 12-13 (describing

12  the onboarding process for a new user, during which no screen prompted the entry of information like

13  name, phone number, or email address).[5]

14         Likewise, Meta's demand for information about the specific "month and year" when users

15  "complet[ed] the initial onboarding questions" more than 6 years ago, and the answers to specific

16  questions, is both unreasonable and irrelevant. Evidence at trial has already proven that Meta collected

17  users' answers to *each* of Flo's questions—regardless of whether they completed the survey, or what

18  they answered.  *See* PTM Order at 13 ("[D]uring the onboarding survey, the Facebook SDK gave

19  Meta . . . information from *every user*[.]") (emphasis added); Trial Tr. at 420:3-421:14 (Meta

20  collected information from onboarding survey about every user's goal); *id.* at 433:18-435:17 (Meta

21  collected information about every user's menstrual cycle during onboarding survey); *id*. at 435:18-

22  436:3 (Meta collected information about every user's age during the onboarding survey); *id.* at 437:5-

23  438:8 (Meta collected information about every user related to ovulation or pregnancy during the

24  onboarding survey); *id*. at 430:6-431:10 (Meta collected device and advertising identifiers from every

25  user during the onboarding survey). Meta's requirement that Class Members submit

26  "documentation", such as "proof of your residence in California" with a six-plus-year-old "utility

27

28  _____

[5] This is reflected in the discrepancy between the 13 million registered Flo App users in Flo's data, and the 3.7 million email addresses Flo produced to the Claims Administrator. ECF No. 694-1 ¶5.

bill," and "photo ID" that matches the "legal name" is even more absurd. Not only does this discriminate against Class Members who may not have such documentation, but it specifically targets documents that likely do not exist. All of this is inappropriate. *See Andrews*, 2022 WL 18143936, at *1 (endorsing claim form that "avoids requiring information that is burdensome or readily obtained elsewhere").[6]

*Claim Resolution Process.* Upon receiving a claim form, the claims administrator, A.B. Data, will verify that it was submitted by an individual who lived in California during the Class Period. *See* Villegas Decl. Ex. C ¶41. A.B. Data, with the assistance of ClaimScore,[7] a legal technology firm specializing in fraud detection (Villegas Decl. Ex. D, Declaration of Bryan Heller), will also analyze each claim for fraud or impropriety. Villegas Decl. Ex. C ¶40. If any deficiencies are noted by A.B. Data, A.B. Data will notify the claimant and they will have a period of time to cure any such deficiencies. *Id.* ¶43. Absent deficiencies, A.B. Data will deem the claim presumptively valid. Villegas Decl. Ex. A ¶¶31, 35.

Meta will then have an opportunity to challenge the presumptively valid claim with A.B. Data. In the event Meta or the claimant disagrees with A.B. Data's conclusion, they may dispute the claim by raising it with a Special Master.  However, given Meta's incentive to challenge every claim, no matter how frivolous, Meta would be limited to raising disputes clear on the face of the claim form (*e.g.*, incomplete forms, duplicative submission) or raising evidence-based challenges to whether the form was filed by the party listed in the Claim Form and/or whether the attestations in the Claim Form were false.[8] Meta and claimants will have an opportunity to appeal the Special Master's determination to the District Court. This process should streamline disputes and drastically minimize the number of disputes raised before the District Court, while still allowing Meta a full and fair opportunity to challenge claims.

---

[6] If anything, Meta's demand for additional data fields supports the production of the customer records described in Section I.A so that this information can be incorporated as part of the claim process.
[7] Gibson Dunn itself has retained ClaimScore in two separate actions: *Jimenez v. Artsana USA, Inc.*, No. 7:21-cv-07933 (S.D.N.Y.), and *Hasemann v. Gerber Products Co.*, No. 1:15-cv-02995 (E.D.N.Y.).
[8] While this process does not *depend* on additional information, Plaintiffs believe that Meta's and Flo's customer records, described in Section I.A above, would help facilitate the process of efficiently reviewing claims.

1    Claims processing procedures, like this, are routinely endorsed by courts, particularly because

2   they balance class members' rights to recovery with defendants' rights to challenging claims. *See Six*

3   *(6) Mexican Workers*, 641 F. Supp. at 263 (endorsing the use of a "committee of counsel or a master"

4   to "process[] proof of claims" and establish that class members are "who they say they are"); *see also*

5   *Allapattah Servs., Inc. v. Exxon Corp*., 157 F. Supp. 2d 1291, 1324 (S.D. Fla. 2001), *aff'd*, 333 F.3d

6   1248 (11th Cir. 2003), *aff'd*, 545 U.S. 546 (2005) (using claim administrator to resolve disputes about

7   class member eligibility); *Krakauer*, 2017 WL 3206324, at *4 (same).

8    Meta's claims process proposal, on the other hand, effectively requires the court to adjudicate

9   *each Class Member's claim* in a new litigation, including discovery and a jury trial. But, in a post-

10   judgment claims process, a defendant "is not entitled to discovery and trials on the identities of class

11   members." *See Krakauer*, 2017 WL 3206324, at *4-5.  Nor can it use the process as an attempt to

12   relitigate Class Members' claims after all elements of liability were already established during trial.

13   *Id*. This is especially true here where Meta already had an opportunity "to request limited discovery

14   of absent class members ***before*** trial" but "did ***not*** do so." *See* PTM Order at 19.  Rather, all Meta is

15   entitled to is a process that employs "reasonable measures" to verify Class Members' identities so

16   that funds are distributed to the correct individuals. *See Krakauer*, 2017 WL 3206324, at *4.  That is

17   exactly what Plaintiffs' proposal accomplishes.

18    Meta's argument that such a burdensome process is required because the Seventh Amendment

19   entitles it to pursue individual trials on each Class Member's claim is completely unfounded. Not

20   only is this contrary to the law, but it entirely undermines the purpose of Rule 23.  *See Victorino v.*

21   *FCA US LLC*, 2021 WL 4124245, at *1-4 (S.D. Cal. Sept. 9, 2021) (rejecting defendant's argument

22   that the class action "would require numerous individual trials" where its contention "80% of class

23   members did not suffer an injury" was "already presented [and rejected] at class certification");

24   *Bultemeyer v. CenturyLink Inc.*, 2025 WL 671760, at *8 (D. Ariz. Mar. 3, 2025) (requiring "separate

25   findings based on each individual class members' claim . . . refute[s] the basic purpose of a class

26   action"); *Krueger v. Wyeth, Inc.*, 2016 WL 3981125, at *10 (S.D. Cal. Apr. 4, 2016), *objections*

27   *overruled*, No. 303CV2496JAHMDD, 2019 WL 4785862 (S.D. Cal. Oct. 1, 2019) (denying

28   defendant's motion to re-open discovery into absent class members because "determination of

membership in the Class does not require defendants to 'question each prospective class member to determine if they rightfully belong to the class,' which would transform this case into a 'plethora of mini-trials'").  To the extent Meta intended to present evidence about absent Class Members and challenge their claims, the time to do that was *at trial*.  *See* PTM Order at 19.  There is no justification for doing so now.

**Damages Distribution.**  Under Plaintiffs' proposed claims process, Meta's substantive rights would be protected with respect to its payment obligations.  Payments into an escrow account would be due upon entry of a judgment for any amount in a monetary judgment or upon claims being accepted pursuant to the claims administration process.  Additionally, no money would be distributed from such escrow account until both (a) an appropriate order for that distribution is issued by the Court (*e.g.*, an order detailing the per-claimant amount, an order concerning attorney fees and expenses), and (b) Meta's appellate rights have been exhausted.

## C. Injunctive Relief

CIPA § 637.2 explicitly allows a plaintiff to "bring an action to enjoin and restrain any violation of this chapter, and may in the same action seek [statutory] damages."  *See* CIPA § 637.2. The Court has also acknowledged the potential for injunctive relief in this Action.  *See* ECF No. 605 at 34 ("[A]n injunction ancillary to an award of damages, [] may be considered later in the case as warranted by developments.").  Given that a jury has found Meta liable, the following relief is warranted as a part of any forthcoming final judgment.

**Data Deletion.**  While Meta has argued throughout this case that it has deleted the underlying "raw" data recorded from within the Flo App, both trial and discovery established that downstream copies of this data still exist in Meta's systems. *See, e.g.*, Trial Ex. 235 (explaining Meta is "unable to cleanly delete data" sent "via website, app and offline events"). To provide complete relief to Plaintiffs and the Class, this Court should order Meta to delete all data derived from its CIPA violations from its systems.  *See Facebook, Inc. v. Power Ventures, Inc.*, 252 F. Supp. 3d 765, 786 (N.D. Cal. 2017) (granting permanent injunctive relief requiring defendant to destroy unlawfully obtained data as well as "anything derived from such data and/or information"), *aff'd*, 749 Fed. App'x 557 (9th Cir. 2019); *Cap Diagnostics, LLC v. Emeritus Med. Tech. LLC*, 2023 WL 8351561, at *8-9

1    (C.D. Cal. Oct. 25, 2023) (requiring deletion of data and "data based on edited or modified [at issue]

2    data" because "destroy[ing] data that should not lawfully be in its possession does not qualify as a

3    hardship").

4        *Monitoring Program.* Evidence at trial proved that Meta lacked mechanisms to enforce

5    compliance with terms requiring app developers to obtain end-user consent before implementing

6    Meta's SDKs. *See* Trial Tr. Vol. 4, 864:9-22. Thus, for example, despite any terms and agreements

7    between Meta and Flo, Meta eavesdropped and/or recorded confidential communications while Flo

8    assured users it would "never transfer your Personal Data [including health data] to any third party

9    without your prior explicit consent." *See, e.g.*, Trial Ex. 29 at '163. An injunction directing Meta to

10   conduct routine audits at regular intervals and implement monitoring procedures subject to validation

11   by an outside third party to ensure its customers actually obtain consent before implementing Meta's

12   SDK, would be an appropriate restraint on Meta's further violation of CIPA.

13   **II.    DEFENDANT'S POSITIONS**

14       Meta proposes that the Court enter a partial final judgment in plaintiffs' favor under Federal

15   Rule of Civil Procedure 54(b) and stay further proceedings in this Court, permitting the parties to

16   litigate an immediate appeal on the merits that could resolve this case and eliminate the need to

17   fashion any further proceedings to adjudicate whether Meta is liable to absent class members.

18       The Court should not accept plaintiffs' suggestion that they may seek a classwide judgment

19   in the *billions* of dollars, which would evidently be premised on an estimate of class size that plaintiffs

20   have never before advanced, much less proved at trial, and that Meta has never had an opportunity to

21   challenge.  A classwide judgment should be entered only after the claims of all absent class members

22   have been resolved on the merits in a manner consistent with the Constitution, and after this Court

23   has received briefing and argument on whether the resulting aggregated statutory-damages award is

24   unconstitutionally excessive.

25       As for the process that will adjudicate Meta's liability to claimants, this Court has already

26   explained that Meta "is entitled to 'receive a fair opportunity to present its defenses when putative

27   class members actually come forward'" and submit claims for damages.  Dkt. 776 at 16 (quoting

28   *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131 (9th Cir. 2017)).  But plaintiffs propose

1   requiring absent class members to do very little to demonstrate that they are part of the class, and

2   plaintiffs also propose forbidding Meta from challenging any claims except with "factual evidence"—

3   which Meta will not have unless class members are required to actually provide information on their

4   claim forms and are available for discovery.  Plaintiffs' proposal that Meta test supposed class

5   members' claims with evidence it does not have and cannot obtain is not the "fair opportunity" the

6   Ninth Circuit contemplated in *Briseno*.  Instead, Meta proposes a process that would ensure the

7   collection of the information necessary to confirm claimants' membership in the class and their

8   entitlement to relief, while screening out fraudulent claims.  To the extent the parties have material

9   factual disputes about any absent class member's claim to relief—regarding, for example, whether

10  their survey responses resulted in Meta receiving information beyond the mere fact that they were

11  using a period-tracking app, or whether they completed the Flo onboarding survey within the class

12  period—those proceedings must include either a jury trial pursuant to the Seventh Amendment or a

13  grant of summary judgment by this Court under the normal Rule 56 standard, not fact-finding by a

14  non-Article III claims administrator.  At all times, the burden of proof must remain with the absent

15  class member to establish the necessary elements of her claim by a preponderance of the evidence.

16      Although plaintiffs glancingly acknowledge the danger of fraud in this case given the potential

17  payout of $5,000 per claiming class member, they also propose measures that in fact would encourage

18  it.  Those measures include a six-month window for claims (significantly longer than what courts

19  have approved) and a claim form that requires no evidence whatsoever—just a purported class

20  member's say-so.  Plaintiffs' proposal would also severely hamper Meta's ability to meaningfully

21  challenge claims, by forbidding discovery of absent class members (even as plaintiffs themselves

22  seek additional discovery from Meta) and disallowing any sort of cross-examination.   The process

23  proposed by Meta, by contrast, would be fair, consistent with the normal rules of litigation, and

24  designed to minimize fraudulent claims.

25      Finally, no injunctive relief is warranted.  The Court rejected class certification on plaintiffs'

26  injunctive-relief claim; plaintiffs then sought an order compelling Meta to delete the information it

27  received from Flo, but Meta did that long ago, and there is no basis for any injunctive relief.  Now

28  plaintiffs appear to seek other injunctive relief that they have never sought to date in this litigation.

1   The Court should not enter any injunction, and certainly not one that plaintiffs did not seek previously

2   (including in their pretrial statement).  To the extent the Court is considering entering any injunctive

3   relief, plaintiffs should be required to file a motion that Meta could oppose.[9]

**A.    This Court Should Enter a Partial Final Judgment in Plaintiffs' Favor to Facilitate an Immediate Appeal on the Merits That Might Avert the Need for Further Proceedings**

6          The most efficient way to reduce the jury's verdict to an appealable final judgment is for the

7   Court to enter partial final judgment under Federal Rule of Civil Procedure 54(b) as to the three

8   plaintiffs whose claims against Meta were tried to verdict and to stay all further proceedings in this

9   Court pending Meta's appeal.  Entry of partial final judgment under Rule 54(b) is justified where an

10  immediate appeal could avoid further complex proceedings and conserve judicial and party resources.

11  *See Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1484 (9th Cir. 1993); *Fox v. Baltimore City*

12  *Police Dept.*, 201 F.3d 526, 531–32 (4th Cir. 2000).

13         That is the case here.  Should Meta prevail on the issues it intends to raise on appeal—

14  including whether code from Meta's software development kit functions as an "electronic amplifying

15  or recording device" and whether Meta "intentionally" used the kit "to eavesdrop upon or record"

16  plaintiffs' conversations with Flo, Cal. Pen. Code § 632(a)—that appellate resolution would obviate

17  the need for any of the complex, expensive, and time-consuming post-verdict processes contemplated

18  by the parties in this joint statement.  If the Court stayed further proceedings pending Meta's appeal,

19  the parties and the Court could refrain from the costly and time-consuming process of designing and

20  completing any further proceedings, which would include additional notice, a claims process to

21  identify potential class members, adjudication of any disputes under the normal rules for litigation

22  and applicable constitutional standards, as well as significant briefing on the legal issues that will

23  inevitably arise, including the constitutionality of any resulting aggregated statutory-damages award.

24  That approach would also avoid the confusion that could result if class members were notified of a

25  claims process and then the verdict were reversed on appeal.  Continuing with proceedings while

---

[9] The parties have exchanged their proposed claim forms and claims protocols, but not their respective portions of this joint report.  Plaintiffs refused to agree to exchange portions of the joint report despite repeated requests from Meta.  Because Meta has not seen plaintiffs' submission, it reserves the right to respond to any new arguments or requests at the hearing.

1    Meta's appeal is pending, by contrast, would risk wasting both the Court's and the parties' resources

2    and efforts, and potentially create needless logistical difficulties. *See, e.g.*, *Doe v. Univ. of Cal.*, 1993

3    WL 361540, at *2 (N.D. Cal. Sept. 2, 1993); *Matek v. Murat*, 638 F. Supp. 775, 784 (C.D. Cal. 1986).

4    **B.    The Court Should Not Enter a Lump-Sum Judgment Premised on a Theoretical**
         **Number of Class Members That Meta Never Had an Opportunity to Test**
5        **Before or During Trial**

6        In conferring with counsel for Meta, plaintiffs' counsel suggested that the Court could enter a

7    judgment of several billion dollars. *See also* Plaintiffs' Proposal § V(72) (suggesting possibility of

8    near-term classwide aggregate judgment). That would be unlawful for several independent reasons.

9    First, Meta's liability to absent class members has not even been resolved, given the existence of

10   individualized issues that remain to be adjudicated before a jury, consistent with Meta's Seventh

11   Amendment and due-process rights. *See infra* Parts III, VI. But even if the Court disagrees with that

12   position, plaintiffs' theory that a snap judgment would be permissible is wrong all the same. Their

13   proposed judgment, Meta understands, would be the product of $5,000 and a yet-to-be-determined

14   number that they contend reflects the total size of the class—but that they did not establish at trial and

15   have not even shared with Meta to date. Plaintiffs' counsel also stated that they would insist that

16   Meta obtain a supersedeas bond and fund an escrow account to secure the judgment pending any

17   appeal. The Court should not enter the proposed judgment or require the security for that judgment

18   that plaintiffs demand for four reasons.

19       **1.** There is no lawful basis for entering a classwide judgment to the tune of several billion

20   dollars based solely on late-breaking conjecture about the class size that Meta has never had an

21   opportunity to challenge.

22       Before now, plaintiffs have never identified how many Flo app users were affected by the

23   practices they brought this suit to challenge. The complaint speculated that "[t]he Class likely consists

24   of millions of individuals." Dkt. 64 ¶ 247. Plaintiffs presented no reliable measure of the class size

25   in discovery, in their expert reports, or at trial. Accordingly, there is no evidence in the trial record

26   to support plaintiffs' request. Although plaintiffs asked Flo to produce information about its users

27   broken out by state, Flo could not supply that information. Ex. 335 (not in evidence). For purposes

28   of providing notice to potential class members, Flo provided 3.7 million email addresses to the claims

1  administrator.  Dkt. 679 at 2.  But that list was imprecise; it included *all* email addresses in Flo's

2  records, including for non-California users.  *See* Dkt. 661 at 2.

3    In circumstances like these, where the class size is unknown, defendants cannot immediately

4  become liable for classwide damages awards.  The Ninth Circuit has explained that "allowing gross

5  damages by treating unsubstantiated claims of class members collectively significantly alters

6  substantive rights under the antitrust statutes," in violation of the Rules Enabling Act.  *In re Hotel*

7  *Telephone Charges*, 500 F.2d 86, 89–90 (9th Cir. 1974).  And when a district court "enter[ed]

8  aggregate classwide judgments based on estimates of [the defendant's] liability"—even after

9  acknowledging "that its estimates were likely inflated"—the Second Circuit vacated them.  *Seijas v.*

10  *Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010).  The court explained that entering a judgment

11  premised on an imprecise estimate of class size, even if "practical," was "improper" because it was

12  "likely to result in an astronomical damages figure that does not accurately reflect the number of

13  plaintiffs actually injured"—a "disconnect" that "offends the Rules Enabling Act."  *Id.*

14    The same is true here.  In an action with traditionally joined plaintiffs who are seeking

15  statutory damages, Meta would know its potential liability from the start and make decisions about

16  whether and how to defend against individual claims in light of that information.  That this is a class

17  action should not mean that Meta must forfeit its right to understand or challenge representations

18  about the size of the class.  Plaintiffs' effort to put the cart before the horse—to impose a massive

19  judgment first and then ask questions informing the propriety of that judgment later—would violate

20  due process.

21    **2.**  Plaintiffs do not stop at suggesting that the Court could enter a lump-sum judgment entered

22  in favor of an unknown group of people who have yet to demonstrate that they are even members of

23  the class.  They also urge the Court to take another unprecedented step and require Meta to secure

24  that arbitrary judgment with a supersedeas bond *and* with real-time funding of an escrow account.

25  There is no authority for that double security, which is also completely unnecessary.

26    In fact, no security is required in these circumstances.  Courts dispense with supersedeas bonds

27  where, as here, an appealing defendant's "ability to pay the judgment is so plain that the cost of the

28  bond would be a waste of money."  *Olympia Equip. Leasing Co. v. Western Union Telegraph Co.*,

13

1   786 F.2d 794, 796 (7th Cir. 1986).  The prospect of the shifting of bond costs after a successful appeal
2   might also cause plaintiffs to rethink the necessity of insisting on a bond.  *See City of San Antonio v.*
3   *Hotels.com, LP*, 593 U.S. 330, 332 (2021).

4       Even if some security were required, there would be no basis for requiring security twice over:
5   both a supersedeas bond and the real-time funding of an escrow account, potentially to the tune of
6   billions.  The whole point of a supersedeas bond is to permit a defendant to appeal without
7   immediately paying the full amount of a judgment and to ensure that the judgment will be paid if it
8   is affirmed.  And the supersedeas bond is security enough; a defendant may not be ordered to secure
9   a bond (which here could cost millions per year) and *also* be deprived of the money necessary to
10  satisfy the judgment.  For that reason, a court may not order a defendant to prepay a judgment in an
11  escrow account when the defendant has made clear it is willing and able to secure a bond.  *E.g.*, *In re*
12  *Swift Aire Lines, Inc.*, 21 B.R. 12, 14 (B.A.P. 9th Cir. 1982).

13      Plaintiffs appear to believe that Meta would suffer no harm by making payments to fund an
14  escrow account, with Meta to receive "refunds" of any unclaimed money (either because Meta
15  prevailed on appeal or because not every class member made a claim).  But even "a temporary,
16  nonfinal deprivation of property is nonetheless a 'deprivation'" that violates due process.  *Fuentes v.*
17  *Shevin*, 407 U.S. 67, 85 (1972).

18      **3.**  The Court should not enter any judgment until it has received briefing and heard argument
19  on whether the massive aggregated statutory-damages award that results from the claims process is
20  unconstitutionally excessive.

21      The Ninth Circuit recently held that "aggregated statutory damages awards are, in certain
22  extreme circumstances, subject to constitutional due process limitations."  *Wakefield v. ViSalus, Inc.*,
23  51 F.4th 1109, 1121 (9th Cir. 2022).  That court expressed concern that "[a]n aggregated award could,
24  like a per-violation award, be wholly disproportioned to the prohibited conduct (and its public
25  importance) and greatly exceed any reasonable deterrence value."  *Id.* at 1122.  "[E]xtraordinarily
26  large awards wholly disproportionate to the goals of the statute" may raise due-process concerns,
27  especially where "plaintiffs are unable to quantify any actual damages they have suffered."  *Id.* at
28  1120.  In these cases, "constitutional limit[s] may require reduction."  *Id.* at 1122.  This concern is

especially pronounced "in the mass communications class action context," in which "vast cumulative damages can be easily incurred, because modern technology permits hundreds of thousands of automated calls and triggers minimum statutory damages with the push of a button." *Id.* at 1124–25.

This case will implicate all the concerns expressed in *Wakefield*. This case, like *Wakefield*, concerns a technology that can turn a single decision (here, the decision to permit app developers to incorporate in their apps a snippet of open-source code from Meta's SDK) into an avalanche of claims for significant statutory damages. And when aggregated in a class judgment, those claims could become so large as to be disproportionately "punitive and untethered to the statute's purpose." *Wakefield*, 51 F.4th at 1122; *see also, e.g.*, *Montera v. Premier Nutrition Corp.*, 2025 WL 751542, at *5 (N.D. Cal. Mar. 10, 2025) (deciding, under *Wakefield*, that $83 million award was "grossly punitive and thus wholly disproportionate to the legislative goals" and reducing it to $8.3 million), *appeal pending*, No. 25-2133 (9th Cir.). In fact, the judgment here could exceed the $925 million judgment that the Ninth Circuit vacated in *Wakefield* as potentially "so severe and oppressive that it violates [the defendant's] due process rights." 51 F.4th at 1125. Given the possibility of a significant statutory-damages award that could unduly punish Meta for one app developer's unauthorized use of code from Meta's SDK, the parties should brief and argue whether any proposed award is unconstitutionally excessive *before* any classwide judgment is entered.

**4.** The entry of plaintiffs' proposed judgment would cause the clock on Meta's deadline to appeal to begin ticking. Meta intends to appeal from any judgment entered in this case. But if the Court enters a classwide judgment straightaway, before individualized issues bearing on Meta's liability to absent class members have been resolved, there will inevitably be confusion about what issues are fair game for the Ninth Circuit to decide. Given the difficulties that would inevitably arise following an appeal from a premature final judgment, the Court should not enter a classwide judgment until all claims (and all the individualized issues those claims present) have been resolved.

In sum, if this Court declines to permit an immediate appeal from a partial final judgment as to the named plaintiffs' claims under Rule 54(b) and to order a second phase of trial, *see infra* Part VI, it should order a process for deciding whether absent class members have valid claims and whether the sum of statutory damages across the entire class is unconstitutionally excessive. Only

15

after those issues have been addressed should the Court enter an appealable, classwide final judgment. And if the Court requires any security at all for that judgment, a bond alone should be enough; there is no need to order Meta to direct huge sums of money to an escrow account on top.

## C.  Any Claims Process Should Permit Meta to Meaningfully Test Whether Absent Class Members Are Eligible to Recover

No class member is entitled to recover from Meta unless it is proven that (1) she completed the Flo app onboarding survey during the class period; (2) she did so while a California resident and while physically present in California; (3) her answers to the survey would have caused Meta to receive information beyond the scope of her consent (at a minimum, information beyond the mere fact that she was using a period-tracking app); and (4) she was a Facebook or Instagram user at the time she completed the survey (such that the data provided could be matched to her).  Meta also maintains (and reserves for appeal) its position that there are individualized issues regarding implied consent and whether and to what extent class members are entitled to statutory damages under *Campbell v. Facebook Inc.*, 315 F.R.D. 250 (N.D. Cal. 2016), though Meta acknowledges this Court has rejected those arguments.  *See* Dkt. 775 at 21–24.

Plaintiffs have taken the position that those issues can be resolved through a so-called claims process that does not involve meaningful discovery or the opportunity to have a jury adjudicate material factual disputes.  *See, e.g.*, Dkt. 769 at 1.  Meta's position is that such a process would violate its right to a jury trial under the Due Process Clause, the Seventh Amendment, and the Rules Enabling Act, which require that these individualized issues be subject to full adversarial testing and adjudication in a jury trial overseen by an Article III judge, not resolution by a claims administrator. Meta explains those issues in greater detail below.  *See infra* Part VI.

Even if a bare claims process were appropriate, plaintiffs' proposal still would not comport with Due Process and the Seventh Amendment.  This Court has acknowledged that Meta is at least "entitled to 'receive a fair opportunity to present its defenses when putative class members actually come forward" and submit claims for damages.  Dkt. 776 at 16 (quoting *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131 (9th Cir. 2017)).  Relying on the seminal Ninth Circuit precedent addressing this issue, this Court explained that "Meta 'will have similar opportunities to individually challenge

1    the claims of absent class members if and when they file claims for damages.'" *Id.* (quoting *Briseno*,

2    844 F.3d at 1131). That time is now, and affording Meta an opportunity to challenge the individual

3    claims of absent class members is consistent with what other courts have described as a class-action

4    defendant's "due process right . . . to 'challenge the proof used to demonstrate class membership.'"

5    *Byrd v. Aaron's Inc.*, 784 F.3d 154, 171 (3d Cir. 2015). That "fair opportunity" guaranteed by the Due

6    Process Clause has at least two components.

7        First, any claim form must generate enough information to measure each class member's

8    entitlement to recover against these requirements. This Court should not permit recovery by *anyone*

9    who cannot prove she belongs in the class and has satisfied the elements of a Section 632 claim. In

10   fact, the Court has already observed that the claims process is an opportunity for Meta to question

11   whether absent class members completed the onboarding survey outside of California. Dkt. 776 at

12   16–17 (concern that "a California resident completed the onboarding survey during a brief out-of-

13   state excursion" could be "handled in the claims process").

14       Second, the claims process must be "rigorous enough to deter submission of fraudulent

15   claims." *In re NFL Players' Concussion Injury Litig.*, 307 F.R.D. 351, 414 (E.D. Pa. 2015). In its

16   ruling on Meta's post-trial motions, the court cited authority emphasizing the importance of efforts

17   to "combat 'mistaken or fraudulent claims' by relying on 'claim administrators, various auditing

18   processes, sampling for fraud detection,'" and other techniques. Dkt. 776 at 17 (quoting *Mullins v.*

19   *Direct Digital, LLC*, 795 F.3d 654, 667 (7th Cir. 2015)). Those efforts are vital because fraudulent

20   claims are a well-documented feature of class actions. *See, e.g.*, *In re Diet Drugs*

21   *(Phentermine/Fenfluramine/ Dexfenfluramine) Prods. Liab. Litig.*, 573 F. App'x 178, 180 (3d Cir.

22   2014) (settlement was "inundated with fraudulent claims that included manipulated [medical] test

23   results"); *United States v. Penta*, No. 08–0550 (E.D. Pa. Sept. 11, 2008) (indictment charging five

24   people, who all ultimately pleaded guilty, with submitting $40 million in fraudulent claims to various

25   settlements); *Oetting v. Green Jacobson, P.C.*, 2014 WL 942952, at *1 (E.D. Mo. Mar. 11, 2014)

26   (millions' worth of false claims submitted in securities settlement); *see also, e.g.*, Diana N. Jones,

27   *Scammers flood US class action settlements with fraudulent claims*, Reuters (May 7, 2024),

28

https://tinyurl.com/4azrn5s8/ (describing recent class settlement that resulted in millions of fraudulent claims).

Although Meta agrees with Plaintiffs that robust anti-fraud measures are essential, any claims process also must guard against smaller-scale fraud that may evade fraud-prevention efforts.  This case will be an especially attractive target for fraudsters (both individually and at scale) because of the unusually large potential payout (up to $5,000) for each claiming class member.  *See, e.g.*, *In re California Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 679 (9th Cir. 2025) (noting, in an appeal from a substantially smaller judgment ($1.75 million) than the one plaintiffs propose entering here, the danger of "fraudulent or invalid claims" when "settlements offer[] potentially lucrative compensation").

Plaintiffs' proposal will not achieve the goals of ensuring that absent class members belong in the class and weeding out fraudulent claims.  Plaintiffs propose asking absent class members almost nothing, and they also propose limiting any challenges by Meta to arguments, "with specificity" and supported by "factual evidence," that "the challenged Claim was not filed by the person whose name is listed on the Claim Form" or that "the Claimant misrepresented information in the Claim Form."  Plaintiffs' Proposal § IV(B)(1).  The trouble with that approach is that plaintiffs nowhere propose permitting Meta to *obtain* any evidence—which would make Meta's ability to challenge claims more theoretical than real, for Meta does not have data showing, for example, when and where Flo app users completed the onboarding survey.  When Meta raised this issue with plaintiffs' counsel, they expressed confidence that Meta must, by virtue of its data-centric business model, have ample information to challenge any claims.  But this claim is based on nothing more than conjecture and ignores that Meta long ago deleted the at-issue data received from the Flo app.  Meta also has a privacy policy and other terms of use with users that it must adhere to; plaintiffs' proposal recognizes that fact and expressly threatens sanctions for any violation of such terms in this process.  *See id.* § VIII(3).  Plaintiffs also propose sanctioning Meta simply for unsuccessfully challenging claims.  *Id.* § IV(D)(5).

Plaintiffs' proposed process for challenging claims is a sham.  Meta would have the right to challenge claims, but only with evidence that it does not have and cannot get.  Plaintiffs' counsel

themselves have illustrated that confirming class membership is difficult in this case.  They did not know at trial whether Madeline Kiss, who was a named plaintiff until class certification, is in the class.  Tr. 1117:12-19.  And in conferring with Meta's counsel before this filing, they *still* did not know whether she is a class member.  If Ms. Kiss's own lawyers cannot be sure whether she is a member of the class, even after working with her on a complaint and written discovery and defending her in a deposition, it is unclear how Meta will be able to challenge other absent class members' claims under plaintiffs' proposal, especially with the "specificity" and "factual evidence" plaintiffs demand.

Meta proposes a different approach that should be merely the first step on the way to the second jury trial the Constitution requires, as set out in Villegas Decl. Ex. E.  Even if this alternative claims process were not followed by a jury trial, it would at least permit Meta some opportunity to ensure that claimants are members of the class and to screen out fraudulent claims.  Claimants should answer the following questions, under penalty of perjury.  *See, e.g.*, *In re Sony PS3 "Other OS" Litig.*, 2017 WL 5598726, at *28 (N.D. Cal. Nov. 21, 2017) (claim form stating that "[i]t is a crime to submit a false Claim Form and sign under the penalty of perjury").  These questions are also set out in Meta's proposed claim form (attached as Villegas Decl. Ex. F).

1.  Did you download the Flo period-tracking app created by Flo Health, Inc.?  If you answered "Yes," please support this contention with documentation.  For example, if you have an iPhone, please navigate to the App Store, tap My Apps, and then find the download date for the Flo app, which will be listed either under "All" (apps currently installed on the phone) or "Not on this iPhone" (apps that you have downloaded on an iPhone but no longer have installed on your current phone).  Once you see the download date, please take a screenshot and upload it (or, if you are submitting this claim via mail, please enclose a printout of the screenshot).

2.  What is the name you provided to Flo (if any) when signing up for the Flo app?

3.  What is the phone number you provided to Flo (if any) when signing up for the Flo app?

4.  What is the email address you provided to Flo (if any) when signing up for the Flo app?

5.  Did you complete the initial onboarding survey after downloading the Flo app?

6.  When you responded to the survey, did you enter accurate and truthful information about your own menstrual cycle and/or pregnancy?

7.  In what month and year did you complete the initial onboarding survey for the Flo app?

8.  When you completed the initial onboarding survey, how did you respond to the question asking why you wanted to use the Flo app (track your cycle / get pregnant / track your pregnancy)?

9.  When you completed the initial onboarding questions, did you enter the date of your last period (yes / no / don't remember)?

10. In which state did you complete the initial onboarding survey for the Flo app?

11. Were you living in California between November 1, 2016, and February 28, 2019?  If so, please provide proof of your residence in California during that period, such as a utility bill.

12. If you answered "part of that time" for Question 11, please specify which dates you resided in California.

13. What is your full legal name?  Please submit a copy of your photo ID with that name.

14. What is your date of birth?  Please submit a copy of your photo ID with that date of birth.

15. At the time you completed the onboarding survey, did you have a Facebook or Instagram account?

16. If you did have a Facebook or Instagram account, what was your user ID?  If you do not know your user ID, please provide the phone number or email address associated with the account.

The parties and a claims administrator should use the answers to these questions and the documentation provided to limit fraudulent claims in several ways.  For example, they could:

- cross-check answers against Flo's aggregate and individualized data (ensuring that the number of claimants does not exceed any plausible total number of California residents who downloaded the Flo app, and finding reason to further scrutinize any claimants whose claim-form answers do not match Flo's data);

- screen out duplicative claims;

- call into question claims by people who were assigned the male sex at birth and cannot menstruate or who would have been too young or too old to use a period-tracking app; and

- using photo IDs, limit claims by those who were, in fact, Flo app users but who likely did not reside in California or complete the onboarding survey there and therefore would be ineligible to recover.

There is ample precedent for requiring claimants to answer questions and submit documentary proof before recovering.  Courts regularly require proof to support claims even in settlements of

consumer class actions where the average recovery is limited.  In many cases, for example, consumers are eligible to recover low amounts without proof of purchase and higher amounts with proof of purchase.  *See, e.g.*, *Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 81 (1st Cir. 2015); *In re Procter & Gamble Aerosol Prods. Mktg. & Sales Practice Litig.*, 2022 WL 20178514, at *5 (S.D. Ohio Oct. 8, 2022); *Hill v. Canidae Corp.*, 2021 WL 4988032, at *2 (C.D. Cal. Apr. 2, 2021); *Broomfield v. Craft Brew Alliance, Inc.*, 2020 WL 1972505, at *9 (N.D. Cal. Feb. 5, 2020).  Courts also regularly explain that documentation is necessary to prevent fraud.  *See, e.g.*, *In re NVIDIA GPU Litig.*, 539 F. App'x 822, 824 (9th Cir. 2013); *In re Remicade Antitrust Litig.*, 2023 WL 2530418, at *19 (E.D. Pa. Mar. 15, 2023); *Asghari v. VW Group of Am., Inc.*, 2015 WL 12732462, at *29 (C.D. Cal. May 29, 2015).  Plaintiffs themselves have recognized the value of documentation; their settlement with Flurry states that "Authorized Claimants who provide reasonable documentation showing they were residents of California during the Class Period will receive twice the *pro rata* share of Authorized Claimants who are residents of other states."  Dkt. 589 at 2.  Plaintiffs' settlements with Google and Flo contain similar provisions.  Dkt. 780-1 at 26; Dkt. 780-2 at 25.

Particularly given the potential recovery for each class member here—which is far higher than the amounts available in consumer class actions, where courts regularly insist on proof of purchase— the Court should require a claim form that will allow the parties to meaningfully test absent class members' claims.  The alternative—self-authenticating affidavits backed solely by claimants' say-so—would inadequately protect Meta's due-process right to meaningfully contest each claimant's membership in the class.  *See, e.g.*, *Asacol*, 907 F.3d at 53 (criticizing plaintiffs' proposal to "rely on unrebutted testimony in affidavits," which "would be inadmissible hearsay at trial"); *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 594 (3d Cir. 2012) (eligibility to recover cannot be premised on "potential class members' say so"); *Lilly v. Jamba Juice Co.*, 2014 WL 4652283, at *6 (N.D. Cal. Sept. 18, 2014) (liability cannot be premised on supposed class members' "own self-identification," with the defendant having "no opportunity to challenge that determination" and its "bill" rising "every time an individual submits a form"); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 214 F.R.D. 614, 618–19 (W.D. Wash. 2003) (defendants not required to accept "sworn oaths or affidavits" as sole proof of liability to absent class members).

Finally, the Court should permit Meta, once it has received completed claim forms and documentation from absent class members, to seek discovery from them.  *See, e.g.*, *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1131 n.10 (9th Cir. 2017) ("District courts also have discretion to allow limited discovery from absent class members if the particular circumstances of a specific case justify it."); *In re Vivendi Universal, S.A. Sec. Litig.*, 123 F. Supp. 3d 424, 426 (S.D.N.Y. 2015) (court permitted defendant to take individual discovery after adverse class verdict).  This discovery would help Meta identify claims that would (and would not) be subject to challenge.  And it is especially appropriate in light of plaintiffs' representation that they intend to seek additional (and as yet unspecified) discovery from Meta; discovery is not a one-sided enterprise.

### D.    Potential Class Members Should Not Have Six Months to Make a Claim, As Plaintiffs Propose

Plaintiffs propose a claim-filing window of six months.  There is no reason for a six-month window, which would only invite fraudulent claims, thereby increasing the parties' costs and further delaying payments to class members.

A six-month claims window is double (or more) the length of claims windows in cases that have settled and cases that have resulted in a jury verdict and are moving on to a claims process.  This Court has consistently approved settlement claims windows of between about 45 and 90 days.  *See, e.g.*, *Arnold v. DMG MORI USA, Inc.*, No. 3:18-cv-02373, Dkt. 123 at 2–3 (N.D. Cal. Aug. 27, 2021) (45 days); *Relente v. Viator, Inc.*, No 3:12-cv-05868, Dkt. 76 at 6 (N.D. Cal. Nov. 14, 2014) (53 days); *Norcia v. Samsung Telecom. Am., LLC*, 3:14-cv-00582, Dkt. 177 at 4 (N.D. Cal. July 22, 2020) (60 days); *In re Facebook Biometric Priv. Litig.*, No. 3:15-cv-03747, Dkt. 474 at 7 (N.D. Cal. Aug. 19, 2020) (61 days); *Siddle v. Duracell Co.*, No. 4:19-cv-00568, Dkt. 117 at 2 (N.D. Cal. Oct. 26, 2020) (90 days).

Claim windows after verdicts in favor of class representatives are likewise often a couple of months long.  *E.g.*, *Del Valle v. Gen. Motors LLC*, 2025 WL 1651157, at *3 (N.D. Cal. June 10, 2025) (approving plan that called for 65-day window).  And plaintiffs' six-month window exceeds even unusually long windows in some cases, without good explanation.  *E.g.*, *HsingChing Hsu v. Puma Biotechnology, Inc.*, No. 8:15-cv-00865, Dkt. 749 at 1 (C.D. Cal. June 14, 2019) (120 days).

Plaintiffs have not advanced any compelling justification for a six-month claims window. The Ninth Circuit has emphasized that "a cutoff date is essential and at some point the matter must be terminated," and that "even three months is ordinarily a sufficiently long period within which class members may file claims." *In re Gypsum Antitrust Cases*, 565 F.2d 1123, 1127–28 (9th Cir. 1977). Courts reject efforts to stretch claims windows beyond any reasonable bounds. *See, e.g.*, *Lyngaas v. Curaden AG*, 436 F. Supp. 3d 1019, 1028–29 (E.D. Mich. 2020), *aff'd*, 992 F.3d 412 (6th Cir. 2021) (rejecting request for 120-day claim window because "a period of sixty days is sufficient to permit claimants to submit their claim forms and affidavits"). Plaintiffs have never explained why a six-month window is appropriate here.

Unnecessarily extending the claims window also would create practical problems. Class members would not be paid until the completion of the claims process and the exhaustion of Meta's appeals. Although plaintiffs assume that any appeals could be litigated in tandem with the claims process, that assumption does not reflect the reality that not all appellate issues will be ripe for decision until the claims of absent class members have been resolved and this Court has decided the legal issues flowing from those claims, including whether the aggregated statutory-damages award is unconstitutionally excessive. There is no reason to push payment out longer than necessary.

There is another critical reason not to keep the claims window open for six months: it would provide ample time for bad actors to coordinate the submission of fraudulent claims. Legitimate class members will not need half a year to answer the 16 questions Meta proposes asking them and to locate the documentary proof (like a driver's license or utility bill) that Meta proposes that they provide. They certainly would not need that long to answer the *two* questions plaintiffs proposed asking them. But fraudsters would doubtless avail themselves of the opportunity to steal up to $5,000 as many times as they possibly could.

In short, there is no principled reason for a six-month claims window, which would serve only to benefit bad actors at Meta's expense.

### E.    No Injunctive Relief Is Warranted

This Court declined to certify an injunctive-relief class because "[t]he focus for most of the plaintiffs' claims was on some sort of monetary relief," but that denial was "without prejudice to the

23

1    possibility of an injunction ancillary to an award of damages, which may be considered later in the

2    case as warranted by developments." Dkt. 605 at 33–34.  No developments have warranted injunctive

3    relief.

4         Plaintiffs did not share their final proposal for injunctive relief until a few hours before this

5    filing, and that proposal differs from what their counsel described a few days earlier in conferring

6    with Meta's counsel.  Plaintiffs' written proposal suggests two forms of relief:  an injunction

7    "requir[ing] Meta to delete all data derived from their violations of CIPA in this Action" and an

8    injunction "directing Meta to conduct routine audits at regular intervals and implement monitoring

9    procedures subject to validation by an outside third party to ensure its customers actually obtain

10    consent before implementing Meta's SDK, would be an appropriate restraint on Meta's further

11    violation of CIPA."  The first proposal is unnecessary because Meta has already deleted the data, and

12    the second should be denied because plaintiffs have never proposed anything like it before and it is

13    wildly overbroad.

14         It is unclear what plaintiffs mean by their first request, but it may be that they are seeking the

15    same relief they sought in their pretrial statement: "an order requiring Meta and Google to delete all

16    forms of Flo user data improperly intercepted from the Flo App."  Dkt. 656 at 5.  If so, the Court

17    should deny that request because plaintiffs have never justified it.  Throughout this litigation, Meta

18    has explained that it long ago deleted all app event data transmitted by Flo during the class period, in

19    accordance with Meta's regular data-retention policies.  *E.g.*, Dkt. 491 at 2, 13; Dkt. 527-3 at 5 n.1;

20    Dkt. 651 at 4; Tr. 1216:4–5.  As a result, Meta has no data subject to plaintiffs' request for injunctive

21    relief.  And at no point during this litigation, including at trial, did plaintiffs ever identify evidence

22    supporting any theory that Meta has retained any Flo app user data transmitted to Meta during the

23    class period.  Further, Flo removed code from the Facebook SDK from its app in early 2019, so there

24    is no prospect of the resumption of the data-sharing practices challenged in this case.  Courts routinely

25    deny injunctions as moot when a defendant has long since ceased the challenged practice and the

26    plaintiff cannot carry its evidentiary burden of proving that the defendant will resume the practice.

27    *See, e.g.*, *Fleet Feet, Inc. v. NIKE, Inc.*, 986 F.3d 458, 462–63 (4th Cir. 2021); *Seven-Up Co. v. Coca-*

28    *Cola Co.*, 86 F.3d 1379, 1389–90 (5th Cir. 1996); *Sample v. Johnson*, 771 F.2d 1335, 1338–43 (9th

24

1    Cir. 1985).  Under those decisions, there would be no basis to enter the injunction plaintiffs still

2    appeared to be seeking before trial.

3        Now, after trial, and just hours before this filing, plaintiffs have proposed for the first time

4    third-party "audits" and "monitoring" to oversee the use of Meta's SDK code.  That suggestion comes

5    far too late.  At no point either before or during trial did plaintiffs indicate they would seek injunctive

6    relief that would subject Meta to an outside monitor.  The Ninth Circuit has "consistently held that

7    issues not preserved in the pretrial order have been eliminated from the action." *S. Cal. Retail Clerks*

8    *Union v. Bjorklund*, 728 F.2d 1262, 1265 (9th Cir. 1984).  Plaintiffs may not now—for the first time

9    and after more than four years of litigation—dramatically expand the scope of the injunctive relief

10   they are seeking.  (The same goes for plaintiffs' first request if in fact it is not the same injunctive

11   relief they proposed in their pretrial statement.)  And their newly requested relief is also overbroad.

12   Plaintiffs ask for a monitor to ensure that Meta's "customers"—an undefined term, but presumably

13   app developers other than Flo—obtain consent before using Meta's SDK code.  But as the Supreme

14   Court recently made clear, that would flout "the party-specific principles that permeate [the Court's]

15   understanding of equity." *Trump v. CASA, Inc.*, 606 U.S. 831, 844 (2025).  The only app at issue in

16   this case was Flo's; plaintiffs cannot obtain an injunction against Meta's SDK writ large.

17       If the Court has any doubt about that conclusion, it should invite the parties to submit further

18   briefing and evidence on the subject.  Meta should have the benefit of plaintiffs' full proposals in

19   writing, as well as an opportunity to challenge those proposals, before the Court enters any injunction.

20   **F.    Meta Objects to a Claims Process in Lieu of a Second Phase of Trial Before a
         Jury and/or Summary-Judgment Determinations by an Article III Judge**

21

22       Meta acknowledges that, given the Court's rulings in this case, including its recent decision

23   denying Meta's post-trial motions, Dkt. 775, the Court does not appear inclined to hold a jury trial or

24   make claimant-by-claimant summary-judgment determinations to resolve remaining individualized

25   issues for absent class members.  Meta respectfully objects to that conclusion and will briefly explain,

26   for purposes of appellate preservation, how in its view further proceedings in this case should be

27   conducted.  Meta's proposal, which includes a claims-screening process, followed by discovery, trial,

28   and post-trial briefing, is also set out in the attached Exhibit E.

1    As Meta sees it, this Court should order a second phase of trial to resolve individualized issues

2    bearing on whether Meta is liable to the absent class members, except where this Court (not a non-

3    Article III claims administrator) determines that a particular absent class member carried her burden

4    under Rule 56's summary-judgment standard.  Because the jury's verdict has resolved only classwide

5    issues—and several individualized issues have yet to be decided, *see supra* Part III (identifying

6    remaining individualized issues)—the Seventh Amendment and Due Process Clause require that

7    Meta be permitted to contest whether and to what extent it is liable to each absent class member in a

8    jury trial.  *See, e.g.*, *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 367 (2011) ("[A] class cannot be

9    certified on the premise that [a defendant] will not be entitled to litigate its statutory defenses to

10   individual claims."); *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) ("A defendant in a

11   class action has a due process right to raise individual challenges and defenses to claims").

12   That right to contest absent class members' claims should include an opportunity to cross-

13   examine claimants.  *See, e.g.*, *In re Namenda Indirect Purchaser Antitrust Litig.*, 2022 WL 4298767,

14   at *10 (S.D.N.Y. Sept. 19, 2022).  Although absent from the trial of classwide issues, class members

15   submitting claims are still parties to this action.  *See Smith v. Bayer Corp.*, 564 U.S. 299, 313 (2011).

16   Before those class members are entitled to recover anything, Meta should have an opportunity to

17   cross-examine them, just as it would be able to cross-examine all parties in an individual action.  *See,*

18   *e.g.*, *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 345 (4th Cir. 1998) (defendant

19   cannot be "forced to defend against a fictional composite without the benefit of deposing or cross-

20   examining the disparate individuals behind the composite creation"); *In re Fibreboard Corp.*, 893

21   F.2d 706, 711–12 (5th Cir. 1990) (similar); *see also Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) ("In

22   almost every setting where important decisions turn on questions of fact, due process requires an

23   opportunity to confront and cross-examine adverse witnesses.").

24   Courts have also held that a defendant's challenges to absent class members' eligibility to

25   recover should be resolved by a jury.  The First Circuit, for example, has held that "[t]he fact that

26   plaintiffs seek class certification provides no occasion for jettisoning . . . the Seventh Amendment."

27   *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53 (1st Cir. 2018).  And the D.C. Circuit has made clear

28   that any mechanism for testing the claims of absent class members must be "robust enough to preserve

1  the defendants' Seventh Amendment and due process rights to contest every element of liability and

2  to present every colorable defense." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619,

3  625 (D.C. Cir. 2019).  The right to a jury trial does not yield to "'the passing demands of expediency

4  or convenience.'"  *SEC v. Jarkesy*, 603 U.S. 109, 122 (2024).

5        The opposite conclusion would create an unconstitutional and invalid judgment.  If, whenever

6  a case proceeded as a class action, defendants *lost* their due-process right to litigate individualized

7  issues before a jury, including through cross-examination of claimants, then Rule 23 would violate

8  the Rules Enabling Act, which states that no rule may "abridge, enlarge, or modify any substantive

9  right." 28 U.S.C. § 2072(b); *see also Dukes*, 564 U.S. at 367.  In other words, a class action "merely

10  enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits"—

11  but it "leaves the parties' legal rights and duties intact and the rules of decision unchanged." *Shady

12  Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) (plurality opinion).

13  Meta should therefore have an opportunity to raise individualized challenges to the claims of absent

14  class members in a second phase of trial before a jury, at which claimants would be required to testify,

15  present evidence to support their claim, and be subject to cross-examination—all the same due-

16  process rights that Meta would have if those claimants had sued it individually.

17        If the Court ordered a second phase of trial, it could streamline those proceedings to conserve

18  party and judicial resources while preserving Meta's constitutional and statutory rights.  For example,

19  the parties could stipulate to background facts, jury instructions, a single set of in limine rulings, and

20  a single set of voir dire questions.  Resolving these issues for all claimants—whether through a

21  stipulation of the parties or the Court's ruling in event disputes arise—would ensure consistency

22  in adjudicating each absent class member's claim.  Other courts have approved exactly this process

23  to manage the second phase of a trial following a jury verdict in favor of the plaintiff in a class action.

24  *E.g.*, *Chadwick v. State Farm Mutual Auto. Ins. Co.*, Case No. 21-cv-1161 (E.D. Ark.), Dkt. 266 at

25  3–4.  The parties could also stipulate to try the second phase before a magistrate judge.

26        In short, Meta respectfully objects that a "claims process" without a jury trial would deprive

27  it of its Due Process and Seventh Amendment rights to challenge absent class members' claims in the

28  same way it might have challenged them in individual actions.

1

2   Dated: September 28, 2025

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

/s/ Carol C. Villegas
Carol C. Villegas (*pro hac vice*)
Michael P. Canty (*pro hac vice*)
Jake Bissell-Linsk (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
mcanty@labaton.com
jbissell-linsk@labaton.com

*Co-Lead Counsel*

Christian Levis (*pro hac vice*)
Amanda Fiorilla (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com

*Co-Lead Counsel*

Diana J. Zinser (*pro hac vice*)
Jeffrey L. Kodroff (*pro hac vice*)
**SPECTOR ROSEMAN & KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611
dzinser@srkattorneys.com
jkodroff@srkattorneys.com

*Co-Lead Counsel*

James M. Wagstaffe (SBN 95535)
**ADAMSKI MOROSKI MADDEN CUMBERLAND & GREEN LLP**
P.O. Box 3835
San Luis Obispo, CA 93403-3835
Telephone: 805-543-0990
Facsimile: 805-543-0980
wagstaffe@ammcglaw.com

*Counsel for Plaintiffs Erica Frasco
and Sarah Wellman*

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Ronald A. Marron (CA Bar 175650)
ron@consumersadvocates.com
Alexis M. Wood (CA Bar 270200)
alexis@consumersadvocates.com
Kas L. Gallucci (CA Bar 288709)
kas@consumersadvocates.com
**LAW OFFICES OF RONALD A. MARRON**
651 Arroyo Drive
San Diego, CA 92103
Tel: (619) 696-9006
Fax: (619) 564-6665

*Counsel for Plaintiffs Jennifer Chen
and Tesha Gamino*

Kent Morgan Williams (*pro hac vice*)
**SIRI GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone: (929) 220-2759
kent.williams@sirillp.com

William Darryl Harris, II (*pro hac vice*)
**HARRIS LEGAL ADVISORS LLC**
3136 Kingsdale Center, Suite 246
Columbus, OH 43221
Tel: (614) 504-3350
Fax: (614) 340-1940
will@harrislegaladvisors.com

*Counsel for Plaintiffs Leah Ridgway
and Autumn Meigs*

Dated: September 28, 2025

/s/ Melanie M. Blunschi
Melanie M. Blunschi (Bar No. 234264)
melanie.blunschi@lw.com
Kristin Sheffield-Whitehead (Bar No. 304635)
kristin.whitehead@lw.com
Catherine A. Rizzoni (Bar No. 322267)
cat.rizzoni@lw.com
**LATHAM & WATKINS LLP**
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

29

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Andrew B. Clubok (pro hac vice)
andrew.clubok@lw.com
555 Eleventh Street, NW, Suite 1000 Washington,
D.C. 20004
Telephone: +1.202.637.2200

Michele D. Johnson (Bar No. 198298)
michele.johnson@lw.com
650 Town Center Drive, 20th Floor Costa Mesa, CA
92626
Telephone:  +1.714.540.1235

Christopher Chorba (SBN 216692)
**GIBSON, DUNN & CRUTCHER LLP**
333 South Grand Avenue
Los Angeles, CA 90071 Telephone:213.229.7503
CChorba@gibsondunn.com
Elizabeth K. McCloskey (SBN 268184) Abigail A.
Barrera (SBN 301746)
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone:415.393.8200
EMcCloskey@gibsondunn.com
ABarrera@gibsondunn.com

*Counsel for Defendant Meta Platforms, Inc. (formerly
known as Facebook, Inc.)*

1

## **<u>FILER'S ATTESTATION</u>**

2        Pursuant to Civil Local Rule 5-1(i)(3), I, Carol C. Villegas, hereby attest under penalty of

3 perjury that concurrence in the filing of this document has been obtained from all signatories.

4
Dated: September 28, 2025                    By: *<u>/s/ Carol C. Villegas</u>*
5                                                Carol C. Villegas

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JOINT STATEMENT ON POST-TRIAL PROCESSES RE: ECF NO. 770
CASE NO. 3:21-CV-00757-JD