Pages 1 - 40

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable James Donato, Judge

ERICA FRASCO, et al.,            )
                                 )
          Plaintiffs,            )
                                 )
  VS.                            )      NO. 21-CV-00757-JD
                                 )
FLO HEALTH, INC., ET AL.,        )
                                 )
          Defendants.            )
_____)

                    San Francisco, California
                    Tuesday, September 30, 2025

              TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:
                    LABATON KELLER SUCHAROW LLP
                    140 Broadway
                    New York, NY 10005
               BY:  MICHAEL P. CANTY, ATTORNEY AT LAW
                    CAROL C. VILLEGAS, ATTORNEY AT LAW
                    JAKE BISSELL-LINSK, ATTORNEY AT LAW

                    LOWEY DANNENBERG, P.C.
                    44 South Broadway, Suite 1100
                    White Plains, NY 10601
               BY:  CHRISTIAN LEVIS, ATTORNEY AT LAW

                    SPECTOR ROSEMAN & KODROFF, P.C.
                    2001 Market Street, Suite 3420
                    Philadelphia, PA 19103
               BY:  DIANA J. ZINSER, ATTORNEY AT LAW

          (APPEARANCES CONTINUED ON THE NEXT PAGE.)

REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                    Official United States Reporter

APPEARANCES: (Continued)

For Defendants:

DECHERT LLP
U.S. Bank Tower
633 West 5th Street, Suite 4900
Los Angeles, CA 90071
BY: **BENJAMIN SADUN, ATTORNEY AT LAW**

GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
BY: **CHRISTOPHER CHORBA, ATTORNEY AT LAW**

GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
BY: **ABIGAIL A. BARRERA, ATTORNEY AT LAW**

LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
BY: **ANDREW B. CLUBOK, ATTORNEY AT LAW**

LATHAM & WATKINS LLP
330 N Wabash Avenue, Suite 2800
Chicago, IL 60611
BY: **GARY FEINERMAN, ATTORNEY AT LAW**

LATHAM & WATKINS LLP
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
BY: **MICHELE D. JOHNSON, ATTORNEY AT LAW**

LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
BY: **MELANIE M. BLUNSCHI, ATTORNEY AT LAW**

Also Present:        Nikki Sokol
                     Carrie Bodner
                     Bryan Heller

**Tuesday - September 30, 2025**                              **10:31 a.m.**

P R O C E E D I N G S

---oOo---

**THE COURTROOM DEPUTY:**  All rise.  Court is now in session, the Honorable James Donato presiding.

**THE COURT:**  Good morning.

**ALL:**  Good morning, Your Honor.

**THE COURTROOM DEPUTY:**  Please be seated.

Calling Civil Matter 21-757, Frasco v. Flo Health, Inc.

Counsel, please go to the podiums to state your appearances for the record, starting with the plaintiffs.

**MR. LEVIS:**  Good morning, Your Honor.  Christian Levis from Lowey Dannenberg, for the plaintiffs.

**MR. CANTY:**  Morning, Your Honor.  Michael Canty from Labaton Keller Sucharow.

**MS. VILLEGAS:**  Good morning, Your Honor.  Carol Villegas from Labaton Keller Sucharow.

**MS. ZINSER:**  Good morning, Your Honor.  Diana Zinser, Spector Roseman and Kodroff.

**MR. BISSELL-LINSK:**  Good morning, Your Honor.  Jake Bissell-Linsk from Labaton.

**THE COURT:**  Defendants?

**MR. CHORBA:**  Morning, Your Honor.  Chris Chorba, Gibson Dunn, on behalf of defendant, Meta.

**MR. FEINERMAN:**  Good morning, Your Honor.  Gary

Feinerman, Latham & Watkins, on behalf of Meta.

**THE COURT:**  Mr. Chorba, were you at the trial?

**MR. CHORBA:**  I was not, Your Honor.

**THE COURT:**  Oh, okay.

**MR. CHORBA:**  I was invited back for this.

**THE COURT:**  All right.  Okay.  Good.  Yeah.

**MS. JOHNSON:**  Good morning, Your Honor.  Michele Johnson, Latham & Watkins, for Meta.

**MR. CLUBOK:**  Good morning, Your Honor.  Andrew Clubok, Latham & Watkins, for Meta.

**MS. BARRERA:**  Good morning, Your Honor.  Abbey Barrera, Gibson Dunn, for Meta.

**MS. BLUNSCHI:**  Good morning, Your Honor.  Melanie Blunschi, from Latham, for Meta.  And also with us today are our clients, Nikki Sokol and Carrie Bodner, from Meta.

**MR. SADUN:**  Good morning, Your Honor.  Benjamin Sadun from Dechert for defendant, Flo Health.

**THE COURT:**  Sadun or Sadun?

**MR. SADUN:**  Sadun.

**THE COURT:**  Sadun?

**MR. SADUN:**  Yes.

**THE COURT:**  Okay.  All right.  Who's going to take the lead on the plaintiffs' side?

Plaintiffs' side?

Okay.  It's Mr. Canty?

MR. CANTY:  Yes, Your Honor.

THE COURT:  Yes.  All right.

Okay.  Well, I read the proposal with interest.  Let me ask -- I have -- I have some questions.  First, what are you envisioning to be the maximum recovery per claimant?

MR. CANTY:  $5,000 per claimant.

THE COURT:  Okay.  So one incident, one person, and that's it; is that right?

MR. CANTY:  Yes, Your Honor.

THE COURT:  Okay.  I think that goes a long way to helping me make sure that we do not have a due process problem that can crop up, as I'm sure you're aware.  And the award is statutory damages.  I've written about this coincidentally in another Facebook case, In Re BIPA Facebook settlement.  And it is a problem that we have to guard against.  So that gives me some comfort.

Now, the second thing I'm wondering about is with respect to the claim form, you have an attestation by each claimant under penalty of perjury with respect to residency in California during the class period.  And then -- do you have it handy?  It's Docket Number 781-3.  And then the second attestation is you were located in the state of California and began using the Flo app.

MR. CANTY:  Yes.

THE COURT:  I am comfortable with where we are in the

geographic issue, as I made clear in my post-trial -- very lengthy post-trial decision -- but I think that language needs to be a little bit tighter; okay?

MR. CANTY:  Yes, Your Honor.

THE COURT:  All right.  So, you know, one way -- I'm not going to line at it.  I'll leave it -- I'll leave it up to you to think of something.  But you might say something along the lines of -- and, again, I'm not -- this is just me, you know, freelancing right now -- you were located in the state of California when you began using or when you first enrolled or whatever you want the trigger date to be.  But make it -- the conjunction might be just a little vague.

MR. CANTY:  Yes, Your Honor.

THE COURT:  Does that sound all right?

MR. CANTY:  Yes.

THE COURT:  Okay.  Now, with respect to the user data -- so Flo gave you a pretty good list of about 3 million California users during the class period?

MR. CANTY:  They provided us those email addresses. But I'm happy to report that we have reached an agreement with Flo, and they're going to provide us a far more detailed list of information for nationwide users, which would be inclusive of California users, as well.  That data would include name; email address; device model; device identifiers, including IDFA, AAID; and then registration date, which would include the

date they completed at least one onboarding survey question; and Flo created a user ID -- when Flo created a user ID for them and captured at least their device identifiers and IP address.

We believe that that's critical and will be helpful. Certainly, we believe that the proposal we have is sufficient. But this may expedite the process, because --

THE COURT:  Well, but that -- that's a national -- how are you going to get California out of that?

MR. CANTY:  It's inclusive of the California data. So --

THE COURT:  Oh, I see.  Okay.

MR. CANTY:  Yeah.

THE COURT:  And it's clearly denominated as California?

MR. CANTY:  They've agreed to separate it out for California.  That's correct.

THE COURT:  And how did Flo assign a state?

MR. CANTY:  It's predictive.  So it's through the IDFA -- or the IP address -- excuse me.

THE COURT:  Predictive?

MR. CANTY:  Yeah.  So they provide the name, email address, and then it also includes the IP address they were using.

Now, again, oftentimes if somebody's using an IP address,

it's not 100 percent accurate.  But it's certainly helpful in identifying whether they were in California.

THE COURT:  Well, in this time period -- 2016 to 2019 -- I think a good argument could be made it's probably more predictive then than it is now, because there are options for VPNs and other things that -- masking -- IP masking -- that aren't -- weren't common back then.

Flo, do you want to come up?  Yeah.

Okay.  So it sounds like you have an agreement; is that right?

MR. SADUN:  Yes, Your Honor.  The parties are cooperating.  I do want to reiterate, Flo never asked users where they reside.  We'll be providing, based on IP addresses, the approximations inherently limited by to what degree can anyone extrapolate a residence.

THE COURT:  But Flo came up with the geographic location of its users on its own for its own use; is that --

MR. SADUN:  That is not correct, Your Honor.

THE COURT:  Well, where is this coming from?

MR. SADUN:  Flo has IP addresses for its users.  And so using the IP address, working with registered geographic IP address sets, we can identify --

THE COURT:  Oh, I see.  Okay.

MR. SADUN:  -- using approximations, who resided in California and who didn't, using the method --

**THE COURT:** But this is -- this is the list you want me to use for your settlement; right?

**MR. SADUN:** For our settlement, it's a fixed sum settlement. But we have agreed with plaintiffs they can use it, as well, to better facilitate targeting individuals for notice.

**THE COURT:** I know. But this is -- this list, which has California people, is what Flo relied on in reaching its settlement that you want me to approve; right?

**MR. SADUN:** Our settlement was not specific to California; it was nationwide. The Meta case is unique to California.

**THE COURT:** All right. So your proposed settlement is national?

**MR. SADUN:** Yes, Your Honor.

**THE COURT:** Okay. All right. Well, I didn't realize that. $8 million looks a lot less interesting to me. I thought it was just California.

**MR. SADUN:** The --

**THE COURT:** Really? 8 million nationally? Are you --

**MR. SADUN:** The CMIA --

**THE COURT:** I don't know if that's going to -- all right. Let's save this for a different day. But -- I did not realize -- I'm sorry -- I haven't read it yet. I just haven't had a chance, but -- I just got files. I just haven't read it

yet.  But I didn't know Flo was trying to get 8 million nationally.  I thought it was 8 million just for California.

MR. SADUN:  Your Honor, they have never turned a profit once.  Until even the very last months of the class period, they didn't receive any money from any users.

THE COURT:  All right.  Well, we'll save this for another time.

Okay.  So --

MR. CANTY:  Your Honor, if I may --

THE COURT:  -- how are you going to make me comfortable that predictive is good?

MR. CANTY:  Well, in our papers, we talked about ClaimScore.  And additional information that Flo is going to provide are name, email addresses, and phone numbers.  So through phone numbers, ClaimScore can identify if somebody was located in California, as well.

So a lot of this is going to be -- you're going to have the attestation.  Somebody's going to fill out a form saying, yes -- if we tighten up that language, as the Court has suggested -- that, yes, I did, in fact, reside in California, and I did, in fact, use the Flo Health app during the class period.

We are going to be able to verify that through their attestation, and then also ClaimScore is going to ferret out all of the fraudulent claims that come in.  We're not even

going to have to deal with them.  They're going to be able to ferret those out.  They're going to have presumptive valid or presumptive invalid.  And with this data that we get from Flo Health, we're going to be able to cross-check that to ensure that they are, in fact, California residents that used the Flo -- because the data will definitively tell us that this user used the Flo Health app.  The only open question is, were they in California and did they use it during the class period?

THE COURT:  All right.  Well, you used the right word, which is "cross-check."

Now, the problem in most settlements -- and it's a problem I and many other judges have talked about -- is that the settlement claims rate tends to be miserably low.  A dated but I think still accurate study that came out many years ago put it at about roughly, you know, two to three percent in most consumer cases, of which this would be one.  The difference here though is that this is not a $1.99 off your next purchase. This is a rather large award.

Now, I have no reason at all, and certainly have not seen any evidence, that gives me undue concern that there will be rampant fraud.  But we do have to be mindful of making sure, in this case, as in every case -- I'm not singling your case out at all, because every case has this concern -- we're not going to let people cheat the system.

So I want to see as many cross-checks as we can possibly

have.  Now, that sounds good.  I've never heard of ClaimScore. I don't know what they are.  I don't know who does it.  I don't know what their systems are.  So you need to make me a little more comfortable on that.

MR. CANTY:  Well, Your Honor, Bryan Heller is --

(Court reporter clarified.)

MR. CANTY:  Oh, I'm sorry.  My name is Michael Canty from Labaton Keller Sucharow.

THE COURT:  I'm sorry, Kendra.

Okay.  Go ahead.

MR. CANTY:  Your Honor, Bryan Heller -- who's a representative -- he's the founder of ClaimScore -- is here. So I think he'd probably be best to answer the question.

THE COURT:  All right.  Sure.  Yeah.

MR. HELLER:  Good morning, Your Honor.  Bryan Heller, ClaimScore.

THE COURT:  Well, what do you do?

MR. HELLER:  So we essentially are a database validation company.  So the information that comes in the claim form -- we enrich that using first-party and third-party data and we validate across our propriety system to determine whether the information provided on the form is accurate and if fraud is being attempted.

THE COURT:  Now, how long have you been around as a company?

MR. HELLER:  We were founded in 2022.

THE COURT:  Okay.  I have never seen you in any of my cases before.  And that includes, you know, cases that settled for, you know, between $500 million and $1 billion, with a B.  So is this all you do for federal courts?  You do this all day, every day for federal cases?

MR. HELLER:  Yes.  Yes.

THE COURT:  Okay.

MR. HELLER:  We've been involved in a number of federal cases -- 30-plus -- and reviewed over 150 million claims.

THE COURT:  All right.  And what are your metrics in terms of your -- what do you understand your success rate to be in establishing good versus bad claims?

MR. HELLER:  Yeah.  So we've had an independent study and then internal benchmarks, and it's put us over 99.99 percent accurate in both identifying valid class members and fraudulent claims.

THE COURT:  Okay.  So, in this case, you know, we just want to make sure that somebody was in California when they started using the Flo app in 2016 to 2019.  Just tell me, you know, at a high level, how would you validate that to make sure that that's right?

MR. HELLER:  Yeah.  So we leverage data providers that have that information.  So it's when someone had residency in a

particular state -- the time frame -- we do what's called "entity resolution" to match the claimant to this digital identity and then ensure that they had a residence during that time.

THE COURT:  Okay.  Anything else?  Is that it basically?

MR. HELLER:  That's essentially it on the residency side.

THE COURT:  Okay.

MR. HELLER:  Yeah.

THE COURT:  All right.  Okay.

And how are you going to supplement that, Mr. Canty?

MR. CANTY:  So that will -- we're confident that that will identify individuals that lived in California.  Whether or not they used the Flo Health app would be supplemented by three things:  Number one, the attestation.  They'd be swearing under oath that they, in fact, did use the Flo Health app during the class period.

Number two, we can cross-check that with the data that we get from Flo Health.  Additionally, the information that Flo Health gives us -- including the IDFA and a AAID -- we know from trial testimony that Meta identified known users through those data sources.  So we can provide that data to Meta, and Meta can provide us with the names and email addresses of those individuals that used the Flo Health app that they have

Facebook accounts for as another cross-check to send direct notice to.

THE COURT:  So, now, I just -- help me understand -- so the Flo -- what you're calling the Flo settlement class list has about 3.1 million email addresses on it.  But those are not -- those are national, not just California.

MR. CANTY:  Correct.  The -- if I could just step back and explain the dataset.  There are a number of data points -- the list is not exhaustive.  So for every user, you're not going to get, let's say, 12 data points.  You may get 10.  We haven't seen the data, so we need to digest it, as well.  This is based on the representations that we've received from Flo.  But it would include -- may not be an exhaustive list -- but would include name, email address, device model, IDFA, AAID, and the IP address and phone numbers for those individuals.  With that data, we can provide -- we can either do direct contact with those individuals to alert them that they are, in fact, a class member.

Now, they've already been validated by ClaimScore as being a California resident.  So we've checked -- there's essentially two questions that need to be answered in order to be a class member:  Were you a California resident when you signed up for the app?  And did you, in fact, sign up for the app?  And ClaimScore handles the first question about residency.  The second question is handled through all this information.

We can then provide that information to Meta, as well, as essentially a third cross-check, where they can provide us email addresses for known Facebook users that they matched through AAID and the IDFA.

THE COURT:  I mean, that all sounds promising.  But presumably the California -- the total California number is going to be substantially below 3.1 million.

MR. CANTY:  Correct.

THE COURT:  Okay.  That's the national group.  California's going to be a portion of that.

MR. CANTY:  We don't know the total size of the national group.  That was the total email addresses for the national group.  If you recall from the testimony at trial, Your Honor, individuals did not have to provide an email address to sign up for the Flo Health app.  So --

THE COURT:  All right.  I understand.  But I don't know if that's going to be useful for you in the claims process.

MR. CANTY:  We think it's approximately 13 million -- the total national class.

THE COURT:  Okay.

MR. CANTY:  And we've estimated the California class to be approximately 1.6.

THE COURT:  1.6 million?

MR. CANTY:  Yes.

**THE COURT:**  All right.

**MR. CANTY:**  That's based on --

**THE COURT:**  That sounds more reasonable.  Okay.

All right.  And the Facebook side -- look, I'm a big believer that culpable defendants knee-deep use their resources to provide notice to the victims that pass through their system.  I'm just a little unsure here about whether that makes sense.  This ended seven years ago basically.  2019; okay?  That's -- I mean, February 2019.  So we are actually coming up on seven years quickly.  35 million Facebook user profiles -- I mean, there are only 33 million people in the entire state.  So I don't know how useful that's going to be.

**MR. CANTY:**  I understand the point.  And we're not asking them to send it to 35 million people that were identified.  What we're saying is they can identify, through an IDFA or an AAID, Facebook users.  And when they do that, that person is definitively a class member.  ClaimScore has validated they live in California.  And the data from Flo indicates that they were, in fact, using the Flo Health app.

**THE COURT:**  All right. Okay.  That --

**MR. CANTY:**  It's a much smaller group, not 35 million.

**THE COURT:**  I think that's a -- as an additional cross-check, that would be in everyone's interest.

Okay.  I would like to see a little bit more on ClaimScore.  I don't know how much you gave me, but I'd like to

see a list of cases that they've used.

MR. CANTY:  We've provided that to the Court.

THE COURT:  You did?

MR. CANTY:  Yeah.

THE COURT:  Where is that?

MR. CANTY:  It was an addendum to the ClaimScore filing --

THE COURT:  Plaintiffs' declaration?  Okay.

MR. CANTY:  Yeah.

THE COURT:  Oh, okay.  Oh, I think I see it.  All right.

MR. CANTY:  In fact, I believe there are a number of cases in the Northern District of California where they've provided assistance.

THE COURT:  All right.

I am not a fan of special masters.  I used one once, reluctantly, in a much, much different context, and -- very many years ago -- and did not enjoy the experience.  I'm not particularly sanguine about using one here.  Do we really need that?

MR. CANTY:  If -- no.  We were just trying to build in the protections to give the opportunity to -- to check against claims that they had questions about.  But I think in light of the fact that we have this data from Flo Health, it may not be necessary.

**THE COURT:**  Well, typically, the settlement administrator resolves disputes.

**MR. CANTY:**  Okay.

**THE COURT:**  Why do we have to have another person involved?

**MR. CANTY:**  I don't think we do if we have this data. If the data is what we think it will be from Flo Health, I don't think we will need it.

**THE COURT:**  But what I'm saying is, separate and apart from the data, in every other settlement, large and small and in between, you know, the claims administrator -- they get -- the settlement administrator gets paid to do these things.  Do you have a good claim or not?  You know, is it timely, is it on point, did you sign it?  Do we need to pay a special master?

**MR. CANTY:**  No, we don't.

**THE COURT:**  I'm just not really seeing -- okay.  So maybe we can -- I'm going to have you revise this; okay?  So I think --

**MR. CANTY:**  Yes.

**THE COURT:**  I would really prefer not to have this whole special master structure.

And then just looking at -- we don't have to decide this today, but I want to just tell you what I'm thinking. Injunctive relief -- just I'm not really seeing a pressing need for it.  And this is somewhat transient data in the sense that

you're pregnant for nine months and then it stops.  And your menstrual cycles and so on are also very dependent on time.  This data is all now, as we've talked about, getting on seven years old.  It's been out for seven years.  Whatever Meta's done with it to exploit it, they've already done.  I can't imagine it's particularly useful at this point.  Maybe I'm wrong.  It probably isn't.  You know, in the online world, the currency is how fresh your data is.  And so I'm just not really seeing any pressing need for that.

With respect to a monitor, I could possibly see maybe a little monitoring just with respect to Flo, nothing else.  That's the only party in this case.  But, you know, based on what I've seen, I'm not really sure there's a need for that either.  So we don't have to decide this now, but --

MR. CANTY:  Understood, Your Honor.

THE COURT:  -- I'm just not really seeing -- and this isn't -- this isn't something that looks like it's going to demand a remedy to prevent an imminent threat of irreparable harm going forward, which is the -- I know it's post-trial.  That's still the test.  And so -- okay.  It's also not an antitrust case where I would be looking at structural remedies to cure, you know, entrenched anticompetitive advantages.  So -- just for the future, but I think the chances are slim I'm going to order that.

MR. CANTY:  Yes, Your Honor.

**THE COURT:** All right. So what do you want to do next? Do you just want to send me a draft?

**MR. CANTY:** Yeah. Yeah. We can send you an updated claim form and an updated draft with respect to the claims provisions. And we should be able --

**THE COURT:** Well, put it all in a proposed order; okay? And -- oh, by the way, that 1.6 million in fees for the settlement administrator -- does that include ClaimScore?

**MR. CANTY:** Yes, it does.

**THE COURT:** That's inclusive of everything?

**MR. CANTY:** Yes.

**THE COURT:** Okay. And --

**MR. CANTY:** And that's a max, Your Honor.

**THE COURT:** And -- all right.

**MR. CANTY:** Your Honor, with respect to any additional or new proposal, Flo Health has indicated that it's going to take them three weeks to get us the data. We'd obviously like an opportunity to have it. We want to get this done as soon as possible. But I don't think it would be productive to provide you a proposed order without having that data --

**THE COURT:** That's fine. You know, this is going to be a bit of a slug. So I'd rather just get a product I can use and not have to have you back in.

**MR. CANTY:** Yes, Your Honor. Thank you.

**MR. CHORBA:** Your Honor --

THE COURT:  I tell you what, I won't put any time limit on it.  You just do it when you want to do it.

MR. CANTY:  Thank you, Your Honor.

THE COURT:  Okay.  All right.

Okay.  There will be one judgment, Mr. Chorba.  It will come when the time for judgment comes.  We're doing anything in between.

Look, you know...

MR. CHORBA:  There are --

THE COURT:  I've read everything else.  It's just -- I don't know if you wrote this.  I've seen you many times before.  I've always appreciated your presence here.

MR. CHORBA:  Thank you, Your Honor.

THE COURT:  I mean, these objections are just not grounded in reality.  So they're just -- you know, they're -- it's squirting ink like the class certification order never happened, the evidence at trial never happened, the jury verdict never happened, my very detailed post-trial motion never happened.  And it's fine.  And you can tell your client whatever you want.  But here, in this courtroom, we're a reality-based experience.  So we're not going to act like these things -- individualized claim hearings after the record in this case -- there's just --

MR. CHORBA:  Can I --

THE COURT:  It's, just candid, slightly ludicrous.

But, yeah, go ahead.

And please don't say anything to make a record.  This is your record.  You filed it.  That's all you -- you need to tell somebody else, oh, look at the horrible things that that yahoo did; okay?  So, yeah.

MR. CHORBA:  Putting that aside, Your Honor, there are three quick points in light of what's been --

THE COURT:  Sure.  Yes.

MR. CHORBA:  -- disclosed.

THE COURT:  Yes.  Something constructive would be great.

MR. CHORBA:  And you're not going to read this -- what I'm about to say -- in the papers, because a lot of this is new.

THE COURT:  Perfect.  That's what we're here for.  All right.

MR. CHORBA:  First -- and I appreciate Your Honor recognizing we've preserved what we need to preserve, but I want to turn to the practical at this point.

THE COURT:  Yes.

MR. CHORBA:  First of all, this news with respect to "Flo has the data" -- that's earth-shattering to us.  That's news to us.  This was litigated --

THE COURT:  It came out of their settlement.

MR. CHORBA:  This was litigated.  There were

representations made to the Court.  If we're going to have three weeks, we have a lot of questions.  We literally just found out --

THE COURT:  Questions for Flo?

MR. CHORBA:  We're going to have questions for Flo. We're going to have questions for plaintiffs, Your Honor. Because --

THE COURT:  What are the questions?

MR. CHORBA:  The questions are -- Mr. Canty made certain representations about certain data that we can match. We need to check that.  There was a lot of discussions going into this filing.  There were no discussions of this.

THE COURT:  Well, I think that was all -- that was all in his papers --

MR. CHORBA:  Not the --

THE COURT:  They wanted to ask Facebook to look at the 35 million cross-checks and --

MR. CHORBA:  But, Your Honor, I want to make sure you appreciate what is being disclosed this morning is news.  This was addressed back in June when we were talking about class notice.  There was a 3.5.  Now we're hearing 13 million.  It's a totally different number from the 35 million.  It's a different number than the 3.5.  Counsel's shaking their head. We'd like an opportunity to have this discussion.

THE COURT:  That's fine.  That's all right.

**MR. CHORBA:** Okay.

**THE COURT:** I'm not worried about the number. It's going to be a little bit of a target, but it's -- you know --

**MR. CHORBA:** Well --

**THE COURT:** -- we're going to get the number fixed.

Now, I'm just going to tell you, for all of Meta's handwringing about due process, which I think is completely misplaced given the record in this case and my commitment to ensuring that there will not be a runaway damages award, you know, you ought to be jumping at the -- chomping at the bit to do cross-checks of your data to make sure that you're protecting your corpus, so to speak.

So I'm expecting you -- and I did not see this in the papers, because the papers were just purely obstructionist, as Meta has been throughout this case -- I'm expecting it's you, Mr. Chorba -- new day, new lawyer -- new-ish -- you know, back in the saddle -- however you want to see it -- you're going to put -- you know -- put some order on this and -- you know -- this is what your client should want. They should want to use their data to run a cross-check.

**MR. CHORBA:** I agree, Your Honor.

**THE COURT:** Are you with me on that?

**MR. CHORBA:** I'm with you on that. And as usual --

**THE COURT:** All right.

**MR. CHORBA:** -- you're a step ahead of me, Your Honor.

The proposal that plaintiffs --

THE COURT:  Say that again.

MR. CHORBA:  You're one step ahead of me --

THE COURT:  "As usual" I think you said.

MR. CHORBA:  As usual, yes.

THE COURT:  Okay, good.

MR. CHORBA:  Get that last part for the court reporter.

But, Your Honor, the proposal that was put forward to you -- we conferred with plaintiffs -- there's certain restrictions on what Meta can and can't do.

THE COURT:  That's fine.  Listen, I can't -- I'm not going to be the tech mech expert.

MR. CHORBA:  Fair enough.

THE COURT:  You all work it out.  You know better than I do what the systems do.  But just bring to it, Mr. Chorba, your usual interest -- you know, of course you're an advocate for your client -- that's what you're here to be -- but, you know, bring your spirit of cooperation.

Now, what questions -- your Flo colleague is right here. What do you want to ask him?

MR. SADUN:  And if I may just correct a few things Mr. Chorba said.  I'm sure --

THE COURT:  Well, let's not, you know, start fighting among defendants, but go ahead.

**MR. SADUN:** The 13 million figure was the same figure all parties used in the trial brief. It was the same figure plaintiffs used in their --

**THE COURT:** I'm sorry. You need to get closer -- I'm sorry, just get a little --

**MR. SADUN:** The 13 million figure was the same figure used in the trial brief. It was the same figure used in plaintiffs' disclosures I think five days before the start of trial. Technically it's 11.9 million, because they're including people pre the class period, but it's the same raw dataset.

**THE COURT:** I'm not worried about it. We're going to work all of this out.

**MR. SADUN:** I would also say, Flo has always been completely transparent with the Court about the data it has and doesn't have. We're creating records. Going through the manual process is going to take hundreds of engineering hours. It's the same reason why the Court previously denied a motion to compel for this data. But when both plaintiffs and Meta asked us for these records, we decided to voluntarily do that process.

**THE COURT:** All right.

**MR. SADUN:** So that's what we're doing now.

**THE COURT:** Okay.

**MR. CHORBA:** We'll work through this. We'll discuss

with them.  I don't want to belabor it.

The second point to move on is ClaimScore.  I'd like to start by saying, Your Honor --

**THE COURT:**  The claim form?

**MR. CHORBA:**  ClaimScore.

**THE COURT:**  Oh, ClaimScore.  Yes.

**MR. CHORBA:**  I'm probably the first lawyer that's worked with them.  We had a case in New York where they -- our client sold 600,000 booster seats for young children.  There were 6 million claims.  It was obvious fraud.  We had nowhere to turn.  We worked with them.  The judge lauded them for the work that they did.  But I want to make absolutely clear --

**THE COURT:**  What court?  SDNY or --

**MR. CHORBA:**  I think it was actually EDNY.  It was in White Plains.

**MR. CANTY:**  That's SDNY.

**MR. CHORBA:**  No, SDNY.  Thank you.  My New York friends will always correct me on that.  I had another settlement last week in Brooklyn, which I know is EDNY.

**MR. CANTY:**  Yes.

**THE COURT:**  ClaimScore helped you out?

**MR. CHORBA:**  ClaimScore helped us out.  And they helped us out in both cases, Your Honor.  And that was one which -- we had the -- I was in the unenviable position of opposing final approval of a settlement I negotiated because it

was a fraud on the court.  The Court saw it.  They were instrumental.  But I want to flag one thing -- and Mr. Heller -- I would invite him to confirm this -- they can absolutely root out what's called programmatic fraud --

THE COURT:  Yes.

MR. CHORBA:  -- where you see the click farm with 100 iPhones.  They can absolutely detect the difference between a bot and a human being.  But, importantly, what they cannot do -- and he will verify this -- they cannot identify an individual who is lying on a claim form or representing something that is not.

And so from our perspective -- and I think we should have universal agreement on that -- to us, when you have $5,000 in statutory damages, that is a critical concern.

THE COURT:  Let me just jump in.

MR. CHORBA:  Sure.

THE COURT:  I understand that.  And it happens in every case.  It's just sort of where we are.  I mean, there's only so much we can do.  You know, when you threaten someone with civil or criminal, you know, consequences for lying on a claim form, which we will do here -- and, by the way, that just reminded me, the statement of penalty of perjury -- I want it to be -- what the United States Code provides --

MR. CANTY:  Yes.

THE COURT:  -- use that same language.

**MR. CANTY:** Yes, Your Honor.

**THE COURT:** Put it in bold. I want it separate from that last line. I don't want it to say, and, by the way, here's my name, and I affirm. You say, right before the signature line, in bold and caps -- maybe 14-point font, all caps -- the language in 28 USC -- whatever that section is on -- you know, the federal affirmation that you use for penalty of perjury; okay?

**MR. CANTY:** Yes, Your Honor.

**THE COURT:** And I think you should say in there somewhere above that -- you know, we're not holding a gun to anybody's head -- but, you know, this is being submitted under penalty of perjury, and there will be consequences for misrepresentations.

**MR. CANTY:** Yes, Your Honor.

**THE COURT:** So I understand, but, look, part of this is empirical; okay? Of course we can spend all day saying, oh, these thousands of things might go wrong. The key word is "might." We have to wait and see.

Now, if we get 33 million claims, just like your 6 million versus 600,000, we'll talk; okay? And there will be maybe a next round of data scrubbing or something. But let's just --

**MR. CHORBA:** Well --

**THE COURT:** -- take it one step -- these are not reasons not to do it. They are reasons to be mindful and aware

while we're doing it.

MR. CHORBA:  Absolutely, Your Honor.

THE COURT:  Okay.

MR. CHORBA:  And one --

THE COURT:  Let me -- can I just ask one other question?

MR. CHORBA:  Please.

THE COURT:  So did you hire ClaimScore or did -- who hired ClaimScore in your case?

MR. CHORBA:  We found out about them when plaintiffs -- we conferred with plaintiffs and they mentioned it.  We did not hire them here.  We have not discussed -- but we will engage in that process to make sure --

THE COURT:  All right.

MR. CHORBA:  -- they're doing everything they can --

THE COURT:  Are there any competitors you want me to think about --

MR. CHORBA:  Your Honor, I've looked.  I'm not aware of any if there are --

THE COURT:  Okay.

MR. CHORBA:  -- that can do what they can do.  And their model -- just so you know for this case and future cases -- their model learns -- they're on, like, version 30, where mine was the first.  It was version one.

THE COURT:  Oh.

MR. CHORBA:  They create a database of IP addresses. So, for example, they score each claim.  If they find a claim here, and it's from someone -- an email address, an IP address -- and let's say their last 29 settlements they evaluated, that IP address, that individual, was flagged, that's going to deduct from their score.  And that's one of the things that we will examine.

THE COURT:  Is that right?  Where's that ClaimScore person?  Come on up.

Mr. Chorba is giving you a good endorsement.  Is that right?

MR. HELLER:  That's correct, yes.  So in our history of cases, we have developed a list of identity information and otherwise that we can use to deduct scores.

THE COURT:  And you're now on iteration 30?

MR. HELLER:  I don't know the exact number, but it's 3.19, which is -- there's a lot of points in between -- 30-plus.

THE COURT:  All right.  Let me ask you, just out of curiosity, did you work on that car seat case?

MR. HELLER:  I did.

THE COURT:  So how did you satisfy that judge that you got to the point where the claims were all legitimate?

MR. HELLER:  So the way that our system works, every time a criteria is failed, the score is deducted, and we tag

the claim with what's called a "deduction code."  So it's the burden of evidence for each individual claim.  So if any claim were to be questioned, you can provide backup evidence.  We also have Metadata that backs up even more than the deduction codes, to provide comfort.

And, visibly, when you start sorting the claims by fraud indicators, you start to see what we call "fingerprints of fraud."  So the patterns of how the claims were fake created or the things that people were doing to submit fraudulent claims start to cluster, and they become visually obvious when sorted by score and deduction codes, where, as Chris mentioned -- or Mr. Chorba mentioned -- there's needles in haystacks.  Like, these claims may not look fraudulent by themselves, but when clumped in 10,000, which of 6 million is still needles in haystacks, it's very obvious that they're fraudulent.  But then we also provide the backup data, so anyone, everyone, can get comfortable with the determinations.

THE COURT:  Now, are these -- when you discover these clumps of say 10,000 claims, is it one source?  I mean, is it a bot?  Is it automated?  Is it actually a scam that some person is doing?  I mean, what --

MR. HELLER:  Yeah.  So there is definitely organizations behind this I would say beyond one person.  I mean, there's resources being deployed to commit fraud.  This is the same fraud that you see in various sectors across the

Internet, even in Government payments; right?  You know?  So it's synthetic identity thefts, it's fake identity fraud, it's duplication fraud.  I mean, there are sophisticated systems that are trying to beat out what is out there.

And I know you mentioned competitors.  There's obviously many ways to address this problem.  But many of those are single checklist items.  Like, if an IP address is used 20 times, they get eliminated.  The fraudsters have learned that that's the case, so they buy or steal single-use residential IPs to submit a single claim.  They use technology that remote configures cell phones to look like an individual device that --

THE COURT:  Can I -- how do you deal with that single fraud residential IP -- how do you catch that?

MR. HELLER:  So that is -- so those IPs will not flag our system.  It is other evidence that ultimately determines whether the claim is fraudulent or not.  So we use all of the data points on the claim form.  We enrich it with a lot more data, call it 20 points off those 10, and it's those cookie crumb trails of data that lead us to make a determination.  And it's how we can gain the accuracy we gain.

THE COURT:  Why am I hearing about you only now?  Have you been around?  I have an enormous number of class action settlements.  Not all of them are --

MR. CHORBA:  I need to have another settlement before

Your Honor and you'll hear about them.

THE COURT:  Is it coming up?

MR. CHORBA:  No, I don't -- no.  I'm not aware of any, Your Honor.  But that -- that --

THE COURT:  I always like to hear class action settlement.

MR. CHORBA:  We love to resolve them for you, Your Honor.

THE COURT:  I got to get -- I'm sorry -- Mr. Heller is it?  So I just -- I'm a little -- I mean, look, this district does more, I think, than any other district in the country.  I can guarantee you that no one in the building, with one exception or two exceptions, have heard of it.

MR. HELLER:  So --

THE COURT:  We talk about this all the time.  The word "ClaimScore" has never come up.

Now, I'm not suggesting you need a PR or marketing person.  But, I mean, what I'm trying to say, in an indirect way, is this is good technology, not a big outlier that people are just sort of rolling the dice on; right?

MR. HELLER:  Correct.  Yeah.  So we're a back-of-house tool.  A lot of the administrators rely on our information --

THE COURT:  Oh.

MR. HELLER:  -- but we're not called out specifically.  But in the list of cases, there are several.

**MR. CANTY:**  And, Your Honor, if I may, we included, in his affidavit, cases.  So just from the -- from the Northern District of California, *Hubbard v. Google* that we used -- that was 2019.  Northern District of California*, Perez v. Rash Curtis & Associates*.

**THE COURT:**  I'm kind of surprised they weren't used in my Meta BIPA case.

**MR. CHORBA:**  They didn't exist then, Your Honor.  If they did, we would have absolutely -- or Meta would have absolutely used them.

**THE COURT:**  Oh, because that was -- we settled that before 2022?

**MR. CHORBA:**  It was a few years before, Your Honor.

**THE COURT:**  Okay.  All right.  Thank you.

**MR. CHORBA:**  Your Honor --

**THE COURT:**  Yes, go ahead.

**MR. CHORBA:**  I just -- I want to underscore the primary point.  Although I'm a fan of ClaimScore, you heard Mr. Heller say they can't identify this --

**THE COURT:**  It's not perfect.  I get it.  Yeah.

**MR. CHORBA:**  So what I would propose -- and this will help us in your conferrals with plaintiffs' counsel -- is -- you know -- again, we've made proposals in this statement. I've heard you say you're going to go in a different direction. We've preserved those.  At a minimum, do some sampling --

**THE COURT:** That's fine.  Look, you two work it out.

**MR. CHORBA:**  Okay.

**THE COURT:**  Look, we have a shared goal here.  That is getting you the right -- the checks in the hands of the victims; okay?  And we want to make sure they're 100 percent class members.  Everybody shares that goal.  For different reasons, but we all converge on that goal; right?

**MR. CHORBA:**  I think sampling will help us, Your Honor.

**THE COURT:**  Well, work something out.

**MR. CHORBA:**  Okay.

**THE COURT:**  Mr. Chorba, I want you to take the lead on that.  All right?

**MR. CHORBA:**  I will, Your Honor.

**THE COURT:**  Yeah.

**MR. CHORBA:**  And if I can just -- one point on notice. I think I heard you -- when you were questioning Mr. Canty about in-app notice on Meta -- if we have a list, that's unnecessary.  I didn't want to leave here, because we saw that for the first time on last week's filing, as well.

**THE COURT:**  Let me just jump in.  This is what I -- I -- because -- look, I demand it in all of my cases where the harm is recent and/or possibly ongoing.  But seven years ago, I just -- I -- you know, I don't want to do anything that is inconsistent with what we did with class notice.  And I don't

remember what we did --

MR. CHORBA:  Okay.

THE COURT:  I don't remember what we did with the class notice.  But I just -- I'm going to leave it up to you two to have a rational -- Mr. Chorba will take the lead -- rational discussion with the plaintiffs about this.  But I don't know if the Jewel notice from 2019, 2016 makes a lot of sense.  I'm not saying no, I'm just not --

MR. CHORBA:  Thank you.

MR. CANTY:  Understood.  But to the extent that we know we could put a Jewel notice in front of a known class member, that's something that we would be interested in, because it's the most direct way to reach somebody.  If they can identify --

THE COURT:  Well, but you already know; don't you? You already sent notice --

MR. CHORBA:  Email.

MR. CANTY:  No.  We don't have a complete email list. Our understanding is we won't have a complete email list.  So we're --

THE COURT:  I let Flo do something.

Flo, can you come back up here?

Flo told me something about -- what was it about the class period?  You determined that, you know, there are only a handful -- when we were doing email notice, you determined --

oh, I know what it was.  Your current users weren't users back then.

**MR. SADUN:**  That's correct.  Most current users were not using the app --

**THE COURT:**  Right.

**MR. SADUN:**  -- during the class period, which is further reason not to use in-app notice.  And so we would ask, Your Honor, if you're disinclined to use in-app notice in the Meta judgment, that the same would apply --

**THE COURT:**  What are we doing in class cert?  You gave notice to that group of people.

**MR. SADUN:**  We did use in-app notice --

**THE COURT:**  Okay.

**MR. SADUN:**  -- over our objection, Your Honor.

**THE COURT:**  I understand.

**MR. SADUN:**  I just --

**THE COURT:**  Look, I don't -- I don't know if we necessarily -- I'm not saying no.  But, in this case, you need rather unique circumstances, given its age.  Just talk with Mr. Chorba and come up with something.

**MR. CANTY:**  Yes, Your Honor.

**MR. SADUN:**  Your Honor, I would ask that we be invited --

**THE COURT:**  And talk with Flo too.

**MR. SADUN:**  Yes.  Thank you.

THE COURT:  Okay.  Anything else for today?

MR. CANTY:  No, thank you, Your Honor.

THE COURT:  All right.  Let's make it happen.

MR. CHORBA:  Thank you.

THE COURT:  All right.  Thank you.

(Proceedings adjourned at 11:10 a.m.)

---oOo---

### CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:    Monday, October 6, 2025



Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court