UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | | |
|---|---|---|
| ERICA FRASCO, ET AL., INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, | ) ) ) | C-21-00757 JD SAN FRANCISCO, CALIFORNIA |
| PLAINTIFFS, | ) ) | DECEMBER 4, 2025 |
| VS. | ) ) | PAGES 1-24 |
| FLO HEALTH, INC., META PLATFORMS, INC., GOOGLE, LLC, AND FLURRY, INC., | ) ) ) ) | |
| DEFENDANTS. | ) ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES DONATO
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFFS:      LABATON KELLER SUCHAROW LLP
                         BY:  CAROL C. VILLEGAS
                              JASON BISSELL-LINSK
                              DANIELLE IZZO
                         140 BROADWAY
                         NEW YORK, NEW YORK  10005


APPEARANCES CONTINUED ON THE NEXT PAGE


REMOTE REPORTED BY:    LEE-ANNE SHORTRIDGE, CSR, CRR
                       CERTIFICATE NUMBER 9595


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

APPEARANCES (CONTINUED):


FOR THE PLAINTIFFS:      LOWEY DANNENBERG, P.C.
                         BY:  AMANDA G. FIORILLA
                         44 SOUTH BROADWAY, SUITE 1100
                         WHITE PLAINTS, NEW YORK  10601

                         SPECTOR ROSEMAN & KODROFF, P.C.
                         BY:  DIANA J. ZINSER
                         2001 MARKET STREET, SUITE 3420
                         PHILADELPHIA, PENNSYLVANIA  19103


FOR THE DEFENDANTS:      COOLEY LLP
                         BY:  TIFFANY M. LIN
                              BENEDICT Y. HUR
                              SIMONA A. AGNOLUCCI
                         3 EMBARCADERO CENTER, 20TH FLOOR
                         SAN FRANCISCO, CALIFORNIA  94111

                         DECHERT LLP
                         BY:  BRENDA R. SHARTON
                              BENJAMIN SADUN
                         ONE INTERNATIONAL PLACE
                         100 OLIVER STREET
                         BOSTON, MASSACHUSETTS  02210

                         HUNTON ANDREWS KURTH LLP
                         BY:  JASON J. KIM
                         550 SOUTH HOPE STREET, SUITE 2000
                         LOS ANGELES, CALIFORNIA  90071

                         GIBSON, DUNN & CRUTCHER LLP
                         BY:  CHRISTOPHER CHORBA
                         333 SOUTH GRAND AVENUE
                         LOS ANGELES, CALIFORNIA  90071

SAN FRANCISCO, CALIFORNIA                    DECEMBER 4, 2025

P R O C E E D I N G S

(COURT CONVENED AT 12:55 P.M.)

THE CLERK:  CALLING CIVIL 21-757, FRASCO VERSUS FLO HEALTH, INC.

COUNSEL.

MS. VILLEGAS:  CAROL VILLEGAS FROM LABATON KELLER SUCHAROW ON BEHALF OF THE PLAINTIFFS.

MR. BISSELL-LINSK:  JAKE BISSELL-LINSK FROM LABATON ON BEHALF OF PLAINTIFFS.

MS. IZZO:  DANIELLE IZZO FROM LABATON ON BEHALF OF PLAINTIFFS.

MS. FIORILLA:  AMANDA FIORILLA FROM LOWEY DANNENBERG ON BEHALF OF THE PLAINTIFFS.

MS. ZINSER:  DIANA ZINSER, SPECTOR ROSEMAN & KODROFF, ON BEHALF OF PLAINTIFFS.

MS. VILLEGAS:  YOUR HONOR, WE ALSO HAVE JUSTIN PARKS FROM A.B. DATA, AND BRYAN HELLER FROM CLAIMSCORE --

THE COURT:  OKAY, GOOD.

MS. VILLEGAS:  -- IF THE COURT HAS ANY QUESTIONS FOR THEM.  THEY'RE SITTING RIGHT HERE IN THE FIRST ROW.

THE COURT:  ALL RIGHT.

MS. LIN:  GOOD MORNING, YOUR HONOR.

TIFFANY LIN FROM COOLEY LLP ON BEHALF OF GOOGLE, AND I'M HERE WITH MY COLLEAGUES, BEN HUR AND SIMONA AGNOLUCCI.

MS. SHARTON:  GOOD MORNING.

BRENDA SHARTON FROM DECHERT ON BEHALF OF FLO HEALTH.  WITH ME IS BENJAMIN SADUN.

MR. KIM:  GOOD MORNING, YOUR HONOR.

JASON KIM ON BEHALF OF DEFENDANT FLURRY.

THE COURT:  OH, FLURRY?

MR. KIM:  FLURRY.

THE COURT:  I THOUGHT FLURRY WAS LONG GONE.

MR. KIM:  YOUR HONOR PRELIMINARILY APPROVED THE SETTLEMENT, BUT THEY WERE HOLDING OFF ON THE NOTICE PIECE, WHICH IS --

THE COURT:  OH, OKAY.  ALL RIGHT.

SO OVERALL, IT SEEMS FINE.  I MEAN, GIVEN THE VERDICT, AN ARGUMENT COULD BE MADE THAT IT'S WAY TOO LITTLE, BUT THAT SHIP HAS SAILED.

SO LET ME ASK YOU A QUESTION, THOUGH.  HOW MUCH IS EACH CLAIMANT -- FIRST OF ALL, I STILL DON'T HAVE A GOOD IDEA OF HOW MANY CLAIMANTS ARE POTENTIALLY IN THIS.

HOW MANY CLASS MEMBERS DO YOU EXPECT?

MS. VILLEGAS:  SO WE ESTIMATE THAT THERE'S ABOUT 12 MILLION, 12 TO 13 MILLION NATIONWIDE CLASS MEMBERS.

AND SO REMEMBER THAT THE CLASS IS A NATIONWIDE CLASS, BUT IT'S ALSO A CALIFORNIA SUBCLASS.  THE CALIFORNIA SUBCLASS WE ESTIMATE TO BE ANYWHERE FROM ABOUT 1.4 TO 1.6 MILLION PEOPLE.

THE COURT:  AND WHAT'S THE AVERAGE RECOVERY GOING TO

BE?

MS. VILLEGAS:  THE AVERAGE RECOVERY IS GOING TO BE 25 TO $90 A PERSON, AND THE CALIFORNIA SUBCLASS IS GOING TO GET DOUBLE THE PRO RATA RECOVERY OF THE NATIONWIDE CLASS, AND THAT'S BECAUSE THE CALIFORNIA CLAIMS WERE THE ONES THAT SURVIVED SUMMARY JUDGMENT AND WERE STRONGER.

THE COURT:  OKAY.  SO THE FLOOR FOR THE NATIONWIDE CLAIMS IS GOING TO BE $25?

MS. VILLEGAS:  THAT'S WHAT WE EXPECT, YOUR HONOR.

THE COURT:  AND 50 IN CALIFORNIA?

MS. VILLEGAS:  CORRECT.

THE COURT:  AND WE'RE GOING TO GET THIS MONEY TO THEM AS EASILY AS POSSIBLE, RIGHT?

MS. VILLEGAS:  ABSOLUTELY.

THE COURT:  PAYPAL, VENMO, WHATEVER?

MS. VILLEGAS:  YES, YOUR HONOR.

THE COURT:  NOW, NOTICE.  YOU KNOW, THE 6 PERCENT CLAIMS RATE WAS ROLLED OUT AS IF IT WERE A STATEMENT OF TRIUMPH.  IT'S NOT.  IT'S A STATEMENT OF FAILURE.

NOW, THESE ARE PEOPLE WHOSE NAMES AND ADDRESSES, BY DEFINITION, ARE IN THE HANDS OF SOMEONE, EVEN THOUGH -- EVEN BACK IN TIME.  THIS WAS AN ONLINE SERVICE WHERE YOU HAD TO PUT THAT INFORMATION IN OR YOU COULDN'T USE IT.

SO 6 PERCENT, NOT GOING TO -- YOU'VE GOT TO GET THAT UP TO DOUBLE DIGITS, HIGH DOUBLE DIGITS.

MS. VILLEGAS:  UNDERSTOOD, YOUR HONOR, AND OUR GOAL IS TO GET THE CLAIMS RATE AS HIGH AS POSSIBLE.

AS WE SPOKE ABOUT IN PREVIOUS HEARINGS, WE DO HAVE A LIST OF EMAIL ADDRESSES FROM FLO.  THOSE WERE THE EMAIL ADDRESSES THAT WE USED FOR CLASS NOTICE.  THERE WERE JUST OVER -- CLOSE TO 3,000 EMAIL ADDRESSES -- SORRY -- MILLION, CLOSE TO 3 MILLION EMAIL ADDRESSES.

YOU DIDN'T HAVE TO INPUT YOUR EMAIL ADDRESS TO USE THE APP, SO WE DON'T HAVE EVERYONE'S EMAIL ADDRESS.

WHAT WE DO HAVE NOW IS SOME ADDITIONAL INFORMATION FROM FLO, INCLUDING SOME NAMES OF USERS THAT AREN'T ASSOCIATED WITH AN EMAIL ADDRESS.

SO WE'RE WORKING THROUGH A PROCESS, AN ENRICHMENT PROCESS WITH CLAIMSCORE TO TRY TO GET CONTACT INFORMATION FOR THOSE INDIVIDUALS.

WE WERE ALSO PROVIDED ACCESS, OR FLO PROVIDED ACCESS TO A.B. DATA TO SOME ADDITIONAL INFORMATION ABOUT THE USER BASE, INCLUDING I.P. ADDRESSES, ADVERTISING IDENTIFIER, AND WHAT WE'RE IN THE PROCESS OF DOING NOW IS WORKING WITH CLAIMSCORE TO ENRICH THAT DATA, AND ALSO WORKING WITH META TO SEE IF WE ARE ABLE TO USE THE I.P. ADDRESSES AND THE ADVERTISING I.D.'S IN ORDER TO GET MORE DIRECT CONTACT INFORMATION FOR THE ACTUAL CLAIMANTS IN THIS CASE.

THE COURT:  I WAS GOING TO ASK, SO THE EVIDENCE AT TRIAL WAS THAT META WAS LINKING THESE TO ITS USERS.

MS. VILLEGAS:  THAT'S RIGHT, YOUR HONOR.

THE COURT:  THAT'S A GOLD MINE OF -- THAT'S A GOLD PAVED HIGHWAY OF REACHING THESE PEOPLE, SO HOW ARE YOU GOING TO USE THAT?

MS. VILLEGAS:  SO, YOUR HONOR, WE'VE BEEN IN DISCUSSIONS WITH META.  WE'VE BEEN MEETING AND CONFERRING WITH THEM ON THIS DATA.  WE PROVIDED TO THEM THE FIELDS THAT WE HAVE ACCESS TO THROUGH THE FLO DATA, THE USER NAME, THE EMAIL ADDRESS, THE I.P. ADDRESS, ET CETERA.

WE JUST THIS MORNING HAD A MEET AND CONFER ABOUT THE DATA, AND OUR NEXT -- THE NEXT STEP IS THAT WE'RE GOING TO COME TO THE COURT AND ASK THE COURT FOR AN ORDER FOR A.B. DATA TO SHARE A SAMPLE OF THE DATA WITH META TO SEE WHAT KIND OF MATCHING THEY CAN DO.

IT'S OUR UNDERSTANDING FROM THE FLO DATA THAT THE I.P. ADDRESSES ARE THE MOST RECENT I.P. ADDRESS THAT A USER USED, SO EVEN IF THEY CHANGED THEIR DEVICE, IT'S THE MOST RECENT ONE, AND OUR HOPE IS THAT WE WILL BE ABLE TO ENRICH THIS DATA WITH HELP FROM META, WITH ASSISTANCE FROM CLAIMSCORE, TO GET THE WIDEST DIRECT NOTICE THAT WE CAN AND TO MAKE SURE THAT THE CLAIM RATE IS VERY HIGH IN THIS CASE.

THE COURT:  SO RIGHT NOW YOU HAVE 3 MILLION ADDRESSES THAT YOU CAN BANK ON.

MS. VILLEGAS:  YES.

THE COURT:  AND WHAT'S ALL THIS ENRICHMENT GOING TO

INCREASE THAT TO?

MS. VILLEGAS:  SO WE HAVE THE EMAIL ADDRESSES.

WE ALSO NOW HAVE FIRST AND LAST NAMES THAT WE'RE GOING TO ENRICH AND TRY TO MAKE SURE THAT WE GET TO THOSE PEOPLE AND FIND EMAIL ADDRESSES FOR THEM.

THE NEXT STEP WOULD BE TO TRY TO REVERSE THE I.P. ADDRESSES TO GET TO HOUSEHOLDS THAT WE CAN SEND NOTICE TO, OR INDIVIDUALS IN THAT HOUSEHOLD THAT WE CAN SEND NOTICE TO IF IT'S A HOUSEHOLD VERSUS A DEVICE.

AND SO WE'RE GOING TO WORK CLOSELY WITH META AND WITH CLAIMSCORE TO MAKE SURE THAT HAPPENS.

THE COURT:  BUT WHAT'S THAT GOING TO GET YOU TO?  IF THAT ALL WORKS OUT WELL, WHERE WILL THAT GET YOU OUT OF THE 12 MILLION?

MS. VILLEGAS:  I CAN'T ANSWER THAT STANDING HERE TODAY, YOUR HONOR.  IT'S OUR HOPE TO GET TO AS MANY PEOPLE AS POSSIBLE.

THE COURT:  WHAT ABOUT THOSE -- I DON'T USE SOCIAL MEDIA FOR A VARIETY OF REASONS, BUT WHAT ABOUT WHAT USED TO BE CALLED JEWEL NOTICES ON META?

MS. VILLEGAS:  WE WOULD BE IN FAVOR OF DOING A JEWEL NOTICE.

THE COURT:  DO THEY STILL DO THAT?

MS. VILLEGAS:  YES.

THE COURT:  OKAY.

MS. VILLEGAS:  SO THAT WOULD BE PART OF THE NOTICE, THE NOTICE PROGRAM AS WELL.

THE COURT:  YOU'VE WORKED ALL THIS OUT WITH META ALREADY?

MS. VILLEGAS:  SO THE JEWEL NOTICE IS THE ONLY ASPECT THAT ISN'T PART OF THE CURRENT NOTICE PLAN, YOUR HONOR.

BUT THE NOTICE PLAN THAT WE CURRENTLY HAVE IS THE ONE THAT WE USED AT CLASS CERTIFICATION, WHICH WAS EXTREMELY ROBUST.

WE NOW HAVE SOME ADDITIONAL DATA FROM FLO THAT WE THINK IS GOING TO HELP US ENRICH THE DATA AND JUST GET A LARGER CLAIMANT RESPONSE, SO WE'RE EXCITED ABOUT USING THAT.

BUT WE HAVE NOT SPOKEN WITH META ABOUT DOING A JEWEL NOTICE FOR THIS SETTLEMENT.  OUR GOAL WOULD BE TO DO AS MUCH NOTICES AS WE CAN, AS PRACTICABLE, FOR THIS, AS WELL AS FOR THE META VERDICT.

MR. CHORBA:  YOUR HONOR, GOOD MORNING.

CHRIS CHORBA.  I DID NOT MAKE AN APPEARANCE BECAUSE WE WEREN'T ON CALENDAR THIS MORNING.

BUT TO ADDRESS THAT, WE DO NEED TO CONFER OVER THAT, BECAUSE WE DISAGREE.  AS WE'VE REPRESENTED TO YOU AT PAST HEARINGS, AND AS YOU ADDRESSED AT THE CLASS CERTIFICATION STAGE, JEWEL NOTICE WILL BE SIGNIFICANTLY OVERINCLUSIVE HERE, WILL NOTIFY TOO MANY PEOPLE.

WE ARE WORKING COOPERATIVELY WITH PLAINTIFFS.  WE GOT THE INFORMATION --

THE COURT:  TOO MANY?  HOW SO?

MR. CHORBA:  WELL, IT WOULD BE OVERINCLUSIVE BECAUSE IT WOULD GO TO TOO MANY USERS.  WE CAN'T SAY FOR SURE WHO WAS ACTUALLY USING THIS APP DURING THE CLASS PERIOD.  THAT'S SOMETHING THAT WAS THE PRODUCT OF DISCOVERY.

THE COURT:  BUT WHAT'S THE HARM IN THAT?  PEOPLE GET BOMBARDED WITH THINGS THAT THEY DON'T WANT ALL DAY.  AND IF YOU JUST SAY "IF," YOU KNOW, IT STARTS WITH A CONDITIONAL, "IF X, Y, AND Z, THEN YOU SHOULD GO HERE," AND SOMEONE WILL READ THAT AND SAY, "WELL, THAT'S NOT ME."

WHAT'S THE DOWNSIDE?

MR. CHORBA:  WELL, BECAUSE, YOUR HONOR, WE ARE CONCERNED -- WE TALKED LAST TIME ABOUT THE FRAUDULENT CLAIMS. WE ARE CONCERNED WITH OVER NOTIFICATION HERE GIVEN THE INCENTIVE WITH A $5,000 CLAIM THAT'S AVAILABLE.

WE'RE GOING TO BE INCREASING THE POOL OF PEOPLE THAT WE DO NOT BELIEVE --

THE COURT:  NO, THAT'S FOR YOU.  THAT'S NOT FOR THIS. THIS SETTLEMENT FOR GOOGLE, THIS IS JUST -- WE'RE JUST TALKING ABOUT GOOGLE AND --

MS. VILLEGAS:  FLURRY AND FLO.

THE COURT:  FLO ITSELF.

THIS IS JUST A $56 MILLION PACKAGE.  YOUR END HASN'T EVEN BEEN DETERMINED YET.

MR. CHORBA:  I UNDERSTAND THAT.

THE COURT: I'M NOT TALKING ABOUT THE FIVE GRAND BELL RINGER.

THIS IS THE $25 OR $50. I UNDERSTAND FRAUD IS THERE.

SOMEBODY -- I THOUGHT IT WAS YOU, MR. CHORBA -- GAVE ME A GOOD PRESENTATION ABOUT ALL THE ANTI-FRAUD PRACTICES PEOPLE DO NOW. WAS THAT YOU?

MR. CHORBA: THAT WAS ME, YOUR HONOR, WITH THE ASSISTANCE FROM CLAIMSCORE.

HOWEVER, YOU'LL RECALL --

THE COURT: WHO WAS THAT? WHAT WAS THAT?

MR. CHORBA: CLAIMSCORE, AND THEY'RE HERE.

THE COURT: ARE THEY DOING THIS ONE?

MS. VILLEGAS: YES. BRYAN HELLER IS HERE.

THE COURT: YEAH, OKAY. THAT'S RIGHT, YEAH.

MR. CHORBA: YOUR HONOR, AGAIN, WHAT WE DISCUSSED AT THE SEPTEMBER 30 HEARING IS THEY ARE GOOD AT PROGRAMMATIC FRAUD.

WHAT THEY ARE NOT ABLE TO DO IS IDENTIFY INDIVIDUALS WHO MAY NOT HAVE USED THE APP.

SO IF WE'RE TALKING ABOUT NOTICE FOR THE CLASS PROCESS AND USING META'S JEWEL NOTICE WHEN META IS NOT A PARTY TO THIS SETTLEMENT, WE WOULD LIKE TO CONFER WITH PLAINTIFFS BECAUSE IF WE'RE THEN GOING TO FOLLOW THAT UP WITH A NOTICE WITH RELATION TO THE VERDICT, IT'S GOING TO GET VERY CONFUSING. IT'S THE SAME CASE.

WE HAVEN'T DISCUSSED THIS.  WE WOULD LIKE AN OPPORTUNITY TO CONFER WITH PLAINTIFFS.  AGAIN, IF WE'RE ABLE TO ENRICH THE DATA, GET EMAIL NOTICES, THAT WILL BE A FORM OF DIRECT NOTICE.

THE COURT:  I WOULDN'T UNDERESTIMATE USERS SO MUCH. YOU CAN VERY PLAINLY SAY, "THIS IS PART ONE OF A SETTLEMENT, AND THEN PART TWO RELATED TO A VERDICT MAY BE COMING."

YOU CAN SPELL ALL OF THIS OUT.  I DON'T THINK ANYONE IS GOING TO BE COMPLETELY FLUMMOXED BY GETTING TWO NOTICES.

AND SO IT'S GOING TO BE A PERIOD OF TIME IN BETWEEN BECAUSE I DON'T KNOW WHY, BUT WE HAVEN'T CLOSED THE DOOR YET ON THE TRIAL.  I WAS JUST ASKING IN CHAMBERS ABOUT WHY THAT HASN'T HAPPENED, BUT THAT DAY IS GOING TO COME.

BUT IN ANY EVENT, HERE'S WHAT I WANT YOU TO DO.  AS A GENERAL RULE, IT LOOKS FINE, OKAY?

BUT I WANT A MUCH MORE ROBUST PROPOSAL ON NOTICE BEFORE I SIGN ANY APPROVAL ORDERS.  I WANT TO SEE WHAT YOU'RE GOING TO DO.

YOU'VE USED THE WORD "ENRICHED" A LOT TODAY.  THAT'S FINE. THAT WORD MEANS NOTHING.  LET'S PUT METRICS ON IT.  "ENRICHED" MEANING WE'RE GOING TO TAKE 3 MILLION, WE EXPECT WE MIGHT BE ABLE TO GET TO 5 MILLION; AND THEN WE'RE GOING TO GET BETWEEN 5 MILLION TO 8 MILLION THROUGH A JEWEL NOTICE THAT WE'VE WORKED OUT WITH META.

NOW, YOU TWO WORK TOGETHER, COME UP WITH A PLAN, OKAY? AND IT'S GOING TO HAPPEN, META, SO JUST PITCH IN.  THIS IS NOT

AN OPPORTUNITY TO SAY, "WE'RE NOT GOING TO DO IT."  SOMETHING IS GOING TO HAPPEN ON META'S END, SO PUT YOUR HAND ON THE TILLER AND GUIDE THE SHIP WHERE YOU WANT IT TO GO OR I'LL JUST DRIVE IT FOR YOU.

SO JUST WORK THAT OUT.  TAKE THIS OPPORTUNITY TO SEE WHAT YOU CAN WORK OUT.

AND WHEN DO YOU WANT TO -- OH, ALSO, WHILE YOU'RE DOING THIS, GIVE ME A PROPOSED DRAFT, SEND A DRAFT, LODGE IT ON MY BOX, BUT PUT ACTUAL DATES IN.  DON'T SAY 60 DAYS FROM THIS. YOU KNOW, PUT ACTUAL DATES IN.  YOU KNOW, ASSUME AN APPROVAL DATE, SAY, MID-JANUARY, SOMETHING LIKE THAT.

NOW, ALSO, MAKE SURE YOU HAVE AT LEAST 60 DAYS, MAYBE YOU DID, BETWEEN FILING OF THE FEE PETITION OR REQUEST AND OPT OUT AND OBJECTION DEADLINES.  OKAY?

MS. VILLEGAS:  YOUR HONOR, BEFORE WE ACTUALLY COME TO YOU WITH A PLAN, THE FIRST STEP IS GOING TO BE REQUESTING, OR ASKING THE COURT FOR AN ORDER THAT A.B. DATA BE ALLOWED TO SHARE A SAMPLE OR ALL OF THE DATA THAT WE'VE RECEIVED TO FLO.

THE COURT:  GRANTED.  THAT'S DONE.

MS. VILLEGAS:  GREAT.

THE COURT:  NOW, I WOULD LIKE TO HEAR, JUST FOR A MOMENT, WHO'S GOING TO BE DOING ALL THE ENRICHING?  A.B.?

MS. VILLEGAS:  IT'S GOING TO BE CLAIMSCORE, BRYAN HELLER.

THE COURT:  OKAY.  CAN YOU COME UP FOR A MOMENT?

AND, MR. CHORBA, YOU CAN STAY THERE.

MR. CHORBA: WELL, WHILE HE'S COMING UP, YOUR HONOR, I JUST WANT TO ADDRESS WHAT WE DID AT THE CLASS CERTIFICATION STAGE IS THERE WAS NOTICE PROVIDED THROUGH OTHER SOCIAL MEDIA MEANS.

WE WOULD LIKE AN OPPORTUNITY JUST TO CONFER WITH PLAINTIFFS' COUNSEL.

THE COURT: YOU ARE. YOU'RE GOING TO HAVE THAT.

MR. CHORBA: I UNDERSTAND. BUT YOU SAID YOU'RE GOING TO BE DRIVING THIS SHIP IF I DON'T DRIVE IT ALONG WITH YOU.

I JUST WANT TO BE CLEAR THAT JEWEL NOTICE IS SOMETHING WHERE WE HAVE CONCERNS. I'D LIKE AN OPPORTUNITY TO CONFER. AT THE LAST HEARING, YOU INDICATED THAT A JEWEL NOTICE WOULD PROBABLY NOT BE NECESSARY HERE.

I'D LIKE TO SEE WHERE THE DATA IS.

THE COURT: NOW WE'RE TALKING ABOUT PAYMENTS. THAT WAS A LITTLE BIT DIFFERENT.

MR. CHORBA: I UNDERSTAND. BUT I'D LIKE AN OPPORTUNITY JUST TO CONFER OVER THIS AND COME UP WITH A PLAN, AND IF THERE IS DISPUTES OR CONCERNS FROM OUR END, JUST HAVE AN OPPORTUNITY TO PRESENT IT. THAT'S ALL.

THE COURT: I -- YOU HAVE IT. YOU HAVE IT. ALL I'M SAYING IS DON'T, DON'T SAY, "WE'RE NOT GOING TO DO IT."

MR. CHORBA: OF COURSE.

THE COURT: THIS IS AN OPPORTUNITY TO DISCUSS, NOT AN

OPPORTUNITY TO SAY NO.  THAT'S WHAT I'M SAYING.  ALL RIGHT?

MR. CHORBA:  I UNDERSTAND, AND I'M TAKING THAT AS AN OPPORTUNITY NOT TO SAY NO TO PARTICIPATE IN THE PROCESS.

WE HAVEN'T SETTLED ON A SPECIFIC FORM, AND THAT'S THE PART WHERE I WOULD LIKE AN OPPORTUNITY.

THE COURT:  THAT'S FINE.

MR. CHORBA:  THANK YOU.

THE COURT:  BUT REMEMBER THAT THE MAN IN BLACK WILL BE LOOMING BEHIND YOU, SO JUST MAKE SURE --

MR. CHORBA:  AS ALWAYS, YOUR HONOR.

THE COURT:  OKAY.

-- EVERYBODY IS FLEXIBLE AND COOPERATIVE, BECAUSE THIS IS GOING TO BE A TEMPLATE FOR WHEN IT'S YOUR TURN.

MR. CHORBA:  WE UNDERSTAND.

AND I WANT TO STRESS, WE GOT THE DATA THE FRIDAY BEFORE THANKSGIVING.  MY CLIENT HAS BEEN WORKING VERY HARD TO SEE --

THE COURT:  WHAT DATA IS THAT?

MR. CHORBA:  THE DATA FROM FLO.  IT TOOK A LITTLE LONGER, AND I'M NOT ACCUSING ANYONE OF ANYTHING --

THE COURT:  YOU MEAN THE NAMES?

MR. CHORBA:  THIS IS THE 18 -- I'M UNDERSTANDING IT'S, LIKE, 18 MILLION DIFFERENT ROWS.

WE THEN ASKED A.B. DATA, THEY SAID THEY'RE NOT AUTHORIZED TO PROVIDE IT.  SO THERE WAS BACK AND FORTH BECAUSE IT'S SENSITIVE INFORMATION.  WE GET THAT.

BUT WE'VE BEEN WORKING HARD -- ONE OF THE THINGS THAT MY COLLEAGUE REFERENCED IS GETTING AN ORDER SO THAT WE CAN GET A SAMPLE OF THE DATA.  I THINK THAT'S THE NEXT STEP.  WE HAVE THE HEADER ROWS --

THE COURT:  I JUST GRANTED THAT.

MR. CHORBA:  WE THINK WE MIGHT WANT TO PREPARE SOMETHING FORMAL, BUT WE APPRECIATE THAT.  I THINK THAT'LL --

THE COURT:  WHY DO YOU NEED THAT?  I'LL PUT IT IN THE MINUTE ORDER.  THAT'S ALL I'M GOING TO DO.

MR. CHORBA:  OKAY.  BUT WE WANT TO BE SPECIFIC ABOUT THE SIZE OF THE SAMPLE, THE KIND OF -- YOUR HONOR, WE CAN GET IT TO YOU TOMORROW, VERY, VERY QUICKLY.

THE COURT:  ARE YOU DISAGREEING ABOUT THE SAMPLE?

MS. VILLEGAS:  WE'RE NOT.  WE DON'T THINK WE NEED ANYTHING MORE SPECIFIC THAN YOUR HONOR SAYING --

THE COURT:  THAT'S FINE.  FILE IT BY TOMORROW.

MS. VILLEGAS:  OKAY.

MR. CHORBA:  THANK YOU.

THE COURT:  I'D LIKE TO HEAR FROM --

MS. VILLEGAS:  BYAN HELLER FROM CLAIMSCORE?

THE COURT:  YES.

SO WHAT'S THE ENRICHMENT GOING TO LOOK LIKE?

MR. HELLER:  SO WE'RE TAKING THE FRAGMENTED DATA SETS.  SOME OF THAT, AS WAS MENTIONED, WAS FIRST NAME AND LAST NAME.

WE WERE ABLE TO TAKE AN I.P. ADDRESS, ATTACHED WITH THE DATE, AND PULL SOME BASIC LOCATION INFORMATION.

AND THEN USING FIRST NAME, LAST NAME, AND LOCATION, WE'RE ABLE TO ASCERTAIN ADDITIONAL INFORMATION, AND THEN FURTHER ENRICH, SO WHETHER THAT'S ADDRESSES, PHONE NUMBERS, AND THEN ENRICH THAT FURTHER INTO EMAIL ADDRESSES, ET CETERA.

BUT IT'S ESSENTIALLY CONNECTING THE DOTS BETWEEN THE FRAGMENTED DATA POINTS.

THE COURT:  BUT HOW FAR IS THAT GOING TO GET YOU? I'M NOT TYING YOUR HANDS.  I KNOW YOU'VE GOT TO TRY IT.

BUT WE'RE AT 3 MILLION, MORE OR LESS, IN THE BAG.  HOW MANY MORE ARE YOU GOING TO BE ABLE TO PUT IN THE BAG WITH ALL THIS?

MR. HELLER:  I THINK WITHOUT META -- I CAN'T SPEAK TO WHAT THEY'RE ABLE TO ENRICH -- BUT WHAT WE'RE ABLE TO ENRICH, IT'S PROBABLY GOING TO BE IN THE NUMBERS THAT YOU SPOKE, WHETHER IT'S 5 MILLION OR SOMEWHERE IN THAT BALLPARK.

THE COURT:  UP TO 5 MILLION.

MR. HELLER:  YEAH, SOMEWHERE IN THAT BALLPARK.

THE COURT:  AND THEN IF YOU HAD THE JEWEL AND OTHER THINGS THROUGH META, HOW MUCH MORE DO YOU THINK?  JUST A BALLPARK.

MR. HELLER:  I CAN'T SPEAK FOR META.

THE COURT:  LAST TIME YOU WERE HERE, I THINK YOU GAVE ME A VERY GOOD EXPLANATION ABOUT ANTI-FRAUD EFFORTS, AND THAT'S

GOING TO APPLY HERE TOO, RIGHT?

MR. HELLER:  ABSOLUTELY, CORRECT.

THE COURT:  I MEAN, $20, $50 IS NOT -- I GUESS IN BULK IT MIGHT BE A PROBLEM, BUT IT'S NOT THE 5,000 THAT MAY BE COMING DOWN THE PIKE.  I'VE FORGOTTEN NOW WHAT THE REMEDIES ARE FROM THE VERDICT.

BUT -- OKAY.  SO YOU'RE GOING TO DO ALL THAT HERE.  OKAY.

THAT STILL MEANS THAT MAYBE HALF THE CLASS MIGHT NOT GET NOTICE, RIGHT?  YOU MIGHT -- IF YOU'RE LUCKY, IT SOUNDS LIKE YOU MIGHT GET TO 6 MILLION, MAYBE 7, AND THEN THERE'S A LOT OF PEOPLE WHO DON'T GET THE DIRECT NOTICE.

MS. VILLEGAS:  WE WOULD STILL BE DOING NOTICE ON THE FLO APP WITH THE BANNER ADS.

THE COURT:  THAT'S NOT GOING TO REACH THE PEOPLE WHO GAVE UP ON FLO A LONG TIME AGO.

MS. VILLEGAS:  TRUE, YOUR HONOR.

BUT WE ARE ALSO GOING TO BE DOING NOTICE ON FACEBOOK, INSTAGRAM, PINTREST, YOUTUBE, AND WE'RE GOING TO ALSO BE PUTTING OUT NOTICE ON A NUMBER OF WEBSITES THAT WE BELIEVE WOULD MEET AND REACH THIS DEMOGRAPHIC.

THE COURT:  OKAY.  I MEAN, WHEN YOU SAY THOSE, THOSE ARE JUST -- YOU'RE GOING TO DO MORE -- ARE YOU GOING TO DO A TIKTOK THING?  ARE YOU GOING TO DO DISCORD?

MS. VILLEGAS:  SO WE'RE NOT DOING TIKTOK, BUT WE ARE DOING FACEBOOK, INSTAGRAM, PINTREST, AND YOUTUBE.

THE COURT:  IF YOU'RE GOING TO DO YOUTUBE, WHY NOT DO TIKTOK?  THEY'RE THE SAME FORMAT BASICALLY.

MR. BISSELL-LINSK:  THIS IS JAKE BISSELL-LINSK FROM LABATON.

I BELIEVE NOT DOING TIKTOK ADVERTISING AS JUST ONE CHANNEL AND USING SUBSTITUTE CHANNELS WAS A CONDITION OF THE DEAL WE MADE WITH FLO TO GET THE UNDERLYING DATA.  SO WE LOOKED AT THE VARIOUS CHANNELS THAT WE COULD USE, AND WE THOUGHT GETTING THEIR COOPERATION AND TURNING OVER THAT DATA IMMEDIATELY WITHOUT MOTION PRACTICE WAS WORTHWHILE IN GIVING UP ON ONE POSSIBLE INDIRECT NOTICE CHANNEL GIVEN THE OTHER OPTIONS.

THE COURT:  ALL RIGHT.  SO YOU TOLD -- YOU TOLD FLO, "WE WON'T USE TIKTOK"?

MR. BISSELL-LINSK:  I BELIEVE THAT'S CORRECT.

AND OUR THINKING THERE WAS TIKTOK IS A GOOD WAY OF REACHING PEOPLE, BUT SO ARE ALL OF THE OTHER SOCIAL MEDIA PLATFORMS THAT WE CAN USE.

THE COURT:  WHAT'S WRONG WITH USING TIKTOK?

MR. BISSELL-LINSK:  FROM OUR PERSPECTIVE, TIKTOK IS A FINE WAY TO REACH PEOPLE, AND THERE'S A CERTAIN NUMBER OF IMPRESSIONS THAT WE WOULD SEEK TO GET PUBLICLY.  WE WOULD SERVE A CERTAIN AMOUNT OF ADS, AND IT'S SOMEWHAT FUNGIBLE FROM OUR PERSPECTIVE WHETHER OR NOT WE'RE SERVING THEM ON TIKTOK OR OTHER SITES.

SO OUR THOUGHT WAS FLO WAS PARTICULARLY SENSITIVE TO US

ADVERTISING ON TIKTOK, MY UNDERSTANDING IS, SO WE SAID THAT AS A COMPROMISE, WE'LL DO ALL THESE OTHER --

THE COURT:  I'M NOT BOUND BY THAT.  I OWE THIS THE BEST PRACTICABLE NOTICE.  I'M NOT BOUND TO ANY DEALS YOU CUT WITH FLO ABOUT WHICH AVENUES YOU'RE GOING TO USE.

THAT DOESN'T TIE MY HANDS AT ALL, SO I WANT YOU TO USE TIKTOK.

MR. BISSELL-LINSK:  UNDERSTOOD, YOUR HONOR.

MS. SHARTON:  YOUR HONOR, MAY I HAVE 30 SECONDS ON THAT?

THE COURT:  SURE, YES.

MS. SHARTON:  IT WAS VERY DELIBERATE.  THERE'S BEEN A TREMENDOUS AMOUNT OF FRAUD RELATED TO FLO ON TIKTOK, FRAUDULENT POSTINGS, FRAUDULENT ADVERTISING AND OTHER THINGS, AND THAT WAS A SPECIFIC REASON WHY THEY DID NOT WANT TIKTOK AS PART OF IT.

AND THERE'S BEEN A NUMBER OF OTHER SKIRMISHES AND SO FORTH WITH FRAUDULENT POSTINGS, SO THEY FELT LIKE THAT WAS GOING TO BE INCREDIBLY CONFUSING.

THE COURT:  WHAT WOULD SOMEONE USE -- WHAT IS FLO BEING TARGETED FOR ON TIKTOK?

MS. SHARTON:  THERE'S BEEN OTHER -- I CAN PROVIDE EXAMPLES -- AND MAYBE, BEN, YOU CAN THINK OF ONE RIGHT OUT -- YEAH, BY ITS FOUNDERS.

THERE'S BEEN A NUMBER OF OTHER SKIRMISHES ON TIKTOK, AND ALSO A LOT OF FRAUDULENT POSTING ABOUT FERTILITY APPS AND SO

FORTH.

SO IT WAS A POINT OF PAIN FOR --

THE COURT:  WHEN YOU SAY "FRAUDULENT," WHAT DO YOU MEAN?

MS. SHARTON:  MISSTATEMENTS, PRETENDING TO BE FLO, THEY'VE HAD A NUMBER OF IMPERSONATION ISSUES WITH TIKTOK. THAT'S MY UNDERSTANDING OF THIS.

SO IT WAS A PARTICULARLY SENSITIVE CHANNEL THAT THEY DIDN'T -- THAT THEY WANTED TO EXCLUDE.

AND ALL THESE OTHER ONES WILL HIT THE SAME DEMOGRAPHICS, AND SO THAT'S WHY.

THE COURT:  IS A.B. HANDLING THE NOTICE?

MS. VILLEGAS:  YES, YOUR HONOR.

THE COURT:  CAN YOU COME UP FOR A MOMENT?

WHAT DO YOU THINK ABOUT -- I'M SORRY, YOU NEED TO MAKE YOUR APPEARANCE.

MR. PARKS:  GOOD MORNING, YOUR HONOR.

JUSTIN PARKS WITH A.B. DATA.

THE COURT:  WHAT DO YOU THINK ABOUT NOT USING TIKTOK? IS THAT TYING ONE HAND BEHIND YOUR BACK?  IS THAT -- I MEAN, TIKTOK IS WHERE EVERYBODY IS, RIGHT?  IT SEEMS LIKE SAYING I'M NOT GOING TO PRINT -- "I'M GOING TO GIVE PRINT NOTICE, BUT I'M GOING TO SKIP *THE NEW YORK TIMES*."

I MEAN, DOES THIS MAKE SENSE TO YOU?

MR. PARKS:  OUR TEAM ALWAYS EVALUATES THOSE THINGS

WHEN WE'RE MAKING A MEDIA -- OR A NOTICE PLAN.  WE PRESENTED OPTIONS THAT WE THOUGHT WOULD BE GOOD AND PRACTICABLE.

AGAIN, WE WEREN'T PARTY OF THE DISCUSSIONS WITH FLO AND CLASS COUNSEL ON THE NOT USE OF TIKTOK.

THE COURT:  NO, I UNDERSTAND THAT.  BUT JUST PUT ALL THAT ASIDE.  WOULDN'T YOU LIKE TO USE TIKTOK?

MR. PARKS:  WE THINK IT WOULD BE A SUFFICIENT MEANS TO HELP SERVE NOTICE IN THIS INSTANCE GIVEN THE USERS AND THE DEMOGRAPHICS FOR SURE.

THE COURT:  IT WOULD HELP, RIGHT?

MR. PARKS:  CORRECT, YES.

THE COURT:  YOU'RE GOING TO HAVE TO SHOW ME, FLO, WHY TIKTOK IS, YOU KNOW, A BANNED AVENUE.  I MEAN, IT JUST DOESN'T MAKE ANY SENSE TO ME.

MS. SHARTON:  IT WAS A VERY MATERIAL TERM FOR THEM, AND I WILL PURPORT TO DO THAT AND GET SOMETHING TO YOU.

THE COURT:  YOU CAN -- YOU CAN FILE IT UNDER SEAL IF YOU WANT.

MS. SHARTON:  YEAH.

THE COURT:  I MAY NOT KEEP IT UNDER SEAL, BUT YOU CAN FILE IT UNDER SEAL.

BUT YOU'RE GOING TO HAVE TO SHOW ME THAT IT'S MORE THAN JUST, YOU KNOW, ONE OR TWO UNCOMFORTABLE, EMBARRASSING OR THINGS YOUR FOUNDERS DIDN'T LIKE.  I'M GOING TO HAVE TO SEE SOMETHING THAT SAYS FOR SOME REASON, FLO IS RADIOACTIVE ON

TIKTOK.

MS. SHARTON:  YEAH, UNDERSTOOD.

AND I WILL STATE FOR THE RECORD, WE DID ACTUALLY EVEN EXCEED THE PLAN THAT A.B. ORIGINALLY PROPOSED IN TERMS OF OTHER AVENUES TO TRY TO DEAL WITH THIS.

SO I WILL TAKE YOU UP ON THAT AND --

THE COURT:  ALL RIGHT.  WHEN DO YOU WANT TO FILE THAT?

MS. SHARTON:  WE NEED A WEEK OR -- WHY DON'T WE SAY TEN DAYS?

THE COURT:  IS THAT ENOUGH TIME?

MS. SHARTON:  I HOPE SO.

THE COURT:  I'LL GIVE YOU -- I'LL GIVE YOU A LITTLE -- I'LL GIVE YOU UNTIL PROBABLY THE SECOND WEEK OF JANUARY.

MS. SHARTON:  OKAY, PERFECT.

THE COURT:  YOU TWO CAN RESUBMIT THE NOTICE PLAN WHENEVER YOU WANT, BUT MAKE IT GOOD.  I THINK YOU UNDERSTAND WHAT I'M CONCERNED ABOUT.

TALK, STRATEGIZE, BE COOPERATIVE.  THIS IS A JOINT EFFORT AT THIS POINT.  ALL RIGHT?

MS. VILLEGAS:  YES, YOUR HONOR.

THE COURT:  AND WHAT YOU GET DONE HERE IS GOING TO GO A LONG WAY TO THE VERDICT DAMAGES, DISTRIBUTING THOSE AS WELL.

MS. VILLEGAS:  YOUR HONOR --

THE COURT:  WE DON'T HAVE TO SOLVE THAT NOW.  DON'T GET HUNG UP ON THAT.  THIS IS JUST THE GOOGLE AND FLO PART.  OKAY?

MS. VILLEGAS:  YOUR HONOR, WOULD YOU LIKE US TO RESPOND TO FLO'S IN CAMERA SUBMISSION WITH THE ASSISTANCE OF A.B. DATA?

THE COURT:  IF I'M CONCERNED THAT IT'S NOT ADEQUATE, I'LL CALL FOR A RESPONSE.

MS. VILLEGAS:  THANK YOU, YOUR HONOR.

THE COURT:  BUT I'M TAKEN ABACK BY, YOU KNOW, HOBBLING THE NOTICE THROUGH ONE OF THE MOST POPULAR PLATFORMS THE WORLD HAS EVER SEEN.  OKAY?

ALL RIGHT.  SO I'M NOT GOING TO SIGN ANYTHING UNTIL WE GET ALL THIS WORKED OUT.  OKAY?

SO DO WHATEVER YOU WANT.  I'LL SET A DEADLINE FOR FLO, BUT YOU DO YOU WHATEVER YOU WANT WITH YOUR COLLEAGUES ON -- MR. CHORBA AND OTHERS -- GETTING IT DONE.  OKAY?

MS. VILLEGAS:  OKAY.

THE COURT:  ANYTHING ELSE FOR TODAY?

MS. VILLEGAS:  NOTHING ELSE.

THE COURT:  DEFENDANTS?  NO?  OKAY.  GOOD.

THANKS FOR COMING IN.

THE CLERK:  ALL RISE.  COURT'S IN RECESS.

(THE PROCEEDINGS WERE CONCLUDED AT 1:19 P.M.)

CERTIFICATE OF REPORTER


        I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED

STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

1301 CLAY STREET, OAKLAND, CALIFORNIA, DO HEREBY CERTIFY:

        THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS

A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE

ABOVE-ENTITLED MATTER.




_____
LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

DATED:  DECEMBER 15, 2025