**LATHAM & WATKINS LLP**
Andrew B. Clubok (*pro hac vice*)
*andrew.clubok@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200

Melanie M. Blunschi (Bar No. 234264)
*melanie.blunschi@lw.com*
Kristin Sheffield-Whitehead (Bar No. 304635)
*kristin.whitehead@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Michele D. Johnson (Bar No. 198298)
*michele.johnson@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: +1.714.540.1235

**GIBSON, DUNN & CRUTCHER LLP**
Christopher Chorba (Bar No. 216692)
*cchorba@gibsondunn.com*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1.213.229.7503

Elizabeth K. McCloskey (Bar No. 268184)
*emccloskey@gibsondunn.com*
Abigail A. Barrera (Bar No. 301746)
*abarrera@gibsondunn.com*
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: +1.415.393.8200

*Attorneys for Defendant Meta Platforms, Inc. (formerly known as Facebook, Inc.)*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

ERICA FRASCO, et al., individually and on behalf of all others similarly situated,

Plaintiffs,

v.

FLO HEALTH, INC., et al.,

Defendants.

Case No. 3:21-CV-00757-JD

**DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION TO ENTER CLAIMS ADMINISTRATION AND NOTICE PROGRAMS**

Date: October 29, 2026
Time: 10:00 a.m.
Judge: Hon. James Donato
Court: Courtroom 11 – 19th Floor

## TABLE OF CONTENTS


Page

I. INTRODUCTION .......... 1

II. ARGUMENT .......... 3

A. Plaintiffs' Surreptitious Engagement Of Covalynt Has Made It Impossible To Assess Covalynt's Reliability, Undermining A Key Safeguard Against Fraud .......... 3

B. Plaintiffs' Proposed Claims Process Is Deeply Flawed .......... 7

1. Plaintiffs' Proposed Claim Form Is Substantively Deficient .......... 7

2. Plaintiffs' Proposed Claim Program Insulates Fraud From Detection .......... 11

C. Plaintiffs' Wildly Overbroad Notice Program Compounds All These Problems By Inviting Fraudulent Claims .......... 12

III. CONCLUSION .......... 15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Asghari v. VW Grp. of Am., Inc.*,
2015 WL 12732462 (C.D. Cal. May 29, 2015) ....................9

*Bezdek v. Vibram USA, Inc.*,
809 F.3d 78 (1st Cir. 2015) ....................9

*Broomfield v. Craft Brew All., Inc.*,
2020 WL 1972505 (N.D. Cal. Feb. 5, 2020) ....................9

*Hill v. Canidae Corp.*,
2021 WL 4988032 (C.D. Cal. Apr. 2, 2021) ....................9

*Hoffman v. PennyMac Holdings, LLC*,
2018 WL 6448779 (W.D. Wash. Dec. 10, 2018) ....................10

*In re Google Location Hist. Litig.*,
2026 WL 2509404 (9th Cir. Aug. 26, 2026) ....................10, 12

*In re NVIDIA GPU Litig.*,
539 F. App'x 822 (9th Cir. 2013) ....................9

*Kelly v. Dir., Fed. Bureau of Prisons*,
2013 U.S. Dist. LEXIS 56070 (E.D. Cal. Apr. 17, 2013) ....................10

*Schneider v. Chipotle Mexican Grill, Inc.*,
2019 WL 1512265 (N.D. Cal. Apr. 8, 2019) ....................14

*United States v. Flake*,
746 F.2d 535 (9th Cir. 1984) ....................10

*Yeoman v. Ikea U.S. W., Inc.*,
2013 WL 5944245 (S.D. Cal. Nov. 5, 2013) ....................14

## STATUTES

28 U.S.C. § 1746 ....................10

## RULES

Fed. R. Civ. P. 23(c)(2)(B) ....................12

## I. INTRODUCTION

Meta respectfully requests that the Court deny Plaintiffs' motion seeking approval of a post-trial process riddled with significant defects. As explained more fully in Meta's pending emergency motion (Dkt. 844), plaintiffs have spent much of the past year seeking to co-opt the claims process and conceal information about the true size and composition of the class. Specifically, plaintiffs have conscripted the Court-appointed claims administrator (A.B. Data) and the third party meant to assist the administrator with fraud detection and claims validation (Covalynt) to do plaintiffs' unilateral bidding, concealed from Meta crucial data and analysis that supposedly establishes the class size and the people comprising it, and sent misleading and unauthorized text messages to untold numbers of people under the guise of class notice. Those improper actions directly violate this Court's orders and admonitions. Now, plaintiffs compound these problems by proposing a post-trial process that is designed to inflate Meta's overall damages liability by inviting illegitimate claims and eliminating crucial safeguards against fraud—while seeking a billion-dollar "partial" judgment based on their self-serving characterization of conclusory declarations submitted by their own paid consultant. *See* Dkt. 846. All this gamesmanship flies in the face of this Court's well-founded concerns about fraudulent claims.

Meta agrees that the post-trial process should begin as soon as practicable. But plaintiffs' improper stonewalling and deception have delayed it, and their motion to start the post-trial process is flawed at every step. For starters, their refusal to share Covalynt's data and analysis has made it impossible to assess the reliability of Covalynt's purported findings. Plaintiffs insist the class includes some 1.2 million "people"—and claim that they have definitively proved that more than 200,000 identifiable people are in fact class members. But all they have are bought-and-paid-for declarations from Covalynt, which speak vaguely in terms of "entities," "identity clusters," and "bonds" (rather than individuals or women), and which make no meaningful attempt to show Covalynt's work. Indeed, plaintiffs have done everything they can to ensure that no one else—not Meta, not this Court—can examine the analysis and data underlying Covalynt's purported findings. Covalynt's latest declaration exemplifies plaintiffs' antics. It claims that Covalynt's

findings are the result of a "neutral, documented, and rigorous process," describes that process in generalities, and then expressly states that Covalynt's "specific findings and results" are not being disclosed to Meta (or this Court) because plaintiffs forbid it. Dkt. 847-3 ¶ 32.

The rest of plaintiffs' proposal is transparently designed to exploit the information gap they have created about Covalynt's analysis and conclusions. Their Proposed Claim Form obscures the requirements for class membership, intentionally avoids seeking adequate information to combat fraud, and includes a watered-down perjury declaration that does not adequately deter false claims. Plaintiffs' Proposed Claims Program compounds these deficiencies by gutting Meta's ability to make good-faith challenges to suspicious claims, to suss out non-programmatic fraud that Covalynt (by its own admission) cannot detect, and to otherwise ensure a fair and accurate process. Meanwhile, plaintiffs' wildly indiscriminate "Proposed Notice Program" would make things even worse by targeting *all* "California Adult Women 18–49," including millions of women who never used Flo, and by saturating the internet, social media, radio, and the national press with the goal of reaching millions more people across the country. That is an open invitation for fraud. And the risk of fraud is substantially heightened by a recovery of up to $5,000 per claimant, while plaintiffs' secret retention of Covalynt has critically undermined what was supposed to be a crucial back-end safeguard. As plaintiffs' counsel has represented to the Court, the more claims that Covalynt deems valid, the larger the fee award plaintiffs' counsel will seek. *See* Dkt. 833 at 26:11-23.

Each of these defects independently warrants denial of plaintiffs' motion. Taken together, they reveal a proposed post-trial process engineered to maximize claim *volume* at the expense of claim *validity*. Substantial modifications to the Claim Form and Claims Program—to say nothing of addressing the no-longer-independent expert at the front line of fighting fraud—are necessary before any post-trial process can proceed, much less before any final judgment extending beyond the named plaintiffs can be entered.[1]

---

[1] Meta previously sought entry of a partial judgment in favor of named plaintiffs on their individual claims—and explained how, in its view, post-trial proceedings as to unnamed class members should proceed, consistent with Rule 23, the Rules Enabling Act, due process, and the Seventh Amendment. *See* Dkt 783 at 9-10, 16-21, 25-27. Meta stands by those arguments but acknowledges that the Court has decided "to go in a different direction," over Meta's-preserved

Meta respectfully requests that the Court deny plaintiffs' motion and direct the parties to jointly propose (to the extent practicable) a mutually agreeable claim form, post-trial process, and notice program by a date certain—which so far plaintiffs have consistently refused to do. To ensure a cooperative and productive process, the relief requested in Meta's emergency motion should also be granted, which will address Covalynt and A.B. Data's conflicts of interest and ensure both sides have access to crucial information about the class. As for plaintiffs' motion for entry of a premature final judgment, Meta's forthcoming opposition will explain why this Court would do well to stick to what it has told plaintiffs already: "we're not going to do that." Dkt. 833 at 25:19-26:8. All these steps are urgently needed to get this matter back on track.

## II. ARGUMENT

### A. Plaintiffs' Surreptitious Engagement Of Covalynt Has Made It Impossible To Assess Covalynt's Reliability, Undermining A Key Safeguard Against Fraud

Plaintiffs offer Covalynt's automated screening as the guarantor of claim validity and the central safeguard against fraud. But as explained in Meta's emergency motion, their separate retention of Covalynt has threatened Covalynt's ability to serve as a neutral arbiter. Dkt. 844 at 9-11. It has also enabled plaintiffs to stonewall Meta's repeated requests for crucial information about Covalynt's analysis and methodology, making it impossible for Meta or the Court to assess the work Covalynt has done. *Id.* The vague and conclusory disclosures about Covalynt's analysis in plaintiffs' motion exacerbate these problems. And Covalynt's latest declaration (Dkt. 847-3)—which boasts about the purported reliability of its processes, while revealing zero specifics about the actual analysis conducted in this particular case—only compounds them.[2]

Plaintiffs ask this Court to blindly trust that they have somehow already established that Meta will owe billions of dollars in damages based on black-box analysis of undisclosed data. Plaintiffs (but not Covalynt) assert that Covalynt's analysis suggests a class of some 1.2 million

objections. Dkt. 792 at 36:23-25. Meta respectfully requests the opportunity to cooperate with plaintiffs on a proposal for implementing the Court's ruling, while reserving all rights.

[2] The night before this opposition brief was due, plaintiffs submitted yet another declaration from Covalynt, this time purporting to describe in more detail the company's methodology for identity verification. Plaintiffs' selective and delayed sharing of this basic (and still inadequate) information exemplifies the fundamental problems with their approach to the post-verdict process.

people. Dkt. 845 at 2. And in their motion for entry of a final judgment, they claim more than 200,000 purported class members have been "completely identified down to their name and current address." Dkt. 846 at 3. But the initial Heller Declaration (Dkt. 845-8) is conspicuously vague about where those numbers come from and whether those purported class members are women—or even people, as opposed to "entities." And while plaintiffs have since filed another Heller Declaration (Dkt. 847-3), that declaration only underscores the need for transparency—and doubles down on plaintiffs' indefensible refusal to disclose any of its underlying data and analysis.

So far as Meta can tell, Covalynt's plaintiff-directed use of Flo and Meta's data appears to intentionally overstate the number of potential Class Members. Take IP addresses, for example. For the 1.2 million figure, neither Heller Declaration discloses how many of plaintiffs' claimed 1.2 million class members are merely IP addresses, rather than verified (much less identifiable) individuals. In fact, the latest Heller Declaration makes clear that the 1.2 million figure includes "bonds" which are a "cluster of records" and "not a determination of personhood," Dkt. 847-3 ¶ 8, most of which apparently could not be "matched to a known identity" or otherwise did not "contain[] contact information," so could very well be only IP addresses. *Id.* ¶ 27 (explaining that using DeepValidation to find active email addresses depends on a bond either matching to a known identity or containing contact information in the source records); Dkt. 845-8 ¶¶ 14–15 (explaining active email addresses were only found for less than 379,000 "entities"). Covalynt never explains whether those IP addresses date from the Class Period or merely reflect later user activity.

Covalynt also does not indicate that the data was narrowed to individuals who actually resided in California when they filled out the Flo App's onboarding survey, as opposed to individuals who later used a California IP address. In fact, as plaintiffs themselves represented back in December, the IP address data Flo retained reflects only a user's *most recent* IP address, not the user's IP address from the time they filled out the onboarding questions at issue in this case. Dkt. 813 ("Dec. 4, 2025 Hr'g Tr.") at 7:24–8:3. So, there doesn't appear to be any way of knowing what date is associated with the IP addresses in the Flo data. This bare IP address information thus says nothing about when or where a person filled out the onboarding survey at

the center of this case (which could have happened up to 12 years ago). And, as Dr. Konstantinos Psounis[3] explains, an IP address cannot reliably be used to figure out who the Flo user in question was or where that Flo user was located at the time they used that IP address. Psounis Decl. ¶¶ 14-23; *see also* Dkt. 845-8 ¶ 18 (Covalynt explaining that an IP address, even combined with device model, is a "materially weaker" signal for identification purposes). That unreliability is only exacerbated where, as here, the precise time that a given IP address was used is unknown, because, among other things, IP addresses are frequently reassigned over time, including across different geographies. Psounis Decl. ¶¶ 24-35; *see* Dkt. 845-8 at ¶ 18 (Covalynt noting that IP addresses are "transient" and "can be shared among thousands of unrelated people"). Plaintiffs tellingly do not disclose what fraction of their 1.2 million figure is bare IP address data.

Moreover, neither Heller Declaration claims that the class size is, as plaintiffs assert, 1.2 million *people*. The Heller Declaration that plaintiffs filed with their claims-process motion speaks only of "entities." Dkt. 845-8 ¶ 12. That vague term is absent from the subsequently filed Heller Declaration (dated September 22, 2026), which instead uses the terms "record," "identity," and "bond," and provides no clarity on whether the 1.2 million figure reflects people or not. *See* Dkt. 847-3 ¶ 8 ("a bond is not a determination of personhood"). Covalynt apparently did not attempt to exclude actual entities—such as those that are obviously corporations. Dkt. 845-8 ¶ 12.

Equally problematic, the "1,246,866 Class Members" figure (Dkt. 846 at 2) appears to include "entities" or "bonds" that Covalynt determined had only a "remote connection" to California, "such as a VPN or proxy through which a person located outside California could appear to be connecting from within the state," *id.* ¶ 13. And it appears Covalynt included an "entity" or "bond" even if it only had a single association with a California address during a single point in time in the class period—no matter how brief—as long as there was also a single connection to an IP address in California, *id.* ¶ 12. Remote and one-time connections to California are hardly criteria supporting residency in California during the Class Period.

---

[3] Dr. Psounis is a Professor of Electrical and Computer Engineering and of Computer Science at the University of Southern California with extensive expertise on networked distributed systems, with more than 100 published papers on the topic. Psounis Decl. ¶¶ 2-9.

It is also unclear if the 1.2 million class size figure excludes males. The Heller Declaration filed with plaintiffs' motion notes that, of some 380,000 emails purportedly belonging to Flo App users in California, more than 10,000 belong to "males identified by Meta"—while conspicuously omitting any description of efforts to exclude men from the rest of plaintiffs' 1.2 million estimate. Dkt. 845-8 ¶ 19. The more recent Heller Declaration now indicates that Covalynt excluded males *only* based on Meta's data, even though that data is limited and is "user-reported." Dkt. 847-3 Heller Decl. ¶ 22. It would be surprising if Covalynt does not have access to other gender/sex data, but it is clear that additional gender/sex data was not used here. *Id.* ¶ 22. It is thus almost certain that the 1.2 million figure includes an unknown number of males, who cannot be class members. *See* Dkt. 505-1 at 1667 (evidence showing at least 15% of Flo users were men).

As for the 222,115 individuals that plaintiffs claim that Covalynt has "completely identified," Dkt. 846 at 3, the Heller Declarations state only that, "[a]fter incorporating Meta's data, Covalynt reran the ClassResolution and DeepValidation processes on the Flo Data" and—voilà—came up with that figure, Dkt. 845-8 ¶ 18. They do not explain the specifics of how those processes were applied in this case.

Plaintiffs' assertions about the overall class size thus appear to rest on a totally unreliable foundation—and their claim to have definitively proved class membership for more than 200,000 people rests on black-box data and analysis that neither Meta nor this Court has seen, and which plaintiffs steadfastly refuse to share, despite Meta's repeated requests. *See* Dkt. 844-1 ("Chorba Decl.") ¶¶ 14-22. To this day, plaintiffs have offered zero meaningful insight into how these figures were calculated or whether they withstand even basic scrutiny. That is unacceptable.

The Heller Declarations are no clearer about Covalynt's methodology than they are about the purported results of Covalynt's analysis. The first Heller Declaration speaks vaguely about "a proprietary, expert-based process" involving a so-called "identity graph" but those generalized assertions are insufficient for Meta or this Court to understand what those are or how they work, let alone establish that they are current and reliable. Dkt. 845-8 ¶ 8; Dkt. 847-3 ¶ 8. The second Heller Declaration touts the virtues of its ClassResolution and DeepValidation processes in

somewhat more detail, but it still offers zero specifics about the actual analysis Covalynt conducted using those processes in this particular case—because plaintiffs forbid it. *See* Dkt. 847-3 ¶¶ 8-33.

Given these gaps, Meta has no way of testing the identity graph's accuracy for residency or sex determinations or otherwise assessing Covalynt's self-reported statistics. That matters because, based on the purported reliability of their inflated class size estimate, plaintiffs propose a truncated claims process that fails to provide a meaningful safeguard against fraudulent claims. Plaintiffs cannot use their black-box estimate of class size as a fig leaf to mask potentially expansive fraud by individual claimants who slip through Covalynt's processes aimed at programmatic fraud. It is not in anyone's interest to allow such a deficient claims process to go forward, as it will not ultimately withstand appellate scrutiny. Meta thus seeks an order requiring plaintiffs to produce Covalynt's methodology and data, and permit Meta to conduct adversarial testing—including by deposing Covalynt's Bryan Heller—before the claims process proceeds.

### B. Plaintiffs' Proposed Claims Process Is Deeply Flawed

On top of these data uncertainties, plaintiffs' Proposed Claims Process is flawed from start to finish. At the front end, their Proposed Claim Form obscures the criteria for class membership and lacks critical safeguards against fraud. At the back end, the Proposed Claim Program strips Meta of the ability to meaningfully challenge potentially fraudulent or otherwise flawed claims.

#### 1. Plaintiffs' Proposed Claim Form Is Substantively Deficient

Plaintiffs' Proposed Claim Form is deficient in at least three respects and still does not comply with the guidance that this Court provided last year. First, its attestation questions obscure the requirements for recovery. Second, it omits critical cross-checks against fraud. And third, its watered-down perjury warning fails to adequately deter false claims. Meta's concurrently filed alternative proposed claim form seeks to address these deficiencies.

**Attestation Questions.** On September 30, 2025, the Court instructed plaintiffs to include attestation language that a claimant "[was] located in the state of California when [she] began using or when [she] first enrolled." Dkt. 792 at 6:9–12. Plaintiffs agreed that a claimant must have been a "California resident" when she "signed up for the app"—i.e., when she filled out the

onboarding survey. *Id.* at 15:22–16:4. The Court's instruction and plaintiffs' concession were correct, as the only event data at issue in this case is from the onboarding survey. *See* Jury Instr. 14 (listing the Custom App Event names at issue in this lawsuit).

Plaintiffs' new Proposed Claim Form contains the following attestation:

> I was a California resident and in the State of California when I began using the Flo App to track my menstruation (period) and/or pregnancy information between November 1, 2016 and February 28, 2019

Dkt. 845-3 ("Ex. B") at 2. That attestation has two problems that warrant correction. First, it obscures the crucial fact that class membership hinges on filling out the Flo App's initial onboarding survey. And second, it does not unambiguously establish that the claimant is a woman. The fix is straightforward. The attestation can be revised to read:

> I am a woman who was a California resident and in the State of California when I filled out the Flo App's onboarding survey between November 1, 2016 and February 28, 2019.

**Fraud Cross-Checks.** Last September, this Court also emphasized that—given the significant size of the individual awards in this case—it would like to see "as many cross-checks as we can possibly have." Dkt. 792 at 11:17–12:2. The Proposed Claim Form falls short in that regard as well. As Dr. Malcolm Sparrow explains, the claim form should also require claimants to provide, for verification and fraud-prevention purposes: (1) their address when they signed up for the Flo App (in addition to their current address); (2) their date of birth; and (3) their Facebook and Instagram user information, if any. Sparrow Decl. ¶¶ 18-25, 27.[4] Each of these data points would enhance fraud detection, without imposing an unreasonable burden on legitimate claimants.

The claimant's address at the time of onboarding is particularly important. Again, all agree that a claimant must have been a California resident when she filled out the onboarding survey. Requiring claimants to provide a specific historical address would elicit verifiable information that could be cross-checked. Sparrow Decl. ¶ 21. It would also deter fraud because, as Dr. Sparrow explains, people are less likely to submit false claims when they know specific information can be

---

[4] Dr. Malcolm Sparrow is a Professor of the Practice of Public Management at the John F. Kennedy School of Government at Harvard University. Sparrow Decl. ¶ 2. He has advised numerous government agencies and other organizations on fraud control policy and practice in connection with claim submissions, including with respect to the Medicare and Medicaid systems. *Id.* ¶ 5

used to validate the accuracy of their claims. *Id.* ¶ 14-15. As for date of birth, that information helps confirm identity, and it can also flag implausible claims—for example, claims from people whose ages suggest that they had no need for a menstruation-tracking app during the class period. Sparrow Decl. ¶¶ 23-25. Facebook and Instagram user information would facilitate verification against Meta's records and public profile information. *Id.* ¶ 27.

The Proposed Claim Form also does not request any supporting documentation, such as proof of California residency during the Class Period (e.g., a lease or utility bill), which is likewise vital to deterring and detecting fraud. That is in stark contrast to the Flurry, Flo, and Google settlements in this case, which all require claimants to "provide reasonable documentation showing they were residents of California during the Class Period" to be eligible to recover far less significant sums. *See* Dkt. 589 at 2 (Flurry); Dkt. 780-1 at 30 (Flo); Dkt. 780-2 at 29 (Google). That omission is particularly galling given plaintiffs' assurance that their proposed Claim Form supposedly "mirrors the claim form the Court previously approved in connection with th[ose] Settlements," Dkt. 845 at 3, to say nothing of plaintiffs' sweeping proposed nationwide advertising campaign, *see infra* at 13-15. If claimants seeking approximately $10 in the Flurry, Flo, and Google settlements must submit such basic documentation, claimants seeking $5,000 from Meta must submit at least as much evidence in support of their claims. The risk of fraud here given the high per-claimant recovery is significant—and warrants more, not fewer, safeguards against illegitimate claims. That is especially true given that Flo, Flurry, and Google's total liability cannot be increased above the agreed-upon settlement amount, whereas every additional claim here increases Meta's liability by $5,000 dollars (and with it Plaintiffs' counsel's recovery).

The case law backs all this up. Courts routinely require proof of purchase or other similar documentation to support recovery of anything but nominal sums. *See, e.g.*, *In re NVIDIA GPU Litig.*, 539 F. App'x 822, 824 (9th Cir. 2013); *Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 81 (1st Cir. 2015); *Hill v. Canidae Corp.*, 2021 WL 4988032, at *2 (C.D. Cal. Apr. 2, 2021); *Broomfield v. Craft Brew All., Inc.*, 2020 WL 1972505, at *9 (N.D. Cal. Feb. 5, 2020); *Asghari v. VW Grp. of Am., Inc.*, 2015 WL 12732462, at *29 (C.D. Cal. May 29, 2015). That principle also justifies

requesting proof of downloading the Flo app during the Class Period (while providing a step-by-step guide for finding their easy-to-obtain download history on the Apple or Android app store). But at the very least, it demands the same proof of California residency during the Class Period that this Court has already required in the Flo, Flurry, and Google settlements. Under Ninth Circuit precedent, claimants may not recover $5,000 based solely on their own "self-identification." *In re Google Location Hist. Litig.*, 2026 WL 2509404, at *6 (9th Cir. Aug. 26, 2026).

**Perjury Warning.** At the hearing last September, the Court emphasized the importance of the perjury declaration, directing that the form make clear that "this is being submitted under penalty of perjury, and there will be consequences for misrepresentations." Dkt. 792 at 29:18–30:14. But the Proposed Claim Form's warning against perjury is improperly watered down. It asks a claimant to affirm only "to the best of your knowledge" that she meets the eligibility criteria for class membership. Ex. B at 2. The form then requires the claimant to "state under penalty of perjury … that the foregoing is true and correct." *Id.* at 3 (citing 28 U.S.C. § 1746). A claimant thus swears only that *to the best of her knowledge* she is eligible to recover. Because perjury requires a knowing falsehood, *United States v. Flake*, 746 F.2d 535, 539 (9th Cir. 1984), claimants who swear that something is true "to the best of their knowledge" can avoid prosecution simply by choosing not to investigate the accuracy of their assertions and then arguing that their "knowledge" was incomplete or mistaken.[5] That hedge is a tell-tale departure from standard practice. *See, e.g.*, *Kelly v. Dir.*, *Fed. Bureau of Prisons*, 2013 U.S. Dist. LEXIS 56070, at *6 (E.D. Cal. Apr. 17, 2013) (to-the-best-of-knowledge "qualification . . . fails to comply with the requirements of § 1746"); *Hoffman v. PennyMac Holdings, LLC*, 2018 WL 6448779, at *3 (W.D. Wash. Dec. 10, 2018) (collecting similar cases). Indeed, it guts the straightforward, unvarnished language of 28 U.S.C. § 1746 that requires a definitive declaration: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct," full stop.

[5] For example, a potential claimant might know she used a menstrual tracking app during the relevant time period but not recall whether it was the Flo App or one of dozens of other options. Or she might not recall whether she downloaded the Flo App before or after November 1, 2016, or the exact dates she lived in California. All of these are likely verifiable facts, but the declaration as proposed offers no incentive to review available information to check.

This not-so-subtle effort to diminish deterrence against fraud is particularly troubling given Covalynt's acknowledged limitations. As Meta's counsel explained—and Covalynt's declarant does not dispute—Covalynt is equipped to "root out what's called programmatic fraud" and "detect the difference between a bot and a human being," but it "cannot identify an individual who is lying on a claim form or representing something that is not [accurate]." Dkt. 792 at 29:5–15; *see also* Dkt. 813 at 11:15-19. Covalynt's admitted inability to detect simple dishonesty by individual claimants makes the perjury declaration an even more critical safeguard—especially here, where each valid claim entitles the claimant to up to $5,000 in statutory damages, a sum large enough to attract numerous one-off fraudulent claims. *See* Dkt. 792 at 11:17–12:2 ("[T]his is not a $1.99 off your next purchase . . . . [W]e're not going to let people cheat the system."). There is no justification for diluting the perjury declaration.

**2. Plaintiffs' Proposed Claim Program Insulates Fraud From Detection**

Plaintiffs' Proposed Claim Program compounds the foregoing front-end problems by hamstringing Meta's ability to challenge questionable claims on the back end. It creates a "Presumptive Validity" framework that effectively locks in the front-end failures.

Under the Proposed Claim Program, once a claim form is completed and passes Covalynt's automated screening, it is deemed "Presumptively Valid." Dkt. 845-2 ("Ex. A"), ¶¶ 29, 34. As plaintiffs would have it, Meta could challenge a Presumptively Valid claim on just three narrow grounds: (a) a "specific showing that the Claim Form . . . contains error(s) apparent on its face, such as where it is incomplete, internally inconsistent, or duplicative"; (b) "[a] specific showing, based on factual evidence, that the challenged Claim was not filed by the Claimant listed on the Claim Form"; or (c) "[a] specific showing, based on factual evidence, that the Claimant misrepresented information in the Claim Form." Ex. A ¶ 42.

These narrow grounds are inadequate to catch fraud, and they improperly shift the burden to Meta. Under plaintiffs' Proposed Claim Program, a claimant need only sign an attestation "to the best of their knowledge" and provide contact information on an unverified form to be deemed "Presumptively Valid" and entitled to $5,000. Meta, by contrast, must produce "specific factual

evidence"—which plaintiffs do not define, much less explain how Meta could realistically obtain such evidence—to challenge even a suspicious claim. Even worse, plaintiffs propose punitive sanctions if Meta's challenge is rejected. *Id.* ¶ 50. This burden-shifting is backwards: the party seeking a $5,000 payout must provide proof beyond bare "self-identification." *In re Google*, 2026 WL 2509404, at *6. That is especially so because plaintiffs' Proposed Claim Program does not give Meta any tools to run cross-checks that could lead to "scientifically sound" evidence proving (or contradicting) a given claim, which would otherwise be based on "pure speculation." *Id.*

In addition, any post-trial process should incorporate robust statistical sampling to combat fraud. The Court itself expressed openness to considering this approach at the September 2025 hearing, agreeing that "sampling will help" with fraud detection. Dkt. 792 at 37:8. And as Dr. Sparrow explains, testing a statistically significant sample of claims through an enhanced verification process would enable the parties and the Court to gauge the prevalence of fraudulent or ineligible claims before payments are made. Sparrow Decl. ¶¶ 30-33. Warning claimants that a random sample of claims may be subjected to heightened scrutiny would also deter false claims at the outset. Yet despite this Court's endorsement of that sensible approach, the Proposed Claim Program includes no sampling whatsoever. That makes no sense.

**C. Plaintiffs' Wildly Overbroad Notice Program Compounds All These Problems By Inviting Fraudulent Claims**

Federal Rule of Civil Procedure 23(c)(2)(B) requires "the best notice that is practicable under the circumstances" directed "to class members." The key phrase is "to class members." The rule does not authorize—much less require—a nationwide advertising campaign targeting the general public. Yet that is precisely what plaintiffs' Notice Program proposes.

After months of data analysis, plaintiffs' (overstated) estimate puts the class at around 1.2 million people in California. Yet they boast that their proposed Notice Program would generate nearly *50 million* gross impressions delivered *nationwide*. Dkt. 845-7 ("Parks Decl."), ¶ 21. And the professed target audience of this nationwide campaign is not California residents who began using Flo during the Class Period, but rather *all* "California Adult Women from 18-49 years of age," *id.* ¶ 19, which indisputably includes millions of non-members. There is no basis for using

such a crude proxy demographic that dwarfs even plaintiffs' inflated estimate of overall class membership, as Meta explained months ago, much less to blanket the entire country with notice for a California class. *See* Dkt. 833 at 7:17–8:3.

The Court has indicated that it does not want to do "anything that is inconsistent with what we did with class notice." Dkt. 792 at 37:24–25. For good reason: there is no legitimate basis for providing more expansive notice at the judgment stage than at the class-certification stage. Yet, plaintiffs' Notice Program departs from the procedures adopted for class notice in fundamental ways. For example, while the earlier notice procedures called for a minimum of roughly 8.5 million advertising impressions to reach the nationwide class that was certified as to Flo, the Notice Program would deliver nearly *six times* that number to reach the much-smaller, California-only class that was certified as to Meta. *Compare* Dkt. 784-12, ¶ 20, *with* Parks Decl. ¶ 21. And unlike this proposal, neither the pre-trial class notice nor the post-settlement notice procedures in this case called for jewel notice on Meta's platforms. *See* Dkts. 589, 612, 617, 784, 820, 834. Plaintiffs themselves urged the Court to adopt the earlier notice procedures, and no party has objected to their effectiveness. There is simply no justification for plaintiffs' expansive new requests.

Plaintiffs' request for retroactive judicial approval of their unauthorized text message notice is particularly troubling. *See* Dkt. 845 at 4. Contrary to plaintiffs' (and A.B. Data's) unfounded assertion, this use of "text messages" was emphatically *not* "[c]onsistent with the prior Pretrial Class Notice Plan." Parks Decl. ¶ 6. This Court has never authorized text message notice, let alone a false and misleading notice touting victory on "wiretapping" claims that this Court rejected. *See* Dkt. 844 at 6-9, 11-14. Tellingly, plaintiffs do not even lay out what their planned text messages will say—and they certainly do not explain or justify who has received them already and who will receive them going forward. They also want open-ended permission to disseminate additional forms of direct notice, such as text messages, emails, digital media, public relations strategies, or other forms of outreach, with no need for Court approval. Parks Decl. ¶ 15. Plaintiffs are asking for free rein to invite fraudulent claims by untold numbers of people via text.

Plaintiffs' renewed request for jewel notice on Meta's platforms is equally unjustified.

This Court has itself expressed skepticism about the appropriateness of jewel notice in this case. At the September 30, 2025 hearing, the Court observed that jewel notice may not "make[] a lot of sense" given that "nearly seven years have passed since the events at issue." Dkt. 792 at 37:24–38:8. At an April 2026 hearing, the Court further noted that ordering jewel notice raises a "proportionality issue" and that such notice "seems a little much." Dkt. 833 at 8:7-9, 9:5–11. Those concerns are as valid now as they were then. Plaintiffs ask the Court to order push and jewel notifications on Facebook and Instagram to "current users located in California or women who Meta believes, based on data it has collected, to be "currently in California and/or who may have been in California during the Class Period." Parks Decl. ¶ 13. But Courts routinely—and quite rightly—reject direct notice mechanisms that cannot distinguish class members from non-members. *See Schneider v. Chipotle Mexican Grill, Inc.*, 2019 WL 1512265, at *3 (N.D. Cal. Apr. 8, 2019) (rejecting use of "overinclusive" direct email notice that "could not distinguish between class members and non-class members"); *Yeoman v. Ikea U.S. W., Inc.*, 2013 WL 5944245, at *5–6 (S.D. Cal. Nov. 5, 2013) (similar). Because jewel notice cannot be tailored to actual Flo users—let alone those who are likely to be class members—it is inappropriate.

Taking a step back, the overbreadth of plaintiffs' Proposed Notice Program is staggering. Digital ads will appear on the Google Display Network, YouTube, Facebook, Instagram, TikTok, and Pinterest. Parks Decl. ¶ 21. Print advertisements will run in the *Los Angeles Times*, *New York Times*, *People*, and additional lifestyle publications. *Id.* ¶ 26. Radio advertising will run on Spotify, Pandora, iHeartRadio, and Apple Podcasts. *Id.* ¶ 27.[6] In addition, the program employs behavioral targeting, "look-alike" modeling, and contextual advertising—techniques specifically designed to reach women who share some demographic similarities with Flo users but very likely have never used Flo themselves. *Id.* ¶ 22. Such techniques would also involve A.B. Data's "[t]arget[ing] users based on their previous online browsing activity"—e.g., "if a user views or

---

[6] Plaintiffs' proposed order says that, for notices included on "one of Meta's platforms," "Meta may not act in any way to prevent or reduce the likelihood of individuals receiving notice of the settlement, such as by demoting or hiding this content, changing potential Class Members feeds or the content or ads shown to them." Dkt. 845-10 ¶ 4. Meta understands this to mean that such content must be treated by Meta's algorithms consistent with how it treats other content.

searches content related to women's reproductive health," then A.B. Data asserts that "a data profile with that information is created and targeted ads are served to them"[7]—which, rather ironically, resembles the alleged conduct that plaintiffs complained about in this very case. Parks Decl. ¶¶ 21-22. And all told, notice is expected to reach "approximately 90.9% of CA Adult Wom[en] 18–49"—that is, many millions more California women than even plaintiffs' inflated class size estimate of 1.2 million people, to say nothing of the *nationwide* outreach plaintiffs propose. *Id.* ¶ 32. This overbroad notice program massively exacerbates fraud risks. Saturating the internet, print media, and streaming platforms with advertisements telling tens of millions of women they may be entitled to up to $5,000 for using the Flo App—while requiring nothing more than a hedged, imprecise attestation to collect—is an invitation for large-scale fraud.

In sum, the Notice Program is wildly disproportionate to the task of notifying actual class members and presents unacceptable fraud risk. It should be narrowed to target identified Flo App users during the Class Period, and the requests for text message and jewel notice should be denied.

## III. CONCLUSION

For the above reasons, Meta respectfully requests that plaintiffs' motion (Dkt. 845) be denied. Meta also requests permission to depose Bryan Heller of Covalynt and an order directing the parties to jointly propose (to the extent practicable) a mutually agreeable claim form, claims process, and notice program by a date certain. In addition Meta requests that, the Court grant Meta's emergency motion (Dkt. 844) and require plaintiffs to cure Covalynt and A.B. Data's conflicts of interest—and to disclose Covalynt's data, methodology, and analysis. Plaintiffs' motion to enter a partial final judgment (Dkt. 846) extending beyond the named plaintiffs in this action should be denied as well, consistent with Meta's forthcoming opposition to that motion.

---

[7] To be clear, Meta does *not* offer advertisers the ability to target ads based on whether a user has searched for or viewed content related to women's reproductive health. But Plaintiffs' proposed notice plan goes well beyond Meta's services and (according to A.B. Data) would apparently include services that offer such targeting.

DATED: September 23, 2026

**GIBSON, DUNN & CRUTCHER LLP**

/s/ *Christopher Chorba*
Christopher Chorba (Bar No. 216692)
*cchorba@gibsondunn.com*
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: +1.213.229.7503

Elizabeth K. McCloskey (Bar No. 268184)
*emccloskey@gibsondunn.com*
Abigail A. Barrera (Bar No. 301746)
*abarrera@gibsondunn.com*
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: +1.415.393.8200

**LATHAM & WATKINS LLP**

Andrew B. Clubok (*pro hac vice*)
*andrew.clubok@lw.com*
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
Telephone: +1.202.637.2200

Melanie M. Blunschi (Bar No. 234264)
*melanie.blunschi@lw.com*
Kristin Sheffield-Whitehead (Bar No. 304635)
*kristin.whitehead@lw.com*
505 Montgomery St., Suite 2000
San Francisco, CA 94111
Telephone: +1.415.391.0600

Michele D. Johnson (Bar No. 198298)
*michele.johnson@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: +1.714.540.1235

*Counsel for Defendant Meta Platforms, Inc. (formerly known as Facebook, Inc.)*