**LATHAM & WATKINS LLP**
Andrew B. Clubok (*pro hac vice*)
*andrew.clubok@lw.com*
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Telephone: 202.637.2200

Michele D. Johnson (SBN 198298)
*michele.johnson@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: 714.540.1235

Melanie M. Blunschi (SBN 234264)
*melanie.blunschi@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: 415.395.5942

**GIBSON, DUNN & CRUTCHER LLP**
Christopher Chorba (SBN 216692)
*cchorba@gibsondunn.com*
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7396

Elizabeth K. McCloskey (SBN 268184)
*emccloskey@gibsondunn.com*
Abigail A. Barrera (SBN 301746)
*abarrera@gibsondunn.com*
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200

*Attorneys for Defendant Meta Platforms, Inc.*
*(formerly known as Facebook, Inc.)*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

ERICA FRASCO, et al.,

Plaintiffs,

v.

FLO HEALTH, INC., GOOGLE, LLC, FACEBOOK, INC., and FLURRY, INC.,

Defendants.

CASE NO. 3:21-cv-00757-JD (consolidated)

**META PLATFORMS, INC.'S REPLY IN SUPPORT OF EMERGENCY MOTION TO TERMINATE AND RETRACT UNAUTHORIZED CLASS NOTICE UNDER FEDERAL RULE OF CIVIL PROCEDURE 23(d)(1) AND FOR ADDITIONAL RELIEF**

Judge: Hon. James Donato
Courtroom: 11 – 19th Floor
San Francisco Courthouse
Date: October 29, 2026
Time: 11:00 a.m.

# TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1

II. ARGUMENT .......... 2

A. Plaintiffs' Opposition Confirms They Compromised Covalynt's Neutrality. .......... 2

B. Plaintiffs Must Correct Their False and Unauthorized Text Message Notice. .......... 5

C. Meta Has Consistently Worked to Advance the Post-Trial Process. .......... 8

III. CONCLUSION .......... 10

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Cal. Pizza Kitchen Data Breach Litig.*, 129 F.4th 667 (9th Cir. 2025)....9

*Camp v. Alexander*, 300 F.R.D. 617 (N.D. Cal. 2014)....9

*Dillon v. Clackamas Cnty.*, 2019 WL 6709545 (D. Or. Aug. 6, 2019), *report and recommendation adopted sub nom. Dillon v. Clackamas Cnty. & Craig Roberts*, 2019 WL 6709381 (D. Or. Dec. 9, 2019)....6

*Erhardt v. Prudential Grp., Inc.*, 629 F.2d 843 (2d Cir. 1980)....7

*Gordon v. Kaleida Health*, 737 F. Supp. 2d 91 (W.D.N.Y. 2010)....7

*In re Grand Jury Subpoena*, 357 F.3d 900 (9th Cir. 2004)....5

*Retiree Support Grp. of Contra Costa Cnty. v. Contra Costa Cnty.*, 2016 WL 4080294 (N.D. Cal. July 29, 2016)....8

*Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035 (9th Cir. 2019)....7, 9

*Stewart v. USA Tank Sales & Erection Co.*, 2014 WL 836212 (W.D. Mo. Mar. 4, 2014)....9

*United States v. Nobles*, 422 U.S. 225 (1975)....5

## I. INTRODUCTION

The Court ordered a neutral, judicially supervised process for notifying class members and administering claims for the Flo, Google, and Flurry settlements, and directed plaintiffs and Meta to "work cooperatively" on a post-trial process for claims against Meta. Dkt. 791. Plaintiffs have done the opposite. They commandeered the neutral entities meant to administer both processes, withheld information from Meta, and directed that false and unauthorized notices be sent to an untold number of recipients—and they have attempted to run the post-trial process unilaterally and in secret. Plaintiffs' conduct after Meta moved for relief and their Opposition only confirm that the Court's intervention is needed now to ensure a fair and orderly process going forward.

*First*, plaintiffs compromised the post-trial process by conscripting a purportedly neutral party, Covalynt, to do their bidding. They told the Court (and defendants) last fall that Covalynt had been retained by the Court-appointed administrator, A.B. Data, to detect fraud and validate claims. But plaintiffs then secretly and separately retained Covalynt earlier this year. They have since used that retention to withhold Covalynt's data and analysis as their own "work product"—and now ask for a $1.1 billion judgment built entirely on that one-sided work, which no one else has even seen. Covalynt's latest declaration underscores the problem: it touts Covalynt's work as "neutral," "transparent," and "fully auditable," while conceding that plaintiffs have forbidden Meta or anyone else from accessing the information necessary to actually audit that work. Dkt. 847-3 ¶¶ 12, 31–32. Plaintiffs, meanwhile, inexplicably oppose any adversarial testing or verification of any kind, claiming it is unnecessary to—as they put it—"audit Class Counsel's work product." Dkt. 847 at 1. An assurance of transparency that no one may verify is not transparency at all, much less the cooperation that this Court ordered. This is particularly true given that Covalynt's declaration raises more doubts than it resolves. Among other things, it reveals that, of plaintiffs' reported 1.2 million class size, ***less than 20%*** have been identified by Covalynt as "known person[s]" as opposed to "bonds"—i.e., "cluster[s] of records" that are "not a determination of personhood." Dkt. 847-3 ¶¶ 8–9.

*Second*, plaintiffs violated this Court's order by directing A.B. Data—again, the supposedly neutral administrator—to send unauthorized text messages to untold recipients (without alerting Meta or the Court) that falsely stated that Meta was found liable for "wiretapping." The Court never

approved that notice, and none of the defendants was given the chance to object. Plaintiffs now claim the Court's order preliminarily approving the Flo and Google settlement notice plans somehow allowed them to send false and misleading texts about the Meta verdict. But the Meta verdict will (rightfully) be subject to its own notice plan. And the Flo and Google settlement-related order plaintiffs cite says the exact opposite of what they claim: it directed plaintiffs and A.B. Data to "seek from the Court" approval for any material "modifications" to the approved notice, permitting only "[n]on-material modifications" like "formatting" to be made "without further order of the Court." Dkt. 834 ¶ 10.

Faced with this record, plaintiffs try to shift blame, accusing Meta of trying to "control" and "obstruct" the post-trial process while misrepresenting Meta's conduct at every turn. But plaintiffs' accusations have it backwards. Meta produced the results of its enrichment of the Flo data in July 2026, just three months after receiving that data in April 2026, and simultaneously offered to confer about it, consistent with the Court's order. Plaintiffs did not respond to Meta's offer to confer for nearly two months, and when they finally asked to confer for the first time in September 2026, Meta did so. Plaintiffs, by contrast, have withheld details about Covalynt's work—which has apparently taken over eight months (since January 2026)—most recently under the guise of "work product."

Meta respectfully asks for relief consistent with the Court's prior orders and tailored to address plaintiffs' misconduct, including relief designed to ensure that the parties work cooperatively and transparently on the post-trial process, that A.B. Data and Covalynt act as neutrals, that the unauthorized text notice is corrected, and that class notice receive Court approval before being sent.

## II. ARGUMENT

### A. Plaintiffs' Opposition Confirms They Compromised Covalynt's Neutrality.

For all of plaintiffs' bluster, the key facts are undisputed. Plaintiffs told the Court and Meta in late 2025 that the Court-appointed claims administrator, A.B. Data, had "retained" Covalynt "to analyze the claims collected in [this] class action . . . for evidence of fraud and to confirm the claimant resided in California during the applicable Class Period." Dkt. 781-5 ¶ 1. Meta—and presumably the Court—thus understood Covalynt to be working under the direction of a Court-appointed neutral. *See* Dkt. 844 at 4, 10. In January 2026, plaintiffs told the Court and Meta that Covalynt had begun analyzing how the Flo data "may be enhanced for direct notice" after receiving that data from A.B.

Data, consistent with Meta's understanding that A.B. Data (not plaintiffs) had retained Covalynt. Dkt. 818 at 1. But plaintiffs then secretly retained Covalynt on their own "in March 2026 to perform identity matching resolution on customer records," despite previously representing that Covalynt had already been working on those efforts for several months (in what Meta understood to be a neutral capacity). Dkt. 839-8 ¶ 3. Meanwhile, plaintiffs have consistently rebuffed Meta's requests for transparency regarding Covalynt's work, most recently using their retention of Covalynt to cloak that information in supposed "work-product" protection. Dkt. 844 at 9–11; *see also* Dkt. 847 at 14.

Developments since Meta filed its motion have only magnified the need for immediate Court intervention. Plaintiffs now seek a billion-dollar "partial" judgment as to a subset of purported class members based entirely on Covalynt's identity-matching efforts—work completed at plaintiffs' sole direction that remains a black box given plaintiffs' claims of work-product protection. *See* Dkt. 846 at 1; Dkt. 847 at 14. Plaintiffs also seek to further curtail Meta's due process right to challenge submitted claims by, among other things, asking that claims processed by Covalynt be treated as presumptively valid and failing to address how to reconcile their proposed post-trial process with their request to enter partial judgment. Dkt. 847 at 2, 13; *see also* Dkt. 845 at 7–8. In short, plaintiffs have put Covalynt at the center of the post-trial process that will determine Meta's overall damages liability, while simultaneously co-opting Covalynt's neutrality and forbidding it from sharing its analysis with Meta—effectively foreclosing any meaningful way to test Covalynt's work.

The Heller Declaration (from Covalynt) filed with plaintiffs' Opposition only confirms these problems. That declaration asserts that Covalynt's work is "documented to ensure transparency" and "fully auditable, explainable, and reproducible." Dkt. 847-3 ¶¶ 9, 11–13, 31. The declaration also says that, while the "specific findings and results of the . . . work performed for Class Counsel remain . . . for Class Counsel to disclose[,] . . . the methodology by which those findings were produced is the neutral, documented, and rigorous process set forth in this declaration." *Id.* ¶ 32. Despite these assurances, plaintiffs fault Meta for seeking to "audit" that "fully auditable" work. Dkt. 847 at 1. Phrases like "fully auditable," "reproducible," and "neutral" mean nothing when plaintiffs alone have directed Covalynt's work and asserted work-product protection to avoid disclosing it.

The Heller Declaration also raises more questions than it answers. *See* Dkt. 850 at 4–7. For

example, plaintiffs claim that, "through Covalynt," they have identified "at least 1,246,866 Class Members" (Dkt. 845 at 2), but the Heller Declaration reveals that the 1.2 million figure reflects "bonds"—meaning "cluster[s] of records" that are "***not*** a determination of personhood." Dkt. 847-3 ¶¶ 8–9 (emphasis added). As to actual people, the declaration refers only to "222,115 identities"—i.e., "known person[s]." *Id.* ¶¶ 8, 17. In other words, ***less than 20%*** of plaintiffs' claimed class are "known person[s]" based on Covalynt's analysis, with the rest presumably being "clusters of records" that may not even correspond to an actual person and may reflect solely IP addresses (as opposed to verifiable people). Dkt. 850 at 4. In addition, while Covalynt apparently attempted to exclude males, it did so only based on Meta's limited data that reflects "user-report[ing]," apparently without attempting to use other sources of gender/sex information. Dkt. 847-3 ¶ 22. And while the declaration praises Covalynt's "proprietary" tools in general terms, it gives no details about key methodological decision points specific to this case. As one example, although Covalynt purported to analyze a "***person's*** California presence during the Class Period," it did so by analyzing "bonds" instead of limiting that analysis to only known persons. *Id.* ¶¶ 8–9, 13 (emphasis added). The declaration does not explain why "bonds" rather than "known person[s]" were used for that analysis, other than to broadly state at the outset that Covalynt performed its work "at the direction of, and for, Class Counsel." *Id.* ¶ 5. Given the nearly six-fold multiplier on purported class size when considering "bonds" as opposed to "known person[s]," it is not hard to guess why "bonds" were ultimately used.

In arguing that Covalynt can still remain neutral, plaintiffs make much of the fact that they and A.B. Data have "separately retained Covalynt for different purposes"—with plaintiffs' retention pertaining to the notice process, and A.B. Data's to the post-trial process. Dkt. 847 at 2. That is ridiculous. Plaintiffs would surely have grounds to complain if Meta "separately retained" a court-appointed special master or mediator for "different purposes" other than helping adjudicate or mutually resolve the very same dispute.

Regardless, plaintiffs' argument falsely assumes the two processes are entirely separate. They are not. As a fundamental matter, class notice necessarily shapes the resulting claims. *See, e.g.*, Fed. R. Civ. P. 23, advisory committee's notes to 2018 amendment ("goal" of notice is to enable class members to decide whether to opt out, object, or make claims). Plaintiffs' and Covalynt's conduct

have only confirmed this fundamental principle. The same Covalynt "work product" that identifies class members for notice has also driven plaintiffs' class-size figure, their request for a billion-dollar judgment, and the claim validation on which their proposed post-trial process depends. Indeed, plaintiffs have represented that Covalynt's fraud detection technology is "based in part by identifying anomalies such as claimants providing address information for which they were never associated," and that "[a]n expansion of this identity resolution process, which is built into the fraud review process, will be utilized to verify" claims. Dkt. 839-8 ¶ 35. In other words, Covalynt's identity resolution work—performed solely at plaintiffs' direction—will be "built into" Covalynt's supposedly "neutral" fraud detection work. Meta should thus be permitted to test *both* stages of that work, not just the latter half.[1]

It is no surprise that purported engagement formalities have not been respected. Plaintiffs' refusal to permit Meta to access Covalynt's data and results—in violation of this Court's orders requiring "cooperation on notice *and* claims"—shows that Covalynt has so far answered only to plaintiffs. Dkt. 847 at 13 (emphasis added). None of the cases plaintiffs cite to support their work-product argument supports this one-sided approach (let alone excuses their failure to comply with this Court's orders), because none permitted a party to conceal what should be a neutral class-notice process behind "work-product" protection. *See United States v. Nobles*, 422 U.S. 225 (1975) (concerning work-product protection over witness-interview report); *In re Grand Jury Subpoena*, 357 F.3d 900 (9th Cir. 2004) (concerning environmental consultant's documents). The Court's intervention is thus needed to restore the cooperative and transparent post-trial process the Court ordered in the first place.

**B. Plaintiffs Must Correct Their False and Unauthorized Text Message Notice.**

The Court never approved text-message notice for co-defendants' settlements, let alone text notice that falsely said Meta was found liable for "wiretapping." *See* Dkt. 844 at 9, 11–12 (Google and Flo agreeing text notices were unauthorized). Instead, the Court approved specific forms and content of notice, and directed that only "[n]on-material modifications, including formatting, to the forms of

[1] Plaintiffs claim Meta endorsed Covalynt's fraud detection technology at the September 2025 hearing, but Meta's counsel's comment was limited to that technology's ability to identify programmatic fraud and simultaneously cautioned that the technology "cannot identify an individual who is lying on a claim form." Dkt. 792 at 29:6-14. Covalynt's separate retention by plaintiffs was news to undersigned counsel.

notice and the Claim Form may be made without further order of the Court." Dkt. 834 ¶ 10. The approved notice plan was otherwise "subject to modifications that Plaintiffs and A.B. Data *may seek from the Court* after the review of any data provided to them by Flo." *Id.* (emphasis added). Plaintiffs do not dispute that neither they nor A.B. Data sought Court approval for the text notice. And they do not dispute that Meta was never found liable for "wiretapping," as the text notice stated. The straightforward conclusion is that plaintiffs violated the Court's order by directing A.B. Data—the purportedly independent Court-appointed neutral—to send the unauthorized and false text notice.[2]

In arguing otherwise, plaintiffs claim the texts were consistent with Rule 23's "best notice practicable" requirement, and that plaintiffs' "clear goal, as furthered by the texts, was to help more people learn they may recover $5,000 as a consequence." Dkt. 847 at 8, 12. But "[t]he court cannot fulfill its duty under FRCP 23(c)(2)(B) to direct the 'best notice that is practicable,' if it has no opportunity to review the notice before it is sent to class members." *Dillon v. Clackamas Cnty.*, 2019 WL 6709545, at *2 (D. Or. Aug. 6, 2019), *report and recommendation adopted sub nom. Dillon v. Clackamas Cnty. & Craig Roberts*, 2019 WL 6709381 (D. Or. Dec. 9, 2019). Because plaintiffs sent the text notice without warning, "[t]he court did not have the opportunity to scrutinize the form and content of the proposed notice, and defendants had no opportunity to object or suggest changes." *Id.* In contrast, the Court approved specific notice language for co-defendants' settlements, which was reached cooperatively and with Court supervision—and as a result was accurate, unlike plaintiffs' unilateral text notice. *See* Dkt. 844 at 6. Now, plaintiffs have filed their motion seeking preliminary approval for a notice plan as to the Meta verdict that includes text message notice *after* the unauthorized text notices were already sent and *after* Meta brought the issue to their attention. *See* Dkt. 845 at 4; Dkt. 844 at 7. Plaintiffs' decision to act first and seek approval later should not be tolerated.

Plaintiffs next assert that the Court's order preliminarily approving the notice plan for the Flo and Google settlements "was purposefully flexible and contemplates additional forms of notice at Class Counsel and A.B. Data's discretion." Dkt. 847 at 8. But the order itself says otherwise. The only paragraph of the order that plaintiffs cite is the same one that directs them (or A.B. Data) to "seek"

---

[2] Despite previously refusing to disclose the source of the phone numbers used to send the texts, plaintiffs now reveal that those numbers apparently came from Covalynt, and not Meta. Dkt. 847-1 ¶ 23. Once again, plaintiffs' decision to dole out information about Covalynt's work at their convenience is not the cooperation this Court ordered.

Court approval for material "modifications," excluding only non-material edits like "formatting" changes. *See* Dkt. 834 ¶ 10; Dkt. 847 at 8 (citing only Dkt. 834 ¶ 10). Adding an entirely new form of notice, and including false and misleading information, are not mere "formatting" changes. None of plaintiffs' cited cases involved plaintiffs sending unauthorized class notice without advance warning to the Court or defendants and in direct violation of a court order. *See Gordon v. Kaleida Health*, 737 F. Supp. 2d 91, 94–95 (W.D.N.Y. 2010) (plaintiffs "advised the court and Defendants" about their intent to contact "potential witnesses," defendants did not object, and court's order did not restrict such contact); *Erhardt v. Prudential Grp., Inc.*, 629 F.2d 843, 845 (2d Cir. 1980) (plaintiff "conceded" that defendant's communications to class members did not "directly violate[]" court's order approving notice); *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1044 (9th Cir. 2019) (addressing "adequacy of notice" to class in case not involving any dispute about unauthorized class notice).

As to the text notice's substance, plaintiffs do not dispute that "[u]napproved notices to class members which are factually or legally incomplete, lack objectivity and neutrality, or contain untruths will surely result in confusion and adversely affect the administration of justice," requiring court intervention. *Erhardt*, 629 F.2d at 846; Dkt. 844 at 12–14. Instead, plaintiffs insist the texts "are [n]ot [f]alse and [m]isleading," which is incorrect. Dkt. 847 at 10–12. Plaintiffs' federal wiretapping claim was rejected at summary judgment, and plaintiffs abandoned the state wiretapping claim after this Court declined to certify it. *See* Dkt. 844 at 7, 12–13. The texts thus contained false information about Meta's liability that "will surely result in confusion." *Erhardt*, 629 F.2d at 846. Plaintiffs also ignore that they recently told the press that class members would be "eligible for $5,000 each under CIPA," but that it would be "a bit of a long road ahead" before they would be paid. Dkt. 844 at 13. That information differs from what they had A.B. Data send via text, i.e., that recipients may "be entitled to claim $5,000, minus fees"—and "soon." *Id.* That inconsistency is likewise cause for confusion. And such confusion does not, as plaintiffs argue, somehow "rest[] on the premise that Class Members would not understand that the settlements and the Meta verdict are separate sources of relief." Dkt. 847 at 9. The likelihood of confusion here comes from the false and misleading nature of the text notices—and the ways in which they differ from plaintiffs' counsel's own public statements.

Plaintiffs nevertheless insist that, even if the texts were false and misleading, they were not

*sufficiently* false so as to warrant retraction, because the terms "wiretapping" and "recording" are supposedly "not categorically distinct," class members would not be confused by the wrong word, and Meta "was already found liable for violating CIPA § 632." Dkt. 847 at 9–12. But the law and plaintiffs' own pleadings demonstrate that the terms are meaningfully different. *See, e.g.*, Dkt. 64 ¶¶ 392–413 (alleging separate "wiretapping" and "recording" claims); Dkt. 477 at 20–21 (referring to CIPA § 631 as the "wiretapping provision" and § 632 as the "recording provision"). If anything, the parties' disagreement over the negative connotations of those terms only underscores why Court approval was needed (and required). Nor does the jury verdict help plaintiffs; that verdict does not allow them to falsely say Meta was found liable under another provision. And plaintiffs' attempts to minimize the seriousness of this issue by drawing comparisons to Meta's cited cases fall flat. Both the text notice here and the communication in *Retiree Support Group of Contra Costa County v. Contra Costa County*, 2016 WL 4080294 (N.D. Cal. July 29, 2016), for example, had a "transparently false" statement, which alone can "constitute[] grounds to correct" it. *Id.* at *7. The falsity here is graver still, because the text notice falsely said Meta was adjudged liable for a claim it actually defeated.

Plaintiffs' last-ditch argument is that, at most, they should have to resend the same text, at class counsel's expense, swapping the term "recording" for "wiretapping." Dkt. 847 at 11. Meta agrees class counsel should bear any expense associated with correcting their false and misleading text message. But Meta disagrees that plaintiffs' offer is sufficient, particularly since they intend to continue sending notices without oversight. *See* Dkt. 844 at 15; Dkt. 847 at 7 (plaintiffs "intend to send further outreach" via text). And while plaintiffs argue Meta's proposed retraction will "undermin[e] confidence in the claims process" (Dkt. 847 at 12), what threatens confidence in that process is plaintiffs firing off false and unauthorized notice; correcting that notice is a necessary step in restoring such confidence (as is the other targeted relief that Meta requests).

### C. Meta Has Consistently Worked to Advance the Post-Trial Process.

As described in detail in the Chorba Declaration filed with Meta's motion (Dkt. 844-1) and the concurrently filed Barrera Declaration, Meta has made every effort to move the post-trial process along. This motion is the latest effort, whereby Meta seeks to ensure the case proceeds in a manner consistent with the Court's prior orders. Unable to adequately justify compromising Covalynt's neutrality,

refusing to work cooperatively on the post-trial process, and directing A.B. Data to send unauthorized notices with false information, plaintiffs try to blame Meta, claiming Meta seeks to "control" notice and "has sought to obstruct" the post-trial process. Dkt. 847 at 1, 12–15. Neither is true.

*First*, Meta seeks relief that aligns with the Court's instructions that the parties "work cooperatively" on the post-trial process and addresses plaintiffs' efforts to derail that process. *See* Dkt. 844 at 15. Plaintiffs fail to explain how granting that relief—which includes, for instance, "direct[ing] that A.B. Data and Covalynt act as neutral and independent entities" and requiring Court approval for class notice—could amount to Meta taking "control" over the notice process. Dkt. 844-8 at 1. It plainly would not; it would properly put *this Court* in control. The cases that plaintiffs rely on do not help them, because none involved facts remotely similar to class counsel sending unauthorized notice with false information about the defendant's liability. *See Roes*, 944 F.3d at 1043 (scrutinizing settlement agreement's reversionary clause); *In re Cal. Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 675–77 (9th Cir. 2025) (reviewing settlement for collusion); *Camp v. Alexander*, 300 F.R.D. 617, 625 (N.D. Cal. 2014) (evaluating communication that "discourages participation in the collective action"); *Stewart v. USA Tank Sales & Erection Co.*, 2014 WL 836212, at *9 (W.D. Mo. Mar. 4, 2014) (rejecting settlement where defendant would administer claims and recoup unclaimed funds).

*Second*, plaintiffs mischaracterize Meta's conduct at every turn to distract from their own wrongdoing. For example, plaintiffs suggest it took Meta "a year after the verdict" to complete its analysis of the Flo data. Dkt. 847 at 1. But Meta did not receive Flo's data until *April 19, 2026*, and completed the analysis in just *three months*, in contrast to the over eight months it has apparently taken Covalynt to analyze the same data. Dkt. 844-1 ¶¶ 17, 23–26. Plaintiffs also blame Meta for the "delay" in getting the parties' proposed Order Regarding Class Information approved in April 2026. Dkt. 847 at 3. But Meta sent plaintiffs and Flo a draft proposed order the day after the December 2025 hearing when the order was first discussed, and plaintiffs and Flo then added numerous provisions with detailed technical requirements that were unduly burdensome and/or technically infeasible. Dkt. 816 at 1. Plaintiffs then unilaterally declared an impasse on the issue, and it was Meta that spearheaded efforts to reach a compromise proposal in April 2026, which the Court adopted. Dkt. 844-1 ¶¶ 8, 11.

Plaintiffs also claim Meta "manipulat[ed] . . . data sources" when analyzing the Flo data

because, for example, Meta did not include IP address-only matches where a single IP address matched to more than 10 users of Meta's services. Dkt. 847 at 5. But both parties acknowledged that single IP addresses with 10-plus users posed difficulties, as demonstrated by the proposed order entered by the Court: "If more than 10 users of Meta services may be associated with the same value (e.g., an IP address) in the Flo Data without other corroborating data values to identify the Meta user as a Flo user, Meta shall meet and confer with Class Counsel about a reasonable process for addressing those situations." Dkt. 827 ¶ 6 n.2. Consistent with that order, when Meta transmitted its results in July 2026, it offered "to meet and confer regarding a reasonable process for addressing situations where more than 10 users of Meta's services are associated with the same IP address." Barrera Decl. Ex. A. Meta explained that including those matches would cause "the number of unique matched Facebook accounts [to] balloon[] to at least 160 million"—nearly half the U.S. population. *Id.* Plaintiffs need only look to the Heller Declaration to learn why that is: as Mr. Heller admits, "IP addresses are transient" and "can be shared among thousands of unrelated people." Dkt. 847-3 ¶ 18. Plaintiffs did not respond to Meta's offer to confer until nearly two months later, in September 2026, Dkt. 844-1 ¶ 20, and Meta has been responding to plaintiffs' questions in good faith since then, Barrera Decl. ¶ 3.

Plaintiffs' claim that Meta seeks "one-sided transparency" into the enrichment process (Dkt. 847 at 6) is also false. Again, plaintiffs first asked Meta questions about its analysis in early September, and Meta has cooperated by addressing them (unlike plaintiffs). Dkt. 844-1 ¶ 20; Barrera Decl. ¶ 3. And it was plaintiffs who created any asymmetry by co-opting Covalynt's enrichment analysis and withholding it as supposedly confidential "work product." Nor is there any equivalence in Meta's declining to produce its engineers for questioning (Dkt. 847 at 6): Meta produced record-level data and offered to confer, while plaintiffs co-opted the once-neutral Covalynt and have withheld its data. These examples are representative, not exhaustive, and they expose plaintiffs' blame-shifting as an effort to distract from their behavior that has compromised the post-trial process. The Court should require plaintiffs to adhere to the cooperative, court-supervised process that has been ordered.

## III. CONCLUSION

Meta respectfully requests that the Court grant its emergency motion.

Dated: September 29, 2026

*/s/ Christopher Chorba*

**GIBSON, DUNN & CRUTCHER LLP**
Christopher Chorba (SBN 216692)
*cchorba@gibsondunn.com*
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone: 213.229.7396

Elizabeth K. McCloskey (SBN 268184)
*emccloskey@gibsondunn.com*
Abigail A. Barrera (SBN 301746)
*abarrera@gibsondunn.com*
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: 415.393.8200

**LATHAM & WATKINS LLP**
Andrew B. Clubok (*pro hac vice*)
*andrew.clubok@lw.com*
555 Eleventh Street NW, Suite 1000
Washington, D.C. 20004
Telephone: 202.637.2200

Michele D. Johnson (SBN 198298)
*michele.johnson@lw.com*
650 Town Center Drive, 20th Floor
Costa Mesa, CA 92626
Telephone: 714.540.1235

Melanie M. Blunschi (SBN 234264)
*melanie.blunschi@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, CA 94111-6538
Telephone: 415.395.5942

*Counsel for Defendant Meta Platforms, Inc.*