Christian Levis (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
clevis@lowey.com

*Co-Lead Class Counsel*

Diana J. Zinser (*pro hac vice*)
**SPECTOR CALDES & CORRIGAN, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Telephone: (215) 496-0300
Facsimile: (215) 496-6611
dzinser@scc.law

*Co-Lead Class Counsel*

Carol C. Villegas (*pro hac vice*)
Michael P. Canty (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
cvillegas@labaton.com
mcanty@labaton.com

*Co-Lead Class Counsel*

James M. Wagstaffe (SBN 95535)
**ADAMSKI MOROSKI MADDEN CUMBERLAND & GREEN LLP**
P.O. Box 3835
San Luis Obispo, CA 93403-3835
Telephone: 805-543-0990
Facsimile: 805-543-0980
wagstaffe@ammcglaw.com

*Counsel for Plaintiffs Erica Frasco and Sarah Wellman*

[additional counsel listed below]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

ERICA FRASCO, et al., individually and on behalf of all others similarly situated,

Plaintiffs,

v.

FLO HEALTH, INC., META PLATFORMS, INC., GOOGLE, LLC, and FLURRY, INC.,

Defendants.

Case No.: 3:21-cv-00757-JD

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION TO ENTER CLAIMS ADMINISTRATION AND NOTICE PROGRAMS**

Date: October 29, 2026
Time: 10:00 a.m.
Location: Courtroom 11, 19th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Judge: Hon. James Donato

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

ARGUMENT ..... 2

A. The Notice Program is Reasonable and Appropriate ..... 2

B. The Proposed Claims Program is Appropriate and Should Be Entered ..... 9

C. Meta's Recycled Attacks on Covalynt are Irrelevant to the Issues Before the Court ..... 14

CONCLUSION ..... 15

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alvarez v. Sirius XM Radio Inc.*,
2020 WL 7314793 (C.D. Cal. July 15, 2020) ........ 13

*Asghari v. VW Grp. of Am., Inc.*,
2015 WL 12732462 (C.D. Cal. May 29, 2015) ........ 14

*Bezdek v. Vibram USA, Inc.*,
809 F.3d 78 (1st Cir. 2015) ........ 14

*Broomfield v. Craft Brew All., Inc.*,
2020 WL 1972505 (N.D. Cal. Feb. 5, 2020) ........ 14

*Carter v. Vivendi Ticketing US LLC*,
2023 WL 8153712 (C.D. Cal. Oct. 30, 2023) ........ 11

*Dean v. Colgate-Palmolive Co.*,
2018 WL 6265003 (C.D. Cal. Mar. 8, 2018) ........ 11

*Domingo v. New England Fish Co.*,
727 F.2d 1429 (9th Cir. 1984) ........ 7

*Draeger v. Transamerica Life Ins. Co.*,
2021 WL 3172911 (C.D. Cal. July 26, 2021) ........ 2

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) ........ 10

*Flores v. Comput. Merch., Ltd.*,
2026 WL 457566 (S.D. Cal. Feb. 18, 2026) ........ 11

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ........ 10

*Hill v. Canidae Corp.*,
2021 WL 4988032 (C.D. Cal. Apr. 2, 2021) ........ 14

*In re Google Location History Litig.*,
2026 WL 2509404 (9th Cir. Aug. 26, 2026) ........ 14

*In re NVIDIA GPU Litig.*,
539 F. F. App'x 822 (9th Cir. 2013) ........ 14

*Lyngaas v. Curaden AG*,
436 F. Supp. 3d 1019 (E.D. Mich. 2020) .......... 3

*McKenzie L. Firm, P.A. v. Ruby Receptionists, Inc.*,
2020 WL 2789873 (D. Or. May 29, 2020) .......... 7

*Pampena v. Musk*,
2026 WL 1948057, at *19 (N.D. Cal. July 6, 2026) .......... 2-3

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
944 F.3d 1035 (9th Cir. 2019) .......... 2

*Schneider v. Chipotle Mexican Grill, Inc.*,
2019 WL 1512265 (N.D. Cal. Apr. 8, 2019) .......... 5

*Six (6) Mexican Workers v. Ariz. Citrus Growers*,
904 F.2d 1301 (9th Cir. 1990) .......... 2

*Yeoman v. Ikea U.S. W., Inc.*,
2013 WL 5944245 (S.D. Cal. Nov. 5, 2013) .......... 5

**Other Authorities**

Fed. R. Civ. P. 23 .......... 2

Plaintiffs submit this reply in support of their Motion to Enter Claims Administration and Notice Programs (ECF No. 845, the "Motion"), and in response to Meta's opposition to the Motion (ECF No. 850, "Opposition").

**INTRODUCTION**

The verdict was reached in this case over a year ago and each Class Member is entitled to $5,000 in statutory damages. The next step in this litigation is the identification of Class Members.

As detailed in Plaintiffs' motion for partial final judgment, based on customer records produced by Flo, Plaintiffs have already reliably identified 222,115 Class Members. ECF No. 846. Judgment should be immediately entered for those Class Members for the reasons stated in Plaintiffs' motion. *Id.* Plaintiffs also identified an estimated 987,970 additional Class Members based on the Flo customer records. *Id*. The proposed Notice (Mot. Ex. F) and Claims Programs (Mot. Ex. A) provide orderly processes for identifying the Class Members and distributing their recovery.

First, Plaintiffs will engage in robust efforts to notify the Class Members via familiar direct and indirect notice processes. Given the significant recovery available, the estimated Class size, and the Court's repeated instructions to conduct thorough notice, this program is entirely appropriate. As discussed herein, Meta raises a litany of misplaced critiques about this process. This effort reflects Meta's self-interest; it is adverse to the Class and motivated to suppress notice. Its criticisms, however, are far afield of the traditional considerations relevant to notice programs: whether the program is sufficiently robust, likely to lead to claims, and makes appropriate use of Class resources.

Second, Class Members will file claims, and those claims will be reviewed. The Claim Form requires a sworn statement, under penalty of perjury, to the facts establishing Class membership. Once claims are filed, A.B. Data and Covalynt will review the filing and subject the claim to rigorous anti-fraud analysis. Meta will then be presented with the information relevant to each claim and will have an opportunity to raise any fact-based concerns with the veracity of any claim. The Court has already commented favorably on this proposed process. Meta's speculative concerns about potential fraud are misguided and, once again, seek to deter valid claimants from filing claims.

## ARGUMENT

**A. The Notice Program is Reasonable and Appropriate**

Plaintiffs' proposed Notice Program should be entirely uncontroversial. The Court has already approved similar programs in the context of initial class notice and notice of the Settlements. *See* ECF Nos. 619, 834. The proposed forms of notice are familiar aspects of many class actions. Notably, Plaintiffs already proposed a substantially similar notice program for the post-verdict process in advance of the September 30, 2025 Remedies Hearing, and Meta's ***only*** objection to that proposal concerned jewel notice. *See* Sep. 30, 2025 Hr'g Tr. (ECF No. 792) at 37:17-38:8. Now, in an apparent strategy of taking shots at everything in sight, in hopes of reducing its liability, Meta broadly complains about the Proposed Notice Program. *See* Opp. at 12-14. Meta's new primary argument is that the notice will be overly broad. That argument is meritless.

The Court's role in reviewing a proposed notice program is to balance two interests: on the one hand notice must be sufficiently robust to reach the Class and on the other hand, efficiently designed to encourage claims while avoiding wasteful spending of Class Member recovery. *See Draeger v. Transamerica Life Ins. Co.*, 2021 WL 3172911, at *6 (C.D. Cal. July 26, 2021); *see generally* Fed. R. Civ. P. 23(c)(2)(B) (programs should provide "the best notice that is practicable under the circumstances" with an emphasis on delivering "individual notice to all members who can be identified through reasonable effort"). These considerations are focused on ensuring notice is in the best interests of the Class—*i.e.*, doing everything reasonable to maximize recovery.

With that context, Meta's supposed concern rings hollow. Meta is not a fiduciary of the Class. Rather, Meta hopes to limit notice to minimize the number of Class Members that file claims, because doing so is in *Meta's* financial interest. This is why courts routinely find that defendants have no role in designing class notice. *See Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1058-59 (9th Cir. 2019) (explaining defendants' incentive to "negotiate for a subpar notice process . . . or restrictive claim eligibility conditions"); *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990) (where "the only question is how to distribute the damages, the interests affected are not the defendant's but rather those of the silent class members"); *Pampena v. Musk*, 2026 WL

1948057, at *19 (N.D. Cal. July 6, 2026) (post-verdict; rejecting defendant's proposed verification requirements and notice language that "would only create confusion and potential intimidation"); *Lyngaas v. Curaden AG*, 436 F. Supp. 3d 1019, 1024 (E.D. Mich. 2020), *aff'd*, 992 F.3d 412 (6th Cir. 2021) (post-trial; defendant's due process rights are protected "so long as the defendant is given a fair opportunity to challenge the claim . . . and to contest the amount owed each claimant").

The scope of the notice program here is entirely proportionate to the recovery owed to Class Members and the size of the Class. Plaintiffs have obtained a trial verdict against Meta entitling each Class Member to $5,000 in statutory damages. As a result of this large per-claimant recovery, there is a uniquely compelling reason to invest substantially in a notice program to ensure each Class Member is aware of her rights to that money. Analysis of Flo's user data shows approximately 1,210,085 unique California Flo app users in Flo's customer records (Mot. Ex. G ¶13), meaning that the potential class-wide recovery totals approximately $6 billion—again, a sum that justifies substantial investment in reaching Class Members.

Moreover, Meta's arguments ignore the Court's instructions about notice. For example, when reviewing the Settlements, the Court required Plaintiffs to return with a "much more robust proposal on notice," directed Meta to "pitch in," and explained that the resulting program would serve as "a template for when it's [Meta's] turn."[1] Dec. 4, 2025 Hr'g Tr. (ECF No. 813) at 12:13–13:6, 15:8–14. And when presented with a proposal that omitted one potentially useful advertising channel, the Court emphasized that this was unacceptable because Plaintiffs "owe" the Class "the best practicable notice." *Id.* at 20:3–8, 24:10–16. Those instructions carried forward to the April 2026 hearing. When Plaintiffs explained that they wanted to reach 100% of the Class through Settlement notice, the Court responded, "I don't disagree." Apr. 16, 2026 Hr'g Tr. (ECF No. 833) at 10:1–10.

The Court already rejected Meta's overbreadth argument. When Meta argued that jewel notice "would be overinclusive," the Court responded: "But what's the harm in that? People get bombarded with things that they don't want all day. And if . . . it starts with a conditional, 'If X, Y,

[1] Notably, Meta has not done so, as reflected by its concealment of Class data in violation of the April 16 Order. *See* ECF No. 827; ECF No. 847 at 5-6.

and Z, then you should go here,' and someone will read that and say, 'Well, that's not me.' What's the downside?" Dec. 4, 2025 Hr'g Tr. at 9:18–10:11. The Court concluded this wording, which the proposed notice utilizes, would be sufficient, commenting: "I wouldn't underestimate users so much." *Id.* at 11:20–12:6; Mot. Ex. D; *supra* Section A.

Despite the Court's prior comments and instructions to conduct broad notice, Meta now argues that the notice program is problematic because it reaches individuals who are not part of the Class and supposedly increases the risk of fraud. Notably, Meta does not identify any limiting principle for this concern; of course, *any* effort to notify the public could also notify fraudsters. But aside from being entirely speculative—and mooted by Plaintiffs' robust anti-fraud proposals (*see* Section B)—Meta's argument does not even pass logical muster. Scammers committed to filing fraudulent claims need not wait for notice to arrive in their inbox or to appear in their Google results, they can simply go ahead and file claims. Limiting the information disseminated to actual Class Members (as Meta wants) will not limit fraud, it will only limit Class recovery.

Meta's supposed concerns are also belied by its continuous obstruction and actual active efforts to prevent Plaintiffs from identifying more Class Members to better target notice. As Plaintiffs' opposition to Meta's "emergency" motion explained, despite feigning an interest in cooperation in hopes of creating some argument for the appellate record, Meta has purposefully withheld information in its possession that would identify Class Members and address its "concerns" in violation of the Court's Order. *See* ECF No. 847 at 5-6; ECF No. 847-1 ¶¶10-15. This includes: (1) withholding and, in fact, never searching historical information in its possession, (2) limiting its search to general data tables containing (a) IP addresses from 45 days in *this year* (*i.e.*, ten years after the start of the Class Period), and (b) device identifiers from August 2024 to present; (3) failing to search data Meta received from the Flo app, as identified by Flo's SDK ID, for information it received from Class Members, and (4) arbitrarily excluding individuals based on IP filters that were never discussed with Class Counsel as required by the Order. *Id.* Any one of these actions would be enough to dispose of Meta's arguments about the scope of notice; the combination is overwhelming.

Unsurprisingly, Meta cites *no* case holding that speculative fraud concerns justify limiting notice programs. Instead, Meta merely cites two pre-verdict cases that had nothing to do with fraud or the issues presented by this Motion, and actually prove Plaintiffs' point. Opp. at 14.

First, Meta's reliance on *Yeoman* is both factually and legally misplaced. Factually, *Yeoman* concerned a narrow issue about a largely arbitrary contact list. *Yeoman v. Ikea U.S. W., Inc.*, 2013 WL 5944245, at *5-6 (S.D. Cal. Nov. 5, 2013) (internal citations omitted). Specifically, the court rejected plaintiffs' request to use Ikea's general 1.6-million-email-address list because it bore "no reasonable relationship" to the class—customers whose ZIP codes had been recorded during certain transactions. The list was largely arbitrary, because it was both materially over-inclusive and under-inclusive. Here, by contrast, Plaintiffs' proposed direct notice methods are tightly aligned with Class membership. It is based on contact information derived from Flo's user records of the women who began using the app during the Class Period and is tailored to California users.

The legal defect in Meta's citation of *Yeoman* is even more apparent. *Yeoman* did not voice a general concern with the breadth of notice: it does not support Meta's attempt to limit ***indirect*** notice or Plaintiffs' use of information available to them to contact likely Class Members. Rather, it dealt with whether Ikea should be required to provide an arbitrary list for direct notice purposes. In addressing that narrow issue, the court recognized that direct notice "must" be used where "class members may be ascertained through reasonable efforts," but concluded that because the list was arbitrary, the minimum due process standards could be satisfied with notice by publication. *Id.*

Second, Meta's citation of *Schneider* (which relies on *Yeoman*) is similarly misplaced. *See Schneider v. Chipotle Mexican Grill, Inc.*, 2019 WL 1512265, at *2-3 (N.D. Cal. Apr. 8, 2019). It also concerned an arbitrary contact list. Specifically, the class was limited to "in restaurant" customers, but plaintiffs sought to contact a list of "online" purchasers. *Schneider* held that use of an "overinclusive list . . . may be proper," but determined that plaintiffs had not shown that "even a single class member," would be contacted. *Id.* (citation omitted). Indeed, *Schneider* cites *Macarz* which recognized that direct notice to an "overinclusive list" where it may contain class members. *Id.* Ultimately, *Schneider* permitted a broad advertising campaign.

Indeed, Meta's scattershot objections to the Notice Program's individual components reveal its true aim is to impede notice. None warrants rejecting or narrowing Plaintiffs' proposal.

**Direct Notice.** In two sentences, Meta accuses Plaintiffs of improperly seeking "open-ended permission to disseminate additional forms of direct notice" to "untold numbers of people." Opp. at 13. This is simply not true. Plaintiffs have plainly explained that they will undertake efforts to directly notify the Class Members present in the Flo User data for whom they were able to find contact information. This is not an "untold" number of people, but a finite list of likely Class Members identified in the records Flo provided as part of this litigation. Many of the individuals in the Flo data set have been directly identified along with corresponding contact information. Likely contact information for other Class Members has been identified through the Court-ordered data enrichment process and will likewise be used for direct notice. *See* Motion at 4.[2] With respect to the form of notice, Plaintiffs have provided the Court with various examples of the anticipated content which will be used throughout direct notice channels including text messages.

**Indirect Notice.** Meta cites many of the components of Plaintiffs' indirect notice proposal (*e.g.*, digital, print, and radio advertising) without articulating any basis for why such efforts are insufficient under Rule 23. Instead, Meta attempts to equate A.B. Data's use of ordinary targeted advertising tools with the conduct at issue in this case. Opp. at 14–15. The comparison is both legally irrelevant and factually wrong. This case concerned Meta's undisclosed interception and commercial use of Flo users' confidential in-app communications for its own, unauthorized commercial purposes. The proposed Notice Program uses standard advertising tools for the purpose of informing potential Class Members of their rights; it does not intercept, disclose, or monetize their private communications. Those same notice methods are routinely used in class administration and have already been employed in the Court-approved certification and Settlement notice programs in this case. The "irony" Meta suggests does not identify any defect in the proposed Notice Program and provides no basis for denying approval.

---

[2] For the avoidance of doubt, all direct notice will be accompanied by conditional language stating "if you were a…" *See* Mot. at 6.

Meta's attempt to block Plaintiffs' use of digital ads further highlights the need for the protections Plaintiffs included in their Proposed Order, ensuring Meta does not suppress, hide, inhibit or otherwise prevent ads on its platforms from reaching Class Members. *See* ECF No. 845-10 ¶ 4. Meta attempts to side-step this provision in a footnote (claiming it "understands this to mean that such content must be treated by Meta's algorithms consistent with how it treats other content" (Opp. at 14 n.6)) are inadequate given Meta's strong incentive to automatically suppress adverse information about itself. Meta's objection to this condition only highlights Plaintiffs' legitimate concern for obvious reasons: if Meta's default practices already did not impede Settlement or verdict notice, or information relating to Meta, they would have no reason to object to such a provision. The response is telling and warrants explicit protections for the Class to ensure that Meta does not interfere.

**Target Demographic.** Meta takes the proposed Notice Program's reference to "California Adult Women 18–49" badly out of context. That phrase does not redefine the Class or propose notifying every California woman, but merely identifies the demographic audience to be selected when purchasing advertisements. Again, all indirect notice will clearly state the conditions for Class membership to make clear that the notice is directed to the Class. Whether individuals meet those criteria will be determined when they file claims, not by whether they received an ad.

**Advertising Impressions.** Meta asserts that the estimated total gross impressions is too high and should not "blanket the entire country with notice." Opp. at 12-13. As an initial matter, and as addressed earlier, Meta utterly lacks support for the notion that a defendant can complain about the breadth of *indirect notice*. Meta's apparent view that they can restrict such communication is puzzling. Even aside from formal "notice," Plaintiffs and Class Counsel obviously have First Amendment rights—and attorney-client rights—to communicate with the public and Class Members. *See McKenzie L. Firm, P.A. v. Ruby Receptionists, Inc.*, 2020 WL 2789873, at *4 (D. Or. May 29, 2020) ("a certification under Rule 23(c) makes the [c]lass the attorney's client for all practical purposes"); *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1441 (9th Cir. 1984) (finding "restrictions on communications [that] 'create[] at least potential difficulties for [counsel] as they sought to vindicate the legal rights of a class'" are impermissible).

In addition to lacking any legal support, Meta's assertion is gross hyperbole. Plaintiffs have not proposed to "blanket" the country. They have advanced a robust notice program that emphasizes California and the ten states Class Members were likely to have moved into. *See* Mot. Ex. F. The total scale of proposed indirect notice (here, approximately 99 million impressions) is consistent with the scale this Court already approved in connection with the Settlements (*i.e.*, at least 93 million impressions). *See* ECF No. 820-12 at 6-7, 834. It makes no sense for Meta to now suggest—with $6 billion of potential recovery at issue—that 99 million impressions is too high since essentially that same figure was ruled appropriate by the Court in the context of the far smaller Settlements. Worse, Meta's distortion of the record stoops to misrepresenting what this Court previously approved. Meta argues that Plaintiffs should be limited to 8.5 million advertising impressions based on earlier submissions to the Court, but omits the glaring fact that the Court ***rejected*** that proposal as too limited to be sufficient for the Settlements. Meta cannot seriously claim that this previously-rejected, limited number of impressions is appropriate given that potential liability here is far greater.

**Text Messages.** Meta also objects to the use of text messages, but its arguments conflate notice for the Settlements with notice for the verdict against it. Opp. at 13. Plaintiffs are not seeking belated or retroactive approval of the August 18 message through this Motion; whether that communication was appropriate is addressed separately in Plaintiffs' opposition to Meta's emergency motion. *See* ECF No. 847 at 7–11. Here, Plaintiffs are clearly stating they plan to use text messages as one component of the notice program to directly reach individuals for whom they have active and valid phone numbers. These messages would be sent to phone numbers identified in Flo's user records through Plaintiffs' data enrichment efforts. Meta also mischaracterizes Plaintiffs' proposed use of text messages as improper. However, Rule 23 expressly recognizes that notice may be provided through "electronic means" and favors direct notice where possible. Text messages are aligned with those ends. Meta does not cite contrary authority.

**Jewel Notice.** Meta's objection to jewel notice rests on the false notion that the Court previously rejected this form of notice. Opp. at 14. It did not. In fact, the Court expressly stated, "I'm not saying no," later clarified that "the Jewel part is deferred," and stated that a "culpable

defendant[]" should "use [its] resources to provide notice to the victims that pass through [its] system." *See* Sep. 30, 2025 Hr'g Tr. at 17:4-7, 38:3–8; Apr. 16, 2026 Hr'g Tr. at 15:7–22. The Court's earlier reservations about involving Meta in notice for Settlements it was not a party to are of no moment here, where Meta is the sole party at issue. Thus, Plaintiffs propose the use of jewel notice reasonably tailored to target the demographic most likely to have used the Flo app. Motion at 5.

Moreover, Meta's obstructionist conduct in violation of the April 16 Order warrants jewel notice. As the Court previously recognized, if Meta would not cooperate in identifying its victims, jewel notice would be appropriate to reach Class Members on its platforms. *See* Dec. 4, 2025 Hr'g Tr. at 12:24-13:4 ("it's going to happen, Meta, so just pitch in. . . . Something is going to happen on Meta's end, so put your hand on the tiller and guide the ship where you want it to go or I'll just drive it for you."); *see also* Apr. 16, 2026 Hr'g Tr. at 15:24-16:1 (Court would revisit jewel notice if Plaintiffs returned with names "we want Meta to run"). Having been given every opportunity to identify individuals for direct notice, Meta's refusal and active concealment of Class data supports ordering jewel notice to ensure it does "everything in its power"—as Meta claims it already has, ECF No. 844 at 1—to reach its victims. *See* Sep. 30, 2025 Hr'g Tr. at 17:4-7 ("And the Facebook side – look, I'm a big believer that culpable defendants knee-deep [sic] use their resources to provide notice to the victims that pass through their system"); Dec. 4, 2025 Hr'g Tr. at 7:2-4 (Meta's linking of Flo data to its users is a "gold paved highway of reaching these people").

**B. The Proposed Claims Program is Appropriate and Should Be Entered**

Plaintiffs' proposed Claims Program has been thoughtfully designed to enable Class Members to claim the recovery to which they are entitled, while ensuring a transparent and rigorous process to identify fraudulent or wrongful claims. The proposed program and Claim Form is largely the same as the proposal Plaintiffs submitted prior to the Remedies Hearing. At that time, the Court reviewed the proposal, made certain comments (such as the removal of an intermediate special master step), and largely indicated that the proposal was sound.[3] *See* Sep. 30, 2025 Hr'g Tr. at 5:17–6:13

---

[3] The only change Plaintiffs propose to the Claim Form is to conform the language to the Court-approved Class definition. *See* Mot. Ex. B.

(instructing Plaintiffs to incorporate revisions to Claim Form); 29:17–30:15 ("I want it separate from that last line. . . . You say, right before the signature line, in bold and caps—maybe 14-point font, all caps—the language in 28 USC . . . the federal affirmation that you use for penalty of perjury").

Despite this, Meta rehashes a litany of speculative concerns that the Court previously rejected in an attempt to introduce a more convoluted process aimed at deterring claims. Meta's submission of two experts in support of its Opposition (ECF Nos. 850-1, 850-3) does nothing to revitalize its flawed arguments and these submissions should be stricken.

Meta lacks any legitimate basis for the submission of supposed experts to advocate for its convoluted counterproposal. It has not established any justification for treating the commentary it submitted as "expert" opinion on the topic of designing notice or claims processes. The submissions largely ignore Plaintiffs' actual proposals, *e.g.*, they comment on IP-only matching Plaintiffs do not propose, ECF No. 850-1, and on "sampling" that would provide Meta ***less*** information than Plaintiffs' proposal. ECF No. 850-3. Both submissions are essentially ungrounded commentary divorced from the facts and data and lack any articulation of established principles or methodology. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (courts need not admit opinion "connected to existing data only by the ipse dixit," and may exclude it where "there is simply too great an analytical gap"); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025) (under amended Rule 702, the proponent must show admissibility by a preponderance, and "there is no presumption in favor of admission").

The first "expert," Konstantinos Psounis, PhD, raises unfounded concerns with Covalynt's anti-fraud measures through observations that have no bearing on this process. ECF No. 850-1. Meta itself has previously attested to the reliability of Covalynt's methodology, and the Court already took and accepted testimony from Covalynt on its process. *See infra* Section C. Psounis provides no reason to doubt the veracity of that process. For example, Defendant's expert comments that individuals cannot be uniquely identified purely by IP address (ECF No. 850-1 ¶¶14-18), but Plaintiffs never suggested otherwise and the anti-fraud processes Covalynt undertakes do not rely on identifying individuals purely based on IP addresses. Instead, Covalynt relies on "objective, evidence-based framework[s]" that account for "the totality of available evidence." ECF No. 847-3 ¶10.

Meta's second expert, Malcolm Sparrow, PhD, essentially makes one point throughout his report. ECF No. 850-3. He argues that if steps are taken to frustrate the filing of claims, that will incidentally also deter the filing of fraudulent claims. *Id.* ¶14 (loosely musing that "[l]ying several times over seems more risky to a potential claimant than lying just once or twice."). This is not expert opinion, but the ruminations of someone with no apparent experience designing class action claims processes. *Id.* ¶¶1-10. As discussed below, Plaintiffs' proposal is already well tailored to detect fraudulent claims and Professor Sparrow's requests to solicit additional or irrelevant information and attestations merely because doing so *might* deter fraud (by deterring claims) is an improper attempt by Meta to lower the number of claims to its own financial benefit.

Indeed, courts routinely approve claims administration programs (like Plaintiffs' proposal here) that employ "thorough notice and claims administration procedures [to] minimize any consumer confusion or fraud." *Dean v. Colgate-Palmolive Co.*, 2018 WL 6265003, at *5 (C.D. Cal. Mar. 8, 2018), *aff'd*, 772 F. App'x 561 (9th Cir. 2019) (collecting cases); *Carter v. Vivendi Ticketing US LLC*, 2023 WL 8153712, at *6 (C.D. Cal. Oct. 30, 2023) ("A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding."); *Flores v. Comput. Merch., Ltd.*, 2026 WL 457566, at *12 (S.D. Cal. Feb. 18, 2026) ("[T]he goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible.").

As this Court has recognized, no processes can completely eliminate the possibility of fraud, but that is not a basis to impose arbitrary burdens on the filings of legitimate claims. Sep. 30, 2025 Hr'g Tr. at 29:17-19 ("there's only so much we can do."). Likewise, the Court rejected Meta's speculative concerns as premature, stating: "Of course we can spend all day saying, oh, these thousands of things might go wrong. The key word is 'might.'" *Id.* 30:16-31:1.

Ultimately, Meta's arguments are grounded in a distorted representation of the proposed Claims Program. Meta's sampling argument is perhaps the most profound example of its manufactured complaints. Specifically, Meta complains that Plaintiffs' proposal lacks sampling and incorrectly argues that the Court "agree[d] that 'sampling will help." *Compare* Opp. at 12 *with* ECF

No. 792 at 37:8–9. (the Court responded only with "[w]ell, work something out," to Meta's statement "I think sampling will help us, Your Honor."). But Meta's decision to advance this argument—and serve supposed expert material on the issue—betrays that in its eagerness to amass gripes with Plaintiffs' proposal, Meta ignores what has actually been proposed. The proposal goes far beyond sampling and, instead, provides Meta with the relevant information related to ***every claim*** deemed presumptively valid. Meta's request asks for ***less*** than what Plaintiffs have agreed to provide.

Meta also wrongly suggests that any person who submits an unverified attestation will automatically receive $5,000. Opp. at 7–12. That is incorrect. A claim will be deemed Presumptively Valid only after the claimant submits a completed Claim Form under penalty of perjury, A.B. Data reviews the submission, and Covalynt screens it for fraud and other irregularities. If necessary, A.B. Data will initiate a deficiency process and request additional information. Meta will then receive notice of Claims deemed Presumptively Valid, may raise fact-based challenges to those Claims, and may appeal the administrator's determination to the Court. Mot. at 7–8. This is not unverified "self-identification." It is a multi-step administrative process that protects both legitimate claimants and Meta's right to contest the validity of claims.

Meta also proposes a litany of additions to the Claim Form this Court has already reviewed. Again, these suggestions are unreasonable and unnecessary. First, Meta challenges the attestation. Plaintiffs' proposed attestation requires each claimant to confirm that she was a California resident and physically present in California when she "began using the Flo App to track [her] menstruation (period) and/or pregnancy information" during the Class Period. ECF No. 845-3 ¶14. That language directly tracks the Court's instruction that the claimant must have been in California when she "began using or when [she] first enrolled" in the Flo App. Sep. 30, 2025 Hr'g Tr. at 6:9–12. Next, Meta seeks to replace this straightforward language with a requirement that claimants remember whether they completed the App's "onboarding survey." Not only is this not part of the Class definition, it is a defined term the lawyers in this case created during litigation that users will not recognize because it does not appear in the Flo App. *See, e.g.*, ECF No. 637 at 1 (referring to the selection and information a user had to input to use the Flo App as the "onboarding survey"); ECF Nos. 762-20,

762-21, 762-22, 762-23, 762-24, 762-25 (reflecting questions and information users are required to input to use the Flo App, none of which are referred to as an "onboarding survey"). Flo users must have completed the onboarding survey to have entered menstruation or pregnancy information (*id.*), meaning Plaintiffs' proposal captures the same information Meta seeks. Meta insists on jargon solely to create confusion and reduce the chance of Class Members filing claims. *See Alvarez v. Sirius XM Radio Inc.*, 2020 WL 7314793, at *6 (C.D. Cal. July 15, 2020) (citing Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes) ("[a] claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding.").

Meta's additional proposal that every claimant attest "I am a woman" would similarly add a condition found nowhere in the Class definition. Meta's demand that every claimant also provide a historical address, date of birth, Facebook and Instagram account information, app store records, and documentary proof of California residency would impose unnecessary obstacles without reliably resolving Class membership. Many legitimate claimants will not possess utility bills, download histories, or other records dating back to 2016–2019. For the same reasons that Meta believes requesting this information could theoretically deter fraud (*i.e.*, because asking for the information itself creates friction, *see* ECF No. 850-3 ¶¶13-18), it will also discourage legitimate claimants who may—because the information is requested—wrongly assume the information is required.

A download record, moreover, would not establish where the claimant used the app or entered the information at issue, while the absence of a retrievable record would not establish that the claimant never used Flo. Requiring these documents, which cannot prove Class membership is simply designed to exclude as many individuals as possible. As is requiring proof of a Facebook or Instagram account, which appears nowhere in the Class definition and, thus, is irrelevant as it cannot prove Class membership. The proposed Claims Program takes the more reasonable approach: it collects the information necessary for initial review and permits the claimant to submit, as well as the administrator to request, additional information that may assist in validating that claim. Rule 23 does not require every claimant to satisfy the most burdensome conceivable verification process merely because some claims may require additional scrutiny. Moreover, consistent with the Court's

instructions, the Claim Form requires claimants to declare under penalty of perjury that the information provided is true and correct pursuant to 28 U.S.C. § 1746. ECF No. 845-3 at 3. Meta's focus on the phrase within the attestation "to the best of your knowledge" does not justify rejecting the Claim Form or the Claims Program as a whole; it is merely language concerning the standard of knowledge underlying an attestation.

The cases Meta cites do not apply to this action.[4] Most explicitly state that documentary proof is ***not*** required. In the few instances where proof was requested, the request was made due to hyper-specific factual circumstances that are not present here (*e.g.*, to verify claims by certain objectors); they do not hold that documentary evidence is generally required. Meta's heavy reliance on *In re Google Location History Litigation* is particularly misplaced. Class membership in *Google* turned on surreptitious location tracking tied to specific settings configurations that users could easily have been unaware of. 2026 WL 2509404, at *6 (9th Cir. Aug. 26, 2026). This is starkly different from the situation here, where the question of whether a Flo user "began using the Flo App to track [her] menstruation (period) and/or pregnancy information" is a basic fact known to the individual and for many of them, reflected in Flo's customer records which all parties have.

**C. Meta's Recycled Attacks on Covalynt are Irrelevant to the Issues Before the Court**

Meta devotes a significant portion of its Opposition to recycling the arguments it manufactured in its Emergency Motion regarding Plaintiffs' and Covalynt's credibility. *See* ECF No. 844. These arguments are fully addressed in Plaintiffs' Opposition to Meta's Emergency Motion, ECF No. 847, are meritless, and have no bearing on the issues before the Court.

---

[4] The other cases Meta cites are similarly inapposite. *Broomfield* did ***not*** require proof of purchase. There, the Court found that the fact that "[c]lass [m]embers [we]re able to participate in the settlement without proof that they purchased any Kona Beers" weighed "in favor of approval." *Broomfield v. Craft Brew All., Inc.*, 2020 WL 1972505, at *9 (N.D. Cal. Feb. 5, 2020). Likewise, *Bezdek* did ***not*** require proof of purchase for all claims; proof was only required for certain objectors. *Bezdek v. Vibram USA, Inc.*, 809 F.3d 78, 81 (1st Cir. 2015). *In re NVIDIA GPU Litigation* reflected a common-sense concept that proof was required because, absent records, an individual would likely not know whether they had purchased the version of a computer containing a particular defect; by contrast, Class Members know whether they used the Flo app. 539 F. App'x 822, 825 (9th Cir. 2013) ("requir[ing] only the submission of a simple claim form along with" proof of purchase); *Hill v. Canidae Corp.*, 2021 WL 4988032, at *2 (C.D. Cal. Apr. 2, 2021) (similar); *Asghari v. VW Grp. of Am., Inc*., 2015 WL 12732462, at *29 (C.D. Cal. May 29, 2015) (similar).

To be clear, Covalynt is credible. Meta's complaint that Covalynt has failed to provide sufficient information about its methodology is baseless.[5] Covalynt has repeatedly provided explicit information about its methodology, including in declarations that plainly explain its validation process and ClaimScore product. Further, Covalynt responded to questions about its methodology in open court, at which time the Court stated that Covalynt's technology would "be in everyone's interest." *See* Sep. 30, 2025 Hr'g Tr. at 12:19–14:7, 32:1–34:18. Meta's own counsel ***endorsed*** the reliability of Covalynt's technology and referenced prior matters where they had engaged Covalynt for their own purposes. Dec. 4, 2025 Hr'g Tr. at 17:24–18:1 ("you gave me a very good explanation about anti-fraud efforts"), 11:4–8 ("***<u>Mr. Chorba is giving you a good endorsement</u>***.").

More importantly, Meta's purported concerns are largely beside the point. The Claims Administrator, A.B. Data, is at the center of this proposal and will remain the organization directly responsible for determining if claims are deemed Presumptively Valid—not Covalynt. Covalynt will merely be asked to apply objective standards via its ClaimScore product. The information relevant to Covalynt's ratings determinations will be provided to Meta. Thus, in the event Meta has a valid basis to challenge a claim, Meta will have an opportunity to do so pursuant to the process set forth in the proposal with the benefit of Covalynt's findings.

Meta's remaining arguments misconstrue Covalynt's role in the proposed Claims Program. Meta conflates Covalynt's work (on behalf of Plaintiffs' counsel) in connection with the Judgment with the fraud detection efforts it will undertake on behalf of the Claims Administrator. *See* ECF No. 847-3. Again, Covalynt's role in the proposed Claims Program will be to use its ClaimScore technology to identify instances of fraud, not to make validation determinations. Mot. at 7-8.

## <u>CONCLUSION</u>

For the reasons stated herein, Plaintiffs respectfully request that the Court approve, order, and implement their proposed Notice Program and Claims Program.

---

[5] Meta's request for more information rings hollow against its own efforts to withhold Class Data, and failure to articulate what additional information it purports to need. Presumably, this is because such a request would require comparable disclosure by Meta into its own opaque "data enrichment" efforts, which it has been clear it will not provide. *See* ECF No. 847-1 ¶¶19-20.

Dated: September 30, 2026

/s/ *Carol C. Villegas*
Carol C. Villegas (*pro hac vice*)
Michael P. Canty (*pro hac vice*)
Jake Bissell-Linsk (*pro hac vice*)
Danielle Izzo Mazzeo (*pro hac vice*)
**LABATON KELLER SUCHAROW LLP**
140 Broadway
New York, NY 10005
Tel: (212) 907-0700
Fax: (212) 818-0477
cvillegas@labaton.com
mcanty@labaton.com
jbissell-linsk@labaton.com
dimazzeo@labaton.com

*Co-Lead Counsel*

Christian Levis (*pro hac vice*)
Amanda Fiorilla (*pro hac vice*)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Tel: (914) 997-0500
Fax: (914) 997-0035
clevis@lowey.com
afiorilla@lowey.com

*Co-Lead Counsel*

Diana J. Zinser (*pro hac vice*)
**SPECTOR CALDES & CORRIGAN, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
Fax: (215) 496-6611
dzinser@scc.law

*Co-Lead Counsel*

James M. Wagstaffe (SBN 95535)
**ADAMSKI MOROSKI MADDEN CUMBERLAND & GREEN LLP**
P.O. Box 3835
San Luis Obispo, CA 93403-3835
Telephone: 805-543-0990
Facsimile: 805-543-0980
wagstaffe@ammcglaw.com

*Counsel for Plaintiffs Erica Frasco and Sarah Wellman*

Ronald A. Marron (CA Bar 175650)

ron@consumersadvocates.com
Alexis M. Wood (CA Bar 270200)
alexis@consumersadvocates.com
Kas L. Gallucci (CA Bar 288709)
kas@consumersadvocates.com
**MARRON PC**
651 Arroyo Drive
San Diego, CA 92103
Tel: (619) 696-9006
Fax: (619) 564-6665

*Counsel for Plaintiffs Jennifer Chen and Tesha Gamino*

Kent Morgan Williams (*pro hac vice*)
**SIRI GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, NY 10151
Telephone: (929) 220-2759
kent.williams@sirillp.com

William Darryl Harris, II (*pro hac vice*)
**HARRIS LEGAL ADVISORS LLC**
3136 Kingsdale Center, Suite 246
Columbus, OH 43221
Tel: (614) 504-3350
Fax: (614) 340-1940
will@harrislegaladvisors.com

*Counsel for Plaintiffs Leah Ridgway and Autumn Meigs*

**FILER'S ATTESTATION**

Pursuant to Civil Local Rule 5-1(i)(3), I, Carol C. Villegas, hereby attest under penalty of perjury that concurrence in the filing of this document has been obtained from all signatories.

Dated: September 30, 2026

*/s/ Carol C. Villegas*
Carol C. Villegas